UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re:

CONSUMER ADVOCACY
CENTER, INC.,

Debtor.

_____/

Case No. 19-10655-JKO

Chapter 7

**NOTICE OF FILING REGARDING PROCEEDINGS AGAINST RELATED
ENTITIES AND INDIVIDUALS IN THE UNITED STATES DISTRICT
COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

Sonya S. Slott, as Chapter 7 Trustee (the "**Trustee**") for Consumer Advocacy Center, Inc., by and through her undersigned counsel, hereby gives notice of the commencement of the following proceeding in the United States District Court for the Central District of California captioned *Bureau of Consumer Financial Protection, et al., v. Consumer Advocacy Center, Inc., True Count Staffing, Inc., Prime Consulting, LLC, Albert Kim, Kaine Wen, And Tuong Nguyen, Defendants, and Infinite Management Corp., Hold the Door Corp. and TN Accounting, Inc., Relief Defendants* Case No. 19-cv-01998-JVS. The Trustee also gives notice of the filing of the following:

I.  *Ex Parte Temporary Restraining Order with Asset Freeze, Appointment of Receiver, and other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue*, filed under temporary seal on October 21, 2019 [ECF No. 24], attached hereto as **Exhibit "A"**;

II. *Complaint*, filed under temporary seal, on October 21, 2019 [ECF No. 02], attached hereto as **Exhibit "B"**;

[12339-001/3098728/1]

III.     *Preliminary Report of Temporary Receiver*, filed on November 1, 2019 [ECF No.

75], attached hereto as **Exhibit "C"**.

               Dated November 4, 2019.

               **GENOVESE JOBLOVE & BATTISTA, P.A.**
               *Attorneys for Chapter 7 Trustee*
               100 Southeast Second Street, Suite 4400
               Miami, Florida 33131
               Telephone: (305) 349-2300
               Facsimile: (305) 349-2310

               By:    */s/ Glenn D. Moses*   
                    Glenn D. Moses, Esq.
                    Fla. Bar No.  174556
                    gmoses@gjb-law.com
                    Heather L. Harmon, Esq.
                    Fla. Bar No. 013192
                    hharmon@gjb-law.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via the Court's Case Management/Electronic Case Filing System upon all interested creditors and parties registered to receive electronic notification on this matter (which is incorporated herein by reference) on this 4th day of November, 2019.

               By: /s/ *Glenn D. Moses*   
                   Glenn D. Moses, Esq.

# EXHIBIT "A"

FILED
CLERK, U.S. DISTRICT COURT

10/21/19

CENTRAL DISTRICT OF CALIFORNIA
BY: ____LB____ DEPUTY

# UNDER SEAL

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al. | CASE NO. 8:19-cv-01998 JVS (JDEx) |
| Plaintiffs, | ***EX PARTE* TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| v. | |
| Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al. | |
| Defendants. | |
| | **(FILED UNDER TEMPORARY SEAL)** |

Plaintiffs, the Bureau of Consumer Financial Protection (Bureau), the State of Minnesota, the State of North Carolina, and The People of the State of California have filed a complaint alleging violations of state and federal law against the Defendants. The Bureau has filed the complaint under the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564, and

1

5565, and the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6102(c)(2), 6105(d), based on Defendants' violations of the CFPA and the Telemarketing Sales Rule (TSR), 16 C.F.R. pt. 310. The Complaint alleges that Defendants' acts or practices violate these laws in connection with the marketing and sale of student-loan debt-relief services. The Complaint seeks preliminary and permanent injunctive relief, damages, rescission or reformation of contracts, the refund of monies paid, restitution, compensation for unjust enrichment, the appointment of a temporary Receiver, and other equitable relief, as well as civil money penalties. The Bureau has also moved for a temporary restraining order pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, and an order to show cause why a preliminary injunction should not issue against Defendants and Relief Defendants.

## FACTUAL AND LEGAL FINDINGS

Having considered the Complaint, *ex parte* motion, declarations, exhibits, and memoranda filed in support of the Motion, the Court finds that:

1.	This Court has jurisdiction over the subject matter of this case, there is good cause to believe that it will have jurisdiction over all the parties hereto, and venue in this district is proper;

2.	There is good cause to believe that Defendants: (a) Consumer Advocacy Center Inc., a California corporation, d/b/a Premier Student Loan Center, (collectively CAC); (b) True Count Staffing Inc., a California Corporation, d/b/a SL Account Management (collectively True Count); (c) Prime Consulting LLC, a Wyoming limited liability corporation registered to operate in California d/b/a Financial Preparation Services (collectively, Prime); (d) Albert Kim (aka Albert King), an individual; (e) Kaine Wen (aka Wenting Kaine Dai, Wen Ting Dai, Kaine Wen Dai), an individual; and (f) Tuong Nguyen (aka Tom Nelson), an individual, have engaged and are likely to continue to engage in acts or practices that violate the CFPA and the TSR. And, there is good cause to believe that Relief

Defendants (a) Infinite Management Corp., a California corporation, formerly known as Infinite Management Solutions Inc., (b) Hold The Door, Corp., a California corporation, and (c) TN Accounting Inc., a California corporation, have received funds or assets and are likely to continue to receive funds or assets that can be traced directly to Defendants' unlawful acts and practices. Plaintiff is therefore likely to prevail on the merits of this action;

3.　　There is good cause to believe that immediate and irreparable harm will result from Defendants' ongoing violations of these laws unless Defendants and Relief Defendants are restrained and enjoined by Order of this Court;

4.　　There is good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for consumers in the form of monetary damages, restitution, and disgorgement or compensation for unjust enrichment will occur from the transfer, dissipation, or other disposition or concealment by Defendants and Relief Defendants of their assets or business records unless Defendants and Relief Defendants are restrained and enjoined by Order of this Court; and that in accordance with Rule 65(b) of the Federal Rules of Civil Procedure, the interest of justice requires that Plaintiff's application be granted without prior notice to Defendants or Relief Defendants. Therefore, there is good cause for relieving Plaintiff of the duty to provide Defendants and Relief Defendants with prior notice of its motion;

5.　　Good cause exists for appointing a temporary Receiver over True Count and Prime; freezing Defendants and Relief Defendants assets except as set forth below; permitting Plaintiff and the Receiver immediate access to True Count's and Prime's business premises; and permitting Plaintiff and the Receiver to take expedited discovery;

6.　　Weighing the equities and considering Plaintiff's likelihood of ultimate success on the merits, a temporary restraining order with an asset freeze,

TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

appointment of a temporary receiver, immediate access to business premises, limited expedited discovery, and other equitable relief is in the public interest;

7.      The automatic stay of the Bankruptcy Code does not stay this civil action against CAC, which has filed for bankruptcy in United States Bankruptcy Court in the Southern District of Florida, Fort Lauderdale Division, Case No. 10-10655, because the action falls within the police and regulatory power exception to the automatic stay set forth in 11 U.S.C. § 362(a), (b)(4);

8.      This Court has authority to issue this order pursuant to 12 U.S.C. § 5565, Federal Rule of Civil Procedure 65; and

9.      As the Bureau is an agency of the United States, no security is required for this Order. Fed. R. Civ. P. 65(c).

**DEFINITIONS**

For the purposes of this Order, the following definitions shall apply:

1.      "**Assets**" means any legal or equitable interest in, right to, or claim to any real, personal, or intellectual property owned or controlled by, or held, in whole or in part for the benefit of, or subject to access by any Defendant or Relief Defendant, wherever located, whether in the United States or abroad. This includes, but is not limited to, chattel, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds, contracts, mail or other deliveries, shares of stock, commodities, futures, inventory, checks, notes, accounts, credits, receivables (as those terms are defined in the Uniform Commercial Code), funds, cash, and trusts, including, but not limited to any trust held for the benefit of any Individual Defendants' minor children, or any of the Individual Defendants' spouses. It shall

4

include both existing Assets and Assets acquired after the date of entry of this Order;

2.      "**Assisting Others**" includes, but is not limited to

a.   providing paralegal or administrative support services;

b.   performing customer service functions including, but not limited to, receiving or responding to Consumer complaints;

c.   formulating or providing, or arranging for the formulation or provision of, any advertising or marketing material, including, but not limited to, any telephone sales script, direct mail solicitation, or the text of any Internet website, email, or other electronic communication;

d.   formulating or providing, or arranging for the formulation or provision of, any marketing support material or service, including but not limited to, web or Internet Protocol addresses or domain name registration for any Internet websites, affiliate marketing services, or media placement services;

e.   providing names of, or assisting in the generation of, potential customers;

f.   performing marketing, billing, or payment services of any kind;

g.   acting or serving as an owner, officer, director, manager, or principal of any entity; and

3.      "**Bankruptcy Proceeding**" means *In re Consumer Advocacy Center Inc.*, Case No. 19-10655, currently pending in the United States Bankruptcy Court, Southern District of Florida, Fort Lauderdale Division;

4.      "**Chapter 7 Trustee**" means Sonya Salkin Slott, the Trustee appointed over Defendant Consumer Advocacy Center Inc. d/b/a Premier Student Loan Center by the United States Bankruptcy Court, Southern District of Florida, Fort Lauderdale Division in the Bankruptcy Proceeding and any successor trustee.

5. "**Consumer**" means an individual or an agent, trustee, or representative acting on behalf of an individual;

6. "**Debt**" means any obligation or alleged obligation to pay money, whether or not such obligation has been reduced to judgment;

7. "**Debt-Relief Product or Service**" means any product, service, plan, or program represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the Debt between a Consumer and one or more creditors or Debt collectors, including but not limited to, a reduction in the balance, interest rate, or fees owed by a Person to a creditor or Debt collector;

8. "**Defendants**" means the Corporate Defendants, Individual Defendants, and Relief Defendants, individually, collectively, or in any combination, and each of them by whatever names each might be known;

    a. "**Corporate Defendants**" means Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, True Count Staffing Inc., d/b/a SL Account Management, Prime Consulting LLC, d/b/a Financial Preparation Services, and any other name by which each Corporate Defendant may be known or operate;

    b. "**Individual Defendants**" means Albert Kim (aka Albert King), Kaine Wen (aka Wenting Kaine Dai, Wen Ting Dai, Kaine Wen Dai), and Tuong Nguyen (aka Tom Nelson), and any other name by which each Individual Defendant may be known;

    c. "**Receivership Defendants**" means True Count Staffing Inc., d/b/a SL Account Management, Prime Consulting LLC, d/b/a Financial Preparation Services and their successors, assigns, affiliates, or subsidiaries, and each of them, by whatever names each may be known, provided that the Receiver has reason to believe they

6

are owned or controlled in whole or in part by any of the Receivership Defendants;

d.    "**Relief Defendant**" means Infinite Management Corp., f/k/a Infinite Management Solutions Inc., Hold The Door, Corp., TN Accounting Inc., and any other name by which each Relief Defendant may be known or operate; and

9.    "**Document**" and "**Electronically Stored Information**" are synonymous in meaning and equal in scope to the usage of the terms in Rule 34(a) of the Federal Rules of Civil Procedure and include but are not limited to:

a.    the original or a true copy of any written, typed, printed, electronically stored, transcribed, taped, recorded, filmed, punched, or graphic matter or other data compilations of any kind, including, but not limited to, letters, email or other correspondence, messages, memoranda, paper, interoffice communications, notes, reports, summaries, manuals, magnetic tapes or discs, tabulations, books, records, checks, invoices, work papers, journals, ledgers, statements, returns, reports, schedules, files, charts, logs, electronic files, stored in any medium;

b.    any electronically created or stored information, including but not limited to electronic mail, instant messaging, videoconferencing, SMS, MMS, or other text messaging, and other electronic correspondence (whether active, archived, unsent, or in an deleted items folder), word processing files, spreadsheets, databases, Document metadata, presentation files, and sound recordings, whether stored on any cell phones, smartphones, flash drives, personal digital assistants ("PDAs"), cards, desktop personal computer and workstations, laptops, notebooks and other portable computers, or other electronic storage media, backup disks and tapes,

7

archive disks and tapes, and other forms of offline storage, whether
assigned to individuals or in pools of computers available for shared
use, or personally owned but used for work-related purposes, whether
stored on-site with the computer used to generate them, stored offsite
in another company facility, or stored, hosted, or otherwise
maintained off-site by a third party; and computers and related offsite
storage used by Defendants or Defendants' participating associates,
which may include Persons who are not employees of the company
or who do not work on company premises; and

10.     "**Electronic Data Host**" means any Person or entity that stores, hosts, or otherwise maintains electronically stored information;

11.     "**Bankruptcy Estate**" means the bankruptcy estate created within the Bankruptcy Proceeding by operation of law pursuant to 11 U.S.C. § 541;

12.     "**Financial Institution**" means any bank, savings and loan institution, credit union, or any financial depository of any kind, including, but not limited to, any brokerage house, trustee, broker-dealer, escrow agent, title company, commodity trading company, or precious metal dealer;

13.     "**Person**" means an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity;

14.     "**Plaintiff**" or "**Bureau**" means the Bureau of Consumer Financial Protection;

15.     "**Receiver**" means the temporary receiver appointed in Section XII of this Order and any deputy receivers that shall be named by the temporary receiver;

16.     "**Telemarketer**" means any Person who, in connection with Telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(cc); and

8

17.    "**Telemarketing**" means a plan, program, or campaign (whether or not covered by the TSR, 16 C.F.R. Part 310) that is conducted to induce the purchase of goods or services or a charitable contribution by use of one or more telephones.

## ORDER

### I.  RESTRICTIONS ON ADVANCE FEES

**IT IS FURTHER ORDERED** that, in connection with Telemarketing, Defendants and their successors, assigns, officers, agents, servants, employees, and attorneys, and those Persons in active concert or participation with any of them, who receive actual notice of this Order by personal service, facsimile transmission, email, or otherwise, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from requesting or receiving payment or fees or consideration for any Debt-Relief Product or Service before:

A. They have negotiated, settled, reduced, or otherwise altered the terms of at least one Debt pursuant to a settlement agreement, Debt management plan, or other such valid contractual agreement executed by the customer; and

B. The customer has made at least one payment pursuant to that agreement.

### II. PROHIBITED REPRESENTATIONS

**IT IS FURTHER ORDERED** that Defendants and their successors, assigns, officers, agents, servants, employees, and attorneys, and those Persons in active concert or participation with any of them, who receive actual notice of this Order by personal service, facsimile transmission, email, or otherwise, whether acting directly or indirectly, in connection with the advertising, marketing, promotion, offering for sale, sale, performance of any Debt-Relief Product or Service, are hereby temporarily restrained and enjoined from falsely representing, or from Assisting Others who are falsely representing, expressly or by implication,

9

any material aspect of any service performed by the Defendant or any other person, including, but not limited to:

   A. The nature, purpose, or any other material aspect of any fee collected by any Defendant or any other person;

   B. That any Defendant or any other Person will or likely will help obtain forgiveness of any loan under a federal student loan forgiveness program; and

   C. That any Defendant or any other Person will or likely will help obtain lower payments on any loan under a federal student loan repayment program.

## III.   PRESERVATION OF RECORDS AND TANGIBLE THINGS

**IT IS FURTHER ORDERED** that Defendants and their successors, assigns, officers, agents, servants, employees, independent contractors, and attorneys, and those Persons in active concert or participation with any of them, who receive actual notice of this Order by personal service, facsimile transmission, email, or otherwise, whether acting directly or indirectly are hereby temporarily enjoined from destroying, erasing, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, any Documents or records that relate to the business practices, or business or personal finances of any Defendant, or other entity directly or indirectly under the control of any Defendant.

## IV.   WEBSITES

**IT IS FURTHER ORDERED** that, immediately upon service of the Order upon them and pending determination of Plaintiff's request for a preliminary injunction, (1) any Person hosting any Internet website for, or on behalf of, any Defendant, and (2) Defendants and their successors, assigns, officers, agents, servants, employees, independent contractors, and attorneys, and those Persons in active concert or participation with any of them, who receive actual notice of this order by personal service, facsimile transmission, email, or otherwise, whether

TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

acting directly or through any corporation, subsidiary, division, or other device, shall:

    A. Prevent the destruction or erasure of any Internet website used by Defendants for the advertising, marketing, promotion, offering for sale, sale, or performance of any Debt-Relief Service, by preserving such website in the format in which it is maintained currently; and

    B. Immediately notify Plaintiff's counsel, in writing, of any other Internet website operated or controlled by any Defendant.

## V.  INTERNET DOMAIN NAME REGISTRATIONS

**IT IS FURTHER ORDERED** that, pending determination of Plaintiff's request for a preliminary injunction, any domain name registrar shall provide immediate notice to Plaintiff's counsel of any Internet domain names registered or controlled by any Defendants.

## VI.    ASSET FREEZE

**IT IS FURTHER ORDERED** that Receivership Defendants, Individual Defendants, or Relief Defendants, and their successors, assigns, officers, agents, servants, employees, independent contractors, and attorneys, and all Persons directly or indirectly under the control of any of them, including any Financial Institution, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order by personal service, facsimile, email, or otherwise, are hereby temporarily restrained and enjoined from directly or indirectly:

    A. Selling, liquidating, assigning, transferring, converting, loaning, hypothecating, disbursing, gifting, conveying, encumbering, pledging, concealing, dissipating, spending, withdrawing, or otherwise disposing of any Asset that is:

11

1.  owned or controlled, directly or indirectly, by any Defendant, including, but not limited to those for which a Defendant is a signatory on the account;

2.  held, in part or in whole, for the benefit of any Defendant

3.  in the actual or constructive possession of any Defendant; or

4.  in the actual or constructive possession of, or owned or controlled by, or subject to access by, or belonging to, any corporation, partnership, trust or other entity directly or indirectly owned, managed or controlled by any Defendant; and

B.  Opening, or causing to be opened, any safe deposit box, commercial mail box, or storage facility belonging to, for the use or benefit of, controlled by, or titled in the name of any Defendant or subject to access by any Defendant;

C.  Incurring charges or cash advances on any credit card, stored value card, debit card, or charge card issued in the name, singly or jointly, of any Defendant or any other entity directly or indirectly owned, managed, or controlled by any Defendant;

D.  Cashing any checks or depositing or processing any payment from any Consumer, client, or customer of any Defendant; and

E.  Incurring liens or encumbrances on real property, personal property, or other Assets in the name, singly or jointly, of Defendants or of any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant.

**IT IS FURTHER ORDERED** that the Assets affected by this Section shall include: (a) all Assets of each Receivership Defendant, Individual Defendant, or Relief Defendant, as of the time this Order is entered, and (b) those Assets obtained or received after entry of this Order that are derived, directly or indirectly, from the actions alleged in Plaintiff's Complaint. This Section does not prohibit

12

transfers to the Receiver, as specifically required in Section XVI (Delivery of Receivership Property), nor does it prohibit the Repatriation of Foreign Assets, as specifically required in Section X of this Order.

## VII.  RETENTION OF ASSETS AND RECORDS BY FINANCIAL INSTITUTIONS AND OTHER THIRD PARTIES

**IT IS FURTHER ORDERED** that, except as otherwise ordered by this Court, any Financial Institution, brokerage, business entity, Electronic Data Host, payment processor, merchant bank, payment gateway, or Person served with a copy of this Order, or who otherwise has actual or constructive knowledge of this Order, that has held, controlled, or maintained custody of any account, Document, or Asset of, on behalf of, in the name of, for the benefit of, subject to withdrawal by, subject to access or use by, or under the signatory power of any Defendant, or other party subject to Section VI (Asset Freeze) above, or has held, controlled, or maintained any such account, Document, or Asset shall:

A.  Hold, preserve, and retain within such person's control, and prohibit the withdrawal, removal, alteration, assignment, transfer, pledge, hypothecation, encumbrance, disbursement, dissipation, conversion, sale, liquidation, or other disposal of such account, Document, or Asset held by or under such person's control, except (1) as directed by further order of the Court; (2) as directed in writing by the Receiver regarding accounts, Documents, or Assets held in the name of or benefit of any Defendant; or (3) as directed in writing by the Chapter 7 Trustee regarding accounts and Assets held in the name of or for the benefit of the Bankruptcy Estate;

B.  Provide the Receiver, the Receiver's agents, Plaintiff, and Plaintiff's agents immediate access to Documents, including those electronically stored, hosted, or otherwise maintained on behalf of Defendants, for forensic imaging or copying;

13

C.  Deny access to any safe deposit box, commercial mail box, or storage facility belonging to, for the use or benefit of, controlled by, or titled in the name of any Defendant, or subject to access by any Defendant or other party subject to Section VI (Asset Freeze) above, except that this subsection shall not limit the Receiver's or Chapter 7 Trustee's access to such places;

D.  Provide to Plaintiff's counsel and the Receiver, within three business days of receiving a copy of this Order, a sworn statement setting forth:

   1.  the identification of each account or Asset titled in the name, individually or jointly, or held on behalf of or for the benefit of, subject to withdrawal by, subject to access or use by, or under the signatory power of any Defendant, or other party subject to Section VI (Asset Freeze) above, whether in whole or in part;

   2.  the balance of each such account, or a description of the nature and value of such Asset, as of the close of business on the day on which this Order is served;

   3.  the identification of any safe deposit box, commercial mail box, or storage facility belonging to, for the use or benefit of, controlled by, or titled in the name of any Defendant, or subject to access by any Defendant, or other party subject to Section VI (Asset Freeze) above, whether in whole or in part;

   4.  if the account, safe deposit box, or other Asset has been closed or removed, the date closed or removed, the balance on said date, and the name or the Person or entity to whom such account or other Asset was remitted;

   5.  Subsection VII.D does not apply to the Chapter 7 Trustee; and

E.  Provide to Plaintiff's counsel and the Receiver, within three business days of receiving a request, copies of all Documents pertaining to such

14

account or Asset, including but not limited to originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs; provided that such institution or custodian may charge a reasonable fee;

F.  Cooperate with all reasonable requests of the Receiver relating to this Order's implementation;

G.  The accounts subject to this provision include: (a) all Assets of each Defendant deposited as of the time this Order is entered, and (b) those Assets deposited after entry of this Order that are derived from the actions alleged in Plaintiff's Complaint. This Section does not include Assets under the exclusive control of the Chapter 7 Trustee in the Bankruptcy Proceeding. Further, this Section does not prohibit transfers to the Receiver, as specifically required in Section XVI (Delivery of Receivership Property), nor does it prohibit the Repatriation of Foreign Assets, as specifically required in Section X of this Order; and

H.  Plaintiff is granted leave, pursuant to Rule 45 of the Federal Rules of Civil Procedure, to subpoena Documents immediately from any Financial Institution, brokerage, business entity, Electronic Data Host, or Person served with a copy of this Order that holds, controls, or maintains custody of any account, Document, or Asset of, on behalf of, in the name of, for the benefit of, subject to access or use by, or under the signatory power of any Defendant or party subject to Section VI (Asset Freeze) above, or has held, controlled, or maintained any such account, Document, or Asset and such financial or brokerage institution, business entity, Electronic Data Host or Person shall respond to such subpoena within three business days after service.

15

## VIII.  FINANCIAL STATEMENTS AND ACCOUNTING

**IT IS FURTHER ORDERED** that as set forth below, each Receivership Defendant, Individual Defendant, and Relief Defendant, within three (3) business days of service of this Order, shall prepare and deliver to Plaintiff's counsel and to the Receiver:

A. For each Individual Defendant, a completed financial statement accurate as of the date of service of this Order upon such Defendant on the form of Attachment A to this Order captioned "Individual Financial Statement";

B. For each Receivership Defendant and Relief Defendant, a completed financial statement accurate as of the date of service of this Order upon such Defendant (unless otherwise agreed upon with Plaintiff's counsel) in the form of Attachment B to this Order captioned "Corporate Financial Statement";

C. A list of all officers and directors of the Receivership Defendants and Relief Defendants and all other individuals or entities with authority to direct the operations of each Receivership Defendant and Relief Defendant or withdraw money from the account of such Defendant;

D. For each Receivership Defendant, Individual Defendant, and Relief Defendant, a statement, verified under oath, of all payments, transfers, or assignments of any Assets worth $5,000 or more since January 1, 2015. Such statements shall include: (a) the amount transferred or assigned; (b) the name of each transferee or assignee; (c) the date of the assignment or transfer; and (d) the type and amount of consideration paid by or to the Defendant.  Each statement shall specify the name and address of each Financial Institution at which Receivership Defendant, Individual Defendant, or Relief Defendant, has accounts or safe deposit boxes; and

E. For each Receivership Defendant, Individual Defendant, and Relief Defendant, a detailed accounting, verified under oath, of all gross and net profits obtained from, derived from, or related in any way to the offer for sale or sale of any Debt-Relief Product or Service since January 1, 2015.

## IX.    CONSUMER CREDIT REPORTS

**IT IS FURTHER ORDERED** that pursuant to Section 604(a)(1) of the Fair Credit Reporting Act, 15 U.S.C. § 1681b(a)(1), Plaintiff may obtain credit reports concerning any Defendant or Relief Defendant, and that, upon written request, any credit reporting agency from which such reports are requested shall provide them to Plaintiff.

## X.    REPATRIATION OF FOREIGN ASSETS

**IT IS FURTHER ORDERED** that, within three business days following the service of this Order, each Defendant shall:

A. Provide Plaintiff's counsel and the Receiver with a full accounting, verified under oath and accurate as of the date of this Order, of all Assets, accounts, and Documents outside of the territory of the United States of America that are held (1) by the Defendant; (2) for any Defendant's benefit or for the benefit of any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed, or controlled by any Defendant; (3) in trust by or for any Defendant, individually or jointly; or (4) under any Defendant's direct or indirect control, individually or jointly;

B. Transfer to the territory of the United States of America all Assets, accounts, and Documents in foreign countries held (1) by any Defendant; (2) for any Defendant's benefit; (3) in trust by or for any Defendant, individually or jointly; or (4) under any Defendant's direct or indirect control, individually or jointly;

17

C. Hold and retain all repatriated Assets, accounts, funds, and Documents, and prevent any transfer, disposition, or dissipation whatsoever of any such Assets, accounts, or Documents;

D. Provide Plaintiff access to all records of accounts, Documents, or Assets of the Receivership Defendant, Individual Defendant, or Relief Defendant held by Financial Institutions or other third parties located outside the territorial United States of America by signing the Consent to Release of Financial Records attached to this Order as Attachment C. All repatriated Assets, accounts, and Documents are subject to Section VI (Asset Freeze) of this Order; and

E. The same business day as any repatriation, (1) notify the Receiver and counsel for Plaintiff of the name and location of the Financial Institution or other entity that is the recipient of such Assets, accounts, and Documents; and (2) serve this Order on any such Financial Institution or other entity.

## XI.   NONINTERFERENCE WITH REPATRIATION

**IT IS FURTHER ORDERED** that Defendants and their successors, assigns, officers, agents, servants, employees, and attorneys, and those Persons in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from taking any action, directly or indirectly, which may result in the hindrance of the repatriation required by Section X of this Order, including, but not limited to:

A. Sending any statement, communication, letter, fax, email or wire transmission, or telephoning or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign

18

trust agreement until such time that all Assets have been fully repatriated pursuant to Section X (Repatriation of Foreign Assets) of this Order; or

B. Notifying any trustee, protector, or other agent of any foreign trust or other related entities of either the existence of this Order, or of the fact that repatriation is required pursuant to a court order, until such time that all Assets have been fully repatriated pursuant to Section X (Repatriation of Foreign Assets) of this Order.

## XII.   APPOINTMENT OF A TEMPORARY RECEIVER

**IT IS FURTHER ORDERED** that Thomas W. McNamara is appointed temporary Receiver for the business activities of Receivership Defendants with the full power of an equity receiver. The Receiver shall be the agent of this Court and solely the agent of this Court in acting as Receiver under this Order. The Receiver shall be accountable directly to this Court. The Receiver shall comply with all laws and Local Rules of this Court governing federal equity receivers.

## XIII.  DUTIES AND AUTHORITIES OF TEMPORARY RECEIVER

**IT IS FURTHER ORDERED** that the Receiver is directed and authorized to accomplish the following:

A. Assume full control of the Receivership Defendants by removing, as the Receiver deems necessary or advisable, any director, officer, independent contractor, employee, attorney, or agent of any of the Receivership Defendants, including but not limited to any named Defendant, from control of, management of, or participation in, the affairs of the Receivership Defendants;

B. Take exclusive custody, control, and possession of all Assets and Documents of, or in the possession, custody, or under the control of, the Receivership Defendants, wherever situated. The Receiver will assume control over the income and profits therefrom and all sums of money now or hereafter due or owing to the Receivership Defendants. The Receiver

19

shall have full power to divert mail and to sue for, collect, receive, take into possession, hold, and manage all Assets and Documents of the Receivership Defendants and other Persons whose interests are now held by or under the direction, possession, custody, or control of the Receivership Defendants. *Provided, however,* however, that the Receiver will not attempt to collect or receive any amount from a Consumer if the Receiver or Plaintiff believes the Consumer was a victim of the unlawful conduct alleged in the complaint in this matter;

C. Take all steps necessary to secure the business premises of the Receivership Defendants. Such steps may include, but are not limited to, the following as the Receiver deems necessary or advisable:

1. serving and filing this Order;
2. completing a written inventory of all Receivership Assets;
3. obtaining pertinent information from all employees and other agents of the Receivership Defendants, including but not limited to, the name, home address, social security number, job description, method of compensation, and all accrued and unpaid commissions and compensation of each such employee or agent, and all computer hardware and software passwords;
4. videotaping or photographing all portions of such business premises;
5. securing the location by changing the locks and alarm codes and disconnecting any internet access or other means of access to the computers, servers, internal networks, or other records maintained at that location;
6. requiring any Persons present on the premises at the time this Order is served to leave the premises, to provide the Receiver with proof of identification, or to demonstrate to the satisfaction of the

20

TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

Receiver that such Persons are not removing from the premises Documents or Assets of the Receivership Defendants;

    7. requiring all employees, independent contractors, and consultants of the Receivership Defendants to complete a questionnaire submitted by the Receiver; and

D. Conserve, hold, and manage all Receivership Defendants' Assets, and perform all acts necessary or advisable to preserve the value of those Assets, in order to prevent any irreparable loss, damage, or injury to Consumers or to creditors of the Receivership Defendants, including, but not limited to, obtaining an accounting of the Assets and preventing transfer, withdrawal, or misapplication of Assets;

E. Liquidate any and all securities or commodities owned by or for the benefit of the Receivership Defendants as the Receiver deems to be advisable or necessary;

F. Take all steps necessary to prevent the modification, destruction, or erasure of any web page or website registered to and operated, in whole or in part, by any Defendant, and to provide access to all such web page or websites to Plaintiff's representatives, agents, and assistants, as well as Defendants and their representatives;

G. Enter into contracts and purchase insurance as the Receiver deems to be advisable or necessary;

H. Prevent the inequitable distribution of Assets and determine, adjust, and protect the interests of Consumers and creditors who have transacted business with the Receivership Defendants;

I. Manage and administer the business of the Receivership Defendants until further order of this Court by performing all incidental acts that the Receiver deems to be advisable or necessary, which includes retaining, hiring, or dismissing any employees, independent contractors, or agents;

TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

J.  Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

K.  Make payments and disbursements from the Receivership Defendants' estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order. The Receiver shall apply to the Court for prior approval of any payment of any Debt or obligation incurred by the Receivership Defendants prior to the date of entry of this Order, except payments that the Receiver deems necessary or advisable to secure Assets of the Receivership Defendants, such as rental payments;

L.  Determine and implement measures to ensure that the Receivership Defendants comply with and prevent violations of this Order and all other applicable laws, including, but not limited to, if appropriate, revising sales materials and implementing monitoring procedures;

M. Institute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Defendants, or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

N.  Defend, compromise, adjust, or otherwise dispose of any or all actions or proceedings instituted in the past or in the future against the Receiver in his or her role as Receiver, or against the Receivership Defendants, that the Receiver deems necessary and advisable to preserve the Assets of the Receivership Defendants or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

O. Continue and conduct the business of the Receivership Defendants in such manner, to such extent, and for such duration as the Receiver may in good faith deem to be necessary or appropriate to operate the business profitably and lawfully, if at all; *provided, however*, that the continuation and conduct of the business shall be conditioned upon the Receiver's good faith determination that the businesses can be lawfully operated at a profit using the Assets of the Receivership Defendants' estate;

P. Take depositions and issue subpoenas to obtain Documents and records pertaining to the receivership estate and compliance with this Order. Subpoenas may be served by agents or attorneys of the Receiver and by agents of any process server retained by the Receiver;

Q. Open one or more bank accounts as designated depositories for funds of the Receivership Defendants. The Receiver shall deposit all funds of the Receivership Defendants in such a designated account and shall make all payments and disbursements from the receivership estate from such account(s);

R. Maintain accurate records of all receipts and expenditures that made as Receiver;

S. Cooperate with reasonable requests for information or assistance from any state or federal law enforcement agency;

T. If the Receiver identifies a nonparty entity as a Receivership Entity, promptly notify the entity as well as the parties, and inform the entity that it can challenge the Receiver's determination by filing a motion with the Court. Provided, however, that the Receiver may delay providing such notice until the Receiver has established control of the nonparty entity and its Assets and records, if the Receiver determines that notice to the entity may result in the destruction of records, dissipation of Assets, or any other obstruction of the Receiver's control of the entity;

U. Maintain the chain of custody of all of Defendants' records in their possession; and

V. Notify all courts in which Receivership Defendants have litigation pending, that this case is pending, and request temporary stays, where appropriate, of those cases or any other necessary relief to preserve the rights of Consumers.

## XIV.  IMMEDIATE ACCESS TO BUSINESS PREMISES AND RECORDS

**IT IS FURTHER ORDERED** that Plaintiff, the Receiver, and their respective representatives, agents, contractors, or assistants, are permitted immediate access to the Receivership Defendants' business premises.

**IT IS FURTHER ORDERED** that Defendants and their successors, assigns, officers, directors, agents, servants, employees, attorneys, and all other Persons directly or indirectly, in whole or in part, under their control, and all other Persons in active concert or participation with them, who receive actual notice of this Order by personal service, facsimile, email, or otherwise, whether acting directly or, shall:

A. Allow Plaintiff and the Receiver, and their respective representatives, agents, attorneys, investigators, paralegals, contractors, or assistants, including, but not limited to, federal, state, and local law enforcement officers, including the United States Marshals Service, the Federal Bureau of Investigation, the Internal Revenue Service, the Sheriff or deputy of any county, and the Police Department or police officer of any community, immediate access to:

1. all of the Receivership Defendants' business premises, including but not limited to:

   a. 173 Technology Dr. Suite 202, Irvine, CA 92618; 15261 Laguna Canyon Road, Suite 200, Irvine, CA 92618; 8 Hughes Parkway, Irvine, CA 92618;

24

      b.  any storage facilities;

      c.  such other business locations that are wholly or partially owned, rented, leased, or under the temporary or permanent control of any Receivership Defendant; and

2. any other premises where Receivership Defendants conduct business, sales operations, or customer service operations;

3. any premises where Documents related to the Receivership Defendants' businesses are stored or maintained, including but not limited to a storage unit;

4. any premises where Assets belonging to any Receivership Defendant are stored or maintained;

5. any Documents located at any of the locations described in this Section; and

B. Immediately identify to Plaintiff's counsel and the Receiver:

1. all of Defendants' business premises and storage facilities;

2. any non-residence premises where any Defendant conducts business, sales operations, or customer service operations;

3. any non-residence premises where Documents related to the business, sales operations, or customer service operations of any Defendant are hosted, stored, or otherwise maintained, including but not limited to the name and location of any Electronic Data Hosts;

4. any non-residence premises where Assets belonging to any Defendant are stored or maintained; and

C. Provide Plaintiff and the Receiver, and their respective representatives, agents, attorneys, investigators, paralegals, contractors, or assistants with any necessary means of access to, copying of, and forensic imaging of Documents, including, without limitation, identifying the locations of

Receivership Defendants' business premises, keys and combinations to business premises locks, passwords to devices that hold Electronically Stored Information, computer access codes of all computers used to conduct Receivership Defendants' business, access to (including but not limited to execution of any Documents necessary for access to and forensic imaging of) any data stored, hosted or otherwise maintained by an Electronic Data Host, and storage area access information.

**IT IS FURTHER ORDERED** that:

D. Plaintiff and the Receiver are authorized to employ the assistance of federal, state, and local law enforcement officers, including, but not limited to, the United States Marshals service, the United States Marshal or Deputy United States Marshal, the Federal Bureau of Investigation, the Internal Revenue Service, and the Sheriff or deputy of any county, and the Police Department and police officer of any community, to effect service, to implement peacefully the provisions of this Order, and to keep the peace;

E. The assistance of law enforcement is highly advisable to ensure that this Order is executed in an efficient, safe, and orderly manner. It is the primary role and mission of the United States Marshals Service to provide security and to obey, execute, and enforce all orders of the United States District Courts and the United States Courts of Appeals as provided by law. The United States Marshals Service shall execute all lawful writs, process, and orders issued under the authority of the United States, and shall command all necessary assistance to execute its duties. The United States Marshals Service, the Federal Bureau of Investigation, the Internal Revenue Service, or the local law enforcement is authorized to use any reasonable force in the enforcement of this Order;

TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

F.  The Receiver shall immediately allow Plaintiff and its representatives, agents, contractors, or assistants into the premises and facilities described in this Section to inspect, inventory, image, and copy Documents relevant to any matter contained in this Order, wherever they may be situated. The Receiver may exclude Receivership Defendants, Individual Defendants, and Relief Defendants and their agents and employees from the business premises and facilities during the immediate access. No one shall interfere with Plaintiff's or the Receiver's inspection of Receivership Defendants' premises or Documents;

G.  The Receiver and Plaintiff shall have the right to remove any Documents, including any devices containing Electronically Stored Information related to Defendants' business practices from the premises in order that they may be inspected, inventoried, and copied. The materials so removed shall be returned within five business days of completing said inventory and copying. If any property, records, Documents, or computer files relating to the Receivership Defendants' finances or business practices are located in the residence of any Individual Defendant or are otherwise in the custody or control of any Defendant, then such Defendant shall produce them to the Receiver within twenty-four hours of service of this Order. In order to prevent the destruction of computer data, upon service of this Order upon Defendants, any such computers may be powered down (turned off) in the normal course for the operating systems used on such computers and shall not be powered up or used again until produced for copying and inspection, along with any codes needed for access. Plaintiff's and the Receiver's representatives may also photograph and videotape the inside and outside of all premises to which they are permitted access by this Order, and all Documents and other items found on such premises;

27

H. Plaintiff's access to the Defendants' Documents pursuant to this Order shall not provide grounds for any Defendant to object to any subsequent request for Documents served by Plaintiff; and

I. The Receiver shall allow the Defendants and their representatives reasonable access to the premises of the Receivership Defendants. The purpose of this access shall be to inspect, inventory, and copy any and all Documents and other property owned by or in the possession of the Receivership Defendants, provided that those Documents and property are not removed from the premises. The Receiver shall have the discretion to determine the time, manner, and reasonable conditions of such access.

**IT IS FURTHER ORDERED** that:

J. The United States Marshals, the Federal Bureau of Investigation, the Internal Revenue Service, or other local law enforcement officers are authorized to escort Plaintiff, the Receiver, and Plaintiff's and the Receiver's representatives and agents inside Defendants' business premises including, but not limited to, the locations identified in Subsection XIV.A of this Order;

K. The United States Marshals, the Federal Bureau of Investigation, the Internal Revenue Service, or other local law enforcement officers, and those Persons acting under their supervision, including Plaintiff and its representatives and attorneys are authorized and directed to serve this Order along with any summons, complaint, motions, declarations, and discovery requests on Defendants, including at the premises identified in Subsection XIV.A of this Order;

L. Defendants and their employees, agents, and bookkeepers shall provide immediate access to such locations to Plaintiff, the Receiver, the United States Marshals Service, the Federal Bureau of Investigation, the Internal

28

Revenue Service,  or other local law enforcement officers and to
Plaintiff's attorneys;

M. Receivership Defendants, Individual Defendants, and Relief Defendants, and their employees, agents, and bookkeepers shall also immediately provide usernames and passwords to all computers and systems that store information concerning Defendants' business operations; and

N. Receivership Defendants, Individual Defendants, and Relief Defendants, and their employees shall surrender iPhone, Android, or other mobile access devices that contain information concerning Defendants' business operations to the Receiver or Plaintiff's representatives.

## XV.   COOPERATION WITH TEMPORARY RECEIVER

**IT IS FURTHER ORDERED** that:

A. Receivership Defendants, Individual Defendants, and Relief Defendants and their successors, assigns, officers, agents, directors, servants, employees, salespersons, independent contractors, attorneys, and corporations, and all other Persons or entities in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, or any of them, shall fully cooperate with and assist the Receiver. Receivership Defendants', Individual Defendants', and Relief Defendants' cooperation and assistance shall include, but not be limited to:

1. Providing any information to the Receiver that the Receiver deems necessary to exercising the authority and discharging the responsibilities of the Receiver under this Order, including but not limited to allowing the Receiver to inspect Documents and Assets and to partition office space;

29

2. Providing any username or password and executing any Documents required to access any computer or electronic files in any medium, including but not limited to Electronically Stored Information stored, hosted, or otherwise maintained by an Electronic Data Host;

3. Advising all Persons who owe money to the Receivership Defendants that all Debts should be paid directly to the Receiver; and

B. Receivership Defendants, Individual Defendants, and Relief Defendants and their successors, assigns, officers, directors, agents, servants, employees, attorneys, and all other Persons or entities directly or indirectly, in whole or in part, under their control, and all other Persons in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, shall not interfere in any manner, directly or indirectly with the custody possession, management, or control by the Receiver of Assets and Documents, and are hereby temporarily restrained and enjoined from directly or indirectly:

1. Transacting any of the business of the Receivership Defendants;

2. Destroying, secreting, erasing, mutilating, defacing, concealing, altering, transferring or otherwise disposing of, in any manner, directly or indirectly, any Documents or equipment of Defendants, including but not limited to contracts, agreements, Consumer files, Consumer addresses and telephone numbers, correspondence, advertisements, brochures, sales material, sales presentations, Documents evidencing or Defendants' services, training materials, scripts, data, computer tapes, disks, or other computerized records, books, written or printed records, handwritten notes, telephone logs, "verification" or "compliance" tapes or other audio or video

30

tape recordings, receipt books, invoices, postal receipts, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, copies of federal, state or local business or personal income or property tax returns, photographs, mobile devices, electronic storage media, accessories, and any other Documents, records or equipment of any kind that relate to the business practices or business or personal finances of the Defendants or any other entity directly or indirectly under the control of the Defendants;

3.  Transferring, receiving, altering, selling, encumbering, pledging, assigning, liquidating, or otherwise disposing of any Assets owned, controlled, or in the possession or custody of, or in which an interest is held or claimed by, the Receivership Defendants, or the Receiver;

4.  Excusing Debts owed to the Receivership Defendants;

5.  Failing to notify the Receiver of any Asset, including accounts, of a Receivership Defendant held in any name other than the name of the Receivership Defendant, or by any Person or entity other than the Receivership Defendant, or failing to provide any assistance or information requested by the Receiver in connection with obtaining possession, custody, or control of such Assets;

6.  Failing to create and maintain books, records, and accounts which, in reasonable detail, accurately, fairly, and completely reflect the incomes, assets, disbursements, transactions and use of monies by the Defendants or any other entity directly or indirectly under the control of the Defendants;

7.  Doing any act or refraining from any act whatsoever to interfere with the Receiver's taking custody, control, possession, or

31

managing of the Assets or Documents subject to this Receivership; or to harass or to interfere with the Receiver in any way; or to interfere in any manner with the exclusive jurisdiction of this Court over the Assets or Documents of the Receivership Defendants; or to refuse to cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their duties or authority under any Order of this Court; and

8. Filing, or causing to be filed, any petition on behalf of the Receivership Defendants for relief under the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, or of any similar insolvency proceeding on behalf of the Receivership Defendants, without prior approval of the Receiver and the Court.

## XVI.  DELIVERY OF RECEIVERSHIP PROPERTY

**IT IS FURTHER ORDERED** that immediately upon service of this Order upon them or upon their otherwise obtaining actual knowledge of this Order (or within a period permitted by the Receiver), Defendants, and any other Person or entity, including but not limited to Financial Institutions and Electronic Data Hosts, shall transfer or deliver access to possession, custody, and control of the following to the Receiver:

A. All Assets held by or for the benefit of the Receivership Defendants;

B. All Documents of the Receivership Defendants, including but not limited to books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, records of ACH transactions, and check registers), client or customer lists, title Documents and other papers;

C. All Assets belonging to members of the public now held by the Receivership Defendants;

D. All keys, computer and other passwords, user names, entry codes, combinations to locks required to open or gain or secure access to any Assets or Documents of or pertaining to the Receivership Defendants, wherever located, including, but not limited to, access to their business premises, means of communication, accounts, computer systems (onsite and remote), Electronic Data Hosts, or other property;

E. All Assets and Documents belonging to other Persons or entities whose interests are under the direction, possession, custody, or control of the Receivership Entities; and

F. Information identifying the accounts, employees, properties, or other Assets or obligations of the Receivership Defendants.

**IT IS FURTHER ORDERED** that, in the event any Person or entity fails to deliver or transfer immediately any Asset or otherwise fails to comply with any provision of this Section, the Receiver may file *ex parte* with the court an Affidavit of Non-Compliance regarding the failure. Upon filing of the affidavit, the Court may authorize, without additional process or demand, Writs of Possession or Sequestration or other equitable writs requested by the Receiver. The writs shall authorize and direct the United States Marshal, any Deputy United States Marshal, the Federal Bureau of Investigation, the Internal Revenue Service, or any sheriff or deputy sheriff of any county to seize the Asset, Document, or other thing and to deliver it to the Receiver.

## XVII. COMPENSATION FOR TEMPORARY RECEIVER

**IT IS FURTHER ORDERED** that the Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order, and for the cost of actual out-of-pocket expenses incurred by them, from the Assets now held by or in the possession or control of, or which may be received by, the Receivership Defendants. The Receiver shall file with the

33

Court and serve on the parties periodic requests for the payment of such reasonable compensation, with the first such request filed no more than sixty (60) days after the date of this Order. The Receiver shall not increase the hourly rates used as the bases for such fee applications without prior approval of the Court.

### XVIII.    TEMPORARY RECEIVER'S REPORTS

**IT IS FURTHER ORDERED** that the Receiver shall report to this Court on or before the date set for the hearing to Show Cause regarding the Preliminary Injunction, regarding: (1) the steps taken by the Receiver to implement the terms of this Order; (2) the value of all liquidated and unliquidated Assets of the Receivership Defendants; (3) the sum of all liabilities of the Receivership Defendants; (4) the steps the Receiver intends to take in the future to (a) prevent any diminution in the value of Assets of the Receivership Defendants, (b) pursue receivership Assets from third parties, and (c) adjust the liabilities of the Receivership Defendants, if appropriate; (5) the Receiver's assessment of whether the business can be operated in compliance with this Order; and (6) any other matters that the Receiver believes should be brought to the Court's attention. *Provided, however,* that if any of the required information would hinder the Receiver's ability to pursue receivership assets, the portions of the Receiver's report containing such information may be filed under seal and not served on the parties.

### XIX.  WITHDRAWAL OF TEMPORARY RECEIVER

**IT IS FURTHER ORDERED** that the Receiver and any professional retained by the Receiver, including but not limited to his or her attorneys and accountants, be and are hereby authorized to reasonably withdraw from his or her respective appointments or representations and apply for payment of their professional fees and costs at any time after the date of this Order by sending written notice seven days prior to the date of the intended withdrawal to the Court and to the parties along with a written report reflecting the Receiver's work,

34

findings, and recommendations, as well as an accounting for all funds and Assets in possession or control of the Receiver. The Receiver shall be exonerated and the receivership deemed closed seven days from the date of the mailing of such notice of withdrawal. The Court will retain jurisdiction to consider the fee applications, report, and accounting submitted by the Receiver and the professionals. The written notice shall include an interim report indicating the Receiver's actions and reflect the knowledge gained along with the fee applications of the Receiver and his or her professionals. The report shall also contain the Receiver's recommendations, if any.

## XX.    TEMPORARY RECEIVER'S BOND/LIABILITY

**IT IS FURTHER ORDERED** that no bond shall be required in connection with the appointment of the Receiver. Except for an act of gross negligence, the Receiver and the professionals shall not be liable for any loss or damage suffered by any of the Defendants, their officers, agents, servants, employees, and attorneys or any other person, by reason of any act performed or omitted to be performed by the Receiver and the professionals in connection with the discharge of his or her duties and responsibilities, including but not limited to their withdrawal from the case under Section XIX.

## XXI.    PROHIBITION ON RELEASE OF CONSUMER INFORMATION

**IT IS FURTHER ORDERED** that, except as required by a law enforcement agency, law, regulation, or court order, Defendants, and their successors, assigns, officers, agents, servants, employees, and attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, are temporarily restrained and enjoined from disclosing, using, or benefitting from Consumer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a

Consumer's account (including a credit card, bank account, or other financial account), of any person, which any Defendant obtained prior to entry of this Order in connection with any Debt-Relief Product or Service.

## XXII. STAY OF ACTIONS

**IT IS FURTHER ORDERED** that:

A. Except by leave of this Court, during pendency of the Receivership ordered herein, Defendants are hereby stayed from taking any action for, against, on behalf of, or in the name of any of the following: the Receivership Defendants, any of their subsidiaries, affiliates, partnerships, Assets, Documents, or the Receiver or the Receiver's duly authorized agents acting in their capacities as such. Such hereby-stayed actions include, but are not limited to, the following:

  1. Commencing, prosecuting, continuing, entering, or enforcing any suit or proceeding, except that such actions may be filed to toll any applicable statute of limitations;

  2. Attempting to foreclose, forfeit, alter, or terminate any interest in any Asset, whether such acts are part of a judicial proceeding, are acts of self-help, or otherwise;

  3. Executing, issuing, serving, or causing the execution, issuance, or service of, any legal process, including, but not limited to, attachments, garnishments, subpoenas, writs of replevin, writs of execution, or any other form of process whether specified in this Order or not; or

  4. Doing any act or thing whatsoever to interfere with the Receiver taking custody, control, possession, or management of the Assets or Documents subject to the Receivership, or to harass or interfere with the Receiver in any way, or to interfere in any manner with

36

the exclusive jurisdiction of this Court over the Assets or
Documents of the Receivership Defendants; and

B. This Section does not stay:

1. The commencement or continuation of a criminal action or proceeding;

2. The commencement or continuation of an action or proceeding by a state bar association to enforce its police or regulatory power;

3. The commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;

4. The enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;

5. The Bankruptcy Proceeding; or

6. The issuance to a Receivership Defendant of a notice of tax deficiency; and

C. Except as otherwise provided in this Order, all Persons and entities in need of Documentation from the Receiver shall in all instances first attempt to secure such information by submitting a formal written request to the Receiver, and, if such request has not been responded to within thirty days of receipt by the Receiver, any such Person or entity may thereafter seek an Order of this Court with regard to the relief requested.

## XXIII.    LIMITED EXPEDITED DISCOVERY

**IT IS FURTHER ORDERED** that Plaintiff is granted leave to conduct certain expedited discovery, and that, commencing with the time and date of this Order, in lieu of the time periods, notice provisions, and other requirements of Rules 19, 26, 30, 34, and 45 of the Federal Rules of Civil Procedure, and applicable Local Rules, Plaintiff and the Receiver are granted leave to:

A. Take the deposition, on three days' notice, of any Person or entity, whether or not a party, for the purpose of discovering: (1) the nature, location, status, and extent of Assets of Defendants or their affiliates or subsidiaries; (2) the nature, location, and identity of participants in and extent of Defendants' business transactions and operations; (3) Documents reflecting Defendants' business transactions and operations; and (4) compliance with this Order. The limitations and conditions set forth in Rules 30(a)(2) and 31(a)(2) of the Federal Rules of Civil Procedure regarding subsequent depositions shall not apply to depositions taken pursuant to this Section. In addition, any such depositions taken pursuant to this Section shall not be counted toward the ten deposition limit set forth in Rules 30(a)(2)(A)(i) and 31(a)(2)(A)(i) of the Federal Rules of Civil Procedure and shall not preclude Plaintiff from subsequently deposing the same Person or entity in accordance with the Federal Rules of Civil Procedure. Service of discovery upon a party, taken pursuant to this Section, shall be sufficient if made by facsimile, email or by overnight delivery. Any deposition taken pursuant to this Subsection that has not been reviewed and signed by the deponent may be used by any party for purposes of the preliminary injunction hearing;

B. Serve upon parties requests for production or inspection of Documents, or interrogatories that require production, inspection, or interrogatory responses within three calendar days of service, and may serve subpoenas upon non-parties that direct production, inspection, or responses to interrogatories within five calendar days of service, for the purpose of discovering: 1) the nature, location, status, and extent of Assets of Defendants or their affiliates or subsidiaries; (2) the nature, location, identify of participants, and extent of Defendants' transactions; (3) Documents reflecting Defendants' business transactions and operations;

38

and (4) enforcing compliance with this Order, *provided that* twenty-four hours' notice shall be deemed sufficient for the production of any such Documents that are maintained or stored only as electronic data;

C.  Serve deposition notices and other discovery requests upon the parties to this action by facsimile or overnight courier, and take depositions by telephone or other remote electronic means;

D.  If a Defendant fails to appear for a properly noticed deposition or fails to comply with a request for production or inspection, seek to prohibit that Defendant from introducing evidence at any subsequent hearing;

E.  Any expedited discovery taken pursuant to this Section is in addition to, and is not subject to, the limits on discovery set forth in the Federal Rules of Civil Procedure and the Local Rules of this Court. The expedited discovery permitted by this Section does not require a meeting or conference of the parties, pursuant to Fed. R. Civ. P. 26(d) & (f); and

F.  The Parties are exempted from making initial disclosures under Fed. R. Civ. P. 26(a)(1) until further order of this Court.

### XXIV.    MONITORING

**IT IS FURTHER ORDERED** that Plaintiff's agents or representatives may contact Defendants directly or anonymously for the purpose of monitoring compliance with this Order, and may tape record any oral communications that occur in the course of such contacts.

### XXV. DEFENDANTS' DUTY TO DISTRIBUTE ORDER

**IT IS FURTHER ORDERED** that Defendants shall immediately provide a copy of this Order to each affiliate, subsidiary, division, sales entity, successor, assign, officer, director, employee, independent contractor, client company, Electronic Data Host, agent, authorized signatory to bank accounts, attorney, spouse, and representative of Defendants and shall, within three calendar days from the date of entry of this Order, provide Plaintiff's counsel with a sworn

39

statement that: (a) confirms that Defendants have provided copies of the Order as required by this Section and (b) lists the names and addresses of each entity or Person to whom Defendants provided a copy of the Order. Furthermore, Defendants shall not take any action that would encourage officers, agents, directors, employees, salespersons, independent contractors, attorneys, subsidiaries, affiliates, successors, assigns, or other Persons or entities in active concert or participation with Defendants to disregard this Order or believe that they are not bound by its provisions.  This Section does not apply to the Chapter 7 Trustee.

## XXVI.    DURATION OF TEMPORARY RESTRAINING ORDER

**IT IS FURTHER ORDERED** that the Temporary Restraining Order granted herein shall expire on the 4th day of November,  2019,  4:00 o'clock p.m., unless within such time, the Order, for good cause shown, is extended with the consent of the parties, or for an additional period not to exceed fourteen calendar days, or unless it is further extended pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## XXVII.    ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION

**IT IS FURTHER ORDERED** that, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, each of the Defendants shall appear before this Court on the 4th day of November, 2019 at 3:00 o'clock p.m., to show cause, if there is any, why this Court should not enter a preliminary injunction enjoining the violations of law alleged in Plaintiff's Complaint, continuing the freeze of their Assets, and imposing such additional relief as may be appropriate.

## XXVIII.    SERVICE OF PLEADINGS, MEMORANDA AND OTHER EVIDENCE

**IT IS FURTHER ORDERED** that Defendants shall file any answering affidavits, pleadings, or legal memoranda with the Court and serve the same on

Plaintiff's counsel no later than five business days prior to the preliminary injunction hearing in this matter. Plaintiff may file responsive or supplemental pleadings, materials, affidavits, or memoranda with the Court and serve the same on counsel for Defendants no later than noon one business day prior to the preliminary injunction hearing in this matter. *Provided that* service shall be performed by personal or overnight delivery, facsimile, e-filing, or email, and Documents shall be delivered so that they shall be received by the other parties no later than noon (PT) on the appropriate dates listed in this Section.

### XXIX.      LIVE TESTIMONY; WITNESS IDENTIFICATION

**IT IS FURTHER ORDERED** that the question of whether this Court should enter a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure enjoining the Defendants during the pendency of this action shall be resolved on the pleadings, declarations, exhibits, and memoranda filed by, and oral argument of, the parties. Live testimony shall be heard only on further order of this Court on motion filed with the Court and served on counsel for the other parties at least five business days prior to the preliminary injunction hearing in this matter. Such motion shall set forth the name, address, and telephone number of each proposed witness, a detailed summary or affidavit disclosing the substance of each proposed witness' expected testimony, and an explanation of why the taking of live testimony would be helpful to this Court. Any papers opposing a timely motion to present live testimony or to present live testimony in response to live testimony presented by another party shall be filed with this Court and served on the other parties at least three business days prior to the preliminary injunction hearing in this matter. *Provided that* service shall be performed by personal or overnight delivery or by facsimile, e-filing, or email, and Documents shall be delivered so that they shall be received by the other parities no later than 4 p.m. (PT) on the appropriate dates listed in this Section. *Provided further*, however, that an evidentiary hearing on Plaintiff's request for a preliminary injunction is not

necessary unless Defendants demonstrate that they have, and intend to introduce, evidence that raises a genuine issue of material fact.

## XXX. CORRESPONDENCE WITH PLAINTIFF BUREAU OF CONSUMER FINANCIAL PROTECTION

**IT IS FURTHER ORDERED** that, for the purposes of this Order, because mail addressed to the Bureau is subject to delay due to heightened security screening, all correspondence and service of pleadings on Plaintiff Bureau of Consumer Financial Protection shall be sent either via electronic submission through the court's electronic filing system or via commercial overnight express delivery to:

Bureau of Consumer Financial Protection

Office of Enforcement

1700 G Street, NW

Washington, DC 20552

ATTN: Sarah Preis

Email: Sarah.Preis@cfpb.gov

## XXXI.    SERVICE OF THIS ORDER

**IT IS FURTHER ORDERED** that copies of this Order may be served by facsimile transmission, email, personal or overnight delivery, or US Mail, by Plaintiff's agents and employees or any local, state, or federal law enforcement agency or by private process server, upon any Financial Institution or other entity or Person that may have possession, custody, or control of any Documents or Assets of any Defendant, or that may otherwise be subject to any provision of this Order. Service upon any branch, subsidiary, affiliate, or office shall effect service upon the entire entity.

## XXXII.    RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for all purposes of construction, modification, and enforcement of this Order.

**SO ORDERED**, this 21st day of October, 2019, at 4:00 p.m. (PDT).

_____
United States District Court Judge

**James V Selna**

43

## Attachment A

## Individual Financial Statement

**Instructions**:

1      Complete all items.  Enter "None" or "N/A" ("Not Applicable") where appropriate.  If you cannot fully answer a question, explain why.

2      "Dependents" include your live-in companion, dependent children, or any other person, whom you or your spouse (or your children's other parent) claimed or could have claimed as a dependent for tax purposes at any time during the past five years.

3      "Assets" and "Liabilities" include <u>ALL</u> assets and liabilities,  located within the United States or elsewhere, whether held individually  or jointly.

4      Attach continuation pages as needed. On the financial disclosure form, state next to the Item number that the Item is being continued. On the continuation page(s), identify the Item number(s) being continued.

5      Type or print legibly.

6      Initial each page in the space provided in the lower right corner.

7      Sign and date the completed financial disclosure form on the last page.

**Penalty for False Information**:

Federal law provides that any person may be imprisoned for not more than five years, fined, or both, if such person in any:

(a) "matter within the jurisdiction of the executive, legislative,  or judicial branch of the Government of the United States, knowingly and willfully  (1) falsifies,  conceals or covers up by any trick, scheme, or device a material fact; (2) makes any false, fictitious  or fraudulent statement or representation; or (3) makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry" (18 U.S.C. § 1001);

(2) "statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully  subscribes as true any material matter which he does not believe to be true" (18 U.S.C. § 1621); or

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

(3) "(...statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information...knowing the same to contain any false material declaration." (18 U.S.C. § 1623)

For a felony conviction under the provisions cited above, federal law provides that the fine may be not more than the greater of (i) $250,000 for an individual or $500,000 for a corporation, or (ii) if the felony results in pecuniary gain to any person or pecuniary loss to any person other than the defendant, the greater of twice the gross gain or loss. 18 U.S.C. § 3571.

2

Initials _____

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

# BACKGROUND INFORMATION

## Item 1.  Information About You

Your Full Name _____ Social Security No. _____

Place of Birth _____ Date of Birth _____ Drivers License No. _____

Current Address _____ From (Date) _____

Rent or Own? _____ Telephone No. _____ Facsimile No. _____

E-Mail Address _____ Internet Home Page _____

Previous Addresses for past five years:

Address_____ Rent or Own?_____ From/Until_____

Address_____ Rent or Own?_____ From/Until_____

Identify any other name(s) and/or social security number(s) you have used, and the time period(s) during which they were

used_____ _____

Marital Status: _____ (i.e., Married, Single, Divorced, Widowed, Separated)

3                                                             Initials _____
                                                                    Att. A
                                                            To Proposed TRO
                                                    [Filed Under Temporary Seal]

**<u>Item 2</u>. Information About Your Spouse or Live-In Companion**

Spouse/Companion's Name _____ Social Security No. _____

Place of Birth _____ Date of Birth _____

Identify any other name(s) and/or social security number(s) your spouse/companion has used, and the time period(s) during

which they were used
_____

Address (if different from yours)
_____

From (Date) _____ Rent or Own? _____ Telephone No. _____

Employer's Name and Address
_____

Job Title _____ Years in Present Job _____ Annual Gross Salary/Wages $_____

**<u>Item 3</u>. Information About Your Previous Spouse**

Previous Spouse's Name & Address
_____

_____ Social Security No. _____ Date of Birth _____

Initials _____

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

**Item 4**.  **Contact Information**

Name & Address of Nearest Living Relative or Friend

_____

_____ Telephone No.
_____

**Item 5**.  **Information About Dependents Who Live With You**

Name _____ Date of Birth
_____

Relationship _____ Social Security No.
_____

Name _____ Date of Birth
_____

Relationship _____ Social Security No.
_____

Name _____ Date of Birth
_____

Relationship _____ Social Security No.
_____

**Item 6**.  **Information About Dependents Who Do Not Live With You**

Name & Address

_____
_____

Date of Birth _____ Relationship _____ Social Security
No._____

5                                                            Initials _____

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

Name Address

_____
_____

Date of Birth _____ Relationship _____ Social Security
No._____

Name & Address

_____
_____

Date of Birth _____ Relationship _____ Social Security
No._____

## Item 7.  Employment Information

Provide the following information for this year-to-date and for each of the previous five full
years, for each company of which you were a director, officer, employee, agent, contractor,
participant or consultant at any time during that period. "Income" includes, but is not limited to,
any salary, commissions, draws, consulting fees, loans, loan payments, dividends, royalties or
other benefits for which you did not pay (*e.g.,* health insurance premiums, automobile lease or
loan payments) received by you or anyone else on your behalf.

Company Name & Address

_____

Dates Employed:  From (Month/Year) _____ To (Month/Year)
_____

Positions Held with Beginning and Ending Dates

_____

Income Received:  This year-to-date: $_____ :
$_____

                      20_____ :  $_____ :
                      $_____

6                                                          Initials _____

                                              Att. A
                                    To Proposed TRO
                                [Filed Under Temporary Seal]

_____: $_____ _____:
$_____

Company Name & Address
_____

Dates Employed:  From (Month/Year) _____ To (Month/Year)
_____

Positions Held with Beginning and Ending Dates
_____

Income Received:  This year-to-date: $_____ _____:
$_____

            20_____: $_____ _____:
    $_____

            _____: $_____ _____:
    $_____

Company Name & Address
_____

Dates Employed:  From (Month/Year) _____ To (Month/Year)
_____

Positions Held with Beginning and Ending Dates
_____

Income Received:  This year-to-date: $_____ _____:
$_____

            20_____: $_____ _____:
    $_____

7                                              Initials _____

                                              Att. A
                                       To Proposed TRO
                                  [Filed Under Temporary Seal]

_____ :    $_____ _____ :
$_____

## Item 8.  Pending Lawsuits Filed by You or Your Spouse

List all pending lawsuits that have been filed by you or your spouse in court or before an administrative agency.
(List lawsuits that resulted in final judgments or settlements in Items 16 and 25).

Opposing Party's Name & Address
_____

Court's Name & Address
_____

Docket No. _____ Relief Requested _____ Nature of Lawsuit
_____

_____ Status
_____

## Item 9.  Pending Lawsuits Filed Against You or Your Spouse

List all pending lawsuits that have been filed against you or your spouse in court or before an administrative agency.
(List lawsuits that resulted in final judgments or settlements in Items 16 and 25).

Opposing Party's Name & Address
_____

Court's Name & Address
_____

Docket No. _____ Relief Requested _____ Nature of Lawsuit
_____

_____ Status

8                                                                 Initials _____

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

_____

9                                                                    Initials _____

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

**<u>Item 10</u>.  Safe Deposit Boxes**

List all safe deposit boxes, located within the United States or elsewhere, held by you, your spouse, or any of your dependents, or held by others for the benefit of you, your spouse, or any of your dependents.  On a separate page, describe the contents of each box.

Owner's Name   Name & Address of Depository Institution     Box No.

_____  _____
   _____

_____
   _____

**<u>Item 11</u>.  Business Interests**

List all businesses for which you, your spouse, or your dependents are an officer or director.

Business' Name & Address
_____

Business Format (e.g., corporation) _____ Description of Business
_____

_____ Position(s) Held, and By Whom
_____

Business' Name & Address
_____

Business Format (e.g., corporation) _____ Description of Business
_____

_____ Position(s) Held, and By Whom
_____

Business' Name & Address

10                Initials \_\_\_\_\_

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

_____

Business Format (e.g., corporation) _____ Description of Business

_____

_____ Position(s) Held, and By Whom

_____

Initials _____

                                                                                                   Att. A
                                                                                  To Proposed TRO
                                                                   [Filed Under Temporary Seal]

## FINANCIAL INFORMATION: ASSETS AND LIABILITIES

**REMINDER: "Assets" and "Liabilities" include ALL assets and liabilities, located within the United States or elsewhere, whether held individually or jointly.**

## <u>Item 12</u>.  Cash, Bank, and Money Market Accounts

List cash and all bank and money market accounts, including but not limited to, checking accounts, savings accounts, and certificates of deposit, held by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.  The term "cash" includes currency and uncashed checks.

Cash on Hand $_____ Cash Held For Your Benefit $_____

| Name on Account | Name & Address of Financial Institution | Account No. Current Balance |
|---|---|---|
| _____ $_____ | _____ | |
| _____ $_____ | _____ | |
| _____ $_____ | _____ | |
| _____ $_____ | _____ | |
| _____ $_____ | _____ | |
| _____ $_____ | _____ | |

Initials _____

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

**<u>Item 13</u>.  U.S. Government Securities**

List all U.S. Government securities, including but not limited to, savings bonds, treasury bills, and treasury notes, held by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

Name on Account  Type of Obligation                    Security Amount       Maturity
Date _____ _____      $_____
          _____

_____ _____      $_____
          _____

_____      $_____
          _____

**<u>Item 14</u>.  Publicly Traded Securities and Loans Secured by Them**

List all publicly traded securities, including but not limited to, stocks, stock options, registered and bearer bonds, state and municipal bonds, and mutual funds, held by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

Issuer _____ Type of Security _____No. of
Units Owned _____

Name on Security _____ Current Fair Market Value $_____ Loan(s) Against
Security $_____

Broker House,  Address _____ Broker
Account No. _____

13                                                            Initials _____

**Item 15.  Other Business Interests**

List all other business interests, including but not limited to, non-public corporations, subchapter-S corporations, limited liability corporations ("LLCs"), general or limited partnership interests, joint ventures, sole proprietorships, and oil and mineral leases, held by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

Business Format _____ Business' Name & Address _____

_____

Ownership % _____

Owner (e.g., self, spouse) _____ Current Fair Market Value $ _____

**Item 16.  Monetary Judgments or Settlements Owed to You, Your Spouse, or Your Dependents**

List all monetary judgments or settlements owed to you, your spouse, or your dependents.

Opposing Party's Name & Address _____

Court's Name & Address _____

Docket No. _____ Nature of Lawsuit _____

Date of Judgment _____ Amount $ _____

**Item 17.  Other Amounts Owed to You, Your Spouse, or Your Dependents**

List all other amounts owed to you, your spouse, or your dependents.

Debtor's Name, Address, & Telephone No.

14                                                                        Initials _____

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

_____

Original Amount Owed $_____ Current Amount Owed $_____ Monthly Payment $_____

## Item 18. Life Insurance Policies

List all life insurance policies held by you, your spouse, or your dependents.

Insurance Company's Name, Address, & Telephone No._____

Insured _____ Beneficiary _____ Face Value $_____

Policy No. _____ Loans Against Policy $_____ Surrender Value $_____

Insurance Company's Name, Address, & Telephone No._____

Insured _____ Beneficiary _____ Face Value $_____

Policy No. _____ Loans Against Policy $_____ Surrender Value $_____

15                                                            Initials _____

## Item 19.  Deferred Income Arrangements

List all deferred income arrangements, including but not limited to, deferred annuities, pensions plans, profit-sharing plans, 401(k) plans, IRAs, Keoghs, and other retirement accounts, held by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

Name on Account _____ Type of Plan _____ Date
Established _____

Trustee or Administrator's Name, Address & Telephone
No._____

Account No. _____ Surrender Value $_____

Name on Account _____ Type of Plan _____ Date
Established_____

Trustee or Administrator's Name, Address & Telephone
No._____

Account No. _____ Surrender Value $_____

## Item 20.  Personal Property

List all personal property, by category, whether held for personal use or for investment, including but not limited to, furniture and household goods of value, computer equipment, electronics, coins, stamps, artwork, gemstones, jewelry, bullion, other collectibles, copyrights, patents, and other intellectual property, held by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

| Property Category (e.g., artwork, jewelry) | Name of Owner | Property Location | Acquisition Cost | Current Value |
|---|---|---|---|---|
| _____ | _____ | _____ | $_____ | $_____ |
| _____ | _____ | _____ | $_____ | $_____ |

16                                                              Initials _____

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

_____    _____    _____$_____$_____

_____    _____    _____$_____$_____

_____    _____    _____$_____$_____

**Item 21**.  **Cars, Trucks, Motorcycles, Boats, Airplanes, and Other Vehicles**

List all cars, trucks, motorcycles, boats, airplanes, and other vehicles owned or operated by you, your spouse, or your dependents, or held by others for the benefit of you, your spouse, or your dependents.

Vehicle Type _____ Make _____ Model _____ Year _____

Registered Owner's Name _____ Registration State & No._____

Address of Vehicle's Location
_____

Purchase Price $_____ Current Value $_____ Account/Loan No._____

Lender's Name and Address_____
\_

Original Loan Amount $_____ Current Loan Balance $_____ Monthly Payment $_____

Mileage _____ Current condition of car _____ Purchase date _____

Vehicle Type _____ Make _____ Model _____

17                                                                                      Initials \_\_\_\_\_

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

_____ Year _____

Registered Owner's Name _____ Registration State & No.
_____

Address of Vehicle's Location
_____

Purchase Price $_____Current Value $_____ Account/Loan
No._____

Lender's Name and
Address_____
_

Original Loan Amount $_____ Current Loan Balance $_____ Monthly
Payment $_____

Mileage _____ Current condition of car _____ Purchase
date _____

## Item 22.  Real Property

List all real estate held by you, your spouse, or your dependents, or held by others for the
benefit of you, your spouse, or your dependents.

Type of Property_____Property's
Location_____

Name(s) on Title and Ownership
Percentages_____

Acquisition Date_____ Purchase Price $_____ Current Value
$_____

Basis of Valuation_____ Loan or Account
No._____

18                                                                Initials _____

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

Lender's Name and
Address_____
_

Current Balance On First Mortgage $_____ Monthly Payment $_____

Other Loan(s) (describe)_____Current Balance
$_____

Monthly Payment $_____ Rental Unit?_____ Monthly Rent
Received $_____

Type of Property_____ Property's
Location_____

Name(s) on Title and Ownership
Percentages_____

Acquisition Date_____ Purchase Price $_____ Current Value
$_____

Basis of Valuation_____ Loan or Account
No._____

Lender's Name and
Address_____
_

Current Balance On First Mortgage $_____ Monthly Payment $_____

Other Loan(s) (describe)_____Current Balance
$_____

Monthly Payment $_____ Rental Unit?_____ Monthly Rent
Received $_____

19                                                           Initials_____

                                                              Att. A
                                                    To Proposed TRO
                                          [Filed Under Temporary Seal]

**Item 23.  Other Assets**

List all other assets not identified above, held by you, your spouse, or your dependents, including but not limited to, patents, and other intellectual property, and cryptocurrency and other virtual currencies.

| Description | Location | Acquisition Cost | Current Value |
|---|---|---|---|

$_____$ \$_____ \$_____

$_____$ \$_____ \$_____

$_____$ \$_____ \$_____

$_____$ \$_____ \$_____

$_____$ \$_____ \$_____

**Item 24.  Credit Cards**

List each credit card held by you, your spouse, or your dependents.  Also list any other credit cards that you, your spouse, or your dependents use.

| Name of Credit Card (e.g., Visa, MasterCard, Department Store) | Account No. | Name(s) on Account | Current Balance | Minimum Monthly Payment |
|---|---|---|---|---|
| _____ | _____ | _____ | \$_____ | \$_____ |

20

Initials \_\_\_\_

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

_____  _____  _____  $_____

$_____

_____  _____  _____  $_____

$_____

_____  _____  _____  $_____

$_____

_____  _____  _____  $_____

$_____

_____  _____  _____  $_____

$_____

## __Item 25__.  **Taxes Payable**

List all taxes, such as income taxes or real estate taxes, owed by you, your spouse, or your dependants.

| Type of Tax | Amount Owed | Year Incurred |
|---|---|---|
| _____ | $_____ | |
| _____ | | |
| _____ | $_____ | |
| _____ | | |
| _____ | $_____ | |
| _____ | | |
| _____ | $_____ | |
| _____ | | |

## __Item 26__.  **Judgments or Settlements Owed**

List all judgments or settlements owed by you, your spouse, or your dependents.

Initials _____

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

Opposing Party's Name &
Address_____

Court's Name & Address_____

Docket No._____ Nature of Lawsuit_____

Date_____ Amount $_____

## Item 27.  Other Loans and Liabilities

List all other loans or liabilities  in your, your spouse's, or your dependents' names.

Name & Address of Lender/Creditor
_____

Nature of Liability_____ Name(s) on
Liability_____

Date of Liability_____ Amount Borrowed $_____ Current
Balance $_____

Payment Amount $_____ Frequency of Payment_____

Name & Address of Lender/Creditor
_____

Nature of Liability_____ Name(s) on
Liability_____

Date of Liability_____ Amount Borrowed $_____ Current
Balance $_____

Payment Amount $_____ Frequency of Payment_____

22                                                          Initials _____

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

23                                                                                       Initials _____

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

# OTHER FINANCIAL INFORMATION

## Item 28.  Tax Returns

List all federal tax returns that were filed during the last three years by or on behalf of you, your spouse, or your dependents. Provide a copy of each signed tax return that was filed during the last three years, including amendments (if any).

Tax Year                Name(s) on Return                                                Refund
Expected _____

_____ $_____

_____ _____
$_____

_____ _____
$_____

_____

Initials \_\_\_\_\_

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

**Item 29**.  **Applications for Credit**

List all applications for bank loans or other extensions of credit that you, your spouse, or your dependents have submitted within the last two years.  Provide a copy of each application, including all attachments.

Name(s) on Application          Name & Address of Lender

_____

_____

_____

_____

**Item 30**.  **Trusts and Escrows**

List all funds or other assets that are being held in trust or escrow by any person or entity for you, your spouse, or your dependents. Also list all funds or other assets that are being held in trust or escrow by you, your spouse, or your dependents, for any person or entity.  Provide copies of all executed trust documents.

| Trustee or Escrow Agent's Name & Address Assets | Date Established | Grantor | Beneficiaries Present Market Value of |
|---|---|---|---|
| $_____ | | | |
| $_____ | | | |
| $_____ | | | |
| $_____ | | | |

25                                                              Initials \_\_\_\_\_

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

_____  _____  _____  _____
$_____

## Item 31.  Transfers of Assets

List each person to whom you have transferred, in the aggregate, more than $2,500 in funds or other assets during the previous three years by loan, gift, sale, or other transfer.  For each such person, state the total amount transferred during that period.

| Transferee's Name, Address, & Relationship | Property of Transfer | Aggregate Value | Transfer Date | Type (e.g., Loan, Gift) |
|---|---|---|---|---|
| _____ | _____ | $_____ | _____ | _____ |
| _____ | _____ | $_____ | _____ | _____ |
| _____ | _____ | $_____ | _____ | _____ |
| _____ | _____ | $_____ | _____ | _____ |
| _____ | _____ | $_____ | _____ | _____ |

## Item 32.  Foreign Assets and Liabilities

In any location outside of the United States, do you, or your spouse, or your dependents have any of the following:

Do you, your spouse, or your dependents have, in any location outside of the United States, any assets not otherwise identified in this disclosure (including, but not limited to real estate, bank accounts, investments, or other financial products)?

26

Initials \_\_\_\_\_

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

Yes/No

Do you, your spouse or your dependents have, in any location outside of the United States, any liabilities  not otherwise identified in this disclosure (including,  but not limited to liens, credit card debt or other financial obligations)?

Yes/No

If yes, to any of the above, please separately list below each asset and liability  category, their location, the acquisition cost and current value.  Please include a copy of all Reports of Foreign Bank and Financial Accounts (FBAR) filings.

Asset Category              Asset Location                    Acquisition
      Current

                                                         Cost        Value

_____    _____

$_____ $_____

_____    _____

$_____ $_____

_____    _____

$_____ $_____

_____    _____

$_____ $_____

Liability  Category         Liability  Location               Acquisition
      Current

                                                         Cost        Value

_____    _____

$_____ $_____

_____    _____

$_____ $_____

27                                                    Initials _____

Att. A<br/>To Proposed TRO<br/>[Filed Under Temporary Seal]

_____ _____

$_____ $_____

_____ _____

$_____ $_____

## Item 33.  Foreign Positions

Do you, your spouse, or your dependents hold any corporate office or partnership in any entity located outside the United States? Yes/No

Are you, your spouse, or your dependents the trustee of any trust or similar entity outside the United States? Yes/No

If yes to any of the above, please separately list below the name of the entity or trust, the country under which such entity or trust is organized and your position with such entity or trust. Please include a copy of all organizing documents for each such corporation, partnership or trust.

Name of Entity or Trust          Country

_____

_____

_____

_____

## Item 34.  Credit Report

Provide a copy of you and your spouse's most recent credit report, within the last 60 days upon receipt of this form, from a credit bureau.

## SUMMARY FINANCIAL SCHEDULES

## Item 35.  Combined Balance Sheet for You, Your Spouse, and Your Dependents

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Cash on Hand (Item | | Credit Cards (Item 23) | |

28                                                      Initials _____

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

| | | | | |
|---|---|---|---|---|
| 12) | | | | |
| Cash in Financial Institutions (Item 12) | | Motor Vehicles - Liens (Item 21) | | |
| U.S. Government Securities (Item 13) | | Real Property - Encumbrances (Item 22) | | |
| Publicly Traded Securities (Item 14) | | Loans Against Publicly Traded Securities (Item 14) | | |
| Other Business Interests (Item 15) | | Taxes Payable (Item 24) | | |
| Judgments or Settlements Owed to You (Item 16) | | Judgments or Settlements Owed (Item 25) | | |
| Other Amounts Owed to You (Item 17) | | | | |
| Surrender Value of Life Insurance (Item 18) | | Other Loans and Liabilities (Item 26) | | |
| Deferred Income Arrangements (Item 19) | | | | |
| Personal Property (Item 20) | | Other Liabilities (Itemize): | | |
| Motor Vehicles (Item 21) | | | | |
| Real Property (Item 22) | | | | |
| | | | | |
| Other Assets (Itemize): | | | | |

29                                                                    Initials _____

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

| | | | |
|---|---|---|---|

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

**<u>Item 36</u>.  Combined Average Monthly Income and Expenses for You, Your Spouse, and Your Dependents for
the Last 6 Months**

Provide the average monthly income and expenses for you, your spouse, and your dependents for the last 6 months.  Do not include credit card payments separately; rather, include credit card expenditures in the appropriate categories.

Initials _____

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

| INCOME | | EXPENSES | |
|---|---|---|---|
| Salary - After Taxes | $_____ | Mortgage Payments for Residence(s) | $_____ |
| Fees, Commissions, and Royalties | $_____ | Property Taxes for Residence(s) | $_____ |
| Interest | $_____ | Rental Property Expenses, Including Mortgage Payments, Taxes, and Insurance | $_____ |
| Dividends and Capital Gains | $_____ | Car or Other Vehicle Lease or Loan Payments | $_____ |
| Gross Rental Income | $_____ | Food Expenses | $_____ |
| Profits from Sole Proprietorships | $_____ | Clothing Expenses | $_____ |
| Distributions from Partnerships, S-Corporations, and LLCs | $_____ | Utilities | $_____ |
| Distributions from Trusts and Estates | $_____ | Medical Expenses, Including Insurance | $_____ |
| Distributions from Deferred Income Arrangements | $_____ | Other Insurance Premiums | $_____ |
| Social Security Payments | $_____ | Other Transportation Expenses | $_____ |
| Alimony/Child Support Received | $_____ | Other Household Expenses | $_____ |
| Gambling Income | $_____ | Other Expenses (Itemize) | |
| Other Income (Itemize) | | _____ | $_____ |
| _____ | $_____ | _____ | $_____ |
| _____ | $_____ | _____ | $_____ |
| _____ | $_____ | _____ | $_____ |
| **Total Income** | $_____ | **Total Expenses** | $_____ |

Initials _____

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

# ATTACHMENTS

## Item 37.  Documents Attached to this Financial Disclosure Form

Indicate whether the below documents are being submitted with the financial disclosure form.

Item No. Document        Description of Document
Relates To

| Item 27. | Tax Returns | Yes/No |
|---|---|---|
| Item 28. | Applications of Credit | Yes/No |
| Item 31. | Reports of Foreign Bank & Financial Account Filings | Yes/No |
| Item 32. | Credit Report | Yes/No |

List any other documents and forms as well as the item number, in the financial form, the document relates to and a description of the document.

Item No. Document            Description of Document
Relates To

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**WARNING**:

33                                                      Initials _____

                                                              Att. A
                                                    To Proposed TRO
                                            [Filed Under Temporary Seal]

I am submitting this financial disclosure form with the understanding that it may affect action by the Bureau of Consumer Financial Protection or a federal court.  The responses I have provided to the items above are true and contain all the requested facts and information of which I have notice or knowledge. I have provided all requested documents in my custody, possession, or control. I further declare that I have no assets, owned either directly or indirectly (including owned by my spouse or dependents), or income of any nature other than as shown in, or attached to, this statement. I understand that the Bureau of Consumer Financial Protection is a federal agency and that this financial disclosure form is being submitted in connection with a matter within its jurisdiction.  I understand that a false, fictitious, or fraudulent statement or representation on this form, or the concealment of any material fact is a violation of Federal law and could result in criminal prosecution, and significant civil penalties. I understand that a false statement is punishable under 18 U.S.C. §§ 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000.

Executed on:

_____                    _____

(Date)                                                                          Signature

34                                                                                      Initials \_\_\_\_\_

Att. A
To Proposed TRO
[Filed Under Temporary Seal]

## Attachment B

## Corporate Financial Statement

**Instructions**:

1       Complete all items.    Enter "None" or "N/A" ("Not Applicable") where appropriate.    If you cannot fully answer a question, explain why.

2       In completing this financial disclosure form, "the corporation" refers not only to this corporation but also to each of its predecessors that are not named defendants in this action.

3       When an Item asks for information about assets or liabilities  "held by the corporation," include <u>ALL</u> such assets and liabilities,  located within the United States or elsewhere, held by the corporation or held by others for the benefit of the corporation.

4       Attach continuation pages as needed. On the financial disclosure form, state next to the Item number that the Item is being continued. On the continuation page(s), identify the Item number being continued.

5       Type or print legibly.

6       The corporation's Chief Executive Officer and its Chief Financial Officer (or their equivalents in a non-public company or an entity without such named positions) must sign and date the completed financial disclosure form on the last page and initial each page in the space provided in the lower right corner.

**Penalty for False Information**:

Federal law provides that any person may be imprisoned for not more than five years, fined, or both, if such person in any:

(a) "matter within the jurisdiction of the executive, legislative,  or judicial branch of the Government of the United States, knowingly and willfully  – (1) falsifies,  conceals or covers up by any trick, scheme, or device a material fact; (2) makes any false, fictitious or fraudulent statement or representation; or (3) makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry" (18 U.S.C. § 1001);

(2) "statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully  subscribes as true any material matter which he does not believe to be

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

true" (18 U.S.C. § 1621); or

(3) "(...statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information...knowing the same to contain any false material declaration." (18 U.S.C. § 1623)

For a felony conviction under the provisions cited above, federal law provides that the fine may be not more than the greater of (i) $250,000 for an individual or $500,000 for a corporation, or (ii) if the felony results in pecuniary gain to any person or pecuniary loss to any person other than the defendant, the greater of twice the gross gain or loss. 18 U.S.C. § 3571.

2                                                      Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

## BACKGROUND INFORMATION

### Item 1.  General Information

Corporation's Full Name

_____

Primary Business Address _____

From (Date) _____

Telephone No. _____ Fax No.

_____

 E-Mail Address_____ Internet Home
Page_____

 All other current addresses & previous addresses for past five years, including post office boxes and mail drops:

 Address_____
From/Until_____

 Address_____
From/Until_____

 Address_____
From/Until_____

 All predecessor companies for past five years:

 Name & Address _____
From/Until _____

 Name & Address _____
From/Until _____

 Name & Address _____

3                                                         Initials _____     _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

From/Until _____

## Item 2.   Legal Information

Federal Taxpayer ID No. _____ State & Date of Incorporation
_____

State Tax ID No. _____ State _____ Profit or Not For Profit
_____

Corporation's Present Status:   Active _____ Inactive _____
Dissolved _____

If dissolved: Date dissolved _____ By Whom
_____

Reasons
_____
_____

Fiscal Year-End (Mo./Day) _____ Corporation's Business Activities
_____

## Item 3.   Registered Agent

Name of Registered Agent
_____

Address _____ Telephone
No. _____

4                                                                Initials _____     _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

**Item 4.   Principal Stockholders**

List all persons and entities that own at least 5% of the corporation's stock.

Name                          Address                                      % Owned

_____        _____        _____

_____        _____        _____

_____        _____        _____

**Item 5.   Board Members**

List all members of the corporation's Board of Directors.

Name                          Address                                      % Owned    Term
(From/Until)

_____        _____        _____

      _____

_____        _____        _____

      _____

_____        _____        _____

      _____

**Item 6.   Officers**

List all of the corporation's officers, including de facto officers (individuals with significant management responsibility whose titles do not reflect the nature of their positions).

Name                          Address                                      % Owned

_____        _____        _____

_____        _____        _____

5                                                    Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

_____    _____  _____

## Item 7.   Businesses Related to Corporation

List all corporations, partnerships, and other business entities in which this corporation has an ownership interest.

Name                              Address                          Business Activities
    % Owned

_____    _____  _____

   _____  _____

_____    _____

   _____  _____

_____    _____

   _____  _____

State which of these businesses, if any, has ever transacted business with the corporation
_____

6                                                        Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

**Item 8**.    **Businesses Related to Individuals**

List all corporations, partnerships, and other business entities in which the corporation's principal stockholders, board members, or officers (i.e., the individuals listed in Items 4 - 6 above) have an ownership interest.

Individual's Name                    Business Name              Address                    Business Activities
    % Owned

_____          _____          _____
    _____

_____          _____
    _____

_____          _____
    _____

State which of these businesses, if any, have ever transacted business with the corporation
_____

**Item 9**.    **Related Individuals**

List all related individuals with whom the corporation has had any business transactions during the three previous fiscal years and current fiscal year-to-date.   A "related individual" is a spouse, sibling, parent, or child of the principal stockholders, board members, and officers (i.e., the individuals listed in Items 4 - 6 above).

Name                                   Address                    Relationship
    Business Activities

_____          _____          _____  \_\_\_\_\_
    _____

_____          _____          _____
    _____

_____          _____          _____
    _____

Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

**Item 10.**   **Outside Accountants**

List all outside accountants retained by the corporation during the last three years.

Name                          Firm Name                      Address
    CPA/PA?

_____    _____        _____

    _____  _____

_____    _____

    _____  _____

_____    _____

    _____  _____

**Item 11.**   **Corporation's Recordkeeping**

List all individuals within the corporation with responsibility for keeping the corporation's financial books and records for the last three years.

Name                          Address                        Telephone Number      Position(s) Held

_____    _____        _____    \_\_\_\_\_

    _____

_____    _____        _____    \_\_\_\_\_

    _____

_____    _____        _____    \_\_\_\_\_

    _____

8                                                    Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

## <u>Item 12</u>.    Attorneys

List all attorneys retained by the corporation during the last three years.

Name                              Firm Name                          Address

_____    _____

_____

_____    _____

_____

_____    _____

_____

## <u>Item 13</u>.    Pending Lawsuits Filed By Corporation

List all pending lawsuits that have been filed by the corporation in court or before an administrative agency.
(List lawsuits that resulted in final judgments or settlements in favor of the corporation in Item 25).

Opposing Party's Name &
Address_____

Court's Name &
Address_____
_____

Docket No._____Relief Requested_____Nature of
Lawsuit_____

_____
Status_____

Opposing Party's Name &
Address_____

Court's Name &
Address_____

9                                                                    Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

_____

Docket No._____ Relief Requested_____ Nature of
Lawsuit_____

_____
Status_____

Opposing Party's Name &
Address_____

Court's Name &
Address_____

_____

Docket No._____ Relief Requested_____ Nature of
Lawsuit_____

_____
Status_____

Opposing Party's Name &
Address_____

Court's Name &
Address_____

_____

Docket No._____ Relief Requested_____ Nature of
Lawsuit_____

_____
Status_____

Opposing Party's Name &
Address_____

Court's Name &

10                                                              Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

Address_____

_____

Docket No._____ Relief Requested_____ Nature of
Lawsuit_____

_____
Status_____

Opposing Party's Name &
Address_____

Court's Name &
Address_____

_____

Docket No._____ Relief Requested_____ Nature of
Lawsuit_____

_____
Status_____

## <u>Item 14</u>.   **Current Lawsuits Filed Against Corporation**

List all pending lawsuits that have been filed against the corporation in court or before an
administrative agency.
(List lawsuits that resulted in final judgments, settlements, or orders in Items 26 - 27).

Opposing Party's Name &
Address_____

Court's Name &
Address_____

_____

Docket No._____ Relief Requested_____ Nature of
Lawsuit_____

11                                                              Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

_____

Status_____

Opposing Party's Name &
Address_____

Court's Name &
Address_____
_____

Docket No._____Relief Requested_____Nature of
Lawsuit_____

_____

Status_____

Opposing Party's Name &
Address_____

Court's Name &
Address_____
_____

Docket No._____Relief Requested_____Nature of
Lawsuit_____

_____

Status_____

Opposing Party's Name &
Address_____

Court's Name &
Address_____
_____

Docket No._____Relief Requested_____Nature of
Lawsuit_____

12                                                      Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

_____

Status_____

Opposing Party's Name &
Address_____

Court's Name &
Address_____
_____

Docket No._____ Relief Requested_____ Nature of
Lawsuit_____

_____

Status_____

Opposing Party's Name &
Address_____

Court's Name &
Address_____
_____

Docket No._____ Relief Requested_____ Nature of
Lawsuit_____

_____

Status_____

## <ins>Item 15</ins>.    **Bankruptcy Information**

List all state insolvency and federal bankruptcy proceedings involving the corporation.

Commencement Date _____ Termination Date _____ Docket No.
_____

If State Court: Court & County _____ If Federal Court: District

13                                                        Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

_____

Disposition

_____
_____

**<u>Item 16</u>.    Safe Deposit Boxes**

List all safe deposit boxes, located within the United States or elsewhere, held by the
        corporation, or held by others for the
benefit of the corporation. On a separate page, describe the contents of each box.

Owner's Name                    Name and Address of Depository Institution Box No.

_____          _____ _____

_____          _____ _____

_____          _____ _____

14                                                      Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

# FINANCIAL INFORMATION

**REMINDER: When an Item asks for information about assets or liabilities "held by the corporation," include ALL such assets and liabilities, located within the United States or elsewhere, held by the corporation or held by others for the benefit of the corporation.**

## Item 17.    Tax Returns

List all federal and state corporate tax returns filed for the last three complete fiscal years. Attach copies of all returns.

| Federal/State/Both | Tax Year | Tax Due Federal | Tax Paid Federal | Tax Due State | Tax Paid State | Preparer's Name |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

## Item 18.    Financial Statements

List all financial statements that were prepared for the corporation's last three complete fiscal years and for the current fiscal year-to-date.  *Attach copies of all statements, providing audited statements if available.*

| Year | Balance Sheet | Profit and Loss Statement | Cash Flow Statement | Changes in Owner's Equity | Audited? |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

15                                                        Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

16                                          Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

<u>**Item 19**</u>.    **Financial Summary**

For each of the last three complete fiscal years and for the current fiscal year-to-date for which the corporation has not provided a profit and loss statement in accordance with Item 18 above, provide the following summary financial information.

|  | Current Year-to-Date | 1 Year Ago | 2 Years Ago | 3 Years Ago |
|---|---|---|---|---|
| <u>Gross Revenue</u> | $ | $ | $ | $ |
| <u>Expenses</u> | $ | $ | $ | $ |
| <u>Net Profit After Taxes</u> | $ | $ | $ | $ |
| <u>Payables</u> | $ | | | |
| <u>Receivables</u> | $ | | | |

<u>**Item 20**</u>.    **Cash, Bank, and Money Market Accounts**

List cash and all bank and money market accounts, including but not limited to, checking accounts, savings accounts, and certificates of deposit, held by the corporation.   The term "cash" includes currency and uncashed checks.

Cash on Hand $_____ Cash Held for the Corporation's Benefit $_____

| Name & Address of Financial Institution | Signator(s) on Account | Account No. | Current Balance |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

<u>**Item 21**</u>.    **Government Obligations and Publicly Traded Securities**

Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

List all U.S. Government obligations, including but not limited to, savings bonds, treasury bills, or treasury notes, held by the corporation. Also list all publicly traded securities, including but not limited to, stocks, stock options, registered and bearer bonds, state and municipal bonds, and mutual funds, held by the corporation.

Issuer _____ Type of Security/Obligation _____

No. of Units Owned _____ Current Fair Market Value $_____ Maturity Date _____

Issuer _____ Type of Security/Obligation _____

No. of Units Owned _____ Current Fair Market Value $_____ Maturity Date _____

18                                          Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

## Item 22.   Real Estate

List all real estate, including leaseholds in excess of five years, held by the corporation.

Type of Property_____ Property's
Location_____

Name(s) on Title and Ownership
Percentages_____

Current Value $_____ Loan or Account No.
_____

Lender's Name and
Address_____
____

Current Balance On First Mortgage $_____ Monthly Payment $_____

Other Loan(s) (describe)_____ Current
Balance $_____

Monthly Payment $_____ Rental Unit?_____ Monthly Rent
Received $_____

Type of Property_____ Property's
Location_____

Name(s) on Title and Ownership
Percentages_____

Current Value $_____ Loan or Account No.
_____

Lender's Name and
Address_____
____

19                                         Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

Current Balance On First Mortgage $_____ Monthly Payment $_____

Other Loan(s) (describe)_____ Current
Balance $_____

Monthly Payment $_____ Rental Unit?_____ Monthly Rent
Received $_____

## Item 23.   Other Assets

List all other property, by category, with an estimated value of $2,500 or more, held by the
corporation, including but not limited to, inventory, machinery, equipment, furniture, vehicles,
customer lists, computer software, patents, other
intellectual property, cryptocurrencies., and other virtual currencies.

| Property Category | Property Location | Acquisition Cost | Current Value |
|---|---|---|---|
| $_____ $_____ | _____ | | |
| $_____ $_____ | _____ | | |
| $_____ $_____ | _____ | | |
| $_____ $_____ | _____ | | |
| $_____ $_____ | _____ | | |

20                                                    Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

## Item 24.    Trusts and Escrows

List all persons and other entities holding funds or other assets that are in escrow or in trust for the corporation.

| Trustee or Escrow Agent's | Description and Location of Assets |
| Present Market | |
| Name & Address | Value of Assets |

_____
_____ $_____

_____
_____ $_____

_____
_____ $_____

_____
_____ $_____

_____
_____ $_____

_____
_____ $_____

_____
_____ $_____

## Item 25.    Monetary Judgments and Settlements Owed To the Corporation

List all monetary judgments and settlements, recorded and unrecorded, owed to the corporation.

Opposing Party's Name &
Address_____

21                                                   Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

Court's Name & Address_____
Docket No._____

Nature of Lawsuit_____ Date of Judgment_____
Amount $_____

Opposing Party's Name &
Address_____

Court's Name & Address_____
Docket No._____

Nature of Lawsuit_____ Date of Judgment_____
Amount $_____

## __Item 26__.   Monetary Judgments and Settlements Owed By the Corporation

List all monetary judgments and settlements, recorded and unrecorded, owed by the corporation.

Opposing Party's Name &
Address_____

Court's Name & Address_____
Docket No._____

Nature of Lawsuit_____ Date_____
Amount $_____

Opposing Party's Name &
Address_____

Court's Name & Address_____
Docket No._____

Nature of Lawsuit_____ Date of Judgment_____
Amount $_____

22                                                          Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

Opposing Party's Name &
Address_____

Court's Name & Address_____
Docket No._____

Nature of Lawsuit_____ Date of Judgment_____
Amount $_____

Opposing Party's Name &
Address_____

Court's Name & Address_____
Docket No._____

Nature of Lawsuit_____ Date of Judgment_____
Amount $_____

Opposing Party's Name &
Address_____

Court's Name & Address_____
Docket No._____

Nature of Lawsuit_____ Date of Judgment_____
Amount $_____

## <u>Item 27</u>.   Government Orders and Settlements

List all existing orders and settlements between the corporation and any federal or state
government entities.

Name of Agency _____ Contact Person
_____

Address _____ Telephone
No. _____

23                                                          Initials _____    _____

Att. B<br>
To Proposed TRO<br>
[Filed Under Temporary Seal]

Agreement Date _____ Nature of Agreement

_____

## Item 28.   Credit Cards

List all of the corporation's credit cards and store charge accounts and the individuals authorized to use them.

Name of Credit Card or Store                    Names of Authorized Users and Positions
Held

_____

    _____

_____

    _____

_____

    _____

24                                                                Initials _____      _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

**<u>Item 29</u>.    Compensation of Employees**

List all compensation and other benefits received from the corporation by the five most highly compensated employees, independent contractors, and consultants (other than those individuals listed in Items 5 and 6 above), for the two previous fiscal years and current fiscal year-to-date. "Compensation" includes, but is not limited to, salaries, commissions, consulting fees, bonuses, dividends, distributions, royalties, pensions, and profit sharing plans.    "Other benefits" include, but are not limited to, loans, loan payments, rent, car payments, and insurance premiums, whether paid directly to the individuals, or paid to others on their behalf.

Name/Position                          Current Fiscal              1 Year Ago  2 Years Ago
     Compensation or
                Year-to-Date                                              Type of Benefits

_____    $_____    $_____    $_____
_____

_____    $_____    $_____    $_____
_____

_____    $_____    $_____    $_____
_____

_____    $_____    $_____    $_____
_____

_____    $_____    $_____    $_____
_____

**<u>Item 30</u>.    Compensation of Board Members and Officers**

List all compensation and other benefits received from the corporation by each person listed in Items 5 and 6, for the current fiscal year-to-date and the two previous fiscal years. "Compensation" includes, but is not limited to, salaries, commissions, consulting fees, dividends, distributions, royalties, pensions, and profit sharing plans.    "Other benefits" include, but are not limited to, loans, loan payments, rent, car payments, and insurance premiums, whether paid directly to the individuals, or paid to others on their behalf.

25                                                              Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

Name/Position        Current Fiscal        1 Year Ago 2 Years Ago
      Compensation or
           Year-to-Date                  Type of Benefits

_____ $_____ $_____ $_____
_____

_____ $_____ $_____ $_____
_____

_____ $_____ $_____ $_____
_____

_____ $_____ $_____ $_____
_____

_____ $_____ $_____ $_____
_____

_____ $_____ $_____ $_____
_____

_____ $_____ $_____ $_____
_____

26                                        Initials _____ _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

**Item 31.**    **Transfers of Assets Including Cash and Property**

List all transfers of assets over $2,500 made by the corporation, other than in the ordinary course of business, during the previous three years, by loan, gift, sale, or other transfer.

| Transferee's Name, Address, & Relationship | Type of Transfer (e.g., Loan, Gift) | Property Transferred | Aggregate Value | Transfer Date |
|---|---|---|---|---|

_____    _____ $_____

_____ _____

_____    _____ $_____

_____ _____

_____    _____ $_____

_____ _____

_____    _____ $_____

_____ _____

_____    _____ $_____

_____ _____

**Item 32.**    **Foreign Assets and Liabilities**

Does the corporation have, in any location outside of the United States, any assets not otherwise identified in this disclosure (including but not limited to real estate, bank accounts, investments, or other financial products)?

Yes/No

Does the corporation have, in any location outside of the United States, any liabilities not otherwise identified in this disclosure (including but not limited to liens, credit card debt, or other financial obligations)?

Yes/No

27                                                                                    Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

If yes, please separately list below each asset and liability category, their location, the acquisition cost and current value.   Please include a copy of all Reports of Foreign Bank and Financial Accounts (FBAR) filings.

| Asset Category | Asset Location | Acquisition Cost | Current Value |
|---|---|---|---|

_____    _____

$_____ $_____

_____    _____

$_____ $_____

_____    _____

$_____ $_____

_____    _____

$_____ $_____

| Liability Category | Liability Location | | |
| Acquisition | Current | | |
| | | Cost | Value |

_____    _____

$_____ $_____

_____    _____

$_____ $_____

_____    _____

$_____ $_____

_____    _____

$_____ $_____

28                                                          Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

**Item 33.    Foreign Positions**

Does the corporation hold any corporate office or partnership in any entity located outside the United States?       Yes/No
Is the corporation the trustee of any trust or similar entity outside the United States?
            Yes/No

If yes to any of the above, please separately list below the name of the entity or trust and the country under which such entity or trust is located. Please include a copy of all organizing documents for each such corporation, partnership or trust.

Name of the Entity or Trust                              Country

_____
_____

_____
_____

_____
_____

_____
_____

**Item 34.    Credit Report**

Provide a copy of the corporation's most recent credit report, within the last 60 days upon receipt of this form, from a credit bureau.

**Item 35.    Documents Attached to Financial Disclosure Form**

Indicate whether the below documents are being submitted with the financial disclosure form.

| Item 17. | Tax Returns | Yes/No |
|---|---|---|
| Item 18. | Financial Statements | Yes/No |
| Item 32. | Reports of Foreign Bank & Financial Account Filings | |

29                                                              Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

_____ Yes/No

Item 33.              Credit Report                                        Yes/No

List any other documents and forms as well as the item number, in the financial form, the document relates to and a description of the document.

Item No. Document          Description of Document
Relates To

_____

                  _____

_____

                  _____

_____

                  _____

_____

                  _____

_____

                  _____

_____

                  _____

Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

**WARNING**:

"The Corporation" submits this financial disclosure form with the understanding that it may affect action by the Bureau of Consumer Financial Protection or a federal court. The responses the Corporation has provided to the items above are true and contain all the requested facts and information of which the Corporation has notice or knowledge. The Corporation has provided all requested documents in its custody, possession, or control. The Corporation further declares that it has no assets, owned either directly or indirectly, or income of any nature other than as shown in, or attached to, this statement. The Corporation understands that the Bureau of Consumer Financial Protection is a federal agency and that this financial disclosure form is being submitted in connection with a matter within its jurisdiction. The Corporation understands that a false, fictitious, or fraudulent statement or representation on this form, or the concealment of any material fact is a violation of Federal law and could result in criminal prosecution, and significant civil penalties. The Corporation understands that a false statement is punishable under 18 U.S.C. §§ 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000.

Executed on:

_____

_____

(Date)                                                          Signature

                                                          _____

                                                          [Name of Chief Executive Officer, Chief
                                                          Executive Officer of [name of
                                                          respondent/corporation]

Executed on:

_____

_____

(Date)                                                          Signature

                                                          _____

                                                          [Name of Chief Financial Officer, Chief
                                                          Financial Officer of [name of
                                                          respondent/corporation]

31                                                          Initials _____      _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

32                                                            Initials _____    _____

Att. B
To Proposed TRO
[Filed Under Temporary Seal]

**Attachment C**

**Consent to Release of Financial Records**

I,_____, of
_____(City, State), do hereby
direct any bank, saving and loan association, credit union, depository institution,
finance company, commercial lending company, credit card processor, credit card
processing entity, automated clearing house, network transaction processor, bank
debit processing entity, brokerage house, escrow agent, money market or mutual
fund, title company, commodity trading company, trustee, or person that holds,
controls, or maintains custody of assets, wherever located, that are owned or
controlled by me or at which there is an account of any kind upon which I am
authorized to draw, and its officers, employees, and agents, to disclose all
information and deliver copies of all documents of every nature in its possession or
control which relate to the said accounts to any attorney of the Bureau of
Consumer Financial Protection, and to give evidence relevant thereto, in the matter
of the Bureau of Consumer Financial Protection *et al.*, v. Consumer Advocacy
Center Inc., *et al.*, now pending in the United States District Court for the Central
District of California, and this shall be irrevocable authority for so doing.

This direction is intended to apply to the laws of countries other than the Unites
States of America which restrict or prohibit disclosure of bank or other financial
information without the consent of the holder of the account, and shall be
construed as consent with respect hereto, and the same shall apply to any of the
accounts for which I may be a relevant principal.

Dated:_____

Signature:_____

Printed Name:_____

# EXHIBIT "B"

Case 8:19-cv-01998-JVS-JDE   Document 2   Filed 10/21/19   Page 1 of 49   Page ID #:11

1 │ **BUREAU OF CONSUMER FINANCIAL PROTECTION**
SARAH PREIS (D.C. Bar No. 997387)
2 │ (*Pro Hac Vice application pending*)
Tel.: (202)-435-9318 / Email: sarah.preis@cfpb.gov
3 │ JESSE STEWART (N.Y. Bar No. 5145495)          **8:19-cv-01998 JVS (JDEx)**
(*Pro Hac Vice application pending*)
4 │ Tel: (202)-435-9651 / Email: jesse.stewart@cfpb.gov
1700 G Street, NW
5 │ Washington, DC 20552
Fax: (202) 435-5471
6 │
7 │ LEANNE E. HARTMANN (CA Bar No. 264787)
(Local Counsel for the Bureau of Consumer Financial Protection)
8 │ 301 Howard Street, Suite 1200
San Francisco, CA 94105
9 │ Email: leanne.hartmann@cfpb.gov/Fax: (415) 844-9788

*Attorneys for Plaintiffs the Bureau of Consumer Financial Protection*
10 │
11 │ **THE STATE OF MINNESOTA**
EVAN ROMANOFF (Attorney Reg. No. 0398223)
12 │ (*Pro Hac Vice application pending*)
Assistant Attorney General
445 Minnesota Street, Suite 1200
13 │ St. Paul, MN 55101-2130
Tel.: (651) 757-1454/Email: evan.romanoff@ag.state.mn.us
14 │
15 │ *Attorneys for Plaintiff the State of Minnesota*

16 │ **THE STATE OF NORTH CAROLINA**
M. LYNNE WEAVER (N.C. Bar No. 19397)
17 │ (*Pro Hac Vice application pending*)
MICHAEL T. HENRY (N.C. Bar No. 35338)
18 │ (*Pro Hac Vice application pending*)
North Carolina Department of Justice
19 │ 114 W. Edenton Street
Raleigh, NC 27602
20 │ Tel.: (919) 716-6000 / Fax: (919) 716-6050
Emails: lweaver@ncdoj,gov/mhenry@ncdoj.gov

21 │ *Attorneys for Plaintiff the State of North Carolina*

22 │ **THE PEOPLE OF THE STATE OF CALIFORNIA**
MICHAEL N. FEUER, City Attorney (CA Bar No. 111529)
23 │ MARY CLARE MOLIDOR, Chief Assistant City Attorney, (CA Bar No. 82404)
CHRISTINA V. TUSAN, Supervising Deputy City Attorney (CA Bar No. 192203)
24 │ OFFICE OF THE CITY ATTORNEY
200 N. Main Street, 500 City Hall East
25 │ Los Angeles, California 90012-4131
Tel: (213) 978-8707/Fax: (213) 978-8112
26 │ Emails: christina.tusan@lacity.org / william.pletcher@lacity.org

27 │ *Attorneys for Plaintiff the People of the State of California*

28 │ //

ORIGINAL                     I/s

No Fee

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

**BUREAU OF CONSUMER FINANCIAL PROTECTION**
SARAH PREIS (D.C. Bar No. 997387)
(*Pro Hac Vice application pending*)
Tel.: (202)-435-9318 / Email: sarah.preis@cfpb.gov
JESSE STEWART (N.Y. Bar No. 5145495)
(*Pro Hac Vice application pending*)
Tel: (202)-435-9651 / Email: jesse.stewart@cfpb.gov
1700 G Street, NW
Washington, DC 20552
Fax: (202) 435-5471

LEANNE E. HARTMANN (CA Bar No. 264787)
(Local Counsel for the Bureau of Consumer Financial Protection)
301 Howard Street, Suite 1200
San Francisco, CA 94105
Email: leanne.hartmann@cfpb.gov/Fax: (415) 844-9788

*Attorneys for Plaintiffs the Bureau of Consumer Financial Protection*

**THE STATE OF MINNESOTA**
EVAN ROMANOFF (Attorney Reg. No. 0398223)
(*Pro Hac Vice application pending*)
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel.: (651) 757-1454/Email: evan.romanoff@ag.state.mn.us

*Attorneys for Plaintiff the State of Minnesota*

**THE STATE OF NORTH CAROLINA**
M. LYNNE WEAVER (N.C. Bar No. 19397)
(*Pro Hac Vice application pending*)
MICHAEL T. HENRY (N.C. Bar No. 35338)
(*Pro Hac Vice application pending*)
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27602
Tel.: (919) 716-6000 / Fax: (919) 716-6050
Emails: lweaver@ncdoj,gov/mhenry@ncdoj.gov

*Attorneys for Plaintiff the State of North Carolina*

**THE PEOPLE OF THE STATE OF CALIFORNIA**
MICHAEL N. FEUER, City Attorney (CA Bar No. 111529)
MARY CLARE MOLIDOR, Chief Assistant City Attorney, (CA Bar No. 82404)
CHRISTINA V. TUSAN, Supervising Deputy City Attorney (CA Bar No. 192203)
OFFICE OF THE CITY ATTORNEY
200 N. Main Street, 500 City Hall East
Los Angeles, California 90012-4131
Tel: (213) 978-8707/Fax: (213) 978-8112
Emails: christina.tusan@lacity.org / william.pletcher@lacity.org

*Attorneys for Plaintiff the People of the State of California*

//

1

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection; State of Minnesota, by its Attorney General, Keith Ellison; State of North Carolina, *ex rel.* Joshua H. Stein, Attorney General; and The People of The State of California, Michael N. Feuer, Los Angeles City Attorney, | ) Case No: <br> ) <br> ) **COMPLAINT** <br> ) <br> ) **[FILED UNDER TEMPORARY** <br> ) **SEAL]** <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| v. | ) <br> ) |
| Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center; True Count Staffing Inc., d/b/a SL Account Management; Prime Consulting LLC, d/b/a Financial Preparation Services; Albert Kim, a/k/a Albert King; Kaine Wen, a/k/a Wenting Kaine Dai, Wen Ting Dai, and Kaine Wen Dai; and Tuong Nguyen, a/k/a Tom Nelson, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| Defendants, and | ) <br> ) |
| Infinite Management Corp., f/k/a Infinite Management Solutions Inc.; Hold The Door, Corp.; and TN Accounting Inc., | ) <br> ) <br> ) <br> ) <br> ) |
| Relief Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## INTRODUCTION

1.     The Bureau of Consumer Financial Protection (Bureau) brings this action under §§ 1031, 1036(a), 1054, and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564 & 5565; and under and the Telemarketing and Consumer Fraud and Abuse Prevention Act (Telemarketing Act), 15 U.S.C. §§ 6101-6108, and its implementing regulation, the Telemarketing Sales Rule

(TSR), 16 C.F.R. Part 310. The Bureau brings this action in connection with the offer and sale of debt-relief services by Defendants Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center; True Count Staffing Inc., d/b/a SL Account Management; Prime Consulting LLC, d/b/a Financial Preparation Services (collectively, Student Loan Debt Relief Companies); and Defendants Albert Kim, Kaine Wen, and Tuong Nguyen (collectively, Individual Defendants).

2.    The State of Minnesota, by its Attorney General, brings this enforcement action to, among other things, obtain temporary, preliminary, and permanent injunctive relief, restitution, and civil penalties for Defendants' acts or practices in violation of the Minnesota Prevention of Consumer Fraud Act (MNCFA), Minn. Stat. §§ 325F.68-.694; the Minnesota Uniform Deceptive Trade Practices Act (MNDTPA), Minn. Stat. §§ 325D.43-.48; and the Telemarketing Act, 15 U.S.C. §§ 6101-6108, and its implementing regulation, the TSR, 16 C.F.R. Part 310, in connection with Defendants' offer and sale of student loan debt relief services.

3.    The State of North Carolina, by its Attorney General, brings this enforcement action to, among other things, obtain temporary, preliminary, and permanent injunctive relief, restitution, and civil penalties for Defendants' acts or practices in violation of North Carolina's Debt Adjusting Act, N.C. Gen. Stat. § 14-423, *et seq.*, (NCDAA); North Carolina's Unfair and Deceptive Practices Act, N.C. Gen. Stat. § 75-1.1 (NCUDPA); North Carolina's Telephonic Seller Registration Act, N.C. Gen. Stat. § 66-260, *et seq.* (NCTSRA); and the Telemarketing Act, 15 U.S.C. §§ 6101-6108, and its implementing regulation, the TSR, 16 C.F.R. Part 310, in connection with Defendants' offer and sale of student loan debt relief services.

4.    The People of the State of California (collectively with the States of Minnesota and North Carolina, "the States"), by and through Michael N. Feuer, Los Angeles City Attorney, bring this enforcement action to, among other things, obtain temporary, preliminary, and permanent injunctive relief, restitution, and civil penalties for Defendants' acts or practices in violation of California's Business and Professions

1  Code section 17200 et seq. (the "Unfair Competition Law," or "UCL") and the
2  Telemarketing Act, 15 U.S.C. §§ 6101-6108, and its implementing regulation, the TSR,
3  16 C.F.R. Part 310, in connection with Defendants' offer and sale of student loan debt
4  relief services.

5       5.    Defendants engage in an ongoing, unlawful student-loan debt-relief business
6  that harms consumers nationwide by charging consumers unlawful advance fees and
7  misrepresenting the terms and conditions of their services.

8       6.    The Bureau and the States bring this action to stop Defendants' unlawful
9  conduct, obtain relief for harmed consumers, and impose civil money penalties on
10 Defendants for their unlawful actions.

11      7.    The Bureau and the States also bring this action against Infinite Management
12 Corporation, Hold the Door, Corp., and TN Accounting Inc., as Relief Defendants.

13                                  **OVERVIEW**

14      8.    Since at least 2015, Defendants have operated a debt-relief enterprise that
15 has deceived thousands of federal-student-loan borrowers and collected over $71 million
16 in illegal advance fees, in violation of the TSR, the CFPA, the MNCFA, the MNDTPA,
17 the NCDAA, the NCUDPA, the NCTSRA, and the UCL. Unless otherwise noted, all
18 references to "borrowers" and "consumers" in this Complaint include California,
19 Minnesota, and North Carolina borrowers and consumers.

20      9.    Defendants purported to help federal-student-loan borrowers obtain loan
21 forgiveness or lower monthly payments through programs administered by the U.S.
22 Department of Education (DOE).

23      10.   In fact, Defendants deceived consumers, including by misrepresenting that
24 consumers would qualify for loan forgiveness in a matter of months, when forgiveness
25 takes at least 10 years of on-time payments and is determined by DOE; that consumers
26 were approved for lower monthly payments on their student loans, when consumers had
27 not yet been approved or when the new payment amount was approved based on false
28 information; and that consumers' lower payments would be permanent when in fact they

are subject to change based on changes in the consumers' family size, income, and marital status.

11.    Defendants also falsely told consumers, or led consumers to believe, that the consumers' payments to the companies would go toward paying consumers' student loan balances.

12.    When describing the services offered to consumers, Defendants failed to inform consumers that it was their practice to request that consumers' loans be placed into forbearance or that interest would continue to accrue during the forbearance period, thereby increasing consumers' overall loan balances.

13.    When describing the services offered to consumers, Defendants failed to inform consumers that it was their practice to submit false information about consumers' income, family size, and marital status on loan adjustment applications in order to try to qualify consumers for lower monthly payments.

14.    Defendants charged consumers an initial fee, typically totaling about $900-$1,300 for Defendants' services. This initial fee was typically levied well before consumers had been accepted to and made a payment under their new loan agreement, in violation of the TSR.

15.    Defendants conducted this operation using a network of several interrelated companies and over a dozen unregistered and fictitious business names. These entities operated as a common enterprise controlled by the individual defendants, rendering each jointly and severally liable for the illegal acts of all Defendants.

## JURISDICTION AND VENUE

16.    This Court has subject-matter jurisdiction over this action because it is brought under federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345. This Court has supplemental jurisdiction over the States' claims pursuant to 28 U.S.C. § 1367.

17.    Venue is proper in this district pursuant to 12 U.S.C. § 5564(f) because

Defendants are located, reside, or do business in this district.

## PARTIES

18.    The Bureau is an independent agency charged with enforcing violations of Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority, 12 U.S.C. § 5564(a)-(b), including the authority to enforce the CFPA's prohibitions on unfair, deceptive, and abusive acts or practices, 12 U.S.C. §§ 1031, 1036, and the TSR as it applies to persons subject to the CFPA, 15 U.S.C. §§6102(c), 6105(d).

19.    The Bureau has authority to bring civil actions against persons violating federal consumer-financial laws and to "seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law." 12 U.S.C. § 5564(a).

20.    Keith Ellison, Attorney General of the State of Minnesota, is authorized under Minnesota Statutes chapter 8; the MNCFA, Minn. Stat. § 325F.69, *et seq.*; the MNDTPA, Minn. Stat. § 325D.44, *et seq.*; the Telemarketing Act, 15 U.S.C. § 6103(a); and has common law authority, including *parens patriae* authority, to bring this action on behalf of the State of Minnesota and its citizens to enforce Minnesota law.

21.    The State of North Carolina is acting through its Attorney General Joshua H. Stein, pursuant to authority granted by Chapters 14, 66, 75, and 114 of the North Carolina General Statutes, and the Telemarketing Act, 15 U.S.C. § 6103(a).

22.    Michael N. Feuer, City Attorney for the City of Los Angeles, is authorized under California Business and Professions Code section 17200 et seq. (the "Unfair Competition Law," or "UCL") and the Telemarketing Act, 15 U.S.C. § 6103(a) and (f)(2), to bring this civil law enforcement action on behalf of the People of the State of California.

23.    Defendant Consumer Advocacy Center Inc. (CAC) is a California corporation formed on August 6, 2014, and it has held itself out as doing business at the following addresses: 173 Technology Drive, Suite 202, Irvine, CA 92618; 29901 Santa

COMPLAINT [FILED UNDER TEMPORARY SEAL]

1  Margarita Pkwy, Suite 200F, Rancho Santa Margarita, CA 92688; 8 Hughes Parkway,
2  Irvine, CA 92618; 5350 E Suncrest Rd., Anaheim, CA 92807; and 24852 Acropolis Dr.,
3  Mission Viejo, CA 92691.

4       24.    CAC has held itself out as doing business as Premier Student Loan Center.

5       25.    CAC has transacted its student-loan debt-relief business in the Central
6  District of California since at least November 2015.

7       26.    On January 16, 2019, CAC filed for protection under chapter 11 of the
8  Bankruptcy Code in the United States Bankruptcy Court for the Southern District of
9  Florida. *See In re Consumer Advocacy Center, Inc.*, No. 19-10655-BKC-JKO (Bankr.
10 S.D. Fla.).

11      27.    Defendant True Count Staffing Inc. (True Count) registered as a California
12 corporation on February 13, 2017, and it has held itself out as doing business at the
13 following addresses: 173 Technology Dr., Ste 202, Irvine, CA 92618; 777 E. Sierra
14 Madre Ave, Azusa, CA 91702; 8 Hughes Parkway, Irvine, CA 92618; and 7545 Irvine
15 Center Drive, Suite 200, PMB #108, Irvine, CA, 92618.

16      28.    True Count has held itself out as doing business as SL Account
17 Management.

18      29.    Defendant Prime Consulting LLC (Prime) is a Wyoming limited-liability
19 company that registered with the California Secretary of State on April 25, 2018, and it
20 has held itself out as doing business at 11932 Klingerman Street, Suite 3, El Monte, CA,
21 91732 and 7545 Irvine Center Drive, Suite 200, Room 108, Irvine, CA, 92618.

22      30.    Prime has held itself out as doing business as Financial Preparation Services.

23      31.    Defendant Albert Kim (a/k/a Albert King) is CAC's primary owner and
24 founder. Kim is a resident of the State of California and performed work for CAC while
25 residing in this jurisdiction.

26      32.    Kim exercised substantial control over CAC's business practices.

27      33.    Kim exercised managerial responsibility for CAC and participated in the
28 conduct of its affairs.

COMPLAINT [FILED UNDER TEMPORARY SEAL]

34.    Defendant Kaine Wen (a/k/a Wenting Kaine Dai, Wen Ting Dai) is True Count's primary owner and founder and has also been an owner and manager of CAC. Wen incorporated True Count and has served as its chief executive officer, director, partner, and president.

35.    Wen exercised substantial control over True Count's business practices.

36.    Wen exercised managerial responsibility for True Count and participated in the conduct of its affairs.

37.    Wen exercised managerial responsibility for CAC and participated in the conduct of its affairs.

38.    Defendant Tuong Nguyen (a/k/a Tom Nelson) served as CAC's controller and as True Count's secretary.

39.    Nguyen exercised managerial responsibility for CAC and participated in the conduct of its affairs.

40.    Nguyen exercised managerial responsibility for True Count and participated in the conduct of its affairs.

41.    Relief Defendant Infinite Management Corp., f/k/a Infinite Management Solutions Inc. (Infinite Management) registered as a California corporation on September 8, 2016, and it has held itself out as doing business at 9228 City Lights Drive, Aliso Viejo, CA, 92656.

42.    Kim served as Infinite Management's registered agent and president, and he is the sole signatory on a bank account belonging to it.

43.    Relief Defendant Hold the Door Corp. (Hold the Door) registered as a California corporation on December 30, 2016, and it listed its address as 777 E. Sierra Madre Ave, Azusa, CA 91702. It described its business type as "consulting services" in corporate filings with the California Secretary of State.

44.    Hold the Door was incorporated by Wen, and he has served as its sole corporate officer.

45.    Relief Defendant TN Accounting Inc. (TN Accounting) is a California

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

corporation that filed its Articles of Incorporation with the California Secretary of State on February 8, 2017, and it has listed its principal place of business address of 1704 S. Granada Ave, Alhambra, CA 91801 in corporate filings with the Secretary of State.

46.     Nguyen has served as TN Accounting's president and sole corporate officer.

## FACTS

### Student Loan Forgiveness and Repayment Programs

47.     DOE administers several federal student-loan repayment programs. Some potentially offer lower monthly loan payments. Others allow consumers who make the requisite qualifying payments over a period ranging from 10 to 25 years (and who meet other eligibility criteria) to obtain loan forgiveness.

48.     One such program is the income-driven repayment (IDR) program. IDR plans may lower consumers' monthly payments to more affordable amounts based on the consumers' income and family size. Consumers enrolled in IDR plans who make qualifying payments may also have their outstanding student-loan balances forgiven after 20-25 years.

49.     Under another program, the Public Service Loan Forgiveness program, consumers who work full-time for a qualifying public-service employer, make 120 qualifying payments, and meet other eligibility criteria, can apply to have their outstanding student-loan balances forgiven after 10 years.

50.     Because a borrower's income and family size can fluctuate over the life of the loan, consumers are required to recertify their eligibility for IDR programs on an annual basis. Variables such as marital status and tax-filing status (single, married filing separately, married filing jointly) may affect how DOE calculates monthly payment amounts. As a result, monthly payments under the IDR programs can vary from year to year.

### The Student Loan Debt Relief Companies

51.     CAC began offering student-loan debt-relief services purporting to lower consumers' monthly loan payments and obtain loan forgiveness through enrollment in

1  loan forgiveness or IDR plans as early as November 2015.

2  52.    Initially, CAC's internal structure included sales, processing, and customer-
3  service departments.

4  53.    The sales department fielded incoming consumer calls, made outbound
5  marketing calls, and enrolled consumers in the Student Loan Debt Relief Companies'
6  services by providing consumers with contracts for electronic signature during sales calls.

7  54.    The processing department charged consumers the initial advance fees, and
8  prepared and submitted forbearance, loan-consolidation, and IDR requests to consumers'
9  student-loan servicers. The consumer's student-loan servicer then evaluated the requests.

10  55.    In March 2018, Kim and Wen moved CAC's processing and customer-
11  service operations into a new entity, True Count.

12  56.    As part of this shift, CAC's processing and customer-service departments
13  physically moved to a new office location.

14  57.    CAC continued to handle sales, while True Count took over preparing and
15  submitting loan-consolidation and IDR-plan applications and collecting payments from
16  consumers (including from consumers who had enrolled for services with CAC).

17  58.    As early as April 2018, CAC transferred its sales functions to a new entity,
18  Prime, which ultimately assumed CAC's role as the main sales company enrolling
19  consumers for True Count's services.

20  **Debt Relief Sales and Business Practices**

21  59.    The Student Loan Debt Relief Companies marketed their debt-relief services
22  through inbound and outbound calls, websites, social media, and direct mail.

23  60.    When consumers called the front-end sales company (CAC or Prime), the
24  consumer first spoke with a sales representative.

25  61.    Sales representatives instructed consumers on how to create an ID and
26  password for consumers' online accounts with Federal Student Aid (FSA), an office of
27  DOE, if the consumer had not previously done so. The sales representatives then
28  instructed the consumer to provide the sales representative with the consumer's FSA ID

and password.

62.    Sales representatives downloaded student-loan data from the consumer's online FSA account into the company's customer–relationship-management system.

63.    Sales representatives often stated that there was an urgent need to sign up for the respective Student Loan Debt Relief Company's services.

64.    For example, some sales representatives told consumers that they had a limited time in which they could apply for an IDR program.

65.    At times, sales representatives represented that the respective Student Loan Debt Relief Company was affiliated with DOE.

### Representations about Fees

66.    During sales calls, sales representatives made affirmative representations or material omissions about the purpose of the fees paid by consumers to the Student Loan Debt Relief Companies.

67.    Sales representatives frequently represented that the fees would be applied to the balance of consumers' student loans.

68.    In fact, all monies paid by the consumers to the Student Loan Debt Relief Companies were fees retained by the companies and were not remitted to student-loan servicers to be applied toward consumers' loan balances.

69.    Sales representatives frequently represented that fees paid to the Student Loan Debt Relief Companies would be the only payments consumers would owe on their student loans after being accepted into a DOE repayment program.

70.    In fact, the fees paid to the Student Loan Debt Relief Companies were in addition to, and did not relieve consumers of, their obligation to pay their student loans.

71.    Sales representatives frequently represented to consumers that the fees charged by the Student Loan Debt Relief Companies were necessary to participate and remain enrolled in a loan-forgiveness or IDR program.

72.    In fact, consumers can apply free of charge for loan forgiveness or IDR programs, either through their student-loan servicer or directly to the DOE.

73.    Moreover, consumers can recertify annually their eligibility to remain enrolled in their IDR plans through their student-loan servicer for free.

### Representations about Loan Forgiveness

74.    The Student Loan Debt Relief Companies' sales representatives often told consumers that they were qualified or approved for loan forgiveness.

75.    Sales representatives frequently represented to consumers that they can get consumers' student loans forgiven in whole or in part shortly after enrolling in the respective Student Loan Debt Relief Company's services.

76.    The DOE's loan forgiveness programs require anywhere from 10-25 years of qualifying payments, as well as satisfaction of other eligibility criteria, to qualify for loan forgiveness.

77.    Only the DOE can approve consumers for loan forgiveness.

78.    Because only the DOE can approve consumers for loan forgiveness, and only after a consumer makes qualifying monthly payments over a period ranging from 10 to 25 years, the Student Loan Debt Relief Companies' representations to consumers that all or part of their loans would be forgiven upon payment of enrollment fees were false.

### Representations about Lower Monthly Payments

79.    The Student Loan Debt Relief Companies' sales representatives often told consumers that they qualified or were approved for a specific lower monthly payment.

80.    In fact, the new, lower monthly payment amount identified by sales representatives was often calculated based on an incorrect family size, income, or marital status.

81.    Sales representatives often represented that consumers' lower monthly payment would be in place over the life of the loan.

82.    In fact, monthly payment amounts are determined by student loan servicers and can fluctuate year to year depending on changes in consumers' income, family size, or marital status, and it is therefore not possible to determine a set monthly payment for an IDR plan for the life of the loan.

**Preparing and Submitting Forbearance Requests and IDR Plan Applications**

83.    Following an initial sales call, consumers who purchased the Student Loan Debt Relief Companies' services were assigned to a company representative called a "processor."

84.    Processors conducted a "welcome call" during which they typically asked consumers for proof of income and, at times, verified certain information.

85.    Following the welcome call, processors submitted forbearance requests to student-loan servicers on behalf of consumers.

86.    Processors typically asked for a forbearance period of three months in the forbearance requests they submitted.

87.    If a servicer approves a forbearance request, the consumer is excused from making his or her monthly student loan payments during the period of forbearance. But interest on the consumer's student loan accrues during the period of forbearance and may be added to the principal balance.

88.    Typically, consumers were not informed during sales calls or the welcome call that processors would submit forbearance requests on their behalf.

89.    Typically, consumers were not informed during sales calls or the welcome call that interest on the consumer's student loan accrues during the period of forbearance and may be added to the principal balance.

90.    In fact, most consumers did not ask the Student Loan Debt Relief Companies for forbearance requests, and many consumers were not aware that the Student Loan Debt Relief Companies submitted forbearance requests to their student loan servicers on their behalf.

91.    Processors signed the forbearance requests in the consumer's name so that it appeared the request was submitted by the consumer.

92.    Many consumers were unaware the fees they paid to the Student Loan Debt Relief Companies were not paying down their student loans.

///

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

**Submitting Consolidation and IDR Requests with False Information**

93.    Processors submitted IDR applications to servicers on behalf of consumers with false information about consumers' income, family size, or marital status.

94.    For consumers who did not provide proof of income to the Student Loan Debt Relief Companies, processors frequently listed those consumers as unemployed on their IDR applications, even when the consumers were employed at the time.

95.    Processors frequently submitted IDR applications to consumers' student loan servicers that listed consumers' family sizes greater than the consumers' actual family size.

96.    Processors frequently submitted IDR applications to consumers' student loan servicers that listed consumers as single, even if the consumer had informed the Student Loan Debt Relief Companies that he or she was married.

97.    When submitting IDR applications to consumers' student loan servicers, processors typically changed consumers' email address to an email address created by the Student Loan Debt Relief Company in order to temporarily divert all email correspondence from the consumer's student-loan servicer to the Student Loan Debt Relief Company.

98.    When submitting IDR applications to consumers' student-loan servicers, processors typically changed consumers' mailing address to a mailing address used by the Student Loan Debt Relief Company in order to temporarily divert all postal mail from the consumer's student-loan servicer to the Student Loan Debt Relief Company.

99.    After receiving confirmation from a consumer's student loan servicer that a consumer's loan consolidation or IDR application had been approved, processors typically logged back into the consumer's loan account and changed the consumers email and mailing address back to the consumer's actual information.

100.   The Student Loan Debt Relief Companies' practice of diverting correspondence to consumers from the consumers' student-loan servicers helped conceal the Student Loan Debt Relief Companies' practice of submitting false information to

student loan servicers.

### Representations about and Collection of Fees from Consumers

101.    The Student Loan Debt Relief Companies typically collected enrollment fees from consumers before consumers had been approved for a loan consolidation or an IDR plan.

102.    The Student Loan Debt Relief Companies collected monthly fees, typically ranging from $10-$42, before submitting the consumer's corresponding annual IDR plan recertification.

103.    At all times material to this Complaint, the Student Loan Debt Relief Companies did not track whether consumers had made an initial payment on an adjusted loan.

104.    As early as April 2018, the Student Loan Debt Relief Companies' contracts began including a section entitled "No Advance Fees."

105.    The section of the Student Loan Debt Relief Companies' contract entitled "No Advance Fees" states that the company "does not take any advance fees from Client" and further provides that consumer fees will be held in an independent third party "trust account" and not paid to the company until the consumer "has received a consolidation, adjustment, or otherwise satisfactory result" and makes one payment "towards such."

106.    At all times material to this Complaint, the Student Loan Debt Relief Companies did not use trust accounts to hold fees collected from consumers before placing consumers into loan repayment plans.

107.    Rather, fees collected from consumers by the Student Loan Debt Relief Companies were directly deposited into the companies' bank accounts and commingled with company assets.

108.    The Defendants have collected over $71 million in illegal advance fees from thousands of consumers nationwide.

### Roles of the Individual Defendants

109.    Albert Kim (a/k/a Albert King) is CAC's primary owner and manager.

COMPLAINT [FILED UNDER TEMPORARY SEAL]

110.   Kim was in the office frequently and helped manage CAC's and True Count's day-to-day operations.

111.   Kim oversaw CAC's marketing.

112.   Kim signed CAC's merchant-account applications or agreements with at least three different payment processors.

113.   At times, Kim personally responded to consumers' complaints.

114.   Kim has controlled CAC's bank accounts, and he has been an authorized user on CAC's and True Count's bank accounts.

115.   When Kim applied for a merchant account on CAC's behalf in or about July 2017, he agreed to maintain fraud and chargebacks below certain levels.

116.   Monthly account statements sent to CAC's corporate address for that merchant account identify tens of thousands of dollars in chargebacks and hundreds of thousands of dollars in consumer refunds between August 2017 and March 2019.

117.   After CAC filed for bankruptcy, Kim personally generated marketing leads for Prime.

118.   Kaine Wen served as CAC's owner, managing partner, and general counsel.

119.   CAC's 2016 tax returns and U.K. registration documents list Wen as CAC's 50% owner.

120.   Wen made capital contributions to CAC in October 2015 that accounted for 75% of capital contributions by members at that time.

121.   Wen participated in the decision to move CAC's processing functions to True Count.

122.   Wen personally guaranteed True Count's lease agreement.

123.   Wen set up payment-processing agreements for True Count.

124.   Wen corresponded with payment processors regarding True Count's excessive chargeback rates.

125.   Wen represented to a payment processor that True Count "understands, currently fully complies with, and during the term of the Agreement will fully comply

with" the TSR, CFPA, and "all other applicable federal, state, and local laws, rules, and regulations."

126.   Wen has been an authorized user on CAC's, Premier Student Loan Center's, True Count's, and Hold the Door's bank accounts.

127.   Wen was also a point of contact or signed for at least three merchant accounts for CAC and at least one merchant account for True Count.

128.   Tuong Nguyen served as the controller and provided accounting services for CAC.

129.   Nguyen was responsible for paying CAC's bills, reviewed its bank statements, and was a signatory on several of CAC's bank accounts.

130.   At times, Nguyen also responded to consumer complaints, and was listed as a point of contact for CAC's d/b/a, Premier Student Loan Center, in the Bureau's consumer-complaint portal.

131.   True Count identified Nguyen as its secretary in select dealings with banks.

132.   Nguyen was a point of contact for at least two of CAC's merchant accounts and one of True Count's merchant accounts.

133.   In January 2018, Nguyen signed a letter to a payment processor acknowledging CAC had incurred "excessive chargebacks" during "December/2017."

134.   Nguyen also acknowledged that the top chargeback reasons included fraud.

135.   Nguyen incorporated TN Accounting and served as its president and sole corporate officer.

136.   Nguyen has been a signatory on a bank account held by TN Accounting.

137.   TN Accounting's primary source of income is over $225,000 from CAC and True Count from March 2017 through December 2018.

138.   Nguyen was also an authorized user on bank accounts held by CAC, Premier Student Loan Center, and True Count.

///

///

COMPLAINT [FILED UNDER TEMPORARY SEAL]

**The Student Loan Debt Relief Companies Operate as a Common Enterprise**

139.   CAC, True Count, and Prime shared employees, customers, scripts, and training materials, and they used the same database to store consumers' information and track aspects of their business activity.

140.   CAC, True Count, and Prime shared the proceeds of the debt-relief enterprise.

141.   For example, since April 2018, True Count, acting as the purported "billing department" for CAC and Prime, has transferred at least $12 million to CAC and at least $25 million to Prime.

142.   CAC lent hundreds of thousands of dollars to True Count without interest or any written agreement.

143.   CAC stated in a lease guarantee that it had a "financial interest" in True Count.

144.   CAC guaranteed at least one lease on behalf of Prime Consulting and two leases on behalf of True Count.

145.   CAC, True Count, and Prime have used overlapping addresses to carry out the debt-relief operation.

146.   For example, addresses True Count identifies as its business addresses are also business addresses for CAC, Prime, and Hold the Door.

147.   To market their debt-relief services to consumers, CAC, True Count, and Prime shared over a dozen fictitious names, including but not limited to South Coast Financial Center, Direct Account Services, Financial Loan Advisors, Account Preparation Services, Administrative Financial, Tangible Savings Solutions, Coastal Shores Financial Group, First Choice Financial Centre (a/k/a First Choice Financial Center), Administrative Account Services, Primary Account Solutions, Prime Document Services, Financial Accounting Center, Doc Management Solutions, First Priority LLC, ALW Loans Administrative Accounting Center, Best Choice Financial Center, First Document Services, Global Direct Accounting Solutions, Keystone Document Center,

COMPLAINT [FILED UNDER TEMPORARY SEAL]

Pacific Palm Financial Group, Pacific Shores Advisory, Sequoia Account Management, Signature Loan Solutions, Yellowstone Account Services, EDU Doc Support, ClearStudentLoanDebt, and Clear Student Loan Debt.

148.   The websites for Doc Management Solutions, Financial Accounting Center, Prime Document Services, Primary Account Solutions, Administrative Account Services, South Coast Financial Center, First Choice Financial Center, Coastal Shores Financial Group, Tangible Savings Solutions, Administrative Financial, Account Preparation Services, Financial Loan Advisors, and Direct Account Services are nearly identical.

### Transfer of Assets to Relief Defendants

149.   Defendants Wen, Kim, and Nguyen direct and control Relief Defendants Hold the Door, Infinite Management, and TN Accounting, respectively.

150.   Wen, Kim, and Nguyen are the signatories on bank accounts for the respective companies and thus control the flow of money into and out of their corporate accounts.

151.   From 2017 to 2019, payments from CAC or True Count made up most or almost all the income of Hold the Door, Infinite Management, and TN Accounting.

152.   Monies were transferred from Hold the Door, Infinite Management, and TN Accounting to the respective individuals' personal accounts or to pay their personal expenses.

153.   Hold the Door made over $200,000 in direct transfers to Wen's personal bank accounts, and it made payments for purchases of art and for Wen's Tesla and Mercedes Benz automobiles.

154.   Infinite Management made more than $300,000 in payments to pay Kim's personal credit cards, wedding expenses, dental expenses, and to purchase luxury cars.

155.   TN Accounting transferred over $100,000 to Nguyen's personal bank accounts and made payments on Nguyen's personal credit cards and Tesla.

///

///

COMPLAINT [FILED UNDER TEMPORARY SEAL]

# LEGAL BACKGROUND

## The TSR

156.  The TSR defines "debt relief service" as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector." 16 C.F.R. § 310.2(o).

157.  The TSR defines a "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd).

158.  The TSR defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer." 16 C.F.R. § 310.2(ff).

159.  The TSR defines "telemarketing" in relevant part as "a plan, program, or campaign which is conducted to induce the purchase of goods or services . . . by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg).

160.  The Student Loan Debt Relief Companies offer services to renegotiate, settle, or alter the terms of payments of consumers' federal student loans by submitting requests for loan forgiveness or IDR plans to consumers' student-loan servicers.

161.  The Student Loan Debt Relief Companies offered and provided these services to consumers nationwide using the telephones and employed more than one interstate telephone call.

162.  The Student Loan Debt Relief Companies offered and provided these services to consumers in exchange for payment of enrollment and monthly fees in connection with a telemarketing transaction.

163.  The Student Loan Debt Relief Companies are each a "telemarketer" or

"seller" offering a "debt relief service" under the TSR.

164.    Kim arranged for CAC to provide debt-relief services to consumers in exchange for consideration and personally generated marketing leads for Prime. Kim is a "telemarketer" or "seller" offering a "debt relief service" under the TSR. 16 C.F.R. § 310.2(dd), (ff), (o).

165.    Wen arranged for CAC and True Count to provide debt-relief services to consumers in exchange for consideration. Wen is a "seller" offering a "debt relief service" under the TSR. 16 C.F.R. § 310.2(dd), (o).

166.    Nguyen arranged for CAC and True Count to provide debt-relief services to consumers in exchange for consideration. Nguyen is a "seller" offering a "debt relief service" under the TSR. 16 C.F.R. § 310.2(dd), (o).

### The CFPA

167.    Sections 1031 and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B), prohibit "covered person[s]" from engaging in any "unfair, deceptive, or abusive act or practice."

168.    The Student Loan Debt Relief Companies are each "covered persons" under the CFPA because they offer or provide consumer-financial products or services, including financial-advisory services such as assisting consumers with debt-management or debt-settlement and modifying the terms of any extension of credit. 12 U.S.C. § 5481(5), (6), (15)(A)(viii).

169.    Section 1002(25) of the CFPA defines the term "related person" to mean "any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of," or "any . . . other person . . . who materially participates in the conduct of the affairs of" a non-bank provider of a consumer-financial product or service. 12 U.S.C. § 5481(25)(C). Section 1002(25) further provides that a "related person" shall be "deemed to mean a covered person for all purposes of any provision of Federal consumer financial law." 12 U.S.C. § 5481(25)(B).

170.    Kim is a "related person" and "covered person" under the CFPA because he

is CAC's owner and officer and has managerial responsibility for CAC. He controlled CAC's bank accounts, oversaw CAC's sales and marketing, entered into contractual relationships on CAC's behalf with payment processors, and responded to certain consumer complaints.

171.    Wen is a "related person" and "covered person" under the CFPA because he is True Count's owner and officer, has been an owner and manager of CAC, and has had managerial responsibility for both companies. He was involved in making decisions for CAC, including the decision to shift CAC's processing function to True Count, entered into contractual relationships on behalf of True Count with payment processors, and was a signatory on True Count's bank accounts.

172.    Nguyen is a "related person" and "covered person" under the CFPA because he is an officer of CAC and True Count and has managerial responsibility for CAC , and because he materially participated in the conduct of the Student Loan Debt Relief Companies. He managed CAC's finances and responded to consumers' complaints on CAC's behalf. He also was the point of contact for several of CAC's and True Count's merchant accounts.

## COUNT I

**By the Bureau and the States**
**(Advance Fees in Violation of the TSR – Enrollment Fees)**
**(All Defendants)**

173.    The allegations in paragraphs 1-166 are incorporated by reference.

174.    Under the TSR, it is an abusive act or practice for a seller or telemarketer to request or receive payment of any fee or consideration for any debt-relief services unless and until (A) the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the customer; and (B) the customer has made at least one payment pursuant to that settlement agreement, debt-management plan, or other valid contractual agreement between the customer and the creditor or debt collector. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

175.    In the course of providing, offering to provide, or arranging for others to provide debt-relief services, Defendants charged and collected from consumers enrollment fees before consumers had been approved for IDR plans and before consumers had made any payments toward such IDR plans, in violation of the TSR. 16 C.F.R. § 310. 4(a)(5)(i)(A)-(B).

176.    Moreover, because the IDR plans in which consumers were placed often were based on false information about consumers' family size, income, and marital status that the Defendants submitted to consumers' student-loan servicers, none of the payments made by consumers in these plans were made pursuant to a "valid contractual agreement" within the meaning of the TSR and thus were collected in violation of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B)

## COUNT II

### By the Bureau and the States
### (Advance Fees in Violation of the TSR – Monthly Fees)
### (All Defendants)

177.    The allegations in paragraphs 1-166 are incorporated by reference.

178.    In the course of providing, offering to provide, or arranging for others to provide debt-relief services, the Defendants charged and collected from consumers monthly fees before consumers had completed their annual recertifications of eligibility for IDR plans and before consumers had made any payments toward such recertified IDR plans, in violation of the TSR. 16 C.F.R. § 310. 4(a)(5)(i)(A)-(B).

179.    Moreover, because the IDR plans in which consumers were placed often were based on false information about consumers' family size, income, and marital status that Defendants submitted to consumers' student-loan servicers, none of the payments made by consumers in these plans were made pursuant to a "valid contractual agreement" within the meaning of the TSR and thus were collected in violation of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

///

///

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

## COUNT III

### By the Bureau and the States
### (Misrepresentations About Material
### Aspects of Their Services in Violation of the TSR)
### (All Defendants)

180.    The allegations in paragraphs 1-166 are incorporated by reference.

181.    It is a deceptive practice under the TSR for a seller or telemarketer to misrepresent any material aspect of the efficacy of their services and to misrepresent any material aspect of a debt-relief service. 16 C.F.R. § 310.3(a)(2)(iii), (x).

182.    Among other things, Defendants misrepresented, directly or indirectly, expressly or by implication that:

a.    fees paid by consumers were payments toward the consumer's outstanding loan debt;

b.    fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

c.    consumers' loans would be forgiven in whole or in part shortly after enrolling in Student Loan Debt Relief Companies' services;

d.    consumers were eligible or approved for lower monthly payments, including where such payment amounts had been calculated based on an incorrect family size, income, or marital status; and

e.    consumers' monthly payment amount had been lowered for the life of the repayment plan; and

f.    any fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services.

183.    Defendants also failed to inform consumers that:

a.     it was Defendants' practice to submit forbearance requests on behalf of consumers; and

b.    it was Defendants' practice to falsify consumers' family size, marital

---

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

1  status, and income to consumers' student-loan servicers.

2  Defendants' acts or practices, as set forth in this paragraph, are deceptive

3  acts or practices that violate the TSR, 16 C.F.R. 310.3(a)(2)(iii), (x).

4  ### COUNT IV

5  **By the Bureau and the States**
**(Substantial Assistance in Violation of the TSR)**

6  **(Individual Defendants)**

7  184.    The allegations in paragraphs 1-166 are incorporated by reference.

8  185.    The TSR prohibits any person from providing "substantial assistance or

9  support to any seller or telemarketer when that person knows or consciously avoids

10  knowing that the seller or telemarketer is engaged in any act that engages in deceptive or

11  abusive conduct" under the Rule. 16 C.F.R. § 310.3(b).

12  186.    Kim managed both CAC's and True Count's day-to-day operations. As

13  CAC's co-owner and president, Kim oversaw CAC's marketing and approved its sales

14  scripts.

15  187.    Kim knew, or recklessly avoided knowing, the material misrepresentations

16  and omissions that CAC's and True Count's sales representatives and processors made to

17  consumers.

18  188.    Kim knew, or recklessly avoided knowing, that the Student Loan Debt

19  Relief Companies charged and collected enrollment and monthly fees from consumers

20  before the companies had obtained loan-repayment plans for consumers and before

21  consumers had made their first payments toward such repayment plans.

22  189.    Kim represented CAC in contractual relationships with payment processors.

23  190.    As CAC's point of contact on a merchant account where he agreed to keep

24  chargebacks and fraud below a certain level, Kim knew, or recklessly avoided knowing,

25  that the merchant's monthly statements identified tens of thousands of dollars in

26  chargebacks and hundreds of thousands of dollars in consumer refunds between August

27  2017 and March 2019.

28  191.    As CAC's co-owner and officer and True Count's owner and officer, Wen

entered into payment-processing agreements on True Count's behalf, including at least one where he represented that True Count intended to fully comply with the TSR.

192.   As a principal representative for CAC's and True Count's merchant accounts and a signatory on the bank accounts from which refunds and chargebacks to consumers were paid, Wen knew, or recklessly avoided knowing, CAC's and True Count's high chargeback and refund rates, including that during at least one period, the top chargeback reasons included "fraud."

193.   Wen knew, or recklessly avoided knowing, the material misrepresentations and omissions that CAC's and True Count's sales representatives and processors made to consumers.

194.   Wen knew, or recklessly avoided knowing, that the Student Loan Debt Relief Companies charged and collected enrollment and monthly fees from consumers before the companies had obtained loan-repayment plans for consumers and before consumers had made their first payments toward such repayment plans.

195.   As an officer of CAC and True Count, Nguyen managed CAC's finances, served as a point of contact for several of CAC's and True Count's merchant accounts, and responded to consumer complaints on CAC's behalf.

196.   Because he signed a January 2018 letter from CAC to a payment processor in which he acknowledged that CAC had incurred excessive chargebacks and that fraud was one of the top reasons for such chargebacks, Nguyen knew, or recklessly avoided knowing, the material misrepresentations and omissions that CAC's and True Count's sales representatives and processors made to consumers.

197.   Nguyen knew, or recklessly avoided knowing, that the Student Loan Debt Relief Companies charged and collected enrollment and monthly fees from consumers before the companies had obtained loan-repayment plans for consumers and before consumers had made their first payments toward such repayment plans.

198.   Kim, Wen, and Nguyen provided substantial assistance to the Student Loan Debt Relief Companies in their violations of the TSR.

## COUNT V

### By the Bureau
### (CFPA – Deception)
### (All Defendants)

199.   The allegations in paragraphs 1-155 and 167-172 are incorporated by reference.

200.   Among other things, Defendants misrepresented, directly or indirectly, expressly or by implication that:

      a.   fees paid by consumers were payments toward the consumer's outstanding loan debt;

      b.   fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

      c.   consumers' loans would be forgiven in whole or in part following payment of the initial enrollment fees;

      d.   consumers were eligible or approved for lower monthly payments, including where such payment amounts have been calculated based on an incorrect family size, income, or marital status;

      e.   consumers' monthly payment amounts had been lowered for the life of the repayment plan; and

      f.   any fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services.

201.   The Student Loan Debt Relief Companies also failed to inform consumers that:

      a.   it was Defendants' practice to submit forbearance requests on behalf of consumers; and

      b.   it was Defendants' practice to falsify consumers' family size, marital status, and income to consumers' student-loan servicers and the consequences for consumers of that practice.

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

202.   The Student Loan Debt Relief Companies' representations were material and likely to mislead consumers acting reasonably under the circumstances.

203.   Among other things, Kim generated marketing leads for Prime, approved sales scripts for CAC, and managed day-to-day operations for CAC and True Count. He was also aware of CAC's and True Count's high chargeback and consumer-refund rates. He participated directly in these representations or had the authority to control them as CAC's co-owner and president and had knowledge of these representations, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud along with an intentional avoidance of the truth.

204.   Among other things, Wen managed payment-processor relationships on behalf of True Count, was a signatory on True Count's bank accounts, and was aware of CAC's and True Count's high chargeback and consumer-refund rates. He participated directly in these representations or had the authority to control them as CAC's co-owner and president and True Count's owner and president and had knowledge of these representations, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud along with an intentional avoidance of the truth.

205.   Among other things, Nguyen managed CAC's finances, responded to consumer complaints, and served as point of contact on several of CAC's and True Count's merchant accounts. He was aware of CAC's and True Count's high chargeback and consumer-refund rates. He participated directly in these representations or had the authority to control them and had knowledge of these representations, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud along with an intentional avoidance of the truth.

206.   Defendants have therefore engaged in deceptive acts or practices in violation of §§ 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536.

///

///

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

## COUNT VI

### By the Bureau
### (Substantial Assistance in Violation of the CFPA)
### (Individual Defendants)

207.   The allegations in paragraphs 1-155 and 167-172 are incorporated by reference.

208.   Section 1036(a)(3) of the CFPA prohibits any person from "knowingly or recklessly provid[ing] substantial assistance to a covered person or service provider in violation of the provisions of section 1031" and states that "the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided." 12 U.S.C. § 5536(a)(3).

209.   As CAC's co-owner and president, and as someone who managed the day-to-day operations of CAC and True Count and who generated marketing leads for Prime, Kim knowingly or recklessly provided substantial assistance to the Student Loan Debt Relief Companies in their deceptive acts or practices.

210.   As CAC's co-owner and True Count's owner and president who was aware that high chargeback and consumer refund rates were attributable at least in part to fraud, Wen knowingly or recklessly provided substantial assistance to the Student Loan Debt Relief Companies in their deceptive acts or practices.

211.   As an individual responsible for managing CAC's finances and responding to consumers' complaints on behalf of CAC and who was aware that the Student Loan Debt Relief Companies' high chargeback and consumer-refund rates were attributable at least in part to fraud, Nguyen knowingly or recklessly provided substantial assistance to the Student Loan Debt Relief Companies in their deceptive acts or practices.

212.   The Individual Defendants thus provided substantial assistance to the Student Loan Debt Relief Companies in their deceptive acts or practices, in violation of § 1036(a)(3) of the CFPA. 12 U.S.C. § 5563(a)(3).

///

///

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

**COUNT VII**

**By the Bureau**
**CFPA Violation Based on Violation of TSR**
**(All Defendants)**

213.   The allegations in paragraphs 1-172 are incorporated by reference.

214.   The Bureau is authorized to enforce the Telemarketing Act with respect to the offering or provision of a consumer-financial product or service subject to the CFPA. 15 U.S.C. § 6105(d).

215.   Defendants' violations of the TSR are treated as violations of a rule under § 1031 of the CFPA. 15 U.S.C. § 6102(c).

216.   Because Defendants are "covered persons" who violated the TSR by charging and collecting illegal advance fees from consumers and engaging in deceptive conduct, they violated § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

**COUNT VIII**

**By the Bureau and the States**
**(Relief Defendants)**

217.   The allegations in paragraphs 1-216 are incorporated by reference.

218.   Relief Defendants Hold the Door, Infinite Management, and TN Accounting have received, directly or indirectly, funds or other assets from Defendants that are traceable to funds obtained from consumers through the deceptive and unlawful practices described herein.

219.   The Relief Defendants are not bona fide purchasers with legal or equitable title to the funds or other assets received from Defendants.

220.   The Relief Defendants would be unjustly enriched if not required to disgorge funds or the value of the benefits received as a result of Defendants' unlawful acts or practices.

221.   The Relief Defendants therefore hold funds and assets in constructive trust for the benefit of the Student Loan Debt Relief Companies' customers.

///

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

## COUNT IX

### By the State of Minnesota
### Prevention of Consumer Fraud Act
### Minn. Stat. § 325F.69, et seq.
### (All Defendants)

222.   The allegations in paragraphs 1-198 and 217-221 are incorporated by reference.

223.   Minnesota Statutes section 325F.69, subdivision 1 reads:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

224.   The term "merchandise" within the meaning of Minnesota Statutes section 325F.69 includes services.  *See* Minn. Stat. § 325F.68, subd. 2.

225.   The term "person" includes "any natural person or legal representative, partnership, corporation (domestic and foreign), company, trust, business entity, or association, and any agent, employee, salesperson, partner, officer, director, member, stockholder, associate, trustee, or cestui que thereof."  Minn. Stat. § 325F.68, subd. 3. Defendants are "persons" within the meaning of the statute.

226.   Defendants have repeatedly violated Minnesota Statutes section 325F.69, subdivision 1, by engaging in the deceptive and fraudulent practices described in this Complaint, with the intent that others rely thereon in connection with the sale of their student loan debt relief services.  This conduct includes, but is not limited to:

      a.     Misrepresenting to consumers that Defendants could forgive consumers' loans and otherwise misrepresenting their ability to reduce or eliminate student loan debt;

      b.     Misrepresenting to consumers that the consumers were "approved" for student loan relief, and otherwise misrepresenting their ability to qualify borrowers

1    for government programs;

2         c.    Misrepresenting and falsely leading consumers to believe that

3    Defendants would apply payments made to it to consumers' loans;

4         d.    Misrepresenting and falsely leading consumers to believe that fees

5    paid by consumers reflected the adjusted amount of the consumers' periodic

6    payments toward their outstanding loan balance;

7         e.    Misrepresenting to consumers that the amount owed on their student

8    loans would be reduced;

9         f.    Misrepresenting to consumers that their loans would be forgiven in

10   whole or in part following payment of the enrollment fees;

11        g.    Misrepresenting to consumers that their monthly student loan payment

12   amount had been lowered for the life of the repayment plan;

13        h.    Misrepresenting to consumers that fees collected would be held in

14   trust accounts maintained by a third-party account provider until the Student Loan

15   Debt Relief Companies had performed certain services;

16        i.    Misleading consumers to believe that Defendants are tied to or have a

17   relationship with the federal government or a particular federal debt relief plan;

18        j.    Misrepresenting government programs and payment plan terms to

19   consumers; and

20        k.    The other practices described in this Complaint.

21   227.   Due to the deceptive and fraudulent conduct described in this Complaint,

22   Minnesota consumers have made payments to Defendants for services that they otherwise

23   would not have purchased, thereby causing harm to those consumers.

24   228.   Defendants' conduct, practices, and actions described in this Complaint

25   constitute multiple, separate violations of Minnesota Statutes section 325F.69.

26   ///

27   ///

28   ///

# COUNT X

**By the State of Minnesota**
**Uniform Deceptive Trade Practices Act**
**Minn. Stat. § 325F.43, et seq.**
**(All Defendants)**

229.   The allegations in paragraphs 1-198 and 217-221 are incorporated by reference.

230.   Minnesota Statutes section 325D.44, subdivision 1 provides, in part that: A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

\*\*\*

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

\*\*\*

(5)    represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

\*\*\*

(7)    represents that goods or services are of a particular standard [or] quality . . . if they are of another;

\*\*\*

(9) advertises goods or services with intent not to sell them as advertised; [or]

\*\*\*

(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

231.   Defendants are "persons" within the meaning of the statute.

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

232.   Defendants have repeatedly violated Minnesota Statutes section 325D.44, subdivision 1, by, in the course of business, engaging in the deceptive and fraudulent practices described in this Complaint that caused a likelihood of confusion or of misunderstanding among consumers in connection with the sale of Defendants' student loan debt relief services, including by making false, deceptive, fraudulent, and/or misleading representations to consumers regarding its advertised services. These practices include but are not limited to:

a.   Misrepresenting to consumers that Defendants could forgive consumers' loans and otherwise misrepresenting their ability to reduce or eliminate student loan debt;

b.   Misrepresenting to consumers that the consumers were "approved" for student loan relief, and otherwise misrepresenting their ability to qualify borrowers for government programs;

c.   Misrepresenting and falsely leading consumers to believe that Defendants would apply payments made to it to consumers' loans;

d.   Misrepresenting and falsely leading consumers to believe that fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

e.   Misrepresenting to consumers that the amount owed on their student loans would be reduced;

f.   Misrepresenting to consumers that their loans would be forgiven in whole or in part following payment of the enrollment fees;

g.   Misrepresenting to consumers that their monthly student loan payment amount had been lowered for the life of the repayment plan;

h.   Misrepresenting to consumers that fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services;

COMPLAINT [FILED UNDER TEMPORARY SEAL]

i.      Misleading consumers to believe that Defendants are tied to or have a relationship with the federal government or a particular federal debt relief plan;

j.      Misrepresenting government programs and payment plan terms to consumers; and

k.      The other practices described in this Complaint.

233.   Due to the deceptive and fraudulent conduct described in this Complaint, Minnesota consumers have made payments to Defendants for services that they otherwise would not have purchased, thereby causing harm to those consumers.

234.   Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325D.44.

**Count XI**

**By the State of North Carolina**
**North Carolina Debt Adjusting Act**
**N.C. Gen. Stat. § 14-423, et seq.**
**(All Defendants)**

235.   The allegations in paragraphs 1-198 and 217-221 are incorporated by reference.

236.   Defendants are engaged in illegal "debt adjusting" as that term is defined in Article 56 of Chapter 14 of the North Carolina General Statutes. Specifically, N.C. Gen. Stat. § 14-423(2) defines "debt adjusting" as any of the following:

> "Debt adjusting" means entering into or making a contract, express or implied, with a particular debtor whereby the debtor agrees to pay a certain amount of money periodically to the person engaged in the debt adjusting business and that person, for consideration, agrees to distribute, or distributes the same among certain specified creditors in accordance with a plan agreed upon.

> Debt adjusting includes the business or practice of any person who holds himself out as acting or offering or attempting to act for consideration as an intermediary between a debtor and his creditors for the purpose of settling, compounding, or in any way altering the terms of payment of any debt of a debtor, and to that end receives money or other property from the debtor, or on behalf of the debtor, for the

35

payment to, or distribution among, the creditors of the debtor.

Debt adjusting also includes the business or practice of debt settlement . . . whereby any person holds himself or herself out as acting for consideration as an intermediary between a debtor and the debtor's creditors for the purpose of reducing, settling, or altering the terms of the payment of any debt of the debtor, whether or not the person distributes the debtor's funds or property among the creditors, and receives a fee or other consideration for reducing, settling, or altering the terms of the payment of the debt in advance of the debt settlement having been completed or in advance of all the services agreed to having been rendered in full.

237.  Debt adjusting is prohibited by N.C. Gen. Stat. § 14-424, which provides that "[i]f any person shall engage in, or offer to or attempt to, engage in the business or practice of debt adjusting, or if any person shall hereafter act, offer to act, or attempt to act as a debt adjuster, he shall be guilty of a Class 2 misdemeanor."

238.  Defendants' offering and purported rendering of debt adjusting services to North Carolina's debt adjusting statute.  Specifically:

a.      Defendants have entered into contracts with North Carolina student loan debtors whereby the debtors agree to pay certain amounts of money periodically to Defendants, and Defendants, for consideration, represent or imply that they will distribute debtors' money among debtors' student loan servicers or lenders and/or DOE in accordance with a plan agreed upon.

b.      Defendants have engaged, and are engaged in, the business or practice of holding themselves out as acting or offering or attempting to act for consideration, as an intermediary between North Carolina student loan debtors and their servicers or lenders and/or DOE for the purpose of settling, compounding, or altering the terms of payment of the student loan debts of the debtors, and to that end receive money from the debtors, or on behalf of the debtors, for the payment to, or distribution among, the student loan creditors of the debtors.

c.      Defendants have engaged, and are engaging in, a business or practice in which they hold themselves out as acting or offering or attempting to act, for consideration, as an intermediary between North Carolina student loan debtors and

their student loan servicers or lenders and/or DOE for the purpose of reducing, settling, or altering the terms of payment of North Carolina debtors' student loan debts, and defendants receive a fee in advance of the debt settlements having been completed or in advance of all the services agreed to having been rendered in full.

239.    Pursuant to N.C. Gen. Stat. § 14-425, the Attorney General is authorized to seek (a) injunctive relief to enjoin Defendants from the continuation of any debt adjusting activities or the offering of any debt adjusting services in North Carolina; (b) the disgorgement of all monies unlawfully collected by Defendants from North Carolina consumers; (c) the appointment of a receiver to assist in the recovery of funds unlawfully collected by Defendants and to ensure their return to consumers; and (d) the assessment of civil penalties under N.C. Gen. Stat. § 75-15.2 and attorneys' fees for the State under N.C. Gen. Stat. § 75-16.1.

**Count XII**

**By the State of North Carolina**
**North Carolina Unfair and Deceptive Practices Act**
**N.C. Gen. Stat. § 75-1.1**
**(All Defendants)**

240.    The allegations in paragraphs 1-198, 217-221, and 235-239 are incorporated by reference.

241.    In the course of soliciting and promoting their student loan debt relief services to North Carolina consumers, in entering into agreements with North Carolina consumers to provide such services, and in either performing or failing to meaningfully perform those services, defendants have engaged in unfair and deceptive acts and practices in trade or commerce in violation of N.C. Gen. Stat. § 75-1.1.

242.    Defendants are engaged in trade or commerce in the State of North Carolina.

243.    Defendants' unfair or deceptive acts and practices include, but are not limited to, the following:

a.    Engaging in violations of the TSR, as set forth *supra*, which are specifically prohibited by 16 C.F.R. Part 310;

b.     Engaging in illegal debt adjusting activities, as set forth *supra*, which are specifically prohibited by N.C. Gen. Stat. 14-423, *et seq.*;

c.     Failing to register as a telephonic seller under North Carolina's Telephonic Seller Registration Act, N.C. Gen. Stat §§ 66-260 and 66-261, as set forth *infra*; and

d.     Making deceptive and misleading representations to consumers, including but not limited to:

Misrepresenting to consumers that Defendants could forgive consumers' loans and otherwise misrepresenting Defendants' ability to reduce or eliminate student loan debt;

      i.     Misrepresenting to consumers that the consumers were "approved" for student loan relief, and otherwise misrepresenting their ability to qualify borrowers for government programs;

      ii.    Misrepresenting and falsely leading consumers to believe that Defendants would apply payments made to Defendants to the consumers' outstanding loans;

      iii.   Misrepresenting and falsely leading consumers to believe that fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

      iv.    Misrepresenting to consumers that the amount owed on their student loans would be reduced if students signed up for the Student Loan Debt Relief Companies' services;

      v.     Misrepresenting to consumers that their loans would be forgiven in whole or in part shortly after enrolling in the Student Loan Debt Relief Companies' services;

      vi.    Misrepresenting to consumers that their monthly student loan payment amount had been lowered for the life of the repayment plan;

      vii.   Misrepresenting that consumers were eligible or approved for lower monthly payments, including where such payment amounts

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

had been calculated based on an incorrect family size, income, or marital status;

viii.    Misrepresenting to consumers that fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services;

ix.    Misleading consumers to believe that the Student Loan Debt Relief Companies are tied to or have a relationship with the federal government or a particular federal debt relief plan;

x.    Failing to inform consumers that it was their practice to submit false information about consumers' income, family size, and marital status on loan adjustment applications in order to try to qualify consumers for lower monthly payments;

xi.    Misrepresenting government programs and payment plan terms to consumers; and

xii.    The other practices described in this Complaint.

244.    The Attorney General is authorized to seek an injunction against Defendants' practices under N.C. Gen. Stat. § 75-14, the restoration of any moneys obtained by defendants from North Carolina consumers as well as the cancellation of defendants' contracts with North Carolina consumers under N.C. Gen. Stat. § 75-15.1, civil penalties under N.C. Gen. Stat. § 75-15.2, and attorneys' fees under N.C. Gen. Stat. § 75-16.1.

## Count XIII

### By the State of North Carolina
### North Carolina Telephonic Seller Registration Act
### N.C. Gen. Stat. § 66-260
### (All Defendants)

245.    The allegations in paragraphs 1-198, 217-221, and 235-244 are incorporated by reference.

COMPLAINT [FILED UNDER TEMPORARY SEAL]

246.   North Carolina's Telephonic Seller Registration Act, N.C. Gen. Stat §§ 66-260 and 66-261, requires any non-exempt person engaged in telephonic solicitations directed to North Carolina consumers to: (a) register with the North Carolina Secretary of State not less than 10 days before commencing telephone solicitations; (b) provide specified information on a form provided by the Secretary of State that contains the notarized signature of each principal of the telephonic seller; and (c) pay a $100.00 filing fee.

247.   Pursuant to N.C. Gen. Stat. § 66-261(c), a registration of a telephonic seller is valid for one year from the effective date of the provision of all required information, and may be renewed annually by making the filing required by N.C. Gen. Stat. § 66-262, and paying the filing fee of $100.00.

248.   Defendants are a "telephonic seller" as defined in N.C. Gen. Stat. § 66-260(11), as defendants have caused directly, or through employees or agents, telephone solicitations or attempted telephone solicitations to occur, and Defendants are not exempt from the Act.

249.   Defendants have engaged in violations of the Telephonic Seller Registration Act, N.C. Gen. Stat. § 66-260, *et seq.*, by failing to register with the North Carolina Secretary of State as a telephonic seller; by failing to provide the North Carolina Secretary of State with the information mandated by N.C. Gen. Stat. § 66-262; by failing to pay the filing fee of $100.00; and by failing to register in each year defendants have engaged in telephonic solicitations.

250.   N.C. Gen. Stat. § 66-266(a) provides that any violation of the Telephonic Seller Registration Act "shall constitute an unfair and deceptive trade practice in violation of N.C. Gen. Stat. §75-1.1."

251.   N.C. Gen. Stat. § 66-266(c) further provides that the remedies and penalties available under the section "shall be supplemental to others available under the law, both civil and criminal."

252.   Pursuant to N.C. Gen. Stat. §§ 66-266(b), in an action by the Attorney

General against a telephonic seller for violation of the Telephonic Seller Registration Act, or for any other act or practice by a telephonic seller constituting a violation of N.C. Gen. Stat. § 75-1.1, the court may impose civil penalties of up to $25,000 for each violation involving North Carolina purchasers or prospective purchasers who are 65 years of age or older.

**Count XIV**

**By the People of the State of California**
**California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 et seq.**
**(All Defendants)**

253.   The People of the State of California re-allege and incorporate herein paragraphs 1 through 221 of this Complaint.

254.   California's UCL, Business and Professions Code section 17200, prohibits any "unlawful, unfair or fraudulent business act[s] or practice[s]." Cal. Bus. & Prof. Code § 17200.

255.   Section 17203 of the UCL provides that "(a)ny person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction." Section 17203 also permits recovery of any "interest in money or property, real or personal" acquired by a violation of the UCL. Cal. Bus. & Prof. Code § 17203.

256.   Section 17206, subdivision (a), of the UCL provides that any person violating Section 17200 "shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the [P]eople of the State of California . . . by any city attorney of a city having a population in excess of 750,000," thereby authorizing the City Attorney of Los Angeles, which has a population in excess of 750,000, to bring such an action. Cal. Bus. & Prof. Code § 17206.

257.   Under the UCL's Section 17205, these remedies and penalties are "cumulative to each other and to the remedies or penalties available under all other laws

41

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

of this state." Cal. Bus. & Prof. Code § 17205.

258.   Defendants are all "persons" within the meaning of UCL. Cal. Bus. & Prof. Code § 17201.

259.   "Unlawful" acts or practices, "unfair" acts or practices, and "fraudulent" acts or practices each independently violate Section 17200. Beginning no later than 2015, and continuing to the present, Defendants, and each of them, have repeatedly violated the UCL by engaging in "unlawful, unfair, or fraudulent business act[s] or practice[s]" with the sale of their purported student loan debt settlement services. Cal. Bus & Prof Code § 17200. These violations include, but are not limited to:

   a.  Violating the UCL through the following unlawful acts or practices committed against California consumers, including in the City and County of Los Angeles:

      i.  As to Defendants CAC, True Count, Infinite Management, Hold the Door, TN Accounting, Albert Kim, Kaine Wen and Tuong Nguyen violating California Financial Code § 12000 et seq., the California Check Sellers, Bill Payers and Proraters Law, by acting as a check seller, bill payer, or prorater without first obtaining a license from the California Commissioner of Business Oversight. Cal. Fin. Code § 12200;

         1.  As alleged in Paragraphs 8, 9, 23, 25, 27-31, 41, 43, 45 and 47-148 of this Complaint, California consumers have provided funds to Defendants based upon assurances and representations that Defendants will assist them in reducing or otherwise managing their student loan debts and/or negotiate with their creditors and distribute payments.

         2.  Defendants are not licensed by the California Corporations Commissioner as required by Financial Code § 12000 et seq.

      ii.  Violating California Financial Code section 28100, et seq., the California Student Loan Servicing Act, which requires Student Loan Servicers to be

licensed to lawfully operate, by engaging in the business of servicing student loans in California without obtaining a license as required under the Act;

1. Defendants are "persons" under the Student Loan Servicing Act. Cal. Fin. Code § 28104, subd. (j).

2. As alleged in Paragraphs 8, 9, 23, 25, 27-31, 41, 43, 45 and 47-148 of this Complaint, Defendants have engaged in the business of servicing student loans in California. Cal. Fin. Code § 28104, subds. (f), (g), (l), (m), (n).

3. Defendants have never obtained a license to service student loans as required under the California Student Loan Servicing Act. Cal. Fin. Code § 28102, subd. (a).

iii.    Violating the Telemarketing Sales Rule ("TSR"), which is specifically set forth in 16 C.F.R. Part 310, as alleged in Paragraphs 8-15, 53, 57, 59, 66, 88-89, 156-166, 173-176 (Count I - Advance Fees in Violation of the TSR – Enrollment Fees), 177-179 (Count II - Advance Fees in Violation of the TSR – Monthly Fees), 180-183 (Count III - Misrepresentations About Material Aspects of Their Services in Violation of the TSR), and 184-198 (Count IV - Substantial Assistance in Violation of the TSR); and

iv.    Violating the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531 et seq., as alleged in Paragraphs 8-148, 167-172, 199-206 (Count V- CFPA – Deception), 207-212 (Count VI - Substantial Assistance in Violation of the CFPA), and 213-216 (Count VII - CFPA Violation Based on Violation of TSR), as set forth in this Complaint.

b.  Defendants also violated the UCL through the following unlawful, fraudulent and/or unfair acts or practices committed against California consumers, including consumers in the City of Los Angeles:

i. Misrepresenting to consumers that Defendants could forgive consumers' loans and otherwise misrepresenting Defendants' ability to reduce or eliminate student loan debt;

ii. Misrepresenting to consumers that the consumers were "approved" for student loan relief, and otherwise misrepresenting their ability to qualify borrowers for government programs;

iii. Misrepresenting and falsely leading consumers to believe that Defendants would apply payments made to Defendants to the consumers' outstanding loans;

iv. Misrepresenting and falsely leading consumers to believe that fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

v. Misrepresenting to consumers that the amount owed on their student loans would be reduced if students signed up for Student Loan Debt Relief Companies' services;

vi. Misrepresenting to consumers that their loans would be forgiven in whole or in part shortly after enrolling in Student Loan Debt Relief Companies' services;

vii. Misrepresenting to consumers that their monthly student loan payment amount had been lowered for the life of the repayment plan;

viii. Misrepresenting that consumers were eligible or approved for lower monthly payments, including where such payment amounts had been calculated based on an incorrect family size, income, or marital status;

ix. Misrepresenting to consumers that fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services;

x. Misleading consumers to believe that the Student Loan Debt Relief Companies are tied to or have a relationship with the federal government

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

1    or a particular federal debt relief plan;

2    xi.    Failing to inform consumers that it was their practice to submit false

3    information about consumers' income, family size, and marital status on

4    loan adjustment applications in order to try to qualify consumers for

5    lower monthly payments;

6    xii.    Misrepresenting government programs and payment plan terms to

7    consumers; and

8    xiii.    The other practices described in this Complaint.

9    260.    Due to the deceptive and fraudulent conduct described in this Complaint,

10   California consumers have made payments to Defendants for services that they otherwise

11   would not have purchased, thereby causing harm to those consumers.

12   261.    Defendants' conduct, practices, and actions described in this Complaint

13   constitute multiple, separate violations of California Business and Professions Code

14   section 17200.

15   **DEMAND FOR RELIEF**

16   262.    WHEREFORE, the Bureau and the States request, under 12 U.S.C.

17   §§ 5538(a), 5565(a); Minn. Stat. §§ 8.31, 325D.45, and 325F.70; the State of Minnesota's

18   common law authority, including *parens partiae* authority; N.C. Gen. Stat. §§ 14-424,

19   75-14, 75-15.1, 75-16.1, and 66-266; and Cal. Bus. & Prof. Code §§ 17200 et seq. that

20   the Court:

21   a.    award the Bureau and the States such preliminary and injunctive and

22   ancillary relief as may be necessary to avert the likelihood of consumer injury

23   during the pendency of this action, including but not limited to a temporary and

24   preliminary injunction, an order freezing assets, immediate access to business

25   premises, and appointment of a Receiver against Defendants and Relief

26   Defendants;

27   b.    permanently enjoin Defendants from committing future violations of

28   the TSR, the CFPA, the MNCFA, the MNDTPA, the NCDAA, the NCUDPA, the

45

COMPLAINT [FILED UNDER TEMPORARY SEAL]

NCTSRA, and the UCL, and enter such other injunctive relief as appropriate;

c.      permanently enjoin Defendants from the advertisement, marketing, promotion, offering for sale, or selling of any consumer-financial product or service, including but not limited to any debt relief service;

d.      grant additional injunctive relief as the Court may deem to be just and proper;

e.      award damages and other monetary relief against Defendants and Relief Defendants as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA, the TSR, the MNCFA, the MNDTPA, the NCDAA, the NCUDPA, and the NCTSRA, including but not limited to rescission or reformation of contracts, the refund of monies paid, restitution, disgorgement or compensation for unjust enrichment;

f.      award restitution against Defendants and Relief Defendants as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the UCL;

g.      award the Bureau and the States civil money penalties;

h.      award the Bureau and the States the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper; and

i.      award the States the costs of investigation and attorneys' fees.

Dated: October __, 2019

                              Respectfully submitted,

                              CARA PETERSEN
                              Acting Enforcement Director

                              DEBORAH MORRIS
                              Deputy Enforcement Director

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

1

2

3             Leanne Hartmann (local counsel)

4             Sarah Preis (*pro hac vice* admission pending)

5             Jesse Stewart (*pro hac vice* admission pending)

6             Enforcement Attorneys

7

8             *Attorneys for Plaintiff Bureau of Consumer*
              *Financial Protection*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

47

**COMPLAINT [FILED UNDER TEMPORARY SEAL]**

KEITH ELLISON
Attorney General of Minnesota

Evan S. Romanoff, Assistant Attorney General
(*pro hac vice* pending)

*Attorneys for the State of Minnesota,
By Its Attorney General, Keith Ellison*

JOSHUA H. STEIN
Attorney General of North Carolina

M. Lynne Weaver, Special Deputy Attorney
General, (*pro hac vice* pending)
Michael T. Henry, Assistant Attorney General (*pro
hac vice* pending)

*Attorneys for the State of North Carolina*

MICHAEL N. FEUER
Los Angeles City Attorney

Christina V. Tusan, Supervising Dep. City Atty.

*Attorneys for the People of the State of California*

47

COMPLAINT [FILED UNDER TEMPORARY SEAL]

UNITED ST    'S DISTRICT COURT, CENTRAL DISTRICT OF '    'FORNIA
CIVIL COVER SHEET

| **I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ ) | **DEFENDANTS** ( Check box if you are representing yourself ☐ ) |
|---|---|
| Bureau of Consumer Financial Protection, State of Minnesota, State of North Carolina, The People of the State of California | Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center; True Count Staffing Inc., d/b/a SL Account Management; Prime Consulting LLC d/b/a Financial Preparation Services; Albert Kim; Kaine Wen; Tuong Nguyen |

| **(b) County of Residence of First Listed Plaintiff** | **County of Residence of First Listed Defendant**   Orange County |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| **(c) Attorneys** (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information. | **Attorneys** (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information. |
|---|---|
| Bureau of Consumer Financial Protection, Office of Enforcement, 1700 G Street NW, Washington, DC 20552 (202) 435-9318 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1. U.S. Government Plaintiff

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding   ☐ 2. Removed from State Court   ☐ 3. Remanded from Appellate Court   ☐ 4. Reinstated or Reopened   ☐ 5. Transferred from Another District (Specify)   ☐ 6. Multidistrict Litigation - Transfer   ☐ 8. Multidistrict Litigation - Direct File

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☐ No   **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Consumer Financial Protection Act, 12 U.S.C. 5531, 5536(a), 55564, 5565 and the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. 6101 and its implementing regulation, the Telemarketing Sales Rule, 16 C.F.R. Part 310.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 376 Qui Tam (31 USC 3729(a)) | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 400 State Reapportionment | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 835 Patent - Abbreviated New Drug Application |
| ☐ 410 Antitrust | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | **FEDERAL TAX SUITS** |
| ☒ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| | ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**   Case Number:   **8:19-cv-01998 JVS (JDEx)**

CV-71 (05/17)   CIVIL COVER SHEET   Page 1 of 3

ORIGINAL

**UNITED ST   S DISTRICT COURT, CENTRAL DISTRICT OF C   FORNIA**
**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| ☐ Yes   ☒ No | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | | Western |
| If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Orange | | Southern |
| | ☐ Riverside or San Bernardino | | Eastern |

| QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action?<br><br>☒ Yes  ☐ No<br><br>If "no," skip to Question C. If "yes," answer Question B.1, at right. | **B.1.** Do 50% or more of the defendants who reside in the district reside in Orange Co.?<br><br>*check one of the boxes to the right* ➡ | ☒ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there.<br><br>☐ NO. Continue to Question B.2. |
|---|---|---|
| | **B.2.** Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)<br><br>*check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there.<br><br>☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action?<br><br>☐ Yes  ☐ No<br><br>If "no," skip to Question D. If "yes," answer Question C.1, at right. | **C.1.** Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.?<br><br>*check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there.<br><br>☐ NO. Continue to Question C.2. |
|---|---|---|
| | **C.2.** Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)<br><br>*check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there.<br><br>☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | A.<br>Orange County | B.<br>Riverside or San Bernardino County | C.<br>Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☒ | ☐ | ☐ |

| D.1. Is there at least one answer in Column A?<br><br>☒ Yes  ☐ No<br><br>If "yes," your case will initially be assigned to the<br>SOUTHERN DIVISION.<br><br>Enter "Southern" in response to Question E, below, and continue from there.<br><br>If "no," go to question D2 to the right. ➡ | D.2. Is there at least one answer in Column B?<br><br>☐ Yes  ☐ No<br><br>If "yes," your case will initially be assigned to the<br>EASTERN DIVISION.<br><br>Enter "Eastern" in response to Question E, below.<br><br>If "no," your case will be assigned to the WESTERN DIVISION.<br><br>Enter "Western" in response to Question E, below. ⬇ |
|---|---|

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: ➡ | SOUTHERN |

| QUESTION F: Northern Counties? | | |
|---|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes | ☒ No |

CV-71 (05/17)                         CIVIL COVER SHEET                         Page 2 of 3

UNITED ST      S DISTRICT COURT, CENTRAL DISTRICT OF       FORNIA
CIVIL COVER SHEET

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court**?           ☒ NO           ☐ YES

If yes, list case number(s):

**IX(b). RELATED CASES**: Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court**?

                                                            ☒ NO           ☐ YES

If yes, list case number(s):

**Civil cases** are related when they (check all that apply):

   ☐ A. Arise from the same or a closely related transaction, happening, or event;

   ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

   ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

   ☐ A. Arise from the same or a closely related transaction, happening, or event;

   ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

   ☐ C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):** *Leanne E Harton*           DATE: 10/21/2019

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

---

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

# EXHIBIT "C"

1  Sanjay Bhandari (SBN 181920)
   sbhandari@mcnamarallp.com
2  Edward Chang (SBN 268204)
   echang@mcnamarallp.com
3  McNamara Smith LLP
   655 West Broadway, Suite 1600
4  San Diego, California 92101
   Telephone: 619-269-0400
5  Facsimile:  619-269-0401

6  *Attorneys for Temporary Receiver,*
   *Thomas W. McNamara*
7

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12  Bureau of Consumer Financial Protection; State of Minnesota, by its Attorney 13  General, Keith Ellison; State of North Carolina, *ex rel.* Joshua H. Stein, Attorney 14  General; and The People of The State of California, Michael N. Feuer, Los Angeles 15  City Attorney, | Case No. 8:19-cv-01998-JVS (JDEx) **PRELIMINARY REPORT OF TEMPORARY RECEIVER** JUDGE:    Hon. James V. Selna CTRM:    10C |

16            Plaintiffs,

17       v.

18  Consumer Advocacy Center Inc., d/b/a
    Premier Student Loan Center; True Count
19  Staffing Inc., d/b/a SL Account
    Management; Prime Consulting LLC,
20  d/b/a Financial Preparation Services;
    Albert Kim, a/k/a Albert King; Kaine
21  Wen, a/k/a Wenting Kaine Dai, Wen Ting
    Dai, and Kaine Wen Dai; and Tuong
22  Nguyen, a/k/a Tom Nelson,

23            Defendants, and

24  Infinite Management Corp., f/k/a Infinite
    Management Solutions Inc.; Hold The
25  Door, Corp.; and TN Accounting Inc.,

26            Relief Defendants.

27

28

1          **TABLE OF CONTENTS**

2                    **Contents**

3  I. INTRODUCTION ............................................................................................1
   II. RECEIVERSHIP ACTIVITIES .......................................................................2
4      A.    Immediate Access ................................................................................2
           1.    15261 Laguna Canyon Rd, Suite 200, Irvine, CA.....................2
5          2.    173 Technology Drive, Suite 202, Irvine, CA...........................4
           3.    8 Hughes Parkway, Suite 210, Irvine, CA.................................4
6      B.    Bank Accounts ......................................................................................5
       C.    Documents/Information/Electronic Data ..............................................6
7      D.    Accounting ............................................................................................7
       E.    Notice to Consumers.............................................................................7
8  III. DEFENDANTS' PIVOT TOWARD COMPLIANCE IN AUGUST 2019........7
   IV. DEFENDANTS COLLECT UNLAWFUL ADVANCE FEES .......................11
9      A.    The Law – Telemarketing Sales Rule (16 C.F.R. § 310.4(a)(5)) .......11
       B.    Defendants Collect Advance Fees .......................................................12
10     C.    No Valid Escrow or Trust Procedure...................................................12
   V. TRUSTED ACCOUNT SERVICES ................................................................14
11     A.    Defendants Establish Trusted Account Services .................................15
           1.    Incorporation............................................................................15
12         2.    Website .....................................................................................16
       B.    Defendants' First Attempt to Secure Payment Processing for
13           Trusted Account Services ....................................................................17
       C.    Defendants Deceive DebtPayPro to Get Trusted Account
14           Services on the Platform ......................................................................18
       D.    Defendants Purloined Legitimate Third Party Companies'
15           Methods and Documents to Establish Trusted Account Services ......19
       E.    Defendants Own and Control the Trusted Account Services
16           Bank Accounts .....................................................................................20
       F.    Defendants Arrange Trusted Account Services Payment
17           Processing through Jimmy Lai and National Merchant Center..........21
       G.    Defendants' Assertion that Trusted Account Services Is a Third
18           Party Dedicated Account Provider Is False ........................................23
   VI. STUDENT LOAN DEBT RELIEF – THE SALES PITCH AND
19     PROCESS..............................................................................................25
       A.    Leads ...................................................................................................26
20     B.    Sales Tactics........................................................................................26
       C.    Enrollment Fees ..................................................................................28
21     D.    Customer Service and Processing .......................................................29
       E.    Compliance ..........................................................................................32
22     F.    Complaints ...........................................................................................32
   VII. FINANCIAL INFORMATION .......................................................................35
23 VIII. CAN THE BUSINESSES BE OPERATED  LAWFULLY AND
       PROFITABLY?.....................................................................................36

24

25

26

27

28

# I.

## INTRODUCTION

I was appointed Temporary Receiver for the business activities of Receivership Defendants True Count Staffing Inc., d/b/a SL Account Management ("True Count") and Prime Consulting LLC, d/b/a Financial Preparation Services ("Prime Consulting") by the Temporary Restraining Order ("TRO") entered October 21, 2019.[1]  Defendant Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center ("CAC"), which is in bankruptcy, is not a Receivership Defendant.  Albert Kim, Kaine Wen, and Tuong Nguyen are named Individual Defendants.

By this Preliminary Report, I convey to the Court my team's preliminary observations and initial actions.

Our onsite review of operations has identified the basic realities of the student loan debt relief business of Receivership Defendants:

- The overall enterprise secured more than 170,000 customers and more than $71 million in gross revenue.  But, 70% of these customers cancelled their enrollments.  *See* Exhibit 1.

- Historically, the sales process to secure consumers with student loan debt relief has included hard sell tactics and misrepresentations prohibited by the TRO which have misled and confused consumers.

- Beginning in late August 2019, Defendants pivoted to a more compliant process, but based on recent documents and consumer

---

[1] Receivership Defendants are defined in the TRO to mean True Count and Prime Consulting "and their successors, assigns, affiliates, or subsidiaries, and each of them, by whatever names each may be known, provided that the Receiver has reason to believe they are owned or controlled in whole or in part by any of the Receivership Defendants."  *See* TRO, Definitions, pages 6-7.

On October 25, 2019, pursuant to Section XIII(T) of the TRO we gave notice to the parties that First Priority LLC, Horizon Consultants LLC, and TAS 2019 LLC d/b/a Trusted Account Services qualify as Receivership Defendants.  No party has challenged that determination.

---

1                    Case No. 8:19-cv-01998-JVS (JDEx)
PRELIMINARY REPORT OF TEMPORARY RECEIVER

complaints, this pivot was not comprehensive and, of course, it did not remedy prior unlawful practices.

- Defendants collect consumer fees in advance without complying with the Telemarketing Sales Rule, which renders the entire business unlawful.  The August 2019 pivot included representations that fees would be deposited to a "dedicated customer account" at third party Trusted Account Services and only paid out when work was completed.  But, this appears to be a new deception designed to create the appearance of a procedure consistent with the Telemarketing Sales Rule "escrow exception" to the advance fee prohibition.  Not only is Trusted Account Services not an independent third party, I have determined that it is a Receivership Defendant.

## II.

## RECEIVERSHIP ACTIVITIES

### A.    Immediate Access

As authorized by the TRO (Section XIV, page 24), we took control and exclusive custody of Defendants'[2] three business premises in Irvine, California on October 23, 2019, commencing at approximately 10:30 a.m.  At each location, we received support from law enforcement officers.  After securing each site, we provided access to counsel and other representatives of Plaintiffs and retained locksmiths who changed all exterior locks.

### 1.    15261 Laguna Canyon Rd, Suite 200, Irvine, CA

This 22,000 square foot space, bearing a nondescript "Prime Consulting" sign, comprises the entire second floor of a two-story building in an upscale office

///

---

[2]  "Defendants" means collectively the Corporate Defendants, Individual Defendants and Relief Defendants, individually, collectively, or in any combination.  TRO, Definitions at p. 6.

1    park.  Prime Consulting is the lessee at a monthly rent of approximately $65,000.
2    Exhibit 2 is a schematic of the space and an inventory of the property on site.

3         At our arrival, we encountered an active operation with approximately
4    130 personnel on site, many of whom appeared to be either brand new hires
5    commencing training or prospects on site for job interviews.  None of the
6    Individual Defendants were present.

7         Given the large number of people, many with minimal history with the
8    business, it was a challenge to assemble them as a group and secure their
9    cooperation.  While several supervisors were on site, they were not cooperative;
10   they did not assist during our effort to explain the receivership situation and secure
11   TRO-required questionnaires from employees.[3]  We ultimately imposed order,
12   secured questionnaires from those employees who were cooperative, and met with
13   a small number of sales personnel.

14        The premises are built out to support a large telephone sales operation.  The
15   open floor space includes nearly 150 individual workstations equipped with
16   telephones, computers, and monitors and organized in a pod-type system with each
17   pod housing 12-15 sales workstations and one team leader.  At our arrival,
18   97 workstations appeared to be currently active.  The walls are adorned with
19   multiple big screen TVs and the usual accoutrements of sales boiler rooms,
20   including white boards tracking the daily "closings" of each sales agent,
21   motivational sales posters, and instructions to "close" the sale.  *See* Section VI
22   below for a summary of the sales operation.

23        The space also includes a large conference room, eleven interior offices,[4]

24

25   ───────────────
     [3]  Two of the supervisors who refused to cooperate and complete questionnaires –
     Compliance Manager Nicole Balestreri and HR Director Shirena Hulzar – did,
26   however, file declarations in connection with Defendants' opposition to a
     Preliminary Injunction.
27
     [4]  The interior offices are allocated to Human Resources (2), Training (4), the Floor
28   Manager and his staff (2), a Compliance Manager, Information Technology, and
     Marketing.  The marketing office is occupied by Pub Club Leads, allegedly a third

                                    3         Case No. 8:19-cv-01998-JVS (JDEx)
                          PRELIMINARY REPORT OF TEMPORARY RECEIVER

1  and four exterior offices.[5]

2             2.      173 Technology Drive, Suite 202, Irvine, CA

3         This suite of approximately 15,000 square feet is subleased by Defendant

4  CAC from a neighboring company at a monthly rent of approximately $18,000.

5         The site has capacity for nearly 120 staff with 4 individual exterior offices.

6  At our arrival, approximately 60 employees were on site:  2 managers (the

7  Customer Support Manager and the head of "Junior Processing"); 10-15 members

8  of the Customer Service team; 10-15 members of the Junior Processing Team; and

9  30 temporary employees, just recently hired for the reverification campaign

10 described below.  Two other managers (Adon Janse and Isabel Banda) with offices

11 at this site were both at the Hughes location, conducting hiring and training of

12 temporary employees for the reverification campaign.

13        Nearly all employees at this site were cooperative, completed questionnaires,

14 and responded to our questions.

15        Exhibit 3 is a schematic of the office and an inventory of the property on

16 site.

17            3.      8 Hughes Parkway, Suite 210, Irvine, CA

18        This site is an approximately 10,000 square foot suite in a two-story building

19 in an office park leased by True Count at a monthly rate of approximately $10,000.

20 A small sign for "SL Account Management" is posted on the front door.

21        About a dozen people were present – most were temporary staff from

22 AppleOne, a staffing agency regularly used by Receivership Defendants, on their

23 first day of training for the reverification campaign.

24        The suite consists of seven rooms built out along the windows (only one in

25 ─────────────────────

26 party firm to which Defendants have subcontracted advertising and lead
   generation.

27 [5]  The exterior offices are allocated to operations/accounting (with 9 workstations),
   employee Le Ho (aka Calvin Ho) and one office each to Individual Defendants
28 Tuong Nguyen (aka Tom Nelson) and Albert Kim.

active use) and a large open area with approximately 120 cubicles (almost all of which were out of use).[6, 7]

Exhibit 4 is a schematic of the space and an inventory of the property on site.[8]

**B.    Bank Accounts**

Immediately after receiving the TRO, Plaintiffs and the Receiver served the asset freeze on banks and other financial institutions where Defendants were known to maintain accounts.  In the brief time since the TRO was entered, we have received the following information as to frozen accounts:

| Account Name | Financial Institution | Acct. No. | Balance Frozen |
|---|---|---|---|
| First Priority LLC | JPMorgan Chase Bank | 8566 | $159,457.33 |
| First Priority LLC | Sunwest Bank | 0992 | $4,534.25 |
| Hold The Door Corp. (Relief Defendant) | Wells Fargo | 7284 | $53,634.41 |
| Horizon Consultants LLC | Sunwest Bank | 1069 | $707,127.02 |
| Infinite Management Corp. | JPMorgan Chase Bank | 3880 | $40,628.40 |
| Prime Consulting LLC | JPMorgan Chase Bank | 0325 | $517,412.78 |
| Prime Consulting LLC | Sunwest Bank | 1026 | $10,000.00 |
| TAS 2019 LLC | HSBC Bank USA | 3327 | $2,870,097.75 |
| TAS 2019 LLC | HSBC Bank USA | 0413 | $3,096.99 |

[6] One of the rooms was set up as a training room and was in use when we arrived. Another office was occupied by Ms. Banda (HR), and another appeared to be in occasional use by IT personnel.  The rest seemed to be unoccupied.  Nearly all the cubicles were equipped with computer monitors, but many lack an actual computer, and appear to have been out of use for some time.

[7] Both IT personnel (Keneth Hu and Mr. Vu) listed 8 Hughes as their principal office, but Mr. Hu told us that IT had offices in each location, and determined where they would spend each day based on the support requests it needed to address. Next to the IT office in the corner of 8 Hughes, we found a room containing a large rack of computer equipment apparently running bitcoin mining computations as a personal hobby of Mr. Hu.  With Mr. Hu's consent, we turned that equipment off.

[8] At all three locations, we observed thousands of unopened letters from various student loan servicers and the Department of Education addressed to customers but sent to Defendants' various mail drops.

| Account Name | Financial Institution | Acct. No. | Balance Frozen |
|---|---|---|---|
| TN Accounting Inc. (Relief Defendant) | JPMorgan Chase Bank | 7163 | $18,461.53 |
| True Count Staffing Inc. | BNY Mellon | 2000 | $2,824.83 |
| True Count Staffing Inc. | JPMorgan Chase Bank | 1126 | $8,887.95 |
| True Count Staffing Inc. | Sunwest Bank | 2499 | $364,355.56 |
| True Count Staffing Inc. | Wells Fargo | 7276 | $1,500.00 |
| **TOTAL** | | | **$4,762,018.80** |

## C.    Documents/Information/Electronic Data

Upon taking possession of each of the three offices, we confirmed the hard copy documents onsite were secure.  We retained a computer forensic firm to supervise Plaintiffs' computer forensics experts in making images of selected desktop computers.

Receivership Defendants utilize multiple cloud computing services – Microsoft Office 365 for email; Intuit QuickBooks Online for accounting; and DebtPayPro for their customer relationship management database (CRM).  Despite some initial difficulty, we ultimately secured access, via the administrative credentials, to most of the email accounts attached to the active domains[9] and to QuickBooks Online for most of the Receivership Defendants.[10]  DebtPayPro immediately suspended the CRM accounts.[11]

---

[9]  slaccountmgmt.com, financialpreparationservices.com, processingsupport.com, and studentservicesplus.com.

[10]  We do not yet have QuickBooks access for Receivership Defendants First Priority, Horizon Consultants, or Trusted Account Services.

[11]  DebtPayPro also suspended the CRM database for EDU Doc Support – a related entity identified by Plaintiffs.  When EDU Doc Support complained that their account should not be locked, we asked them to provide additional information to determine whether they are a related entity (i.e., owner's name, type of business, location, etc.).  To date, EDU Doc Support has not provided any information. Based on a review of their website (www.edudocsupport.com), they also provide student loan debt relief services.  Until EDU Doc Support demonstrates that they are not related to the common enterprise, we are not comfortable taking its DebtPayPro account off suspension.

Receivership Defendants employed CallerReady for telephone services. CallerReady's counsel has confirmed they have preserved call recordings and are cooperating with the Receiver.

### D.    Accounting

Our forensic accountant, Lisa Jones, is in the process of reviewing available financial records, which include QuickBooks records, bank statements, and merchant account statements for True Count and Prime Consulting. Based on the information available to date, she has prepared a Receivership Initial Account Records Review report attached as Exhibit 5. She has confirmed Defendants took in more than $71 million in gross deposits from consumer payments from January 2016 to August 2019. We have also identified accountants who have provided bookkeeping and tax preparation services for Receivership Defendants in the past. We will follow up with them to secure relevant records and tax returns.

### E.    Notice to Consumers

We added an outgoing telephone greeting to the Receivership Defendants' telephone numbers noting the suspension of operations and strongly encouraging customers to contact their student loan servicers. We have also placed a notice on the Receiver's website and will use that as a vehicle to communicate with consumers.

### III.
### DEFENDANTS' PIVOT
### TOWARD COMPLIANCE IN AUGUST 2019

As important context for this receivership, we must note Defendants' operation has attracted significant state and federal regulatory attention over the last several years. Defendants failed to comply with fundamental regulations for telemarketing sales, including the prohibition of advance fees. Only beginning in August 2019 did Defendants initiate any material changes to their operations and then only after the regulators were knocking at the door.

As alleged in Plaintiffs' submissions to the Court and reflected in CAC's bankruptcy filings, Defendants' regulatory exposure was highlighted by a $31 million bankruptcy claim by the State of Minnesota and by the CFPB's issuance on September 10, 2018 of a civil investigative demand ("CID") to Defendant CAC.

Around the time of the CID, CAC shifted operations and assets to other Receivership Defendants – the sales operations were transferred to Prime Consulting and the customer base and revenue stream were shifted to True Count. CAC then filed bankruptcy in Florida in January 2019 with the goal, according to the testimony of Individual Defendant Albert Kim, to avoid the regulatory enforcement agencies which were circling.  Because of concerns about false statements in its filings, the bankruptcy court later appointed a trustee over CAC's bankruptcy estate.

The CFPB's and the states' investigation of Defendants proceeded despite the bankruptcy.  In July 2019, the CFPB took the investigative testimony of at least two former employees.[12]  Individual Defendants Kaine Wen and Albert Kim were aware of this testimony and they contacted one of the witnesses just before his scheduled appearance.

Defendants appear to have reached a tipping point after the *Wall Street Journal* published an article highly critical of their practices on August 26, 2019, which was immediately emailed to Individual Defendants Albert Kim and Kaine Wen.  *See* Exhibit 6.

A day after the *Wall Street Journal* article ran, management[13] convened an emergency meeting which resulted in a decision to immediately suspend all sales

---

[12]  Excerpts of the testimony of these former employees – Maxwell Camp and Jovani Ortoro – are attached as Exhibits 33 and 34 to Plaintiffs' TRO Application.

[13]  This meeting of management included Kaine Wen, Albert Kim, Isabel Banda, Sal Avila, Kenny Nguyen, and Eric Ortiz.

1  efforts.  Defendants announced to employees that "effective immediately all sales

2  and marketing will be paused until further notice."  The stated purpose of this

3  pause, projected to last approximately three weeks, was that "[d]uring this period

4  the company and each department will work on re-training, compliance, and

5  policies.  In addition, each department will work together to address any and all

6  mistakes on all client files."  *See* Exhibit 7.

7  The sales pause was broadcast on the Financial Preparation Services website

8  on August 28, 2019.[14]  Human Resources emailed customer service personnel on

9  August 28, 2018 to alert them that there was a new script to follow and instructed

10  them to tell customers as follows:

11  "[W]e are upgrading our technology and other systems to
   ensure that clients have received and continue to receive

12  high-quality services from us.  While our acceptance of
   new clients has been temporarily put on pause, we are

13  absolutely continuing to work with current clients who
   have paid at least one installment for our services."

14

15  *See* Exhibit 8.[15]

16  At the outset of the sales pause, management identified prohibited practices

17  that would be subject to a new "zero tolerance" policy.[16]  We located a flyer

18  reciting these new policies posted just outside the "Junior Processing" department

19  _____

20  [14]  The "ATTENTION ALL CUSTOMERS" notice recited that as of that date
   Financal Preparation Services "will be integrating new operational changes" and

21  had "decided to temporarily pause our acceptance of new clients while
   undertak[ing] this integration."  *See* Exhibit 8.

22  [15]  The email also instructed that customers needing more information be told (1)
   "We are working on a variety of upgrades, including the way we process payments

23  and other operational processes"; and (2) "Improved quality control to ensure that
   100% of our customers received the services that they paid for and are in the right

24  loan modification, repayment, or forgiveness plan."  If a customer wanted to
   cancel, customer service should "process the cancellation without hesitation."

25

26  [16]  These prohibited practices included: Accessing NSLDS (National Student Loan
   Data System); accessing FSA (Federal Student Aid); changing FS (family size);
   signing documents on behalf of clients; misrepresentation of the company

27  (Example: we work with the DOE/servicer); submitting clients as unemployed on
   annual recertifications; and final pay without ROA [release of

28  authorization]/confirmation documents uploaded.  *See* Exhibits 7 and 9.

1    with a character wagging his fingers, "Ah, Ah, Ah, You Didn't Say the Magic

2    Words." *See* Exhibit 9.

3    During this sales pause (August 29, 2019 to September 30, 2019),

4    Defendants took some steps toward compliance, including new sales scripts and

5    training, a reverification campaign, and new claims about not accepting advanced

6    fees. *See* Section VI.E "Compliance" below.  A new dba "Student Services Plus"

7    was also launched as Defendants' public face for new customers, replacing

8    Financial Preparation Services which had been featured prominently in the *Wall*

9    *Street Journal* article.  The launch of a new dba was consistent with Defendants'

10   practice of deploying multiple generic-sounding business names.[17]

11   The business changes implemented after the *Wall Street Journal* article

12   could fairly be interpreted as a mad scramble to correct illegal practices to stave off

13   potential regulatory, civil, and possibly criminal liability.  Or, the changes might be

14   a sincere effort to embrace compliance.  But as Receiver, I need not reach a

15   definitive conclusion on such internal motivations, which do not impact my

16   determination, as detailed below, that the Receivership Defendants operated

17   unlawfully even after the August pivot and the businesses cannot operate profitably

18   and lawfully using the assets of the Receivership Estate going forward.

19   With this history as context, we present below a summary of the operations

20   as we found them.

21

22   [17]  At the time of immediate access, we found lists identifying employee teams,
     each with a different, and very generic, company name including: Premier Student
23   Loan Center; Financial Preparation Services; South Coast Financial Center; Direct
     Account Services; Financial Loan Advisors; Account Preparation Services;
24   Administrative Financial; Tangible Savings Solutions; Coastal Shores Financial
     Group; First Choice Financial Centre; Administrative Account Services; Primary
25   Account Solutions; Prime Document Services; Financial Accounting Center; Doc
     Management Solutions; Sequoia Account Management; Pacific Palm Financial
26   Group; Pacific Shores Advisory; First Document Services; Keystone Document
     Center; Administrative Accounting Center; Global Direct Accounting Services;
27   Signature Loan Solutions; Best Choice Financial Center; Yellowstone Account
     Services; Regional Accounting Center; and Financial Direct Services. *See*
28   Exhibit 10.

## IV.

## DEFENDANTS COLLECT UNLAWFUL ADVANCE FEES

The Telemarketing Sales Rule prohibition of such fees is a significant structural obstacle to this business succeeding as a lawful enterprise.  The well-documented policy goal of the advance fee rule is to deter telemarketing opportunists from entering the debt relief business by removing a critical lure of such businesses – instant cash flow from susceptible consumers.  Without that cash flow, the financial rationale for the business expires.  Even with a TSR-compliant escrow, the impact on cash flow of deferring actual collection until the TSR pre-conditions are met is significant.

Defendants' current position, which is that their collection of advance fees is now lawful because the fees go to dedicated client accounts provided by third-party Trusted Account Services, is an ill-conceived effort to invoke the escrow exception to the TSR's advance fee prohibition.

### A.    The Law – Telemarketing Sales Rule (16 C.F.R. § 310.4(a)(5))

The Telemarketing Sales Rule (16 C.F.R. § 310, "TSR") expressly prohibits the collection of advance fees for any debt relief service.  *See* 16 C.F.R. § 310.4(a)(5).  The full text is complex, but at its core, it prohibits requesting or receiving payment of any fee unless and until (A) the telemarketer has settled at least one debt pursuant to an agreement executed by the customer, and (B) the customer has made at least one payment pursuant to that agreement.

The TSR includes a very narrow exception (the "Escrow Exception") which permits the collection of advance fees if the funds are placed in a dedicated escrow-type account that meets five specific requirements, namely:

- The account is at an insured financial institution;
- The customer owns those funds and is paid accrued interest;
- The account holder is not owned or controlled by the debt relief servicer;

---

- The account holder does not give or accept any referral fees; and
- The customer may withdraw from the debt relief service at any time without penalty and, upon withdrawal, must receive all funds in the account, except for compliant advance fees, within seven days of the withdrawal request.

**B.   Defendants Collect Advance Fees**

Consumer payments for Defendants' services have been and continue to be collected long before any work has been completed or the customer has made a first payment on a new renegotiated plan.  During the initial sales call, Defendants acquire the customer's payment information and schedule the first payment, which is generally processed almost immediately after the customer executes the Services Agreement.

The recurring monthly "recertification fee" is by definition collected in advance for 12 months before the annual recertification process even commences.

**C.   No Valid Escrow or Trust Procedure**

In four years of operation, Defendants have not had escrow or trust procedures which could lawfully invoke the TSR's Escrow Exception.[18] Consumer payments have been collected and deposited directly to Defendants' bank accounts.  Nearly $71 million have flowed directly to Defendants in this manner.

Despite these immediate deposit procedures, Defendants have for years **falsely** trumpeted the absence of advance fees.  A standard "No Advance Fees" provision of the form contract recites: A "third-party dedicated account provider ("DAP") [will be used] to collect and deposit payments that Client has agreed to

---

[18]  There are two very minor exceptions.  Defendants contracted with third party dedicated account holders Reliant Account Management and Account Management Plus for a very short time.  As best we can discern this was done so Defendants could steal these companies' trade practices, methods, and documents. (Discussion below).

make with company . . . and to deposit and hold Client's funds in a trust account established and serviced by the DAP.  The DAP will not disburse any Client fees until Client has received a consolidation, adjustment, or otherwise satisfactory result, and Client completes one payment towards such."[19]

Now, Defendants have introduced Trusted Account Services into this "No Advance Fees" misrepresentation.  The October 21, 2019 Sales Script in use at the time of the TRO proclaims:

- "Our fees will be placed into your own Dedicated Client Account and these funds belong to you at all times. Your dedicated account provider is Trusted Account Services, and they will only release our fees after the Department of Education approves your Income Driven Repayment Program every year."  *See* Exhibit 11.

- "As noted earlier on the call, all payments to us will be placed into your Dedicated Client Account.  Any time before completion of the work, you can cancel and get your funds back.  Your funds will only be released to us after we prove to you and Trusted Account Services that we have completed the work . . . ."  *See* Exhibit 11.

The "Compliance Call Script" within the Sales Script further recites:
"Do you understand that our company does not take any upfront fees, and that your payments to us will be placed into your own Dedicated Client Account for your benefit until we successfully complete our work for you?"  If the consumer responds No, then the script continues:  "It is very important to us your money is protected.  You are making payments for our fees to your own Dedicated Client Account held by a non-related company (like a trust company).  Your payments will be released to our company only after the Department of Education accepts your program/plan.  That money belongs to you at all times and you can ask for it back prior to completion of our work."

---
[19]  The consumer declarations filed by plaintiffs in connection with the TRO Motion include these underlying contracts.  *See, e.g.*, Pl. Exhibit 52, attachment A, p. 1466, para. 4.  *See also* Pl. Exhibit 53, attachment A, para. 4.

*See* Exhibit 11 (emphasis in original).  Even if Defendants followed procedures as described in the scripts, they do not comply with the specific requirements of the TSR.[20]

Defendants' fundamental misrepresentation is that a Dedicated Client Account has been set up with a third party:  Trusted Account Services.  Our investigation has revealed that Trusted Account Services is not a third party, but an appendage of Defendants' operation which is maintained in-house by a very narrow group of insiders.  Hence, Trusted Account Services does not provide Defendants cover that they are in compliance with the TSR.

Given the complex history of Defendants' deep deception as to Trusted Account Services, we present below as Section V a summary of Trusted Account Services' formation and implementation based on the materials available to us from the immediate access.

## V.

## TRUSTED ACCOUNT SERVICES

Trusted Account Services (sometimes referred to as TAS) is not an independent third-party provider of dedicated client accounts.  Rather, it was created and is beneficially owned and controlled by the Defendants who have closely guarded their ownership secret.  The truth was shared with only a handful of Defendants' high-level and trusted employees, who, in turn, relied on internal IT personnel and IT contractors located in Vietnam to build the Trusted Account Services facade.[21]

---

[20]  TSR prohibits the release of fees from the consumer's trust account until (A) the telemarketer has settled at least one debt pursuant to an agreement executed by the customer, and (B) the customer has made at least one payment pursuant to that agreement.  Defendants' script ignores the one payment requirement, stating that funds will be released "only after Department of Education accepts your program/plan," *not* after the plan has been accepted and one payment has been made as the TSR requires.

[21]  Outside the C-suite executives and IT functionaries, employees within Defendants' companies were fed the party line about Trusted Account Services.  Despite that, however, some employees we interviewed – who were mid-level

Because Trusted Account Services is owned and controlled by the Individual Defendants and affiliated with the Receivership Defendants – and indeed is part of the Defendants' student loan debt relief common enterprise – I have determined it is a Receivership Defendant.

Once Trusted Account Services was operational, it was touted as the independent provider of dedicated client accounts for Receivership Defendants, all in an effort to create the appearance of an escrow procedure compliant with the TSR advance fee rule.

### A.    Defendants Establish Trusted Account Services

#### 1.    Incorporation

The Trusted Account Services entity, TAS 2019 LLC ("TAS 2019"), was incorporated on March 20, 2019 as a Wyoming entity through an anonymous process using a local registered agent.  The Wyoming Secretary of State does not provide information beyond the name of the registered agent – this allowed Defendants to conceal their involvement.

The address listed for Trusted Account Services on its website is 109 E. 17th Street Suite 5656, Cheyenne, WY which is simply a virtual office that accepted mail and provided the false appearance of an actual operating company.  The Wyoming virtual office was rented in the name of Trusted Account Services and Kenny Huang and was instructed to forward Trusted Account Services mail to an address in Huntington Beach, CA – 17011 Beach Blvd, Suite 900.  *See* Exhibit 12. The Beach Blvd location is yet another virtual office/mail drop arranged and paid for by Defendants' employees, including operations manager Calvin Ho, in the name of Trusted Account Services and Kenny Huang.  *See* Exhibit 13.

The TAS 2019 incorporation documents we recently secured identify Kenny Huang as the managing member of the LLC.  We believe Kenny Huang is or was

---

managers and line employees – noted they were suspicious about the independence of Trusted Account Services.

1 an employee of the Defendants or perhaps was simply acting as a "front" for the
2 Defendants in their effort to secure merchant payment processing.[22]  During a
3 phone call with Kenny Huang at 6:12 p.m. on October 30, 2019, I directly asked
4 him if he was the owner of TSA 2019, and he responded "yes" twice, but then
5 would not answer further questions and has not responded to our several calls since
6 then.

7            2.    Website

8        On March 20, 2019, Defendants also registered a website –
9 trustedaccountservices.com.  Although the domain is registered anonymously with
10 internet domain registrar GoDaddy, our investigation indicates that Defendants
11 control the Trusted Account Services server and website.  We discovered
12 correspondence between Defendants' employees Calvin Ho and Thein Nguyen
13 discussing, evaluating and revising the initial content for this website.  We also
14 located the GoDaddy and TAS domain credentials (username and password) in
15 Individual Defendant Albert Kim's Dropbox.

16        Defendants also controlled the Trusted Account Services email system.  In a
17 Customer Service Manager's workstation, we located the Outlook password for
18 email account studentloanmanagement@trustedaccountservices.com.  *See*
19 Exhibit 14.  That email mailbox was only recently created (October 13th), but had
20 already received several hundred emails from customers.  Although they were
21 addressed to a Trusted Account Services account, these emails were regularly
22 reviewed and responded to by Defendants' employees.

23
24 [22]  We found an IRS W-4 form completed in the name of Kenny Huang at
Defendants' Laguna Canyon office.  Trusted Account Services merchant account
25 application documents purportedly completed by Kenny Huang reflect he is
employed by the U.S. Department of Labor.  Regardless of where Mr. Huang is
26 employed, we believe he was acting as a "front" or nominee used to establish TAS
2019, open bank accounts, and most importantly obtain merchant account payment
27 processing.  Defendants have used other employees, for example, Keneth Hu
(discussed below), to act as "front" for Defendants' merchant account applications.
28 In Mr. Hu's case, he opened a Horizon Consultants LLC d/b/a Premier Student
Loan Center merchant account.

**B.    Defendants' First Attempt to Secure Payment Processing for Trusted Account Services**

In February 2019, even before the Trusted Account Services name had been selected, Defendants sought a payment processing vendor for the new venture. They began discussions with Donald Cook, a broker who seems to cater to high-risk clients.  On February 26, Cook told the Individual Defendants Wen and Nguyen and senior employee Calvin Ho that he could secure processing services, but warned they needed a third party intermediary for client funds.  *See* Exhibit 15.[23]

Not long after the entity was incorporated, Kaine Wen (copying the other Individual Defendants and Calvin Ho) notified Donald Cook that TAS 2019 LLC would be the processing applicant with Kenny Huang as the owner.  *See* Exhibit 18.  Cook responded by email to Kenny Huang (who Mr. Cook understood was an employee of the Defendants) with more requests for information.  In response, Kaine Wen, who had been copied on the email, forwarded Cook's requests to his operations manager Calvin Ho to complete (which he did).[24]  While he was able to secure some payment processing for Defendants, Cook terminated the relationship after a falling out with Defendants.  As a result, Trusted Account Services was left without payment processing capability, but the void was later filled by Jimmy Lai – a long-time associate of the Defendants, discussed below.

///

///

---

[23]  A few days later, on March 3, Calvin Ho emailed the Individual Defendants a flow chart for a new "DAP" [dedicated account provider] intermediary, Exhibit 16, and on March 11, he emailed his technical team a list of desired functions for the DAP intermediary, **which for the first time he identifies as Trusted Account Services**.  Exhibit 17.

[24]  Kenny Huang was purported to be using the email TAS2019@gmail.com, but in fact Kaine Wen actually controlled that email account and used it frequently (posing as Kenny Huang) in communications with vendors.

**C.    Defendants Deceive DebtPayPro to Get Trusted Account Services on the Platform**

For Trusted Account Services to function, it had to be integrated with Defendants' customer relation management (CRM) software, provided by DebtPayPro.  Kaine Wen along with Calvin Ho orchestrated a ruse to get Trusted Account Services accepted and integrated in the DebtPayPro CRM database.  They went to great lengths to posture Trusted Account Services as a real and independent company, including creating fictional characters to interact with DPP via email and over the telephone.

On May 1, 2019, Kaine Wen emailed DebtPayPro's support team, writing:

> "Please provide detailed answers and explanations to the following questions from Trusted Account Services.  *We are testing out their dedicated account provider services (same services as Reliant Account Management or Account Management Plus)*.  Thank you in advance.
>     1.    *How can we integrate with DPP?*
>     2.    *Do you have any document that details what information we need to receive from DPP's end or pass to DPP from our end?*
>     3.    *Do you have any API to use for integration?*
>     4.    *How can we manage the transactions and clients between our systems and DPP?*"

*See* Exhibit 19 (emphasis added)

The questions posed by Kaine Wen did not, however, originate from Trusted Account Services, but were crafted by Defendants' IT employee[25] who had been tasked to integrate Trusted Account Services into the DebtPayPro platform.  *See* Exhibit 20.

Kaine Wen created these questions and the lead-in to them to paint the mirage of Trusted Account Services as a separate company.  When DebtPayPro support staff followed up with a request for the company's website and the name of a direct contact there, Calvin Ho responded with a link to the website

---

[25]  We believe the Vietnam company, Processing Service Co., Ltd., is owned by Calvin Ho's mother.  It received nearly $600,000 from Horizon Consultants.

1   (https://trustedaccountservices.com) and an email address

2   (technicalsupport@tasportal.com).  *See* Exhibit 19.  DebtPayPro support then

3   asked, "[i]s there a person there you've been working with that I can ask reach

4   [*sic*] out to specifically?"  *Id.*  Calvin Ho responded with a name: Michael Tabin

5   (michaelt@trustedaccountservices.com) whose signature listed him as Trusted

6   Account Services' Chief Technology Officer.  *Id.* We believe, however, that

7   "Michael Tabin" is a fictional name invented by Kaine Wen and Calvin Ho to deal

8   with DebtPayPro.

9       On May 23, Ho emailed the group – addressing both DebtPayPro and

10  "Michael" – to ask how the integration was proceeding and when Defendants

11  could begin using Trusted Account Services.  *Id.*  DebtPayPro responded that they

12  were still reviewing the API documentation and drafting a scope of work proposal

13  and quote.  *Id.*  Throughout the email chain with DebtPayPro, Wen and Ho

14  maintained the deception that they were Trusted Account Services.  Trusted

15  Account Services was ultimately accepted by DebtPayPro – which gave

16  Defendants the ability to process consumer payments through Trusted Account

17  Services on the DebtPayPro platform.

18      **D.    Defendants Purloined Legitimate Third Party Companies'**

19          **Methods and Documents to Establish Trusted Account Services**

20      Our review also revealed that in establishing Trusted Account Services,

21  Defendants just copied the methods, operations and documents of other such

22  providers like Reliant Account Management ("RAM") and Account Management

23  Plus ("AMP").  Defendants had their IT contractor in Vietnam copy wholesale the

24  practices and documents (generally word-for-word) of RAM and AMP which were

25  then only slightly modified and rebranded as Trusted Account Services materials.

26  We located in Defendants' team management software, Monday.com (which is

27  used to monitor IT and operations projects), a project associated with the creation

28  of Trusted Account Services.  The Defendants' Monday.com platform includes

1  tasks such as "Figure AMP's services charges to find a processing comp for TAS"

2  and "Create a new agreement based on RAM Authorization Form," as well as

3  "Build database for TAS" and "Revise TAS Contents." *See* Exhibit 21.[26]  This

4  "creative" history demonstrates that Trusted Account Services was hatched by

5  Defendants, complete with intellectual property thievery.

6          **E.      Defendants Own and Control the Trusted Account Services Bank**

7                  **Accounts**

8          Defendants opened Trusted Account Services bank accounts at HSBC Bank

9  shortly after TAS 2019 was incorporated.  While we have not yet received a

10 fullsome response from HSBC, we found the following documents at the Laguna

11 Canyon offices which show Defendants own and control these HSBC accounts:

12         • An HSBC account statement for Trusted Account Services for

13             September/October 2019 was found in a back corner office (where

14             Defendants' operations/accounting were located).

15         • Two large packages of Trusted Account Services HSBC business

16             checks were found in a safe in the same office.  Although Kenny

17             Huang is the signatory on the account, the checks were mailed to the

18             home address of Defendants' accounting employee, Thu Quach.  Ms.

19             Quach labeled the two accounts as an operating account and a client

20             funds account.

21         • One sheet of checks were pre-signed via a signature stamp in the

22             name of Kenny Huang.  *See* Exhibit 22.  We later found the stamp in

23             the safe in Ms. Quach's office.

24

_____

25 [26]  Notably, Defendants contracted with both RAM and AMP for a short period of
   time.  For example, Defendants entered into a contract in November 2018 with
26 RAM, but the relationship terminated in roughly March of 2019 – Defendants
   having used RAM for only a couple of dozen customers (out of the Defendants'
27 roughly 50,000 active customers).  But in doing so, Defendants learned the
   methods of these third party dedicated account provider companies and accessed
28 their agreements and contracts which the Defendants promptly plagiarized.

- We also found Costco receipts, dated September 10, 2019, for two orders of Trusted Account Services HSBC checks. The checks had been mailed to Ms. Quach's home.
- The address on the checks is the Beach Blvd. virtual office for Trusted Account Services, which was opened under Kenny Huang's name but which Defendants arranged.

**F.     Defendants Arrange Trusted Account Services Payment Processing through Jimmy Lai and National Merchant Center**

Once Defendants integrated Trusted Account Services into the DebtPayPro platform, they still needed a payment processing vendor. Defendants had been on alert for payment processing options for several months. *See* Exhibit 23. When the arrangement with Donald Cook fell apart, the Defendants went back to Jimmy Lai, who, like Cook, acts as a middle man between high-risk merchants and payment processors.[27] He has worked with Defendants on numerous occasions to secure payment processing for their various entities.

Defendants did not have to present an elaborate charade of Trusted Account Services' independence with Jimmy Lai. Lai was in on the lie. He understood that Defendants owned and controlled TAS 2019 and that Kenny Huang was a front. He had worked with Defendants for years and, in fact, had previously executed nearly this exact "front" scam with Defendants.

In late 2018, Lai worked with Individual Defendants Wen and Nguyen to use a front – this time Keneth Hu, an IT employee of Defendants – to apply for a merchant processing account in the name of Horizon Consultants LLC d/b/a Premier Student Loan Center. Hu claimed to be the 100% owner of Horizon Consultants for purposes of the application – but all involved understood that

---

[27]  In this instance it is unclear whether Lai was acting as a broker or as an employee of National Merchant Center, as we see that he uses a National Merchant email address in connection with Trusted Account Services.

1    Defendants own and control the company.  When the application was finalized – in
2    Keneth Hu's name and containing all of his personal information – Lai sent it to
3    Individual Defendants Wen and Nguyen, not Hu, with a note: "Please review for
4    accuracy, sign and return."  Kaine Wen then forwarded the application on to Hu
5    with instructions, "Please sign on page 6 (twice) and page 7."  *See* Exhibit 24.
6    Horizon Consultants' merchant application was approved and it proceeded to run
7    consumer charges through the account.  *See* Exhibit 25.

8            Eight months later, Defendants approached Lai about filing another
9    application package using a "front" – this time for Trusted Account Services.  Lai
10   was happy to oblige.  On June 19, Lai submitted an application for TAS 2019 with
11   National Merchant Center with Kenny Huang as the "front" – listed as the 100%
12   owner.  *See* Exhibit 26.  Six days later, the associate director of underwriting wrote
13   to Lai and identified a number of holes in the application.  Lai simply forwarded
14   the email with a one sentence introduction: "Kaine/Kenny, There are a lot of things
15   missing that we need to obtain before we can send to First Data for review and
16   approval."  *Id.*  The application was revised and submitted on July 1.  *See*
17   Exhibit 27.  Again, Kenny Huang was the "front," listed as the owner of TAS
18   2019.  On July 9, Lai forwarded the final application for signature, listing Kenny
19   Huang as the 100% owner.  But Lai did not send the application to Kenny Huang;
20   he sent it **only** to Kaine Wen with the instruction to "[p]lease execute with Wet
21   Signature."  *See* Exhibit 28.

22           National Merchant Center accepted the application – an application that
23   Kaine Wen, Kenny Huang and Jimmy Lai knew was false.  Processing for Trusted
24   Account Services began on September 12 and by the end of the month more than
25   $800,000 in consumer funds had been processed.  Another $2,000,000 in consumer
26   charges were processed before the TRO was issued.[28]

27
28   ---
     [28]  Based upon information contained in the Trusted Account Services portal that
     Defendants' employees control, more than 56,000 separate transactions were
     processed in the roughly six weeks of operation.  Indeed, it appears that all of

1    **G.    Defendants' Assertion that Trusted Account Services Is a Third**
2    **Party Dedicated Account Provider Is False**

3    In Defendants' Response to the Order to Show Cause, they assert that
4    Trusted Account Services is a "third party" which is "a dedicated account provider
5    that provides escrow services" and that "[n]o Defendant or Relief Defendant owns
6    or controls (or has ever owned or controlled) [Trusted Account Services]."
7    Response at pp. 9-10.  Each of these assertions is based entirely on the declaration
8    of Jimmy Lai attached to the Response.  Mr. Lai's declaration is riddled with
9    extraordinary falsehoods.

10    As discussed above, Mr. Lai was a long-time payment processing broker for
11    the Defendants and was instrumental on at least two occasions in obtaining
12    merchant accounts for Defendants using "fronts" or nominees, including Trusted
13    Account Services.  Nevertheless, Mr. Lai now claims that Trusted Account
14    Services is not, and was never, owned or controlled by any Defendant or Relief
15    Defendant (¶ 6).  This claim is belied by substantial evidence as described above.
16    Mr. Lai also claims he is the majority owner of TAS 2019 and has been since
17    September 1, 2019 (¶ 1), and that since his involvement with Trusted Account
18    Services, its connection to Defendants has been limited to software integration
19    (¶ 6).  These claims are inconsistent with the facts described above and any number
20    of objective post-September 1, 2019 facts:

21    • On September 9, 2019, two Merchant Account Change Request
22      Forms for Trusted Account Services were filed with National
23      Merchant Center (a company at which Mr. Lai is or was employed).
24      The owner of Trusted Account Services is listed as Kenny Huang and
25      a signature in that name appears on the forms. *See* Exhibit 29.  The

26
27    _____
28    Defendants customers' payment processing was transferred to Trusted Account
      Services without notice to customers.

email listed for Mr. Huang, tas2019llc@gmail.com, is controlled by
Kaine Wen.

- A Trusted Account Services voided check was attached to the
  September 9th Merchant Account Change Request Forms.  The
  address listed on the check is Kenny Huang's home address.  *Id.*
- Also included with the Merchant Account Change Request Forms was
  a letter from HSBC, dated September 9, 2019, reflecting that
  TAS 2019 and Kenny Huang established a business account with the
  bank.  *Id.*
- On September 10, 2019, Defendants' employees ordered new HSBC
  Trusted Account Services checks and had them mailed to an
  employee's home.
- On September 19, 2019, National Merchant Center ran another check
  on the Wyoming Secretary of State site to confirm that TAS 2019
  remained active at the mail drop in Wyoming.  *See* Exhibit 30.
- On September 20, 2019, a Trusted Account Services mail drop
  invoice in the amount of $125 for October 2019 was forwarded to an
  employee of Defendants for payment.
- National Merchant Center sent a "card processing statement" for the
  period of September 1 to September 30, 2019 to Kenny Huang at the
  mail drop in Wyoming.  *See* Exhibit 31.
- In early October, National Merchant Center mailed the Trusted
  Account Services September processing statement to Kenny Huang at
  the mail drop in Wyoming (the address listed on the Wyoming
  Secretary of State site).  *See* Exhibit 32.
- We located the check stub for the last customer refund check written
  on the Trusted Account Services HSBC business account at the

Laguna Canyon office; the check was written on October 4 using a signature stamp in the name of Kenny Huang.

- On October 7, 2019, National Merchant Center forwarded the TAS 2019 September statements to Jimmy Lai at his swiftpaymentsinc.com and his nationalmerchant.com addresses. (Again, it is unclear if Mr. Lai continues to work at National Merchant Center.)  Within eight minutes of getting the statements, Lai forwarded them to Defendant Nguyen.  *See* Exhibit 33.

- Two days ago, Wednesday, October 30 at 6:12 p.m., in a short telephone call with me, Kenny Huang claimed (twice) that **he owns** TAS 2019.  Mr. Huang asked to see the TRO before having any further conversation.  The TRO was provided.  Mr. Huang has not responded to our emails or telephone calls since.

We noticed and served a deposition notice on Mr. Lai on Tuesday, October 29, for a Friday, November 1 deposition.  (That deposition is now set for Tuesday, November 5.)

## VI.

## STUDENT LOAN DEBT RELIEF –
## THE SALES PITCH AND PROCESS

Defendants' acceptance of advance fees in violation of the TSR dooms the business from the start.[29]   But, the analysis of whether this business can continue lawfully and profitably does not hang entirely on advance fees.  We identified fundamental flaws in the tactics deployed to secure customers which have left consumers feeling confused and misled.  *See* Section VI.F "Complaints" below.

Defendants' student loan debt relief business is built on a challenging premise:  identify and target consumers with student loan debt to sell them a

---

[29]  Even advance fees collected through TSR-compliant escrow would pose serious challenges to financial sustainability – see discussion below.

1   utilitarian service they can do themselves (by filling out Department of Education

2   forms or with the assistance of resources available from the DOE, DOE-approved

3   loan servicers, and other consumer-friendly resources.  And do this in an

4   environment that is heavily regulated to protect consumers and prohibits advance

5   fees until the work is completed and accepted by consumers.  By any definition,

6   this is not a promising business model for a lawful operator, and this reality is

7   borne out by Defendants' 70% cancellation rate.  *See* Exhibit 1.

8       **A.    Leads**

9       New customers are secured by the telemarketing sales team by calls to and

10  from consumer "leads."  Lead generation has been managed by Pub Club Leads

11  ("Pub Club"), the marketing business which operated from an interior office at the

12  Laguna Canyon site.  Pub Club was tasked to generate "Billable Leads" based on

13  parameters set forth in time-specific orders from Prime Consulting.  Pub Club did

14  this by retaining and managing multiple sub-vendors who deployed various data

15  mining techniques.  Pub Club was compensated by a percentage of the total

16  "advertising buy" for each of the Orders.  Our review indicates that for the period

17  October 2018 to October 2019, Pub Club received approximately $9 million from

18  Prime Consulting.  Pub Club also received approximately $5 million from Horizon

19  Consultants between March 2019 and September 2019.

20      **B.    Sales Tactics**

21      Defendants' new "zero tolerance compliance" protocols, announced in

22  August 2019, are themselves confirmation of bad practices that historically

23  permeated the sales process.  *See* Exhibit 7.  One such practice related to family

24  size where sales agents, with or without the customer's assistance, inflated family

25  size to secure lower payments.  In one recorded telephone call from July 25, 2019,

26  that we reviewed, the sales advisor added the customer's two dogs to increase

27  family size.  In June 2019, a customer service manager identified an issue

28  internally that customers felt "scammed" because they were paying $1,300 when

Defendants do "very little."  *See* Exhibit 34.  In April, 2019, Individual Defendant Nguyen internally reported that he had done a small audit on family size and found that 6 out of 10 failed with "All fake FS."  *See* Exhibit 35.

Our review of the Laguna Canyon site confirmed the obvious reality that Defendants were in the sales business with sales personnel incentivized to <u>sell</u>:

- The Sales Department was physically structured to maximize results with sales agents organized in pods headed by a Team Leader, each with a separate white board to track results and weekly goals.

- Sales advisors (who were retitled Student Loan Specialists on September 30, 2019) were paid weekly with an hourly minimum ($12-$15 per hour) and a commission based on a percentage (18%-22%) of the dollar value of closed deals after the enrollment payment cleared.  The applicable percentage was determined by the advisor's rank, which was based on total revenue from sales over the previous four weeks.  *See* Exhibit 36.

- Sales advisors were also paid bonuses through various "performance sprints", including special bonuses for same day closings/payments and 5 deals in a day. The big producers even got to participate in raffles for laptops, gaming consoles, headphones and movie tickets. *See* Exhibit 37.

- The overriding mission was to "Close."  A big screen TV in the main room ranked the highest closers.  Inspirational signs promoted "Always Be Closing" and "Assume the Close."

- Sales advisors were exhorted to complete the "Hard Close," sometimes called "Same Days," by manufacturing a need to close now.  Rebuttals to customers wanting to "call back" included "the government is very strict" and the "system does not allow me to keep your application open."  *See* Exhibit 38.

1     Absent aggressive real time supervision, these incentives created an
2 atmosphere where sales agents are tempted to do whatever necessary to "close"
3 and get their commissions and bonuses.

4     We reviewed scripts, training materials, and sales directives found at each
5 workstation in the Sales Department.  After August 2019, the Sales Scripts were
6 revised several times, but even the most recent Sales Script – October 21, 2019
7 (Exhibit 11) – may confuse consumers about the services and the related fees, and
8 creates the impression that fees paid to Defendants would be credited to their loan.
9 This confusion is reflected in consumer complaints.  *See* Section VI.F
10 "Complaints" below.

11     **C.    Enrollment Fees**

12     "Enrollment Fees" (now called "Initial Fees") were a key component of the
13 sales process and engendered significant confusion among customers.  The most
14 recent schedule includes three tiers based on the customers student loan balance.
15 The "Initial Fee" was set at $1,545 (loan balance above $40,000), $1,395 (loan
16 balance $25,000-$40,000), and $1,245 (loan balance $9,000 – $25,000).[30]  The
17 standard payment plan was five monthly payments (six with manager approval).
18 Consumers who agreed to immediately pay in full were rewarded with a $100
19 discount and sales advisors received bonuses.  The fee structure with the
20 corresponding monthly payment amounts and related commissions were published
21 in materials and on white boards around the office.  *See* Exhibit 36.

22     All customers were also charged a recurring monthly "recertification fee"
23 ($22, $32, or $42) as required by most repayment plans.  This recertification fee
24 created residual monthly cash flow for Defendants with no immediate benefit to
25 the customer and was paid out well before the annual recertification application
26 was actually prepared or even due.

27
28 [30] Fee amounts have varied over time with $1,750 being the highest level we
identified.

1    Fee payment schedules were entered into DebtPayPro and monthly auto

2    payments were pulled from customer accounts.  The recertification fee was

3    scheduled to be charged in the month after receipt of the final payment on the

4    Initial Fee.[31]

5        **D.    Customer Service and Processing**

6    At the time of the TRO, customer service operated from the 173 Technology

7    Drive site.  In early October 2019, Defendants actually laid off the entire

8    processing department as a prelude to outsourcing processing functions to an

9    offshore vendor.[32]

10    The Customer Service Team was primarily tasked to handle complaints from

11    consumers, the BBB, and regulators.  Internal protocols emphasized, however, that

12    representatives were to answer the phone generically as "customer

13    service/customer support" and to give the appearance of being a "third party."[33]

14    Scripts and instructions found on site confirmed complaints were a big part

15    of the business.  Written instructions found in Customer Service cubicles identified

16    two primary goals (1) retain the customer by resolving the issue and (2) mitigate

17    the fallout from customers likely to complain to outsiders.  "Retention Policies"

18

---

19    [31]  For example, the DPP file for customer L. Burdick (loan balance $40,303)

20    shows enrollment on October 4, 2019 with the Initial Fee of $1,245 scheduled out
      at 5 monthly payments of $249 commencing October 4, 2019, completing

21    February 4, 2020, and the $42 monthly recertification fee scheduled to commence
      March 4, 2020 and running through September 4, 2029.

22    [32]  Historically, the primary processing functions were to pick up the customer
      "file" from the sales agent once the agreement was signed.  From there, processing

23    finalized data collection on income and other matters, secured customer signatures
      on the necessary documents and commenced the processing of enrollment fees.

24

25    [33]  The customer service representatives were provided scripted language:  "We are
      a third party customer service department that takes care of customer support for
      many different companies.  It looks like you have been working with (insert

26    appropriate name here: SL Account Management, Premier Student Loan Center,
      Financial Preparation Services, Financial Loan Advisors, and Tangible Saving

27    Solutions.)."  They were also instructed not to acknowledge any of Defendants'
      name changes or that customer service was part of any of those companies.  *See*

28    Exhibit 39.

---

1  directed that full refunds be given to consumers likely to complain to the BBB,
2  regulators, or enforcement authorities.  *See* Exhibit 40.

3       Customer Service also maintained a list of 20 "Disposition Codes" which
4  highlight the level of customer confusion.  These codes included "Fees not
5  Explained to Me," "Program not Explained Correctly," and "Payments did not go
6  toward my Student Loan Payment."  *See* Exhibit 41.

7       During September and October 2019, a primary activity at the Technology
8  Drive site was a reverification campaign supposedly designed to confirm the data
9  on more than 40,000 files and have customers sign new documentation.  This
10 campaign was implemented by personnel from Junior Processing, Customer
11 Service, and approximately 30 temporary workers who made outbound calls to
12 customers based on a script.  After verifying identity, the customer was directed to
13 a website to verify and initial a series of compliance questions and provide fresh
14 signatures on documents signed at their original enrollment.  This campaign also
15 introduced customers for the first time to Trusted Account Services and directed
16 them to sign a contract with Trusted Account Services.[34, 35]

17

18 _____
[34]  In this regard, the reverification script included Compliance Questions,
19 Paragraph 10 of which provides:

20    • "Do you understand that your monthly recertification assistance fee to us
         will be placed into your own Dedicated Client Account held for your
21       benefit until we successfully complete our work for you?"

22    • "You are making payments for our fees to your own Dedicated Client
         Account **held by a non-related company (like a trust account) until
23       your program is finalized and complete**."

24    • "To fully emphasis we do not take upfront fees.  That means that until
         your program is approved any payments you are making are going into a
25       separate trust account for you until you are placed in the program initially
         outlined with the payment details initially discussed."
26
   *See* Exhibit 42 (Emphasis added).
27
   [35]  Notably, Defendants unilaterally transferred all customer payment processing to
28 Trusted Account Services in September 2019 without customer consent.

In their recent filings, Defendants cite a supposed 96% success rate in the reverification campaign as evidence that their customers were fully satisfied and re-executed agreements willingly.  *See, e.g.*, Defendants' Response re: OSC at 8-9 (citing Balestreri Decl. ¶ 12 & Ex. F).  They claim this high success rate for the 3,252 reverifications is "more statistically significant and a more accurate picture" than the customer complaints relied on by the CFPB because Defendants' "sampling of customers is random."  *Id.* at 8.  This success figure is astounding and suspect, particularly in a business with a 70% customer cancellation rate.

My investigation indicates, however, that the reverification campaign was not an objective scientific process confirming universally happy customers. Rather, it was a hastily organized exercise using temporary employees with little training to retroactively confirm data in old files, guided by a script that required more than 90 minutes of talk time to complete.  In addition, Defendants' "sampling" does not appear random at all, but instead it appears Defendants cherry-picked the initial files to be reverified in order to achieve a higher success rate.  Notes we found in the office of Mr. Ortiz, the head of Junior Processing, from a September 20, 2019 meeting with customer service managers Christian Sangalang and Adon Janse indicate that Mr. Ortiz's team was assigned 2,800 files designated "High priority."  All of these had small "FS (family size)," between 1 and 5 members, thus reducing the likelihood of prior family size inflation.  The notes indicate that Mr. Janse stated that approximately 2% of these files "have issues" and that "Most clients will sign."  *See* Exhibit 43.

Defendants also suggest that the reverification campaign reflected a "random" sampling of calls coming *into* customer service.  This is, however, belied by the reverification scripts which state: "I am calling you today on a recorded line to ensure the accuracy of all details on your account.  We are contacting all our existing clients to complete a routine follow up as part of our ///

1    newly required compliance policies and procedures."[36]  *See* Exhibit 42.

2        **E.    Compliance**

3        Compliant practices did not come naturally to Defendants.  Compliance

4    concerns and procedures before the August pivot were sporadic.  Beginning

5    August, 2019, however, compliance efforts were upgraded, including:

6        • The zero tolerance policies first announced in the August 27, 2019

7            Memo, were re-stated in various other formats.  *See* Exhibit 44.

8        • New Hires were run through a week of day-long training and

9            education sessions.  *See* Exhibit 45.

10       • The basic Sales Script was updated and revised multiple times

11           resulting in the current version of October 21, 2019.  *See* Exhibit 11.

12       • The 4 training rooms at the Laguna Canyon site, each outfitted with 4

13           workstations, were updated with new directives and information

14           posted above each workstation, including Rebuttals, Doc. Assistance,

15           File Accuracy, and Verbal Consent.  *See* Exhibit 46.

16       These are representative, but not exhaustive examples of compliance efforts

17   after the August pivot.  These moves were in the right direction, although some

18   elements could be described as window dressing.  Regardless of motivation or

19   sincerity, however, compliance was on Defendants' radar, beginning in August

20   2019.

21       **F.    Complaints**

22       The ultimate gauge of whether consumers are confused or feel misled is to

23   review the flow of complaints generated by those consumers.  Defendants suggest

24   that the August pivot has resulted in a compliant operation and claim a

25

26   _____
     [36]  Customer service representatives were instructed that they could conduct the
27   reverification during regular customer service calls, but when customers called
     with concerns about withdrawals made by a new entity (Trusted Account Services)
28   they were told they would be receiving separate calls to reverify their information
     and sign contracts with Trusted Account Services.

96% satisfaction rate by customers contacted in the reverification campaign.
While we did not have the time or resources to statistically sample all the data, we
do have the ability to get a sense of the situation by reviewing Defendants'
customer contacts post-pivot.

We identified a Trusted Account Services email box
studentloanmgmt@trustedaccountservices.com established around October 13,
2019.  Defendants controlled and monitored this email box.  Defendants'
employees reviewed and responded (as necessary) to customer inquiries.[37]  This
has given us a discrete stream of inquiries to review – some 400 emails delivered
since October 13 – which again, is obviously after the Defendants' August pivot.

We identified approximately 250 informational inquiries (*e.g.*, requests for a
return call or email, requests to update payment information, inquiries about the
status of consumers' application or the recertification process, etc.).  One customer
stated he was satisfied with Defendants' service, but then asked for clarification
why FedLoan was asking him for a large payment, thinking that the monthly $40
payment handled his obligation.

We identified approximately 150 troubling customer contacts – complaints
of one kind or another.  Some examples follow:

- "The payments that are being taken each month are not the payments I
  agreed to and not an amount I can manage.  I need to hear back from
  someone asap and get this resolved."  *See* Exhibit 47.
- "If I'm paying $40/month, WHY has my student loan increased from
  $52k to $54k? . . . Instead of paying $52k to Nelnet, at the end of 240
  payments, I will pay a total of $10,555 to Premier Student Loans?
  Will the balance be expunged from my financial obligation?"  *See id.*

---

[37]  We have not yet been able to canvas all Defendants' email accounts and
therefore have not identified all mailboxes which might be receiving customer
inquiries and complaints.

- "I have spoken to Navinet - who hlds my student loan perNavinet they have nothing from you concerning my student loan and they are now delinquent.  I need answer's and I am stoping Payment." *See id.*
- "This is a scam and I want all of my money returned or I am prepared to legal action.  My student loans are still showing up as unpaid on my credit report." *See id.*
- "If I am going through this organization for my student loans, and if you are charging me $42.00 per month, I have two questions that are confusing me?

  1. My loan amount has increased by $5,000 since I turned my information over to you.

  2. Fed Loan just sent me an email saying they are going to deduct $131 from my account each month starting November.

  Can someone please explain all of this to me, and why did my amount increase?" *See id.*
- "This is a scam.  You've been reported.  Stop contacting me." *See id.*
- "STOP TAKING THE AUTOMATIC PAYMENT IMMEDIATELY.  I WANT A REFUND.  The Department of Education called me – you are a fraud!" *See id.*
- "I am just trying to figure out why I am still receiving bills from fedloan.  They are saying I am behind and that i am not paying.  I was told that I wouldn't have to worry about them once I sign on with you guys.  Can you please explain." *See id.*
- "This service was set up to help me with the payments at FEDLOAN SERVICING.  I keep getting emails and phone calls saying my account is past due.  Are the payments you're pulling from my account not being sent to the FEDLOAN SERVICING?" *See id.*

- "Who is this payment going to?  I just logged into my FEdloan Servicing Account, and none of my $40 monthly payments are showed as posting to my actual student loans.  I am wondering who I am paying?"  *See id.*
- "Why am I paying y'all money and fed loan servicing is reporting missed payments to the credit bureaus.  It's messing up my credit score and I really do not need that."  *See id.*
- "Is Navient aware that I am paying my student loans through this company now?"  *See id.*

The volume of complaints (roughly 150) compared to the number of customer contacts (roughly 400) is very high – 40% of the people who contacted Defendants through the email box had a complaint.  This paints a far different picture of customer satisfaction than that presented by the purported 96% satisfaction rate in the reverification campaign.  And these are customer initiated contacts, rather than outreach instituted by a reverification campaign.

Beyond the volume of complaints, the content of the complaints is troubling.  The complaint themes are consistent with the consumer declarations and the allegations made by the Plaintiffs.  Pre-pivot or post-pivot, Defendants' sales materials and tactics have left consumers confused and feeling misled, particularly about Defendants' services, their fees, and whether the fees reduced their loan balances.

## VII.

## FINANCIAL INFORMATION

The Receiver's forensic accountant, Lisa Jones, has prepared a Receivership Initial Account Records Review report based on available Receivership Defendant records which is attached as Exhibit 5.

///

///

# VIII.

## CAN THE BUSINESSES BE OPERATED
## LAWFULLY AND PROFITABLY?

Section XIII(O) (at page 23) of the TRO directs and authorizes the Temporary Receiver to continue and conduct the business of Receivership Defendants "conditioned on the Receiver's good faith determination that the business can be lawfully operated at a profit using the Assets of the Receivership Defendants' estate." I conclude that the business cannot.

These defendants chose to operate a highly-regulated and revenue-challenged business. The product is not unique or proprietary. The marketing costs to secure and retain customers are high, compounded by very high cancellation rates. Operating expenses, including commission for sales personnel, are high. And the TSR prohibits the collection of fees until the work is completed and the consumer makes the first payment.

Even if Defendants were to activate a legitimate third party provider of dedicated accounts and fully comply with the TSR escrow exception, the impact on cash flow and sustainability would be enormous, all with the added administrative costs of the escrow procedure itself. And the business would still face the compliance challenges, and related new expenses, to re-invent a sales process free of tactics and procedures that leave consumers feeling confused and misled.

Dated:  November 1, 2019

By: /s/ Thomas W. McNamara
Thomas W. McNamara
*Temporary Receiver*

| | |
|---|---|
| 1 | **CERTIFICATE OF SERVICE** |
| 2 | I hereby certify that on the 1st day of November 2019, I caused the foregoing |
| 3 | to be electronically filed with the Clerk of the Court using the CM/ECF system, |
| 4 | which will send notification of the filing to all participants in the case who are |
| 5 | registered CM/ECF users. |
| 6 | |
| 7 | /s/ Edward Chang |
| 8 | Edward Chang<br>*Attorney for Temporary Receiver,*<br>*Thomas W. McNamara* |
| 9 | |

Case No. 8:19-cv-01998-JVS (JDEx)
CERTIFICATE OF SERVICE

Sanjay Bhandari (SBN 181920)
sbhandari@mcnamarallp.com
Edward Chang (SBN 268204)
echang@mcnamarallp.com
McNamara Smith LLP
655 West Broadway, Suite 1600
San Diego, California 92101
Telephone: 619-269-0400
Facsimile:  619-269-0401

*Attorneys for Receiver,*
*Thomas W. McNamara*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection; State of Minnesota, by its Attorney General, Keith Ellison; State of North Carolina, *ex rel.* Joshua H. Stein, Attorney General; and The People of The State of California, Michael N. Feuer, Los Angeles City Attorney,<br><br>Plaintiffs,<br><br>v.<br><br>Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center; True Count Staffing Inc., d/b/a SL Account Management; Prime Consulting LLC, d/b/a Financial Preparation Services; Albert Kim, a/k/a Albert King; Kaine Wen, a/k/a Wenting Kaine Dai, Wen Ting Dai, and Kaine Wen Dai; and Tuong Nguyen, a/k/a Tom Nelson,<br><br>Defendants, and<br><br>Infinite Management Corp., f/k/a Infinite Management Solutions Inc.; Hold The Door, Corp.; and TN Accounting Inc.,<br><br>Relief Defendants. | Case No. 8:19-cv-01998-JVS (JDEx)<br><br>**APPENDIX TO PRELIMINARY REPORT OF RECEIVER**<br><br>JUDGE:   Hon. James V. Selna<br>CTRM:   10C |

1

**INDEX OF EXHIBITS**

2

| Tab | Description | Page |
|---|---|---|
| 1 | DebtPayPro Screenshot | 1 |
| 2 | 15261 Laguna Canyon Road Schematic and Inventory | 2 |
| 3 | 173 Technology Drive Schematic and Inventory | 4 |
| 4 | 8 Hughes Parkway Schematic and Inventory | 6 |
| 5 | Report of Forensic Accountant | 8 |
| 6 | Email re: Wall Street Journal Article (8/27/2019) | 29 |
| 7 | Email re: Sales Pause (8/27/2019) | 49 |
| 8 | Email re: Technology Upgrade Customer Service Script (8/28/2019) | 50 |
| 9 | Zero Tolerance Policy Flyer | 52 |
| 10 | Spreadsheet of Company DBA's | 53 |
| 11 | October 21, 2019 Sales Script | 54 |
| 12 | Receipt for Purchase of 17011 Beach Blvd. Virtual Office (7/8/2019) | 67 |
| 13 | Email re: Billing Information for TAS (6/19/2019) | 71 |
| 14 | Handwritten Note re: TAS Outlook Credentials | 77 |
| 15 | Email re: ACH Processing for True Count (2/26/2019) | 78 |
| 16 | Email re: DAP Flowchart (3/3/2019) | 83 |
| 17 | Email re: TAS Functions (3/11/2019) | 85 |
| 18 | Email re: New TAS Processing Application (4/12/2019) | 87 |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Tab | Description | Page |
|---|---|---|
| 19 | Email re: TAS Integration with DebtPayPro (6/19/2019)............... | 90 |
| 20 | Email re: TAS Questions for DebtPayPro (4/24/2019).................. | 102 |
| 21 | Monday.com Screenshots................................................ | 103 |
| 22 | Signed TAS Checks...................................................... | 107 |
| 23 | Email re: ACH Processing for TAS (4/23/2019) ........................... | 108 |
| 24 | Email re: Quantum ePay Processing for PSLC (12/11/2018)........ | 109 |
| 25 | NMC Merchant Statement for Horizon Consultants LLC ............. | 118 |
| 26 | Email re: TAS Application to First Data (6/25/2019) .................. | 125 |
| 27 | Email re: TAS NMC Application (7/8/2019) .............................. | 128 |
| 28 | Email re: Revised TAS NMC Application (7/9/2019) ................. | 136 |
| 29 | NMC Merchant Account Change Request Form (TAS) .............. | 142 |
| 30 | Wyoming Secretary of State Business Entity Detail for TAS ...... | 146 |
| 31 | NMC Card Processing Statement for TAS.................................. | 148 |
| 32 | NMC Merchant Statement for TAS ...................................... | 149 |
| 33 | Email re: TAS Merchant Statements (10/7/2019) ....................... | 157 |
| 34 | Instructions for Clients Already in a Repayment Plan.................. | 158 |
| 35 | Email re: Sales Call Audits (4/16/2019) ....................................... | 160 |
| 36 | Documents re: Sales Commission Structure ................................ | 161 |
| 37 | FPS Pay Structure and Bonuses .................................................. | 175 |

| Tab | Description | Page |
|-----|-------------|------|
| 38 | Hard Close Sales Script | 180 |
| 39 | Email re: Name Change Reminder (2/6/2019) | 182 |
| 40 | Retention Policies | 183 |
| 41 | Customer Service Disposition Codes | 185 |
| 42 | Reverify Campaign Scripting | 187 |
| 43 | Handwritten Reverification Campaign Notes (9/17/2019) | 191 |
| 44 | FPS Sales Compliance Memo | 192 |
| 45 | New Hire Schedule | 195 |
| 46 | Rebuttals Script (9/22/2019) and Related Documents | 198 |
| 47 | Consumer Complaints | 207 |

Dated: November 1, 2019          McNamara Smith LLP

                                        By:   /s/ Thomas W. McNamara
                                              Court-appointed Receiver

# EXHIBIT 1



EXHIBIT 1
Page 1

# EXHIBIT 2



EXHIBIT 2
Page 2

*Bureau of Consumer Financial Protection, et al. v. Consumer Advocacy Center Inc.,*
*d/b/a Premier Student Loan Center et al.*

U.S. District Court for the Central District of California
Case No. 8:19-cv-01998-JVS (JDEx)

Furniture and Equipment Inventory
15261 Laguna Canyon Rd., Suite 200

| Item | Quantity |
|---|---|
| All-in-one computer | 7 |
| Cabinets | 4 |
| Chairs | 336 |
| Coffee makers and dispensers | 5 |
| Cold brew dispenser | 1 |
| Conference tables | 2 |
| Couch | 3 |
| Computers | 267 |
| Credenza | 4 |
| Cubicles | 102 |
| Desk with credenza | 1 |
| Desks | 58 |
| Easel | 1 |
| File cabinets | 36 |
| Furmax gaming chair | 1 |
| Headsets | 229 |
| Keyboards/mice | 213 |
| Laptop | 1 |
| Microwaves | 2 |
| Mini-fridge | 6 |
| Monitors | 504 |
| Printer | 12 |
| Reception desk | 1 |
| Refrigerator | 2 |
| Shredder | 1 |
| Sofa chair | 13 |
| Stool | 10 |
| Tables | 3 |
| Toaster oven | 1 |
| TV | 11 |
| Vending machine | 4 |
| Walkie-talkie | 5 |
| Wall cabinet | 1 |
| Water dispenser | 2 |

EXHIBIT 2
Page 3

# EXHIBIT 3



EXHIBIT 3
Page 4

*Bureau of Consumer Financial Protection, et al. v. Consumer Advocacy Center Inc.,*
*d/b/a Premier Student Loan Center et al.*

U.S. District Court for the Central District of California
Case No. 8:19-cv-01998-JVS (JDEx)

Furniture and Equipment Inventory
173 Technology Drive, Suite 202

| Item | Quantity |
|---|---|
| Chairs | 150 |
| Computer monitors | 93 |
| Computers | 111 |
| Copiers | 1 |
| Couches | 2 |
| Credenzas | 1 |
| Desks | 177 |
| File cabinets | 11 |
| Headsets | 344 |
| Metal Racks | 3 |
| Office storage cabinet | 1 |
| Printers | 4 |
| Projector screens | 1 |
| Refrigerators | 1 |
| Televisions | 2 |
| Vending machines | 1 |
| White boards | 8 |

EXHIBIT 3
Page 5

# EXHIBIT 4



EXHIBIT 4
Page 6

*Bureau of Consumer Financial Protection, et al. v. Consumer Advocacy Center Inc.,*
*d/b/a Premier Student Loan Center et al.*

U.S. District Court for the Central District of California
Case No. 8:19-cv-01998-JVS (JDEx)

Furniture and Equipment Inventory
8 Hughes Parkway, Suite 210

| Item | Quantity |
|---|---|
| Bookcase | 1 |
| Chairs | 158 |
| Coffee machine | 2 |
| Computers | 69 |
| Copiers | 4 |
| Cubicles with drawers | 121 |
| Desks | 10 |
| Espresso machine | 1 |
| Fax machine | 2 |
| Filing cabinet | 2 |
| Headsets | 77 |
| Heater | 1 |
| Keg fridge with Starbucks and Beer | 2 |
| Keyboards | 72 |
| Laptop | 1 |
| Microwaves | 2 |
| Mini-speakers | 6 |
| Monitors | 199 |
| Phones | 2 |
| Printers/copiers | 13 |
| Refrigerator | 2 |
| Safe | 4 |
| Shredders | 6 |
| Tables | 17 |
| Toaster | 1 |
| TVs | 12 |
| Vending machine | 1 |
| Water dispenser | 2 |
| White board | 1 |

EXHIBIT 4
Page 7

# EXHIBIT 5

*Bureau of Consumer Financial Protection, et al. v. Consumer Advocacy Center Inc., d/b/a*
*Premier Student Loan Center, et al.*
Receivership Initial Accounting Records Review
Lisa Jones, CIRA, CFE
November 1, 2019

On October 23, 2019, I, along with other members of the Receiver's team, gained access to the office of Prime Consulting, LLC, located on Laguna Canyon Drive in Irvine, California. Two days later, defense counsel provided access to QuickBooks Online records for Prime Consulting, LLC doing business as Financial Preparation Services ("Prime Consulting"), and True Count Staffing, Inc. doing business as SL Account Management ("True Count" and collectively, "Receivership Defendants"). The Receivership Defendants had a separate online QuickBooks file for each entity. We received some bank statements from Sunwest Bank, but we have not yet received bank statements from other financial institutions. Below is my preliminary analysis of the Receivership Defendants' financial records.

Even though Receivership Defendants' accounting personnel were not identified, I located the desks used by accounting personnel. There did not appear to be an organized filing system for the physical accounting documents. Based on my review of the QuickBooks files, there are no supporting documents electronically attached to the QuickBooks transactions. I understand that Receivership Defendants used DebtPayPro, a customer relationship management software; however, I have not yet attempted to reconcile transaction information in DebtPayPro with the data in QuickBooks.

Defendants charged consumers an initial document preparation fee (approximately $1,500) for student loan debt relief services. The fee could be divided into four to six payments. After paying the initial document preparation fee in full, the consumers would then pay a monthly amount (between $10 and $42) for ten to twenty years, depending on the agreement, for the "annual recertification." Based on my review of Receivership Defendants' financial records to date, I have not discovered any evidence that any portion of consumers payments were paid to student loan servicers.

Although there appear to be several entities intertwined with Prime Consulting and True Count, Defendants only provided the QuickBooks files for these two entities.

1. <u>Prime Consulting, LLC d/b/a Financial Preparation Services</u>

Based on the QuickBooks records and bank responses, Prime Consulting appears to have one bank account at Sunwest Bank and another bank account at JPMorgan Chase.

The first QuickBooks transaction for Prime Consulting was a journal entry recorded on April 16, 2018. The journal entry recorded the purchase of an aged Wyoming Limited Liability Company to start a business. The first deposit was recorded on July 23, 2018, as an opening bank balance of $6,298. The last entry in QuickBooks was recorded on October 18, 2019. It appears that Defendants regularly downloaded data from their financial institutions into QuickBooks.

1

EXHIBIT 5
Page 8

From September 24, 2018 through September 30, 2019, Prime Consulting recorded "Document Preparation Income" in the amount of $27,951,486 received from True Count. Almost 100% of Prime Consulting's income was received from True Count.

Prime Consulting's largest expense was marketing and lead generation, totaling $15,716,412 or approximately 56% of Prime Consulting's recorded income. Pub Club Leads was the largest lead generation vendor. From October 1, 2018 to October 16, 2019, Prime Consulting reported payments to Pub Club Leads in the amount of $9,480,555 or 40% of Prime Consulting's recorded income.

Mice and Men, LLC ("Mice and Men") was Prime Consulting's second largest vendor. Over a period of 18 days (December 10-28, 2018), Prime Consulting reported payments of $5,041,069 to Mice and Men. Mice and Men filed its Articles of Organization with the Wyoming Secretary of State on December 4, 2018, less than a week before it started receiving payments from Prime Consulting. Mice and Men is believed to be owned by Kaine Wen's mother.

Farrington Leads, Prime Consulting's third largest vendor, was reportedly paid $743,111 from September 24, 2018 through March 15, 2019. All of the transactions recorded for Pub Club Leads, Mice and Men, and Farrington Leads are recorded as advertising and marketing expenses.

Payroll was another large expense for Prime Consulting, with wages and taxes totaling $9,028,656. While ADP processed payroll for Prime Consulting, we have not yet received detailed payroll records. Rent was also a large expense, totaling $747,617.

Based on the QuickBooks Balance Sheet, Prime Consulting's largest asset is cash in the bank accounts totaling $744,541. There are no liabilities recorded.

Attached as Exhibit A is the Prime Consulting, LLC Profit and Loss Statement and Balance Sheet for all dates recorded in QuickBooks (April 16, 2018 to October 18, 2019).

2. <u>True Count Staffing, Inc. d/b/a SL Account Management</u>

Based on QuickBooks records and bank responses, there were eight bank accounts for True Count – Sunwest Bank (five accounts), BNY Mellon (one account), Wells Fargo (one account), and JPMorgan Chase (one account).

The first entry in QuickBooks was a journal entry recorded on January 1, 2018. The last entry was recorded on October 23, 2019. It appears that Defendants regularly downloaded data from their financial institutions into QuickBooks. During this period, True Count recorded "Documentation Preparation Income" of $60,826,505, with refunds and allowances totaling $6,179,675, for a total income of $54,665,905. True Count transferred $27,951,486, over 50% of their total income to Prime Consulting.

Per the QuickBooks records, True Count used three different merchant processors, with at least five different merchant identification numbers. Merchant processors often retain a percentage of the funds collected and hold them in a reserve account. Depending on the merchant processor's policy, funds that have aged for a certain amount of time may be released

2

EXHIBIT 5
Page 9

to the merchant.  The reserve funds for each merchant processor have been recorded in
QuickBooks.  Below is a chart listing the income reported in QuickBooks, along with the reserve
funds, for the three merchant processors.

| Entity | Merchant Processor | Merchant Identification Number | Amount Collected per QuickBooks | Reserve Funds per QuickBooks |
|---|---|---|---|---|
| True Count Staffing, Inc. | Electronic Merchant Systems | x5266 | 1,264,792.00 | 144,446.00 |
| True Count Staffing, Inc. | QuantumEPay | x1149 | 5,831,782.00 | 283,971.00 |
| True Count Staffing, Inc. | QuantumEPay | x1156 | 95,923.00 | 5,232.00 |
| True Count Staffing, Inc. | National Merchant Center | x6283 | 9,444,870.00 | 2,202,411.00 |
| True Count Staffing, Inc. | National Merchant Center | x6317 | 40,948,033.00 | 2,073,160.00 |
| | | | 57,585,400.00 | 4,709,220.00 |
| | | | | |

While the QuickBooks records indicate that National Merchant Center is holding a
combined amount of $4,275,571, National Merchant Center declares that it is holding reserves in
the combined amount of $3,564,494.  Additional analysis is necessary in order to determine the
cause of the discrepancy.

There is an additional merchant processing account recorded in True Count's
QuickBooks file that is not included in the above chart.  On July 30, 2019, True Count began
recording deposits from National Merchant Center for the merchant account ending x5962.  This
merchant account belongs to Horizon Consultants, LLC ("Horizon Consultants").  National
Merchant Center had been depositing funds into the Horizon Consultants' Sunwest Bank account
from January 2019 through September 30, 2019, with one exception.  In August 2019, there were
no funds deposited in Horizon Consultants' Sunwest bank account.  Based on QuickBooks
records, those deposits were re-routed to True Count's JPMorgan Chase account.  In September
2019, National Merchant Center deposited $977,242 into True Count's Chase Bank account.  Per
the QuickBooks data, the source of those funds was the Horizon Consultants' merchant account.

According to the National Merchant Center's statement as of July 31, 2019 for Horizon
Consultants, the 2019 gross sales to date was $10,517,043.  True Count recorded "Document
Preparation Income" relating to income from the Horizon Consulting merchant processing
account in the amount of $2,840,786 for the period July 30, 2019 through September 26, 2019.

True Count's largest expenses reported were commission and referral fees paid to
Consumer Advocacy Center, Inc. in the amount of $12,321,427 and to Prime Consulting in the
amount of $27,951,486.  True Count recorded payroll expenses in the amount of $4,872,313.
ADP processed payroll for True Account; however, we have not yet received the payroll records.
Merchant processing and gateway fees are another large expense, totaling $1,904,009.

True Count's QuickBooks records included an expense category named "1099s".  This
category most likely includes consultant or other non-employee fees; however, the type of work
performed by the consultants is not annotated.  Expenses in this category total $1,993,867.
Among the largest vendors in the "1099s" expense category, and the amounts reported, are Hold
the Door Corp. ($1,007,940), Infinite Management Solutions ($627,367).  Both of the entities are

3

EXHIBIT 5
Page 10

Relief Defendants.  Per the California Secretary of State Statement of Information filed in 2018, Kaine Wen is listed as the Chief Executive Officer, Secretary, and Chief Financial Officer of Hold the Door, Corp.  Per the California Secretary of State Statement of Information filed in 2019, Albert Kim is listed as the Chief Executive Officer, Secretary, and Chief Financial Officer of Infinite Management Solutions, Inc.

There were recorded payments from True Count to TN Accounting, Inc., another Relief Defendant, for the period March 7, 2018 through October 3, 2019 totaling $298,883.  Per the California Secretary of State Statement of Information filed in 2017, Tuong Nguyen is listed as the Chief Executive Officer, Secretary, and Chief Financial Officer of TN Accounting, Inc.

Per the Balance Sheet, the largest asset is the funds in the merchant processor reserve accounts, totaling $4,709,221, followed by funds in the bank accounts totaling $322,718.

Attached as Exhibit B is the True Count Staffing, Inc. Profit and Loss Statement and Balance Sheet for all dates recorded in QuickBooks (January 1, 2018 to October 23, 2019).

3.  Horizon Consultants, LLC

The Receiver identified Horizon Consultants as a Receivership Defendant.  Sunwest Bank provided Horizon Consultants' bank statements, which indicate a monthly recurring payment to Intuit for a QuickBooks Online subscription beginning in February 2019 and continuing each month through September 2019.  While access to Horizon Consultants' QuickBooks file was requested, it has not yet been made available.

Horizon Consultants appears to be an aged shelf company.  It appears that Universal Essence, LLC, a Wyoming LLC, was acquired and the name was changed to Horizon Consultants, LLC.  Universal Essence, LLC was registered with the Wyoming Secretary of State on November 30, 2015.  On October 3, 2018, the name was changed to Horizon Consultants, LLC and on October 22, 2018, Horizon Consultants, LLC filed its Application to Register a Foreign Limited Liability Company with the California Secretary of State.  One of the reasons that aged shelf companies are purchased is to purport a longer company history, giving the appearance of a company's longevity.

The Sunwest Bank account appears to have been opened in November 2018.  The first transactions began in January 2019.  Based on the bank statements, it appears that there are deposits from National Merchant Center, a merchant processor, with the first deposit on January 18, 2019.  Below is a chart summarizing the deposits and withdrawals in the Horizon Consultants Sunwest Bank account for each month from January 2019 through September 2019.

4

EXHIBIT 5
Page 11

Sunwest Bank, Account No. x1069
January 1, 2019 through September 30, 2019

| Month | Deposits | Withdrawals |
|---|---|---|
| January | 113,634.70 | (4,113.15) |
| February | 311,612.29 | (12,742.33) |
| March | 1,636,309.08 | (1,249,585.46) |
| April | 1,857,183.95 | (2,121,466.57) |
| May | 1,639,859.93 | (949,114.43) |
| June | 1,417,541.48 | (1,541,004.78) |
| July | 1,866,534.93 | (173,902.27) |
| August | - | (539,663.91) |
| September | 20,771.80 | (325,671.42) |
| Total | 8,863,448.16 | (6,917,264.32) |

The balance in the Sunwest Bank account as of September 30, 2019 was $1,946,183.84. The funds coming into the Horizon Consultants bank account vastly increased from February 2019 to March 2019, with March deposits reaching more than five times the amount deposited in the prior month.

The withdrawals from the Horizon Consultants bank account primarily consist of merchant processor fees, chargebacks, and outgoing wires. Like the deposits into the account, the withdrawals also drastically increase from February 2019 to March 2019. While the deposits in March were five times the amount of deposits in February, the withdrawals in March are almost 100 times the amount withdrawn in February. Approximately 95% of the March withdrawals were outgoing wires. The chart below summarizes, by month, the total outgoing wires from the Horizon Consultants bank account.

5

EXHIBIT 5
Page 12

Sunwest Bank, Account No. x1069
January 1, 2019 through September 30, 2019
Outgoing Wires

| Month | Wires Out |
|---|---|
| January | - |
| February | - |
| March | 1,192,886.15 |
| April | 1,958,136.20 |
| May | 784,118.16 |
| June | 1,396,319.31 |
| July | 48,545.65 |
| August | 513,107.16 |
| September | 210,807.80 |
| Total | 6,103,920.43 |

One of the outgoing wires in August 2019, in the amount of $400,000, was sent to True Count's Chase Bank account. Another wire in the amount of $78,500 was sent to True Count's Sunwest Bank account in September 2019. From March through September, wires in the amount of $5,131,460 were sent to Pub Club Leads. A company by the name of Aftermath Labs was wired $48,546 in July 2019. Wires totaling $577,971 were sent to a processing services company in Vietnam, including a wire in the amount of 132,556 that was sent in October 2019.

Per the National Merchant Center statement as of July 31, 2019, the 2019 gross reportable sales of Horizon Consultants totaled $10,517,043.12. Merchant fees, chargebacks, and other miscellaneous fees are deducted from the gross amount. Also, the reserve amount is deducted from the gross sales. The reserve amount for the period January 2019 through July 2019 totals $1,357,244.16. This amount should increase with the addition of the August, September, and October sales. It is unclear why the reserve account for Horizon Consultants is recorded in the QuickBooks file for True Count.

4. First Priority, LLC

The Receiver also identified First Priority, LLC ("First Priority") as a Receivership Defendant. At this time, we do not have QuickBooks records for this entity. My analysis is based on First Priority Sunwest Bank account statements.

Like Horizon Consultants, it appears that an aged shelf company, BFF, LLC, was acquired and the name was changed to First Priority, LLC. BFF, LLC was registered with the Wyoming Secretary of State on October 23, 2012. The name was changed from BFF, LLC to First Priority, LLC on April 26, 2018. On May 17, 2018, First Priority filed its Application to Register a Foreign Limited Liability Company with the California Secretary of State.

6

EXHIBIT 5
Page 13

First Priority opened a bank account with Sunwest Bank in November 2018.  Activity in the account began in December 2018, but has been minimal since that time.  The balance in the account, as of September 30, 2019, was $4,534.25.  There has been no activity in the bank account since April 2019.

There was a $2,000 mobile deposit in December 2019, along with deposits from Reliant Account Management ("RAM"), a payment processor, totaling $70.35.  There were no other deposits until March 19, 2019, when a payment was received from RAM in the amount of $3,983.40.  Most of the withdrawals were payments to RAM, with the exception of one check that was issued to First Priority in the amount of $1,200.  The memo on the check reads, "Transfer to Chase First Priority LLC."[1]  For the period December 2018 through September 2019, based on the First Priority Sunwest Bank account statements, deposits total $6,053.75 and withdrawals total $1,519.50.

5.  <u>Summary</u>

I have not yet received all of the relevant bank statements; therefore, a reconciliation of the data in the QuickBooks files with the bank statements has not yet been performed.  Per the data in QuickBooks, the gross income for True Count totals $60,826,505 as of October 23, 2019.  Per the merchant account statements, gross income for Horizon Consultants totals $10,517,043 as of July 31, 2019.  Over a period of less than two years, the combined gross income for these two entities totals 71,343,548.

---

[1]  JPMorgan Chase identified an account for First Priority and reported a balance of $159,457.33 as of October 29, 2019.  We have not yet received any bank statements from JPMorgan Chase.

7

EXHIBIT 5
Page 14

# Exhibit A

EXHIBIT 5
Page 15

# Prime Consulting LLC

## PROFIT AND LOSS
### All Dates

| | TOTAL |
|---|---:|
| Income | |
| Document Preparation Income | |
|   Check | 1,559.00 |
|   True Count Staffing Inc | 27,951,486.42 |
|   **Total Document Preparation Income** | **27,953,045.42** |
| **Total Income** | **$27,953,045.42** |
| GROSS PROFIT | **$27,953,045.42** |
| Expenses | |
| 1099s | |
|   Christian Valdez | 200.00 |
|   Heaven Light LLC Consulting Services | 12,000.00 |
|   Joseph Livio Boylan Consulting Corp | 305,740.95 |
|   Tron Corporation | 28,299.00 |
|   When Dogs Fly Corp | 24,145.00 |
|   **Total 1099s** | **370,384.95** |
| Advertising & Marketing | |
|   Alphonetic | 464.00 |
|   BPO Leads | 64,692.00 |
|   Consumer Advocacy Center Inc | 46,830.00 |
|   DNC Scrub | 3,880.00 |
|   Facebook | 1,077.26 |
|   Farrington Leads | 743,111.52 |
|   First Fidelity Leads | 2,768.00 |
|   Five Marketing Leads | 98,080.00 |
|   Fortress Leads | 53,740.80 |
|   Imperial Calls Leads | 39,635.50 |
|   Le Clix Leads | 119,234.00 |
|   Mice And Men | 5,041,069.00 |
|   Premier Student Loans Inc | 21,275.00 |
|   Pub Club Leads | 9,480,555.11 |
|   **Total Advertising & Marketing** | **15,716,412.19** |
| Bank Charges | |
|   Gateway | 45.00 |
|   **Total Bank Charges** | **45.00** |
| Bank Charges & Fees | 2,299.77 |
| Company Party | 15,980.57 |
| Gift Card | 48,674.02 |
| Insurance | |
|   Kaiser Foundation Health Plan | 43,089.93 |
|   Liberty Mutual Insurance | 46,653.00 |
|   Mission West Insurance Solutions | 64,789.98 |
|   **Total Insurance** | **154,532.91** |
| Job marketing | 864.11 |

| | TOTAL |
|---|---|
| Career Fairs | 450.00 |
| Craigslist | 630.00 |
| Indeed | 31,103.73 |
| LinkedIn | 629.68 |
| Monster | 399.00 |
| Nguoi Viet Newspaper | 93.36 |
| Ziprecruiter | 349.00 |
| **Total Job marketing** | **34,518.88** |
| Legal & Professional Services | -7.42 |
| ADP Payroll Service Expense | 47,579.96 |
| Eva8 HR Consulting | 22,837.50 |
| Huntington Legal Solutions | 50,560.75 |
| Legal Law Center | 95.07 |
| Littler Mendelson PC | 11,574.00 |
| Wyoming Corporation Startup Costs | 2,595.00 |
| **Total Legal & Professional Services** | **135,234.86** |
| Meals & Entertainment | 4,813.94 |
| Office Supplies & Software | 7.98 |
| IT Supplies | 934.07 |
| **Total Office Supplies & Software** | **942.05** |
| Office/General Administrative Expenses | 1,702.42 |
| Bonus Pool | 42,000.00 |
| Copier Rental FBM | 613.14 |
| Department Allowance | |
| HR Allowances | 2,250.00 |
| **Total Department Allowance** | **2,250.00** |
| Food reimbursement | 10,840.93 |
| Janitor Services | 18,218.31 |
| Moving Office | 3,845.97 |
| Office Equipment | 11,311.20 |
| Office Supplies | 41,650.62 |
| Amazon | 78,205.43 |
| Parks Coffee | 23,386.51 |
| **Total Office Supplies** | **143,242.56** |
| Reimbursement Expenses | 3,124.51 |
| Security | 3,400.00 |
| Redrock Sercurity | 250.00 |
| **Total Security** | **3,650.00** |
| Training Course | 1,041.85 |
| Mastery Technologies Inc. | 16,686.40 |
| **Total Training Course** | **17,728.25** |
| **Total Office/General Administrative Expenses** | **258,527.29** |
| Other Miscellaneous Service Cost | 3,078.42 |
| Adecco | 15,679.20 |
| Check Print and Stamp | 1,117.92 |
| Network & Communication Services | |
| Cox&Com | 26,340.00 |
| **Total Network & Communication Services** | **26,340.00** |

| | TOTAL |
|---|---|
| RingCentral | 344.03 |
| Web Services | 8,626.56 |
| GoDaddy | 3,229.63 |
| Host Gator | 531.48 |
| Lechi Web Services | 738.98 |
| Matbao Corporation | 1,710.60 |
| Rebrandly | 452.00 |
| Webhost | 442.45 |
| **Total Web Services** | **15,731.70** |
| **Total Other Miscellaneous Service Cost** | **62,291.27** |
| Payroll Expenses | |
| Taxes | 836,834.99 |
| Wages | 8,191,821.01 |
| **Total Payroll Expenses** | **9,028,656.00** |
| Phone and Internet | |
| Answering Service | 156,542.47 |
| **Total Phone and Internet** | **156,542.47** |
| Rent & Lease | |
| Discovery Business Center | 747,467.11 |
| Irvine Ranch Executive Suites | 150.00 |
| **Total Rent & Lease** | **747,617.11** |
| Shipping, Freight & Delivery | |
| UPS | 9,468.57 |
| **Total Shipping, Freight & Delivery** | **9,468.57** |
| Software | 2,780.23 |
| Appscension Ltd | 346.38 |
| AWS | 6,138.10 |
| Bureau | 3,050.00 |
| Hello Sign | 5,011.10 |
| Intuit | 1,231.17 |
| Microsoft | 28,676.31 |
| Monday.com | 1,629.60 |
| Paddle | 471.41 |
| Screen Connection | 360.00 |
| TechSmith | 49.95 |
| Teramind | 816.15 |
| Twilio | 20.07 |
| Zoho Corporation | 3,012.90 |
| **Total Software** | **53,593.37** |
| Staffing Services | |
| AppleOne | 44,092.60 |
| **Total Staffing Services** | **44,092.60** |
| Taxes & Licenses | 6,241.00 |
| Travel | 22,512.52 |
| Travel Meals | 2,297.97 |
| Uncategorized Expense | 343.29 |
| Utilities | |
| Water Source | 1,895.52 |

Cash Basis  Thursday, October 31, 2019 08:31 PM GMT-7

EXHIBIT 5
Page 18
3/4

|  | TOTAL |
|---|---|
| **Total Utilities** | **1,895.52** |
| **Total Expenses** | **$26,877,918.12** |
| NET OPERATING INCOME | **$1,075,127.30** |
| NET INCOME | **$1,075,127.30** |

# Prime Consulting LLC

## BALANCE SHEET
### All Dates

|  | TOTAL |
|---|---|
| ASSETS |  |
| Current Assets |  |
| Bank Accounts |  |
| Prime Consulting_Sunwest | 10,000.00 |
| TOTAL BUS CHK (0325) | 734,540.91 |
| **Total Bank Accounts** | **$744,540.91** |
| Other Current Assets |  |
| Payroll clearing | 12,625.86 |
| **Total Other Current Assets** | **$12,625.86** |
| **Total Current Assets** | **$757,166.77** |
| Fixed Assets |  |
| Furniture & Fixtures |  |
| Computer Equipment | 168,956.03 |
| **Total Furniture & Fixtures** | **168,956.03** |
| **Total Fixed Assets** | **$168,956.03** |
| Other Assets |  |
| Security Deposits |  |
| Discovery Business Center LLC | 157,967.00 |
| **Total Security Deposits** | **157,967.00** |
| **Total Other Assets** | **$157,967.00** |
| **TOTAL ASSETS** | **$1,084,089.80** |
| LIABILITIES AND EQUITY |  |
| **Total Liabilities** |  |
| Equity |  |
| Opening Balance Equity | 6,297.50 |
| Owner's Investment | 2,665.00 |
| Retained Earnings |  |
| Net Income | 1,075,127.30 |
| **Total Equity** | **$1,084,089.80** |
| **TOTAL LIABILITIES AND EQUITY** | **$1,084,089.80** |

# Exhibit B

EXHIBIT 5
Page 21

# True Count Staffing Inc

PROFIT AND LOSS

All Dates

| | TOTAL |
|---|---:|
| **Income** | |
| Document Preparation Income | |
| 510159011105962 | 2,840,785.81 |
| Check | 319.17 |
| EMS Merchant Account | 1,264,791.58 |
| Horizon Consultant LLC | 400,000.00 |
| Merchant Account 934600000001149 | 5,831,781.79 |
| Merchant Account 934600000001156 | 95,923.03 |
| NMC 1 Merchant Account | 9,444,869.92 |
| NMC 2 Merchant Account | 40,948,033.22 |
| **Total Document Preparation Income** | **60,826,504.52** |
| Refunds and Allowances | |
| Check refunds and allowances | -1,187,975.53 |
| EMS Refunds and Allowances | -20,221.05 |
| EMS Reserve Funds Expense | -79,869.86 |
| EMS Returns and Allowances | -125,812.99 |
| NMC 1 Refunds and Allowances | -29,935.87 |
| NMC 1 Reserve Funds Expense | -444,888.24 |
| NMC 1 Returns and Allowances | -102,136.49 |
| NMC 2 Refunds and Allowances | -1,264,240.01 |
| NMC 2 Reserve Funds Expense | -1,419,940.38 |
| NMC 2 Returns and Allowances | -1,504,654.86 |
| **Total Refunds and Allowances** | **-6,179,675.28** |
| Student Private Loans Referral Income | 19,075.41 |
| **Total Income** | **$54,665,904.65** |
| **GROSS PROFIT** | **$54,665,904.65** |
| **Expenses** | |
| 1099s | |
| Christian Valdez | 200.00 |
| Dinh Enterprises Inc | 42,184.25 |
| Hold the Door Corp | 1,007,940.00 |
| Infinite Management Solutions | 627,366.50 |
| Marissa M Salazar | 394.20 |
| Monique Dinh | 175,627.35 |
| Quality Contact Solutions Inc | 20,750.00 |
| Reputation Management Company | 85,220.00 |
| Rhonda Askeland | 4,995.00 |
| Shirena Huizar | 28,451.25 |
| Susana Esquibel | 738.00 |
| **Total 1099s** | **1,993,866.55** |
| 510159011105962 Processing Fee | 67,546.92 |
| ADP Payroll Service Expense | 28,779.26 |
| Advertising & Marketing | |

EXHIBIT 5
Page 22
1/5

|  | TOTAL |
|---|---|
| All Service Financial LLC | 882.00 |
| First Priority LLC | 0.00 |
| Olive Branch Lending | 425.00 |
| Powers Marketing Group Inc | 5,859.00 |
| Ratezedia Marketing | -2,500.00 |
| **Total Advertising & Marketing** | **4,666.00** |
| Bank Charges & Fees | 32,082.02 |
| EMS Processing Fees | 19,193.57 |
| Gateway | 98,853.55 |
| Merchant Account 934600000001149 Processing Fees | 39,822.07 |
| Merchant Account 934600000001156 Processing Fees | 2,778.40 |
| NMC 1 Merchant Account Merchant Processing Fees | 399,402.68 |
| NMC 2 Merchant Account Processing Fees | 1,311,876.99 |
| **Total Bank Charges & Fees** | **1,904,009.28** |
| Commissions/Referral Expense | |
| Consumer Advocacy Center Inc | 12,321,427.40 |
| Prime Consulting | 27,951,486.42 |
| **Total Commissions/Referral Expense** | **40,272,913.82** |
| Disposal Services | 10,400.00 |
| Donation | 200.00 |
| Efax | 24,233.25 |
| Employee expense reimbursement | 14,108.86 |
| Finance costs | |
| Capital Loss BNY Mellon Stock Losses | 88,856.27 |
| **Total Finance costs** | **88,856.27** |
| Health and Fitness | 8,994.09 |
| Initial set-up expenses | |
| Lamson | 21,395.00 |
| **Total Initial set-up expenses** | **21,395.00** |
| Insurance | |
| Farmers | 3,012.00 |
| Green and Associates | 12,650.41 |
| Kaiser Group | 28,210.39 |
| Liberty Mutual | 14,498.00 |
| Mission West Insurance Solutions, Inc | 23,675.62 |
| R-T Specialty EPLT | 23,146.47 |
| RLI Insurance | 1,619.00 |
| The Hartford | 14,743.00 |
| True Count Worker's Comp Insurance | -4,970.00 |
| **Total Insurance** | **116,584.89** |
| Janitorial Services | 11,067.13 |
| Job marketing expense | |
| Craigslist | 1,015.00 |
| Indeed | 11,254.73 |
| **Total Job marketing expense** | **12,269.73** |
| Legal & Professional Services | 135.74 |
| Akerman LLC Law Firm | 42,819.84 |
| Baker Marquart LLP | 25,000.00 |
| Berkeley Research Group LLC | 102,900.32 |

| | TOTAL |
|---|---|
| Corporations Today Inc | 52.00 |
| Crammer Accounting Services | 23,446.25 |
| Eva8 HR Consulting | 8,387.50 |
| HCVT Accounting Services | 1,000.00 |
| Huntington Legal Solutions | 60,010.11 |
| McCormick Law Firm | 545.00 |
| McGuireWoods LLP | 4,292.22 |
| Melveny and Myers LLP | 429,014.53 |
| Pansky & Markle | 4,683.66 |
| Thurman Legal | 233.33 |
| TN Accounting  Inc | 298,882.69 |
| Venable LLP | 364,796.90 |
| **Total Legal & Professional Services** | **1,366,200.09** |
| Meals & Entertainment | 28,689.00 |
| Miscellanous Expense | 1,350.03 |
| Office Supplies | 219,073.14 |
| Office/General Administrative Expenses | 9,292.55 |
| Check Order | 3,028.16 |
| Copier Rental | 12,543.33 |
| Irvine Office | 6,519.15 |
| Irvine Ranch Executive Suites | 750.00 |
| Mailbox | 90.00 |
| Next7 | 2,450.00 |
| **Total Mailbox** | **2,540.00** |
| Mileage Reimbursement | 1,484.90 |
| Monthly Bonus Pool | 2,000.00 |
| Parks Coffee California | 16,604.98 |
| Stamps | 15,032.19 |
| **Total Office/General Administrative Expenses** | **69,795.26** |
| Other Miscellaneous Service Cost | 3,680.05 |
| Formsite | 855.61 |
| Mail Services | |
| Postalannex | 702.25 |
| Umbral LLC | 1,156.29 |
| **Total Mail Services** | **1,858.54** |
| Mailjet | 731.77 |
| Network&Communication Services | |
| Cox&Com | 105,133.01 |
| Ring Central | 27,505.97 |
| **Total Network&Communication Services** | **132,638.98** |
| Parking | 55.75 |
| Regus | 1,017.45 |
| Shipping | 389.97 |
| Staffing Service | |
| Adecco | 133,572.57 |
| AppleOne Employment Services | 195,534.83 |
| Volt Management Corp | 1,694.17 |
| **Total Staffing Service** | **330,801.57** |
| Survey Monkey | 481.00 |

| | TOTAL |
|---|---|
| Website Services | 420.40 |
| **Total Other Miscellaneous Service Cost** | **472,931.09** |
| Payroll Expenses | |
| Taxes | 332,905.23 |
| Wages | 4,539,408.19 |
| **Total Payroll Expenses** | **4,872,313.42** |
| Phone Expense | |
| AT&T | 810.00 |
| Callerready Sale LLC | 656,901.75 |
| Fonality | 102,063.14 |
| **Total Phone Expense** | **759,774.89** |
| PinPoint | 95,714.54 |
| Promotional Expense | 6,781.78 |
| Referal Gift Card Expense | 111,113.00 |
| Reimbursable Expenses | 107.79 |
| Rent & Lease | 450.00 |
| 8 Hughes | |
| Stivers Investment Group | 311,185.86 |
| **Total 8 Hughes** | **311,185.86** |
| Alliance | 17,218.01 |
| Guaranted Rate | 86,400.06 |
| **Total Rent & Lease** | **415,253.93** |
| Repairs & Maintenance | 385.00 |
| Security | 6,220.88 |
| Redrock | 10,252.80 |
| **Total Security** | **16,473.68** |
| Settlement And Damage | 5,000.00 |
| Software expense | |
| Adobe | 9,203.86 |
| Chargeback VMPI | 5,000.00 |
| Debtpaypro | 242,747.91 |
| Dropbox | 1,286.03 |
| Express VPN | 1,275.29 |
| Godaddy | 2,299.31 |
| Host Gator | 1,506.73 |
| Informative Research | 9,728.44 |
| Iwriter | 40.00 |
| Mailchimp | 110.00 |
| Microsoft | 36,883.43 |
| Paddle.net Gimmeproxy London | 2,885.81 |
| Quickbooks Online | 820.00 |
| SoftLayer | 29,413.72 |
| Tamhonvn | 1,464.30 |
| Twilio | 11,317.91 |
| **Total Software expense** | **355,982.74** |
| Supplies | 677.39 |
| Joyride Coffee | 34,786.81 |
| Pure Green Corp | 305.13 |
| Sparkletts | 617.62 |

| | TOTAL |
|---|---|
| **Total Supplies** | **36,386.95** |
| Taxes & Licenses | 32,468.75 |
| Orange County Tax | 1,534.03 |
| **Total Taxes & Licenses** | **34,002.78** |
| Travel | 46,702.45 |
| Unapplied Cash Bill Payment Expense | 0.00 |
| Utilities | 3,057.76 |
| **Total Expenses** | **$53,496,980.37** |
| **NET OPERATING INCOME** | **$1,168,924.28** |
| **NET INCOME** | **$1,168,924.28** |

# True Count Staffing Inc

## BALANCE SHEET
### All Dates

|  | TOTAL |
|---|---:|
| **ASSETS** | |
| Current Assets | |
| Bank Accounts | |
| BNY Mellon Bank | 2,820.62 |
| Kaine Expense | 0.00 |
| Sunwest TC 2499 | -27,581.77 |
| Sunwest_TC (1670) | 46,172.25 |
| Tom Expense | 0.00 |
| TOTAL BUS CHK (1126) | 301,306.64 |
| **Total Bank Accounts** | **$322,717.74** |
| Other Current Assets | |
| Huntington Legal Solutions Retainer | 121,510.40 |
| Payroll Clearing | -217,515.76 |
| Total Reserve Funds | |
| 934600000001149 Reserve Fund Asset | 283,971.19 |
| 934600000001156 Reserve Fund Asset | 5,232.26 |
| EMS Reserve Funds | 144,446.37 |
| NMC 1 Merchant Account Reserve Fund | 2,202,410.99 |
| NMC 2 Merchant Account Reserve Fund | 2,073,160.42 |
| **Total Total Reserve Funds** | **4,709,221.23** |
| **Total Other Current Assets** | **$4,613,215.87** |
| **Total Current Assets** | **$4,935,933.61** |
| Fixed Assets | |
| Computer Equipment | 1,462.56 |
| Hentium | 168,685.89 |
| newegg | 38,666.63 |
| **Total Computer Equipment** | **208,815.08** |
| **Total Fixed Assets** | **$208,815.08** |
| Other Assets | |
| 8 Hughes Stivers Security Deposit | 12,689.60 |
| **Total Other Assets** | **$12,689.60** |
| **TOTAL ASSETS** | **$5,157,438.29** |
| **LIABILITIES AND EQUITY** | |
| Liabilities | |
| Current Liabilities | |
| Other Current Liabilities | |
| Total Reserve Funds Payable | |
| 934600000001149 Reserve Fund Payable | 283,971.19 |
| 934600000001156 Reserve Fund Payable | 5,232.26 |
| EMS Reserve Funds Payable | 117,795.46 |
| NMC 1 Reserve Fund Payable | 2,202,410.99 |
| NMC 2 Reserve Funds Payable | 2,099,811.33 |

EXHIBIT 5
Page 27

| | TOTAL |
|---|---|
| **Total Total Reserve Funds Payable** | 4,709,221.23 |
| **Total Other Current Liabilities** | $4,709,221.23 |
| **Total Current Liabilities** | $4,709,221.23 |
| **Total Liabilities** | $4,709,221.23 |
| Equity | |
| Opening Balance Equity | -720,707.22 |
| Retained Earnings | |
| Net Income | 1,168,924.28 |
| **Total Equity** | **$448,217.06** |
| **TOTAL LIABILITIES AND EQUITY** | **$5,157,438.29** |

# EXHIBIT 6

**From:**                       Adam Sthay <adams@pubclubleads.com>
**Sent:**                       Tuesday, August 27, 2019 11:08 AM
**To:**                          Advisor
**Cc:**                          Kaine Wen
**Subject:**                wsj 8/26 student debt scams

- U.S. Edition
  - 
  - 
  - 
  - 
  - 
  - 

August 26, 2019
Print Edition
Video
Home
World
U.S.
Politics
Economy
Business
Tech
Markets
Opinion
Life & Arts
Real Estate
WSJ. Magazine

Searc

- 

  SAVE
- 

  SHARE
- 

1

EXHIBIT 6
Page 29

- TEXT
  - 213
- MARKETS
- FINANCE

# Soaring Student Debt Opens Door to Relief Scams

Same testimonials appeared across 26 websites of supposedly different companies; former employee says company submitted claims based on false information

2

EXHIBIT 6
Page 30



Student debt has soared to nearly $1.5 trillion, offering fertile ground to companies that promise to help stretched borrowers by navigating the maze of federal programs that can reduce or forgive debts. PHOTO: DREW ANGERER/GETTY IMAGES

*By*
*Jean Eaglesham,*
*Michael Tobin and*
*Coulter Jones*
Aug. 26, 2019 9:40 am ET

Financial Preparation Services of Irvine, Calif. boasts on its website three glowing testimonials for its debt-relief services for student loans. It quotes Anthony Zwichirowski of California, Dawn Robinson of New Hampshire and a smiling

3

EXHIBIT 6
Page 31

Dean Edelman of Virginia, who says using the company "was the smartest move I
have made since graduating."

One or more of the three ostensibly happy borrowers also appears, with slight
variations, on at least 25 other websites of purportedly different companies
offering student-loan debt-relief in the last four years, The Wall Street Journal
found.

Student debt is soaring—it is now nearly $1.5 trillion—and defaults are at a
record. That has been fertile ground for companies that promise to help stretched
borrowers by navigating the maze of federal programs that can reduce or forgive
debts for those who qualify, such as public-service workers or people on low
incomes.

SHARE YOUR THOUGHTS

*Have you, or someone you know, worked with a student loan debt relief company?
How was that experience? Share your story below.*

Some companies operate legally, although there is nothing they offer that
borrowers can't get free, regulators say. Other firms are outright scams, or make
promises to borrowers that are illegal, regulators and consumer advocates warn.
Financial Preparation Services has submitted claims for federal relief based on
fictitious information, according to a former employee. Sales teams within the
company also switched regularly to using new corporate names and websites, the
former employee said. The company is one of several about which federal
regulators are demanding information, according to a bankruptcy court filing.

4

EXHIBIT 6
Page 32

Many of the websites on which the three testimonials are featured appear to be carbon copies, with only the company's name changed. A few companies attributed the same quote to different people: Dean Edelman becomes Dean Ederman of California, for example. Other websites used the same names and photos with different quotes.

5

EXHIBIT 6
Page 33

## Testimonials



**Anthony Zwichirowski**
CA

"I'm someone who doesn't like to move forward until I know everything. Financial Preparation Services is friendly and knowledgeable and I was able to understand each detail of the program I qualify for before I moved forward."



**Dean Edelman**
VA

"I worked with my servicer for nearly a year attempting to lower my payment. Within 30 minutes of speaking with the Financial Preparation Services I was able to get qualified for a program that my servicer couldn't offer. I am on the path to total loan forgiveness. It was the smartest move I have made since graduating."



### TESTIMONIALS

"I was in default when I contacted the Premier Student Loan Center and they qualified me for a loan that paid off all the delinquent debt and got me 1 new loan with 1 lower payment. They reduced my monthly debt load and saved my credit in the process!"

*Dawn Robinson*
NH

"I'm someone that doesn't like to move forward until I know everything. The PSLC are friendly and knowledgeable and I was able to understand each detail of the program I qualify for before moving forward."

*anthony zwichirowski*
CA

"I worked with my servicer for nearly a year attempting to lower my payment. Within 30 minutes of speaking with the Premier Student Loan Center I was able to get qualified for a program that my servicer couldn't offer. I am on the path to total loan forgiveness. It was the smartest move I have made since graduating."

*Dean Edelman*
VA



❞ *I was in default when I contacted the ClearStudentLoanDebt and they qualified me for a loan that paid off all the delinquent debt and got me 1 new loan with 1 lower payment. They reduced my monthly debt load and saved my credit in the*



❞ *I m someone that doesn't like to move forward until I know everything. ClearStudentLoanDebt Specialists are friendly and knowledgeable and I was able to understand each detail of the program I qualify for before moving forward.* ❞

6

EXHIBIT 6
Page 34

Testimonials on the Financial Preparation Services website appeared on at least 25 other websites. "Dean Edelman," who gave the same endorsement on Premier Student Loan Center's website, was listed as "Mark Peterson" on Clear Student Loan Debt's site and "Dean Ederman" on another.

Financial Preparation Services didn't respond to emails requesting comment, and couldn't be reached by phone at the number listed on its website. The Journal wasn't able to find Mr. Edelman, Mr. Zwichirowski and Ms. Robinson or ascertain whether they were indeed real people.

A record $89.2 billion of student loans was in default at the end of June, New York Federal Reserve data show. Of the $1.48 trillion outstanding, 11%, or $160 billion, was at least 90 days behind on repayments—and the true rate is likely double that, because only half the loans are currently in repayment.

"We'll do the work for you," Financial Preparation Services says on its website. "No more drowning in a sea of confusing paperwork and processing!" Its fee: $1,195 for document preparation, then $40 a month for almost 20 years—a total of $10,555—according to a 2018 client agreement reviewed by the Journal.

Regulators, including the Federal Trade Commission and the Consumer Financial Protection Bureau, share oversight of such companies. One issue they face is the sheer number of small firms offering these services, many using several names.

"This is a relatively target-rich environment," Michelle Grajales, an FTC attorney, said in an interview. "There are unfortunately a lot of companies that still appear to violate the law." Ms. Grajales didn't comment on Financial Preparation Services specifically.

EXHIBIT 6
Page 35

The regulator has filed nine civil cases against alleged student-loan debt-relief scams since 2017, involving a total of 77 different companies. Financial Preparation Services isn't among those companies being sued.

Many of the FTC cases allege that the companies charged upfront fees for debt relief, which is illegal, or engaged in other prohibited practices such as masquerading as being government-approved, or faking information on applications for federal relief.

Stephanie Beger of Moscow Mills, Mo., a former teacher turned paralegal, says Financial Preparation Services promised to help reduce payments on her $109,000 of student loans when she contacted them in October in response to a text message. "I told them I was married, and we have two incomes and no children," she said.

Student-loan balance outstanding, quarterlySource: Federal Reserve Bank of New YorkNote: As of 2Q 2019 .trillionAmount 90 or moredays delinquent2004'06'08'10'12'14'16'180.00.20.40.60.81.01.2$1.4

Ms. Beger signed up. In April, she says she got a notice from the government that a payment was due, and discovered when she called up that Financial Preparation Services had used false information about her to apply for debt relief. "I was told the paperwork said I was a single mother of six," she said. She said she made clear that she had no idea what the company had submitted.

She complained to the Better Business Bureau. In response, Financial Preparation Services refunded the fees she had paid. The company wrote an online response on the BBB's website: "We apologize for your negative experience…We will

8

EXHIBIT 6
Page 36

continue to perfect our process so mistakes do not happen on our clients accounts."

A report by the Government Accountability Office in June identified "indicators of potential fraud or error" in the income-related student loan relief program, including 40,900 plans that were approved based on family sizes of nine or more.

Salespeople at Financial Preparation Services until recently often submitted claims showing a family size of six or seven to qualify callers for debt relief, without the borrower's knowledge, a former employee told the Journal. It couldn't be determined exactly why it changed the practice, but a company email seen by the Journal said that too many of its claims were being rejected.

Financial Preparation Services operates under several different identities, creating new websites every few months, the former employee said. A copy of a sales script, reviewed by the Journal, instructs salespeople when they call customers about payments: "MAKE SURE YOU HAVE THE RIGHT COMPANY NAME: Hi this is NAME with [COMPANY]." The Journal couldn't determine the date of the script.

RED FLAGS FOR A STUDENT LOAN DEBT-RELIEF SCAM

The Federal Trade Commission says borrowers should beware of companies that:

- Charge upfront fees. It is illegal for companies to make you pay before they help you.

- Promise fast loan forgiveness. Scammers may pretend to offer an easy way to wipe out loans—it doesn't exist.

9

EXHIBIT 6
Page 37

- Pretend to have official endorsements, such as using Department of Education logos. The government doesn't approve any debt relief companies: it advises if you have federal loans to go direct to https://studentaid.ed.gov/sa/

- Try to rush you into signing up. Companies may say you have to act fast to qualify for programs: Check them out before you commit to anything.

- Demands your student loan ID, or asks you to sign a power of attorney, to deal with the government on your behalf. You can lose control of your finances, and be cut off from information on what's happening to your loans.

Consumer Advocacy Center—doing business as Premier Student Loan Center, whose website quoted identical testimonials to Financial Preparation Services— filed for chapter 11 bankruptcy in January.

It shut down because of lawsuits by former clients and "investigations from different state attorney generals," according to a court filing. Despite pretax revenues last year of more than $19.4 million, the company had only $24,500 in its bank account when it filed the petition, the bankruptcy trustee said.

Albert Kim, the company's owner, told a bankruptcy court hearing "the possibility of getting into a big lawsuit with, you know, federal regulators made it basically not worth it to continue at that point."

Mr. Kim didn't respond to requests for comment. His lawyer, Peter Levitt, didn't respond to specific questions but said in a statement that Mr. Kim is committed to ensuring all the businesses he is affiliated with operate legally and to "identifying and correcting any compliance deficiencies."

10

EXHIBIT 6
Page 38

After the bankruptcy, Premier Student Loan Center's operations appear to have
carried on as Financial Preparation Services. In addition to the testimonials on
multiple sites, both companies use the same Irvine address on their business
license. The Journal also identified several employees who worked for companies
with those names according to their social media accounts.

In July, the CFPB filed a subpoena in the Premier Student Loan bankruptcy case,
demanding information be sent to the regulator and U.S. Attorney for the
Southern District of Florida. The subpoena named eight companies, including
Prime Consulting LLC, which does business as Financial Preparation Services,
and 11 people, including Mr. Kim.

The CFPB didn't respond to a request for comment. A spokeswoman for the U.S.
Attorney for the Southern District of Florida declined to comment.

One of the companies named in the subpoena is True Count Staffing Inc., which
does business as SL Account Management, also based in Irvine.

A representative declined to comment and the company didn't respond to an
email seeking comment.

Since the start of 2018, SL Account Management has racked up more than 70
complaints with the FTC, according to a public records request.

One borrower, who described himself as a "war veteran who just wanted to go to
college to pursue happiness," said last year in an FTC complaint that his tax
returns and wages have been garnished, he has lost his truck, and "not 1 single
cent of my debt has been diminished."

11

EXHIBIT 6
Page 39

*—Lisa Schwartz contributed to this article.*

MORE

- The Red Flags for Student-Loan Scams
- M.B.A. Students Have Billions in Federal Loans

Write to Jean Eaglesham at jean.eaglesham@wsj.com and Coulter Jones
at Coulter.Jones@wsj.com

Copyright ©2019 Dow Jones & Company, Inc. All Rights Reserved.
87990cbe856818d5eddac44c7b1cdeb8

RECOMMENDED VIDEOS

- 
Water Cannons Deployed in Hong Kong for First Time

- 
Trump Clashes With World Leaders Over Trade at G-7

- 

12

EXHIBIT 6
Page 40

Science of Work: The Health Costs of Stress

- 

Amid Signs of a Recession, Government Is Running Out of Tools

- 

Flipping for Profit: Meet the Couple Making Six Figures by Reselling

MOST POPULAR ARTICLES



- Americans Have Shifted Dramatically on What Values Matter Most



- Wisconsin Congressman Sean Duffy to Resign



- The Wisdom of Andrew Luck's Retirement



- Trump Softens Tone on China, Iran at G-7 Summit



- Cities Are Saying No to 5G, Citing Health, Aesthetics—and FCC Bullying

13

EXHIBIT 6
Page 41

**WSJ MEMBER MESSAGE**

## Redeem Your Free Ticket Club Membership

Get the tickets you want, when you want them, without the surprise service fees and receive $10 off your first purchase.

SHOW CONVERSATION(213)

WHAT TO READ NEXT...

WORLD

**Australian Citizen Yang Hengjun Is Arrested in China on Suspicion of Spying**

REVIEW & OUTLOOK

**Opinion | Smearing Steven Menashi**

TELEVISION REVIEW

**'On Becoming a God in Central Florida' Review: Pyramid Power**

14

EXHIBIT 6
Page 42

LETTERS

**Opinion | Student Loan Fiasco Is a Lesson for BernieCare**

JOURNAL REPORTS: WEALTH MANAGEMENT

**Two Ways to Simplify Your Student-Loan Debt**

*Independent of The Wall Street Journal newsroom*

MARKETWATCH

**How the 'halo effect' is driving e-tailers to brick and mortar**

MANSION GLOBAL ARTICLE

**SoHo Penthouse Designed by Renzo Piano Headed to Market With $42.5 Million Price Tag**

JOIN THE CONVERSATION

- Afghan Withdrawal Plan Faces New Challenges

15

EXHIBIT 6
Page 43



- Diverging Paths of Stocks and Data Vex Investors

- Carlos Ghosn Ran a Tech Fund—Using Millions From an Executive at a Nissan Partner



- Americans Have Shifted Dramatically on What Values Matter Most

- Private Jets Ferried Relatives of NRA Chief Executive



- Central Bankers Worry About Trump's Tactics to Reorder Global Trade

16

EXHIBIT 6
Page 44



- Ferdinand Piëch, Who Transformed Volkswagen, Dies at 82



- Tension Between Trump, World Leaders Takes Spotlight at G-7 Summit



- Big Tech Shares Lose Their Luster



- Leave Your Lunch at Home. This is Shanghai Disneyland.

17

EXHIBIT 6
Page 45

- The Wall Street Journal
- U.S. Edition

○
○
○
○
○
○

- • Sign Out
- BACK TO TOP «

- WSJ Membership

- WSJ+ Membership Benefits
- Digital Subscription
- Print Subscription
- Print and Digital Subscription
- Why Subscribe?
- Corporate Subscriptions
- Professor Journal
- Student Journal
- WSJ Amenity Program
- Customer Service

- Customer Center
- Contact Us
- Tools & Features

- Emails & Alerts
- Guides
- My News
- RSS Feeds
- Video Center
- Watchlist
- Podcasts
- Ads

- Advertise
- Commercial Real Estate Ads
- Place a Classified Ad
- Sell Your Business
- Sell Your Home
- Recruitment & Career Ads

18

EXHIBIT 6
Page 46

- More

  - About the Newsroom
  - Content Partnerships
  - Corrections
  - Jobs at WSJ
  - Masthead
  - News Archive
  - Register for Free
  - Reprints
  - Buy Issues

- ▫
- ▫
- ▫
- ▫
- ▫
- ▫
- ▫
- ▫

- Dow Jones Products

  - Barron's

  - BigCharts

  - Dow Jones DNA

- Dow Jones Newswires

  - Factiva

  - Financial News

  - Mansion Global

  - MarketWatch

  - Private Markets

  - realtor.com

- Risk & Compliance

  - Venturesource

19

EXHIBIT 6
Page 47

- WSJ Conference

- WSJ Pro Central Banking

- WSJ Video

- WSJ Wine

- Privacy Policy
- Cookie Policy
- Copyright Policy
- Data Policy
- Subscriber Agreement & Terms of Use
- Your Ad Choices

- Copyright ©2019 Dow Jones & Company, Inc. All Rights Reserved.

EXHIBIT 6
Page 48

# EXHIBIT 7

| From: | Eric Ortiz |
|---|---|
| To: | Sal Avila; Kenny Nguyen; Erica Tabin |
| Cc: | Kaine Wen; Isabel Banda; Calvin Ho; albert@slaccountmgmt.com |
| Subject: | Compliance Meeting 8/27/2019 |
| Date: | Tuesday, August 27, 2019 5:58:03 PM |

Hello,

Here is a recap of the compliance meeting.

Topic: Compliance
Location: SLAM
Time: 4:00 pm

Present: Kaine Wen, Albert Kim, Isabel Banda, Sal Avila, Kenny Nguyen & Eric Ortiz

Effective immediately all sales and marketing will be paused until further notice (estimated time frame three weeks). The purpose of the pause is to allow for retaining purposes. During this period the company and each department will work on re-training, compliance, and policies. In addition, each department will work together to address any and all mistakes on all client files.

Listed below is a summary but not limited of what is to be considered grounds for suspension/termination with or without notice.

- Zero tolerance for accessing NSLDS
- Zero tolerance for accessing FSA
- Zero tolerance for changing FS (family size)
- Zero tolerance for signing documents on behalf of clients
- Zero tolerance for misrepresentation of the company
    - Example: We work with the DOE/servicer
- Zero tolerance for submitting clients as unemployed on recerts
- Zero tolerance for final pay without ROA/confirmation documents uploaded

*If servicer login credentials are obtain from client. Servicer access will be granted.

If you have any questions or concerns, please contact upper management.

Thank you,

Eric Ortiz

EXHIBIT 7
Page 49

# EXHIBIT 8

| From: | Isabel Banda |
|---|---|
| To: | Christian Stark; Nicole Balestreri; Adon Janse; Amber Alarcon; Carolina Cazarez; Dawn Schoenbein; Dorothy Tipre; Hawalul Hassan; Heather Miklos; Karla Garcia; Kurt Zehrung; Larryce Hedgeman; Leode Ramirez; Mayte Gomez; Mark Christian; Nolan Chiavetta; Oscar Salazar; Paul Burstrom; Ra"anne Naea; Tauemua Faauli; Mike Nguyen; Davidson King; Felicia Ramirez; Leonardo Kiyabu; Nancy Bernal; Sarah Tagatauli; Shubhangi Vyawahare |
| Subject: | URGENT MEMO |
| Date: | Wednesday, August 28, 2019 1:32:08 PM |
| Attachments: | Image-1.png |

Hi Team-

Please be aware of the following temporary changes and see the script below:

**Customer Service Script**

As our announcement states on our website, *we are upgrading our technology and other systems to ensure that clients have received and continue to receive high-quality services from us. While our acceptance of new clients has been temporarily put on pause, we are absolutely continuing to work with current clients who have paid at least one installment for our services.*

- If no further questions, thank the client for the call.
- If asked for more description on changes/upgrades:
    1. *We are working on a variety of upgrades, including to the way we process payments and other operational processes.*
    2. *Improved quality control to ensure that 100% of our customers received the services that they paid for and are in the right loan modification, repayment or forgiveness plan*.
- If the client wants to cancel – process the cancellation without hesitation.

EXHIBIT 8
Page 50



EXHIBIT 8
Page 51

# EXHIBIT 9

# Zero Tolerance Policy

Zero tolerance for accessing NSLDS
Zero tolerance for accessing FSA
Zero tolerance for changing FS (family size)
Zero tolerance for signing documents on behalf of clients
Zero tolerance for misrepresentation of the company
(Example: We work with the DOE/servicer)
Zero tolerance for submitting clients as unemployed on recerts
Zero tolerance for final pay without ROA/confirmation documents uploaded



EXHIBIT 9
Page 52

# EXHIBIT 10

| DBA | TOLL FREE | WEBSITE | MANAGER |
|---|---|---|---|
| Premier Student Loan Center | (855) 340-7773 | N/A; company no longer take new clients | Matt Weinberg |
| Financial Preparation Services | (877) 709-0795 | https://financialpreparationservices.com/ | Zach Kennedy |
| South Coast Financial Center | (855) 877-4831 | https://www.southcoastfinancialcenter.com/ | James Thomas |
| Direct Account Services | (855) 877-5211 | https://www.directaccountservices.com | Matt Weinberg |
| Financial Loan Advisors | (877) 382-2596 | https://www.financialloanadvisors.com/ | |
| Account Preparation Services | (855) 866-2857 | https://www.accountpreparationservices.com/ | |
| Administrative Financial | (855) 877-9458 | https://www.administrativefinancial.com/ | Nicollette Bryan |
| Tangible Savings Solutions | (877) 921-3705 | http://tangiblesavingssolutions.com/ | |
| Coastal Shores Financial Group | (855) 877-2363 | https://www.coastalshoresfinancialgroup.com/ | Zach Kennedy |
| First Choice Financial Centre | (877) 768-4620 | https://www.firstchoicefinancialcentre.com | |
| Administrative Account Services | (855) 773-0028 | https://www.administrativeaccountservices.com | James Clark |
| Primary Account Solutions | (877) 640-4918 | https://www.primaryaccountsolutions.com | |
| Prime Document Services | (877) 795-4896 | https://www.primedocumentservices.com | |
| Financial Accounting Center | (855) 659-8774 | https://www.financialaccountingcenter.com | Morgan Miller |
| Doc Management Solutions | (855) 877-5184 | https://www.docmanagementsolutions.com | |
| Sequoia Account Management | (855) 981-6062 | https://www.sequoiaaccountmanagement.com | Austen Kalevitch |
| Pacific Palm Financial Group | (855) 259-5457 | https://www.pacificpalmfinancialgroup.com | Zach Kennedy |
| Pacific Shores Advisory | (855) 740-7237 | http://www.pacificshoresadvisory.com | Malea Shapley |
| First Document Services | (855) 728-5743 | https://www.firstdocumentservices.com | Morgan Miller |
| Keystone Document Center | (844) 279-8002 | https://www.keystonedocumentcenter.com/ | James Thomas |
| Administrative Accounting Center | (844) 680-0793 | https://www.administrativeaccountingcenter.com | Nicollette Bryan |
| Global Direct Accounting Services | (833) 780-0913 | https://www.globaldirectaccountingsolutions.com | Tara Herrera |
| Signature Loan Solutions | (855) 800-5721 | https://www.signatureloansolutions.com | James Clark |
| Best Choice Financial Center | (844) 817-8003 | https://www.bestchoicefinancialcenter.com | Alyssa Levasseur |
| Yellowstone Account Services | (844) 680-0797 | https://www.yellowstoneaccountservices.com | Matt Weinberg |
| Regional Accounting Center | (855) 997-4589 | https://www.regionalaccountingcenter.com/ | Brian Barnes |
| Financial Direct Services | (855) 394-3709 | https://www.financialdirectservices.com/ | Lindsay Blalock |

EXHIBIT 10
Page 53

# EXHIBIT 11

Updated: 10/21/2019                      Confidential & Business Proprietary Information

### Sales Script

IMPORTANT: **USE CAPS LOCK WHEN COMPLETING THE APPLICATION.** FAILURE TO DO SO WILL PREVENT YOUR FILE FROM MOVING FORWARD TO PROCESSING WHEN YOU SUBMIT.

#### QUALIFYING THE CALLER

Student Services Plus, this is _____. Are you interested in the Federal Student Loan Forgiveness Program or reduced repayment options?

1. Are your federal loans $10,000 or more?
2. Are you currently employed or have a source of income?

**IF NO to EITHER** – Unfortunately, we won't be able to help you today. Please contact the Department of Education if you are interested in learning more about your options. **[HANG UP UNDER 60 SECONDS]**

**IF YES** – Ok great. That means you may qualify for one or more of the Department of Education's programs that can reduce your monthly payments and possibly forgive your student loan balance. What we can do for you today is help you find the loan forgiveness program you may qualify for that will have the lowest monthly payment.

#### INTRODUCTION AND INFORMATION GATHERING

**\*Please note that while we may correspond with your servicers on your behalf, we are not the Department of Education. This call is being recorded for quality control and compliance purposes. \***

Let's go ahead and get started, if I could please get:

1. The proper spelling of your First and Last Name?

2. The best contact number in case we get disconnected.

3. What is your email address associated with your student loans?

4. Can I get your date of birth?

5. These federal programs are income based. Are you currently paid by the hour or are you on salary? What is your hourly rate? How many hours per week do you work?

EXHIBIT 11
Page 54

Updated: 10/21/2019                              Confidential & Business Proprietary Information

a. *ANNUAL SALARY = (Hourly rate x #hours worked per week) x 52*
b. *TAX TRANSCRIPT* (Use Line 37 of your 1040 or Use Line 21 of your 1040A or Use Line 4 of your 1040EZ)

6. **HOW TO PROPERLY EXPLAIN FAMILY SIZE:**

Now we'll determine your "family size" under the DOE programs. It's very important to include everyone that qualifies, so you can receive the lowest monthly DOE payment possible and potential loan forgiveness.

a. **How many children, including unborn, do you provide more than half their financial support?**
   *Ex. Include any unborn child or children.*
   *Ex. Providing half the financial support to any children away from home, such as college or military, or even adults.*
   *Ex. Support includes -- money, gifts, loans, housing, food, clothes, car, medical and dental care, and payment of college costs.*

b. **For anyone living with you, how many do you provide more than half their financial support?**
   *Ex. Providing half the financial support to anyone living with you, even relatives or friends.*

**LET THE CALLER TALK** – Most clients will be very eager to include someone they support financially if it lowers their monthly payment.
- Ex. Yes, my nephew has been living with me.
- Ex. Yes, I support another person financially 50% of the time who lives with me.

   **[Under no circumstances can you assist the client in submitting an incorrect family size.]**

**HOW TO PROPERLY EXPLAIN MARITAL STATUS:**

Under the DOE programs, your marital status will determine whether your monthly payments will be based only on your personal income, or the combined household income for both you and your spouse. Please let me know your marital status based on these 4 DOE application options:

a. **Single**
b. **Married**
c. **Married, but separated** – You will be treated as single
d. **Married, but cannot reasonably access my spouse's income information** – You will be treated as single

**To Caller: "Which Status best describes your current situation?"**

EXHIBIT 11
Page 55

Updated: 10/21/2019   Confidential & Business Proprietary Information

If client selects **b. Married**

**To Caller: "When you filed your last federal income tax return, did you file jointly with your spouse?**

**If YES: You must collect both spouse's incomes; either paystubs or their 1040 Tax Form**

Is your spouse currently paid by the hour or are they on salary?  What is their hourly rate? How many hours per week do they work?

e. *ANNUAL SALARY = (Hourly rate x #hours worked per week) x 52*
f. *TAX TRANSCRIPT* (Use Line 37 of your 1040 or Use Line 21 of your 1040A or Use Line 4 of your 1040EZ)

### \*\*\*NEED BOTH SPOUSES SIGNATURES ON WELCOME CALL\*\*\*

**If NO: You only need to collect the client's income.**

Ex: Recently married, filed as single last year.  This first year they do not need to include their spouse's income.

7.  Do you happen to work for The Government or for a non-profit organization for at least 30 hours per week?

a.  Great! Working for a not-for-profit or public service agency may qualify you for faster loan forgiveness.  If you work for a not-for-profit or public service agency full time (30+ more hours a week) for 10 years you may be eligible for PSLF.

### OBTAINING THE CALLER'S LOANS

The next step in the process is to obtain your loan details to see exactly how much you owe and determine what programs you may qualify for.

[**Note:  Do not obtain or use a client's login information for FSA, that is unlawful.**]

**[Must read Verbal Consent for Soft Credit Inquiry VERBATIM.]**

1.  "Will you authorize us to perform a soft credit inquiry in order to obtain your current amount of outstanding student loans to determine if you may qualify for one of the government's loan forgiveness or income driven repayment programs?"

If NO: "Soft credit inquiries will not affect your credit score and are never considered as a factor in credit scoring models. Potential lenders are not able to see soft credit inquiries."

EXHIBIT 11
Page 56

Updated: 10/21/2019                              Confidential & Business Proprietary Information

**IF YES:**

1. Access **"FRIDAY SUPPORT"**
2. Click forms then choose **"SOFT CREDIT"**.
3. *ENTER:* First name / Last name / Address / City / Zip / State/ **then click** SUBMIT
4. *If Soft credit pull doesn't work with information entered above, then re-enter information*
5. *RE-ENTER:* First name / Last name / Address / City / Zip / State / **SSN OR DOB** / **then click** SUBMIT

**IF NO: or UNABLE TO SUCCESSFULLY COMPLETE SOFT CREDT INQUIRY:** Go to Step 2

## STEP 2
### [OPTIONAL IF NO SOFT PULL]

**[Must read Verbal Consent for Servicer Login VERBATIM.]**

1. "Will you authorize us to log in to your Servicer website or create a login by using your personal identifiers to ensure that your loan details are accurate?"

"Thank you. To the extent we log in or create a login for your loan Servicer, we will provide you with that information."

1. Open servicer website.
2. Create or reset log in for servicer. Add servicer username and password to file.
3. Log in to the online account.
4. Save servicer in DPP

### EXPLAINING THE CALLER'S LOAN DETAILS

Ok (Caller's name), thank you for your patience. I am able to review the loan details you provided. I see here that you have a total of ____(#)____ student loans in your name, which you took out between the years of _____ and _____.

Based on the documents that you sent us, your current loan servicer is _____ and you have a balance of $_____ *and a total of $*_____ *in outstanding interest.* If you would like to write this down, you currently owe the federal government a total of $_____ for your federal student loans.

EXHIBIT 11
Page 57

Updated: 10/21/2019                                Confidential & Business Proprietary Information

## PROCESSING DEPARTMENT REVIEW

"What I am going to do now is take a few minutes to review all this information to determine whether we believe you may qualify for a DOE program. If it appears that you may qualify, we can help you get your application process started today. If for any reason it appears that you are <u>not</u> likely to qualify, I will let you know the reasons why we are unable to assist you.  It usually takes about 3-4 minutes to review your file, so I need to place you on a brief hold. To be ready, please have a pen and paper available so we can go over the notes together when I am done. Give me a few minutes here, I'll be right back, and I will have an answer for you shortly."

**\*\* PLACE THE CALLER ON HOLD (3-4 minutes) \*\***

### THE PITCH AND SERVICE COSTS EXPLAINED

OK (Caller's name), Thank you for your patience, I do have some good news for you. Based on our review, we believe you may be eligible for a loan repayment or forgiveness program with the DOE.

Do you have your pen and paper? Ok great.  Please write this down:  The name of the DOE program that you may be eligible for that gives you the lowest monthly payment based on your current income and family size, and marital status is called the "IBR, PAYE, ICR, REPAYE, PSLF". program. For more information on your program, please refer to pages 5 and 6 of your Income-Driven Repayment Plan Request which will be included in your E-Signature Document Package.

Now I am going to give you some numbers to write down and then I'll review what those numbers mean.

(Have client write down all five numbers, then move into the following explanation)

1.  The first number is \$_____, your total loan balance, which is how much you currently owe the federal government for your student loans.
2.  The second number is \$_____, If you were to stay enrolled in the standard repayment plan this is how much you would end up paying back because of the interest rates associated with your student loans.  Does this number make sense?

EXHIBIT 11
Page 58

Updated: 10/21/2019                        Confidential & Business Proprietary Information

3.  The third number is $ _____. This is your projected forgiveness if your current income, family size, and marital status remains the same for your entire (120/240/300) month term, so congratulations!
4.  The fourth number $(Quote SL + 41), your new monthly payment.
5.  The fifth number is **$1,705**. This is our total Initial Fee or what you pay us to assist you in submitting the documents necessary to obtain a new repayment plan. The good news is, I will break that down into monthly payments for you.

Now, let's take a look at the way your payments are outlined.  For the first 5 months *(whichever selected)* your monthly payments will be **$341** *(or whichever selected),* which will cover all of our fees for assisting you with your document preparation, processing, and enrollment into a government program.

After the first 5 months, your monthly payment may be reduced to just (quote sl + **41**), which includes your monthly student loan payment to your servicer of (Quote SL) and your recertification fee to us of **$41**. Please remember, you must reapply for your program every year with the U.S. Department of Education. However, with the **$41** per month through your (120/240/300) month term, we will make sure to contact you to collect and prepare all the paperwork necessary to keep you in your new loan repayment program every year.

Do these numbers make sense? Ok, great. Please keep in mind that the loan balance, payback number, and savings I provided you are **estimates based on the income and family size that you provided to me today**. These numbers could change if your marital status, income, or family size changes.  To highlight the benefits of these programs if your income decreases or your family size increases you may qualify for a lower payment option.  Please remember since these programs are structured based on those standards they should always work in your favor and your monthly payments should continue to remain affordable. Does that make sense? Okay.

It is very important to us how your money is protected. Our fees will be placed into your own Dedicated Client Account and these funds belong to you at all times. Your dedicated account provider is called Trusted Account Services, and they will only release our fees after the Department of Education approves your Income Driven Repayment program every year. This protects you to make sure we are doing our job, you receive a positive result, and you are satisfied with our services.

**[READ PARAGRAPH BELOW ONLY IF "IN REPAYMENT" STATUS]**

Since your student loans are in repayment status, we will file a forbearance which if approved will pause your payments to your current servicer. Please note that interest will still accrue while your loan is in forbearance. You are required to continue making your student loan payments until your forbearance request is approved and completed, which may take up to 14 business days.

EXHIBIT 11
Page 59

Updated: 10/21/2019                                   Confidential & Business Proprietary Information

### COMPLETE THE APPLICATION

Great! Our next step is to complete your application, pick your dates for your payments to us, place a payment method on file for the payment to us, and complete an e-signature document. This process will only take another 5-10 minutes to complete.

Even though we are going to send you everything in writing to review and sign, our Compliance Group requires us to walk through the basic services and the authorizations that we require on the phone during this call.

Thank you. Let's go ahead and get started by collecting the rest of the information we need for your file, starting with you current mailing address.

1.  VERIFY CURRENT MAILING ADDRESS.
2.  IF PSLF, GET EMPLOYER NAME, ADDRESS, AND LENGTH OF EMPLOYMENT (IN MONTHS).
3.  HAVE CLIENT CONFIRM – a) **PRIMARY PHONE NUMBER**, b) **EMAIL**, and c) **SSN**.
4.  HAVE CLIENT PROVIDE (2) REFERENCES – a) **FULL NAME**, b) **PHONE #**, and c) **RELATIONSHIP**.
5.  SAVE YOUR WORK!!!

### [Must read Verbal Consent for Servicer Login VERBATIM.]

2.  "Will you authorize us to log in to your Servicer website or create a login by using your personal identifiers to ensure that your loan details are accurate?"

"Thank you. To the extent we log in or create a login for your loan Servicer, we will provide you with that information."

5.  Open servicer website.
6.  Create or reset log in for servicer.
7.  Log in to the online account.
8.  Save servicer in DPP

### *TAKE SERVICER SNIPS AND UPLOAD TO DOCS IN DPP*

### SCHEDULE INITIAL PAYMENT

Ok, the next step is to pick a date for your payment to us. Which day works best for you to make your first payment? (Recommend a date that is no later than 10 business days from today, but do not pressure the customer).
**Note:** There is no government-imposed limit – do not indicate otherwise.

As noted earlier on the call, all payments to us will be placed into your Dedicated Client Account. any time before completion of the work, you can cancel and get your funds back.  Your funds will only be released to us after we prove both to you and Trusted Account Services that we have completed the work described above – assisting you with obtaining a new loan repayment / forgiveness program.

7 | P a g e

EXHIBIT 11
Page 60

Updated: 10/21/2019                                Confidential & Business Proprietary Information

## CREATE ENROLLMENT SCHEDULE

1. Choose Base Plan: Split Payments + Recurring
2. Program Length: 240 months / 120 months
3. Fee Down Payment: LEAVE BLANK
4. Initial Fee: $1,705 - Split into 5 Payments
5. Recurring: $41
6. Click Recurring Start Date from drop down Calendar, click on date, then click off
7. Save Enrollment Plan, then OK
8. Click on customer name

## OBTAIN EXPRESS VERBAL CONSENT FOR SERVICES

Before I get your payment information, please confirm that you authorize us to proceed with the following services on your behalf, **by stating YES to each of the following**:

1. Do you authorize us to review all supporting documentation for your application that you provide to us?
2. To make the application process easier and faster, we recommend that you allow us to handle all correspondence from your loan servicer via email/mail by using our mailing and email addresses on your application documents for the sole purpose of completing our services. We will send you a copy of all communications we receive from your servicer for your records. Once we have successfully assisted you in obtaining a new loan repayment program, we will change the contact information back to your email/mailing address. To make sure you understand this, we will send you a request to have this authorization in writing in a document called a Limited Power of Attorney. Do you authorize us to do what I just explained?
3. *(ONLY if Client requests a forbearance)* Do you authorize us to prepare and send you a forbearance request to submit to your servicer?
4. Do you authorize us to prepare and send you your loan repayment or loan forgiveness application for the (name of loan repayment or loan forgiveness program)?
5. Do you authorize us to communicate with you through email, text, and phone to provide us with all of the necessary documentation for your annual recertification?
6. Do you authorize us to prepare and send you your annual recertification applications?

## SECURE PAYMENT METHOD

Now that we have your enrollment schedule saved, the next step is to put a payment method on file for our fees only. You have two options to choose from. You can select either debit or credit, whichever you prefer.

EXHIBIT 11
Page 61

Updated: 10/21/2019                         Confidential & Business Proprietary Information

## Credit or Debit Card

1. Select Credit or Debit
2. How does you name appear on the front of the card?
3. Is your middle initial on there? (input initial if it is)
4. And is the billing address for the card the same as your mailing address?
5. Leave Card Issuer Blank
6. Ok, let's go ahead with the 16-digit number when you're ready
7. And the Expiration Date on the card?
8. And the 3-digit code on the back? (CVV)
9. Click Save

## (RPR) VERIFCATION – REPAYMENT PLAN REQUEST

**Direct consolidated loans in Income driven plan = Repayment plan Request**

   1. File must have Servicer login uploaded in DPP in order to submit file

Open servicer website(s). Create or reset log in for servicer(s). Log in to the online account and upload servicer login Username and password into DPP

Who is your current student loan servicer?  **(Navient, Nelnet, Greatlakes, FedLoan, AES, etc.)**

**[Must read Verbal Consent for Servicer Login VERBATIM.]**

1. "Will you authorize us to log in to your Servicer website or create a login by using your personal identifiers (including your full name, email, date of birth, and social) in order to obtain your current amount of outstanding student loan debt and assist you with finding your lowest monthly payment and potential loan forgiveness options?"

"Thank you. To the extent we log in or create a login for your loan Servicer, we will provide you with that information."

**IF YES:**

9. Open servicer website.
10. Create or reset log in for servicer.
11. Add servicer username and password to file.
12. Log in to the online account.

EXHIBIT 11
Page 62

Updated: 10/21/2019                          Confidential & Business Proprietary Information

Open Repayment Estimator and manually calculate loan repayment options.

## COMPLIANCE (MANDATORY)

Before we get to your Client Agreement, I will first go over our Compliance materials. I am going to send you the link to the Compliance materials via text message.  Please stand by.

**Before sending WC ensure all information is accurate including <u>Marital Status, Income, and Family Size.</u>**

**SEND WC SMS TXT**

**\*\*\*Client will be directed to the "Welcome Email" website. \*\*\***

**Instruct the Client to review and click through their personal and stated information.**

**\*\*\*NEED BOTH SPOUSES SIGNATURES ON WELCOME CALL\*\*\***

**Read all compliance questions VERBATIM and answer any questions Client may have.**

**Client will need to agree "Yes" to all 8 compliance questions.**

When the client finishes, refresh DPP and make sure you see **"WC CONFIRMED"** before moving forward.

## COMPLIANCE CALL SCRIPT

PRIOR TO SUBMITTING YOUR FILE FOR PROCESSING. I AM REQUIRED BY OUR COMPLIANCE DEPARTMENT TO VERIFY YOUR UNDERSTANDING OF THE SERVICES BEING PERFORMED AND OF THE DETAILS OF YOUR INCOME DRIVEN REPAYMENT PROGRAM FOR WHICH YOU ARE APPLYING. YOU WILL BE REQUIRED TO ANSWER 'YES' TO EACH OF THE FOLLOWING QUESTIONS IN ORDER TO MOVE ONTO THE NEXT. IF YOU DO NOT UNDERSTAND ANY OF THE QUESTIONS, PLEASE DO NOT HESITATE TO ASK ME

1. **"Do you understand <u>we are not the government, nor the Department of Education, nor the servicer of your student loans?</u>"**

   If No: We are a third-party document preparation services company who assists with all of the necessary paperwork to ensure accuracy and correct filing of the documentation required for any necessary consolidation, recalculation and/or enrollment into your income driven repayment program. While we may correspond with your servicer on your behalf, <u>we are not affiliated with the Department of Education.</u>

2. **"Do you understand that, for your protection, we are not allowed to and will not access your Federal Student Aid account?**

EXHIBIT 11
Page 63

Updated: 10/21/2019                                Confidential & Business Proprietary Information

If No: As a fully compliant document preparation services company, we will always remain within the guidelines mandated by all governing agencies. As such, we will not access your Federal Student Aid account.

3. "Do you understand that our company does not take any upfront fees, and that your payments to us will be placed into your own Dedicated Client Account held for your benefit until we successfully complete our work for you?"

If No: It is very important to us how your money is protected. You are making payments for our fees to your own Dedicated Client Account held by a non-related company (like a trust account). Your payments will be released to our company only after the Department of Education accepts your program / plan. That money belongs to you at all times and you can ask for it back prior to completion of our work. Once we receive your proof of income, we will complete all necessary correspondences and communications and document preparation services to get your program accepted by the Department of Education. This protects you to make sure we are doing our job, you receive a positive result, and you are satisfied with our services.

4. "Do you understand that the fees that I just mentioned for our services to you are the following:

   a. Our initial fee of $1,705, broken into payments of $____ for the first ___ months, which covers our initial work with you in applying for a loan program with the DOE?" [must receive a yes response

   *If No: For our services of assisting you with gathering the correct information for your application to the Department of Education's Income Driven Repayment program–and submitting your application, we collect $1,705 for our services.  However, these funds will be placed into a Dedicated Client Trust account that are held for your benefit and that you can request back at any time prior to completion of our work for you.  What that means is that we don't get paid until you are accepted into a new Department of Education loan repayment program.*

   b. Our recurring monthly fee of $41, which covers our work with you for your annual recertification.

   If No: You will continue to make monthly recertification payments to your own Dedicated Client Account until your recertification is finalized and completed. Your payments will be released to our company for completing all necessary correspondence and communication and document preparation services only after your recertification is approved.

5. "Do you understand that you may attempt to apply for an Income Based Program through the Department of Education on your own, but you are paying our company to handle all of the paperwork, notifications, and communications for your program?"

11 | P a g e

EXHIBIT 11
Page 64

Updated: 10/21/2019                                    Confidential & Business Proprietary Information

*If No: You may attempt to do this, but our job is to save you a lot of time, effort, and stress by doing all the work professionally and accurately, including preparing and submitting all the paperwork prior to all deadlines.*

6. **"Do you understand that verification of income by the Department of Education will be required to have your new monthly payment accepted, and that the payment details could change if your family size or proof of income changes?"**

   If No: The numbers discussed today are based off of the information that you provided. Our Processing Department will reach out to you in the next couple of days to verify the income that you stated over the phone.

7. **"Do you understand that once the process is complete, you will begin making the payment of $_____ (or SL payment) to the servicer of your student loans?"**
   *(Do NOT include the recertification fee in this number.)*

   If No: Once your Income Driven Program is accepted, you will make your new payment of $_____ (or SL payment) to the servicer of your student loans. {If $___ payment: Even a $_____ payment counts as a qualified payment towards your forgiveness.}

8. **"Do you understand that your loans will not be forgiven immediately, but upon completing 300/240/120 months of eligible payments and IF YOU ARE PSLF ELIGIBLE, you will have to submit a PSLF Loan Forgiveness form to the Department of Education to complete your loan forgiveness?**
   If No: These are term-based programs, which means the forgiveness occurs at the end of the program, which is 300/240 /120 months.

<u>**SEND THE CLIENT FEE AGREEMENT ("DOCS") FOR E-SIGN**</u>

The last step for us today is to complete a very simple E-signature document which I am sending via email and text message. Let me know when you see it. **The subject line will read "Documents Ready to Sign".**

*(DOCS TAB, Generate PDF, Client Agreement SSP, click Send to ClixSign, Generate PDF, Select SMS template "Sales Ready to Sign", from number "Sales", Send for Signature)*

1. **Please take your time to review and let me know when you are ready to begin – I can wait for as long as you would like.  Please review all of it.**
2. When you are ready, please click the "Review and Sign Now" link and click "Begin Signing"
3. Then you will need to draw your signature in the box and click "next"
4. Then draw your initials in the box and click "finished"

Updated: 10/21/2019                              Confidential & Business Proprietary Information

5. At this point it's pretty simple.  Please take as much time as you need to read and sign the document.  There are 12 tabs that you need to click on to add your signature/initials.  Once you have read the agreement and clicked on all of the tabs, hit the "Finish & Submit Document" to have your own copy directly to your email.

*(Read the paragraph below when the client is ready or ask when you can read some additional information to the client)*

**This document is only consent to work on your file and is an acknowledgement of the numbers we already went over.**

Thank you for taking the time to complete that.  What's going to happen next is you will be receiving a phone call from our company's Jr. Underwriting Department within the next 2-3 business days from a **(949) area code**. They will be requesting a copy of your tax returns or 2 most recent paystubs. This is to verify your income for the Department of Education. Our Customer Service and Jr. Underwriting Departments will take care of all your future paperwork, contacts, and notifications, and will update you every step of the way.

**REFERRALS**

LASTLY, were you referred by a friend or family member?

The reason I ask is you're now entitled to your own referrals. Very important: anybody you refer that calls my direct number; we are required to send you a $25 Visa Card for each person I am able to help out. This is mainly to assist anyone unaware of their options and show our appreciation to you for sending us referrals.

**WRAP UP THE CALL**

Besides that, do you have any more questions for me right now? Ok, fantastic. It's been a pleasure assisting you today; I am very pleased that we were able to help you with your student loans. I know this program is going to be a huge benefit for you. I hope you have a great rest of your day. Take care.

EXHIBIT 11
Page 66

EXHIBIT 12

 WyomingRegisteredAgent.com

WyomingRegisteredAgent.com
1621 Central Avenue
Cheyenne, WY 82001
307-637-5151

**Purchasing Information:**

**E-mail Address:**   michaelt@trustedaccountservices.com

**Billing Address:**
TRUSTED ACCOUNT SERVICES
KENNY HUANG
17011 BEACH BLVD, SUITE 900
HUNTINGTON BEACH, CA 92647

**Shipping Address:**
TRUSTED ACCOUNT SERVICES
KENNY HUANG
17011 BEACH BLVD, SUITE 900
HUNTINGTON BEACH, CA 92647

**Billing Phone:**
866-363-6383

**Shipping Phone:**
866-363-6383

**Order Grand Total:  $29.00**

**Payment Method:**   Other

**Invoice Summary:**

**Shipping Details:**

| | |
|---|---|
| **Invoice #:** | 65326 |
| **Invoice Date:** | 2019-07-10 10:43 |
| **Shipping Method:** | Standard delivery |
| Products Subtotal: | $29.00 |
| | ------ |

**Total for this Invoice: $29.00**

**Products on invoice:**

**1 x Virtual Office (Bronze) - Month - $29.00**
  SKU: VOBRM
- Name of the company: Trusted Account Services
- Street Address: 109 E. 17th St.
- Virtual Suite Number: 5656

---

**This order is *PAID IN FULL.***

EXHIBIT 12
Page 67

Case 8:19-cv-01998-JVS-JDE  Document 75-1  Filed 11/01/19  Page 84 of 101  Page ID
#:4178



**Wyoming Registered Agent <info@wyomingregisteredagent.com>**

## Receipt for Order Virtual Office - ch_1EuC8ZDMWj8AjnwYCL0Eec25

1 message

**no-reply@wufoo.com** <no-reply@wufoo.com>                                          Mon, Jul 8, 2019 at 11:51 PM
Reply-To: info@wyomingregisteredagent.com
To: michaelt@trustedaccountservices.com

---

**Jul 8, 2019**                                    **Transaction ID**
11:45pm                                            ch_1EuC8ZDMWj8AjnwYCL0Eec25

### Receipt for Order Virtual Office - ch_1EuC8ZDMWj8AjnwYCL0Eec25

**Billing Address**
Kenny Huang

███████████

Arcadia,CA 91006
US

| Description | Price |
|---|---|
| **Service Level:**<br>*Monthly Bronze $29/mo* | $29.00 |
| **Total** | **$29.00** |

**Credit Card : ****9394**                          **Amount Paid :** $29.00

EXHIBIT 12
Page 68

# WyomingRegisteredAgent.com
## Bronze Virtual Office Instructions

## Your New Mailing Address & Phone Numbers

> **Trusted Account Services**
> **109 E. 17th St.**
> **Suite #5656**
> **Cheyenne, WY 82001**

Thank you for your purchase of the Bronze Wyoming Virtual Office. Below are a few tips and answers to commonly asked questions.

### Forwarding Your Mail

Once a week, your mail will be forwarded to you by first class mail to the address specified in your online account. As we receive mail for you throughout the week, you will be notified by email with a scanned image of the front of the envelope.

### Changing Your Address

You can change your shipping address at any time by sending an email to shipping@wyomingregisteredagent.com, sending a Fax to 307.634.7570, or by managing your online account using your Internet web browser (see below).

### Managing Your Account Online

You can change your email, phone, and mail forwarding address, and view and pay invoices by accessing your online account. To login to your account:

1. Go to http://my.wyomingregisteredagent.com/
2. In the upper right hand corner of the page, enter your username: khuang
3. Enter your password in the password field. If you do not have your password, you can have a new password emailed to you (see below).
4. Click login.

### Lost/Misplaced Password?

To request a temporary password to be emailed to you, please follow these steps:

1. Go to http://my.wyomingregisteredagent.com/user/password
2. Enter your username: khuang
3. Click Email new password

### Questions and Support

If you have any questions about your service, please contact us by email (support@wyomingregisteredagent.com), phone (307.637.5151) or Fax (307.634.7570)

EXHIBIT 12
Page 69



**Wyoming Registered Agent <info@wyomingregisteredagent.com>**

## Order Virtual Office [#133]
1 message

**Wufoo** <no-reply@wufoo.com>                                    Mon, Jul 8, 2019 at 11:43 PM
Reply-To: no-reply@wufoo.com
To: info@wyomingregisteredagent.com

| | |
|---|---|
| Existing Wyoming Entity: * | Trusted Account Services |
| Service Level: * | Monthly Bronze $29/mo |
| Name * | Kenny  Huang |
| Email * | michaelt@trustedaccountservices.com |
| Phone Number * | 8663636383 |
| Send My Mail Here * | 17011 Beach Blvd, Suite 900 Huntington Beach, CA 92647 United States |

EXHIBIT 12
Page 70

# EXHIBIT 13

| | |
|---|---|
| From: | Keneth Hu |
| To: | Thu Quach |
| Cc: | Calvin Ho |
| Subject: | FW: TAS |
| Date: | Wednesday, June 19, 2019 5:27:21 PM |
| Attachments: | Credit Card Authorization .pdf |
| | image002.png |
| | image003.png |
| | image004.png |
| | image007.png |

## Keneth Hu

**System and Data Manager**
**IT Department**

## SL Account Management

**Email: khu@slaccountmgmt.com**
**Phone: (415) 640 - 5133**

**\*\*\*\*\* Email confidentiality notice \*\*\*\*\***

CONFIDENTIALITY STATEMENT: The information contained in this electronic transmission, and any attachments, may contain
CONFIDENTIAL information. The information is intended only for use by the addressee named above. Any unauthorized use, disclosure,
dissemination or copying of the contents of the information and any attachments contained in this electronic transmission is strictly
prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

**From:** Keneth Hu
**Sent:** Friday, June 14, 2019 2:10 PM
**To:** Thu Quach <thuq@financialpreparationservices.com>
**Cc:** Calvin Ho <calvin.ho@slaccountmgmt.com>
**Subject:** TAS

Hi,

Please fill for billing information for TAS. Thank you!

## Keneth Hu

**System and Data Manager**
**IT Department**

## SL Account Management

**Email: khu@slaccountmgmt.com**

EXHIBIT 13
Page 71

**Phone: (415) 640 - 5133**


**\*\*\*\*\* Email confidentiality notice \*\*\*\*\***

CONFIDENTIALITY STATEMENT: The information contained in this electronic transmission, and any attachments, may contain CONFIDENTIAL information. The information is intended only for use by the addressee named above. Any unauthorized use, disclosure, dissemination or copying of the contents of the information and any attachments contained in this electronic transmission is strictly prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

EXHIBIT 13
Page 72

**Credit Card Payment Authorization**

By signing this form you give Debt Pay, Inc permission to perform scheduled or periodic charges to your account by Credit Card for payments due for monthly DebtPayPro Software invoices or when applicable.

**Please complete the information below:**

I _____ authorize Debt Pay, Inc to charge my credit card account indicated below.

Billing Address _____         Phone#_____

City, State, Zip _____         Email _____

| Account Type:  ○ Visa       ○ MasterCard      ○ AMEX      ○ Discover |
| --- |
| Cardholder Name _____ |
| Account Number _____ |
| Expiration Date _____ |
| CVV2 (3 digit number on back of Visa/MC, 4 digits on front of AMEX) _____ |

_____

SIGNATURE                                          DATE

I authorize the above named business to charge the credit card indicated in this authorization form according to the terms outlined above. This payment authorization is for the goods/services described above. I certify that I am an authorized user of this credit card and that I will not dispute the payment with my credit card company; so long as the transaction corresponds to the terms indicated in this form.

**Debt Pay, Inc**   3501 Algonquin Rd, Suite 500, Rolling Meadows, IL 60008   P:(877) 800-5577  F: (800) 694-3530

EXHIBIT 13
Page 73

| From: | Khanh Truong |
|---|---|
| To: | Calvin Ho |
| Cc: | Alex La |
| Subject: | TAS - Form of ID Additional |
| Date: | Monday, July 08, 2019 10:58:34 AM |
| Attachments: | image001.png |

Hi A

Alex 's signing up virtual office for  TAS at Huntington Beach, they required another form of ID from Kenny Huang( Beside Driver License). Can be Passport, Business License ,Etc. With name and address matched with driver license .



logo

# Khanh Quoc Truong
**Operation ,IT & Programming**

phone: (916) 303-6776
ktroung@financialpreparationservices.com
**financialpreparationservices.com**

EXHIBIT 13
Page 74

| From: | Alex La |
| To: | Calvin Ho |
| Subject: | New Virtual Office At Huntington Beach |
| Date: | Monday, July 08, 2019 10:32:45 AM |

Hi anh Calvin,

Day la dia chi Virtual Office tai Huntington Beach: 17011 Beach Blvd Suite 900, Huntington Beach, CA 92647

Nguoi ta hoi cai email and phone number. Anh muon tao mot cai email moi hay la dung email nao anh noi em biet. Nguoi ta noi can them can them 1 form ID nua, co the passport, Car Registaration, Business License…. Co gi anh gui copy cho em nha. Cam on anh !

EXHIBIT 13
Page 75

**From:** Thu Quach
**To:** Calvin Ho
**Subject:** bank info
**Date:** Wednesday, July 03, 2019 1:20:43 PM

| Name of card holder | Card No | Expiration Date | CVV | Address |
|---|---|---|---|---|
| Kenny Tingkai Huang | ███ 9394 | 4/24 | ██ | ███ Arcadia CA 91006 |

EXHIBIT 13
Page 76

EXHIBIT 14

EXHIBIT 14
Page 77

# EXHIBIT 15

| | |
|---|---|
| **From:** | Donald Cook |
| **To:** | "Kaine Wen"; "Calvin Ho"; Calvin Ho; "Tom Nguyen"; "Thien Nguyen" |
| **Cc:** | "Rey Pasinli" |
| **Subject:** | RE: Commitment to move forward for ACH payment processing.... |
| **Date:** | Tuesday, February 26, 2019 8:00:56 AM |
| **Attachments:** | image003.png |
| | image004.png |

Good morning Kaine,

We can get True Count an approved ACH account <u>BUT</u>,

- https://www.consumer.ftc.gov/articles/1028-student-loans
  - It's illegal for companies to charge you before they help you The first step is to complete the Free Application for Federal Student Aid (FAFSA) form at fafsa.gov

Other:

- https://studentaid.ed.gov/sa/repay-loans/consolidation

- There is only one federal loan consolidation program.

- You can visit the Consumer Financial Protection Bureau's "Repay Student Debt" tool, which helps narrow down your options for both private and federal loan repayment. There is also an exhaustive list of student loan repayment options on the Office of Federal Student Aid website.

- Finally, you can report suspected fraud activity to the CFPB (855-411-CFPB) or to the Federal Trade Commission's online Complaint Assistant.

Although it's illegal to "Receive" payment in advance.  It's not illegal for the Students to "Pay" in advance – as long as the accrued fees are held by an independent, non-related 3rd party... Accordingly, we can/will process for True Count as long as Federal (and applicable state mandates) are adhered to.

I also recommend to start using a 3rd party accommodator to monitor and service your existing 50,000 students currently paying you via credit cards.  We can also facilitate this.

Sincerely,

Don
**Donald@DepositChecks.com**
**(866) 927-7180**
**(619) 450-5800**
**(603) 947-5197 - eFax**



---

**From:** Kaine Wen [mailto:kwen@slaccountmgmt.com]
**Sent:** Tuesday, February 26, 2019 3:38 AM
**To:** Donald Cook; Calvin Ho; 'Calvin Ho'; Tom Nguyen; Thien Nguyen
**Cc:** 'Rey Pasinli'
**Subject:** Re: Commitment to move forward for ACH payment processing....

EXHIBIT 15
Page 78

1. *True Count can be approved for ACH debit / credit processing for business purposes other than federal student loan document preparation and processing services and monthly re-certification fees.*

TC only does federal student loan document preparation and processing services. You are not able to get TC an ACH account for that business type? Please confirm so we can look for other options.

Thank you.

Best,

**Kaine Wen**

*Confidentiality Disclaimer: This e-mail correspondence and its attachments (if any) are intended exclusively for the above named addressee(s) and intended to be privileged and confidential. If they have come to you in error, please immediately notify the sender about the error and delete all copies of this e-mail correspondence along with its attachments. Thank you.*

**From:** Donald Cook <Donald@DepositChecks.com>
**Sent:** Monday, February 25, 2019 7:59:36 PM
**To:** Kaine Wen; Calvin Ho; 'Calvin Ho'; Tom Nguyen; Thien Nguyen
**Cc:** 'Rey Pasinli'
**Subject:** RE: Commitment to move forward for ACH payment processing....

Good evening Kaine,

You're welcome – together, we can make True Count sustaining.

1. True Count can be approved for ACH debit / credit processing for business purposes other than federal student loan document preparation and processing services and monthly re-certification fees.
2. Great, the services we propose, work for both Credit Card and ACH.
3. Negotiations are currently in place to integrate with either/both NMI and USAePay.  Non-integration will not impede us from performing our duties set forth below.

Sincerely,

Don
Donald@DepositChecks.com
**(866) 927-7180**
**(619) 450-5800**
**(603) 947-5197 - eFax**

EXHIBIT 15
Page 79

**From:** Kaine Wen [mailto:kwen@slaccountmgmt.com]
**Sent:** Monday, February 25, 2019 6:32 PM
**To:** Donald Cook; Calvin Ho; 'Calvin Ho'; Tom Nguyen; Thien Nguyen
**Cc:** 'Rey Pasinli'
**Subject:** Re: Commitment to move forward for ACH payment processing....

Hi Donald,

Thank you for the comprehensive proposal. It is a large-scale project and transition that we don't have any data on yet. This is what we're looking for in the short-term:

1. Obtain an ACH account for True Count.
2. We will attempt to enroll new clients using ACH.
3. We will gather data on what % of clients agree to ACH (vs credit/debit).
4. We will gather data on what % of payments get approved/NSF'ed, client refund requests, etc.

Is the plan still for you to integrate with NMI or USAePay?

Best,

**Kaine Wen**

*Confidentiality Disclaimer: This e-mail correspondence and its attachments (if any) are intended exclusively for the above named addressee(s) and intended to be privileged and confidential. If they have come to you in error, please immediately notify the sender about the error and delete all copies of this e-mail correspondence along with its attachments. Thank you.*

**From:** Donald Cook <Donald@DepositChecks.com>
**Sent:** Monday, February 25, 2019 2:37:11 PM
**To:** Kaine Wen; Calvin Ho; 'Calvin Ho'; Tom Nguyen; Thien Nguyen
**Cc:** 'Rey Pasinli'
**Subject:** Commitment to move forward for ACH payment processing....

Good afternoon everyone,

Congratulations, after meeting and consultations, we have decided to move forward in processing your ACH transactions and those of your referred Clients.  It is our current belief that "true integration" with DebtPayPro, or any CRM of your choice, is not necessary for us to complete our work.

We need for all involved to understand the operating procedures in moving forward.  Please read the entire text below and be prepared to ask questions and add input in the initial conference call.  We would like to have all representative on this first call.  **Please provide us with 2 dates/times this week that are convenient for your team.**

## Process

- No advance fees are taken/received/controlled by the Doc Prep Company.

EXHIBIT 15
Page 80

- The Doc Prep Company assists the students completing the required forms, depending on what type of loan, etc.
- The students sign a Recurring ACH Authorization form in favor of the Trustee, not the Doc Prep Company.
- The Trustee debits the students over a period of time agreed upon by the parties [e.g. of 3 months for the $1,200 fee ($400 per month)] plus $6.95 per month for the Trustee fees.  At all times the accumulated funds are owned by the student in the trust account held in the Trustee's name until such time as evidence is provided, to the Trustee, that the contracted work has been performed by the Merchant.
- Upon evidence of completed work, Trustee will send accumulated fees to Doc Prep Company either by wire, ACH or paper check.
- Upon receipt of Cancellation / Refund Request by the Student – Trustee will notify Doc Prep Company and return all then accumulated fees to the Student.
- The student always pays "loan" payments directly to the Lender/Government.
- The Trustee never receives "loan" payments, and, in turn never pays the Lender/Government.
- The Doc Prep Company currently uses the CRM of DebtPayPro.com and may switch CRMs at their discretion.
- The Doc Prep Company currently does not process ACH.
- The Doc Prep Company currently uses GroupISO for Credit Card processing.
- The Doc Prep Company will provide Deposit Checks, Inc a daily ACH processing file.  In return, Deposit Checks, Inc. will provide Doc Prep Company a Results file.
- The ACH "Merchant" is the Trustee (i.e. Deposit Checks, Inc.).
- Deposit Checks, Inc will be the Trustee to administer payments.
- The Student signs a Recurring ACH Authorization in favor of Deposit Checks, Inc.  Deposit Checks, Inc will be a processing client of Today Payments, Inc., dba: **TrusteePay.com (site to be completed by month's end).**
- The Doc Prep Company may assign a **unique "Descriptor"** that is presented to the Student on his/her bank statement.
- Upon certified completion of work – the Doc Prep company will receive it's accumulative fees held by Trustee.


My, in-house, programmers have already constructed the layout of the database to be used and we are ready to become the Trustee or assist a Trustee.

## Considerations

The students sign a Recurring Credit Card Authorization form in favor of the Trustee, not the Doc Prep Company.

## Descriptors

ACH descriptor to be agreed upon by Doc Prep Company and Trustee.

## Credit Card

EXHIBIT 15
Page 81

Credit card processor will be provided the Trust bank information for deposits

## Pricing

Services rendered to Company and its Students

1.  $60 Application Fee.

    **ACH Processing**
2.  0.00% Discount Fee
3.  $0.50 Transaction Fee for federal student loan document preparation and processing services and monthly re-certification fees (this is paid for by the Doc Prep Company for all transactions initiated by referred Students)
4.  $30 Monthly Fee – per Doc Prep Company depository Trust account
5.  $2.50 Return Fee (NSF) (this is paid for by the student)
6.  $25 Revocation Fee (RO 5, 7, 10) (this is paid for by the Doc Prep Company)
7.  $6.95/month Student Escrow Fee, via ACH or Card payments, for collection of Doc Prep Company federal student loan document preparation and processing services (this is paid for by the student)

    **Other Fees**
8.  Company Payment Gateway access $100 Monthly Fee Services rendered to Company's Clients
9.  Settlement Disbursement Fee using ACH: $5.00
10. Per occurrence fee for any other appropriate service which includes but is not limited to: $25 Wire Transfer Fee, Certified Check, Cashier's Check Depository Fee $10 Paper Check, Money Order

Upon an agreement to move forward by all parties agreements will be transmitted to Doc Prep Company for review, completion, execution and return.

A $10,000 setup fee, payable in two installments: initial payment upon Execution and return of the Company agreement, second installment collected upon "testing sign-off" by both Doc Prep Company and Deposit Checks, Inc.

Respectfully,

Don

**Donald@DepositChecks.com**
**(866) 927-7180**
**(619) 450-5800**
**(603) 947-5197 - eFax**



EXHIBIT 15
Page 82

# EXHIBIT 16

| From: | Calvin Ho |
|-------|-----------|
| To: | Advisor; Kaine Wen; Tom Nguyen |
| Subject: | DAP Flowchart |
| Date: | Sunday, March 03, 2019 11:00:00 PM |
| Attachments: | DAP Flowchart.pdf |

Please see attached for DAP Flowchart

EXHIBIT 16
Page 83

## DAP FlowChart



EXHIBIT 16
Page 84

# EXHIBIT 17

| | |
|---|---|
| **From:** | Calvin Ho |
| **To:** | "Thu Quach"; Keneth Hu; Khanh Truong; Long Le; Thien Nguyen |
| **Subject:** | TAS |
| **Date:** | Monday, March 11, 2019 7:12:00 PM |
| **Attachments:** | Trusted Account Services.docx |

EXHIBIT 85
Page 85

TAS – Trusted Account Services Functions
1. Transaction Report:
    a. Customer View:
        • Merchant Account ID
        • Company Name
        • Paid Amount
        • Pending Payment
        • Refund Amount
        • Release/Payout Amount
    b. Internal View:
        • Deposit Summary:
            o Batch Amount
            o Deposit
            o Adjustment
            o Reserves
            o Net Deposit
2. CC/ACH Payment:
    a. Charge
    b. Refund
    c. Void
3. Options Setting:
    a. API Configuration
    b. Card ID verification
    c. Address Verification
    d. Settlement Schedule
    e. Transaction Routing
4. Pre-chargeback & Chargeback Alert:
5. Proof of Work Upload
6. Client Profile/Database:
    a. Full  Name (First, Last Name)
    b. CC/DB Card
    c. DPP ID
    d. Address
    e. Uploaded Files
    f. Contracts
7. Client's View
8.

EXHIBIT 85
Page 86

# EXHIBIT 18

| | |
|---|---|
| **From:** | Kaine Wen |
| **To:** | Donald Cook; Calvin Ho; Calvin Ho; Tom Nguyen; Thien Nguyen |
| **Cc:** | "Rey Pasinli" |
| **Subject:** | Re: Closure of Horizon processing account.... |
| **Date:** | Friday, April 12, 2019 2:50:39 AM |
| **Attachments:** | image004.png |
| | image005.png |
| | image003.png |

Hi Donald,

The new application has been submitted under "TAS 2019 LLC".


Best,

**Kaine Wen**

*Confidentiality Disclaimer: This e-mail correspondence and its attachments (if any) are intended exclusively for the above named addressee(s) and intended to be privileged and confidential. If they have come to you in error, please immediately notify the sender about the error and delete all copies of this e-mail correspondence along with its attachments. Thank you.*

**From:** Donald Cook <donald@todaypayments.com>
**Sent:** Thursday, April 4, 2019 12:50:55 PM
**To:** Kaine Wen; Calvin Ho; 'Calvin Ho'; Tom Nguyen; Thien Nguyen
**Cc:** 'Rey Pasinli'
**Subject:** RE: Closure of Horizon processing account....

Hi Kaine,

Sorry for the inconvenience.

We have to await the opening of the "Accommodator" account for testing....

Don
**Donald@TodayPayments.com**
**(866) 927-7180**
**(603) 947-5197 – eFax**



**From:** Kaine Wen [mailto:kwen@slaccountmgmt.com]
**Sent:** Thursday, April 04, 2019 2:14 AM
**To:** Donald Cook; Calvin Ho; 'Calvin Ho'; Tom Nguyen; Thien Nguyen
**Cc:** 'Rey Pasinli'

EXHIBIT 18
Page 87

**Subject:** Re: Closure of Horizon processing account....

Hi Don,

Can you keep the Horizon account open so we can continue testing? Don't worry, we are
working on getting the new application in. I'm not sure if you can view it but I have it mostly
completed - just waiting on the bank account information.


Best,

**Kaine Wen**

*Confidentiality Disclaimer: This e-mail correspondence and its attachments (if any) are intended exclusively for the above named addressee(s) and
intended to be privileged and confidential. If they have come to you in error, please immediately notify the sender about the error and delete all copies of
this e-mail correspondence along with its attachments. Thank you.*

---

**From:** Donald Cook <donald@todaypayments.com>
**Sent:** Wednesday, April 3, 2019 1:18:24 PM
**To:** Kaine Wen; Calvin Ho; 'Calvin Ho'; Tom Nguyen; Thien Nguyen
**Cc:** 'Rey Pasinli'
**Subject:** RE: Closure of Horizon processing account....

Good afternoon Kaine,

The account has seen $-0- processing since inception and we haven't heard from you for several
weeks.

Just "cleaning up the ledgers"....

We are standing ready to receive your new application and processing account!

Respectfully,

Don
**Donald@TodayPayments.com**
**(866) 927-7180**
**(603) 947-5197 – eFax**



---

**From:** Kaine Wen [mailto:kwen@slaccountmgmt.com]
**Sent:** Wednesday, April 03, 2019 1:07 PM
**To:** Donald Cook; Calvin Ho; 'Calvin Ho'; Tom Nguyen; Thien Nguyen
**Cc:** 'Rey Pasinli'

EXHIBIT 18
Page 88

**Subject:** Re: Closure of Horizon processing account....

Hi Don,

Why is the Horizon ACH account closed?

We are in the process of submitting the new application, just waiting on the business bank account to be set up.


Best,

**Kaine Wen**

*Confidentiality Disclaimer: This e-mail correspondence and its attachments (if any) are intended exclusively for the above named addressee(s) and intended to be privileged and confidential. If they have come to you in error, please immediately notify the sender about the error and delete all copies of this e-mail correspondence along with its attachments. Thank you.*

---

**From:** Donald Cook <donald@todaypayments.com>
**Sent:** Wednesday, April 3, 2019 9:05:32 AM
**To:** Kaine Wen; Calvin Ho; 'Calvin Ho'; Tom Nguyen; Thien Nguyen
**Cc:** 'Rey Pasinli'
**Subject:** RE: Closure of Horizon processing account....

Good morning Gentlemen,

Your Horizon processing account has been closed.

Sincerely,

Don
**Donald@TodayPayments.com**
**(866) 927-7180**
**(603) 947-5197 – eFax**



EXHIBIT 18
Page 89

# EXHIBIT 19

| | |
|---|---|
| From: | Michael T |
| To: | Kaitlyn Dorsey |
| Cc: | Calvin Ho; Kaine Wen; Carrie Brown; Advisor; Tom Nguyen |
| Subject: | Re: Integration with Trusted Account Services |
| Date: | Wednesday, June 19, 2019 5:47:05 PM |
| Attachments: | image001.png |
| | image002.png |

Hi Kaitlyn,

I sent you the signed documents. Let me know if there's anything else.

Thanks you,

## Michael Tabin
Chief Technology Officer

**Trusted Account Services**
30 N Gould St, Ste R
Sheridan, WY 82801
t: (307) 200-2961
e: michaelt@trustedaccountservices.com

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

**From:** Kaitlyn Dorsey <kaitlyn@debtpaypro.com>
**Sent:** Friday, June 14, 2019 11:27:32 AM
**To:** Michael T
**Cc:** Calvin Ho; Kaine Wen; Carrie Brown; Advisor; Tom Nguyen
**Subject:** Re: Integration with Trusted Account Services

Hi Michael,

I have attached the updated scope below. Kaine mentioned your company will be the ones being invoiced and paying? If this is correct, I will also attach our CC Form below as well.

Thank you!

Kaitlyn Dorsey
*Software Specialist*
kaitlyn@debtpaypro.com



**Phone:** (855)874-8222 x109
**Sales:** (630)394-6260

EXHIBIT 19
Page 90

**Fax:** (800) 694 3530

**DebtPay Inc**
1900 E Golf Rd, Suite 550
Schaumburg, IL 60173
http://www.debtpaypro.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner.

On Wed, Jun 12, 2019 at 11:24 AM Kaitlyn Dorsey <kaitlyn@debtpaypro.com> wrote:
Hi All,

I am waiting on the Team to review the documentation so I can update our scope to resend your way. I will be in touch shortly.

Kaitlyn Dorsey
*Software Specialist*
kaitlyn@debtpaypro.com

**Phone:** (855)874-8222 x109
**Sales:** (630)394-6260
**Fax:** (800) 694 3530

**DebtPay Inc**
1900 E Golf Rd, Suite 550
Schaumburg, IL 60173
http://www.debtpaypro.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner.

On Wed, Jun 12, 2019 at 11:24 AM Michael T <michaelt@trustedaccountservices.com> wrote:
Hi Mr Calvin,

Full API Documentation was sent to Kaitlyn.

Thanks,

# Michael Tabin
Chief Technology Officer

**Trusted Account Services**
30 N Gould St, Ste R
Sheridan, WY 82801

EXHIBIT 19
Page 91

t: (307) 200-2961
e: michaelt@trustedaccountservices.com

The content of this email is confidential and intended for the recipient specified in
message only. It is strictly forbidden to share any part of this message with any
third party, without a written consent of the sender. If you received this message
by mistake, please reply to this message and follow with its deletion, so that we
can ensure such a mistake does not occur in the future.

---

**From:** Calvin Ho <calvin@financialpreparationservices.com>
**Sent:** Monday, June 10, 2019 11:57:19 PM
**To:** Kaitlyn Dorsey; Michael T
**Cc:** Kaine Wen; Carrie Brown; Advisor; Tom Nguyen
**Subject:** RE: Integration with Trusted Account Services

Hi Michael,

Have you sent fully updated API Documentation to Kaitlyn yet?

Hi Kaitlyn,

Can you guys expedite this for us instead of 20 days?

**From:** Kaitlyn Dorsey <kaitlyn@debtpaypro.com>
**Sent:** Tuesday, June 4, 2019 8:58 AM
**To:** Michael T <michaelt@trustedaccountservices.com>
**Cc:** Kaine Wen <kwen@slaccountmgmt.com>; Calvin Ho
<calvin@financialpreparationservices.com>; Carrie Brown <carrie@debtpaypro.com>;
Advisor <advisor@financialpreparationservices.com>; Tom Nguyen
<tom@slaccountmgmt.com>
**Subject:** Re: Integration with Trusted Account Services

HI Michael,

Thank you for sending, I need to take this back to the team to update our original scope. It
looks like the only thing added is the "GET transaction/create" - I don't see any updates on
here regarding ACH transactions which I know you mentioned in the previous email you
were going to update that.

The api documentation, is this final? No more updates needed? I rather make sure now
before we have to go back and forth with a new scope / timeline. I know this is pretty
urgent for them.

Thanks,

**Kaitlyn Dorsey** *Software Specialist* kaitlyn@debtpaypro.com



**Phone:** (855)874-8222 x109
**Sales:** (630)394-6260

EXHIBIT 19
Page 92

**Fax:** (800) 694 3530

**DebtPay Inc**
1900 E Golf Rd, Suite 550
Schaumburg, IL 60173
http://www.debtpaypro.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner.

On Mon, Jun 3, 2019 at 2:24 PM Michael T <michaelt@trustedaccountservices.com> wrote:

Hi Kaitlyn,

Attached is an updated copy of our API. We included API for requesting transaction status. Please review.

Thank you,

# Michael Tabin

Chief Technology Officer



**T: (307) 200-2961**
michaelt@trustedaccountservices.com
www.trustedaccountservices.com
**30 N Gould St, Ste R Sheridan, WY 82801**

**From:** Kaine Wen <kwen@slaccountmgmt.com>
**Sent:** Thursday, May 30, 2019 6:32:59 PM
**To:** Kaitlyn Dorsey; Michael T
**Cc:** Calvin Ho; Carrie Brown; Advisor; Tom Nguyen
**Subject:** Re: Integration with Trusted Account Services

Hi Kaitlyn,

Please invoice Trusted Account Services for their integration development. Thank you.

Best,

**Kaine Wen**

*Confidentiality Disclaimer: This e-mail correspondence and its attachments (if any) are intended exclusively for the above named addressee(s) and intended to be privileged and confidential. If they have come to you in error, please immediately notify the sender about the error and delete all copies of this e-mail correspondence along with its attachments. Thank you.*

EXHIBIT 19
Page 93

**From:** Kaitlyn Dorsey <kaitlyn@debtpaypro.com>
**Sent:** Thursday, May 30, 2019 10:01:20 AM
**To:** Michael T
**Cc:** Calvin Ho; Carrie Brown; Kaine Wen; Advisor; Tom Nguyen
**Subject:** Re: Integration with Trusted Account Services

Michael,

Sounds good, we will update our scope and quote for Calvin once we receive your
updated documentation.

Thanks!

**Kaitlyn Dorsey** *Software Specialist* kaitlyn@debtpaypro.com



**Phone:** (855)874-8222 x109
**Sales:** (630)394-6260
**Fax:** (800) 694 3530

**DebtPay Inc**
1900 E Golf Rd, Suite 550
Schaumburg, IL 60173
http://www.debtpaypro.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached
to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible
for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the
information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in
error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or
saving in any manner.

On Wed, May 29, 2019 at 6:15 PM Michael T <michaelt@trustedaccountservices.com>
wrote:

> Carrie,
>
> I spoke with Keneth from Calvin's team regarding adding new API for getting
> transaction statuses. Also, we'll be updating transaction/create API to be able to
> process ACH transactions.
>
>
> Thank you,
>
> ## Michael Tabin
>
> Chief Technology Officer
>
>     T: (307) 200-2961
> michaelt@trustedaccountservices.com
> www.trustedaccountservices.com
> 30 N Gould St, Ste R Sheridan, WY 82801

EXHIBIT 19
Page 94

**From:** Calvin Ho <calvin@financialpreparationservices.com>
**Sent:** Tuesday, May 28, 2019 1:36:53 PM
**To:** Carrie Brown
**Cc:** Michael T; Kaine Wen; DebtPayPro Support; Advisor; Tom Nguyen; Kaitlyn Dorsey
**Subject:** RE: Integration with Trusted Account Services

Hi Carrie,

Perfect. Thanks Carrie.

Please keep me posted.

Best regards,


**From:** Carrie Brown <carrie@debtpaypro.com>
**Sent:** Tuesday, May 28, 2019 1:06 PM
**To:** Calvin Ho <calvin@financialpreparationservices.com>
**Cc:** Michael T <michaelt@trustedaccountservices.com>; Kaine Wen
<kwen@slaccountmgmt.com>; DebtPayPro Support <support@debtpaypro.com>;
Advisor <advisor@financialpreparationservices.com>; Tom Nguyen
<tom@slaccountmgmt.com>; Kaitlyn Dorsey <kaitlyn@debtpaypro.com>
**Subject:** Re: Integration with Trusted Account Services

Hi Calvin,

We have a scope and quote. Kaitlyn in sales is finalizing the proposal and will reach
out soon to review.'

Regards,

**Carrie Brown** *Client Success Manager*
carrie@debtpaypro.com



**Phone:** (855) 874 8222 x.115
**DebtPay Inc**
1900 E Golf Rd, Suite 550
Schaumburg, IL 60173
http://www.debtpaypro.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it
may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible
for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the
information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission
in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading
or saving in any manner.


On Thu, May 23, 2019 at 1:00 PM Carrie Brown <carrie@debtpaypro.com> wrote:

Hi Calvin,

EXHIBIT 19
Page 95

We just recently received the API documentation and it is being reviewed by development. No work has or will be started on it until a scope and quote are complete and a proposal for the work is signed off on. Please feel fre to contact me if you have any questions but this is our standard integration procedure.

Regards,

**Carrie Brown** *Client Success Manager*
carrie@debtpaypro.com



**Phone:** (855) 874 8222 x.115

**DebtPay Inc**
1900 E Golf Rd, Suite 550
Schaumburg, IL 60173
http://www.debtpaypro.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner.

On Thu, May 23, 2019 at 12:55 PM Calvin Ho
<calvin@financialpreparationservices.com> wrote:

  Hi Carrie and Michael,

  How's everything with the integration? When can we start using TAS? Do you guys have any timeframes for that ? Do you guys need anything from us?

  Please let me know if we can help with anything else.

  Best regards,

  **From:** Carrie Brown <carrie@debtpaypro.com>
  **Sent:** Wednesday, May 8, 2019 1:29 PM
  **To:** Calvin Ho <calvin@financialpreparationservices.com>
  **Cc:** Michael T <michaelt@trustedaccountservices.com>; Kaine Wen <kwen@slaccountmgmt.com>; DebtPayPro Support <support@debtpaypro.com>; Advisor <advisor@financialpreparationservices.com>; Tom Nguyen <tom@slaccountmgmt.com>
  **Subject:** Re: Integration with Trusted Account Services

  Michael,

  Actually, if it's going to be NMI we'd like to get a VAR sheet instead of credentials. If it's Auth.net then credentials are all we need.

  Thank you,

  **Carrie Brown** *Client Success Manager*

EXHIBIT 19
Page 96

carrie@debtpaypro.com

🔲

**Phone:** (855) 874 8222 x.115
**DebtPay Inc**
1900 E Golf Rd, Suite 550
Schaumburg, IL 60173
http://www.debtpaypro.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner.

On Tue, May 7, 2019 at 3:38 PM Carrie Brown <carrie@debtpaypro.com> wrote:

> No, not for this meeting. Thanks Calvin!
>
> On Tue, May 7, 2019, 1:15 PM Calvin Ho <calvin@financialpreparationservices.com> wrote:
>
>> Hi Carrie,
>>
>> Do you want us to join the meeting as well ?
>>
>> Best regards,
>>
>> **From:** Michael T <michaelt@trustedaccountservices.com>
>> **Sent:** Monday, May 6, 2019 5:19 PM
>> **To:** Carrie Brown <carrie@debtpaypro.com>
>> **Cc:** Calvin Ho <calvin@financialpreparationservices.com>; Kaine Wen <kwen@slaccountmgmt.com>; DebtPayPro Support <support@debtpaypro.com>; Advisor <advisor@financialpreparationservices.com>; Tom Nguyen <tom@slaccountmgmt.com>
>> **Subject:** Re: Integration with Trusted Account Services
>>
>> 1:00pm on Wednesday will work.
>>
>> **From:** Michael T
>> **Sent:** Monday, May 6, 2019 5:15:15 PM
>> **To:** Carrie Brown
>> **Cc:** Calvin Ho; Kaine Wen; DebtPayPro Support; Advisor; Tom Nguyen
>> **Subject:** Re: Integration with Trusted Account Services
>>
>> Yes, that will be fine.
>>
>> Thank you.
>>
>> **From:** Carrie Brown <carrie@debtpaypro.com>
>> **Sent:** Monday, May 6, 2019 10:04:33 AM

EXHIBIT 19
Page 97

**To:** Michael T
**Cc:** Calvin Ho; Kaine Wen; DebtPayPro Support; Advisor; Tom Nguyen
**Subject:** Re: Integration with Trusted Account Services

Hi Michael,

I am out of the office at appointments until Wednesday. I could do 9:00 or
1:00 PST on Wednesday. If one of those times works I'll send out a meeting
invite to block the time.

Regards,

**Carrie Brown** *Client Success Manager*
carrie@debtpaypro.com

**Phone:** (855) 874 8222 x.115

**DebtPay Inc**
1900 E Golf Rd, Suite 550
Schaumburg, IL 60173
http://www.debtpaypro.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages
attached to it may contain confidential information that is legally privileged. If you are not the intended recipient,
or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure,
copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY
PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please
destroy the original transmission and its attachments without reading or saving in any manner.

On Mon, May 6, 2019 at 8:49 AM Michael T
<michaelt@trustedaccountservices.com> wrote:

Carrie,

You can contact me at (307) 200-2961.

Lets schedule a meeting for tomorrow (5/7) 1:00pm MDT.

**From:** Carrie Brown <carrie@debtpaypro.com>
**Sent:** Friday, May 3, 2019 1:20:57 PM
**To:** Calvin Ho; Michael T
**Cc:** Kaine Wen; DebtPayPro Support; Advisor; Tom Nguyen
**Subject:** Re: Integration with Trusted Account Services

Michael,

What phone number can I reach you to discuss this?

Regards,

**Carrie Brown** *Client Success Manager*
carrie@debtpaypro.com

EXHIBIT 19
Page 98

**Phone:** (855) 874 8222 x.115

**DebtPay Inc**
1900 E Golf Rd, Suite 550
Schaumburg, IL 60173
http://www.debtpaypro.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner.

On Thu, May 2, 2019 at 5:16 PM Calvin Ho
<calvin@financialpreparationservices.com> wrote:

Hi Carrie,

Here is Michael contact: michaelt@trustedaccountservices.com

Best regards,

**From:** Carrie Brown <carrie@debtpaypro.com>
**Sent:** Thursday, May 2, 2019 2:25 PM
**To:** Calvin Ho <calvin@financialpreparationservices.com>
**Cc:** Kaine Wen <kwen@slaccountmgmt.com>; DebtPayPro Support
<support@debtpaypro.com>; Advisor
<advisor@financialpreparationservices.com>; Tom Nguyen
<tom@slaccountmgmt.com>
**Subject:** Re: Integration with Trusted Account Services

Thanks, Calvin!

Do you have contact info?

**Carrie Brown** *Client Success Manager*
carrie@debtpaypro.com

**Phone:** (855) 874 8222 x.115

**DebtPay Inc**
1900 E Golf Rd, Suite 550
Schaumburg, IL 60173
http://www.debtpaypro.com

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner.

EXHIBIT 19
Page 99

On Thu, May 2, 2019 at 12:05 PM Calvin Ho
<calvin@financialpreparationservices.com> wrote:

Hi Carrie,

You can reach out for Micheal Tabin.

Please let me know if there are anything that I can help.

Best regards,

**From:** Carrie Brown <carrie@debtpaypro.com>
**Sent:** Thursday, May 2, 2019 9:52 AM
**To:** Calvin Ho <calvin@financialpreparationservices.com>
**Cc:** Kaine Wen <kwen@slaccountmgmt.com>; DebtPayPro Support
<support@debtpaypro.com>; Advisor
<advisor@financialpreparationservices.com>; Tom Nguyen
<tom@slaccountmgmt.com>
**Subject:** Re: Integration with Trusted Account Services

Hi Calvin,

Thanks for sending this over. Is there a person there you've been
working with that I can ask reach out to specifically?

On Wed, May 1, 2019, 6:06 PM Calvin Ho
<calvin@financialpreparationservices.com> wrote:

Hi Carrie,

Here is the website from Trusted Account Services:
https://trustedaccountservices.com/

Contact from Trusted Account Services:
technicalsupport@tasportal.com

Let me know if you need any other information.

Best regards,

**From:** Carrie Brown <carrie@debtpaypro.com>
**Sent:** Wednesday, May 1, 2019 6:43 AM
**To:** Kaine Wen <kwen@slaccountmgmt.com>
**Cc:** DebtPayPro Support <support@debtpaypro.com>; Advisor
<advisor@financialpreparationservices.com>; Tom Nguyen
<tom@slaccountmgmt.com>; Calvin Ho
<calvin@financialpreparationservices.com>
**Subject:** Re: Integration with Trusted Account Services

Hi Kaine,

EXHIBIT 19
Page 100

What is the website for this company? Is there a direct contact there I can speak with?

On Wed, May 1, 2019, 3:56 AM Kaine Wen <kwen@slaccountmgmt.com> wrote:

Dear Support,

Please provide detailed answers and explanations to the following questions from Trusted Account Services. We are testing out their dedicated account provider services (same services as Reliant Account Management or Account Management Plus). Thank you in advance.

1.  *How can we integrate with DPP?*
2.  *Do you have any document that details what information we need to receive from DPP's end or pass to DPP from our end?*
3.  *Do you have any API to use for integration?*
4.  *How can we manage the transactions and clients between our systems and DPP?*

Best,

**Kaine Wen**

*Confidentiality Disclaimer: This e-mail correspondence and its attachments (if any) are intended exclusively for the above named addressee(s) and intended to be privileged and confidential. If they have come to you in error, please immediately notify the sender about the error and delete all copies of this e-mail correspondence along with its attachments. Thank you.*

EXHIBIT 19
Page 101

# EXHIBIT 20

| | |
|---|---|
| **From:** | Long Le |
| **To:** | Calvin Ho |
| **Subject:** | Tas questions for DPP |
| **Date:** | Wednesday, April 24, 2019 2:22:09 PM |

Hi a,

Day la cau hoi cua em va a Thinh.

1. How can we integrate with DPP? Do you guys have any document that help us to know which info that we need to receive from your end or pass to yours from our end?
2. Do you have any API to use for integration?
3. How can we manage the transactions and clients between our systems and DPP?

EXHIBIT 20
Page 102

EXHIBIT 21



EXHIBIT 21
Page 103



Case 8:19-cv-01998-JVS-JDE   Document 75-2   Filed 11/01/19   Page 28 of 80   Page ID #:4223



EXHIBIT 21
Page 104

Case 8:19-cv-01998-JVS-JDE   Document 75-2   Filed 11/01/19   Page 29 of 80   Page ID #:4224



EXHIBIT 21
Page 105

Case 8:19-cv-01998-JVS-JDE   Document 75-2   Filed 11/01/19   Page 30 of 80   Page ID
#:4225



EXHIBIT 21
Page 106

EXHIBIT 22



EXHIBIT 22
Page 107

# EXHIBIT 23

| | |
|---|---|
| **From:** | Thien Nguyen |
| **To:** | Keneth Hu |
| **Subject:** | RE: ACH Processing using Green |
| **Date:** | Tuesday, April 23, 2019 2:22:01 PM |

Yes. But not for FPS. We will contact them again as TAS.

**From:** Keneth Hu <khu@financialpreparationservices.com>
**Sent:** Tuesday, April 23, 2019 1:58 PM
**To:** Thien Nguyen <thien@slaccountmgmt.com>
**Subject:** RE: ACH Processing using Green

Is this still one of your options?

**From:** Thien Nguyen <thien@slaccountmgmt.com>
**Sent:** Monday, April 8, 2019 12:03 PM
**To:** Keneth Hu <khu@slaccountmgmt.com>; Keneth Hu <khu@financialpreparationservices.com>
**Cc:** Khanh Truong <ktroung@financialpreparationservices.com>
**Subject:** FW: ACH Processing using Green

Hi Keneth,
Could you skim through the documents? We're trying to find a new processing company. This is one
that I found that is provide lots of details on contract and how to post API. Please give me your
thought.
Thanks,
Thien Nguyen

**From:** Frank Lewis <frankl@ncms-inc.com>
**Sent:** Monday, April 8, 2019 11:15 AM
**To:** Thien Nguyen <thien@slaccountmgmt.com>
**Subject:** FW: ACH Processing using Green


Thien
I talked with the head underwriting and he is all in to get this done.  He looked at your website and
his comment was this is the first website that is doing this correctly.
Give me a call and I will work through this with you.

Frank Lewis
Independent Account Executive
National Cash Management Systems
www.ncms-inc.com
6850 TPC Drive | Suite 208 | McKinney, Texas 75070
Toll Free 877.370.9645 x 100 | Direct 214.544.2245 x 100
Cell 972.880.8997 | Company Fax 214.544.2246



EXHIBIT 23
Page 108

# EXHIBIT 24

| From: | Keneth Hu |
|---|---|
| To: | Kaine Wen |
| Subject: | RE: QUANTUM HORIZON CONSULTANTS - PSLC APPLICATION |
| Date: | Tuesday, December 11, 2018 9:47:28 AM |
| Attachments: | Quantum Horizon Consultants - PSLC.pdf |

Signed

**From:** Kaine Wen <kwen@slaccountmgmt.com>
**Sent:** Monday, December 10, 2018 11:35 PM
**To:** Keneth Hu <khu@slaccountmgmt.com>
**Subject:** Fw: QUANTUM HORIZON CONSULTANTS - PSLC APPLICATION

Please sign on page 6 (twice) and page 7.


**Kaine Wen**
**SL Account Mgmt**

*Confidentiality Disclaimer: This e-mail correspondence and its attachments (if any) are intended exclusively for the above named addressee(s) and intended to be privileged and confidential. If they have come to you in error, please immediately notify the sender about the error and delete all copies of this e-mail correspondence along with its attachments. Thank you.*


**From:** Jimmy Lai <jimmy.lai@swiftpaymentsinc.com>
**Sent:** Monday, December 10, 2018 11:09 PM
**To:** Kaine Wen; Tom Nguyen
**Subject:** QUANTUM HORIZON CONSULTANTS - PSLC APPLICATION

Please review for accuracy, sign, and return.


Thanks,


**Jimmy Lai**
President
Swift Payments
Office: (949) 596-7550
Mobile: (949) 302-3248
Fax:    (949) 328-7535


The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the addressee. If the person actually receiving this communication or any other reader of the communication is not the named recipient, or the employee or agent responsible to deliver it to the recipient, any

EXHIBIT 24
Page 109

use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by return e-mail, and destroy this communication and all copies thereof, including all attachments.

EXHIBIT 24
Page 110



**MERCHANT PROCESSING APPLICATION & AGREEMENT**
**PAGE 1**

## 1. GENERAL INFORMATION | BUSINESS LOCATION INFORMATION | BUSINESS STRUCTURE    Sales Agent ID: _____

Premier Student Loan Ctr | 8 Whatney, Ste 100, #8
Client Business Name (Doing Business As) | Location Address (physical location)

| Irvine | CA | 92618 | 1-855-757-7727 | |
|---|---|---|---|---|
| City | State | Zip | Location Phone | Location Fax |

| 1-855-757-7727 | www.slaccountmgt.com | info@slaccountmgt.com |
|---|---|---|
| Customer Service Phone | Business Website Address | Business Email |

Horizon Consultants LLC | 2522 Chambers Rd, Ste 100, Rm 209
Client Corporate Name/Legal Name | Corporate Address (if different than location)

| Tustin | Ca | 92780 | Kaine Wen | +1 855-757-7727 |
|---|---|---|---|---|
| City | State | Zip | Contact Name | Contact Phone |

| ▓▓▓▓▓ | | Prior Security Breach? Yes ☐ No ☒ |
|---|---|---|
| Fed Tax ID | Tax Filing Name (if different) | |

| _____ | Send Retrieval/Chargeback Requests to: Corporate Address ☒    Location Address ☐ |
|---|---|
| Date Business Started | |

Multiple Locations? ☐ Yes ☒ No    If Yes, enter # of locations _____    Additional Location to existing MID _____

Indicate Company Structure:

☐ Sole Prop  ☐ Partnership  ☐ C Corp  ☐ S Corp  ☐ 501 C/Tax Ex  ☒ LLC/LLP  ☐ Govt. (Local/State/Federal)

State Filing  CA _____    ☐ I certify that I am a foreign entity/nonresident alien (If checked, please attach IRS Form W-8)

**NOTE:** Failure to provide accurate information may result in a withholding of merchant funding per: IRS regulations (See Part IV, Section A.3 of your Program Guide for further information)

## 2. BANKING ACCOUNT INFORMATION AND MEMBER BANK DISCLOSURE

Bank Name    Sunwest Bank

Bank Phone

Routing #    122228003

Account #    ▓▓▓▓▓▓▓▓▓

ACH Method: ☒ Combined    ☐ Individual

(Must be a checking account. Savings accounts are not permitted.)

Visa and MasterCard Member Bank Information as indicated below by agent: **Commercial Bank of California**

**COMMERCIAL BANK**
O F   C A L I F O R N I A

**Mailing Address:** 19752 MacArthur Blvd., Suite 100, Irvine, CA 92612

Prior Bankruptcies? ☐ Yes  ☒ No    If Yes: ☐ Business    ☐ Personal

Date Discharged _____

## 3. TRADE REFERENCE

| Trade Reference Business Name _____ | Contact _____ |
|---|---|
| Business Address _____ | Telephone _____ |
| City _____ State _____ Zip _____ | Account No. _____ |

PAGE 2

## 4. OWNERS | PARTNERS | OFFICERS

### OWNER | PARTNER | OFFICER 1

| Name | Keneth Hu | Title | Owner | % Ownership* | 100 | Guarantor** | Yes ☐ | No ☐ |

Home Address 2522 Chambers Rd, Ste 100, Rm 209    City Tustin    State Ca    Zip 92780

Cell Phone ▮▮▮▮    Social Security ▮▮▮▮    Date of Birth ▮▮▮▮    Email Address khu@slaccountmgmt.com

### OWNER | PARTNER | OFFICER 2

Name _____ Title _____ % Ownership* _____ Guarantor** Yes ☐ No ☐

Home Address _____ City _____ State _____ Zip _____

Cell Phone _____ Social Security _____ Date of Birth _____ Email Address _____

### OWNER | PARTNER | OFFICER 3

Name _____ Title _____ % Ownership* _____ Guarantor** Yes ☐ No ☐

Home Address _____ City _____ State _____ Zip _____

Cell Phone _____ Social Security _____ Date of Birth _____ Email Address _____

### OWNER | PARTNER | OFFICER 4

Name _____ Title _____ % Ownership* _____ Guarantor** Yes ☐ No ☐

Home Address _____ City _____ State _____ Zip _____

Cell Phone _____ Social Security _____ Date of Birth _____ Email Address _____

* Each individual who owns, directly or indirectly through any contract, arrangement, understanding relationship or otherwise, 25% or more of the equity interests of the Client, or who is the Client's sole proprietor, must be added.

** A control prong owner means a "beneficial owner" who is a single individual (e.g. Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, Treasurer) with significant responsibility to control, manage, or direct Client's legal entity. The control prong owner must also serve as the Guarantor in connection with the Merchant Processing Agreement.

## 5. NATURE OF BUSINESS | TRANSACTION INFORMATION

Business Type:
☐ Retail  ☐ Restaurant  ☐ Healthcare  ☐ Lodging  ☐ Supermarket  ☐ Government
☐ Internet  ☐ QSR  ☐ Education  ☐ Utilities  ☐ Petroleum  ☐ Charity/Non Profit
☐ B2B  ☑ Mail / Telephone Order  ☐ Other _____

| | | | | | |
|---|---|---|---|---|---|
| Requested Monthly V/MC/DS Card Volume | 500,000 | American Exp Monthly Volume | _____ | Card Present Swiped | ___ % | Sales to Consumers 100 % |
| Requested Average V/MC/DS Card Ticket | 30.00 | American Exp Average Ticket | _____ | Card Present Keyed | ___ % | Sales to Business ___ % |
| Requested Highest Payment Card Ticket | 50.00 | | | MOTO | 100 % | Sales to Govt. ___ % |
| | | | | Internet (Ecommerce) | ___ % | |

Seasonal Merchant: Yes ☐ No ▮ Months Closed _____    Previous Processor National Merchant Center    Reason For Leaving Currently Processing

Has the Merchant or Owner been terminated from accepting payment cards from any payment network for this business or any other business? Yes ☐ No ☐
If yes, please explain the reason for termination: _____

Description of Products or Services Sold: Recurring Recertification Fees of $30, $40, and $50 for

Describe your Return Policy: Full refund (no questions asked) if the client's enrollment is not approved, or if company makes a material mistake    Days to delivery 31-90 days

Quantum Electronic Payments LLC is a registered ISO of Commercial Bank of California

EXHIBIT 24
Page 112

**6. SERVICE ACCEPTANCE | FEE SCHEDULES AND OTHER CARD TYPES**                     PAGE 3

## Request to Accept Card Types:

- ☑ Visa Credit
- ☑ Visa Debit
- ☑ MasterCard Credit
- ☑ MasterCard Debit
- ☑ Discover Network
- ☑ AMEX Network
- ☐ PIN Debit

## Select VI/MC/Discover Network Discount Plan:

- ☐ Tiered Basic
- ☐ I/C Flat Rate
- ☑ Pass Through
- ☐ CDP Flat Rate

---

**Assessments & Brand Fees:** Included ☑   Billed Separately ☑    **Requested Discount Payment Method:** Daily ☑   Monthly ☐

---

| DISCOUNT FEES: Visa, MasterCard, Discover, Pin Debit | | | | | | American Express OPT Blue or AMEX Direct | | |
|---|---|---|---|---|---|---|---|---|
| Tiered | % | Per Item | Pass Through | % | Per Item | **Opt Blue Discount Plan:**<br>☐ Tiered Basic<br>☐ Pass Through Program Pricing<br>☐ Flat Rate | **AMEX Direct:**<br>☐ Order New No.<br>Existing SE No. _____<br>☐ Use Existing<br>Cap No. _____<br>(Flat fee of $7.95 or Discount Rate may apply) | |
| Qualified Discount = | | | Pass Through IC+ = | 1.25 | 0.09 | | | |
| Mid Qual = (Qual+) | | | Debit PassThrough IC+ = | 1.25 | 0.09 | | | |
| Non Qual = (Qual+) | | | Pin Debit Pass Through+= | 1.25 | 0.09 | | % | Per Item |
| Debit Qual Discount = | | | **Flat Rate** | % | | Credit Qual = | | |
| Debit Mid Qual = (Qual+) | | | Flat Rate = | | | Credit Mid-Qual = | | |
| Debit Non Qual = (Qual+) | | | Debit Flat Rate = | | | Credit Non-Qual = | | |
| | | | | | | Pass Through IC = | | |

---

## Authorization, Monthly AND Miscellaneous Fees

### Authorization & Per Item Fees

| | |
|---|---|
| Visa/MC/Discover Networks | $ 0.09 |
| AMEX/Fleet/Other | $ 0.09 |
| Pin Debit | $ 0.09 |
| EBT | $ 0.09 |
| FCS# | |
| Electronic AVS | $ 0.05 |
| Voice Auth | $ 1.00 |
| Voice AVS | $ 1.25 |
| Sales Transaction Fee | $ 0.09 |
| Return Transactions | $ 0.50 |
| Batch Fee (Per Item) | $ 0.09 |
| Micros Fee (Per Transaction) | $ ____ |

### Monthly Fees

| | |
|---|---|
| Monthly Service | $ 20.00 |
| Monthly Minimum | $ 250.00 |
| Wireless Fee | $ ____ |
| Pin Debit Monthly | $ ____ |
| EBT Monthly | $ ____ |
| PCI Non-Compliance | $ 35.00 |
| Govt Compliance | $ 3.95 |
| TIN Mis-Match (until validated) | $ 49.00 |
| Licensing Fee | $ ____ |
| PCI Monthly Fee | $ 20.00 |
| Security Software | $ 14.95 |

### Miscellaneous Fees

| | |
|---|---|
| Chargeback Fee (Per Occurrence) | $ 25.00 |
| Retrieval Fee (Per Occurrence) | $ 15.00 |
| ACH Reject Fee (Per Occurrence) | $ 30.00 |
| Annual Fee | $ 199.00 |
| Month to Bill | December |
| PCI Annual Fee | $ 250.00 |
| Risk Monitoring | $ 50.00 |
| POS Software | $ ____ |
| SPM Setup Fee | $ 200.00 |
| SPM Monthly Fee | $ 200.00 |

### Gateway Fees

| | |
|---|---|
| Gateway Setup Fee | $ 150.00 |
| Gateway Monthly Fee | $ 25.00 |
| Gateway Transaction Fee | $ 0.25 |
| Gateway Batch Fee | $ 0.10 |

---

Association fees will be passed through to the merchant. Fees include, but are not limited to, Visa's FANF and APF, Acqr ISA and MasterCard's NABU, Acqr Support, Cross Border Fee and Discover IPF, ISF, Data Usage, AMEX Network, AMEX Non-Swipe, AMEX downgrade, Assessments (MC,Visa Credit,Visa Debit, Discover,MC > $1,000), MC AVS Acqr Access (CNP), MC AVS Acqr Access, MC License, MC KiloByte, Visa AFD Partial Auth, Non Participant, Visa File Transmission, MC CVC2, DISC Network Auth, Visa Acqr Processing (CR), Visa International Acqr, Visa Acqr International Service Assessment, Visa Misuse Auth, Visa Zero Floor, MC Digital Enablement, MC Reversal, Visa Return Data Processing (CR & DB), Visa Acqr Data Processing (Debit), Visa Tran Integrity, Visa Network Part CT, Visa Network CNP. Association fees are set by Associations and are subject to change from time to time.

0.30% non-swiped transaction fee will be charged by American Express for transactions whenever a CNP or Card Not Present Charge occurs. CNP means a charge which the card is not presented at the point of purchase (e.g., Charges by mail, telephone, fax or the Internet). Note: The CNP Fee is applicable to all transactions made on all American Express Cards, including Prepaid Cards.

An inbound fee of 0.40% will be applied on any Charge made using a Card, and including Prepaid Cards that was issued outside the United States (As used herein the United States does not include Puerto Rico, Virgin Islands and other US Territories and possessions).

☑ By checking this box, Guarantor opts out of receiving future commercial marketing communications from American Express. Note that you may continue to receive marketing communications while American Express updates its records to reflect your choice. Opting out of commercial marketing communications will not preclude you from receiving important transactional relationship messages from American Express.

---

PAGE 4

☐ **Next Day Funding*** $ <u>5.00</u> Per Month: *NDF is subject to approval and all POS Device batch(es) must be closed by 4:30pm PST/7:30pm EST Monday-Saturday and by 3pm PST/6pm EST on Sunday. All payments are provisional and are subject to, including but not limited to: additional fees, chargebacks, withholding, set off, security and reserve rights. Processor or Bank will not be liable for any delay in receipt of funds, fees for any delays, or errors in debit and credit entries caused by third parties, including by not limited to, any Association or your financial institution.

In the event that this Agreement is terminated early, Merchant will be responsible for the payment of a $ <u>495</u> Early Termination Fee in accordance with Part III Section A.3. of the Merchant Program Guide. In the event QEP is unable to price match a competitor offer for similar services in the future, QEP will waive Merchant's ETF.  QEP reserves the right to verify proposal and activation.

☐ **Merchant Club:** The representative has explained the Merchant Club program to me and I elect to opt out of the program. I understand I can opt into the program at any time and benefit from the program, which includes equipment support and replacement per terminal/ peripheral (where applicable), as well as great discounts for items such as car rentals, hotels, office supplies, health and legal services and more for my company and employees for an additional fee of $14.95 per month. Initials: _____

## 7. EQUIPMENT | PROCESSING METHOD

**Application Type:**  Retail ☐  Retail w/Tip ☐  MOTO ☐  ■ Quick Serve Restaurant (no tip) ☐  Restaurant w/Tip ☐  Hotel ☐  Auto Rental ☐

### Terminal Features: Choose Desired Functions

| | | | |
|---|---|---|---|
| Fraud Check (last 4-digits) ☐ | Purchasing Card ☐ | Time Zone _____ | IP Connection ☐ |
| AVS + CVV2 ■ | Server / Clerk # ☐ | Auto Close ☐ | Dial ☐ |
| EBT Food Stamps ☐ | Order Gift Card ☐ | If yes, what time? _____ | Wireless ☐ |
| EBT Cash Benefit ☐ | Invoice / PO # ☐ | Wireless MAN/Serial _____ | Special Request _____ |
| ACH / Check Services ☐ | CDP Discount ☐ | SIM Card # _____ | _____ |

| TYPE OF EQUIPMENT | PRODUCT NAME | QUANTITY | DEPLOYMENT |
|---|---|---|---|
| Terminal ☐  Pin Pad ☐  Printer ☐  VAR* ■ | Quantum Gateway | 1 | Existing ☐  Agent ☐  New Order ☐ (Attach Form) |
| Terminal ☐  Pin Pad ☐  Printer ☐  VAR* ☐ | | | Existing ☐  Agent ☐  New Order ☐ (Attach Form) |
| Terminal ☐  Pin Pad ☐  Printer ☐  VAR* ☐ | | | Existing ☐  Agent ☐  New Order ☐ (Attach Form) |

* Manufacturer/product/version of PC/Internet Software:  <u>NMI</u>

Do you use any third party to store, process or transmit cardholder data?  Yes ☐  No ■
If yes, please provide name/address: _____

For software or VAR users, by checking yes below MERCHANT certifies that it has used a certified Qualified Integrator or Reseller (QIR) to install or re-program MERCHANT's software systems. Notwithstanding MERCHANT's use of a QIR as described herein above, MERCHANT acknowledges that is, and shall remain, fully responsible for compliance with PCI-DSS standards at all times in accordance with the Program Terms and Conditions (Program Guide).   Yes ■   No ☐

## 8. SITE INSPECTION (COMPLETED BY SALES AGENT)

I have personally conducted a Site Inspection for this merchant, visually inspected the merchant's inventory (if applicable), verified the merchant's payment application is PA-DSS (Payment Application Data Security Standards) validated (if applicable) and represent that the information in this merchant application is accurate, as to the best of my knowledge. I am subject to criminal penalties and/or financial losses for false or misleading information.

Sales Agent Name (printed)  <u>Jimmy Lai</u>                    Signature _____

**9. CARD NOT PRESENT INFORMATION**                                                                    PAGE 5

If you process more than 20% of your bankcard transactions or volume, without swiping, and/or examining the credit card, please complete this section:

1. Please submit your product catalog; brochures; promotional materials; a current price list; and a copy of your service agreement with card holder, if applicable. If on the internet, please include screen-prints of your website address if your site is not active yet.

2. If internet, please check your type of business:  Selling Hard Goods ☐        Digital Products ☐        Services ■

☐ Other: _____

3. How will the product be advertised or promoted? _Internet_____

4. How often will you bill your customer?     Monthly _100_ %     Yearly _100_ %     One Time _____ %

5. List the name(s) and address(es) of the vendors(s) from which supplies are purchased:
_____

6. Who performs product/service fulfillment? If direct from vendor, please provide vendor name, address and phone number in full:
_____

7. Please describe how a sale takes place from beginning of order until completion of fulfillment:
_____

**10. SIGNATURES**

Client certifies that all information set forth in this completed Merchant Processing Application is true and correct and that Client has received a copy of the version of the Program Guide stated on this Merchant Processing Application which includes the Processor & Bank Confirmation Page ("Confirmation Page"), which Confirmation Page is hereby incorporated by reference into this Merchant Processing Application and Agreement.  Client acknowledges and agrees that we, our Affiliates and our third-party subcontractors and/or agents may use automatic telephone dialing systems to contact Client at the telephone number(s) Client has provided in this Merchant Processing Application and/or may leave a detailed voice message in the event that Client is unable to be reached, even if the number provided is a cellular or wireless number or if Clients has previously registered on a Do Not Call list or requested not to be contacted for solicitation purposes.  Client hereby consents to receiving commercial electronic mail messages from us, our Affiliates and our third-party subcontractors and/or agents from time to time.  Client further agrees that Client will not accept more than 20% of its card transactions via mail, telephone or internet order.  However, if your Application is approved based upon contrary information stated in Section 7 you are authorized to accept transactions in accordance with the percentages indicated in that section.  Client, and each individual signing below on behalf of the Client or as Guarantor, authorizes Quantum Electronic Payments ("Processor) and Commercial Bank of California ("Bank") and their respective agents to investigate the references, statements and other data contained herein and to obtain additional information from credit bureaus and other lawful sources, including persons and companies named in this Merchant Processing Application.  Client, and each individual signing below on behalf of the Client or as Guarantor, authorizes Processor and Bank and their respective agents (a) to procure information from any credit reporting agency bearing on Client's credit standing, credit capacity, general reputation, or characteristics, and to obtain consumer reports from consumer reporting agencies on each individual signing below on behalf of Client or as a Guarantor (if such individual asks Processor or Bank whether such a report was requested, Processor or Bank will tell such individual and if Processor or Bank requests a report, Processor or Bank will give such individual the name and address of the agency that furnished it), and (b) to contact all previous references.  Client also authorizes us and our Affiliates to provide amongst each other the information contained in the Merchant Processing Application and Agreement and any information received from all references, including banks and credit reporting agencies.

Client authorizes Processor and Bank and their affiliates to debit Client's designated bank account via Automated Clearing House (ACH) for costs associated with the equipment hardware, software and shipping.

Client certifies and agrees that Client does not and will not provide, offer or facilitate gambling services, including offering or facilitating internet gambling services, or establishing quasi-cash, credit or monetary value of any type that may be used to conduct gambling.

**CIP - Card Identification Program -** IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We will also ask for a copy of your driver's license or other identifying documents.

Client certifies, under penalties of perjury, that the federal taxpayer identification number and corresponding filing name provided herein are correct. Client agrees to all terms of this Merchant Processing Application and Agreement. This Merchant Processing Application and Agreement shall not take effect until Client has been approved and this Agreement has been accepted by Processor and Bank.

**Certification of Beneficial Owner(s)**

Persons opening an Account on behalf of a legal entity must provide the following information:

**a.** Name and title of natural person opening Account,

**b.** Name, address and entity type of legal entity for which the account is being opened as provided in section 2,

**c.** The following information (Name, Date of Birth, Address, and a Social Security Number for a US person, a Social Security Number or unexpired alien ID card number, or the number and country of issuance of an unexpired passport or other government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard) for each individual, if any, who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25 percent or more of the equity interests of the legal entity (provided in Section 4 above), and

**d.** The following information (Name, Date of Birth, Address, and a Social Security Number for a US person or, for a non-US person, a Social Security Number or unexpired alien ID card number, or the number and country of issuance of an unexpired passport or other government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard) for one individual (referred to herein as the "control prong" for purposes of the FinCEN Rule) with significant responsibility for managing the legal entity listed on the Merchant Processing Application and Agreement such as: An executive officer or senior manager (e.g., Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, Treasurer), or any other individual who regularly performs similar functions. The undersigned individual opening the Account on behalf of the Client legal entity, has identified the Guarantor as the "control prong" for the Client legal entity, and the Guarantor, by his or her signature below acknowledges that he or she is so regarded.

I, the signer and person opening this Account, hereby certify that I am authorized to open accounts for the Client at financial institutions, and, to the best of my knowledge, that the information provided on this Merchant Processing Application and Agreement is complete and correct. Client agrees to all the terms of this Merchant Processing Application and Agreement. This Merchant Processing Application and Agreement shall not take effect until Client has been approved and this Agreement has been accepted by Processor and Bank. Client certifies, under penalties of perjury, that the federal taxpayer identification number and corresponding filing name provided herein are correct.

**Client's Business Principal/Officer**

| | | | |
|---|---|---|---|
| Signature | _Keneth Hu (signature)_ | Title | Owner |
| Print Name | Keneth Hu | Date | 12/11/18 |
| Signature | | Title | |
| Print Name | | Date | |

**Personal Guarantee**

In exchange for Quantum Electronic Payments, LLC ("Processor") AND Commercial Bank of California ("Bank") (the Guaranteed Parties) acceptance of the Merchant Processing Application and Agreement with the Client named therein (which Merchant Processing Application and Agreement is hereby incorporated by reference into this Personal Guaranty), the undersigned unconditionally and irrevocably guarantees the full payment and performance of Client's obligations under the foregoing agreements, as applicable, as they now exist or as modified from time to time, whether before or after termination or expiration of such agreements and whether or not the undersigned has received notice of any

amendment of such agreements. The undersigned waives notice of default by Client and agrees to indemnify the Guaranteed Parties for any and all amounts due from Client under the foregoing agreements. The Guaranteed Parties shall not be required to first proceed against Client to enforce any remedy before proceeding against the undersigned. This is a continuing personal guaranty and shall not be discharged or affected for any reason. The undersigned understands that this is a Personal Guaranty of payment and not of collection and that the

Guaranteed Parties are relying upon this Personal Guaranty in entering in to the foregoing agreements, as applicable. The undersigned authorizes Processor and Bank, and their respective agents, (a) to investigate the references, statements, and other data contained in the Merchant Processing Application and to obtain additional information (including, but not limited to, consumer credit reports) from credit bureaus, consumer reporting agencies and other lawful sources bearing on his or her personal credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, mode of living (if the undersigned asks Processor or Bank whether a consumer report was requested, Processor or Bank will tell such person, and if a report was requested will provide the name and address of the agency which furnished the report), and (b) to contact all previous employers, personal references, and educational institutions as well as to provide amongst each other, the information contained in the Merchant Processing Application as well as any information received from references including banks and consumer reporting agencies. If the Application is approved, the undersigned authorizes Processor and Bank to obtain subsequent consumer reports in connection with the maintenance, updating, renewal or extension of the Agreement.

| | | | |
|---|---|---|---|
| Signature | _Keneth Hu (signature)_ | Print Name | Keneth Hu | Title | Owner |

| **Accepted By Processor** | **Accepted By Commercial Bank of California** |
|---|---|
| 625 The City Drive S. #420, Orange, CA 92868 | 19752 MacArthur Blvd., Suite 100, Irvine, CA 92612 |
| Signature | Signature |
| Title _____ Date _____ | Title _____ Date _____ |

## PART IV: CONFIRMATION PAGE

**ISO INFORMATION:**

Name: **Quantum Electronic Payments LLC**
Address: **625 The City Drive S. #420, Orange, CA 92868**

Please read the Program Guide in its entirety. It describes the terms under which we will provide merchant processing Services to you.

**Program Guide: https://www.quantumelectronicpayments.com/2018-program-guide/**

From time to time you may have questions regarding the contents of your Agreement with Bank and/or Processor. The following information summarizes portions of your Agreement in order to assist you in answering some of the questions we are most commonly asked.

1. **Your Discount Rates are assessed** on transactions that qualify for certain reduced interchange rates imposed by Visa, MasterCard, American Express and/or Discover. Any transactions that fail to qualify for these reduced rates will be charged an additional fee.

2. **We may debit your bank account** from time to time for amounts owed to us under the Agreement.

3. **There are many reasons why a Charge-back may occur.** When they occur we will debit your settlement funds or settlement account. For a more detailed discussion, see the Chargebacks Section of the Program Guide.

4. **If you dispute any charge or funding,** you must notify us within 60 days of the date of the statement where the charge or funding appears for Card Processing.

5. **The Agreement limits our liability to you.** For a detailed description, see the Limitation of Liability section of the Program Guide.

6. **We have assumed certain risks** by agreeing to provide you with Card processing or check services. Accordingly, we may take certain actions to mitigate our risk, including termination of the Agreement, and/or hold monies otherwise payable to you, under certain circumstances as described in the Term, Events of Default, Reserve Account, and Security Interest sections of the Program Guide.

7. **By executing this Agreement** with us you are authorizing us and our Affiliates to obtain financial and credit information regarding your business and the signers and guarantors of the Agreement until all your obligations to us and our Affiliates are satisfied.

8. **The Agreement contains a provision** that in the event you terminate the Agreement prior to the expiration of your term, you will be responsible for the payment of an early termination fee as set forth in the "Additional Fee Information" section of the Program Guide.

9. **You may elect to lease equipment from Processor** or third parties under a separate lease agreement not included in the Program Guide. Notwithstanding anything to the contrary herein, Commercial Bank of California neither sells nor leases any equipment to Client and has no responsibility or liability for equipment you obtain through Processor or from others

10. **For questions regarding your Merchant Processing** Application and Agreement, please contact Customer Service at 1-888-858-1678, and /or refer to Important Phone Numbers on the Additional Important Information Page.

11. **Card Organization Disclosure**

Visa and MasterCard Member Bank Information: Commercial Bank of California

The Bank's mailing address is 19752 MacArthur Blvd., Suite 100, Irvine, CA 92612, and its phone number is (310) 882-4800.

**Important Member Bank Responsibilities:**
a) The Bank is the only entity approved to extend acceptance of Visa and MasterCard products directly to a Merchant.
b) The Bank must be a principal party to the Merchant Agreement.
c) The Bank is responsible for educating Merchants on pertinent Visa and MasterCard rules with which Merchants must comply; but this information may be provided to you by Processor.
d) The Bank is responsible for and must provide settlement funds to the Merchant.
e) The Bank is responsible for all funds held in reserves that are derived from settlement.

**Important Merchant Responsibilities:**
a) Ensure compliance with Cardholder data security and storage requirements.
b) Maintain fraud and Chargebacks below Card Organization thresholds.
c) Review and understand the terms of the Merchant Agreement.
d) Comply with Card Organization rules and applicable law and regulations.
e) Retain assigned copy of this Disclosure Page.
f) You may download "Visa Regulations from Visa's website at: **http://usa.visa.com/merchants/operations/op_regulations.html**
g) You may download "MasterCard Regulations" from MasterCard's website at: **http://www.mastercard.com/us/merchant/support/rules/html**

Print Client's Business Name: _____

**By its signature below, Client acknowledges that it has received (either in person, by facsimile, or by electronic transmission) the complete Program Guide including this confirmation.**

Client further acknowledges reading and agreeing to all terms in the Program Guide, which shall be incorporated into Client's Agreement. Upon receipt of a signed facsimile or original of this Confirmation Page by us, Client's Application will be processed. Client understands that a copy of the Program Guide is also available for downloading from the Internet using the Program Guide link above.

**NO ALTERATIONS OR STRIKE-OUTS TO THE PROGRAM GUIDE WILL BE ACCEPTED.**

Client's Business Principal: Signature _____    Title **Owner**

Print Name of Signer **Keneth Hu**    Date **12/11/18**

**Accepted By Commercial Bank of California** 19752 MacArthur Blvd., Suite 100, Irvine, CA 92612

Signature _____    Title _____    Date _____

**EXHIBIT 24**
Page 117

QEP0418

# EXHIBIT 25

NATIONAL  MERCHANT  CENTER
2955 E MAIN STE 100
IRVINE,  CA
926124

| | | | | MERCHANT  STATEMENT |
|---|---|---|---|---|
| 1428 | 0100 | 1100 | 01 | SUMMARY  OF  BANKCARD  DEPOSITS |
| MERCHANT NUMBER | 5101 | | 5962 | MONTH ENDING 02/28/2019 |

HORIZON  CONSULTANTS  LLC          114838       07

RIVERSIDE  CA  92505-2776

STUDENTLOANMGMT

RIVERSIDE  CA  92505-2776

CUSTOMER  SERVICE  TEL  #:  800-662-8448

| **TOTAL CHARGE TO YOUR ACCOUNT IS** | **17,915.77** |
|---|---|

### SUMMARY OF CARD DEPOSITS

| CARD TYPE | SALES ADJUSTMENTS | | RETURNS EXCL ADJ | | NET |
|---|---|---|---|---|---|
| MASTERCARD | 145 | 20,903.24 | 3 | 447.00 | 20,456.24 |
| | 0 | 0.00 | 1 - | 207.50 - | |
| MC OFLN DB | 705 | 103,656.02 | 24 | 4,614.89 | 99,041.13 |
| AMEXCT043 | 42 | 5,588.37 | 5 | 1,037.50 | 4,550.87 |
| VISA | 222 | 32,555.24 | 6 | 1,160.50 | 31,394.74 |
| | 0 | 0.00 | 4 - | 652.50 - | |
| VS OFLN DB | 2,262 | 338,857.25 | 47 | 9,769.18 | 329,088.07 |
| DCVR ACQ | 34 | 5,214.97 | 1 | 207.50 | 5,007.47 |
| BANKCD TOT | 3,368 | 501,186.72 | 81 | 16,199.07 | 484,987.65 |
| | 0 | 0.00 | 5 | 860.00 - | |
| TOTAL | 3,410 | 506,775.09 | 86 | 17,236.57 | 489,538.52 |
| | 0 | 0.00 | 5 - | 860.00 - | |
| TOTAL RESERVE AMOUNT | | | | | 181,434.38 |

### SUMMARY OF INTERCHANGE FEES

| INTERCHANGE | RATE | ITEM | COUNT | VOLUME | FEE |
|---|---|---|---|---|---|
| MASTERCARD | | | | | |
| MERIT 1 | .0189 | .10 | 69 | 9,482.05 | 186.14 |
| CREDIT REFUND 3 | .0195 | | 3 - | 447.00 - | 8.72 - |
| WC MERIT 1 | .0205 | .10 | 25 | 3,499.01 | 74.20 |
| WCELITE MERIT1 | .0250 | .10 | 9 | 1,603.68 | 41.01 |
| ENHANCEDMERIT 1 | .0204 | .10 | 28 | 4,313.83 | 90.81 |
| HIGHVAL MERIT 1 | .0250 | .10 | 2 | 239.17 | 6.18 |
| REGCORPDATA1LF | .0005 | .22 | 2 | 80.00 | 0.48 |
| CP RATE 1 BUS | .0265 | .10 | 10 | 1,685.50 | 45.67 |
| MC OFLN DB | | | | | |
| MERIT 1 DEBIT | .0160 | .15 | 353 | 53,457.20 | 908.23 |
| DEBIT REFUND 3 | .0140 | | 15 - | 3,190.38 - | 44.73 - |
| MERIT1PREPDDBTC | .0176 | .20 | 34 | 5,228.75 | 98.78 |
| REGREFUND USFA | | | 9 - | 1,424.51 - | |
| REGULATFDMIDMT1 | .0005 | .21 | 7 | 606.67 | 1.77 |
| REGULATFMIDMT1 | .0005 | .22 | 311 | 44,363.40 | 90.47 |
| AMEXCT043 | | | | | |
| B2BNSWP1 | .0185 | .10 | 35 | 4,064.50 | 78.69 |
| PPNSWP2 | .0200 | .10 | 7 | 1,523.87 | 31.17 |
| OPTREFND | | | 5 - | 1,037.50 - | |
| VISA | | | | | |
| CPS MAIL PHONE | .0180 | .10 | 45 | 6,427.75 | 120.19 |

5345     0001     CC01     001     07     20190228     Page 1 of 6                    1428     0100     U1D                    114838

EXHIBIT 25
Page 118

NATIONAL MERCHANT CENTER
5101 ████████5962
MONTH ENDING  02/28/2019
Page 2

## SUMMARY OF INTERCHANGE FEES

| INTERCHANGE | RATE | ITEM | COUNT | VOLUME | FEE |
|---|---|---|---|---|---|
| EIRF CR | .0230 | .10 | 1 | 207.50 | 4.87 |
| US CRDT VCR-ME | .0205 | | 6 - | 1,160.50 - | 23.79 - |
| CPS REWARDS 2 | .0195 | .10 | 121 | 16,260.53 | 329.18 |
| US BUS TR1 B2B | .0210 | .10 | 3 | 277.50 | 6.12 |
| US VSP B2B | .0210 | .10 | 48 | 8,865.46 | 190.97 |
| US BUS TR3 B2B | .0240 | .10 | 2 | 60.00 | 1.64 |
| LAC SPR PREMIUM | .0197 | | 1 | 207.50 | 4.08 |
| US BUS TR4 B2B | .0250 | .10 | 1 | 249.00 | 6.32 |
| VS OFLN DB | | | | | |
| CPS CARD NP DB | .0165 | .15 | 637 | 96,634.22 | 1,690.01 |
| EIRF DB | .0175 | .20 | 12 | 2,572.25 | 47.41 |
| US CV DB | | | 47 - | 9,769.18 - | |
| CPS CNP PP | .0175 | .20 | 80 | 15,411.53 | 285.70 |
| EIRF PP | .0180 | .20 | 3 | 654.00 | 12.37 |
| USREGULATED CNP | .0005 | .22 | 1484 | 215,499.45 | 434.23 |
| USREGULATEDEIRF | .0005 | .22 | 18 | 3,661.80 | 5.79 |
| INTR STANDARD | .0160 | | 1 | 239.00 | 3.82 |
| US BUS CNP DB | .0245 | .10 | 4 | 478.32 | 12.11 |
| REG BUS CNP DB | .0005 | .22 | 20 | 3,042.68 | 5.92 |
| REG BUS ST DB | .0005 | .22 | 3 | 664.00 | 0.99 |
| DCVR ACQ | | | | | |
| P CNP RW | .0197 | .10 | 21 | 3,121.32 | 63.57 |
| CMRCL EL | .0230 | .10 | 7 | 1,129.00 | 26.66 |
| CMADJVR1 | .0225 | | 1 - | 207.50 - | 4.67 - |
| PCNPPRM | .0200 | .10 | 1 | 40.00 | 0.90 |
| DCVR AQ DB | | | | | |
| P CNP DB | .0175 | .20 | 4 | 717.15 | 13.35 |
| P CNP DF | .0005 | .22 | 1 | 207.50 | 0.32 |
| TOTAL INTERCHANGE | | | | | 4,838.20 |

## SUMMARY OF CARD FEES

MASTERCARD

| | | | |
|---|---|---|---|
| DISC 1 | 20,903 | 0.02000 | 418.06 |
| OTHER ITEM FEES | 148 | 0.10730 | 15.88 |
| DUES & ASSESSMENTS | | | 28.06 |

AUTHS & AVS

| | | | |
|---|---|---|---|
| CPU GTWY | 1,158 | 0.1500 | 173.70 |
| AVS CPU-G | 1,100 | 0.1000 | 110.00 |
| INTERCHANGE | | | 444.49 |
| LICENSE RATE | 20,903.24 | 0.0000710 | 1.48 |
| NABU FEES | 1,103 | 0.01950 | 21.51 |
| BIN ICA FEE | | | 1.13 |
| MC ICA AVS CARD NOT PRSNT | 1,100 | 0.01000 | 11.00 |
| MC CVC2 FEE | 1,080 | 0.00250 | 2.70 |
| MC DIGITAL ENABLEMENT | 124,559.26 | 0.00010 | 12.46 |
| MC KILOBYTE FEE | 447 | 0.00350 | 1.56 |
| LOCATION FEE | | | 1.25 |
| TOTAL | | | 1,243.28 |

MC OFLN DB

| | | | |
|---|---|---|---|
| DISC 1 | 103,656 | 0.02000 | 2,073.12 |
| OTHER ITEM FEES | 729 | 0.10730 | 78.22 |
| DUES & ASSESSMENTS | | | 139.05 |
| INTERCHANGE | | | 1,099.25 |
| LICENSE RATE | 103,656.02 | 0.0000710 | 7.36 |
| NABU FEES | 24 | 0.01950 | 0.47 |
| BIN ICA FEE | | | 5.49 |
| TOTAL | | | 3,402.96 |

AMEXCT043

| | | | |
|---|---|---|---|
| DISC 1 | 5,588 | | |
| OTHER ITEM FEES | 47 | 0.10723 | 5.04 |
| OTHER VOLUME FEES | 4,550.87 | 0.02000 | 91.02 |

AUTHS & AVS

| | | | |
|---|---|---|---|
| CPU GTWY | 67 | 0.1500 | 10.05 |
| AVS CPU-G | 62 | 0.1000 | 6.20 |
| INTERCHANGE | | | 109.87 |

NATIONAL MERCHANT CENTER
5101 ████████5962
MONTH ENDING  02/28/2019
Page 3

## SUMMARY OF CARD FEES

| | | | | |
|---|---|---|---|---|
| NETWORK FEE | 5,588.37 | 0.00450 | 25.15 | |
| TOTAL | | | | 247.33 |
| **VISA** | | | | |
| DISC 1 | 32,555 | 0.02000 | 651.10 | |
| OTHER ITEM FEES | 228 | 0.10728 | 24.46 | |
| **AUTHS & AVS** | | | | |
| CPU GTWY | 279 | 0.1500 | 41.85 | |
| AVS CPU-G | 272 | 0.1000 | 27.20 | |
| INTERCHANGE | | | 663.41 | |
| ACQ ISA FEE | 207.50 | 0.00800 | 1.66 | |
| ACQR PROCESSOR FEES | 279 | 0.01950 | 5.44 | |
| INTERNTL ACQUIRER FEE | 207.50 | 0.00448 | 0.93 | |
| TRAN INTEGRITY FEE | 1 | 0.10000 | 0.10 | |
| FIXED NETWORK CNP FEE | 2 | | 160.00 | |
| BIN ICA FEE | | | 0.22 | |
| CR DUES AND ASSESS | 32,555.24 | 0.00140 | 45.58 | |
| FILE TRANSMISSION FEE | | | 4.58 | |
| TOTAL | | | | 1,626.53 |
| **VS OFLN DB** | | | | |
| DISC 1 | 338,857 | 0.02000 | 6,777.15 | |
| OTHER ITEM FEES | 2,309 | 0.10730 | 247.76 | |
| **AUTHS & AVS** | | | | |
| CPU GTWY | 2,942 | 0.1500 | 441.30 | |
| AVS CPU-G | 2,878 | 0.1000 | 287.80 | |
| INTERCHANGE | | | 2,498.37 | |
| ACQ ISA FEE | 239.00 | 0.00799 | 1.91 | |
| ACQR PROCESSOR FEES | 2,942 | 0.01550 | 45.60 | |
| INTERNTL ACQUIRER FEE | 239.00 | 0.00451 | 1.08 | |
| TRAN INTEGRITY FEE | 37 | 0.10000 | 3.70 | |
| BIN ICA FEE | | | 2.26 | |
| ACQ DATA PROC RTN D | | | 0.73 | |
| DB DUES AND ASSESS | 338,857.25 | 0.00130 | 440.51 | |
| TOTAL | | | | 10,748.17 |
| **DCVR ACQ** | | | | |
| DISC 1 | 5,215 | 0.02000 | 104.30 | |
| OTHER ITEM FEES | 35 | 0.10733 | 3.76 | |
| **AUTHS & AVS** | | | | |
| CPU GTWY | 39 | 0.1500 | 5.85 | |
| AVS CPU-G | 38 | 0.1000 | 3.80 | |
| INTERCHANGE | | | 104.80 | |
| DSCV DATA USAGE FEE | 35 | 0.01950 | 0.68 | |
| DISC NETWORK AUTH FEE | 38 | 0.00250 | 0.10 | |
| TOTAL | | | | 223.29 |
| TOTAL CARD FEES | | | | 17,491.56 |

## SUMMARY OF MISCELLANEOUS FEES

| | | | | |
|---|---|---|---|---|
| TOTAL CARD FEES | | | | 17,491.56 |
| BATCH HEADER | 28 | | 0.3000 | 8.40 |
| RETURNS | 86 | AT | 0.1500 | 12.90 |
| CHARGEBACKS | 5 | AT | 35.000 | 175.00 |
| SERVICE FEE | | | | 20.00 |
| REGULATORY FEE | | | | 4.95 |
| ANNUAL FEE | | | | 99.00 |
| WIRELESS FEE | | | | 15.00 |
| COMPLIANCE FEE | | | | 3.96 |
| MERCHANT CLUB | | | | 50.00 |
| AMEX DISPUTE | 1 | AT | 35.00000 | 35.00 |
| | | | | |
| TOTAL CHARGES | | | | 17,915.77 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 5345 | 0001 | CC01 | 001 | 07 | 20190228 | Page 3 of 6 | | 1428 | 0100 | U1D | 114838 |

EXHIBIT 25
Page 120

NATIONAL MERCHANT CENTER
5101 ████████5962
MONTH ENDING  02/28/2019
Page 4

---

### SUMMARY OF MONETARY BATCHES

#### BATCHES

| GROSS | R&C | NET | DATE | REF |
|---|---|---|---|---|
| 40.00 - | 0.00 | 40.00 - | 01/27 | 021019MOADJ |
| 207.50 - | 0.00 | 207.50 - | 02/04 | 022119MOADJ |
| 12,755.92 | 0.00 | 12,755.92 | 02/04 | 98003541603 |
| 3,440.98 | 0.00 | 3,440.98 | 02/04 | 98003541604 |
| 5,525.87 | 0.00 | 5,525.87 | 02/04 | 98003541605 |
| 73.72 - | 0.00 | 73.72 - | 02/05 | 98003641612 |
| 5,149.46 | 0.00 | 5,149.46 | 02/05 | 98003641613 |
| 4,573.34 | 0.00 | 4,573.34 | 02/06 | 98003741626 |
| 4,720.31 | 0.00 | 4,720.31 | 02/07 | 98003841672 |
| 207.50 - | 0.00 | 207.50 - | 02/08 | 021319MOADJ |
| 5,537.30 | 0.00 | 5,537.30 | 02/08 | 98003941673 |
| 207.50 - | 0.00 | 207.50 - | 02/11 | 022019MOADJ |
| 37,001.36 | 0.00 | 37,001.36 | 02/11 | 98004241624 |
| 15,754.76 | 0.00 | 15,754.76 | 02/11 | 98004241625 |
| 35,325.88 | 0.00 | 35,325.88 | 02/11 | 98004241626 |
| 21,050.85 | 0.00 | 21,050.85 | 02/12 | 98004341657 |
| 15,158.98 | 0.00 | 15,158.98 | 02/13 | 98004441654 |
| 19,084.40 | 0.00 | 19,084.40 | 02/14 | 98004541638 |
| 30.00 - | 0.00 | 30.00 - | 02/15 | 022219MOADJ |
| 24,571.65 | 0.00 | 24,571.65 | 02/15 | 98004641654 |
| 103,226.55 | 0.00 | 103,226.55 | 02/15 | 98004611127 |
| 40.00 | 0.00 | 40.00 | 02/17 | 021719MOADJ |
| 13,009.36 | 0.00 | 13,009.36 | 02/18 | 98004941607 |
| 20,707.66 | 0.00 | 20,707.66 | 02/18 | 98004941608 |
| 21,026.51 | 0.00 | 21,026.51 | 02/19 | 98005041627 |
| 14,508.15 | 0.00 | 14,508.15 | 02/20 | 98005141631 |
| 22,430.18 | 0.00 | 22,430.18 | 02/21 | 98005241664 |
| 22,493.91 | 0.00 | 22,493.91 | 02/22 | 98005341667 |
| 42,857.93 | 0.00 | 42,857.93 | 02/25 | 98005641631 |
| 8,354.55 | 0.00 | 8,354.55 | 02/25 | 98005641632 |
| 14,307.35 | 0.00 | 14,307.35 | 02/25 | 98005641633 |
| 26.79 | 0.00 | 26.79 | 02/26 | 98005741638 |
| 1,538.71 - | 0.00 | 1,538.71 - | 02/27 | 98005841662 |
| 207.50 - | 0.00 | 207.50 - | 02/28 | 022819PA001 |
| 1,449.05 - | 0.00 | 1,449.05 - | 02/28 | 98005941658 |

---

### SUMMARY OF DAILY DEPOSITS
### ALL CARD TYPES

| DATE | COUNT | SALES CHRGBK/ADJ AMOUNT | COUNT | RETURNS EXCL ADJ AMOUNT | DAILY TOTAL |
|---|---|---|---|---|---|
| 02/04 | 126 | 22,408.27 | 3 | 685.50 | |
| | 0 | 0.00 | 0 | 0.00 | 21,722.77 |
| TOTAL RESERVE AMOUNT | | 2,240.79 | | TOTAL AFTER RESERVE | 19,481.98 |
| 02/05 | 32 | 5,149.46 | 2 | 73.72 | |
| | 0 | 0.00 | 0 | 0.00 | 5,075.74 |
| TOTAL RESERVE AMOUNT | | 514.94 | | TOTAL AFTER RESERVE | 4,560.80 |
| 02/06 | 38 | 4,971.68 | 2 | 398.34 | |
| | 0 | 0.00 | 0 | 0.00 | 4,573.34 |
| TOTAL RESERVE AMOUNT | | 497.16 | | TOTAL AFTER RESERVE | 4,076.18 |

| 5345 | 0001 | CC01 | 001 | 07 | 20190228 | Page 4 of 6 | | 1428 | 0100 | U1D | 114838 |

EXHIBIT 25
Page 121

NATIONAL MERCHANT CENTER
5101 █████5962
MONTH ENDING  02/28/2019
Page 5

---

**SUMMARY OF DAILY DEPOSITS**
**ALL CARD TYPES**

| DATE | SALES CHRGBK/ADJ COUNT | AMOUNT | RETURNS EXCL ADJ COUNT | AMOUNT | DAILY TOTAL |
|---|---|---|---|---|---|
| 02/07 | 32 | 4,927.81 | 1 | 207.50 | |
| | 0 | 0.00 | 0 | 0.00 | 4,720.31 |
| TOTAL RESERVE AMOUNT | | 492.77 | | TOTAL AFTER RESERVE | 4,227.54 |
| 02/08 | 33 | 5,786.30 | 1 | 249.00 | |
| | 0 | 0.00 | 0 | 0.00 | 5,537.30 |
| TOTAL RESERVE AMOUNT | | 578.61 | | TOTAL AFTER RESERVE | 4,958.69 |
| 02/10 | 0 | 0.00 | 0 | 0.00 | |
| | 0 | 0.00 | 1 - | 40.00 - | 40.00 - |
| 02/11 | 608 | 88,819.17 | 5 | 737.17 | |
| | 0 | 0.00 | 0 | 0.00 | 88,082.00 |
| TOTAL RESERVE AMOUNT | | 8,881.88 | | TOTAL AFTER RESERVE | 79,200.12 |
| 02/12 | 142 | 22,569.69 | 7 | 1,518.84 | |
| | 0 | 0.00 | 0 | 0.00 | 21,050.85 |
| TOTAL RESERVE AMOUNT | | 2,256.96 | | TOTAL AFTER RESERVE | 18,793.89 |
| 02/13 | 106 | 16,486.98 | 6 | 1,328.00 | |
| | 0 | 0.00 | 1 - | 207.50 - | 14,951.48 |
| TOTAL RESERVE AMOUNT | | 1,648.69 | | TOTAL AFTER RESERVE | 13,302.79 |
| 02/14 | 128 | 19,761.61 | 3 | 677.21 | |
| | 0 | 0.00 | 0 | 0.00 | 19,084.40 |
| TOTAL RESERVE AMOUNT | | 1,976.14 | | TOTAL AFTER RESERVE | 17,108.26 |
| 02/15 | 885 | 129,287.25 | 8 | 1,489.05 | |
| | 0 | 0.00 | 0 | 0.00 | 127,798.20 |
| TOTAL RESERVE AMOUNT | | 12,928.71 | | TOTAL AFTER RESERVE | 114,869.49 |
| 02/17 | 0 | 0.00 | | 0.00 | |
| | 0 | 0.00 | 1 | 40.00 | 40.00 |
| 02/18 | 270 | 34,123.69 | 2 | 406.67 | |
| | 0 | 0.00 | 0 | 0.00 | 33,717.02 |
| TOTAL RESERVE AMOUNT | | 3,412.36 | | TOTAL AFTER RESERVE | 30,304.66 |
| 02/19 | 136 | 21,848.18 | 4 | 821.67 | |
| | 0 | 0.00 | 0 | 0.00 | 21,026.51 |
| TOTAL RESERVE AMOUNT | | 21,026.51 | | TOTAL AFTER RESERVE | 0.00 |
| 02/20 | 103 | 15,836.15 | 6 | 1,328.00 | |
| | 0 | 0.00 | 1 - | 207.50 - | 14,300.65 |
| TOTAL RESERVE AMOUNT | | 14,508.15 | | TOTAL AFTER RESERVE | 207.50 - |
| 02/21 | 187 | 23,546.06 | 6 | 1,115.88 | |
| | 0 | 0.00 | 1 - | 207.50 - | 22,222.68 |
| TOTAL RESERVE AMOUNT | | 22,430.18 | | TOTAL AFTER RESERVE | 207.50 - |
| 02/22 | 137 | 24,456.29 | 10 | 1,962.38 | |
| | 0 | 0.00 | 1 - | 30.00 - | 22,463.91 |
| TOTAL RESERVE AMOUNT | | 22,493.91 | | TOTAL AFTER RESERVE | 30.00 - |
| 02/25 | 420 | 65,926.50 | 2 | 406.67 | |
| | 0 | 0.00 | 0 | 0.00 | 65,519.83 |
| TOTAL RESERVE AMOUNT | | 65,519.83 | | TOTAL AFTER RESERVE | 0.00 |
| 02/26 | 27 | 870.00 | 4 | 843.21 | |
| | 0 | 0.00 | 0 | 0.00 | 26.79 |
| TOTAL RESERVE AMOUNT | | 26.79 | | TOTAL AFTER RESERVE | 0.00 |
| 02/27 | 0 | 0.00 | 7 | 1,538.71 | |
| | 0 | 0.00 | 0 | 0.00 | 1,538.71 - |
| 02/28 | 0 | 0.00 | 7 | 1,449.05 | |
| | 0 | 0.00 | 1 | 207.50 - | 1,656.55 - |

NATIONAL MERCHANT CENTER
5101 ████ 5962
MONTH ENDING  02/28/2019
Page 6

---

### TAX GROSS REPORTABLE SALES BY TIN

| MONTH | DESCRIPTION | TOTAL |
|---|---|---|
| FEB | Gross Reportable Sales - TIN #  *****1582 | $506,775.09 |
| | **2019 YTD GROSS REPORTABLE SALES** | **$633,035.84** |

TAX GROSS REPORTABLE SALES:  Per IRC 6050W, the total dollar amount of aggregate reportable payment card and third party

network transactions for each participating payee, without regard to any adjustments for credits, cash equivalents, discount amounts,

fees, refunded amounts, or any other amounts per respective tax identification number.

---

### BACKUP WITHHOLDING

| MONTH | ENTITY | AMOUNT WITHHELD |
|---|---|---|
| FEB | FED | $0.00 |
| YTD | FED | $0.00 |

LAST PAGE OF THIS STATEMENT

EXHIBIT 25
Page 123

10/30/2019                                            National Merchant Center

NMC.                    ONLINE RESOURCE CENTER                         SIGN OFF
NATIONAL MERCHANT CENTER      COMPREHENSIVE REPORTING              Merchant ID:
                              MERCHANT RESOURCES & TOOLS           STUDENTLOANMGMT
                              REAL TIME SERVICES                   Riverside CA 92505
                                                                   855.888.4908

| HOME | STORED VALUE CARDS | VISA/MC/DISCOVER | DEBIT CARDS | OTHER CARDS | RESOURCES | VIRTUAL TERMINAL |

Transaction Summary | Batch Summary | Deposits Summary | Search

## Deposits Summary

| Period | Batch Amount | Deposits | Adjustments | Reserves | Discounts | Net Deposit |
|---|---|---|---|---|---|---|
| 10/29/2019 | 0.00 | | 0.00 | | 0.00 | 0.00 |
| October, 2019 | 10,735.29 | -28,391.92 | -497,773.00 | 0.00 | 0.00 | -526,164.92 |
| Year, 2019 | 10,508,776.87 | 11,060,545.25 | -19,435.27 | 1,854,124.72 | 0.00 | 11,041,109.98 |

## Deposits Summary Details

**Year 2019 | February, 2019 Report**

| Period | Batch Amount | Deposits | Adjustments | Reserves | Discounts | Net Deposit |
|---|---|---|---|---|---|---|
| 02/04/2019 | 0.00 | 19,481.98 | 0.00 | 2,240.79 | 0.00 | 19,481.98 |
| 02/05/2019 | 0.00 | 4,560.80 | 0.00 | 514.94 | 0.00 | 4,560.80 |
| 02/06/2019 | 0.00 | 4,076.18 | 0.00 | 497.16 | 0.00 | 4,076.18 |
| 02/07/2019 | 0.00 | 4,227.54 | 0.00 | 492.77 | 0.00 | 4,227.54 |
| 02/08/2019 | 0.00 | 4,958.69 | 0.00 | 578.61 | 0.00 | 4,958.69 |
| 02/10/2019 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 02/11/2019 | 0.00 | 79,200.12 | 0.00 | 8,881.88 | 0.00 | 79,200.12 |
| 02/12/2019 | 0.00 | 18,793.89 | 0.00 | 2,256.96 | 0.00 | 18,793.89 |
| 02/13/2019 | 0.00 | 13,510.29 | 0.00 | 1,648.69 | 0.00 | 13,510.29 |
| 02/14/2019 | 0.00 | 17,108.26 | 0.00 | 1,976.14 | 0.00 | 17,108.26 |
| 02/15/2019 | 0.00 | 114,869.49 | 0.00 | 12,928.71 | 0.00 | 114,869.49 |
| 02/17/2019 | 0.00 | 0.00 | 40.00 | 0.00 | 0.00 | 40.00 |
| 02/18/2019 | 0.00 | 30,304.66 | 0.00 | 3,412.36 | 0.00 | 30,304.66 |
| 02/19/2019 | 0.00 | 0.00 | 0.00 | 21,026.51 | 0.00 | 0.00 |
| 02/20/2019 | 0.00 | 0.00 | 0.00 | 14,508.15 | 0.00 | 0.00 |
| 02/21/2019 | 0.00 | 0.00 | 0.00 | 22,430.18 | 0.00 | 0.00 |
| 02/22/2019 | 0.00 | 0.00 | 0.00 | 22,493.91 | 0.00 | 0.00 |
| 02/25/2019 | 0.00 | 0.00 | 0.00 | 65,519.83 | 0.00 | 0.00 |
| 02/26/2019 | 0.00 | 0.00 | 0.00 | 26.79 | 0.00 | 0.00 |
| 02/27/2019 | 0.00 | -1,538.71 | 0.00 | 0.00 | 0.00 | -1,538.71 |
| 02/28/2019 | 0.00 | -1,449.05 | -207.50 | 0.00 | 0.00 | -1,656.55 |
| **Grand Total:** | **$0.00** | **$308,104.14** | **($167.50)** | **$181,434.38** | **$0.00** | **$307,936.64** |

EXHIBIT 25
Page 124

EXHIBIT 26

| From: | Jimmy Lai |
|---|---|
| To: | Kenny Huang; Kaine Wen |
| Subject: | FW: New Application: TAS |
| Date: | Tuesday, June 25, 2019 3:54:02 AM |

Kaine/Kenny,

There are a lot of things missing that we need to obtain before we can send to First Data for review and approval.

- The application was electronically signed with an adobe mouse.  Not able to accept unless they use DocuSign or they physically sign the application. I will send you a electronic application for e-signature upon receipt of missing info
- The principle also missed a signature on last page under "clients business Principles," signature 1. E-signed application will resolve
- Missing Customer Service Phone number and Contact Number for the Company.
- Missing Mobile number for Kenny Huang
- Business Address at 30 North Gould St Ste R Sheridan WY 82801 is a mail forwarding and violates Visa and Mastercard rules.  We need their physical address.  Please provide. Also, please provide a utility bill for the business address.
- Require Copy of Driver's License
- Contract must be updated to say Convivence fee because they can't charge a credit card fee. That is a surcharge fee which would mean they must be registered with Visa and MasterCard as a surcharge merchant. I will update

Website:

- Website has a page which contains Integration setup for NMI, Authorize.net and other processing payment systems.  This suggests they collect credit card payments and could be see as a payment service provided.  Why would they need to show API integration for their Clients?  This suggests third party processing.
- Contact page lists an address that is not a valid business address.
- Contact page doesn't provide a customer service phone number
- Missing Terms and Conditions and refund policy

Thank you,

EXHIBIT 26
Page 125

John Thompson
Associate Director of
Risk & Underwriting

office:
toll free:
fax:
email:
949. 419. 8400 x 1110
800. 662. 8448
949. 861. 6201
jfthompson@nationalmerchant.com
The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the addressee. If the person actually receiving this communication or any other reader of the communication is not the named recipient, or the employee or agent responsible to deliver it to the recipient, any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by return e-mail, and destroy this communication and all copies thereof, including all attachments.

Go Green! Please, consider the environment before printing this email.

-----Original Message-----
From: Jimmy Lai <jimmy.lai@swiftpaymentsinc.com>
Sent: Wednesday, June 19, 2019 6:18 PM
To: John F. Thompson <jfthompson@NationalMerchant.com>
Subject: New Application: TAS

John,

Attached is the complete application pkg.
Please review and let me know if you need anything.

Thanks,

Jimmy

EXHIBIT 26
Page 126

Your message is ready to be sent with the following file or link attachments:

TAS 2019 NMC Application
TAS Agreement revised
Manager Managed LLC -- TAS 2019 LLC
TAS 2019 LLC - Voided Check
TAS 2019 LLC AOO


Note: To protect against computer viruses, e-mail programs may prevent sending or receiving
certain types of file attachments.  Check your e-mail security settings to determine how attachments
are handled.

EXHIBIT 26
Page 127

# EXHIBIT 27

| **From:** | Jimmy Lai <jimmy.lai@swiftpaymentsinc.com> |
|---|---|
| **Sent:** | Monday, July 08, 2019 11:57 PM |
| **To:** | Kaine Wen |
| **Subject:** | FW: TAS Bank Statement |
| **Attachments:** | Application.pdf |

Kaine,

See below

**From:** John F. Thompson <jfthompson@NationalMerchant.com>
**Sent:** Monday, July 8, 2019 3:28 PM
**To:** Jimmy Lai <jimmy.lai@swiftpaymentsinc.com>
**Subject:** RE: TAS Bank Statement

Review and approval of the account must be minimum of Interchange and 199Bps.

Also, they should have their customer service team answering calls during normal business hours.

I updated the location address to his home address and they Wyoming address is the mailing address.

In addition, the website is now down and is no longer active.

Please advise.

Thank you,

1

EXHIBIT 27
Page 128





### What is Plesk

Plesk is a hosting control panel with simple and
web, DNS, mail and other services through a co

Developer Blog          Forum

2

EXHIBIT 27
Page 129

### John Thompson
Associate Director of
Risk & Underwriting


NATIONAL MERCHANT CENTER

| | |
|---|---|
| office: | 949. 419. 8400 x 1110 |
| toll free: | 800. 662. 8448 |
| fax: | 949. 861. 6201 |
| email: | jfthompson@nationalmerchant.com |

*The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the addressee. If the person actually receiving this communication or any other reader of the communication is not the named recipient, or the employee or agent responsible to deliver it to the intended recipient, any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by return e-mail, and destroy this communication and all copies thereof, including all attachments.*

***Go Green!*** Please, consider the environment before printing this email.



**From:** Jimmy Lai <jimmy.lai@swiftpaymentsinc.com>
**Sent:** Monday, June 24, 2019 12:04 PM
**To:** John F. Thompson <jfthompson@NationalMerchant.com>
**Subject:** Fwd: TAS Bank Statement


Get Outlook for Android

**From:** Kenny Huang <tas2019llc@gmail.com>
**Sent:** Wednesday, June 19, 2019 7:43:36 PM
**To:** Jimmy Lai
**Subject:** TAS Bank Statement

3

EXHIBIT 27
Page 130

**NMC**
NATIONAL MERCHANT CENTER

AGENT #    4004

| 1. MERCHANT INFORMATION | MERCHANT PROCESSING APPLICATION & AGREEMENT |
|---|---|

LEGAL NAME OF BUSINESS / IRS FILING NAME (MUST MATCH IRS RECORD)
**TAS 2019 LLC**

DBA (DOING BUSINESS AS)
**Trusted Account Services**

| LOCATION / SITE ADDRESS | CITY Arcadia | STATE CA | ZIP CODE 91006 | COMPANY WEBSITE ADDRESS (URL) trustedaccountservices.com |
|---|---|---|---|---|
| MAILING ADDRESS (IF DIFFERENT FROM LOCATION) 30 N Gould St Ste R | CITY Sheridan | STATE WY | ZIP CODE 82801 | COMPANY E-MAIL ADDRESS tas2019llc@gmail.com |

| COMPANY PHONE # 8663636383 | DESCRIPTOR PHONE # (E-COMMERCE or MOTO) (866) 363-6383 | MOBILE PHONE # 8364 | FAX # | CONTACT NAME Kenny Huang | TITLE |
|---|---|---|---|---|---|

| TAX ID 0057 | ☐ I CERTIFY THAT I'M A FOREIGN ENTITY/NONRESIDENT ALIEN IF CHECKED, PLEASE ATTACH IRS FORM W-8 | NOTE: FAILURE TO PROVIDE ACCURATE INFORMATION MAY RESULT IN A WITHHOLDING OF MERCHANT FUNDING PER IRS REGULATIONS (SEE PROGRAM GUIDE PART III, SECTION A.4 FOR DETAILS) |
|---|---|---|

| BUSINESS TYPE ○ PARTNERSHIP ○ SOLE PROPRIETORSHIP | ○ PUBLIC CORP. ○ PRIVATE CORP. | ○ TAX EXEMPT CORP. ○ LIMITED LIABILITY COMPANY | STATE FILED WY | BUSINESS START DATE ( MM / DD / YYYY ) 03/22/2019 |
|---|---|---|---|---|

| HAS THIS BUSINESS OR ANY ASSOCIATED PRINCIPAL BEEN TERMINATED AS A VISA / MASTERCARD / AMEX / DISCOVER NETWORK MERCHANT? | ○ YES ○ NO | HAS MERCHANT OR ANY ASSOCIATED PRINCIPAL DISCLOSED BELOW FILED BANKRUPTCY OR BEEN SUBJECT TO AN INVOLUNTARY BANKRUPTCY? | ☐ YES ☐ NO | PROVIDE DATE, IF "YES" ( MM / DD / YYYY ) |
|---|---|---|---|---|

| DO YOU CURRENTLY ACCEPT VISA / MC / AMEX / DISCOVER NETWORK? (IF "YES", YOU MUST SUBMIT 3 MOST CURRENT MONTHLY STATEMENTS) | ☐ YES ☐ NO | YOUR PREVIOUS CARD PROCESSOR | REASON TO CHANGE | ☐ RATES ☐ SERVICE ☐ OTHER | TERMINATED ( MM / DD / YYYY ) |
|---|---|---|---|---|---|

| MERCHANT SELLS: (SPECIFY PRODUCT, SERVICE AND/OR INFORMATION) Trust account services | DO YOU USE ANY THIRD PARTY TO STORE, PROCESS OR TRANSMIT CARDHOLDER'S DATA? | ☐ YES ☐ NO | IF "YES", NAME OF COMPANY, ADDRESS AND PHONE |
|---|---|---|---|

| REFUND POLICY FOR VISA / MASTERCARD / AMEX / DISCOVER NETWORK SALES | ○ REFUND WILL BE GRANTED TO A CUSTOMER AS FOLLOWS > ○ NO REFUND, ALL SALES FINAL (MERCHANT MUST NOTIFY CUSTOMERS) | ○ VISA / MC / AMEX / DISCOVER NETWORK CREDIT > ○ EXCHANGE ● STORE CREDIT | ○ 0-3 DAYS ● 8-14 DAYS ○ 4-7 DAYS ○ OVER 14 DAYS |
|---|---|---|---|

## 2. BANK DISCLOSURE

**Please read the Merchant Processing Program Guide in its entirety. It describes the terms under which we will provide merchant processing services to you. From time to time you may have questions regarding the contents of your Agreement with Bank and/or Processor. The following information summarizes portions of your Agreement in order to assist you in answering some of the questions we are most commonly asked.**

1. Your discount rates are assessed on transactions that qualify for certain reduced interchange rates imposed by MasterCard, Visa and Discover Network. Any transactions that fail to qualify for these reduced rates will be charged an additional fee (see Section 19 of the Card Processing Program Guide).
2. We may debit your bank account from time to time for amounts owed to us under the Agreement.
3. There are many reasons why a Chargeback may occur. When they occur we will debit your settlement funds or settlement account. For a more detailed discussion regarding Chargeback's, see Section 10.
4. If you dispute any charge or funding, you must notify us within 45 days of the date of the statement where the charge or funding appears or should have appeared.
5. The Agreement limits our liability to you. For a detailed description of the limitation of liability see Section 21.

6. We have assumed certain risks by agreeing to provide you with Card processing. Accordingly, we may take certain actions to mitigate our risk, including termination of the Agreement, and/or hold monies otherwise payable to you (see Section 24, Term; Events of Default and Section 25, Reserve Account; Security Interest).
7. By executing this Agreement with us you are authorizing us to obtain and guarantors of the Agreement until all your obligations to us are satisfied.
8. The Agreement contains a provision that in the event you terminate the Agreement early, you may be responsible for the payment of early termination fees as set forth in Section 36, Additional Fee Information.
9. If you lease equipment from Processor, it is important that you review Section 35 in Third Party Agreements. This lease is a non-cancelable lease for the full term indicated.

**Association Disclosure**
**Visa and MasterCard Member Bank Information: Wells Fargo Bank, N.A** P.O. BOX 6079 CONCORD, CA 94524, and its phone number is (844) 284-6834.

**Important Member Bank Responsibilities:**
a) The Bank is the only entity approved to extend acceptance of Visa and MasterCard products directly to a Merchant.
b) The Bank must be a principal (signer) to the Merchant Agreement.
c) The Bank is responsible for educating Merchants on pertinent Visa and MasterCard rules with which Merchants must comply; but this information may be provided to you by Processor.
d) The Bank is responsible for and must provide settlement funds to the Merchant.
e) The Bank is responsible for all funds held in reserve that are derived from settlement.

**Important Merchant Responsibilities:**
a) Ensure compliance with cardholder data security and storage requirements.
b) Maintain fraud and chargebacks below Association thresholds.
c) Review and understand the terms of the Merchant Agreement.
d) Comply with Association rules.

**Print Client's Business Legal Name:**  TAS 2019 LLC                                    .

By its signature below, Client acknowledges that it received the complete Program Guide (Version NMC0518) consisting of 37 pages including this confirmation. Client further acknowledges reading and agreeing to all terms in the Program Guide, which shall be incorporated into Client's Agreement. Upon receipt of a signed facsimile or original of this Confirmation Page by us, Client's Application will be processed. Client understands that a copy of the Program Guide is also available for downloading from the Internet at:

**http://www.nationalmerchant.com/PDF/ProgramGuideNMC0518.pdf**

**NO ALTERATIONS OR STRIKE-OUTS TO THE PROGRAM GUIDE WILL BE ACCEPTED AND, IF MADE, ANY SUCH ALTERATIONS OR STRIKE - OUTS SHALL NOT APPLY.**

| *Kenny Huang* | Owner | Jul 1, 2019 |
|---|---|---|
| CLIENT'S BUSINESS PRINCIPAL SIGNATURE | TITLE | DATE (MM/DD/YYYY) |
| Kenny Huang | | |
| PRINT NAME | | |

© COPYRIGHT 2018 NATIONAL MERCHANT CENTER, ALL RIGHTS RESERVED. NATIONAL MERCHANT CENTER IS A REGISTERED ISO/MSP OF WELLS FARGO BANK, N.A., CONCORD, CA

MERCHANT PROCESSING APPLICATION & AGREEMENT
NMC 0518    Revised: MAY, 2018    EXHIBIT 27

Page 131

## 3. TRANSACTION INFORMATION

**FINANCIAL DATA**

| | |
|---|---|
| AVERAGE COMBINED MONTHLY VISA/MC/DISCOVER/AMEX VOLUME | $ 25000.00 |
| AVERAGE VISA / MC / AMEX / DISCOVER NETWORK TICKET | $ 200.00 |
| HIGHEST TICKET AMOUNT | $ 1500.00 |

☐ SEASONAL? > HIGHEST VOLUME MONTHS OPEN    $ _____
> CHECK APPLICABLE MONTHS BELOW

☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐
JAN FEB MAR APR MAY JUN JUL AUG SEP OCT NOV DEC

**VISA / MASTERCARD / AMEX / DISCOVER NETWORK INFORMATION**

**MERCHANT TYPE**

○ RETAIL OUTLET
○ RESTAURANT/FOOD
○ LODGING
○ HOME BUSINESS, TRADE FAIRS
○ OUTSIDE SALES/SERVICE, OTHER, ETC.
○ MAIL/TELEPHONE ORDER ONLY
○ INTERNET
○ HEALTH CARE

**NETWORK PROFILE (VISA/MC/AMEX/DISCOVER)**

SWIPED CREDIT CARDS _____%
KEYED CREDIT CARDS 100 %
TOTAL 100 %
IF KEYED, WHAT % MO/TO 100 %
INTERNET _____%
MERCHANT RECEIVES IMPRINT ○ YES
ON KEYED TRANSACTIONS ○ NO

---

**MAIL / TELEPHONE ORDER / BUSINESS TO BUSINESS INFORMATION** (ALL QUESTIONS MUST BE ANSWERED BY APPLICABLE TYPE OF MERCHANTS)

WHAT % OF TOTAL SALES REPRESENT BUSINESS TO BUSINESS (VS. BUSINESS TO CONSUMER)    B2B 10 % + B2C 90 % = 100% TOTAL SALES
WHAT % OF CREDIT/DEBIT CARD SALES REPRESENT BUSINESS TO BUSINESS (VS. BUSINESS TO CONSUMER)    B2B 10 % + B2C 90 % = 100% TOTAL SALES

WHAT IS THE TIME FROM TRANSACTION TO DELIVERY?
(% OF ORDERS DELIVERED IN DAYS)    0 - 7 DAYS 100 %
+ 8 - 14 DAYS _____%
+ 15 - 30 DAYS _____%
+ OVER 30 DAYS _____%
TOTAL 100 % DELIVERED

VISA/MASTERCARD/AMEX/DISCOVER NETWORK SALES ARE DEPOSITED ON (CHECK ONE)
◉ DATE OF ORDER
☐ DATE OF DELIVERY
☐ OTHER _____

WHO PERFORMS PRODUCT/SERVICE FULFILLMENT?
◉ DIRECT
☐ VENDOR (PROVIDE NAME/ADDRESS/PHONE)
_____
_____
☐ OTHER _____

DO YOU OWN THE PRODUCT / INVENTORY    ○ YES ○ NO
IS THE PRODUCT STORED AT YOUR BUSINESS LOCATION    ○ YES ○ NO
IF NO, WHERE IS IT STORED _____

PRODUCT SHIPPED BY: ☐ US MAIL ☐ OTHER _____
DELIVERY RECEIPT REQUESTED ☐ YES ☐ NO

ADVERTISING METHOD(S): CHECK ALL THAT APPLY
○ NEWSPAPERS ○ INTERNET ○ OTHER
○ MAGAZINE ○ RADIO
○ YELLOW PAGES ○ TV

**REQUIRED:** ATTACH MARKETING MATERIALS FOR ALL MAIL ORDER, B2B, INTERNET BUSINESS WITH OVER $1 MILLION IN ANNUAL VOLUME. ATTACH WEB PAGE PRINTOUT FOR INTERNET MERCHANTS.

PERCENTAGE OF PRODUCTS SOLD VIA
TELEPHONE ORDERS 100 % MAIL/FAX ORDERS _____% INTERNET ORDERS _____% OTHER _____%

WHO ENTERS CREDIT CARD INFO INTO THE PROCESSING SYSTEM
○ MERCHANT ○ CONSUMER
○ FULFILMENT CENTER ○ OTHER _____

IF CREDIT CARD INFO IS TAKEN OVER THE INTERNET, IS THE PAYMENT CHANNEL ENCRYPTED BY SSL OR BETTER    ☐ YES ☐ NO

---

## 4. SITE INSPECTION & BUSINESS INFO

ZONE
☐ COMMERCIAL
☐ INDUSTRIAL
☐ RESIDENTIAL

APPROX. SIZE, (SQUARE FOOTAGE)
☐ 0-500 SqFt
☐ 501-2000 SqFt
☐ 2001+ SqFt

MERCHANT LOCATION
☐ SHOPPING CENTER
☐ OFFICE BUILDING
☐ SEPARATE BUILDING

☐ RESIDENCE
☐ MOBILE
☐ OTHER: _____

THE MERCHANT
☐ OWNS
☐ RENTS
☐ LEASES    THE BUSINESS PREMISES

LANDLORD NAME

LANDLORD PHONE #

I HEREBY CERTIFY THAT I HAVE PHYSICALLY INSPECTED THE BUSINESS PREMISES OF THE MERCHANT AT THIS ADDRESS AND THE INFORMATION STATED ABOVE IS CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

➤ *Shihhao Lai*
Shihhao Lai (Jun 30, 2019)
SIGNATURE

Shih-Hao Lai
INSPECTED BY (PRINT NAME)

Jun 30, 2019
DATE (MM/DD/YYYY)

---

## 5. CREDIT / DEBIT AUTHORIZATION

| | |
|---|---|
| BANK NAME | HSBC |
| BANK ROUTING # | 122240861 |
| BANK ACCOUNT # | ████ 0413 |

> MUST ATTACH VOIDED CHECK FROM THIS ACCOUNT

MERCHANT hereby authorizes SERVICERS in accordance with this MERCHANT Processing Agreement to initiate debit/credit entries to MERCHANT'S checking account, as indicated below. The authority is to remain in full force and effect until (a) SERVICERS have received written notification from a MERCHANT of its termination in such a manner as to afford SERVICERS reasonable opportunity to act on it; and (b) all obligations of MERCHANT to SERVICERS that have arisen under this Agreement have been paid in full. This authorization extends to such entries in such account concerning processing fees, lease, and rental or purchase agreements for POS terminals and/or accompanying equipment and/or check guarantee fees, and amounts due for supplies and materials.

---

## 6. TRADE REFERENCE

| VENDOR | ACCOUNT # | CONTACT NAME | PHONE # |
|---|---|---|---|
| | | | |

---

## 7. EQUIPMENT

PAYMENT GATEWAY > NMI
SOFTWARE > APPLICATION > _____ VERSION # _____
3rd PARTY PROCESSOR > _____
TERMINAL MODEL > _____

---

## 8. NETWORK ACCEPTANCE

ACCEPT ALL VISA / MASTERCARD / AMERICAN EXPRESS DISCOVER NETWORK TRANSACTIONS (PRESUMED, UNLESS ANY SECTION BELOW ARE CHECKED)

☐ ACCEPT VISA CREDIT TRANSACTIONS ONLY
☐ ACCEPT VISA NON-PIN DEBIT TRANSACTIONS ONLY
☐ ACCEPT MASTERCARD CREDIT TRANSACTIONS ONLY
☐ ACCEPT MASTERCARD NON-PIN DEBIT TRANSACTIONS ONLY
☐ ACCEPT AMERICAN EXPRESS CREDIT TRANSACTIONS ONLY
☐ ACCEPT DISCOVER NETWORK CREDIT TRANSACTIONS ONLY
☐ ACCEPT DISCOVER NETWORK NON-PIN DEBIT TRANSACTIONS ONLY

© COPYRIGHT 2018 NATIONAL MERCHANT CENTER, ALL RIGHTS RESERVED.
NATIONAL MERCHANT CENTER IS A REGISTERED ISO/MSP OF WELLS FARGO BANK, N.A., CONCORD, CA

MERCHANT PROCESSING APPLICATION & AGREEMENT
NMC 0518    Revised: MAY, 2018

**EXHIBIT 27**

## 9. SCHEDULE OF CHARGES / FEES

PAYMENT NETWORK INTERCHANGE COST WILL BE CHARGED IN ADDITION TO.

| DISCOUNT RATES: | QUALIFIED RATE (ELECTRONIC *) | AUTHORIZATION FEE |
|---|---|---|
| VISA | Int+ 199bp % | $ .2500 |
| MASTERCARD | Int+ 199bp % | $ .2500 |
| DISCOVER NETWORK | Int+ 199bp % | $ .2500 |
| AMERICAN EXPRESS CREDIT | Int+ 199bp % | $ .2500 |
| SIGNATURE DEBIT | % | $ |
| OTHER | % | $ |

Qualified Rate is assessed when your transactions meet certain criteria set by the applicable Association and Processor. When your Card transactions fail to meet those qualification criteria, we will process your transactions at the higher mid-qualified discount rate of Int+ 150bp % + $ .2500 or in certain circumstances, at a non-qualified discount rate (Standard*) of Int+ 150bp % + $ .2500 , both rates are a surcharge to the qualified rate.

### GATEWAY / VT:

| | |
|---|---|
| GATEWAY NAME | NMI |
| GATEWAY MONTHLY FEE | $ 20.00 |
| GATEWAY PER ITEM FEE | $ 0.2500 |
| ADD VIRTUAL TERMINAL | ☐ YES |

### ERR:

| | |
|---|---|
| VISA / MC / DISCOVER | ☐ |
| QUALIFIED RATE | % |
| NON-QUALIFIED SURCHARGE | % |
| AUTHORIZATION FEE | |

### WIRELESS OR REMOTE :

| | |
|---|---|
| SETUP FEE | $ 100.00 |
| TRANSACTION FEE | $ 0.2500 |
| MONTHLY FEE | $ 10.00 |

### CHARGEBACK SOLUTIONS: (OPTIONAL ) FOR DETAILED DESCRIPTION SEE: www.nationalmerchant.com/pdf/mitigation.pdf

| CHARGEBACK ALERTS ☐ | ETHOCA | $_____ /ALERT | ☐ REPRESENTMENT SERVICES PER CHARGEBACK | $_____ | ☐ RISK / FRAUD DETECTION | $_____ /MONTH |
|---|---|---|---|---|---|---|
| | VERIFI | $_____ /ALERT | | | | $ /RISK INQUIRY |

### DEBIT:

| | |
|---|---|
| MONTHLY ACCESS FEE | $ 10.00 |
| CASH BACK | $ 500.00 MAX |
| AUTHORIZATION/TRANSACTION FEE | $ 0.2500 + NETWORK FEES + 0 % |
| OTHER FEE | $ 0.25 |

### EBT:

| | |
|---|---|
| FCS # | _____ |
| AUTHORIZATION / TRANSACTION FEE | $ 0.00 |

### MISCELLANEOUS :

| | |
|---|---|
| ELECTRONIC AVS FEE | $ 0.2000 |
| ACH/BATCH FEE | $ 0.30 |
| CHARGEBACK FEE | $ 35.00 |
| RETRIEVAL REQUEST | $ 20.00 |
| SERVICE FEE | $ 20.00 |

| | |
|---|---|
| ☒ WEB/G2 MONTHLY MONITORING FEE | $ 250.00 |
| ☒ EIDS MONTHLY FEE | $ 0.00 |
| ☐ MERCHANT CLUB | $ 20.00 |
| MINIMUM MONTHLY DISCOUNT | $ 30.00 |
| APPLICATION FEE | $ 198.00 |
| | $ 0.00 |

### OTHER FEES:

Payment Network Interchange Fees; Debit Network Fees; Returned Item Fee $25 (charged if NMC debits the bank account but is rejected due to insufficient funds); Decline Fee – An amount equal to Authorization Fee amount and charged per item declined; TIN/TFN invalid monthly fee: $19.95. Monthly Compliance Fee $ 3.96; PCI Annual Compliance Fee $ 69.95 ; PCI NON-Compliant Monthly Fee $ 20.00 (doesn't affect your compliance responsibilities and obligations associated with your merchant account). You may be charged a Chargeback Research Fee: $50 per chargeback, Early Termination Fee (ETF) – shall be: (a) average monthly processing fees charged to You for previous 12 months (or such shorter time if You have processed for less than 12 months) multiplied by remaining months of the Agreement, or (b) $ 575.00 whichever is greater; Annual Fee $ 75.00, A Capture per item fee of $ 0.10 is assessed on each bankcard transaction; Monthly Regulatory Fee $ 4.95 ; Voice Referral Authorization Fee $3.50; IVR Voice authorization Fee $1.50; BIN/ICA Fee 0.25 If applicable, you may be charged additional pass through card brand fees. See description of card brand fees here: http://www.nationalmerchant.com/pdf/CardBrandFeeDescription.pdf

## 10. OWNERSHIP INFORMATION

LIST PRINCIPALS NAMES THAT OWN COMBINED AT LEAST: 25% FOR CORPORATIONS, 100% FOR PARTNERSHIPS

| PRINCIPAL NAME (FIRST, MI, LAST) 1) Kenny Huang | | TITLE Owner | OWNERSHIP (%) 100 | DATE OF BIRTH ( MM / DD / YYYY ) /1982 |
|---|---|---|---|---|
| HOME ADDRESS | CITY Arcadia | STATE CA | ZIP CODE 91006 | HOME PHONE # 8364 |
| SOCIAL SECURITY # | DRIVER LICENSE # 0041 | DR.LIC. STATE/EXP DATE CA-8/2022 | EMAIL tas2019llc@gmail.com | PERSONAL RESIDENCE ☐ OWN ☒ RENT | FOR HOW LONG? YRS. MO. |

| PRINCIPAL NAME (FIRST, MI, LAST) 2) | | TITLE | OWNERSHIP (%) | DATE OF BIRTH ( MM / DD / YYYY ) |
|---|---|---|---|---|
| HOME ADDRESS | CITY | STATE | ZIP CODE | HOME PHONE # |
| SOCIAL SECURITY # | DRIVER LICENSE # | DR.LIC. STATE/EXP DATE | EMAIL | PERSONAL RESIDENCE ☐ OWN ☐ RENT | FOR HOW LONG? YRS. MO. |

| PRINCIPAL NAME (FIRST, MI, LAST) 3) | | TITLE | OWNERSHIP (%) | DATE OF BIRTH ( MM / DD / YYYY ) |
|---|---|---|---|---|
| HOME ADDRESS | CITY | STATE | ZIP CODE | HOME PHONE # |
| SOCIAL SECURITY # | DRIVER LICENSE # | DR.LIC. STATE/EXP DATE | EMAIL | PERSONAL RESIDENCE ☐ OWN ☐ RENT | FOR HOW LONG? YRS. MO. |

| PRINCIPAL NAME (FIRST, MI, LAST) 4) | | TITLE | OWNERSHIP (%) | DATE OF BIRTH ( MM / DD / YYYY ) |
|---|---|---|---|---|
| HOME ADDRESS | CITY | STATE | ZIP CODE | HOME PHONE # |
| SOCIAL SECURITY # | DRIVER LICENSE # | DR.LIC. STATE/EXP DATE | EMAIL | PERSONAL RESIDENCE ☐ OWN ☐ RENT | FOR HOW LONG? YRS. MO. |

5) CONTROLLING POSITION COMPLETE THE FOLLOWING INFORMATION FOR ONE INDIVIDUAL WITH SIGNIFICANT RESPONSIBILITY FOR MANAGING THE LEGAL ENTITY LISTED ABOVE, SUCH AS: AN EXECUTIVE OFFICER OR SENIOR MANAGER (E.G., CHIEF EXECUTIVE OFFICER, CHIEF FINANCIAL OFFICER, CHIEF OPERATING OFFICER, MANAGER MEMBER, GENERAL PARTNER, PRESIDENT, VICE PRESIDENT, TREASURER); OR ANY OTHER INDIVIDUAL WHO REGULARLY PERFORMS SIMILAR FUNCTIONS. IF THIS INDIVIDUAL IS ALREADY LISTED ABOVE, JUST COMPLETE THE TITLE SECTION.

| CONTROLLING POSITION (FIRST, MI, LAST) | | TITLE | OWNERSHIP (%) | DATE OF BIRTH ( MM / DD / YYYY ) |
|---|---|---|---|---|
| HOME ADDRESS | CITY | STATE | ZIP CODE | HOME PHONE # |
| SOCIAL SECURITY # | DRIVER LICENSE # | DR.LIC. STATE/EXP DATE | EMAIL | PERSONAL RESIDENCE ☐ OWN ☐ RENT | FOR HOW LONG? YRS. MO. |

© COPYRIGHT 2018 NATIONAL MERCHANT CENTER, ALL RIGHTS RESERVED.
NATIONAL MERCHANT CENTER IS A REGISTERED ISO/MSP OF WELLS FARGO BANK, N.A., CONCORD, CA
NMC 0518    Revised: MAY, 2018

**NMC**
NATIONAL MERCHANT CENTER

## 11. CONFIRMATION

**CERTIFICATION OF BENEFICIAL OWNER(S)**

To help the government fight financial crime, Federal regulation requires certain financial institutions to obtain, verify, and record information about the beneficial owners of legal entity customers. Legal entities can be abused to disguise involvement in terrorist financing, money laundering, tax evasion, corruption, fraud, and other financial crimes. Requiring the disclosure of key individuals who own or control a legal entity (i.e., the beneficial owners) helps law enforcement investigate and prosecute these crimes.

By signing below, I attest that I have accurately provided the name, address, date of birth and Social Security Number (SSN) for the following individuals (i.e. the beneficial owners):

(i)  Each individual, if any, who owns directly or indirectly, 25 percent or more of the equity interests of the legal entity customer (e.g., each natural person that owns 25 percent or more of the shares of a corporation); and

(ii)  An individual with significant responsibility for managing the legal entity customer (e.g., a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, or Treasurer).

The number of individuals that satisfy this definition of "beneficial owner" may vary. Under section (i), depending on the factual circumstances, up to four individuals (but as few as zero) may need to be identified. Regardless of the number of individuals identified under section (i), you must provide the identifying information of one individual under section (ii). It is possible that in some circumstances the same individual might be identified under both sections (e.g., the President of Acme, Inc. who also holds a 30% equity interest). Thus, a completed form will contain the identifying information of at least one individual (under section (i)), and up to five individuals (i.e., one individual under section (ii) and four 25 percent equity holders under section (i)).

I, the undersigned _____ **Kenny  Huang** _____, certify that all of the information furnished
                                                   PRINCIPAL / OWNER:

above with regard to information for each individual, if any, who directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25 percent or more of the equity interests of the legal entity listed above  is complete and accurate.

➔ *Kenny Huang*                                                                        Jul 1, 2019
   Kenny Huang Jul 1, 2019
_____ SIGNATURE _____                                    _____ DATE (MM/DD/YYYY) _____

Client certifies that all information set forth in this completed Merchant Processing Application is true and correct and that Client has received a copy of the Program Guide (NMC0518-M) and Confirmation Page, which is part of this Merchant Processing Application (consisting of Sections 1-10), and by this reference incorporated herein. (**Program Guide can be downloaded from http://www.nationalmerchant.com/PDF/ProgramGuideNMC0518.pdf**). Client expressly acknowledges and certifies that Client has read the said Program Guide, and Client agrees to be bound by its terms including but not limited to the early termination fee provision. Client acknowledges and agrees that we, our Affiliates and our third party subcontractors and/or agents may use automatic telephone dialing systems to contact client at the telephone number(s) Client has provided in this Merchant Processing Application and/or may leave a detailed voice message in the event that Client is unable to be reached, even if the number provided is a  cellular or wireless number of if Client has previously registered on a Do Not Call list of requested not to be contacted Client for solicitation purposes. Client herby consents to receiving commercial electronics mall messages from us, our Affiliates and our third party subcontractors and/or agents from time to time. Client further agrees that Client will not accept more than 20% of its card transactions via mail, telephone or Internet order. However, if your Application is approved based upon contrary information stated in Section 5, Transaction Information section above, you are authorized to accept transactions in accordance with the percentages indicated in that section. This signature page also serves as a signature page to the Equipment Lease Agreement in the Third Party section of the Program Guide, if selected, the undersigned Client being the "Lessee" for purposes of such Equipment Lease Agreement. Client authorizes National Merchant Center ("NMC") and Wells Fargo Bank, N.A. (a member of Visa USA, Inc. and MasterCard International, Inc) ("Bank") and their agents to investigate the references, statements and other data contained herein and to obtain additional information from credit bureaus and other lawful sources, including persons and companies names in this Merchant Processing Application. Client authorizes NMC and BANK and their agents (a) to procure information from any consumer reporting agency bearing his/her personal credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, and (b) to contact all previous employers, personal references and educational institutions. It is our policy to obtain certain information in order to verify your identity while processing your account application.
The individual who signs this Agreement has authority to do so and to bind its Establishment to the terms and conditions of this Agreement. You further represent that you are authorized to sign and enter into this Agreement on behalf of your establishment, subsidiaries and affiliates.

You further acknowledge and agree that you will not use your merchant account and/or Service for illegal transactions, for example, those prohibited by the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. Section 5361 et seq, as may be amended from time to time, or processing and acceptance of transaction in certain jurisdictions pursuant to 31 CRF part 500 et seq. and other laws enforced by the Office of Foreign Assets Control (OFAC)

Client certifies, under penalties of perjury, that the federal taxpayer identification number and corresponding filing name provided herein are correct. Client agrees to all the terms of this Merchant Processing Application and Agreement. This Merchant Processing Application and Agreement shall not take effect until Client has been approved and this Agreement has been accepted by NMC and Bank.

Client's Business Principal(s) / Officer(s):

➔ *Kenny Huang*                    Owner                                        Kenny  Huang                  Jul 1, 2019
   Kenny Huang Jul 1, 2019
_____ MERCHANT  PRINCIPAL 1 SIGNATURE _____   _____ TITLE _____   _____ PRINT NAME _____   _____ DATE (MM/DD/YYYY) _____

➔
_____ MERCHANT  PRINCIPAL 2 SIGNATURE _____   _____ TITLE _____   _____ PRINT NAME _____   _____ DATE (MM/DD/YYYY) _____

**PERSONAL GUARANTEE**

The undersigned guarantor to NMC and Wells Fargo Bank, N.A. (a member of Visa USA, Inc. and MasterCard International, Inc.) ("Bank") the performance of this Agreement, and/or Equipment Lease Agreement, if applicable and any addendum thereto by Client, and in the event of default, hereby waives Notice of Default and agrees to indemnify the other parties, including payment due and owing and costs associated with enforcement of the terms thereof, NMC and Bank shall not be required to first proceed against Client or enforce any other remedy before proceeding against the undersigned individual. This is a continuing guarantee and shall not be discharged or affected for any reason and shall bind the heirs, administra-tors, representatives and assigns and be enforced by or for the benefit of any successor of NMC and Bank. The term of this guarantee shall be for the duration of the Merchant Processing Application and Merchant Terms and Conditions Agreement and any addendum thereto and shall guarantee all obligations which may arise or occur in connection with my activities during the term thereof through enforcement shall be sought subsequent to any termination.

➔ *Kenny Huang*                                                     Kenny  Huang                  Jul 1, 2019
   Kenny Huang Jul 1, 2019
_____ SIGNATURE _____                               _____ PRINT NAME OF GUARANTOR _____         _____ DATE (MM/DD/YYYY) _____

➔
_____ SIGNATURE _____                               _____ PRINT NAME OF GUARANTOR _____         _____ DATE (MM/DD/YYYY) _____

ACCEPTED BY NATIONAL MERCHANT CENTER                    WELLS FARGO BANK, N.A., (A MEMBER OF VISA USA, INC. AND MASTERCARD INTERNATIONAL, INC)
                                                        P.O. BOX 6079 CONCORD, CA 94524 (844) 284-6834

➔
_____ ISO SIGNATURE _____   _____ DATE (MM/DD/YYYY) _____        _____ SIGNATURE _____        _____ DATE (MM/DD/YYYY) _____


_____ TITLE _____                                               _____ TITLE _____

© COPYRIGHT 2018 NATIONAL MERCHANT CENTER, ALL RIGHTS RESERVED.
NATIONAL MERCHANT CENTER IS A REGISTERED ISO/MSP OF WELLS FARGO BANK, N.A., CONCORD, CA

EXHIBIT 27
NMC0518- MAY 2018
Page 34 of 4



# Application

Final Audit Report                                                                      2019-07-01

| | |
|---|---|
| Created: | 2019-07-01 |
| By: | PaymentWorld LLC (esignature@paymentworld.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAkJ2tTYxV9xLGEmmKOJXqWb6YFygHLCwJ |

## "Application" History

📄 Document created by PaymentWorld LLC (esignature@paymentworld.com)
2019-07-01 - 2:10:32 AM GMT- IP address: 66.171.241.2

📧 Document emailed to Shihhao Lai (jimmy.lai@swiftpaymentsinc.com) for signature
2019-07-01 - 2:10:43 AM GMT

✅ Document e-signed by Shihhao Lai (jimmy.lai@swiftpaymentsinc.com)
E-signature hosted by PaymentWorld LLC (esignature@paymentworld.com)
Signature Date: 2019-07-01 - 2:12:54 AM GMT - Time Source: server- IP address: 45.50.224.183

📧 Document emailed to Kenny Huang (tas2019llc@gmail.com) for signature
2019-07-01 - 2:12:56 AM GMT

📄 Email viewed by Kenny Huang (tas2019llc@gmail.com)
2019-07-01 - 6:48:04 AM GMT- IP address: 66.102.7.238

✅ Document e-signed by Kenny Huang (tas2019llc@gmail.com)
Signature Date: 2019-07-01 - 7:49:53 AM GMT - Time Source: server- IP address: 76.219.238.248

✅ Signed document emailed to PaymentWorld LLC (esignature@paymentworld.com), Kenny Huang
(tas2019llc@gmail.com) and Shihhao Lai (jimmy.lai@swiftpaymentsinc.com)
2019-07-01 - 7:49:53 AM GMT

Adobe Sign

EXHIBIT 27
Page 135

# EXHIBIT 28

| | |
|---|---|
| **From:** | Jimmy Lai |
| **To:** | Kaine Wen |
| **Subject:** | TAS - REVISED APP |
| **Date:** | Tuesday, July 09, 2019 1:14:41 AM |
| **Attachments:** | Application-Revised.pdf |

Kaine,

Please execute with Wet Signature.

Thanks,

**Jimmy Lai**
President
Swift Payments
Office: (949) 596-7550
Mobile: (949) 302-3248

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the addressee. If the person actually receiving this communication or any other reader of the communication is not the named recipient, or the employee or agent responsible to deliver it to the recipient, any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by return e-mail, and destroy this communication and all copies thereof, including all attachments.

EXHIBIT 28
Page 136

**NMC.**
NATIONAL MERCHANT CENTER

AGENT # __4004__

## 1. MERCHANT INFORMATION — MERCHANT PROCESSING APPLICATION & AGREEMENT

| LEGAL NAME OF BUSINESS / IRS FILING NAME (MUST MATCH IRS RECORD) | DBA (DOING BUSINESS AS) |
|---|---|
| TAS 2019 LLC | Trusted Account Services |

| LOCATION / SITE ADDRESS | CITY | STATE | ZIP CODE | COMPANY WEBSITE ADDRESS (URL) |
|---|---|---|---|---|
| | Arcadia | CA | 91006 | trustedaccountservices.com |

| MAILING ADDRESS (IF DIFFERENT FROM LOCATION) | CITY | STATE | ZIP CODE | COMPANY E-MAIL ADDRESS |
|---|---|---|---|---|
| 30 N Gould St Ste R | Sheridan | WY | 82801 | tas2019llc@gmail.com |

| COMPANY PHONE # | DESCRIPTOR PHONE # (E-COMMERCE or MOTO) | MOBILE PHONE # | FAX # | CONTACT NAME | TITLE |
|---|---|---|---|---|---|
| 8663636383 | (866) 363-6383 | 8364 | | Kenny Huang | |

| TAX ID | | NOTE: FAILURE TO PROVIDE ACCURATE INFORMATION MAY RESULT IN A WITHHOLDING OF MERCHANT FUNDING PER IRS REGULATIONS (SEE PROGRAM GUIDE PART III, SECTION A.4 FOR DETAILS) |
|---|---|---|
| 0057 | ☐ I CERTIFY THAT I'M A FOREIGN ENTITY/NONRESIDENT ALIEN IF CHECKED, PLEASE ATTACH IRS FORM W-8 | |

| BUSINESS TYPE | | | STATE FILED | BUSINESS START DATE (MM / DD / YYYY) |
|---|---|---|---|---|
| ○ PARTNERSHIP | ○ PUBLIC CORP. | ○ TAX EXEMPT CORP. | WY | 03/22/2019 |
| ○ SOLE PROPRIETORSHIP | ○ PRIVATE CORP. | ○ LIMITED LIABILITY COMPANY | | |

| HAS THIS BUSINESS OR ANY ASSOCIATED PRINCIPAL BEEN TERMINATED AS A VISA / MASTERCARD / AMEX / DISCOVER NETWORK MERCHANT? | ○ YES ○ NO | HAS MERCHANT OR ANY ASSOCIATED PRINCIPAL DISCLOSED BELOW FILED BANKRUPTCY OR BEEN SUBJECT TO AN INVOLUNTARY BANKRUPTCY? | ☐ YES ☐ NO | ⟩ PROVIDE DATE, IF "YES" ( MM / DD / YYYY ) |
|---|---|---|---|---|

| DO YOU CURRENTLY ACCEPT VISA/ MC / AMEX / DISCOVER NETWORK? (IF "YES", YOU MUST SUBMIT 3 MOST CURRENT MONTHLY STATEMENTS) | ☐ YES ☐ NO | YOUR PREVIOUS CARD PROCESSOR | REASON TO CHANGE | ☐ RATES ☐ SERVICE ☐ OTHER | TERMINATED ( MM / DD / YYYY ) |
|---|---|---|---|---|---|

| MERCHANT SELLS: (SPECIFY PRODUCT, SERVICE AND/OR INFORMATION) | DO YOU USE ANY THIRD PARTY TO STORE, PROCESS OR TRANSMIT CARDHOLDER'S DATA? | ☐ YES ☐ NO | IF "YES", NAME OF COMPANY, ADDRESS AND PHONE |
|---|---|---|---|
| Trust account services | | | |

| REFUND POLICY FOR VISA / MASTERCARD / AMEX / DISCOVER NETWORK SALES | ○ REFUND WILL BE GRANTED TO A CUSTOMER AS FOLLOWS ⟩ ○ NO REFUND, ALL SALES FINAL (MERCHANT MUST NOTIFY CUSTOMERS) | ○ VISA / MC / AMEX / DISCOVER NETWORK CREDIT ⟩ ○ EXCHANGE ◉ STORE CREDIT | ○ 0-3 DAYS ◉ 8-14 DAYS ○ 4-7 DAYS ○ OVER 14 DAYS |
|---|---|---|---|

## 2. BANK DISCLOSURE

**Please read the Merchant Processing Program Guide in its entirety. It describes the terms under which we will provide merchant processing services to you. From time to time you may have questions regarding the contents of your Agreement with Bank and/or Processor. The following information summarizes portions of your Agreement in order to assist you in answering some of the questions we are most commonly asked.**

1. Your discount rates are assessed on transactions that qualify for certain reduced interchange rates imposed by MasterCard, Visa and Discover Network. Any transactions that fail to qualify for these reduced rates will be charged an additional fee (see Section 19 of the Card Processing Program Guide).
2. We may debit your bank account from time to time for amounts owed to us under the Agreement.
3. There are many reasons why a Chargeback may occur. When they occur we will debit your settlement funds or settlement account. For a more detailed discussion regarding Chargeback's, see Section 10.
4. If you dispute any charge or funding, you must notify us within 45 days of the date of the statement where the charge or funding appears or should have appeared.
5. The Agreement limits our liability to you. For a detailed description of the limitation of liability see Section 21.

6. We have assumed certain risks by agreeing to provide you with Card processing. Accordingly, we may take certain actions to mitigate our risk, including termination of the Agreement, and/or hold monies otherwise payable to you (see Section 24, Term; Events of Default and Section 25, Reserve Account; Security Interest).
7. By executing this Agreement with us you are authorizing us to obtain and guarantors of the Agreement until all your obligations to us are satisfied.
8. The Agreement contains a provision that in the event you terminate the Agreement early, you may be responsible for the payment of early termination fees as set forth in Section 36, Additional Fee Information.
9. If you lease equipment from Processor, it is important that you review Section 35 in Third Party Agreements. This lease is a non-cancelable lease for the full term indicated.

**Association Disclosure**

**Visa and MasterCard Member Bank Information: Wells Fargo Bank, N.A** P.O. BOX 6079 CONCORD, CA 94524, and its phone number is (844) 284-6834.

**Important Member Bank Responsibilities:**
a) The Bank is the only entity approved to extend acceptance of Visa and MasterCard products directly to a Merchant.
b) The Bank must be a principal (signer) to the Merchant Agreement.
c) The Bank is responsible for educating Merchants on pertinent Visa and MasterCard rules with which Merchants must comply; but this information may be provided to you by Processor.
d) The Bank is responsible for and must provide settlement funds to the Merchant.
e) The Bank is responsible for all funds held in reserve that are derived from settlement.

**Important Merchant Responsibilities:**
a) Ensure compliance with cardholder data security and storage requirements.
b) Maintain fraud and chargebacks below Association thresholds.
c) Review and understand the terms of the Merchant Agreement.
d) Comply with Association rules.

**Print Client's Business Legal Name:** TAS 2019 LLC .

By its signature below, Client acknowledges that it received the complete Program Guide (Version NMC0518) consisting of 37 pages including this confirmation. Client further acknowledges reading and agreeing to all terms in the Program Guide, which shall be incorporated into Client's Agreement. Upon receipt of a signed facsimile or original of this Confirmation Page by us, Client's Application will be processed. Client understands that a copy of the Program Guide is also available for downloading from the Internet at:

**http://www.nationalmerchant.com/PDF/ProgramGuideNMC0518.pdf**

NO ALTERATIONS OR STRIKE-OUTS TO THE PROGRAM GUIDE WILL BE ACCEPTED AND, IF MADE, ANY SUCH ALTERATIONS OR STRIKE - OUTS SHALL NOT APPLY.

| *Kenny Huang* | Owner | Jul 1, 2019 |
|---|---|---|
| CLIENT'S BUSINESS PRINCIPAL SIGNATURE | TITLE | DATE (MM/DD/YYYY) |
| Kenny Huang | | |
| PRINT NAME | | |

© COPYRIGHT 2018 NATIONAL MERCHANT CENTER, ALL RIGHTS RESERVED.
NATIONAL MERCHANT CENTER IS A REGISTERED ISO/MSP OF WELLS FARGO BANK, N.A., CONCORD, CA

MERCHANT PROCESSING APPLICATION & AGREEMENT
NMC 0518    Revised: MAY, 2018    EXHIBIT 28

## 3. TRANSACTION INFORMATION

**FINANCIAL DATA**

AVERAGE COMBINED MONTHLY VISA/MC/DISCOVER/AMEX VOLUME $ 25000.00

AVERAGE VISA / MC / AMEX / DISCOVER NETWORK TICKET $ 200.00

HIGHEST TICKET AMOUNT $ 1500.00

☐ SEASONAL?  > HIGHEST VOLUME MONTHS OPEN $ _____
> CHECK APPLICABLE MONTHS BELOW

☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐
JAN FEB MAR APR MAY JUN JUL AUG SEP OCT NOV DEC

**VISA / MASTERCARD / AMEX / DISCOVER NETWORK INFORMATION**

**MERCHANT TYPE**

○ RETAIL OUTLET
○ RESTAURANT/FOOD
○ LODGING
○ HOME BUSINESS, TRADE FAIRS
○ OUTSIDE SALES/SERVICE, OTHER, ETC.
○ MAIL/TELEPHONE ORDER ONLY
○ INTERNET
○ HEALTH CARE

**NETWORK PROFILE (VISA/MC/AMEX/DISCOVER)**

SWIPED CREDIT CARDS _____ %
KEYED CREDIT CARDS 100 %
TOTAL 100 %

IF KEYED, WHAT % MO/TO 100 %
INTERNET _____ %

MERCHANT RECEIVES IMPRINT ○ YES
ON KEYED TRANSACTIONS ○ NO

---

**MAIL / TELEPHONE ORDER / BUSINESS TO BUSINESS INFORMATION** (ALL QUESTIONS MUST BE ANSWERED BY APPLICABLE TYPE OF MERCHANTS)

WHAT % OF TOTAL SALES REPRESENT BUSINESS TO BUSINESS (VS. BUSINESS TO CONSUMER)  B2B 10 % + B2C 90 % = 100% TOTAL SALES

WHAT % OF CREDIT/DEBIT CARD SALES REPRESENT BUSINESS TO BUSINESS (VS. BUSINESS TO CONSUMER)  B2B 10 % + B2C 90 % = 100% TOTAL SALES

WHAT IS THE TIME FROM TRANSACTION TO DELIVERY?
(% OF ORDERS DELIVERED IN DAYS)
0 - 7 DAYS 100 %
+ 8 - 14 DAYS _____ %
+ 15 - 30 DAYS _____ %
+ OVER 30 DAYS _____ %
TOTAL 100 % DELIVERED

VISA/MASTERCARD/AMEX/DISCOVER NETWORK
SALES ARE DEPOSITED ON (CHECK ONE)
◉ DATE OF ORDER
☐ DATE OF DELIVERY
☐ OTHER _____

WHO PERFORMS PRODUCT/SERVICE FULFILLMENT?
◉ DIRECT
☐ VENDOR (PROVIDE NAME/ADDRESS/PHONE)
_____
_____
☐ OTHER _____

DO YOU OWN THE PRODUCT / INVENTORY ○ YES ○ NO
IS THE PRODUCT STORED AT YOUR BUSINESS LOCATION ○ YES ○ NO
IF NO, WHERE IS IT STORED _____

PRODUCT SHIPPED BY: ☐ US MAIL ☐ OTHER _____
DELIVERY RECEIPT REQUESTED ☐ YES ☐ NO

ADVERTISING METHOD(S): CHECK ALL THAT APPLY
○ NEWSPAPERS  ○ INTERNET  ○ OTHER
○ MAGAZINE  ○ RADIO
○ YELLOW PAGES  ○ TV

**REQUIRED:** ATTACH MARKETING MATERIALS FOR ALL MAIL ORDER, B2B. INTERNET MERCHANTS WITH OVER $1 MILLION IN ANNUAL VOLUME. ATTACH WEB PAGE PRINTOUT FOR INTERNET MERCHANTS.

PERCENTAGE OF PRODUCTS SOLD VIA
TELEPHONE ORDERS 100 % MAIL/FAX ORDERS _____ % INTERNET ORDERS _____ % OTHER _____ %

WHO ENTERS CREDIT CARD INFO INTO THE PROCESSING SYSTEM
○ MERCHANT  ○ CONSUMER
○ FULFILMENT CENTER  ○ OTHER _____

IF CREDIT CARD INFO IS TAKEN OVER THE INTERNET, IS THE PAYMENT CHANNEL ENCRYPTED BY SSL OR BETTER
☐ YES
☐ NO

---

## 4. SITE INSPECTION & BUSINESS INFO

ZONE
☐ COMMERCIAL
☐ INDUSTRIAL
☐ RESIDENTIAL

APPROX. SIZE, (SQUARE FOOTAGE)
☐ 0-500 SqFt
☐ 501-2000 SqFt
☐ 2001+ SqFt

MERCHANT LOCATION
☐ SHOPPING CENTER
☐ OFFICE BUILDING
☐ SEPARATE BUILDING

☐ RESIDENCE
☐ MOBILE
☐ OTHER:

THE MERCHANT
☐ OWNS
☐ RENTS
☐ LEASES  THE BUSINESS PREMISES

LANDLORD NAME

LANDLORD PHONE #

I HEREBY CERTIFY THAT I HAVE PHYSICALLY INSPECTED THE BUSINESS PREMISES OF THE MERCHANT AT THIS ADDRESS AND THE INFORMATION STATED ABOVE IS CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

*Shihhao Lai*
ShihHao Lai (Jun 30, 2019)
SIGNATURE

Shih-Hao Lai
INSPECTED BY (PRINT NAME)

Jun 30, 2019
DATE (MM/DD/YYYY)

---

## 5. CREDIT / DEBIT AUTHORIZATION

BANK NAME  HSBC

BANK ROUTING #  122240861

BANK ACCOUNT #  ▮▮▮▮▮0413

> MUST ATTACH VOIDED CHECK FROM THIS ACCOUNT

MERCHANT hereby authorizes SERVICERS in accordance with this MERCHANT Processing Agreement to initiate debit/credit entries to MERCHANT'S checking account, as indicated below. The authority is to remain in full force and effect until (a) SERVICERS have received written notification from a MERCHANT of its termination in such a manner as to afford SERVICERS reasonable opportunity to act on it; and (b) all obligations of MERCHANT to SERVICERS that have arisen under this Agreement have been paid in full. This authorization extends to such entries in such account concerning processing fees, lease, and rental or purchase agreements for POS terminals and/or accompanying equipment and/or check guarantee fees, and amounts due for supplies and materials.

---

## 6. TRADE REFERENCE

| VENDOR | ACCOUNT # | CONTACT NAME | PHONE # |
|---|---|---|---|
| | | | |

---

## 7. EQUIPMENT

PAYMENT GATEWAY  >  NMI

SOFTWARE  > APPLICATION _____ VERSION # _____

3rd PARTY PROCESSOR > _____

TERMINAL MODEL > _____

---

## 8. NETWORK ACCEPTANCE

ACCEPT ALL VISA / MASTERCARD / AMERICAN EXPRESS DISCOVER NETWORK TRANSACTIONS (PRESUMED, UNLESS ANY SECTION BELOW ARE CHECKED)

☐ ACCEPT VISA CREDIT TRANSACTIONS ONLY
☐ ACCEPT VISA NON-PIN DEBIT TRANSACTIONS ONLY

☐ ACCEPT MASTERCARD CREDIT TRANSACTIONS ONLY
☐ ACCEPT MASTERCARD NON-PIN DEBIT TRANSACTIONS ONLY
☐ ACCEPT AMERICAN EXPRESS CREDIT TRANSACTIONS ONLY

☐ ACCEPT DISCOVER NETWORK CREDIT TRANSACTIONS ONLY
☐ ACCEPT DISCOVER NETWORK NON-PIN DEBIT TRANSACTIONS ONLY

© COPYRIGHT 2018 NATIONAL MERCHANT CENTER, ALL RIGHTS RESERVED.
NATIONAL MERCHANT CENTER IS A REGISTERED ISO/MSP OF WELLS FARGO BANK, N.A., CONCORD, CA

MERCHANT PROCESSING APPLICATION & AGREEMENT
NMC 0518   Revised: MAY, 2018

EXHIBIT 28
Page 138

Case 8:19-cv-01898-JVS-JDE   Document 75-2   Filed 11/01/19   Page 70 of 80   Page ID #:4265

## 9. SCHEDULE OF CHARGES / FEES
*PAYMENT NETWORK INTERCHANGE COST WILL BE CHARGED IN ADDITION TO.*

**DISCOUNT RATES:**

| | QUALIFIED RATE (ELECTRONIC *) | AUTHORIZATION FEE |
|---|---|---|
| VISA | Int+ 199bp % | $ 0.2500 |
| MASTERCARD | Int+ 199bp % | $ 0.2500 |
| DISCOVER NETWORK | Int+ 199bp % | $ 0.2500 |
| AMERICAN EXPRESS CREDIT | Int+ 199bp % | $ 0.2500 |
| SIGNATURE DEBIT | % | $ |
| OTHER | % | $ |

Qualified Rate is assessed when your transactions meet certain criteria set by the applicable Association and Processor. When your Card transactions fail to meet those qualification criteria, we will process your transactions at the higher mid-qualified discount rate of Int+ 150bp % + $ 0.2500 or in certain circumstances, at a non-qualified discount rate (Standard*) of Int+ 150bp % + $ 0.2500 , both rates are a surcharge to the qualified rate.

**GATEWAY / VT:**
| | |
|---|---|
| GATEWAY NAME | NMI |
| GATEWAY MONTHLY FEE | $ 20.00 |
| GATEWAY PER ITEM FEE | $ 0.2500 |
| ADD VIRTUAL TERMINAL | ☐ YES |

**ERR:**
VISA / MC / DISCOVER ☐
| | |
|---|---|
| QUALIFIED RATE | % |
| NON-QUALIFIED SURCHARGE | % |
| AUTHORIZATION FEE | |

**WIRELESS**  OR  **REMOTE :**
| | |
|---|---|
| SETUP FEE | $ 100.00 |
| TRANSACTION FEE | $ 0.2500 |
| MONTHLY FEE | $ 10.00 |

**CHARGEBACK SOLUTIONS:** (OPTIONAL)  FOR DETAILED DESCRIPTION SEE: www.nationalmerchant.com/pdf/mitigation.pdf

| CHARGEBACK ALERTS ☐ | ETHOCA | $ /ALERT | REPRESENTMENT SERVICES $ PER CHARGEBACK | RISK / FRAUD DETECTION ☐ | $ /MONTH |
|---|---|---|---|---|---|
| | VERIFI | $ /ALERT | | | $ /RISK INQUIRY |

**DEBIT:**
| | |
|---|---|
| MONTHLY ACCESS FEE | $ 10.00 |
| CASH BACK | $ 500.00 MAX |
| AUTHORIZATION/TRANSACTION FEE | $ 0.2500 + NETWORK FEES + 0 % |
| OTHER FEE | $ 0.25 |

**EBT:**
| | |
|---|---|
| FCS # | |
| AUTHORIZATION / TRANSACTION FEE | $ 0.00 |

**MISCELLANEOUS :**
| | |
|---|---|
| ELECTRONIC AVS FEE | $ 0.2000 |
| ACH/BATCH FEE | $ 0.30 |
| CHARGEBACK FEE | $ 35.00 |
| RETRIEVAL REQUEST | $ 20.00 |
| SERVICE FEE | $ 20.00 |

| | |
|---|---|
| ☒ WEB/G2 MONTHLY MONITORING FEE | $ 250.00 |
| ☒ EIDS MONTHLY FEE | $ 0.00 |
| ☐ MERCHANT CLUB | $ 20.00 |
| MINIMUM MONTHLY DISCOUNT | $ 30.00 |
| APPLICATION FEE | $ 198.00 |
| | $ 0.00 |

**OTHER FEES:** Payment Network Interchange Fees; Debit Network Fees; Returned Item Fee $25 (charged if NMC debits the bank account but is rejected due to insufficient funds); Decline Fee – An amount equal to Authorization Fee amount and charged per item declined; TIN/TFN invalid monthly fee: $19.95. Monthly Compliance Fee $ 3.96; PCI Annual Compliance Fee $ 69.95 ; PCI NON-Compliant Monthly Fee $ 20.00 (doesn't affect your compliance responsibilities and obligations associated with your merchant account). You may be charged a Chargeback Research Fee: $50 per chargeback, Early Termination Fee (ETF) – shall be: (a) average monthly processing fees charged to You for previous 12 months (or such shorter time if You have processed for less than 12 months) multiplied by remaining months of the Agreement, or (b) $ 575.00 whichever is greater; Annual Fee $ 75.00, A Capture per item fee of $ 0.10 is assessed on each bankcard transaction; Monthly Regulatory Fee $ 4.95 ; Voice Referral Authorization Fee $3.50; IVR Voice authorization Fee $1.50; BIN/ICA Fee 0.25 If applicable, you may be charged additional pass through card brand fees. See description of card brand fees here: http://www.nationalmerchant.com/pdf/CardBrandFeeDescription.pdf

## 10. OWNERSHIP INFORMATION
LIST PRINCIPALS NAMES THAT OWN COMBINED AT LEAST 25% FOR CORPORATIONS, 100% FOR PARTNERSHIPS

| PRINCIPAL NAME (FIRST, MI, LAST) 1) | Kenny Huang | TITLE Owner | OWNERSHIP (%) 100 | DATE OF BIRTH (MM/DD/YYYY) /1982 |
|---|---|---|---|---|
| HOME ADDRESS | CITY Arcadia | STATE CA | ZIP CODE 91006 | HOME PHONE # 8364 |
| SOCIAL SECURITY # | DRIVER LICENSE # 0041 | DR.LIC. STATE/EXP DATE CA-8/2022 | EMAIL tas2019llc@gmail.com | PERSONAL RESIDENCE ○ OWN ● RENT  FOR HOW LONG? YRS. MO. |

| PRINCIPAL NAME (FIRST, MI, LAST) 2) | | TITLE | OWNERSHIP (%) | DATE OF BIRTH (MM/DD/YYYY) |
|---|---|---|---|---|
| HOME ADDRESS | CITY | STATE | ZIP CODE | HOME PHONE # |
| SOCIAL SECURITY # | DRIVER LICENSE # | DR.LIC. STATE/EXP DATE | EMAIL | PERSONAL RESIDENCE ☐OWN ☐RENT  FOR HOW LONG? YRS. MO. |

| PRINCIPAL NAME (FIRST, MI, LAST) 3) | | TITLE | OWNERSHIP (%) | DATE OF BIRTH (MM/DD/YYYY) |
|---|---|---|---|---|
| HOME ADDRESS | CITY | STATE | ZIP CODE | HOME PHONE # |
| SOCIAL SECURITY # | DRIVER LICENSE # | DR.LIC. STATE/EXP DATE | EMAIL | PERSONAL RESIDENCE ☐OWN ☐RENT  FOR HOW LONG? YRS. MO. |

| PRINCIPAL NAME (FIRST, MI, LAST) 4) | | TITLE | OWNERSHIP (%) | DATE OF BIRTH (MM/DD/YYYY) |
|---|---|---|---|---|
| HOME ADDRESS | CITY | STATE | ZIP CODE | HOME PHONE # |
| SOCIAL SECURITY # | DRIVER LICENSE # | DR.LIC. STATE/EXP DATE | EMAIL | PERSONAL RESIDENCE ☐OWN ☐RENT  FOR HOW LONG? YRS. MO. |

5) **CONTROLLING POSITION** COMPLETE THE FOLLOWING INFORMATION FOR ONE INDIVIDUAL WITH SIGNIFICANT RESPONSIBILITY FOR MANAGING THE LEGAL ENTITY LISTED ABOVE, SUCH AS: AN EXECUTIVE OFFICER OR SENIOR MANAGER (E.G., CHIEF EXECUTIVE OFFICER, CHIEF FINANCIAL OFFICER, CHIEF OPERATING OFFICER, MANAGER MEMBER, GENERAL PARTNER, PRESIDENT, VICE PRESIDENT, TREASURER); OR ANY OTHER INDIVIDUAL WHO REGULARLY PERFORMS SIMILAR FUNCTIONS. IF THIS INDIVIDUAL IS ALREADY LISTED ABOVE, JUST COMPLETE THE TITLE SECTION.

| CONTROLLING POSITION (FIRST, MI, LAST) | | TITLE | OWNERSHIP (%) | DATE OF BIRTH (MM/DD/YYYY) |
|---|---|---|---|---|
| HOME ADDRESS | CITY | STATE | ZIP CODE | HOME PHONE # |
| SOCIAL SECURITY # | DRIVER LICENSE # | DR.LIC. STATE/EXP DATE | EMAIL | PERSONAL RESIDENCE ☐OWN ☐RENT  FOR HOW LONG? YRS. MO. |

© COPYRIGHT 2018 NATIONAL MERCHANT CENTER, ALL RIGHTS RESERVED.
NATIONAL MERCHANT CENTER IS A REGISTERED ISO/MSP OF WELLS FARGO BANK, N.A., CONCORD, CA

MERCHANT PROCESSING APPLICATION & AGREEMENT
NMC 0518    Revised: MAY, 2018    **EXHIBIT 28**  PAGE 3 OF 9

**N M C**
NATIONAL MERCHANT CENTER

## 11. CONFIRMATION

**CERTIFICATION OF BENEFICIAL OWNER(S)**

To help the government fight financial crime, Federal regulation requires certain financial institutions to obtain, verify, and record information about the beneficial owners of legal entity customers. Legal entities can be abused to disguise involvement in terrorist financing, money laundering, tax evasion, corruption, fraud, and other financial crimes. Requiring the disclosure of key individuals who own or control a legal entity (i.e., the beneficial owners) helps law enforcement investigate and prosecute these crimes.

By signing below, I attest that I have accurately provided the name, address, date of birth and Social Security Number (SSN) for the following individuals (i.e. the beneficial owners):

(i)  Each individual, if any, who owns directly or indirectly, 25 percent or more of the equity interests of the legal entity customer (e.g., each natural person that owns 25 percent or more of the shares of a corporation); and

(ii)  An individual with significant responsibility for managing the legal entity customer (e.g., a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, or Treasurer).

The number of individuals that satisfy this definition of "beneficial owner" may vary. Under section (i), depending on the factual circumstances, up to four individuals (but as few as zero) may need to be identified. Regardless of the number of individuals identified under section (i), you must provide the identifying information of one individual under section (ii). It is possible that in some circumstances the same individual might be identified under both sections (e.g., the President of Acme, Inc. who also holds a 30% equity interest). Thus, a completed form will contain the identifying information of at least one individual (under section (ii)), and up to five individuals (i.e., one individual under section (ii) and four 25 percent equity holders under section (i)).

I, the undersigned _____  **Kenny  Huang** _____, certify that all of the information furnished
PRINCIPAL / OWNER:

above with regard to information for each individual, if any, who directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25 percent or more of the equity interests of the legal entity listed above  is complete and accurate.

→  *Kenny Huang*                                                            Jul 1, 2019
SIGNATURE:                                                                  DATE (MM/DD/YYYY)

Client certifies that all information set forth in this completed Merchant Processing Application is true and correct and that Client has received a copy of the Program Guide (NMC0518-M) and Confirmation Page, which is part of this Merchant Processing Application (consisting of Sections 1-10), and by this reference incorporated herein. (**Program Guide can be downloaded from http://www.nationalmerchant.com/PDF/ProgramGuideNMC0518.pdf**). Client expressly acknowledges and certifies that Client has read the said Program Guide, and Client agrees to be bound by its terms including but not limited to the early termination fee provision. Client acknowledges and agrees that we, our Affiliates and our third party subcontractors and/or agents may use automatic telephone dialing systems to contact client at the telephone number(s) Client has provided in this Merchant Processing Application and/or may leave a detailed voice message in the event that Client is unable to be reached, even if the number provided is a cellular or wireless number of if Client has previously registered on a Do Not Call list of requested not to be contacted Client for solicitation purposes.  Client herby consents to receiving commercial electronics mall messages from us, our Affiliates and our third party subcontractors and/or agents from time to time. Client further agrees that Client will not accept more than 20% of its card transactions via mail, telephone or Internet order. However, if your Application is approved based upon contrary information stated in Section 5, Transaction Information section above, you are authorized to accept transactions in accordance with the percentages indicated in that section. This signature page also serves as a signature page to the Equipment Lease Agreement in the Third Party section of the Program Guide, if selected, the undersigned Client being the "Lessee" for purposes of such Equipment Lease Agreement. Client authorizes National Merchant Center ("NMC") and Wells Fargo Bank, N.A. (a member of Visa USA, Inc. and MasterCard International, Inc) ("Bank") and their agents to investigate the references, statements and other data contained herein and to obtain additional information from credit bureaus and other lawful sources, including persons and companies names in this Merchant Processing Application. Client authorizes NMC and BANK and their agents (a) to procure information from any consumer reporting agency bearing his/her personal credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, and (b) to contact all previous employers, personal references and educational institutions. It is our policy to obtain certain information in order to verify your identity while processing your account application.
The individual who signs this Agreement has authority to do so and to bind its Establishment to the terms and conditions of this Agreement. You further represent that you are authorized to sign and enter into this Agreement on behalf of your establishment, subsidiaries and affiliates.

You further acknowledge and agree that you will not use your merchant account and/or Service for illegal transactions, for example, those prohibited by the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. Section 5361 et seq, as may be amended from time to time, or processing and acceptance of transaction in certain jurisdictions pursuant to 31 CRF part 500 et seq. and other laws enforced by the Office of Foreign Assets Control (OFAC)

Client certifies, under penalties of perjury, that the federal taxpayer identification number and corresponding filing name provided herein are correct. Client agrees to all the terms of this Merchant Processing Application and Agreement. This Merchant Processing Application and Agreement shall not take effect until Client has been approved and this Agreement has been accepted by NMC and Bank.

Client's Business Principal(s) / Officer(s):

→  *Kenny Huang*                    Owner                                    Kenny Huang                    Jul 1, 2019
MERCHANT  PRINCIPAL 1 SIGNATURE       TITLE                                    PRINT NAME                    DATE (MM/DD/YYYY)

→  _____             _____                            _____                    _____
MERCHANT  PRINCIPAL 2 SIGNATURE       TITLE                                    PRINT NAME                    DATE (MM/DD/YYYY)

PERSONAL GUARANTEE

The undersigned guarantor to NMC and Wells Fargo Bank, N.A. (a member of Visa USA, Inc. and MasterCard International, Inc ) ("Bank") the performance of this Agreement, and/or Equipment Lease Agreement, if applicable and any addendum thereto by Client, and in the event of default, hereby waives Notice of Default and agrees to indemnify the other parties, including payment due and owing and costs associated with enforcement of the terms thereof, NMC and Bank shall not be required to first proceed against Client or enforce any other remedy before proceeding against the undersigned individual. This is a continuing guarantee and shall not be discharged or affected for any reason and shall bind the heirs, administra-tors, representatives and assigns and be enforced by or for the benefit of any successor of NMC and Bank. The term of this guarantee shall be for the duration of the Merchant Processing Application and Merchant Terms and Conditions Agreement and any addendum thereto and shall guarantee all obligations which may arise or occur in connection with my activities during the term thereof through enforcement shall be sought subsequent to any termination.

→  *Kenny Huang*                                                            Kenny Huang                    Jul 1, 2019
SIGNATURE                                                                  PRINT NAME OF GUARANTOR           DATE (MM/DD/YYYY)

→  _____                                                    _____                    _____
SIGNATURE                                                                  PRINT NAME OF GUARANTOR           DATE (MM/DD/YYYY)

ACCEPTED BY NATIONAL MERCHANT CENTER                        WELLS FARGO BANK, N.A., (A MEMBER OF VISA USA, INC. AND MASTERCARD INTERNATIONAL, INC)
                                                           P.O. BOX 6079 CONCORD, CA 94524 (844) 284-6834

→  _____     _____                    _____         _____
ISO SIGNATURE              DATE (MM/DD/YYYY)                 SIGNATURE                     DATE (MM/DD/YYYY)

_____                                        _____
TITLE                                                       TITLE

© COPYRIGHT 2018 NATIONAL MERCHANT CENTER, ALL RIGHTS RESERVED.
NATIONAL MERCHANT CENTER IS A REGISTERED ISO/MSP OF WELLS FARGO BANK, N.A., CONCORD, CA

EXHIBIT 28
NMC0518  MAY 2018
Page 40

# Application

Final Audit Report                                                                           2019-07-01

| | |
|---|---|
| Created: | 2019-07-01 |
| By: | PaymentWorld LLC (esignature@paymentworld.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAkJ2tTYxV9xLGEmmKOJXqWb6YFygHLCwJ |

## "Application" History

📄 Document created by PaymentWorld LLC (esignature@paymentworld.com)
2019-07-01 - 2:10:32 AM GMT- IP address: 66.171.241.2

📧 Document emailed to Shihhao Lai (jimmy.lai@swiftpaymentsinc.com) for signature
2019-07-01 - 2:10:43 AM GMT

✒️ Document e-signed by Shihhao Lai (jimmy.lai@swiftpaymentsinc.com)
E-signature hosted by PaymentWorld LLC (esignature@paymentworld.com)
Signature Date: 2019-07-01 - 2:12:54 AM GMT - Time Source: server- IP address: 45.50.224.183

📧 Document emailed to Kenny Huang (tas2019llc@gmail.com) for signature
2019-07-01 - 2:12:56 AM GMT

📄 Email viewed by Kenny Huang (tas2019llc@gmail.com)
2019-07-01 - 6:48:04 AM GMT- IP address: 66.102.7.238

✒️ Document e-signed by Kenny Huang (tas2019llc@gmail.com)
Signature Date: 2019-07-01 - 7:49:53 AM GMT - Time Source: server- IP address: 76.219.238.248

✅ Signed document emailed to PaymentWorld LLC (esignature@paymentworld.com), Kenny Huang (tas2019llc@gmail.com) and Shihhao Lai (jimmy.lai@swiftpaymentsinc.com)
2019-07-01 - 7:49:53 AM GMT

Adobe Sign

EXHIBIT 28
Page 141

EXHIBIT 29

fees



# MERCHANT ACCOUNT CHANGE REQUEST FORM

*Please sign and return to National Merchant Center (NMC) Fax #: (949) 861-6201*

## Current Business Information

MID # 5101 [ ] 6333     Legal Business Name TAS 2019 LLC

DBA Trusted Account Services     Owner Name:

Website: https://trustedaccountservices.com/   Email Address: tas2019llc@gmail.com

Address: [ ]     City/State/Zip: Arcadia, CA 91006

Home Phone: (_____)     Work Phone: (_____)

Descriptor TAS - Student Loan

## Account Update (Provide updated information below)

DBA Change:

Business Address Change:

Business Mailing Adrs Change:

Email Address Change:

Website URL Change:

Business Phone # Change:

Descriptor Change     TAS - Student Loan

## Change of Bank Account Information

| | |
|---|---|
| Bank Name | HSBC Bank USA |
| Name on Bank Account | TAS 2019 LLC |
| Account Number: | [ ] 0413 |
| Routing Number: | 122240861 |
| Reason | Update for Adjustments, Fees, Chargebacks, Reserves, etc |

### FAX A COPY OF *PRE-PRINTED CHECK* WITH THIS FORM

If you wish to change the bank account, which is receiving your electronic deposits and debits via ACH, please complete and sign this form and attach a pre-printed voided check to confirm the account number. *Note: This change only affects Visa, Mastercard, Discover and American Express Opt-Blue. If you have a "Direct American Express" account, you will need to contact American Express directly at 800-528-5200, to update your bank information.*

The undersigned is authorized to sign on behalf of the entity named above. By signing below, the undersigned agrees to be bound by the terms and conditions of NMC Merchant Agreement and acknowledges that he/she has read this agreement and kept a copy of this agreement for his/her files. In addition, the undersigned verifies that all of the information contained hereon this form is true, complete and correct to the best of their knowledge. Please allow 5-7 business days to process the change.

By signing below, I expressly authorize NMC or its affiliates to fulfill the above request in connection with my merchant account and/or payment gateway account.

| | Kenny Huang | 9/9/2019 |
|---|---|---|
| OWNER/OFFICER SIGNATURE | PRINT NAME | DATE |

| Internal Office Use Only | | |
|---|---|---|
| | ☒ Approved | ☐ Declined |
| Was a Starter Check or Bank Letter Provided? | ☒ Yes | ☐ No |
| Legal name/DBA match the Application/Merchant Account? | ☒ Yes | ☐ No |
| Risk/Underwriter Signature: | | |



NMC - 8:19-cv-01998 JVS - 1738

EXHIBIT 29
Page 143

deposits 

# MERCHANT ACCOUNT CHANGE REQUEST FORM

*Please sign and return to National Merchant Center (NMC) Fax #: (949) 861-6201*

**Current Business Information**

MID # 5101 ▮ 6333     Legal Business Name TAS 2019 LLC

DBA Trusted Account Services     Owner Name:

Website: https://trustedaccountservices.com/   Email Address: tas2019llc@gmail.com

Address:     City/State/Zip: Arcadia, CA 91006

Home Phone: ( )     Work Phone: ( )

Descriptor TAS - Student Loan

---

**Account Update (Provide updated information below)**

DBA Change:

Business Address Change:

Business Mailing Adrs Change:

Email Address Change:

Website URL Change:

Business Phone # Change:

Descriptor Change     TAS - Student Loan

---

**Change of Bank Account Information**

| | |
|---|---|
| Bank Name | HSBC Bank USA |
| Name on Bank Account | TAS 2019 LLC |
| Account Number: | ▮3327 |
| Routing Number: | 122240861 |
| Reason | Update for Deposits and Refunds Only |

## FAX A COPY OF *PRE-PRINTED CHECK* WITH THIS FORM

If you wish to change the bank account, which is receiving your electronic deposits and debits via ACH, please complete and sign this form and attach a pre-printed voided check to confirm the account number. *Note: This change only affects Visa, Mastercard, Discover and American Express Opt-Blue. If you have a "Direct American Express" account, you will need to contact American Express directly at 800-528-5200, to update your bank information.*

The undersigned is authorized to sign on behalf of the entity named above. By signing below, the undersigned agrees to be bound by the terms and conditions of NMC Merchant Agreement and acknowledges that he/she has read this agreement and kept a copy of this agreement for his/her files. In addition, the undersigned verifies that all of the information contained hereon this form is true, complete and correct to the best of their knowledge. Please allow 5-7 business days to process the change.

By signing below, I expressly authorize NMC or its affiliates to fulfill the above request in connection with my merchant account and/or payment gateway account.

| | Kenny Huang | 9/9/2019 |
|---|---|---|
| OWNER/OFFICER SIGNATURE | PRINT NAME | DATE |

---

Internal Office Use Only     ☑ Approved    ☐ Declined

Was a Starter Check or Bank Letter Provided?     ☑ Yes    ☐ No

Legal name/DBA match the Application/Merchant Account?     ☑ Yes    ☐ No

Risk/Underwriter Signature:

# HSBC ◆▶

September 9, 2019

TAS 2019 LLC

Kenny Huang

▬▬ ▬ ▬

Arcadia, CA 91006

To Whom It May Concern:

The above client has established a business account with HSBC.

Account:        ▬3327

ABA:        122240861

Please let me know if you have any questions. Thanks

Sincerely

JIMMY LEE, MBA

Business Banking Relationship Manager - Retail Business Banking

Retail Banking & Wealth Management
HSBC Bank (USA), N.A. 1107 S. Baldwin Ave
Arcadia, CA, 91007

Direct +1 626.316.2228

eFax +1  224.352.4357

Email jimmy.x.lee@us.hsbc.com

HSBC Bank USA, National Association
Arcadia Office, 1107 South Baldwin Avenue Unit C, Arcadia, CA 91007
Tel: 1 (800) 975-4722  Fax: (626) 462-9915

# EXHIBIT 30

Business Entity Detail - Wyoming Secretary of State                                              Page 1 of 2

# Business Center

Online Services    Search

## DETAIL                    RETURN TO YOUR SEARCH         FILE YOUR ANNUAL REPORT

---

TAS 2019 LLC

This detail reflects the current data for the filing in the system.                          Print

**Name**
TAS 2019 LLC

| | | |
|---|---|---|
| **Filing ID**<br>2019-000846927 | **Status**<br>Active | **Fictitious Name** |
| **Type**<br>Limited Liability Company - Domestic | **Sub Status**<br>Current | |
| | **Initial Filing**<br>03/20/2019 | |
| **Standing - Tax**<br>Good | **Term of Duration**<br>Perpetual | |
| **Standing - RA**<br>Good | **Formed In**<br>Wyoming | |
| **Standing - Other**<br>Good | | |
| | **Principal Office**<br>30 N Gould St<br>Ste R<br>Sheridan, WY 82801<br>USA | |
| **Mailing Address**<br>30 N Gould St<br>Ste R<br>Sheridan, WY 82801<br>USA | | |

---

Additional Details

| | |
|---|---|
| **Registered Agent:**<br>Registered Agents Inc.<br>30 N Gould St Ste R<br>Sheridan, WY 82801 USA | **Latest AR/Year**<br>**AR Exempt**<br>**License Tax Paid** |

---

History

---

NMC - 8:19-cv-01998 JVS - 1785
EXHIBIT 30
Page 146

Business Entity Detail - Wyoming Secretary of State                                    Page 2 of 2

| Initial Filing - See Filing ID | Date: **03/20/2019** |
| --- | --- |

Public Notes

No Public Notes Found...

Parties

(Organizer)                                                      Organization: **Registered Agent**
　　　　　Address: **30 N Gould St Ste R, Sheridan, WY 82801**

EXHIBIT 31

## NATIONAL MERCHANT CENTER
2955 E MAIN STE 100
IRVINE, CA 926124

| YOUR CARD PROCESSING STATEMENT |
|---|

026567/000001/863669/STMT/26567/0000/162080 000 01 000000
**KENNY**
**TAS 2019 LLC**
**30 N GOULD ST STE R**
**SHERIDAN WY  82801-6317**

| Page 1 of  5 | **THIS IS NOT A BILL** |
|---|---|
| Statement Period | 09/01/19 - 09/30/19 |
| Merchant Number | 5101 ████ 6085 |
| Customer Service | 800-662-8448 |

Chain Code   06119
Location:
    TRUSTED ACCOUNT SERVICES MAINT
    ████████████████████
    NORTH TUSTIN CA 92705

| SUMMARY | An overview of account activity for the statement period. | |
|---|---|---|
| Page | 4 | **Amounts Submitted** | 0.00 |
| Page | 4 | **Third Party Transactions** | 0.00 |
| Page | 4 | **Adjustments/Chargebacks** | 0.00 |
| Page | 4 | **Fees Charged** | 0.00 |
| | **Total Amount Funded to Your Bank** | **0.00** |

See page 2 for Key Definition of Terms

(Amount Submitted - Third Party) + Adjustments + Chargebacks + Fees Charged = Amount Funded

| IMPORTANT INFORMATION ABOUT YOUR ACCOUNT |
|---|

!ATTENTION!

EFFECTIVE NOVEMBER 2019, THE STAR MERCHANT LOCATION FEE WILL INCREASE FROM $12.00 TO $16.00. AS A RESULT OF THIS FEE AND OUR OWN PRICING CONSIDERATION, YOU WILL BE ASSESSED A STAR ANNUAL FEE IN THE AMOUNT OF $18.00. THIS FEE IS ASSESSED PER PARTICIPATING LOCATION OR WEBSITE THAT IS ENABLED WITH AND/OR ACCEPTS STAR TRANSACTIONS AND COVERS AN ANNUAL PERIOD BEGINNING JUNE 1 OF EACH YEAR. THIS FEE WILL APPEAR ON YOUR NOVEMBER MONTH-END STATEMENT. CONTINUING YOUR MERCHANT ACCOUNT WITH US OR USE OF YOUR MERCHANT ACCOUNT AFTER THE EFFECTIVE DATE WILL CONSTITUTE YOUR ACCEPTANCE TO THESE TERMS.

# EXHIBIT 32

NATIONAL MERCHANT CENTER
2955 E MAIN STE 100
IRVINE, CA
926124

| 1428  0100  1100  01 | MERCHANT STATEMENT |
| MERCHANT NUMBER   5101█████6481 | SUMMARY OF BANKCARD DEPOSITS |

MONTH ENDING 09/30/2019

CHAIN 06515

KENNY                          119291    07
TAS 2019 LLC
30 N GOULD STE R
SHERIDAN WY 82801

TRUSTED ACCOUNT SERVICES EAST

NORTH TUSTIN CA 92705-3252

վ.լ.լ.ՈՒՈՒ.,,ՈՒՈ.Ա.ԱՈՒՈՒ..Ա.Ա.Ա.Ա.Ա.Ա.Ա.

CUSTOMER SERVICE TEL #: 800-662-8448

!ATTENTION!

EFFECTIVE NOVEMBER 2019, THE STAR MERCHANT LOCATION FEE WILL INCREASE FROM
$12.00 TO $16.00. AS A RESULT OF THIS FEE AND OUR OWN PRICING CONSIDERATION,
YOU WILL BE ASSESSED A STAR ANNUAL FEE IN THE AMOUNT OF $18.00. THIS FEE IS
ASSESSED PER PARTICIPATING LOCATION OR WEBSITE THAT IS ENABLED WITH AND/OR
ACCEPTS STAR TRANSACTIONS AND COVERS AN ANNUAL PERIOD BEGINNING JUNE 1 OF
EACH YEAR. THIS FEE WILL APPEAR ON YOUR NOVEMBER MONTH-END STATEMENT.
CONTINUING YOUR MERCHANT ACCOUNT WITH US OR USE OF YOUR MERCHANT ACCOUNT AFTER
THE EFFECTIVE DATE WILL CONSTITUTE YOUR ACCEPTANCE TO THESE TERMS.

| TOTAL CHARGE TO YOUR ACCOUNT IS | | | 0.00 |
|---|---|---|---|

### SUMMARY OF CARD FEES

| | | | | |
|---|---|---|---|---|
| MASTERCARD | | | | |
| DISC 1 | | 0.01990 | | |
| AUTHS & AVS | | | | |
| CPU GTWY | 2 | 0.2500 | 0.50 | |
| TOTAL | | | | 0.50 |
| AMEXCT043 | | | | |
| DISC 1 | | 0.01990 | | |
| AUTHS & AVS | | | | |
| CPU GTWY | 2 | 0.2500 | 0.50 | |
| AVS CPU-G | 2 | 0.2000 | 0.40 | |
| TOTAL | | | | 0.90 |
| VS OFLN DB | | | | |
| DISC 1 | | 0.01990 | | |
| AUTHS & AVS | | | | |
| CPU GTWY | 1 | 0.2500 | 0.25 | |
| AVS CPU-G | 1 | 0.2000 | 0.20 | |
| ACQR PROCESSOR FEES | 1 | 0.01550 | 0.02 | |
| TOTAL | | | | 0.47 |
| TOTAL CARD FEES | | | | 1.87 |

### SUMMARY OF MISCELLANEOUS FEES

| | |
|---|---|
| TOTAL CARD FEES | 1.87 |
| MIN. MONTHLY FEE | 28.15 |
| SERVICE FEE | 20.00 |
| REGULATORY FEE | 4.95 |
| COMPLIANCE FEE | 3.96 |
| WEB G2 MO MONITOR | 250.00 |
| EIDS-DISPUTE-TOOL | 50.00 |
| LESS AMOUNT PAID BY CHAIN | 358.93 |
| | |
| TOTAL CHARGES | 0.00 |

| 5345 | 0001 | CC01 | 001 | 07 | 20190930 | Page 1 of 1 | | 1428 | 0100 | U1D | 119291 |
|---|---|---|---|---|---|---|---|---|---|---|---|

EXHIBIT 32
Page 149

NATIONAL MERCHANT CENTER
2955 E MAIN STE 100
IRVINE, CA
926124

1428    0100    1100    01
MERCHANT NUMBER     51▮▮▮▮8085

MERCHANT STATEMENT
SUMMARY OF BANKCARD DEPOSITS
MONTH ENDING 09/30/2019

CHAIN 06119

KENNY
TAS 2019 LLC
30 N GOULD STE R
SHERIDAN WY 82801

119290     07

TRUSTED ACCOUNT SERVICES MAINT
▮▮▮▮▮▮▮▮▮▮▮▮
NORTH TUSTIN CA 92705

ll.l.l.ll.l.l..l.llll.l......l.ll.lll.lll.....l.l.l.lllll.l.l

CUSTOMER SERVICE TEL #: 800-662-8448

!ATTENTION!

EFFECTIVE NOVEMBER 2019, THE STAR MERCHANT LOCATION FEE WILL INCREASE FROM
$12.00 TO $16.00. AS A RESULT OF THIS FEE AND OUR OWN PRICING CONSIDERATION,
YOU WILL BE ASSESSED A STAR ANNUAL FEE IN THE AMOUNT OF $18.00. THIS FEE IS
ASSESSED PER PARTICIPATING LOCATION OR WEBSITE THAT IS ENABLED WITH AND/OR
ACCEPTS STAR TRANSACTIONS AND COVERS AN ANNUAL PERIOD BEGINNING JUNE 1 OF
EACH YEAR. THIS FEE WILL APPEAR ON YOUR NOVEMBER MONTH-END STATEMENT.
CONTINUING YOUR MERCHANT ACCOUNT WITH US OR USE OF YOUR MERCHANT ACCOUNT AFTER
THE EFFECTIVE DATE WILL CONSTITUTE YOUR ACCEPTANCE TO THESE TERMS.

| TOTAL CHARGE TO YOUR ACCOUNT IS | | | | 0.00 |
|---|---|---|---|---|

### SUMMARY OF CARD FEES

| | | | | |
|---|---|---|---|---|
| MASTERCARD | | | | |
| DISC 1 | | 0.01990 | | |
| AUTHS & AVS | | | | |
| CPU GTWY | 1 | 0.2500 | 0.25 | |
| TOTAL | | | | 0.25 |
| VS OFLN DB | | | | |
| DISC 1 | | 0.01990 | | |
| AUTHS & AVS | | | | |
| CPU GTWY | 1 | 0.2500 | 0.25 | |
| AVS CPU-G | 1 | 0.2000 | 0.20 | |
| ACQR PROCESSOR FEES | 1 | 0.01550 | 0.02 | |
| TOTAL | | | | 0.47 |
| TOTAL CARD FEES | | | | 0.72 |

### SUMMARY OF MISCELLANEOUS FEES

| | |
|---|---|
| TOTAL CARD FEES | 0.72 |
| MIN. MONTHLY FEE | 29.30 |
| SERVICE FEE | 20.00 |
| REGULATORY FEE | 4.95 |
| COMPLIANCE FEE | 3.96 |
| WEB G2 MO MONITOR | 250.00 |
| EIDS-DISPUTE-TOOL | 50.00 |
| LESS AMOUNT PAID BY CHAIN | 358.93 |
| | |
| TOTAL CHARGES | 0.00 |

LAST PAGE OF THIS STATEMENT

5345    0001    CC01    001    07    20190930    Page 1 of 1              1428    0100    U1D              119290

EXHIBIT 32
Page 150

NATIONAL MERCHANT CENTER
2955 E MAIN STE 100
IRVINE, CA
926124

| | | | | MERCHANT STATEMENT |
|---|---|---|---|---|
| 1428 | 0100 | 1100 | 01 | SUMMARY OF BANKCARD DEPOSITS |
| MERCHANT NUMBER | | 510  6333 | | MONTH ENDING 09/30/2019 |

CHAIN 06424

KENNY                                    119349    07
TAS 2019 LLC
30 N GOULD STE R
SHERIDAN WY 82801-6317

TRUSTED ACCOUNT SERVICES

NORTH TUSTIN CA 92705-3252

CUSTOMER SERVICE TEL #: 800-662-8448

!ATTENTION!

EFFECTIVE NOVEMBER 2019, THE STAR MERCHANT LOCATION FEE WILL INCREASE FROM
$12.00 TO $16.00. AS A RESULT OF THIS FEE AND OUR OWN PRICING CONSIDERATION,
YOU WILL BE ASSESSED A STAR ANNUAL FEE IN THE AMOUNT OF $18.00. THIS FEE IS
ASSESSED PER PARTICIPATING LOCATION OR WEBSITE THAT IS ENABLED WITH AND/OR
ACCEPTS STAR TRANSACTIONS AND COVERS AN ANNUAL PERIOD BEGINNING JUNE 1 OF
EACH YEAR. THIS FEE WILL APPEAR ON YOUR NOVEMBER MONTH-END STATEMENT.
CONTINUING YOUR MERCHANT ACCOUNT WITH US OR USE OF YOUR MERCHANT ACCOUNT AFTER
THE EFFECTIVE DATE WILL CONSTITUTE YOUR ACCEPTANCE TO THESE TERMS.

**TOTAL CHARGE TO YOUR ACCOUNT IS**                                      **0.00**

### SUMMARY OF CARD DEPOSITS

| CARD TYPE | | SALES ADJUSTMENTS | | RETURNS EXCL ADJ | | NET |
|---|---|---|---|---|---|---|
| MASTERCARD | 390 | 31,747.15 | 0 | 0.00 | | 31,747.15 |
| | 0 | 0.00 | 1 - | 249.00 - | | |
| MC OFLN DB | 2,095 | 165,368.27 | 5 | 799.00 | | 164,569.27 |
| AMEXCT043 | 120 | 9,664.00 | 1 | 22.00 | | 9,642.00 |
| VISA | 596 | 40,268.26 | 2 | 498.00 | | 39,770.26 |
| | 0 | 0.00 | 4 - | 540.50 - | | |
| VS OFLN DB | 5,937 | 451,978.17 | 9 | 1,785.00 | | 450,193.17 |
| DCVR ACQ | 93 | 6,525.00 | 0 | 0.00 | | 6,525.00 |
| BANKCD TOT | 9,111 | 695,886.85 | 16 | 3,082.00 | | 692,804.85 |
| | 0 | 0.00 | 5 | 789.50 - | | |
| TOTAL | 9,231 | 705,550.85 | 17 | 3,104.00 | | 702,446.85 |
| | 0 | 0.00 | 5 - | 789.50 - | | |

### SUMMARY OF INTERCHANGE FEES

| INTERCHANGE | RATE | ITEM | COUNT | VOLUME | FEE |
|---|---|---|---|---|---|
| MASTERCARD | | | | | |
| MERIT 1 | .0189 | .10 | 96 | 7,425.00 | 150.15 |
| INT MERIT 1 | .0189 | .10 | 71 | 6,522.50 | 130.40 |
| WC MERIT 1 | .0205 | .10 | 68 | 5,487.50 | 119.30 |
| WCELITE MERIT1 | .0250 | .10 | 29 | 2,236.00 | 58.83 |
| ENHANCEDMERIT 1 | .0204 | .10 | 89 | 7,002.50 | 151.83 |
| HIGHVAL MERIT 1 | .0250 | .10 | 7 | 806.00 | 20.86 |
| EVPSBCORPDATAR1 | .0280 | .10 | 1 | 20.00 | 0.66 |
| REGULATEDDBTCMM | .0005 | .21 | 1 | 40.00 | 0.23 |
| REGULATEDFDBTCM | .0005 | .22 | 15 | 1,120.65 | 3.86 |
| CP RATE 1 BUS | .0265 | .10 | 13 | 1,087.00 | 30.13 |
| MC OFLN DB | | | | | |
| MERIT 1 DEBIT | .0165 | .15 | 585 | 43,407.24 | 804.17 |
| MERIT1D INTRNET | .0165 | .15 | 484 | 39,111.29 | 717.80 |

| 5345 | 0001 | CC01 | 001 | 07 | 20190930 | Page 1 of 5 | | 1428 | 0100 | U1D | 119349 |

EXHIBIT 32
Page 151

NATIONAL MERCHANT CENTER
5101      6333
MONTH ENDING  09/30/2019
Page 2

## SUMMARY OF INTERCHANGE FEES

| INTERCHANGE | RATE | ITEM | COUNT | VOLUME | FEE |
|---|---|---|---|---|---|
| MERIT1PREPDDBTC | .0176 | .20 | 74 | 7,285.00 | 142.93 |
| REGREFUND USFA | | | 5 – | 799.00 – | |
| REGULATDMIDMT1 | .0005 | .21 | 6 | 214.00 | 1.38 |
| REGULATFMIDMT1 | .0005 | .22 | 519 | 39,264.74 | 133.93 |
| REGULATDMIDEM1 | .0005 | .21 | 5 | 359.00 | 1.23 |
| REGULATFMIDEM1 | .0005 | .22 | 422 | 35,727.00 | 110.57 |
| AMEXCT043 | | | | | |
| B2BNSWP1 | .0195 | .10 | 107 | 8,498.50 | 176.42 |
| PPNSWP1 | .0165 | .10 | 9 | 330.00 | 6.34 |
| PPNSWP2 | .0200 | .10 | 4 | 835.50 | 17.11 |
| OPTREFND | | | 1 – | 22.00 – | |
| VISA | | | | | |
| CPS MAIL PHONE | .0180 | .10 | 69 | 4,679.50 | 91.13 |
| CPS ECOM BASIC | .0180 | .10 | 55 | 3,423.00 | 67.11 |
| US CRDT VCR-CN | .0176 | | 2 – | 498.00 – | 8.76 – |
| CPS REWARDS 2 | .0195 | .10 | 327 | 21,708.50 | 456.01 |
| US BUS TR1 B2B | .0210 | .10 | 4 | 351.00 | 7.77 |
| US VSP B2B | .0210 | .10 | 134 | 9,862.26 | 220.50 |
| US BUS TR2 B2B | .0225 | .10 | 2 | 50.00 | 1.32 |
| US BUS TR3 B2B | .0240 | .10 | 2 | 82.00 | 2.16 |
| US BUS TR4 B2B | .0250 | .10 | 3 | 112.00 | 3.10 |
| VS OFLN DB | | | | | |
| CPS CARD NP DB | .0165 | .15 | 894 | 61,981.69 | 1,156.79 |
| CPS ECO BAS DB | .0165 | .15 | 781 | 65,516.75 | 1,198.17 |
| IR REGULATED DB | .0005 | .22 | 12 | 1,607.00 | 3.44 |
| US CV DB | | | 9 – | 1,785.00 – | |
| CPS CNP PP | .0175 | .20 | 70 | 6,333.00 | 124.82 |
| CPSECOMBASICPP | .0175 | .20 | 64 | 6,018.50 | 118.12 |
| USREGULATED CNP | .0005 | .22 | 2182 | 151,141.50 | 555.61 |
| REG CPS ECOMBSC | .0005 | .22 | 1870 | 155,195.21 | 488.99 |
| INTR STANDARD | .0160 | | 1 | 30.00 | 0.48 |
| US BUS CNP DB | .0245 | .10 | 7 | 855.50 | 21.65 |
| REG BUS CNP DB | .0005 | .22 | 56 | 3,299.02 | 13.96 |
| DCVR ACQ | | | | | |
| P CNP RW | .0200 | .10 | 28 | 2,307.50 | 48.95 |
| CMRCL EL | .0230 | .10 | 21 | 943.00 | 23.80 |
| PCNPPRM | .0200 | .10 | 2 | 84.00 | 1.88 |
| ECOMRWD | .0200 | .10 | 32 | 2,488.00 | 52.96 |
| ECOMPRM | .0200 | .10 | 1 | 42.00 | 0.94 |
| DCVR AQ DB | | | | | |
| P CNP DB | .0175 | .20 | 6 | 351.50 | 7.36 |
| ECOMDBT | .0175 | .20 | 2 | 60.00 | 1.45 |
| ECOMDBFF | .0005 | .22 | 1 | 249.00 | 0.34 |
| TOTAL INTERCHANGE | | | | | 7,438.17 |

## SUMMARY OF CARD FEES

| | | | | |
|---|---|---|---|---|
| MASTERCARD | | | | |
| DISC 1 | 31,747 | 0.01990 | 631.77 | |
| OTHER ITEM FEES | 390 | 0.10000 | 39.00 | |
| DUES & ASSESSMENTS | | | 43.65 | |
| AUTHS & AVS | | | | |
| CPU GTWY | 1,595 | 0.2500 | 398.75 | |
| POS AUTHS | 5 | 0.2500 | 1.25 | |
| ECI CPU-G | 1,371 | 0.2500 | 342.75 | |
| ECI DIAL | 3 | 0.2500 | 0.75 | |
| AVS CPU-G | 1,573 | 0.2000 | 314.60 | |
| AVS POS | 5 | 0.2000 | 1.00 | |
| AVS ECIC-G | 1,368 | 0.2000 | 273.60 | |
| AVS ECIDIL | 3 | 0.2000 | 0.60 | |
| INTERCHANGE | | | 666.25 | |
| LICENSE RATE | 31,747.15 | 0.0000710 | 2.25 | |
| NABU FEES | 2,948 | 0.01950 | 57.49 | |
| BIN ICA FEE | | | 3.04 | |
| MC ICA AVS CARD NOT PRSNT | 2,949 | 0.01000 | 29.49 | |
| MC CVC2 FEE | 2,872 | 0.00250 | 7.18 | |
| MC DIGITAL ENABLEMENT | 197,115.42 | 0.00010 | 19.71 | |

| 5345 | 0001 | CC01 | 001 | 07 | 20190930 | Page 2 of 5 | | | | 1428 | 0100 | U1D | 119349 |

EXHIBIT 32
Page 152

NATIONAL MERCHANT CENTER
5101█████6333
MONTH ENDING 09/30/2019
Page 3

---

## SUMMARY OF CARD FEES

| | | | | |
|---|---|---|---|---|
| MC KILOBYTE FEE | 1,244 | 0.00350 | 4.36 | |
| LOCATION FEE | | | 1.25 | |
| TOTAL | | | | 2,838.71 |
| | | | | |
| **MC OFLN DB** | | | | |
| DISC 1 | 165,368 | 0.01990 | 3,290.83 | |
| OTHER ITEM FEES | 2,100 | 0.10000 | 210.00 | |
| DUES & ASSESSMENTS | | | 227.76 | |
| INTERCHANGE | | | 1,912.01 | |
| LICENSE RATE | 165,368.27 | 0.0000710 | 11.74 | |
| NABU FEES | 5 | 0.01950 | 0.10 | |
| BIN ICA FEE | | | 16.34 | |
| TOTAL | | | | 5,668.78 |
| | | | | |
| **AMEXCT043** | | | | |
| DISC 1 | 9,664 | 0.01990 | 192.31 | |
| OTHER ITEM FEES | 121 | 0.10000 | 12.10 | |
| | | | | |
| **AUTHS & AVS** | | | | |
| CPU GTWY | 76 | 0.2500 | 19.00 | |
| ECI CPU-G | 68 | 0.2500 | 17.00 | |
| AVS CPU-G | 76 | 0.2000 | 15.20 | |
| AVS ECIC-G | 67 | 0.2000 | 13.40 | |
| INTERCHANGE | | | 199.88 | |
| NETWORK FEE | 9,664.00 | 0.00450 | 43.49 | |
| TOTAL | | | | 512.38 |
| | | | | |
| **VISA** | | | | |
| DISC 1 | 40,268 | 0.01990 | 801.34 | |
| OTHER ITEM FEES | 598 | 0.10000 | 59.80 | |
| | | | | |
| **AUTHS & AVS** | | | | |
| CPU GTWY | 338 | 0.2500 | 84.50 | |
| POS AUTHS | 1 | 0.2500 | 0.25 | |
| ECI CPU-G | 315 | 0.2500 | 78.75 | |
| AVS CPU-G | 338 | 0.2000 | 67.60 | |
| AVS POS | 1 | 0.2000 | 0.20 | |
| AVS ECIC-G | 313 | 0.2000 | 62.60 | |
| INTERCHANGE | | | 849.14 | |
| ACQR PROCESSOR FEES | 654 | 0.01950 | 12.75 | |
| FIXED NETWORK CNP FEE | 2 | | 80.00 | |
| BIN ICA FEE | | | 0.59 | |
| CR DUES AND ASSESS | 40,268.26 | 0.00140 | 56.38 | |
| FILE TRANSMISSION FEE | | | 11.79 | |
| TOTAL | | | | 2,165.69 |
| | | | | |
| **VS OFLN DB** | | | | |
| DISC 1 | 451,978 | 0.01990 | 8,994.37 | |
| OTHER ITEM FEES | 5,946 | 0.10000 | 594.60 | |
| | | | | |
| **AUTHS & AVS** | | | | |
| CPU GTWY | 3,691 | 0.2500 | 922.75 | |
| POS AUTHS | 10 | 0.2500 | 2.50 | |
| ECI CPU-G | 3,256 | 0.2500 | 814.00 | |
| ECI DIAL | 3 | 0.2500 | 0.75 | |
| AVS CPU-G | 3,690 | 0.2000 | 738.00 | |
| AVS POS | 10 | 0.2000 | 2.00 | |
| AVS ECIC-G | 3,247 | 0.2000 | 649.40 | |
| AVS ECIDIL | 3 | 0.2000 | 0.60 | |
| INTERCHANGE | | | 3,682.09 | |
| ACQ ISA FEE | 1,637.00 | 0.01000 | 16.38 | |
| ACQR PROCESSOR FEES | 6,960 | 0.01550 | 107.88 | |
| INTERNTL ACQUIRER FEE | 1,637.00 | 0.00450 | 7.37 | |
| TRAN INTEGRITY FEE | 1 | 0.10000 | 0.10 | |
| BIN ICA FEE | | | 5.93 | |
| ACQ DATA PROC RTN D | | | 0.14 | |
| DB DUES AND ASSESS | 451,978.17 | 0.00130 | 587.57 | |
| INTRNTL ACQ PROC FEE DB | | | 0.26 | |
| TOTAL | | | | 17,126.69 |
| | | | | |
| **DCVR ACQ** | | | | |
| DISC 1 | 6,525 | 0.01990 | 129.84 | |
| OTHER ITEM FEES | 93 | 0.10000 | 9.30 | |
| | | | | |
| **AUTHS & AVS** | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 5345 | 0001 | CC01 | 001 | 07 | 20190930 | Page 3 of 5 | 1428 | 0100 | U1D | 119349 |

EXHIBIT 32
Page 153

NATIONAL MERCHANT CENTER
5101      6333
MONTH ENDING 09/30/2019
Page 4

## SUMMARY OF CARD FEES

| | | | |
|---|---|---|---|
| CPU GTWY | 49 | 0.2500 | 12.25 |
| POS AUTHS | 1 | 0.2500 | 0.25 |
| ECI CPU-G | 51 | 0.2500 | 12.75 |
| AVS CPU-G | 49 | 0.2000 | 9.80 |
| AVS POS | 1 | 0.2000 | 0.20 |
| AVS ECIC-G | 51 | 0.2000 | 10.20 |
| INTERCHANGE | | | 137.68 |
| DSCV DATA USAGE FEE | 93 | 0.01950 | 1.81 |
| DISC NETWORK AUTH FEE | 101 | 0.00250 | 0.25 |
| TOTAL | | | 324.33 |
| TOTAL CARD FEES | | | 28,636.61 |

## SUMMARY OF MISCELLANEOUS FEES

| | | | | |
|---|---|---|---|---|
| TOTAL CARD FEES | | | | 28,636.61 |
| BATCH HEADER | 20 | | 0.3000 | 6.00 |
| RETURNS | 17 | AT | 0.2500 | 4.25 |
| CHARGEBACKS | 5 | AT | 35.000 | 175.00 |
| SERVICE FEE | | | | 20.00 |
| REGULATORY FEE | | | | 4.95 |
| COMPLIANCE FEE | | | | 3.96 |
| WEB G2 MO MONITOR | | | | 250.00 |
| LESS AMOUNT PAID BY CHAIN | | | | 29,100.77 |
| | | | | |
| TOTAL CHARGES | | | | 0.00 |

## SUMMARY OF MONETARY BATCHES

### BATCHES

| GROSS | R&C | NET | DATE | REF |
|---|---|---|---|---|
| 1.65 | 0.00 | 1.65 | 09/10 | 98025311114 |
| 4,876.25 | 0.00 | 4,876.25 | 09/13 | 98025641706 |
| 8,395.00 | 0.00 | 8,395.00 | 09/16 | 98025941610 |
| 311.25 | 0.00 | 311.25 | 09/16 | 98025911100 |
| 42.00 - | 0.00 | 42.00 - | 09/18 | 092419MOADJ |
| 38,557.01 | 0.00 | 38,557.01 | 09/18 | 98026111089 |
| 249.00 - | 0.00 | 249.00 - | 09/20 | 092519MOADJ |
| 207.50 - | 0.00 | 207.50 - | 09/20 | 092919MOADJ |
| 42.00 - | 0.00 | 42.00 - | 09/20 | 092919MOADJ |
| 249.00 - | 0.00 | 249.00 - | 09/20 | 092919MOADJ |
| 2,758.50 | 0.00 | 2,758.50 | 09/20 | 98026341679 |
| 72,008.71 | 0.00 | 72,008.71 | 09/20 | 98026311093 |
| 22.00 | 0.00 | 22.00 | 09/22 | 98026511033 |
| 506.00 | 0.00 | 506.00 | 09/23 | 98026641650 |
| 73,421.50 | 0.00 | 73,421.50 | 09/23 | 98026611099 |
| 57,882.00 | 0.00 | 57,882.00 | 09/24 | 98026711088 |
| 32,586.25 | 0.00 | 32,586.25 | 09/25 | 98026841649 |
| 71,347.74 | 0.00 | 71,347.74 | 09/26 | 98026941684 |
| 57,325.29 | 0.00 | 57,325.29 | 09/26 | 98026941685 |
| 81,434.76 | 0.00 | 81,434.76 | 09/27 | 98027041684 |
| 24,334.25 | 0.00 | 24,334.25 | 09/27 | 98027041685 |
| 33,212.25 | 0.00 | 33,212.25 | 09/29 | 98027241819 |
| 73,942.23 | 0.00 | 73,942.23 | 09/29 | 98027241820 |
| 45,180.71 | 0.00 | 45,180.71 | 09/29 | 98027211028 |
| 24,343.50 | 0.00 | 24,343.50 | 09/30 | 98027341659 |

EXHIBIT 32
Page 154

NATIONAL MERCHANT CENTER
5101████████6333
MONTH ENDING 09/30/2019
Page 5

## SUMMARY OF DAILY DEPOSITS
## ALL CARD TYPES

| DATE | SALES CHRGBK/ADJ COUNT | SALES CHRGBK/ADJ AMOUNT | RETURNS EXCL ADJ COUNT | RETURNS EXCL ADJ AMOUNT | DAILY TOTAL |
|---|---|---|---|---|---|
| 09/10 | 1 | 1.65 | 0 | 0.00 | |
| | 0 | 0.00 | 0 | 0.00 | 1.65 |
| 09/13 | 20 | 4,876.25 | 0 | 0.00 | |
| | 0 | 0.00 | 0 | 0.00 | 4,876.25 |
| 09/16 | 37 | 8,913.75 | 1 | 207.50 | |
| | 0 | 0.00 | 0 | 0.00 | 8,706.25 |
| 09/18 | 609 | 38,557.01 | 0 | 0.00 | |
| | 0 | 0.00 | 0 | 0.00 | 38,557.01 |
| 09/20 | 729 | 74,767.21 | 0 | 0.00 | |
| | 0 | 0.00 | 0 | 0.00 | 74,767.21 |
| 09/22 | 1 | 22.00 | 0 | 0.00 | |
| | 0 | 0.00 | 0 | 0.00 | 22.00 |
| 09/23 | 744 | 74,198.50 | 2 | 271.00 | |
| | 0 | 0.00 | 0 | 0.00 | 73,927.50 |
| 09/24 | 600 | 57,882.00 | 0 | 0.00 | |
| | 0 | 0.00 | 1 - | 42.00 - | 57,840.00 |
| 09/25 | 993 | 33,582.75 | 5 | 996.50 | |
| | 0 | 0.00 | 1 - | 249.00 - | 32,337.25 |
| 09/26 | 1494 | 128,673.03 | 0 | 0.00 | |
| | 0 | 0.00 | 0 | 0.00 | 128,673.03 |
| 09/27 | 1217 | 106,662.51 | 5 | 893.50 | |
| | 0 | 0.00 | 0 | 0.00 | 105,769.01 |
| 09/29 | 2495 | 153,070.69 | 4 | 735.50 | |
| | 0 | 0.00 | 3 - | 498.50 - | 151,836.69 |
| 09/30 | 291 | 24,343.50 | 0 | 0.00 | |
| | 0 | 0.00 | 0 | 0.00 | 24,343.50 |

## TAX GROSS REPORTABLE SALES BY TIN

| MONTH | DESCRIPTION | | TOTAL |
|---|---|---|---|
| SEP | Gross Reportable Sales - TIN # | 0057 | $705,550.85 |
| | **2019 YTD GROSS REPORTABLE SALES** | | **$705,556.85** |

TAX GROSS REPORTABLE SALES: Per IRC 6050W, the total dollar amount of aggregate reportable payment card and third party

network transactions for each participating payee, without regard to any adjustments for credits, cash equivalents, discount amounts,

fees, refunded amounts, or any other amounts per respective tax identification number.

## BACKUP WITHHOLDING

| MONTH | ENTITY | AMOUNT WITHHELD |
|---|---|---|
| SEP | FED | $0.00 |
| YTD | FED | $0.00 |

LAST PAGE OF THIS STATEMENT

EXHIBIT 32
Page 155

NATIONAL MERCHANT CENTER
2955 E MAIN STE 100
IRVINE, CA
926124

1428   0100   1100   01
MERCHANT NUMBER   5101        6481

MERCHANT STATEMENT
SUMMARY OF BANKCARD DEPOSITS
MONTH ENDING 09/30/2019

CHAIN 06515

KENNY
TAS 2019 LLC
30 N GOULD STE R
SHERIDAN WY 82801

119291      07

TRUSTED ACCOUNT SERVICES EAST

NORTH TUSTIN CA 92705-3252

..l..l..llllll...lllll.l.l..llllll...ll...l..l....l..l

CUSTOMER SERVICE TEL #: 800-662-8448

!ATTENTION!

EFFECTIVE NOVEMBER 2019, THE STAR MERCHANT LOCATION FEE WILL INCREASE FROM
$12.00 TO $16.00. AS A RESULT OF THIS FEE AND OUR OWN PRICING CONSIDERATION,
YOU WILL BE ASSESSED A STAR ANNUAL FEE IN THE AMOUNT OF $18.00. THIS FEE IS
ASSESSED PER PARTICIPATING LOCATION OR WEBSITE THAT IS ENABLED WITH AND/OR
ACCEPTS STAR TRANSACTIONS AND COVERS AN ANNUAL PERIOD BEGINNING JUNE 1 OF
EACH YEAR. THIS FEE WILL APPEAR ON YOUR NOVEMBER MONTH-END STATEMENT.
CONTINUING YOUR MERCHANT ACCOUNT WITH US OR USE OF YOUR MERCHANT ACCOUNT AFTER
THE EFFECTIVE DATE WILL CONSTITUTE YOUR ACCEPTANCE TO THESE TERMS.

| TOTAL CHARGE TO YOUR ACCOUNT IS | | | | 0.00 |
|---|---|---|---|---|

### SUMMARY OF CARD FEES

| | | | | |
|---|---|---|---|---|
| MASTERCARD | | | | |
| DISC 1 | | 0.01990 | | |
| AUTHS & AVS | | | | |
| CPU GTWY | 2 | 0.2500 | 0.50 | |
| TOTAL | | | | 0.50 |
| AMEXCT043 | | | | |
| DISC 1 | | 0.01990 | | |
| AUTHS & AVS | | | | |
| CPU GTWY | 2 | 0.2500 | 0.50 | |
| AVS CPU-G | 2 | 0.2000 | 0.40 | |
| TOTAL | | | | 0.90 |
| VS OFLN DB | | | | |
| DISC 1 | | 0.01990 | | |
| AUTHS & AVS | | | | |
| CPU GTWY | 1 | 0.2500 | 0.25 | |
| AVS CPU-G | 1 | 0.2000 | 0.20 | |
| ACQR PROCESSOR FEES | 1 | 0.01550 | 0.02 | |
| TOTAL | | | | 0.47 |
| TOTAL CARD FEES | | | | 1.87 |

### SUMMARY OF MISCELLANEOUS FEES

| | |
|---|---|
| TOTAL CARD FEES | 1.87 |
| MIN. MONTHLY FEE | 28.15 |
| SERVICE FEE | 20.00 |
| REGULATORY FEE | 4.95 |
| COMPLIANCE FEE | 3.96 |
| WEB G2 MO MONITOR | 250.00 |
| EIDS-DISPUTE-TOOL | 50.00 |
| LESS AMOUNT PAID BY CHAIN | 358.93 |
| **TOTAL CHARGES** | 0.00 |

| 5345 | 0001 | CC01 | 001 | 07 | 20190930 | Page 1 of 1 | | 1428 | 0100 | U1D | 119291 |
|---|---|---|---|---|---|---|---|---|---|---|---|

EXHIBIT 32
Page 156

# EXHIBIT 33

| From: | Jimmy Lai |
|---|---|
| To: | Tom Nguyen |
| Subject: | FW: Trusted Account Services Merchant Statements for September 2019 |
| Date: | Monday, October 07, 2019 2:16:41 PM |
| Attachments: | Trusted Account Services Maint Sept 2019 MID 51015901106085.pdf |
| | Trusted Account Services West Sept 2019 MID 510159011106549.pdf |
| | Trusted Account Services Sept 2019 MID 510159011106333.pdf |
| | Trusted Account Services East Sept 2019 MID 510159011106481.pdf |

See attached for NMC version of merchant stmts

**From:** John F. Thompson <jfthompson@NationalMerchant.com>
**Sent:** Monday, October 7, 2019 2:09 PM
**To:** Jimmy Lai <jimmy.lai@swiftpaymentsinc.com>
**Cc:** Jimmy Lai <jimmy.lai@nationalmerchant.com>
**Subject:** Trusted Account Services Merchant Statements for September 2019

Trusted Account Services Merchant Statements for September 2019

### John Thompson
Associate Director of
Risk & Underwriting



office: 949. 419. 8400 x 1110
toll      800. 662. 8448
free:    949. 861. 6201
          jfthompson@nationalmerchant.com
fax:
email:

*The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the addressee. If the person actually receiving this communication or any other reader of the communication is not the named recipient, or the employee or agent responsible to deliver it to the recipient, any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by return e-mail, and destroy this communication and all copies thereof, including all attachments.*

***Go Green!*** Please, consider the environment before printing this email.



EXHIBIT 33
Page 157

EXHIBIT 34

PSLC-315038540

Here's an example of a guy who already did the work and had already enrolled himself into a REPAYE at $0.00 with 11-month credit to his term length

This typically results in:

1. Full Refund (lost all the money paid out towards labor, commissions (processor and SLA),

2. Lost time and energy of our SLA, Processor and CSR reps on outbound and inbound calls,

3. Lost time of our billing department (Issuing refunds) (maybe having to issue checks) (chargebacks)

4. Potential for complaints with BBB, FTC, word of mouth

5. Potential for management involvement because the client feels he was misled to believe he was going into an entirely separate program

Or instead we catch it up front explain what's going on properly and let him know we'd be happy to do the re certification for him so he doesn't have to worry about it and if there are any new programs or better options we would reach out to him. We can charge him $42.00 monthly for recertification and peace of mind knowing he's with a company that let him know what's going on and that he can trust.

This could result in:

1. Long term Happy Client

2. Decreased efforts and labor costs for all departments

3. Word of mouth referrals

4. Potential for positive reviews

I am certain this has been discussed previously and I'm not trying to reinvent the wheel here however I wanted to address selling "Refi'd IDR" or "Re-Calculated IDR" as a discounted option for clients that come in already enrolled into an Income Driven Repayment.

These clients are getting sold the same way as clients that have 10+ trade lines that need to be manually consolidated and enrolled into a PSLF.

That is quite a bit more work and of course for the client we are really doing very little. When a client is sold on consolidation of their loans and enrollment into a loan forgiveness program and they realize all we did is what they did before, but we charged them almost $1,300.00 to do it, they immediately feel scammed.

EXHIBIT 34
Page 158

If enrollment Agents can see on the front end that a client is already in a REPAYE paying $50.00 a month we can still sell them on lowering their monthly payment and processing of paperwork but to set their expectations out of the ballpark just equates to more time wasted, refunds, and disappointment as well as increasing disgruntled clients that will believe that we were trying to SCAM them.

Why not sell a Refinanced IDR for a fraction of the cost and potentially keep the client?

Consolidation and enrollment is $1245.00 ($249.00(5)

Refinance of IDR is $498.00($249.00(2) + RECERT or $747.00(249.(3) +RECERT

**Enrolled Debts**
# ENROLLED (16)    CURRENT $34,121.00    AVERAGE $34,121.00

| Creditor | Account # | Current | Whose Debt | Current Payment | New Payment | Type | Status Date | |
|---|---|---|---|---|---|---|---|---|
| DIRECT CONSOLIDATED UNSUBSIDIZED DEPT OF EDINELMET | | $14,463.00 | Applicant | $0.00 | $0.00 | Student Loan | 01/14/2019 | |
| DIRECT CONSOLIDATED UNSUBSIDIZED SCHOOL CODE FOR CONSOLIDATION LOANS 06/08/2018 IN REPAYMENT POST-REVISED PAY AS YOU EARN ALTERNATIVE PLAN | | | | | | | | |
| DIRECT CONSOLIDATED SUBSIDIZED DEPT OF EDINELMET | | $19,658.00 | Applicant | $0.00 | $0.00 | Student Loan | 01/14/2019 | |
| DIRECT CONSOLIDATED SUBSIDIZED SCHOOL CODE FOR CONSOLIDATION LOANS 06/08/2018 IN REPAYMENT POST-REVISED PAY AS YOU EARN ALTERNATIVE PLAN | | | | | | | | |

EXHIBIT 34
Page 159

# EXHIBIT 35

| | |
|---|---|
| **From:** | Tom Nguyen <tom@slaccountmgmt.com> |
| **Sent:** | Tuesday, April 16, 2019 10:00 PM |
| **To:** | Joseph Boylan; Calvin Ho; Advisor; Kaine Wen |
| **Subject:** | Sales Call Audit |
| **Attachments:** | sales call audit.xlsx |

Hello Joseph,

Please relisten to the calls I highlighted in red. **All fake FS.** Please let me know if I made a mistake in any of them. However I am pretty thorough in listening for the FS. I did my audit by listening to clients that has a FS of 4 or higher. These clients were enrolled on 4/15/19.
Only 4 passed for FS out of the 10 I listened to. **So 6 failed.** Please write up the salesman, and let them know this can't be happening moving forward. See my notes and let me know if you have any questions. Please think of a plan where this wont occur at such a high rate moving forward also. Thank you.


Regards,

Tom

EXHIBIT 35
Page 160

EXHIBIT 36

Sales Commission Calculator

| Commission Percentage | Total Sales | | Total Commissions Paid |
|---|---|---|---|
| 18.0% | $1245 Enrollment Fee X 18% = $224 Per Deal / 5 Payments = $45 Per Payment | | |
| Salesperson | Total Sales Per Payment | Comm Per Week | Comm Per Month (4.2 Weeks) |
| Month #1 | 7 First Pays Cleared  X  $45  Per Payment | $315.00 | $1,323.00 |
| Month # 2 | 7 (1st)  + 7  (2nd)  =  14 X  $45 Per Payment | $630.00 | $2,646.00 |
| Month # 3 | 7 (1st) + 7 (2nd) + 7 (3rd) = 21 X $45 Per Payment | $945.00 | $3,969.00 |
| Month # 4 | 7 (1st) + 7 (2nd) + 7 (3rd) + 7 (4th) = 28 X $45 Per Payment | $1,260.00 | $5,292.00 |
| Month # 5 | 7 (1st) + 7 (2nd) + 7 (3rd) + 7 (4th) + 7(5th) = 35 X $45 Per Payment | $1,575.00 | $6,615.00 |
| Total | | | $19,845.00 |

| Commission Percentage | Total Sales | | Total Commissions Paid |
|---|---|---|---|
| 20.0% | $1245 Enrollment Fee X 20% = $249 Per Deal / 5 Payments = $50 Per Payment | | |
| Salesperson | Total X $45 Per Payment | Comm Per Week | Comm Per Month (4.2 Weeks) |
| Month #1 | 7 First Pays Cleared  X  $50  Per Payment | $350.00 | $1,470.00 |
| Month # 2 | 7 First Pays  + 7  Second Pays =  14 X  $50 Per Payment | $700.00 | $2,940.00 |
| Month # 3 | 7 (1st) + 7 (2nd) + 7 (3rd) = 21 X $50 Per Payment | $1,050.00 | $4,410.00 |
| Month # 4 | 7 (1st) + 7 (2nd) + 7 (3rd) + 7 (4th) = 28 X $50 Per Payment | $1,400.00 | $5,880.00 |
| Month # 5 | 7 (1st) + 7 (2nd) + 7 (3rd) + 7 (4th) + 7(5th) = 35 X $50 Per Payment | $1,750.00 | $7,350.00 |
| Total | | | $22,050.00 |

| Commission Percentage | Total Sales | | Total Commissions Paid |
|---|---|---|---|
| 22.0% | $1245 Enrollment Fee X 22% = $274 Per Deal / 5 Payments = $55 Per Payment | | |
| Salesperson | Total X $45 Per Payment | Comm Per Week | Comm Per Month (4.2 Weeks) |
| Month #1 | 7 First Pays Cleared  X  $55  Per Payment | $385.00 | $1,617.00 |
| Month # 2 | 7 First Pays  + 7  Second Pays =  14 X  $55 Per Payment | $770.00 | $3,234.00 |
| Month # 3 | 7 (1st) + 7 (2nd) + 7 (3rd) = 21 X $55 Per Payment | $1,155.00 | $4,851.00 |
| Month # 4 | 7 (1st) + 7 (2nd) + 7 (3rd) + 7 (4th) = 28 X $55 Per Payment | $1,540.00 | $6,468.00 |
| Month # 5 | 7 (1st) + 7 (2nd) + 7 (3rd) + 7 (4th) + 7(5th) = 35 X $55 Per Payment | $1,925.00 | $8,085.00 |
| Total | | | $24,255.00 |

EXHIBIT 36
Page 161

# SAME DAYS & ENROLLMENTS

## A same day a day keeps the cancels away so slay those same days !!!!!

Fact if you get a same day and proof of income at the end of call, processing can start on the file right away, that way if the client does cancel and we have already begun the work there is less of a chance of the client receiving a refund. This is called "Work Rendered."

EXHIBIT 36
Page 162



# Same Day Pitch

**➥ SD Pitch #1:**

➥ Since we are dealing with interest rates and loan amounts **your first payment will be scheduled for today so we can lock in your rate** and begin processing your file. The Government is very strict with this. We must receive your first payment before they will start processing anything.

➥ Now next month we can select any day of the month you would like Which day <u>NEXT</u> month works best for you?

➥ Ok great, just confirming one more time **your first payment of $249/$207 will be drafted today.**

**➥ SD Pitch #2:**

➥ Since we are enrolling you into the program today, obviously the system will be setting your first payment for today.

➥ Next month we can select any date that falls within 30 days from today, which date works best for you <u>next</u> month?

➥ Ok great, just confirming one more time **your first payment of $249/$207 will be drafted today.**

EXHIBIT 36
Page 163

# What <u>to</u> Say:

➤ <u>Ask questions to uncover "PAIN POINTS"</u>
>  ➤ "How much is Navient asking for on a monthly basis? Can you reasonably afford that payment?"
>  ➤ How have these loan affected your credit? '

➤ <u>Identify Client's WHY and offer SOLUTION</u>
>  ➤ Huge Payments? Target pitch on **LOW, AFFORDABLE payments**
>  ➤ Huge Debt she'll never get out of? Target pitch on the **MAXIMUM amount of FORGIVENESS**
>  ➤ In default and trying to restore credit?  Target pitch on **getting credit score back on track**
>  ➤ **PEACE OF MIND** – "You're in the right place".  We fight to get the maximum benefit awarded under federal guidelines

**KNOW YOUR AUDIENCE** – **ONLY** solve the problems that matter/exist to client

EXHIBIT 36
Page 164

## Enrollment Fees

➡ $1,245 – $9,000+ in loans required ($5,000 if defaulted)

➡ $1,395 – $25,000+ in loans required

➡ $1,545 - $50,000+ in loans required

EXHIBIT 36
Page 165

# $1,245 Enrollment Fee Rep's Revenue

| Fee Break-down | 1 pay | 2 pay | 3 pay | 4 pay | 5 pay | 6 pay |
|---|---|---|---|---|---|---|
|  | $1145.00 | $622.50 | $415.00 | $311.25 | $249.00 | $207.50 |
| 18% | $206.10 | $112.05 | $74.70 | $56.03 | $44.82 | $37.35 |
| 20% | $229.00 | $124.50 | $83.00 | $62.25 | $49.80 | $41.50 |
| 22% | $251.90 | $136.95 | $91.30 | $68.48 | $54.78 | $45.65 |

EXHIBIT 36
Page 166

# $1,395 Enrollment Fee
## Rep's Revenue

| Fee Break-down | 1 pay | 2 pay | 3 pay | 4 pay | 5 pay | 6 pay |
|---|---|---|---|---|---|---|
| | $1,295.00 | $697.50 | $465.00 | $348.75 | $279.00 | $232.50 |
| 18% | $233.10 | $125.55 | $83.70 | $62.78 | $50.22 | $41.85 |
| 20% | $259.00 | $139.50 | $93.00 | $69.75 | $55.80 | $46.50 |
| 22% | $284.90 | $153.45 | $102.30 | $76.73 | $61.38 | $51.15 |

EXHIBIT 36
Page 167

# $1,545 Enrollment Fee
## Rep's Revenue

| Fee Break-down | 1 pay | 2 pay | 3  pay | 4 pay | 5 pay | 6 pay |
|---|---|---|---|---|---|---|
|  | $1,445.00 | $722.50 | $515.00 | $386.25 | $309.00 | $257.50 |
| 18% | $206.10 | $139.05 | $92.70 | $69.53 | $55.62 | $46.35 |
| 20% | $289.00 | $154.50 | $103.00 | $77.30 | $61.80 | $51.50 |
| 22% | $317.90 | $169.95 | $113.30 | $84.98 | $67.98 | $56.65 |

EXHIBIT 36
Page 168

If you are at 18% and you follow this simple key each week you will always exceed your hourly wages and receive, your commission.

| $1,245 Enrollment at 18% | | $1,395 Enrollment at 18% | | $1,545 Enrollment at 18% | |
|---|---|---|---|---|---|
| 1 Full pay 1145 = | $206.10 | 1 Full pay 1295 = | $233.10 | 1 full pay 1445 = | $206.10 |
| 1 Two pay = | $112.05 | 1 Two pay = | $125.50 | 1 two pay = | $139.05 |
| 1 Three pay = | $74.70 | 1 Three pay = | $83.70 | 1 three pay = | $92.70 |
| 1 Four pay = | $56.03 | 1 Four pay = | $62.78 | 1 Four pay = | $69.53 |
| 6 Five pay= | $268.92 | 6 Five pay = | $301.32 | 6 Five pay = | $333.72 |
| Total : | $717.80 | Total : | $806.45 | Total | $895.10 |

* One full pay each week will make up for two cancels and will still give you commission
* One Two pay each week will make up for one cancel and will still give you commission

EXHIBIT 36
Page 169

If you are at 20% and you follow this simple key each week you will always exceed your hourly wages and receive, your commission.

| $1,245 Enrollment at 20% | | $1.395 Enrollment at 20% | | $1,545 Enrollment at 20% | |
|---|---|---|---|---|---|
| 1 Full pay 1145 = | $ 229.60 | 1 Full pay1245 = | $259.00 | 1 full pay 1445 = | $289.00 |
| 1 Two pay = | $ 124.50 | 1 Two pay= | $139.50 | 1 two pay = | $154.50 |
| 1 Three pay = | $ 83.00 | 1 Three pay = | $ 93.00 | 1 three pay = | $103.00 |
| 1 Four pay = | $ 62.25 | 1 Four pay = | $ 69.75 | 1 Four pay = | $77.30 |
| 6 Five pay= | $ 298.80 | 6 Five pay = | $ 334.80 | 6 Five pay = | $370.80 |
| Total : | $797.55 | Total : | $896.05 | Total | $994.60 |

* One full pay each week will make up for two cancels and will still give you commission

* One Two pay each week will make up for one cancel and will still give you commission

EXHIBIT 36
Page 170

**If you are at 22% and you follow this simple key each week you will always exceed your hourly wages and receive, your commission.**

| $1,245 Enrollment at 22% | | $1,395 Enrollment at 22% | | $1,545 Enrollment at 22% | |
|---|---|---|---|---|---|
| 1 Full pay 1145 = | $ 251.90 | 1 Full pay1245 = | $284.90 | 1 full pay 1445 = | $317.90 |
| 1 Two pay = | $ 136.95 | 1 Two pay= | $153.45 | 1 two pay = | $169.95 |
| 1 Three pay = | $ 91.30 | 1 Three pay= | $ 102.30 | 1 three pay = | $113.30 |
| 1 Four pay = | $ 63.48 | 1 Four pay = | $ 76.73 | 1 Four pay = | $84.98 |
| 6 Five pay= | $ 328.68 | 6 Five pay = | $ 334.80 | 6 Five pay = | $407.88 |
| Total : | $872.31 | Total : | $985.66 | Total | $1,094.01 |

* One full pay each week will make up for two cancels and will still give you commission
* One Two pay each week will make up for one cancel and will still give you commission

EXHIBIT 36
Page 171



# The Goal: To make the weekly commission EXCEED your hourly

12.00 x 40hrs = $480.00

- To achieve this goal you want to make sure that you schedule payments on the same day each month
- Keep track of all payments on your commission tracker
- One Full pay a week
- Submit one same day daily
- Be top 15 on the leader board

EXHIBIT 36
Page 172



22 % commission – Ranking 1-15 (Top Reps)
20 % commission – Ranking 16-40
18 % commission – Ranking 41- and bellow

EXHIBIT 36
Page 173



**FPS Pay Structure and Bonuses:**

1. 5 Submissions = **$50.00**
   a. Files must be created AND approved the same day (5 payment plan)
2. Employee referrals = **$300.00**
   a. Received after referral's 30th day of employment
   b. No limit on number of referrals
3. 10 Deals in a Day = **$300.00**
   a. Files must be created AND approved in the same day (5 payment plan)

4. Monthly Bonus
   a. Most net doc prep payments in a calendar month (point system)

1st = **$1,000**, 2nd = **$750**, 3rd = **$750**, 4th = **$500**, 5th = **$500**, 6th = **$400**, 7th = **$400**, 8th = **$350**, 9th = **$350**

**Pay Raise:**

- Raise = $125 per deal, plus recertification fee (either $22/$32/$42, depending on loan type/size) moving forward
- To qualify: must have **80 net cleared** in a **consecutive two-month period (8 weeks)**

**Quota:**

Minimum of **10** cleared each week

Minimum of **10** scheduled for the following week

**Submissions vs. Cleared**

**Submission** – The application from the client has been completed and filled out.

   Ex: Personal information such as date of birth, address, phone number, and credit card info. In addition, the client has signed all documents and has agreed to the compliance call.

**Cleared** – First payment has been made and cleared. The submission is now considered *cleared.*

   Ex: You submitted the application on Monday the 11th, and the 1st payment is scheduled for Wednesday the 13th. The submission turns into a cleared deal on Wednesday the 13th once payment has cleared.

EXHIBIT 36
Page 174

EXHIBIT 37

*PAY STRUCTURE & BONUS*

| Total Enrollments | Total Payout |
|---|---|
| 1 | 480 |
| 2 | 480 |
| 3 | 480 |
| 4 | 480 |
| 5 | 540 |
| 6 | 600 |
| 7 | 700 |
| 8 | 800 |
| 9 | 900 |
| 10 | 1000 |
| 11 | 1125 |
| 12 | 1250 |
| 13 | 1400 |
| 14 | 1550 |
| 15 | 1700 |

*Additional Bonus specialist can earn each week added to their paycheck*

*Full pop cleared payment = **$100.00***

*5 Enrollments in a day = **$75.00***

*3 Enrollments in a day = **$25.00***

*2 Enrollments in a day = **$15.00***

1. ***Company fee:*** Initial Fee of $1,705, and $41 for Recert Fee, Specialists can only split the payments to 7 or 8 payments once a day. Ultron will check and kick back the file if it catches Specialists who attempted Second Enrollment with 7 or 8 payments.

***\*\*NO BACKOUTS'' \*\*NO CHARGEBACKS\*\* \*\*KEEP YOUR MONEY\*\****
*(Even if client cancels and refunds you will not be reversed commission)*

EXHIBIT 37
Page 175

Case 19-10655-JKO    Doc 148    Filed 11/04/19    Page 423 of 478

Case 8:19-cv-01998-JVS-JDE   Document 75-3   Filed 11/01/19   Page 36 of 91   Page ID #:4311

# Bonus Incentives



Quarterly Raffle!

Possible Prizes

MacBook Air

Air Pods

Xbox One

PlayStation 4

Portable Speakers

Movie Tickets

**Suggestions for Prizes Welcome**

# How to earn raffle tickets:

- Top 5 Highest Daily Inbound Connection Rate= 1 Ticket
- Top 3 Highest Monthly Talk Times= 1 Ticket
- Top 3 Highest Monthly Calls= 1Ticket
- Top 3 Highest Monthly Connection= 1 Ticket
- Perfect Weekly Attendance, No Late Days= 5 Tickets

EXHIBIT 37
Page 176

For payroll period of 10/13/2019 – 10/19/2019 and moving forward until further notice, Student Loan Specialist will have the following pay structure:

0-1 Enrollment: Minimum wage of $12

2-4 Enrollments: $15/hour

More than 5 enrollments: Subsidized Pay.

This Pay model will NOT be based on the hours they worked.

Example 1, Specialist A does not go to work for the whole week on the above week, and has 0 Enrollment. That specialist A will get pay $12/hour

Example 2, Specialist B worked 12 hours, and had 4 enrollments on the above week. Specialist B will get pay $15/hour Example 3,

Specialist C worked 30 hours, and had 6 enrollments on the above week. Specialist C will get Subsidized Pay.

SSP Team Manager's Pay Structure:

Team Managers will be guaranteed $34.85 an hour. ($34.85x however many hours they work for the week= total gross pay.) unless they are able to achieve the incentive based model pay structure.

In order for a Team Managers to receive their incentive based pay, all student loan specialists on their team must also have received their incentive based model pay. If a manager is able to have ALL student loan specialists achieve their incentive based pay then they will also receive their current average incentive based hourly rate.

Please review and let me know if you have any questions for this week. For the next pay period, Management will decide on this before the next pay period starts.

- All specialists are set at 12 billable calls in order to receive more must have at least 1 submitted
- Minimum standards will be enforced this week - 1 submitted per day or write up will be issued
- Specialist need to trust the process and pull servicer logins after getting References

EXHIBIT 37
Page 177

Date: _____

Sales Advisor (print): _____

(If applicable)

How long does advisor have to achieve or exceed the requirements?

**Correction period ___/_____ - ____/___/2019**

# *Failure to reach minimum sales requirements two weeks in a row is grounds for disciplinary action, <u>up to and including termination</u>

## Verification of Review

*By signing this form, you confirm that you have discussed this review in detail with your supervisor.*

| | | | |
|---|---|---|---|
| Employee Signature | | Date | |
| Manager's Name | | | |
| Manager Signature | | Date | |

EXHIBIT 37
Page 178

Date: _____

Sales Advisor (print): _____

**<u>Last week, minimum sales requirements met</u>?**     **YES or NO**

If No, Explain. Note any additional training/support provided:

**<u>Sales Requirements This Week:</u>**          **Met / Exceeded?**

**$600+ Revenue?**                    **YES or NO**

**20%+ Closing Ratio?**               **YES or NO**

**10 Deals scheduled this week and next week?**   **YES or NO**

**3 Same Day Pays per week?**         **YES or NO**

**2+ Deals submitted every day?**     **YES or NO**

**60% Retention Rate?**               **YES or NO**

**25 Hrs+ Talk Time**                 **YES or NO**

**Circle One:**

**Under Req's          Meeting Req's          Exceeding Req's**

Substandard performance previously addressed w/ Manager?

When and how?

Which requirement(s) is advisor failing to achieve and why? (or exceeding)

EXHIBIT 37
Page 179

# EXHIBIT 38



BACK TO THE SCRIPT / CLOSE

GO AHEAD WHEN YOU'RE READY

**DOES THAT MAKE SENSE?**

**REBUTTAL**

*1-3 Sentences MAX

*Common Sense

*Stay Neutral

*Smooth Transition

**OBJECTION**

"Great Question"

"We get that all the time"

"I'm Glad you asked"

**HARD CLOSE:**

**EVERY SINGLE CALL WITHOUT EXCEPTION**

CALL BACK REBUTTALS LISTED BELOW:

- **Physically cannot hold your file open**
- **I'll have to cancel your application out at this time**
- **The government is very strict, we can finish your application now or you can try again next year - IF it is still available**
- **Without a card/documents completed, I'll have to cancel out your application and give your seat to the next caller**
- **Unfortunately, the system does not allow me to keep your application open. I'm going to have to give your seat & benefits to the next person that qualifies as there is limited seating in these programs**

**\*STAY NEUTRAL \* ASSUME THE CLOSE \* NO CALLBACKS EVER\***

EXHIBIT 38
Page 180

## Same Day Pitch

### SD Pitch #1:

Since we are dealing with interest rates and loan amounts **your first payment will be scheduled for today so we can lock in your rate** and begin processing your file.  The Government is very strict with this. We must receive your first payment before they will start processing anything.

Now next month we can select any day of the month you would like, or if you need a buffer between your first two payments, we can push it out 45 days for you.

Which day <u>NEXT</u> month works best for you?

Ok great, just confirming one more time **your first payment of $249/$207 will be drafted today.**


### SD Pitch #2:

Since we are enrolling you into the program today, obviously the system will be setting your first payment for today.

Next month we can select any date that falls within 45 days from today, which date works best for you <u>next</u> month?

Ok great, just confirming one more time **your first payment of $249/$207 will be drafted today.**

EXHIBIT 38
Page 181

EXHIBIT 39

**Isabel Banda**

---

**Subject:**                    FW: Name Change Reminder

**From:** Isabel Banda <hr@slaccountmgmt.com>
**Sent:** Wednesday, February 6, 2019 4:16 PM
**Subject:** Name Change Reminder

Hello Team,

As you all know we have had our company name change in the past. Our focus is on being a third party customer service department that takes care of customer support for SL Account Management, Premier Student Loan Center, Financial Preparation Services, Financial Loan Advisors, and Tangible Saving Solutions.

Please continue to answer the phone as customer support/ customer service. You **SHOULD NOT** say that we had a name change or that we are any of those other companies. We are simply the customer service department that supports their clients.

**Script:**
"We are a third party customer service department that takes care of customer support for many different companies. It looks like you have been working with (insert appropriate company name here: SL Account Management, Premier Student Loan Center, Financial Preparation Services, Financial Loan Advisors, and Tangible Saving Solutions)."

If you are unclear or if you have any questions please let us know.

Thank you,

Isabel Banda
**Human Resources**
**SL Account Management**
Direct/Office: (949) 201-2454
Fax: (877) 809-6005

EXHIBIT 39
Page 182

EXHIBIT 40

# Retention Policies

## Cancel: Can't Retain
Refund Rules:

1. If client hasn't sent in appropriate documents to start process = FULL REFUND
2. If Final Pay has not been approved = FULL REFUND
3. If there are only three payments or less and client is extremely insistent and irritated (even if Final Pay has been approved) = FULL REFUND
4. FS issues; threatening to file complaints (BBB, FTC, CFPB, Attorney General, Local PD) anywhere MUST BE SENT TO MANAGEMENT= Management will discuss FULL REFUND. If the client does not mention FS DO NOT BRING IT UP!!

*FAMILY SIZE*

5. If client has 1 Year's Worth of Payments on File and Final Pay was completed client is at Recert stage
   - Step 1: Cancel NO REFUND (Put client on hold to "get permission" for 60 seconds)
   - Step 2: Client insists on refund and recertification has not yet processed= REFUND ALL RECERT FEES ONLY (Put client on hold to "get permission" for 60 seconds)
   - Step 3: If client is insistent on a further refund work through adding 1 enrollment payment at a time for each negotiation past the recert payments. We will not give back more than 3 enrollment payments.

*RETENTION IS NEGOTIATING*

*TAG RETENTION : PLEASE RETAIN OR NEGOTIATE*

## Cancel: Can Retain
Perks Offered Rules:

1. Client has already made 3+ enrollment payments. Client is aware money does not go toward Student Loan Balance. Offer to waive the most recently missed payment and resume payments. If that is not enough negotiate waiving the next enrollment fee (total of 2 fees waived now). Can include a total of 3 enrollment fees waived if a 6 pay. Recert payment must be scheduled within 60 calendar days of last cleared payment to prevent file cancellation.
2. Client has completed enrollment fees. Possibly did resubmission on their own. If client is retained offer to waive the next 12 months of recertification fees. If this is not enough request approval with upper management to see what else could be done for the client.
3. Offer the option to resubmit the IDR/RPR and waive next year's recert fees if there are other discrepancies outside of FS.

** At the end of every retention call stress to the client that if they cannot get ahold of anyone else that you can be the direct line of communication for the client**

As needed **CREATE TASKS** for follow up within timeframe client requests. Utilize tasks and calendar features in DPP.

*Full Refund. No Rehab*

EXHIBIT 40
Page 183

# RETENTION Protocol 02/19/19

Do this every day to retain your clients and make more $$$

**During the FIRST 30 and LAST 30 minutes of your shift EVERYDAY work on your RETENTION using the following lists from DPP:**

1) 1+ Pay Declined
2) 0 Pay Declined
3) Upcoming payments

**1+ PAY DECLINED: Go to DPP - click on the drop-down menu beneath My Contacts – select "1+ Declined"**

- Sort by date
- Determine how many 1+ pay clients you have that have declined for the week
- Call / email / SMS each one of them 2x DAILY AND RESCHEDULE THEIR PAYMENT

**0+ PAY DECLINED: Go to DPP - click on the drop-down menu beneath My Contacts – select "0+ Declined"**

- Sort by date
- Determine how many 0 pay clients you have that have declined for the week
- Call / email / SMS each one of them 2x DAILY AND RESCHEDULE THEIR PAYMENT

**UPCOMING PAYMENTS for the week: Go to DPP - click on the drop-down menu beneath My Contacts – select "Upcoming Payments"**

- Sort by date
- Determine how many upcoming payments you have for the remaining of the week
- Send PAYMENT REMINDER thru SMS to each client 1x daily – have client call if need to

EXHIBIT 40
Page 184

# EXHIBIT 41

## Customer Services Disposition Codes

1. **Fees were not disclosed to me**

   -Enrollment and re-certification fees were not properly explained to the client, this could mean they were not told these fees were going to our company for document preparation services.

2. **Client does not qualify due to income**

   -Client's AGI (Adjusted gross income) came out much higher than what was discussed initially. In this case a client would qualify for a payment they will not be able to afford.

3. **Program not explained correctly/ loan forgiveness was immediate**

   Client assumes that their loan balance will decrease immediately after our services have been rendered. Clients must complete their forgiveness term before their loans are qualified for forgiveness.

4. **Spoke with servicer and reconsidered**

   The client, for whatever reason called their servicer and the servicer informed the client that we are not doing anything for them or tell them we are charging them for something they can do on their own. Client becomes hesitant to move forward with our services.

5. **Unable to get a hold of my loan advisor or processor**

   Clients who repeatedly call their advisor and processor, eventually get to the point where they become hesitant to move forward with our services. Their questions were never answered by the individuals they were trying to get a hold of.

6. **Scam**

   Client did their own research online and came to the conclusion that we could possibly be a scam.

7. **Payments did not go towards my student loan payments**

   Clients were not made aware that our enrollment and re-cert fees go to our company. Not to their student loan balance.

8. **Attempting to do it on my own for free**

   Client is aware that they can file the program paper work on their own and is going to attempt to complete the necessary paper work on their own.

9. **Errors on my application**

   Mistakes were made on the client's paper work and the client found out. The client will most likely be upset.

10. **Other (CS rep must add reason in the Cancellation Notes)**

    When choosing this disposition a client can be cancelling due to some other reasons, not listed in the cancellation dispositions. Please list the reason they are cancelling.

11. **Cannot Afford (Ultron & CS)**

    A client can not afford our enrollment payments and is forced to cancel.

EXHIBIT 41
Page 185

12. **Negative impact on credit score**

After using our services a client's credit score is effected for whatever reason.

13. **Loan Originated Status**

When a client's loans are in a "Loan originated status" those clients loans would not qualify for any programs until their loans are out of loan origination. Client's loans must either be in a grace period or in a repayment status.

14. **Still in school**

A client's loans can not placed into a forgiveness program until they graduate and their loans are out of a "loan originated status".

15. **Client left complaint BBB**

Client filed a complaint with BBB and is requesting for a resolution to their complaint. The BBB mediates a clients complaint.

16. **Client left complaint with CFPB**

Client filed a complaint with the CFPB and is requesting a resolution to their complaint. The CFPB mediates a clients complaints.

17. **No POI after 30 days (Ultron)**

After 30 days of receiving no POI (proof of income) a client's account will automatically be cancelled.

18. **No Welcome after 30 days (Ultron)**

After 30 days if a client is not answering and or returning our calls to complete the welcome call. The client's account will be automatically cancelled.

19. **0 Pay Client (Ultron)**

A client's account will eventually be cancelled out if they do not make a payment. Within one week of a client's payment declining.

20. **Client filed a chargeback**

A client called their bank and filed a dispute on our companies charges. Client received the money back from their bank.

*If CS or Processing field call with angry client please specify in the Cancellation Notes

_____          _____          _____

**Employee Name (print)**          **Employee Name (sign)**          **Date**

EXHIBIT 41
Page 186

# EXHIBIT 42

Reverify Campaign Scripting

## INTRODUCTION

Hi Mr./Mrs. _____, this is _____**YOUR NAME**_____ with Student Loan Management calling on behalf of __**COMPANY NAME**__. I am calling you today on a recorded line to ensure the accuracy of all details on your account. We are contacting all our existing clients to complete a routine follow up as part of our newly required compliance policies and procedures.

[Copy and Paste Phone # into Debt Pay Pro for Client Search and Selection]

**If NOT Able to Complete:** Click **NOT COMPLETED**

## INFORMATION GATHERING

**To Caller: "Can you please verify your contact information for your security?"**

Verify Proper Spelling of First Name, Last Name and Verify Clients D.O.B. and last 4 of their social

**To Caller: "I am showing we have your first name spelled as _-_-_-_-_ and your last name spelled as _-_-_-_-_. And for your security I am showing your Date of Birth listed as __-__-__. Lastly, I have the last 4 of your social listed as. Is that all correct?"**

[Begin Review of Dept Pay Pro Existing Notes Section for most recent corresponding Information: Servicer Name; # of Children; # of Dependents; Repayment Plan; Filing Status]

**"Okay, now I am going to send you a link which will include all of the documents prepared by our compliance department as part of our latest policies to ensure your account is up to date and accurate with all of the correct information. What is the best way to send out the documents to you for you to sign, by email or SMS to your phone?"**

[Verify best method to send via SMS or Email and ensure Cell Phone Field is ALWAYS filled out correctly in Debt Pay Pro. Confirm email if email Send Out ]

**"Please open the Package Sent to you and click on Click Here→ You can then click on 'Get Started' and click on the 'Click to Sign' button to fill out your signature. Please select 'INSERT' to be able to sign, initial and review each page. Once you have completed signing click 'Continue' and then 'I Agree' and I will receive the signed copy of the documents for you file so we can complete the call."**

## DISCREPANCY

**IF NO**: Complete and Click **REVERIFIED** Disposition in Caller Ready

[Prepare for Next Call]

EXHIBIT 42
Page 187

**IF YES: "I do apologize it looks like there are some discrepancies on your account, please allow me to send you another link so we can update your information in our systems. Please bear with me while I send you the link."**

[Enter in Client ID and select send out method via SMS/Email in Reverification Create Form https://processingsupports.com/ReVerification/Create]

**"After I collect your accurate details, I will set up a follow up call with one of our account managers to go over the discrepancies and discuss what makes the most sense moving forward."**

**"Please copy and paste the link into your browser to access the Form to enter in your accurate details. Once you have the form open you can click 'Next' to be taken to the next page. Follow the instructions until you reach the final page and click 'Submit'. Once you see the Formsite Thank you page please let me know so I can verify we received the updated information and I can schedule a follow up with an Account Manager"**

Click **DISCREPANCY COMPLETED** Disposition in Caller Ready

**Compliance Questions**

**1. Do you understand <u>we are not the government, nor the Department of Education, nor the servicer of your student loans?</u>**

**If No:** We are a third-party document preparation services company who assists with the all of the necessary paperwork to ensure accuracy and correct filing of the documentation required for any necessary consolidation, recalculation and/or enrollment into your income driven repayment program. While we may correspond with your servicer on your behalf, <u>we are not affiliated with the Department of Education.</u>

**2. Do you understand that, for your protection, we will not access your Federal Student Aid account?**

**If No:** As a fully compliant document preparation services company, we must remain inside of the guidelines mandated by any governing agencies. As such we do not access your Federal Student Aid account.

**3. Do you understand that you may attempt to apply for an Income Based Program through the Department of Education on your own, but you are paying our company to handle all of the paperwork, notifications, and communications for your program?**

**If No:** Just as you have the ability to file your own taxes or use a professional tax preparer to maximize your return each year, you can also do this on your own. To ensure all of the work is done professionally and accurately, working with a professional document preparation services company will save you on all of the time, effort and research needed ensuring you are placed in the best program for both your short term and long-term benefit. Many people who enroll into

EXHIBIT 42
Page 188

these programs fall out the program within the first 5 years so we are here to ensure you are enrolled into the right program the first time and remain inside of your program to meet all of the necessary requirements to have your loan balance discharged when your terms length is up.

**4. Do you understand that you have been/are seeking to be enrolled into the [REPAYE, PAYE, IBR, or ICR] Income Driven Repayment Program?**

**If No:** Each income driven repayment program has it's own set of guidelines and with each individual program comes it's own set of benefits. We make sure that you are enrolled into the right program based on your eligibility, adjusted gross income and filing status . The major benefit of each program is that they allow for a reduced monthly payment, and the discharge of your remaining loan balance at the end of your term length based on fulfillment of your scheduled qualified monthly payments.

**9. Do you understand that after our initial fee, separate from what you pay your servicer for your loan repayment, we charge an annual recertification fee of [$22/32/42] per month to assist you with your annual recertification due every 12 months?**

**If No:** The Department of Education requires that you recertify every twelve months to remain inside of your program. That means that every twelve months a new set of documents need to go out with proof of income and any changes to your family size. Your recertification fees ensure that we reach out to you when your recertification comes due and that you are recertified inside of your program accurately and on time for each year that you are with us. Many of our clients choose to remain with us until the end of their program knowing that they do not have to worry about misfiling or forgetting to file on time.

**10. Do you understand that your monthly recertification assistance fee to us will be placed into your own Dedicated Client Account held for your benefit until we successfully complete our work for you?**

**If No:** It is very important to us how your money is protected. You are making payments for our fees to your own Dedicated Client Account held by a non-related company (like a trust account) until your program is finalized and completed. That money belongs to you at all times and you can ask for it back prior to completion of our work. Once we receive your proof of income, we will complete all necessary correspondences and communications and document preparation services to get your program approved by the Department of Education. Your payments will be released to our company only after the Department of Education approves your program / plan. This protects you to make sure we are doing our job, you receive a positive result, and you are satisfied with our services

**11. Do you understand that you can request a return of the fees you paid to us that is held in your Dedicated Client Account at any time until we complete our work for you?**

EXHIBIT 42
Page 189

**If No:** To fully emphasize we do not take upfront fees. That means that until your program is approved any payments you are making are going into a separate trust account for you until you are placed in the program initially outline with the payment details initially discussed. This is for your comfort and security knowing that until we can complete the work necessary you have access to any funds transferred into your account.

**12. Are you fully satisfied with our services?**

**If No:** This just means that you are fully satisfied with the service outlined up until this point. Would you be fully satisfied knowing that until you are placed in the best program with the lowest or best monthly payment option, we are not going to collect on any funds transferred into your dedicated client account?

**13. IF YOU ARE PSLF ELIGIBLE, do you understand that your loan will not automatically be forgiven, but that after the successful completion of your program, you will have to submit a PSLF Loan Forgiveness form to the Department of Education to complete your loan forgiveness?**

**If No:** You are already on your way to completing the required monthly payments to have your remaining loan balance discharged. If you are PSLF eligible you will be/have been turning in the Employment Certification Form to ensure there is a paper trail of your qualifying employment. This forgiveness form is just the last step. When the time comes to forgive your loans, we will help you to submit that final form and the rest is taken care of by FedLoan or the Department of Education.

EXHIBIT 42
Page 190

# EXHIBIT 43

Re-verification

September 17, 2019

Caller re-verification Powerpoint
4 Factors
Filing status head of House = Single
Please hold while I review
Upset = Transfer Senior CS.

Sms or Emails
* No mail docs
* We are a paperless document company

- FS, New Address

Only if there is a discrepancy do we send 2nd link.
If no discrepancy = complete Call.

Meeting: Christian, Adon  September 20, 2019

Reverification
    POI Team will assist with
    2,800 Files   High priority

Dealing with FS of 1-5
Only working initially requiring docs "Hello"

If client doesn't answer Rep will set
New Task following day or 2
Follow up until docs are signed or client cancels
Adon - 2% files have issues
    Most clients will sign.
If Issues Tag
    Account Management
    ADON & Christian.

EXHIBIT 43
Page 191

EXHIBIT 44



**Financial Preparation
Services**

SALES COMPLIANCE MEMO

**It is our company policy to adhere to all applicable federal, state, and local laws,
including regulations and formal guidance. This sales compliance memo outlines
and expands upon the compliance call script. All employees should fully understand
its contents and must follow its guidelines while performing his or her job duties and
responsibilities.**

Company Representation

- FPS is NOT the government.
- FPS is NOT the Department of Education.
- FPS is NOT a loan servicer (FedLoan, Navient, Great Lakes, and etc).
- FPS is NOT a "Certified Enrollment Center".
- Do NOT state that FPS has a partnership or relationship with the government,
  Department of Education, or a loan servicer.
- Do NOT state that FPS has any special or exclusive access to any programs, plans, or
  consolidations.
- Do NOT use any seals or logos in email communications that may appear to belong to
  official government agencies or the Department of Education.
- Do NOT imply that FPS is the government, Department of Education, a loan
  servicer, "Certified Enrollment Center" or anything that FPS is not.

Program Availability

- Do NOT state that the Client's eligibility will end at a specific time (i.e. at the end of the
  day/week).
- Do NOT state that any programs, plans, or consolidations will only be available for a
  specific period of time (i.e. until the end of the day/week).
- Do NOT state that the client must act now or lose the benefit of a program.
- Do NOT state that there is limited time to apply to a program.
- Do NOT imply that there is limited time or a short time or an end date to
  apply for a program.

Fee Explanation

- Initial Fee and recertification fees do NOT go to the loan servicer(s).
- Initial Fee and recertification fees are NOT applied to the balance of the loans.

VERSION 9.22

EXHIBIT 44
Page 192



**Financial Preparation**
**Services**

<u>Accurate Information</u>

- All Client information must be completed accurately and verified: name,
  address, telephone number, email address, date of birth, family size, stated
  income, etc.
- Client must sign the Client Fee Agreement himself for herself – NO EXCEPTIONS.

<u>Proper Benefits</u>

- Do NOT state that the Client's loans will be immediately or quickly forgiven.
- Do NOT state that the Client's interest rate(s) will be reduced.
- Do NOT state that the Client's credit will be fixed.
- Do NOT state that the Client's credit score will improve or increase.
- Do NOT state that the Client has been accepted to any program.
- Do NOT state that it is guaranteed that the client will be accepted into any
  program.
- Do NOT state that the Client must use our services to obtain any benefit.

BY SIGNING BELOW, EMPLOYEE ACKNOWLEDGES THAT HE OR SHE HAS READ THIS SALES
COMPLIANCE MEMO AND AGREES TO AND UNDERSTANDS ITS CONTENTS.

By (print):_____ By (signature): _____

Date: _____

# Memo
## Compliance Regarding DOE Statements

By signing this memo, you understand that **NO** representative of SSP is **EVER** to imply that we work with or are the Department of Education or a loan servicer. Per the SSP Employee Handbook, we maintain a **ZERO TOLERANCE POLICY** for any fraudulent activity; therefore, the following statements may never be spoken to a client:

1. "We work with the Department of Education or the D.O.E."
2. "We work directly with the Department of Education or the D.O.E.
3. "We work hand in hand with the Department of Education or the D.O.E."
4. "We are partners with the Department of Education or the D.O.E."
5. "We are affiliated with the Department of Education or the D.O.E."
6. "We are the Department of Education or D.O.E."
7. "We are your servicer"
8. "We are Navient, Nelnet, Fedloans, or Great Lakes"
9. "We work with Navient, Nelnet, Fedloans, or Great Lakes"
10. "We are affiliated with Navient, Nelnet, Fedloans, or Great Lakes"
11. "We are a certified enrollment center"

All calls are recorded and monitored for this fraudulent and unacceptable behavior at all times.

***Any SSP employee who is caught saying any of the above (or variant of the above) will be immediately terminated, without notice or discussion.***

Managers are required to thoroughly train and monitor that none of this verbiage is ever spoken to clients. Please refer to upper management with any questions.

## Verification of Review

*By signing this form, you confirm that you have discussed this memo in detail with your supervisor and understand all terms in full.*

| | | |
|---|---|---|
| Employee Print | | |
| Employee Signature | | Date |
| Manager Signature | | Date |

EXHIBIT 44
Page 194

# EXHIBIT 45

## NEW HIRE SCHEDULE

**MONDAY**

**7:30am** – Arrive – Begin working on New Hire Packet

**8:30am – 9:00am** – HR will check status of Packets – Must be completed by 9:30 am

**9:30am – 11:30am** – New Hire Orientation with HR

**11:30am – 12:00pm** – Lunch

**12:00pm – 2:20pm** – Welcome to the Student Loan Crisis Part 1 – **Nicole**

**2:20pm – 2:30pm** – Break

**2:30pm – 4:00pm** – Welcome to the Student Loan Crisis Part 2 – **Nicole**

**4:00pm** – Sign Out – End of Day 1


**TUESDAY**

**8:00am – 8:30am** – Arrive; Recap of Day 1

**8:30am – 9:00am** – Assignment #1 Program Details – **Tara**

**9:00am – 10:00am** – Company Fees & Commission Training – **Morgan**

Introduction to Assignment #2 Overview (Filling out an Application-DPP)– **Brian/Zach**

**10:00 am – 10:10 am** Break

**10:10am – 11:30am** –Disburse to Training Rooms and Complete Assignment #2 – **Brian/Zach**

**11:30am – 12:00pm** – Lunch

**12:00pm – 1:00pm** – Assignment #3 FSA & NSLDS logins – **Tara/Nicollette**

**1:00pm – 2:30pm** Explaining Loan Details PowerPoint– **Tara/Nicollette**

**2:30pm – 2:40pm** Break

**2:40pm – 3:40pm** – Assignment #4 Debts Tab – **Tara/Nicollette**

**3:40pm – 4:30pm** – Parent Plus Loans PowerPoint – **Monica/Brian**

**4:30pm** – Sign Out – End of Day 2

EXHIBIT 45
Page 195

**NEW HIRE SCHEDULE**

**WEDNESDAY**

**8:00 am – 9:00 am** – Recap of Day 2

**9:00am – 10:30am** – Assignment # 5 Calculating the Numbers – **Brian/Lindsay**

**10:30 am – 10:40 am** -- Break

**10:40 am -- 11:30 am** -- Compliance Questions and Verbal Consent Training – Malea

**11:30 am – 12:00pm** - Lunch

**12:00pm – 1:00 pm** – Family Size & Filing Status Training– **Zach**

**1:00pm – 2:20pm** – Mock Phone Call Assignment with Partner – **Alyssa/Morgan**

**2:20pm – 2:30pm** – Break

**2:30pm – 3:10pm** – Mock Phone Call Assignment with Partner – **Alyssa/Morgan**

**3:10pm – 3:30pm** – Caller Ready, DNC Procedure, Cherry Picking – **Malea**

**3:30pm – 4:30pm** – Shadow on the floor: Take notes

**4:30 pm** Sign out- End of Day 3


**THURSDAY**

**8:00am – 10:00am** – Compliance Training Modules 1 & 2 – **Nicole**

**10:00am – 10:10am** – Break

**10:10am – 11:00am** – Compliance Training Module 3 & Questions – **Nicole**

**11:00am – 11:30 am** – Lunch

**11:30am – 12:00 pm** – Compliance Quiz

**12:00 pm -- 1:00pm** – Shadow on the floor: Take notes

**1:00pm – 2:15pm** – Script Practice – **Lindsay/Monica** Split into 2 Groups

**2:15 pm – 2:25pm** – Break

**2:25pm – 3:30pm** – Flow Control and Expert Rebuttal List with Partner – **Brian/Nicollette**

**4:30pm** – Sign Out – End of Day 4

EXHIBIT 45
Page 196

**NEW HIRE SCHEDULE**

**FRIDAY**

8:00 am – 8:30am – Recap OPEN to ANY QUESTIONS

8:30am – 10:00 am – HelloSign PowerPoint– **Lindsay/Alyssa**

10:00am – 10:10am – Break

10:10am – 11:00am –Client Retention PowerPoints – **Morgan/Monica**

11:00 am – 11:30 – Lunch

11:30 am – 1:00pm – Company Processes

1:00pm – 2:15pm – Shadow on the floor: Take notes

2:15 pm – 2:25pm – Break

2:30 pm- 3:30pm – First Week Recap, Sales 101 Training in Conference Room- **Zach**

3:30 pm Sign Out – End of Day 5

Week 2 or 3:

**Wednesday:** 2:30pm – 4:00pm – Friday Support Training, Proper Tagging, & Resells – **Malea**

Week 4:

**Thursday:** 12:00pm – 1:00 pm – Total and Permanent Disability

EXHIBIT 45
Page 197

EXHIBIT 46

# COMPANY NAME

# STUDENT SERVICES PLUS

# WEBSITE

# WWW.STUDENTSERVICESPLUS.COM

# Toll Free #
# 1-888-394-4852

Training Room
#1

EXHIBIT 46
Page 198

## REBUTTALS

Q: **Why can't I just do this on my own? / I've heard I could do this for free**

A: You may attempt to do this for free through the DOE.  However, our job is to save you a lot of time, effort, and stress by doing all the work professionally and accurately, including preparing and submitting all the paperwork prior to all deadlines.  Our clients love our services and if you have any doubts about our work, please rest assured that we keep your payment of our fees in a Dedicated Client Account that is held for your benefit until we complete our work.  What that means is that you can request a refund if we haven't completed our work.

*Does that make sense? Great, go ahead when you're ready with…*

Q: **I don't want to wait 20 years to have this paid off / or be stuck in a program for 20 years**

A: You can make adjustments to your program once a year.  We are only here to save you the most possible and present the most valuable program available.

*Does that make sense? Great, go ahead when you're ready with…*

Q: **This sounds too good to be true**

A: This is a government program just like any other, similar to social security benefits or disability. Based on your income, family size, and loan history the factors happen to be in your favor.

*Does that make sense? Great, go ahead when you're ready with…*

Q: **What happens if I go back to school? / Can I go back to school?**

A: As long as you remain enrolled in your DOE program your loans will remain in good standing, and you will be eligible to return to school and apply for additional loans.  Any additional loans you take out in the future may also qualify to be added to your forgiveness/repayment program.

*Does that make sense? Great, go ahead when you're ready with…*

## REBUTTALS

Q: **Why do I have to give my social?**

A: Because it is required to locate your federal loans and we will need it for you application: All information input into the system is encrypted for your security.

*Go ahead when you're ready.*

Q: **Is this legit? / Who are you guys?**

Yes, we're a student loan assistance business that operates out of the State of California. My job as a representative working with student borrowers is to assist you with learning about the various government repayment options, finding the best one for you, gathering all the necessary documentation, and applying for the correct loan repayment program.

*Does that make sense? Great, go ahead when you're ready with...*

Q: **How does this work?**

A: In order to qualify you for a DOE program we'll need to gather some basic information and review your loan details. These programs are based on your income, family size, loan amount and occupation. Based on these 4 factors you could qualify for a loan forgiveness / repayment program where the Dept. of Education will basically take over as the lender on your loans and give you a lower monthly payment with the potential of loan forgiveness, where DOE may forgive a portion of your loans if you qualify.

*Does that make sense? Great, go ahead when you're ready with...*

Q: **What happens to my credit?**

**We don't give advice on how to fix or improve credit.**

**However, If Already Consolidated** – It will stay current in regard to your student loans as long as you make on-time payments within your selected program.  **Does that make sense?**

**NOT Consolidated** – All existing loans through your current servicer will show as "paid in full through consolidation" within 60-90 days. The total balance will then be consolidated into 2 loans with your new servicer. If you are in good standing it is unlikely that there will be any long-term effect.

**If Defaulted** – It is likely that consolidation may have positive effects as we are bringing past due accounts back into good standing.

*Does that make sense? Great, go ahead when you're ready with...*

Q: **Can I pay more each month and get done faster?**

A: These are TERM based programs and the forgiveness occurs at the END of the program, which is 240 months (120 months). If you were to pay more than what is required, all you would be doing is eating away at the balance that gets forgiven at the end of the program. This is the type of program where you want to just make the required monthly payments, in order to receive the maximum amount of forgiveness at the end of the program.

*Does that make sense? Great, go ahead when you're ready with...*

## Doc Assistants – Instructions

Send client link in DPP via sms:  docsassistants.com

**Instruct Client to RESET PASSWORD by clicking "FORGOT PASSWORD"**

Have client input their EMAIL, DATE OF BIRTH and click 'SUBMIT', then click 'CONFIRM'

- An error message will appear if the Email and Date of Birth are not associated
  with an FSA account.  "Your account couldn't be found using the username,
  email, or phone number and date of birth that you provided.  Delete the
  responses you entered and try again." Click Ok

Have client input a SECONDARY EMAIL, DATE OF BIRTH and click SUBMIT.

- If the client's Email and Date of Birth are on file, client will then be instructed to
  RESET THEIR PASSWORD.  To do this, the client will email a secure code to their
  email on file, input the 6-digit code, click SUBMIT and create a new password.
- Password must consist of at least 1 uppercase, 1 lowercase and a number
- Instruct the client to then click on the DOC ASSISTANTS ICON, which will take
  them back to the log-in page.
- Have the client enter their EMAIL, NEWLY CREATED PASSWORD, YOUR BADGE #
  and click SUBMIT
- Check your outlook inbox for loan details
- If the same error message appears, this means that the client's email is not in the
  system.  The next step is to walk the caller thru CREATING AN FSA ID.

**Instruct client to Create an FSA ID**

- Click on CREATE NEW ACCOUNT
- Enter username (first part of client's email address + last two digits of their birth
  year)
- Create Password, confirm password, and select 4 challenge questions from drop
  down options.
- Instruct client to leave email and mailing address blank, they are not required.
- Check box at bottom and click CREATE
- Tell client to collect 6-digit code sent as text – and enter in Docs Assistants
- Client Selects Return to Log-In Page – Enter Email, Password, and **Badge #**

EXHIBIT 46
Page 201

## File Accuracy Checklist

## Always Check ALL 18 BEFORE You Submit File!

1. Loans are uploaded to DPP
2. Docs are Signed and read "E-Signature Completed"
3. Servicer Login Username and password Included and Correct
4. Fedloans or AES, 3 security questions answers, Great Lakes: PIN
5. Family Size Calculation is Correct
6. Billing Information with Credit Card Saved
7. W/C is Completed
8. FS input during W/C matches file in DPP
9. NO MOHELA Loans
10.   First Payment Date is within 14 days or less
11.   2nd Payment must be 45 or days less after 1st
12.   LO (Loan Originated) MUST have LO Template included
13.   PARENT PLUS LOANS SOLD ON ICR, box checked Yes
14.   2 DIRECT CONSOLIDATED are NOT in Default
15.   PSLF or FEDLOANS FAMILY SIZE 6 OR LESS
16.   No Active Bankruptcy
17.   Phone Number, DOB, Social, Campaign Name (just REF for Referrals) and Quoted Amount all Correct (Ex. 0 SL + 40 PP)

EXHIBIT 46
Page 202

# Verbal Consent Training

5. Do you authorize us to contact you with reminders in order for you to provide us with all of the necessary documentation for your annual recertification through email, phone call, or text message?

    **I DON'T UNDERSTAND –** In order to maintain the accuracy of your file and avoid any delays in your likely approval we must establish good communication between our company and you.  We must be able to reach you through email, call, or text OR whichever is most convenient for you – in order to keep your program on track and keep you updated throughout your program. **OK?**

6. Do you authorize us to submit your annual recertification after your approval?

    **I DON'T UNDERSTAND -** Please remember, you must reapply for your program every year with the U.S. Department of Education. However, working with us, all this will be done for you. Our Processing Department will contact you to review, collect, and prepare all the paperwork necessary to keep you in the best program available. **OK?**

## 3-STRIKE TERMINATION POLICY FOR:

**A)      Skipping any of the 6 Verbal Consent Questions**

**OR**

**B)      Modifying/Re-Wording any of the 6 Verbal Consent Questions**

EXHIBIT 46
Page 203

# Verbal Consent Training

## HOW TO PROPERLY OBTAIN VERBAL CONSENT:

❖ You must get a verbal "YES" to all 6 questions below in order to proceed with Client's file.
❖ If Client states "No", you must re-explain the question to the Client and obtain a "Yes"
❖ If Client refuses to give a "YES" to any of the 6 questions, **YOU MAY NOT PROCEED WITH FILE**

1. Do you authorize us to gather and review all required documentation for your application?

    **I DON'T UNDERSTAND** – This consent is only to collect and fill out the rest of the information for your file: mailing address, references and payment information – just everything we need to complete the application, **OK?**

2. Do you authorize us to use our mailing and email addresses on your application documents to receive communications on your behalf <u>for the sole purpose of completing our services</u> and to forward a copy of all such communications to your email address on file?

    **I DON'T UNDERSTAND** – In order to ensure the accurate and timely filing of all paperwork for your program, we will handle all correspondence and communication between you and your servicer. This will allow us to complete all work required without any delays - and <u>we will forward you a copy</u> of all correspondence received, **OK?**

## [READ #3 BELOW ONLY IF "IN REPAYMENT" STATUS]

3. Do you authorize us to submit a forbearance request to your servicer after your approval, <u>if you chose that option</u>?

    **I DON'T UNDERSTAND** – We recommend in order to help our clients with their immediate cash flow needs <u>and to pay our fee</u> is to put your loans into forbearance. This is something that allows you to temporarily stop making your federal student loan payments or temporarily reduce the amount of payment you make – until your program is approved and finalized, **OK?**

4. Do you authorize us to submit your loan repayment or loan forgiveness application for the "PAYE, REPAYE, IBR, ICR" program after your approval?

    **I DON'T UNDERSTAND** – Once your application has been approved, your first program fee has been placed into your trust account, and we have received your proof of income – we will be submitting your application to the DOE for your "PAYE, REPAYE, IBR, ICR" program. The submission of your application is of course required for the DOE to begin processing your new program. **OK?**

EXHIBIT 46
Page 204

## Company Fees

### Enrollment Payment Break Down:

$1,705 x 1 payment (full-pop) = $1,605

$1,705 x 2 payments = $852.50 per month

$1,705 x 3 payments = $568.33 per month

$1,705 x 4 payments = $426.25 per month

$1,705 x 5 payments = $341.00 per month

$1,705 x 6 payments = $284.16 per month

$1,705 x 7 payments = $243.57 per month (*Limited 1 per day*)

$1,705 x 8 payments = $213.12per month (*Limited 1 per day*)

**Client Needs Loan Rehab Program (*CANNOT ENROLL*):**

1. Direct Consolidated & Defaulted
2. Wage Garnishment

### RECERTIFICATION

| Loan Amount | Recert Fee |
|---|---|
| $0 - $15,000 | $41 |
| $15,000 - $25,000 | $41 |
| $25,000 + | $41 |

### Minimum Debt Loads:

$9,000 if Current

$5,000 if Defaulted

Standard Repayment Plan = 1% of Debt, for 180 months = 15 years

### DOE FEDERAL STUDENT AID  HELP HOTLINE: 1-800-433-3243

Updated: 10.21.2019

EXHIBIT 46
Page 205

## Company Fees

**Initial Fees:**

$1,245 x 5 payments = $249 per month

$1,245 x 6 payments = $207.50 per month (*Limited 2x per day*)

$1,395 x 5 payments = $279 per month

$1,395 x 6 payments = $232.50 per month (*Limited 2x per day*)

$1,545 x 5 payments = $309 per month

$1,545 x 6 payments = $257 per month (*Unlimited*)

**Client Needs Loan Rehab Program (*CANNOT HELP*):**

1.  Direct Consolidated & Defaulted
2.  Wage Garnishment

**RECERTIFICATION**

| Loan Amount | Recert Fee |
| --- | --- |
| $0 - $15,000 | $22 |
| $15,000 - $25,000 | $32 |
| $25,000 + | $42 |

**Minimum Debt Loads:**

$9,000 if Current

$5,000 if Defaulted

Standard Repayment Plan = 1% of Debt, for 180 months = 15 years

**DOE FEDERAL STUDENT AID  HELP HOTLINE: 1-800-433-3243**

Updated: 9.22.2019

EXHIBIT 46
Page 206

EXHIBIT 47

| | |
|---|---|
| **From:** | ███ Yoder |
| **To:** | Student Loan Mgmt |
| **Subject:** | Payment amount |
| **Date:** | Tuesday, October 15, 2019 4:51:44 PM |

I emailed and called several times today with no response. The payments that are being taken each month are not the payments I agreed to and not an amount I can manage. I need to hear back from someone asap and get this resolved.

EXHIBIT 47
Page 207

| From: | M█████ Plumley |
|---|---|
| To: | Student Loan Mgmt |
| Subject: | Questions about our contact. |
| Date: | Sunday, October 13, 2019 7:54:00 AM |

If I'm paying $40/month, WHY has my student loan increased from $52k to $54k?
Your noncommunication with me and my difficulty getting in touch with a human has caused
me to lose confidence and TRUST in your company. I urge you to start communicating more
effectively.

Change my phone number to █████-4476
Change my address to: ████████, Annapolis MD 21403

I need clarification for the following questions by Mon, Oct 14, 2919 by 5pm EST

1. Instead of paying $52k to Nelnet, at the end of 240 payments, I will pay a total of
$10,555 to Premier Student Loans? Will the balance be expunged from my financial
obligation?



2. Can I pay the $10,555 off sooner and is there a penalty for paying it off early?

3. How does this debt forgiveness affect my credit rating?

4. If my income situation improves, does it change the terms of this contract?

Yours in service,
M█████ Plumley
Business cell: █████-4476
████████████

"One person driven with purpose, fueled with passion and defined by pride..."
-Steve Gilliland

----- Forwarded Message -----
**From:** "studentloanmgmt@trustedaccountservices.com"
<studentloanmgmt@trustedaccountservices.com>
**To:** ████████@yahoo.com" ████████@yahoo.com>
**Sent:** Sun, Oct 13, 2019 at 10:21 AM
**Subject:** Your Payment Has Been Posted
Dear M█████,

We received your Automatic Payment of $40.00 for student loan management and
dedicated client account services.

EXHIBIT 47
Page 208

If you have any questions, please email us at
studentloanmgmt@trustedaccountservices.com.

Thank you for your payment!

Please do not reply directly to this message.

This information message has been sent to you based on your existing relationship with
Trusted Account Services.

If you are not the intended recipient or received this email in error, please call us at
(888)-564-4336 and then delete this email from your system.

Trusted Account Services

18261 Alexandra Place

North Tustin, CA 92705

EXHIBIT 47
Page 209

| | |
|---|---|
| **From:** | M▮▮▮  Reddick |
| **To:** | Student Loan Mgmt |
| **Subject:** | Re: Your Payment Has Been Posted |
| **Date:** | Monday, October 14, 2019 1:47:36 PM |

I have spoken to Navinet - who hlds my student loan perNavinet they have nothing from you concerning my student loan and they are now delinquent. I need answer's and I am stoping Payment.

On Oct 14, 2019 at 10:15 AM, <Studentloanmgmt> wrote:

```
Dear M▮▮▮▮,


We received your Automatic Payment of $40.00 for student loan management and
dedicated client account services.


If you have any questions, please email us at
studentloanmgmt@trustedaccountservices.com.


Thank you for your payment!


Please do not reply directly to this message.


This information message has been sent to you based on your existing
relationship with Trusted Account Services.


If you are not the intended recipient or received this email in error, please
call us at (888)-564-4336 and then delete this email from your system.


Trusted Account Services


18261 Alexandra Place


North Tustin, CA 92705
```

EXHIBIT 47
Page 210

EXHIBIT 47

| | |
|---|---|
| **From:** | S█████ Hauschild |
| **To:** | Student Loan Mgmt |
| **Subject:** | Student loan |
| **Date:** | Thursday, October 24, 2019 9:45:51 AM |

I am asking for a full refund of the money that I have paid you all.  This is a scam and I want all of my money returned or I am prepared to legal action.  My student loans are still showing up as unpaid on my credit report.

Thank you,
S█████ Hauschild

EXHIBIT 47
Page 211

| From: | Student Loan Mgmt |
|---|---|
| To: | Sarah Tagatauli |
| Subject: | Fw: Confusion |
| Date: | Saturday, October 19, 2019 1:53:09 PM |

Please reach out to client.

---

**From:** Support <support@trustedaccountservices.com>
**Sent:** Friday, October 18, 2019 11:36 AM
**To:** Student Loan Mgmt <studentloanmgmt@trustedaccountservices.com>
**Subject:** Fw: Confusion

Hello Slam

Please handle.

TAS Customer Support.

---

**From:** L███████ Harris ████████ @gmail.com>
**Sent:** Friday, October 18, 2019 10:37 AM
**To:** Support <support@trustedaccountservices.com>
**Subject:** Confusion

If I am going through this organization for my student loans, and if you are charging me $42.00 per month, I have two questions that are confusing me?
1. My loan amount has increased by $5,000 since I turned my information over to you.
2. Fed Loan just sent me an email saying they are going to deduct $131 from my account each month starting November.

Can someone please explain all of this to me, and why did my amount increase?

EXHIBIT 47
Page 212

| From: | ████████ Collins |
|---|---|
| To: | Student Loan Mgmt |
| Subject: | Re: Your Payment Has Been Posted |
| Date: | Friday, October 11, 2019 8:11:46 AM |

This is a scam. You've been reported. Stop contacting me.

Sent from my iPhone

> On Oct 11, 2019, at 10:06 AM, studentloanmgmt@trustedaccountservices.com wrote:
>
> Dear C████,
>
> We received your Automatic Payment of $20.00 for student loan management and dedicated client account services.
>
> If you have any questions, please email us at studentloanmgmt@trustedaccountservices.com.
>
> Thank you for your payment!
>
> Please do not reply directly to this message.
>
> This information message has been sent to you based on your existing relationship with Trusted Account Services.
>
> If you are not the intended recipient or received this email in error, please call us at (888)-564-4336 and then delete this email from your system.
>
> Trusted Account Services
>
> 18261 Alexandra Place
>
> North Tustin, CA 92705

EXHIBIT 47
Page 213

| From: | ▮ |
|---|---|
| To: | Student Loan Mgmt |
| Subject: | Re: Your Payment Has Been Posted |
| Date: | Monday, October 14, 2019 2:47:43 PM |

STOP TAKING THE AUTOMATIC PAYMENT IMMEDIATELY.  I WANT A REFUND.

The Department of Education called me - you are a fraud!

I will be filing complaints anywhere I can on you!

S▮▮▮    Newman.

Get Outlook for Android

---

**From:** studentloanmgmt@trustedaccountservices.com <studentloanmgmt@trustedaccountservices.com>
**Sent:** Monday, October 14, 2019 9:17:04 AM
**To:** ▮▮▮@hotmail.com ▮▮▮@hotmail.com>
**Subject:** Your Payment Has Been Posted

Dear S▮▮,

We received your Automatic Payment of $40.00 for student loan management and dedicated client account services.

If you have any questions, please email us at studentloanmgmt@trustedaccountservices.com.

Thank you for your payment!

Please do not reply directly to this message.

This information message has been sent to you based on your existing relationship with Trusted Account Services.

If you are not the intended recipient or received this email in error, please call us at (888)-564-4336 and then delete this email from your system.

Trusted Account Services

18261 Alexandra Place

North Tustin, CA 92705

EXHIBIT 47
Page 214

| | |
|---|---|
| **From:** | ▇▇▇ Crespo |
| **To:** | Student Loan Mgmt |
| **Subject:** | I am receiving a bill from fedloan. |
| **Date:** | Sunday, October 20, 2019 5:16:12 PM |

I am just trying to figure out why I am still receiving bills from fedloan. They are saying I am behind and that i am not paying. I was told that I wouldn't have to worry about them once I sign on with you guys. Can you please explain.

Thank you
J▇▇ Crespo

EXHIBIT 47
Page 215

| From: | ▮  Reimers |
|-------|-----------|
| To: | Student Loan Mgmt |
| Subject: | Inquiry on payment |
| Date: | Wednesday, October 16, 2019 11:16:04 AM |

Hello,

This service was set up to help me with the payments at FEDLOAN SERVICING.  I keep getting emails and phone calls saying my account is past due.  Are the payments you're pulling from my account not being sent to the FEDLOAN SERVICING?  What do I need to do to get this taken care of?

I look forward to hearing from you and getting this resolved.

Thanks you,


L▮  Reimers
▮▮▮▮
Sterling, CO 80751
▮▮▮-4633

EXHIBIT 47
Page 216

| | |
|---|---|
| From: | N█████ THERAPY |
| To: | Student Loan Mgmt |
| Subject: | Re: Your Payment Has Been Posted |
| Date: | Monday, October 14, 2019 7:46:14 AM |

Hi!

Who is this payment going to? I just logged into my FEdloan Servicing Account, and none of my $40 monthly payments are showed as posting to my actual student loans. I am wondering who I am paying?

Thank you so much.

Sincerely,
L███ Tahir
█████-4443



   Go to https://linktr.ee/████████ and with one click you can access:

1. Therapy Sessions
2. Podcast
3. My Book
4. Join Email List
5. Glass Art
6. Non-Profit & US Patent
7. Patreon Crowdfunding
8. My Social Media

- Receive a **free** audiobook download, and free month subscription from my Podcast sponsor, **Audible** at https://audibletrial.com/████████


**EMERGENCY POLICY:**
If you are in crisis or having an emergency, please call 911 or go to your nearest hospital emergency room.

**CONFIDENTIALITY NOTICE:**
This email and any files transmitted with it are confidential and intended only for the use of the individual(s) to which they are addressed. Any distribution, reading, copying, or use of this communication and any attachments by anyone other than the individual(s) they were addressed is strictly prohibited and may be unlawful. If you have received this email in error, please notify L███ Tahir, █████ at: █████████████ or █████-4443 and permanently destroy or delete the original message and any copies or printouts of this email and any attachments.


On Mon, Oct 14, 2019 at 9:08 AM <studentloanmgmt@trustedaccountservices.com> wrote:

EXHIBIT 47
Page 217

Dear L███,

We received your Automatic Payment of $40.00 for student loan management and dedicated client account services.

If you have any questions, please email us at studentloanmgmt@trustedaccountservices.com.

Thank you for your payment!

Please do not reply directly to this message.

This information message has been sent to you based on your existing relationship with Trusted Account Services.

If you are not the intended recipient or received this email in error, please call us at (888)-564-4336 and then delete this email from your system.

Trusted Account Services

18261 Alexandra Place

North Tustin, CA 92705

EXHIBIT 47
Page 218

| | |
|---|---|
| **From:** | ▮▮▮▮▮▮ davis |
| **To:** | Student Loan Mgmt |
| **Subject:** | Student loans |
| **Date:** | Tuesday, October 15, 2019 12:05:09 PM |

I have a question. Why am I paying y'all money and fed loan servicing is reporting missed payments to the credit
bureaus. It's messing up my credit score and I really do not need that
Sent from my iPhone

EXHIBIT 47
Page 219

| From: | █ Bloom |
|-------|---------|
| To: | Student Loan Mgmt |
| Subject: | Student loans |
| Date: | Monday, October 21, 2019 5:57:16 PM |

Is Navient aware that I am paying my student loans through this company now?

-L█  Bloom

EXHIBIT 47
Page 220