UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division
www.flsb.uscourts.gov

In re:

CONSUMER ADVOCACY
CENTER, INC.,

                    Debtor.
_____/

Case No. 19-10655-PGH

Chapter 7

### TRUSTEE'S MOTION TO ENFORCE THE AUTOMATIC STAY

Sonya S. Slott, Chapter 7 Trustee (the "**Trustee**") for Consumer Advocacy Center, Inc. (the "**Debtor**"), by and through undersigned counsel, files this Motion to Enforce the Automatic Stay (the "**Motion**"), specifically as to the Government's (defined herein) prosecution of causes of action in California District Court belonging to this estate, which claims are also currently being litigated by the Trustee in this Court.  In support thereof, the Trustee respectfully states as follows:

### PRELIMINARY STATEMENT

Prior to the appointment of the Trustee, the Debtor along with certain affiliates and individuals were allegedly involved in a student loan debt forgiveness scam.  Before the Debtor filed for bankruptcy, it transferred its operations to those affiliates.  Several months after the Trustee's appointment, the Government commenced litigation in California federal court as to the Debtor and the other defendants which, among other things, shut down the operations there and put those non-debtor entities in the hands of a receiver.

The Trustee has been administering this case for the benefit of creditors, several of which include certain of the governmental entities on behalf of defrauded consumers.  In December, the

1

Trustee filed a $3.6 million fraudulent transfer lawsuit against a third party. At that time, the Government sought to dismiss this case so that, among other things, litigation belonging to the estate could be brought by the receiver in California. Judge Olson denied that motion, finding it was not in the best interest of the estate. One month later, the Government sued the same defendant sued by the Trustee, for the same money sought by the Trustee. In addition to creating the risk for inconsistent results in different forums, the Government's action violates the automatic stay.

As set forth herein, those causes of action belong to the estate, and are within the exclusive power of the Trustee to prosecute. The Government is not acting within its police power by prosecuting the estate's fraudulent transfer claims. As such, this Court should enforce the automatic stay as to those claims.

## BACKGROUND

1.    On January 16, 2019 (the "**Petition Date**"), the Debtor filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.

2.    On July 31, 2019, this Court entered an Order Directing the Appointment of a Chapter 11 Trustee and Setting Status Conference [ECF No. 69]. Sonya S. Slott was thereafter appointed as the Debtor's Chapter 11 trustee [ECF No. 70].

3.    The Debtor's case was converted to a chapter 7 proceeding on August 20, 2019 [ECF No. 86] and Sonya S. Slott was thereafter appointed as the Debtor's Chapter 7 Trustee [ECF No. 89].

### Receivership Proceedings in California

4.    Prior to the Petition Date, the Debtor was purportedly in the business of providing services relating to assistance with student loan debt relief. According to the Debtor, it "assisted

Federal student loan borrowers by helping them choose the best Dept. of Education repayment programs to suit their needs. The Debtor also purportedly "assisted such borrowers by preparing the requisite documentation they needed to submit to the Dept. of Education." *See* ECF No. 11.

5.    Ten months after the Petition Date, on October 21, 2019, the Federal Bureau of Consumer Financial Protection (the "**Bureau**") and certain state governmental entities (the State of Minnesota, the State of North Carolina and the State of California) (collectively, with the Bureau, the "**Government**") commenced a proceeding in the United States District Court for the Central District of California (the "**District Court**") against the Debtor and certain related entities and individuals captioned *Bureau of Consumer Financial Protection, et al., v. Consumer Advocacy Center, Inc., True Count Staffing, Inc., Prime Consulting, LLC, Albert Kim, Kaine Wen, And Tuong Nguyen, Defendants, and Infinite Management Corp., Hold the Door Corp. and TN Accounting, Inc., Relief Defendants* Case No. 19-cv-01998-JVS (the "**Receivership Proceeding**").

6.    On October 21, the District Court entered an *Ex-Parte Temporary Restraining Order with Asset Freeze, Appointment of Receiver, and Other Equitable Relief, and Order to Show Cause why a Preliminary Injunction should not Issue* [ECF No. 24 in the Receivership Court Proceeding].

7.    Thereafter, on November 15, 2019, the District Court entered a *Stipulated Preliminary Injunction With Asset Freeze, Appointment of Receiver, and Other Equitable Relief* [ECF No. 103 in the Receivership Proceeding] (the "**Preliminary Injunction**").  A copy of the Preliminary Injunction is attached as **Exhibit "A"**.

8.    The Preliminary Injunction makes clear in several provisions that it is not intended to interfere with or otherwise impede the Trustee's administration of the Debtor's estate.[1]

**<u>The Government's Effort to Dismiss this Chapter 7 Case</u>**

9.    On December 20, 2019 (almost a year after the Petition Date and several months after the Trustee's appointment), the Government moved to dismiss this Chapter 7 Case [ECF No. 168] (the "**Motion to Dismiss**").    The Government sought the dismissal of this Chapter 7 Case and to have the Debtor's assets and litigation claims (which the Trustee was and is administering) placed under the control of the Receiver in the Receivership Proceeding.    Among other things, the Government argued that it would be more efficient for the Receiver to pursue claims, and further argued that "[c]ontinuation of this proceeding will be harmful to creditors because it will involve the continued accrual of fees by the Ch. 7 Trustee and her professionals and potentially increases the costs of administration of both the bankruptcy estate and the receivership estate, which will unnecessarily deplete the funds available for payments to creditors and distributions to harmed consumers".    *See* Motion to Dismss, p. 1.[2]

---

[1] By way of examples, and as set forth in the Preliminary Injunction, (a) the TRO includes an asset freeze as to all Defendants except the Debtor, which assets are overseen by the Trustee [pg. 2], (b) the definition of "Assets" specifically excludes property of the Debtor's estate [pg. 2-3], (c) the Debtor, because it is under the jurisdiction of this Court and administered by the Trustee, is not a Receivership Defendant [pg. 7, 12-14], (d) several provisions of the Preliminary Injunction state that they do not apply to the Trustee or property of the estate [pg. 14- 17, 32 and 34], (e) the asset freeze does apply to the Trustee nor does it prohibit transfers of property of the estate to the Trustee [pg. 14], (f) financial institutions are directed maintain, preserve or otherwise retain documents or assets of the Debtor's estate as directed by the Trustee in writing, and are further directed to identify and provide the Trustee with account information relating to accounts in the name of the Debtor  [pg. 15-16] and (g) the Receiver is to turn over any property of the Debtor's estate to the Trustee [pg. 34].

[2] As set forth herein, the Government's action in litigating estate causes of action is interfering with the administration of this estate, is harmful to the estate, and will "unnecessarily deplete the funds available for payments to creditors and ultimately distributions to harmed consumers."

10.    This Court (Judge Olson) agreed with the Trustee's argument that dismissal would not be in the best interest of the estate, and denied the Government's Motion to Dismiss by order dated January 25, 2020 [ECF No. 195].

### Trustee's Adversary Against Anan Enterprises, Inc.

11.    On December 30, 2019, the Trustee filed an adversary proceeding against Anan Enterprises, Inc. ("**Anan**") in a matter captioned *Sonya S. Slott, Chapter 7 Trustee v. Anan Enterprises, Inc.*, Adv. No. 19-01960 (the "**Anan Adversary**").

12.    In the Anan Adversary, the Trustee seeks to avoid and recover the total sum of $3,643,000.00 paid by the Debtor to Anan pursuant to sections 548 and 547 of the Bankruptcy Code (the "**Anan Transfers**").

13.    Anan filed its Answer and Affirmative Defenses on March 2, 2020.

### The Government's Amended Complaint in the Receivership Proceeding – Naming Anan and Seeking the Same Recovery

14.    One month after Judge Olson denied the Government's Motion to Dismiss, and with full knowledge that the Trustee sued Anan for the Anan Transfers, on February 24, 2020, the Government filed an Amended Complaint in the Receivership Proceeding (the "**Amended Complaint**").  A copy of the Amended Complaint is attached as **Exhibit "B"**.

15.    In the Amended Complaint, the Government named Anan and others as new Relief Defendants.  In that case, the Government seeks to recover the $3.6 million that the Debtor paid Anan – *the exact same money the Trustee has sued Anan for – i.e., the Anan Transfers*.  Specifically, the Government alleges in paragraph 210 of the Amended Complaint:

> Between 2017-2018, CAC[3] paid Anan Enterprise approximately $3.6 million ostensibly for services, but Anan Enterprise never rendered those services.

---

[3] CAC is defined as Consumer Advocacy Center, Inc., the Chapter 7 Debtor herein.

16.    In fact, the Government readily admits that it is prosecuting Anan for the Anan Transfers. On the day it filed the Amended Complaint, the Government filed a "Notice of Pendency of Other Action or Proceeding" in the Receivership Proceeding (the "**Notice**"), a copy of which is attached as **Exhibit "C"**. In the Notice, the Government states that the Trustee first sued Anan in this Court for the Anan Transfers, and that the Trustee's complaint against Anan ". . . *appears to arise from the same facts that form the Bureau's claims against Anan as a Relief Defendant in this proceeding. The Trustee and the Bureau each allege that Anan was unjustly enriched by payments from CAC to Anan*." *See* **Exhibit "C"** (emphasis added).

17.    By this Motion, the Trustee seeks the entry of an order enforcing the automatic stay as to the prosecution of the Anan Claims by the Government.[4]

<u>**ARGUMENT**</u>

**The Claims Against Anan are Property of the Estate,
<u>Which the Trustee has Exclusive Standing to Prosecute</u>**

18.    The claims asserted against Anan for the Anan Transfers – brought first by the Trustee before this Court and now just recently by the Government in the Receivership Proceeding – are property of this bankruptcy estate. This Court and many others have held that causes of action that exist as of the petition date, including for avoidable fraudulent transfers, are property of the estate under sections 541 and 544(b) of the Bankruptcy Code. *In re Zwirn*, 362 B.R. 536 (Bankr. S.D. Fla. 2007)(In granting a trustee's motion to settle a creditor's pre-petition fraudulent transfer lawsuit over the creditor's objection, Judge Cristol held: ". . . the better, well-reasoned approach is to conclude that [fraudulent transfer] claims are property of the estate as of the petition date, and that they are solely within the power of a bankruptcy trustee to commence and prosecute . . ."(citations omitted)); *In re C.D. Jones & Company, Inc.*, 482 B.R. 449 (Bankr.

---

[4] The Trustee takes no position with respect to any other claims the Government might have against Anan.

N.D. Fla. 2012) (Holding that any claims asserted in state court which belonged to the Debtor as of the petition date (including fraudulent transfer claims) are property of the estate); *In re Xenerga, Inc.*, 449 B.R. 594 (Bankr. M.D. Fla. 2011)(claims based on customers' alter ego allegations where property of the bankruptcy estate); *In re Moore*, 608 F. 3d 253 (5th Cir. 2010) (fraudulent transfer and veil piercing causes of action deemed property of the estate as of the petition date under sections 541(a)(1) and 544(b), which the trustee can sell).

19.     Moreover, it is universally held that once a bankruptcy is filed, the trustee has the exclusive standing to pursue fraudulent transfer litigation and other avoidance causes of action.  *In re Zwirn*, 362 B.R. at 539-540); *In re Xenerga, Inc.*, 449 B.R. at 599; *In re Pearlman*, 472 B.R. 115, 122 (Bankr. S.D. Fla. 2012) ("Indeed, *only the trustee* can bring federal and state law fraudulent transfer actions to recover property for the bankrupt estate)(emphasis in original); *In re Clark*, 374 B.R. 874, 876 (Bankr. M.D. Ala. 2007) ("It is a matter of black letter law that once a bankruptcy case is filed, the Trustee in bankruptcy has the exclusive right to bring a fraudulent conveyance suit to recover property transferred by the debtor"); *In re Morris*, 2011 WL 4544057 *3 (Bankr.N.D. Ohio 2011) ("The chapter 7 trustee has exclusive standing to prosecute or settle avoidance actions for the purpose of orderly administration of the bankruptcy estate"); *In re Fritz,* 88 B.R. 434 (Bankr.S.D. Fla.1988) (creditor lacks standing to assert avoidance claim because this claim "is available only to the bankruptcy trustee, not to a creditor."); *Nat'l Tax Credit Partners, L.P. v. Havlik,* 20 F.3d 705, 708–709 (7th Cir.1994); ("[T]he right to recoup a fraudulent transfer, which outside of bankruptcy may be invoked by a creditor, is property of the estate that only a trustee or debtor in possession may pursue once a bankruptcy is under way.").

20.     There can be no question that the Government is prosecuting claims belonging to the Trustee.  As set forth above, the Government is suing Anan for the exact same $3.6 million (i.e., the Anan Transfers).  The Government readily admits that the Trustee's suit against Anan to avoid and recover fraudulent transfers is based out of "the same facts that form the Bureau's claims against Anan."  *See* Exhibit "C".  Those facts are set forth in paragraph 210 of the Amended Complaint:  the payment of $3.6 million *from the Debtor* to Anan, for services not rendered.  The Government is seeking repayment, or disgorgement, of money the Debtor paid Anan for no consideration.

### The Government's Claims Against Anan are Subject to the Automatic Stay and are not within the "Police Power Exception"

21.     Because the Government is prosecuting a cause of action belonging to this estate, it is subject to 11 U.S.C. § 362(a)(3) which acts as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate".  *In re Zwirn*, 362 B.R. at 539 (". . . *all* courts appear to agree that commencing a bankruptcy case stays any state court fraudulent conveyance actions by a creditor (citations omitted); *GATX Corporation v. Addington*, 2012 WL 896241, *2 (E.D. Ky. 2012) "[C]ourts have consistently held that pre-petition fraudulent conveyance claims brought against a third-party transferee are automatically stayed once the debtor-transferor files a petition for bankruptcy. . . . To allow a creditor to pursue a fraudulent conveyance claim against a third party transferee would frustrate the Bankruptcy Code's policy of equitable distribution among creditors by allowing the creditor 'to push its way to the front of the line of creditors.'" *Id. at *3, citing National Labor Relations Board v. Martin Arsham Sewing Company,* 873 F.2d 884 (6th Cir.1989).

22.     The Government takes the position that its suit to recover the Anan Transfers is subject to the "police power" exception of 11 U.S.C. § 362(b)(4), which permits a government enforce its ". . . police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's . . . police or regulatory power."

23.     However, the "police power" exception is "intended to be given a *narrow construction* in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate." *In re Blunt*, 210 B.R. 626, 634 (Bank. M.D. Fla. 1999) *citing*   HR Rep. No. 595, 95th Cong., 1st Sess. 342 (1977) U.S.Code Cong. & Admin.News 1978, p. 5787 (emphasis added).  "The legislative history of this section indicates that when a debtor is sued by a governmental unit in order "to prevent or stop violation of fraud . . . *consumer protection* . . . or similar police or regulatory laws, *or attempting to fix damages for violation* of such a law, the action or proceeding is not stayed under the automatic stay."  *In re First Alliance Mortgage Co.*, 263 B.R. 99, 106 (9th Cir BAP 2001) (emphasis in original).

24.     Not every police or regulatory action is automatically exempt from the stay. Regulatory actions which "*directly conflict with the control of the res or property by the bankruptcy court will be stayed*."  *Id.*, *citing In re Universal Life Church, Inc.*, 128 F. 3d 1294, 1297 (9th Cir. 1997) (emphasis added).  Moreover, if the government is acting in furtherance of its "pecuniary purpose", the action will also be subject to the automatic stay.  Under the "pecuniary purpose" test, the court must determine "whether the government action relates primarily to the protection of the government's pecuniary interest in the debtor's property or to matters of public safety and welfare." *Id.* at 1297 (citations omitted).  The relevant inquiry is

whether the action is being pursued "solely to advance a pecuniary interest of the governmental unit," in which case the stay will be imposed. *Id.* (citations omitted).  Such actions have been described as those that would "result in an economic advantage to the government or its citizens over third parties in relation to the debtor's estate." *In re First Alliance Mortgage Co.*, 263 B.R. at 106; *In re Charter First Mortg., Inc.,* 42 B.R. 380, 382 (Bankr.D.Or.1984).

25.    By prosecuting the Anan Transfers, the Government is not seeking to stop a fraud or a violation of consumer protection laws.  Nor is it seeking to fix damages for violations of consumer protection laws (by Anan).  Injunctive Relief has been entered with respect to the Debtor's and its affiliates' operations which allegedly violated consumer protection laws.  The operations have ceased.  The Debtor has been in chapter 7 with a court appointed fiduciary for some time.  Contrary to the extensive allegations against the Debtor and certain related entities and individuals, there are no facts alleged in the Amended Complaint that suggest that Anan violated consumer protection laws.  Rather, in one paragraph, the Government alleges that Anan is controlled by a relative of the Debtor's principal (paragraph 63), and in another paragraph the Government alleges that Anan received the Anan Transfers for no consideration (paragraph 210).

26.    Instead, the Government has taken an action which "directly conflicts with the control of the *res* or property" under the jurisdiction of this Court.  And further, the Government's action is solely being pursued to advance a pecuniary interest (i.e., recovery of the Anan Transfers).[5]

---

[5] The Government will argue that it is seeking to recover the Anan Transfers on behalf of consumers of the Debtor, along with consumers of other defendants in the Receivership Proceeding, including True Count Staffing, Inc. and Prime Consulting, LLC.  That is a pecuniary interest.  The Trustee is seeking to recover the Anan Transfers on behalf of the creditors of the estate, which do not necessarily include consumers of the non-debtor entities and also include creditors other than the Government (which Government claims are currently disputed).

27.     Prior to the filing of this Motion, the Trustee advised the Government that by prosecuting the Anan Transfers, it violated the automatic stay and was interfering with the Trustee's administration of the estate.  The parties had a meet and confer to discuss.  To support its argument that it could freely sue Anan for the Anan Transfers, the Government cited two cases:  *In re Wyly*, 526 B.R. 194 (Bankr. N.D. Texas 2015) and an unreported decision by this Court in *Rothschild Reserve International, Inc.*, Case No. 01-30448-BKC-SHF (Bankr. S.D. Fla. May 3, 2001), a copy of which is attached as **Exhibit "D"**.  Each of those cases stand for the unremarkable position that the automatic stay does not bar the government from naming a *debtor* as a relief defendant for alleged violations of federal securities laws.[6]  Neither of those cases state that the government can prosecute claims against third parties based on transfers from the debtor in bankruptcy, nor do they otherwise contradict the extensive authority holding that only the Trustee can prosecute causes of action belonging to the estate.


**[THIS SPACE WAS INTENTIONALLY LEFT BLANK]**

---

[6] Which is exactly what happened in this case.  Several months after the Petition Date, the Government named the Debtor as a defendant in the Receivership Proceeding based on alleged violations of consumer protection laws.  The Trustee has not disputed the Debtor's presence in that lawsuit and in fact has offered to stipulate to the issuance of permanent injunctive relief therein.

**WHEREFORE**, the Trustee respectfully requests that this Court enter an Order granting this Motion, enforcing the automatic stay as to the Government's prosecution of the Anan Transfers, and granting such other and further relief as is proper.

Respectfully submitted on March 10, 2020.

**GENOVESE JOBLOVE & BATTISTA, P.A.**
*Attorneys for Chapter 7 Trustee*
100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310

By*:    /s/ Glenn D. Moses*
      Glenn D. Moses, Esq.
      Florida Bar No. 174556
      gmoses@gjb-law.com
      Heather L. Harmon
      Florida Bar No. 013192
      hharmon@gjb-law.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via CM/ECF notification upon all interested parties registered to receive electronic notification on this matter as indicated on the service list below on this 10th day of March, 2020.

By*:    /s/ Glenn D. Moses*
      Glenn D. Moses, Esq.

12

## **SERVICE LIST**

**Notice will be electronically mailed via CM/ECF upon:**

Jeffrey P. Bast, Esq. on behalf of Interested Party Natural Nine Staffing, Inc.
jbast@bastamron.com,
jdepina@bastamron.com;kjones@bastamron.com;jmiranda@bastamron.com;mdesvergunat@bastamron.com

Jeffrey P. Bast, Esq. on behalf of Interested Party TN Accounting, Inc. jbast@bastamron.com,
jdepina@bastamron.com;kjones@bastamron.com;jmiranda@bastamron.com;mdesvergunat@bastamron.com

Jeffrey P. Bast, Esq. on behalf of Interested Party Tuong Nguyen jbast@bastamron.com,
jdepina@bastamron.com;kjones@bastamron.com;jmiranda@bastamron.com;mdesvergunat@bastamron.com

Brian S Behar, Esq on behalf of Debtor Consumer Advocacy Center Inc. bsb@bgglaw.net

Michael S Budwick, Esq on behalf of Interested Party Anan Enterprises, Inc.
mbudwick@melandrussin.com,
ltannenbaum@melandrussin.com;mrbnefs@yahoo.com;mbudwick@ecf.courtdrive.com;ltannenbaum@ecf.courtdrive.com;phornia@ecf.courtdrive.com

Larry I Glick on behalf of Interested Party Albert Kim
lglick@shutts.com, dsuengas@shutts.com

Heather L Harmon, Esq on behalf of Trustee Sonya Salkin Slott
HHarmon@gjb-law.com, gjbecf@gjb-law.com;ecastellanos@gjb-law.com;gjbecf@ecf.courtdrive.com;jzamora@gjb-law.com

Peter H Levitt, Esq on behalf of Interested Party Albert Kim
plevitt@shutts-law.com, sboisvert@shutts.com

Glenn D Moses, Esq on behalf of Plaintiff Sonya Salkin Slott
gmoses@gjb-law.com, gjbecf@gjb-law.com;chopkins@gjb-law.com;vlambdin@gjb-law.com;jzamora@gjb-law.com;gjbecf@ecf.courtdrive.com;ecastellanos@gjb-law.com

Glenn D Moses, Esq on behalf of Trustee Sonya Salkin Slott
gmoses@gjb-law.com, gjbecf@gjb-law.com;chopkins@gjb-law.com;vlambdin@gjb-law.com;jzamora@gjb-law.com;gjbecf@ecf.courtdrive.com;ecastellanos@gjb-law.com

Michael A. Nardella on behalf of Creditor Guaranteed Rate Inc.
mnardella@nardellalaw.com, service@nardellalaw.com

13

Office of the US Trustee USTPRegion21.MM.ECF@usdoj.gov

Sarah Preis on behalf of Creditor Bureau of Consumer Financial Protection
sarah.preis@cfpb.gov

David A Ray, Esq. on behalf of Interested Party House Lannister Staffing, Inc.
dray@draypa.com, draycmecf@gmail.com;sramirez.dar@gmail.com

Evan Romanoff on behalf of Creditor State of Minnesota Office of the Attorney General
evan.romanoff@ag.state.mn.us

Zana Michelle Scarlett on behalf of U.S. Trustee Office of the US Trustee
Zana.M.Scarlett@usdoj.gov

Sonya Salkin Slott
sonya@msbankrupt.com,
FL41@ecfcbis.com;sls1@trustesolutions.net;mark@msbankrupt.com;Kristen@msbankrupt.com
;sls@msbankrupt.com;trusteesalkin@msbankrupt.com;Zachary@msbankrupt.com

Charles R Sterbach on behalf of U.S. Trustee Office of the US Trustee
Charles.r.sterbach@usdoj.gov

Jesse D Stewart on behalf of Creditor Bureau of Consumer Financial Protection
jesse.stewart@cfpb.gov

M Lynne Weaver on behalf of Creditor State of North Carolina
lweaver@ncdoj.gov

# EXHIBIT "A"

1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| Bureau of Consumer Financial Protection, et al. | CASE NO. 8:19-cv-01998 JVS (JDEx) |
| Plaintiffs, | **STIPULATED PRELIMINARY** |
| v. | **INJUNCTION WITH ASSET** |
| Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, et al. | **FREEZE, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF** |
| Defendants. | |

Plaintiffs, the Bureau of Consumer Financial Protection (Bureau), the State of Minnesota, the State of North Carolina, and The People of the State of California (collectively, Plaintiffs) commenced this civil action on October 21, 2019, alleging violations of state and federal law against the Defendants. The Bureau has filed the complaint under the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564, and 5565, and the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6102(c)(2), 6105(d)

1

(Telemarketing Act), based on Defendants' violations of the CFPA and the Telemarketing Sales Rule (TSR), 16 C.F.R. pt. 310. The State of Minnesota has alleged violations of the Minnesota Prevention of Consumer Fraud Act (MNCFA), Minn. Stat. §§ 325F.68-.694, the Minnesota Uniform Deceptive Trade Practices Act (MNDTPA), Minn. Stat. §§ 325D.43-.48, and the Telemarketing Act and its implementing regulation, the TSR. The State of North Carolina has alleged violations of North Carolina's Debt Adjusting Act (NCDAA), N.C. Gen. Stat. § 14-423 *et seq.*, North Carolina's Telephonic Seller Registration Act (NCTSRA), N.C. Gen. Stat. § 66-260 *et seq.*, North Carolina's Unfair and Deceptive Practices Act (NCUDPA), N.C. Gen. Stat. § 75-1.1, and the Telemarketing Act and its implementing regulation, the TSR. The People of the State of California have alleged violations of California's Business and Professions Code 17200 *et seq.* (the Unfair Competition Law or UCL), and the Telemarketing Act and its implementing regulation, the TSR.

The Complaint alleges that Defendants' acts or practices violate these laws in connection with the marketing and sale of student-loan debt-relief services. The Complaint seeks permanent injunctive relief, damages, rescission or reformation of contracts, the refund of monies paid, restitution, disgorgement, compensation for unjust enrichment, and civil money penalties.

The Bureau also moved for a temporary restraining order pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, and an order to show cause why a preliminary injunction should not issue against Defendants and Relief Defendants. California, Minnesota, and North Carolina joined that motion.  On October 21, 2019, this Court granted Plaintiffs' motion and entered the Temporary Restraining Order (TRO), which included an asset freeze as to Defendants (except Consumer Advocacy Center, Inc., whose assets are currently overseen by a Chapter 7 bankruptcy trustee) and Relief Defendants; preliminary injunctive relief as to all Defendants, and the appointment of a temporary receiver over Defendants True

2

Count Staffing Inc. (True Count) and Prime Consulting LLC (Prime), and other equitable relief. The Court also ordered all named Defendants to show cause as to why the Court should not enter a preliminary injunction (Order) enjoining the violations of law alleged in Plaintiffs' Complaint, continuing the freeze of their Assets, and imposing such additional relief as may be appropriate.

The Plaintiffs and all Defendants, except for the Chapter 7 Trustee on behalf of Defendant Consumer Advocacy Center Inc., have agreed to the entry of this preliminary injunction order, and the Chapter 7 Trustee having advised the Court separately that his does not oppose entry of this order.

**THEREFORE, IT IS ORDERED** as follows:

### FINDINGS

By stipulation of the parties, the Court finds that:

1.    This Court has jurisdiction over the subject matter of this case, there is good cause to believe that it will have jurisdiction over all the parties hereto, and venue in this district is proper;

2.    There is good cause to believe that Defendants: (a) Consumer Advocacy Center Inc., a California corporation, d/b/a Premier Student Loan Center, (collectively CAC); (b) True Count Staffing Inc., a California Corporation, d/b/a SL Account Management (collectively True Count); (c) Prime Consulting LLC, a Wyoming limited liability corporation registered to operate in California d/b/a Financial Preparation Services (collectively, Prime); (d) Albert Kim (aka Albert King), an individual; (e) Kaine Wen (aka Wenting Kaine Dai, Wen Ting Dai, Kaine Wen Dai), an individual; and (f) Tuong Nguyen (aka Tom Nelson), an individual, have engaged and are likely to continue to engage in acts or practices that violate the CFPA, the TSR, the MNCFA, the MNDTPA, the NCDAA, the NCTSRA, the NCUDPA, and the UCL. And, there is good cause to believe that Relief Defendants (a) Infinite Management Corp., a California corporation, formerly known as Infinite Management Solutions Inc., (b) Hold The Door, Corp.,

_____
STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND
OTHER EQUITABLE RELIEF

a California corporation, and (c) TN Accounting Inc., a California corporation, have received funds or assets and are likely to continue to receive funds or assets that can be traced directly to Defendants' unlawful acts and practices. Plaintiffs are therefore likely to prevail on the merits of this action;

3.     There is good cause to believe that immediate and irreparable harm will result from Defendants' ongoing violations of these laws unless Defendants and Relief Defendants are preliminarily restrained and enjoined by Order of this Court;

4.     There is good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for consumers in the form of monetary damages, restitution, and disgorgement or compensation for unjust enrichment will occur from the transfer, dissipation, or other disposition or concealment by Defendants and Relief Defendants of their assets or business records unless Defendants and Relief Defendants continue to be restrained and enjoined by Order of this Court;

5.     Good cause exists for continuing the receivership over True Count and Prime and permitting Plaintiffs continued access to Defendants' business premises at the discretion of the Receiver;

6.     Weighing the equities and considering Plaintiffs' likelihood of ultimate success on the merits, this Order is in the public interest;

7.     The automatic stay of the Bankruptcy Code does not stay the relief granted herein against CAC, which has filed for bankruptcy in United States Bankruptcy Court in the Southern District of Florida, Fort Lauderdale Division, Case No. 10-10655, because the relief granted herein falls within the police and regulatory power exception to the automatic stay set forth in 11 U.S.C. § 362(a), (b)(4);

8.     This Court has authority to issue this order pursuant to 12 U.S.C. § 5565 and Federal Rule of Civil Procedure 65; and

4

9. As the Bureau is an agency of the United States, no security is required for this Order. Fed. R. Civ. P. 65(c).

10. No security is required of the States of Minnesota, North Carolina, or California for issuance of a preliminary injunction. *See* Minn. Stat. § 574.18; *State v. Nelson*, 189 Minn. 87, 89-90, N.W. 751, 752 (1933); N.C. R. Civ. Proc. 65(c); Cal. Code Civ. Proc. § 529, subd. (b)(3).

## DEFINITIONS

For the purposes of this Order, the following definitions shall apply:

1. "**Assets**" means, except as provided herein, any legal or equitable interest in, right to, or claim to any real, personal, or intellectual property owned or controlled by, or held, in whole or in part for the benefit of, or subject to access by any Defendant or Relief Defendant, wherever located, whether in the United States or abroad. This includes, but is not limited to, chattel, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds, contracts, mail or other deliveries, shares of stock, commodities, futures, inventory, checks, notes, accounts, credits, receivables (as those terms are defined in the Uniform Commercial Code), funds, cash, and trusts, including, but not limited to any trust held for the benefit of any Individual Defendants' minor children, or any of the Individual Defendants' spouses. It shall include both existing Assets and Assets acquired after the date of entry of this Order, *provided, however*, all legal and equitable interests in property of the chapter 7 debtor, Consumer Advocacy Center

STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF

Inc., d/b/a Premier Student Loan Center, which interests are property of the Bankruptcy Estate pursuant to 11 U.S.C. § 541, are excluded from this definition;

    2.    "**Assisting Others**" includes, but is not limited to

        a.  providing paralegal or administrative support services;

        b.  performing customer service functions including, but not limited to, receiving or responding to Consumer complaints;

        c.  formulating or providing, or arranging for the formulation or provision of, any advertising or marketing material, including, but not limited to, any telephone sales script, direct mail solicitation, or the text of any Internet website, email, or other electronic communication;

        d.  formulating or providing, or arranging for the formulation or provision of, any marketing support material or service, including but not limited to, web or Internet Protocol addresses or domain name registration for any Internet websites, affiliate marketing services, or media placement services;

        e.  providing names of, or assisting in the generation of, potential customers;

        f.  performing marketing, billing, or payment services of any kind;

        g.  acting or serving as an owner, officer, director, manager, or principal of any entity; and

    3.    "**Bankruptcy Estate**" means the bankruptcy estate created within the Bankruptcy Proceeding by operation of law pursuant to 11 U.S.C. § 541;

    4.    "**Bankruptcy Proceeding**" means *In re Consumer Advocacy Center Inc.*, Case No. 19-10655, currently pending in the United States Bankruptcy Court, Southern District of Florida, Fort Lauderdale Division;

    5.    "**Bureau**" means the Bureau of Consumer Financial Protection;

    6.    "**Chapter 7 Trustee**" means Sonya Salkin Slott, the Trustee appointed over Defendant Consumer Advocacy Center Inc. d/b/a Premier Student

Loan Center by the United States Bankruptcy Court, Southern District of Florida, Fort Lauderdale Division in the Bankruptcy Proceeding and any successor trustee.

     7.    "**Consumer**" means an individual or an agent, trustee, or representative acting on behalf of an individual;

     8.    "**Debt**" means any obligation or alleged obligation to pay money, whether or not such obligation has been reduced to judgment;

     9.    "**Debt-Relief Product or Service**" means any product, service, plan, or program represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the Debt between a Consumer and one or more creditors or Debt collectors, including but not limited to, a reduction in the balance, interest rate, or fees owed by a Person to a creditor or Debt collector;

     10.    "**Defendants**" means the Corporate Defendants, Individual Defendants, and Relief Defendants, individually, collectively, or in any combination, and each of them by whatever names each might be known;

        a.    "**Corporate Defendants**" means Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, True Count Staffing Inc., d/b/a SL Account Management, Prime Consulting LLC, d/b/a Financial Preparation Services, and any other name by which each Corporate Defendant may be known or operate;

        b.    "**Individual Defendants**" means Albert Kim (aka Albert King), Kaine Wen (aka Wenting Kaine Dai, Wen Ting Dai, Kaine Wen Dai), and Tuong Nguyen (aka Tom Nelson), and any other name by which each Individual Defendant may be known;

        c.    "**Receivership Defendants**" means True Count Staffing Inc., d/b/a SL Account Management, Prime Consulting LLC, d/b/a Financial Preparation Services, TAS 2019 LLC d/b/a Trusted Account Services, First Priority LLC, and Horizon Consultants LLC,

and their successors, assigns, affiliates, or subsidiaries, and each of
them, by whatever names each may be known, provided that the
Receiver has reason to believe they are owned or controlled in whole
or in part by any of the Receivership Defendants;

d.    "**Relief Defendants**" means Infinite Management Corp., f/k/a
Infinite Management Solutions Inc., Hold The Door, Corp., TN
Accounting Inc., and any other name by which each Relief Defendant
may be known or operate; and

11.    "**Document**" and "**Electronically Stored Information**" are
synonymous in meaning and equal in scope to the usage of the terms in Rule 34(a)
of the Federal Rules of Civil Procedure and include but are not limited to:

a.    the original or a true copy of any written, typed, printed,
electronically stored, transcribed, taped, recorded, filmed, punched,
or graphic matter or other data compilations of any kind, including,
but not limited to, letters, email or other correspondence, messages,
memoranda, paper, interoffice communications, notes, reports,
summaries, manuals, magnetic tapes or discs, tabulations, books,
records, checks, invoices, work papers, journals, ledgers, statements,
returns, reports, schedules, files, charts, logs, electronic files, stored
in any medium;

b.    any electronically created or stored information, including but
not limited to electronic mail, instant messaging, videoconferencing,
SMS, MMS, or other text messaging, and other electronic
correspondence (whether active, archived, unsent, or in an deleted
items folder), word processing files, spreadsheets, databases,
Document metadata, presentation files, and sound recordings,
whether stored on any cell phones, smartphones, flash drives,
personal digital assistants ("PDAs"), cards, desktop personal

8

computer and workstations, laptops, notebooks and other portable
computers, or other electronic storage media, backup disks and tapes,
archive disks and tapes, and other forms of offline storage, whether
assigned to individuals or in pools of computers available for shared
use, or personally owned but used for work-related purposes, whether
stored on-site with the computer used to generate them, stored offsite
in another company facility, or stored, hosted, or otherwise
maintained off-site by a third party; and computers and related offsite
storage used by Defendants or Defendants' participating associates,
which may include Persons who are not employees of the company
or who do not work on company premises; and

12.    "**Electronic Data Host**" means any Person or entity that stores, hosts,
or otherwise maintains electronically stored information;

13.    "**Financial Institution**" means any bank, savings and loan
institution, credit union, or any financial depository of any kind, including, but not
limited to, any brokerage house, trustee, broker-dealer, escrow agent, title
company, commodity trading company, or precious metal dealer;

14.    "**Person**" means an individual, partnership, company, corporation,
association (incorporated or unincorporated), trust, estate, cooperative
organization, or other entity;

15.    "**Plaintiffs**" means the Bureau of Consumer Financial Protection, the
State of Minnesota, the State of North Carolina, and the People of the State of
California;

16.    "**Receiver**" means the receiver appointed in Section XII of this Order
and any deputy receivers that shall be named by the receiver;

17.    "**Telemarketer**" means any Person who, in connection with
Telemarketing, initiates or receives telephone calls to or from a customer or donor.
16 C.F.R. § 310.2(cc); and

9

18.    "**Telemarketing**" means a plan, program, or campaign (whether or
not covered by the TSR, 16 C.F.R. Part 310) that is conducted to induce the
purchase of goods or services or a charitable contribution by use of one or more
telephones.

## ORDER

## I.  RESTRICTIONS ON ADVANCE FEES

**IT IS FURTHER ORDERED** that, in connection with Telemarketing,
Defendants and their successors, assigns, officers, agents, servants, employees, and
attorneys, and those Persons in active concert or participation with any of them,
who receive actual notice of this Order by personal service, facsimile transmission,
email, or otherwise, whether acting directly or indirectly, are hereby preliminarily
restrained and enjoined from requesting or receiving payment or fees or
consideration for any Debt-Relief Product or Service before:

> A.  They have negotiated, settled, reduced, or otherwise altered the terms of
> at least one Debt pursuant to a settlement agreement, Debt management
> plan, or other such valid contractual agreement executed by the
> customer; and

> B.  The customer has made at least one payment pursuant to that
> agreement.

## II. PROHIBITED REPRESENTATIONS AND CONDUCT

**IT IS FURTHER ORDERED** that Defendants and their successors,
assigns, officers, agents, servants, employees, and attorneys, and those Persons in
active concert or participation with any of them, who receive actual notice of this
Order by personal service, facsimile transmission, email, or otherwise, whether
acting directly or indirectly, in connection with the advertising, marketing,
promotion, offering for sale, sale, performance of any Debt-Relief Product or
Service, are hereby preliminarily restrained and enjoined from falsely representing,
or from Assisting Others who are falsely representing, expressly or by implication,

10

any material aspect of any service performed by the Defendant or any other person, including, but not limited to:

    A.  The nature, purpose, or any other material aspect of any fee collected by any Defendant or any other person;

    B.  That any Defendant or any other Person will or likely will help obtain forgiveness of any loan under a federal student loan forgiveness program; and

    C.  That any Defendant or any other Person will or likely will help obtain lower payments on any loan under a federal student loan repayment program.

    **IT IS FURTHER ORDERED** that Defendants and their successors, assigns, officers, agents, servants, employees, and attorneys, and those Persons in active concert or participation with any of them, who receive actual notice of this Order by personal service, facsimile transmission, email, or otherwise, whether acting directly or indirectly, in connection with the advertising, marketing, promotion, offering for sale, sale, performance of any Debt-Relief Product or Service, are hereby preliminarily restrained and enjoined from engaging in violations of the MNCFA, the MNDTPA, the NCDAA, the NCTSRA, the NCUDPA, and the UCL.

### III.   PRESERVATION OF RECORDS AND TANGIBLE THINGS

    **IT IS FURTHER ORDERED** that Defendants and their successors, assigns, officers, agents, servants, employees, independent contractors, and attorneys, and those Persons in active concert or participation with any of them, who receive actual notice of this Order by personal service, facsimile transmission, email, or otherwise, whether acting directly or indirectly are hereby preliminarily enjoined from destroying, erasing, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, any Documents or

records that relate to the business practices, or business or personal finances of any
Defendant, or other entity directly or indirectly under the control of any Defendant.

## IV.   WEBSITES

**IT IS FURTHER ORDERED** that, immediately upon service of this Order
upon them and to the extent not already done so pursuant to the TRO, (1) any
Person hosting any Internet website for, or on behalf of, any Defendant, and (2)
Defendants and their successors, assigns, officers, agents, servants, employees,
independent contractors, and attorneys, and those Persons in active concert or
participation with any of them, who receive actual notice of this order by personal
service, facsimile transmission, email, or otherwise, whether acting directly or
through any corporation, subsidiary, division, or other device, shall:

    A. Prevent the destruction or erasure of any Internet website used by
        Defendants for the advertising, marketing, promotion, offering for sale,
        sale, or performance of any Debt-Relief Service, by preserving such
        website in the format in which it is maintained currently; and

    B. Immediately notify Plaintiffs' counsel, in writing, of any other Internet
        website operated or controlled by any Defendant.

## V.   INTERNET DOMAIN NAME REGISTRATIONS

**IT IS FURTHER ORDERED** that upon service of this Order and to the
extent not already done so pursuant to the TRO, any domain name registrar shall
provide immediate notice to Plaintiffs' counsel of any Internet domain names
registered or controlled by any Defendants.

## VI.   ASSET FREEZE

**IT IS FURTHER ORDERED** that Receivership Defendants, Individual
Defendants, or Relief Defendants, and their successors, assigns, officers, agents,
servants, employees, independent contractors, and attorneys, and all Persons
directly or indirectly under the control of any of them, including any Financial
Institution, and all other Persons in active concert or participation with any of

12

them, who receive actual notice of this Order by personal service, facsimile, email, or otherwise, are hereby preliminarily restrained and enjoined from directly or indirectly:

    A. Selling, liquidating, assigning, transferring, converting, loaning, hypothecating, disbursing, gifting, conveying, encumbering, pledging, concealing, dissipating, spending, withdrawing, or otherwise disposing of any Asset that is:

        1. owned or controlled, directly or indirectly, by any Defendant, including, but not limited to those for which a Defendant is a signatory on the account;

        2. held, in part or in whole, for the benefit of any Defendant

        3. in the actual or constructive possession of any Defendant; or

        4. in the actual or constructive possession of, or owned or controlled by, or subject to access by, or belonging to, any corporation, partnership, trust or other entity directly or indirectly owned, managed or controlled by any Defendant; and

    B. Opening, or causing to be opened, any safe deposit box, commercial mail box, or storage facility belonging to, for the use or benefit of, controlled by, or titled in the name of any Defendant or subject to access by any Defendant;

    C. Incurring charges or cash advances on any credit card, stored value card, debit card, or charge card issued in the name, singly or jointly, of any Defendant or any other entity directly or indirectly owned, managed, or controlled by any Defendant;

    D. Cashing any checks or depositing or processing any payment from any Consumer, client, or customer of any Defendant; and

    E. Incurring liens or encumbrances on real property, personal property, or other Assets in the name, singly or jointly, of Defendants or of any

13

corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant.

F. Notwithstanding Section VI.D, this Order does not prevent Individual Defendants from opening new bank or credit card accounts so long as such accounts are funded only with monies not attributable to the activities alleged in the Bureau's Complaint, and so long as the Individual Defendants contemporaneously notify the Receiver and the Bureau in writing of such openings, the source of the funds for any such accounts, and the intended source of such funds in the future.

**IT IS FURTHER ORDERED** that the Assets affected by this Section shall include: (a) all Assets of each Receivership Defendant, Individual Defendant, or Relief Defendant, as of the time this Order is entered, and (b) those Assets obtained or received after entry of this Order that are derived, directly or indirectly, from the actions alleged in Plaintiffs' Complaint or actions that are prohibited by this Order. This Section does not prohibit transfers to the Receiver, as specifically required in Section XVI (Delivery of Receivership Property), nor does it prohibit the Repatriation of Foreign Assets, as specifically required in Section X of this Order, nor does it prohibit the transfers of property of the Bankruptcy Estate to the Chapter 7 Trustee.

## VII.   RETENTION OF ASSETS AND RECORDS BY FINANCIAL INSTITUTIONS AND OTHER THIRD PARTIES

**IT IS FURTHER ORDERED** that, except as otherwise ordered by this Court, any Financial Institution, brokerage, business entity, Electronic Data Host, payment processor, merchant bank, payment gateway, or Person served with a copy of this Order, or who otherwise has actual or constructive knowledge of this Order, that has held, controlled, or maintained custody of any account, Document, or Asset of, on behalf of, in the name of, for the benefit of, subject to withdrawal by, subject to access or use by, or under the signatory power of any Defendant, or

14

other party subject to Section VI (Asset Freeze) above, or has held, controlled, or maintained any such account, Document, or Asset shall:

    A. Hold, preserve, and retain within such person's control, and prohibit the withdrawal, removal, alteration, assignment, transfer, pledge, hypothecation, encumbrance, disbursement, dissipation, conversion, sale, liquidation, or other disposal of such account, Document, or Asset held by or under such person's control, except (1) as directed by further order of the Court; (2) as directed in writing by the Receiver regarding accounts, Documents, or Assets held in the name of or benefit of any Defendant; or (3) as directed in writing by the Chapter 7 Trustee regarding accounts and Assets held in the name of or for the benefit of the Bankruptcy Estate;

    B. Provide the Receiver, the Receiver's agents, Plaintiffs, and Plaintiffs' agents immediate access to Documents, including those electronically stored, hosted, or otherwise maintained on behalf of Defendants, for forensic imaging or copying;

    C. Deny access to any safe deposit box, commercial mail box, or storage facility belonging to, for the use or benefit of, controlled by, or titled in the name of any Defendant, or subject to access by any Defendant or other party subject to Section VI (Asset Freeze) above, except that this subsection shall not limit the Receiver's access to such places, nor shall it limit the Chapter 7 Trustee's access to such places insofar as it relates to property interests of Consumer Advocacy Center Inc. d/b/a Premier Student Loan Center;

    D. Provide to Plaintiffs' counsel, the Receiver, and to the Chapter 7 Trustee as it relates to property interests of Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, within three business day of receiving a copy of this Order, a sworn statement setting forth:

1. the identification of each account or Asset titled in the name, individually or jointly, or held on behalf of or for the benefit of, subject to withdrawal by, subject to access or use by, or under the signatory power of any Defendant, or other party subject to Section VI (Asset Freeze) above, whether in whole or in part;

2. the balance of each such account, or a description of the nature and value of such Asset, as of the close of business on the day on which this Order is served;

3. the identification of any safe deposit box, commercial mail box, or storage facility belonging to, for the use or benefit of, controlled by, or titled in the name of any Defendant, or subject to access by any Defendant, or other party subject to Section VI (Asset Freeze) above, whether in whole or in part;

4. if the account, safe deposit box, or other Asset has been closed or removed, the date closed or removed, the balance on said date, and the name or the Person or entity to whom such account or other Asset was remitted;

5. Subsection VII.D does not apply to the Chapter 7 Trustee; and

E. Provide to Plaintiffs' counsel, the Receiver, and to the Chapter 7 Trustee as it relates to property interests of Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center, within three business days of receiving a request, copies of all Documents pertaining to such account or Asset, including but not limited to originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs; provided that such institution or custodian may charge a reasonable fee;

F. Cooperate with all reasonable requests of the Receiver relating to this Order's implementation;

G. The accounts subject to this provision include: (a) all Assets of each Defendant deposited as of the time this Order is entered, and (b) those Assets deposited after entry of this Order that are derived from the actions alleged in Plaintiffs' Complaint or actions prohibited by this Order. This Section does not include property of the Bankruptcy Estate under the exclusive control of the Chapter 7 Trustee in the Bankruptcy Proceeding. Further, this Section does not prohibit transfers to the Receiver, as specifically required in Section XVI (Delivery of Receivership Property), nor does it prohibit the Repatriation of Foreign Assets, as specifically required in Section X of this Order, nor does it prohibit the transfer of property of the Bankruptcy Estate to the Chapter 7 Trustee; and

H. Plaintiffs are granted leave, pursuant to Rule 45 of the Federal Rules of Civil Procedure, to subpoena Documents immediately from any Financial Institution, brokerage, business entity, Electronic Data Host, or Person served with a copy of this Order that holds, controls, or maintains custody of any account, Document, or Asset of, on behalf of, in the name of, for the benefit of, subject to access or use by, or under the signatory power of any Defendant or party subject to Section VI (Asset Freeze) above, or has held, controlled, or maintained any such account, Document, or Asset and such financial or brokerage institution, business entity, Electronic Data Host or Person shall respond to such subpoena within three business days after service. This Section does not apply to the Chapter 7 Trustee.

STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND
OTHER EQUITABLE RELIEF

## VIII.  FINANCIAL STATEMENTS AND ACCOUNTING

**IT IS FURTHER ORDERED** that as set forth below, each Receivership Defendant, Individual Defendant, and Relief Defendant, to the extent that they have not each done so pursuant to the TRO, within three (3) business days of service of this Order, shall prepare and deliver to Plaintiffs' counsel and to the Receiver:

A. For each Individual Defendant, a completed financial statement accurate as of the date of service of this Order upon such Defendant on the form of Attachment A to this Order captioned "Individual Financial Statement";

B. For each Receivership Defendant and Relief Defendant, a completed financial statement accurate as of the date of service of this Order upon such Defendant (unless otherwise agreed upon with Plaintiffs' counsel) in the form of Attachment B to this Order captioned "Corporate Financial Statement";

C. A list of all officers and directors of the Receivership Defendants and Relief Defendants and all other individuals or entities with authority to direct the operations of each Receivership Defendant and Relief Defendant or withdraw money from the account of such Defendant;

D. For each Receivership Defendant, Individual Defendant, and Relief Defendant, a statement, verified under oath, of all payments, transfers, or assignments of any Assets worth $5,000 or more since January 1, 2015. Such statements shall include: (a) the amount transferred or assigned; (b) the name of each transferee or assignee; (c) the date of the assignment or transfer; and (d) the type and amount of consideration paid by or to the Defendant.  Each statement shall specify the name and address of each Financial Institution at which Receivership Defendant, Individual Defendant, or Relief Defendant, has accounts or safe deposit boxes; and

18

E. For each Receivership Defendant, Individual Defendant, and Relief Defendant, a detailed accounting, verified under oath, of all gross and net profits obtained from, derived from, or related in any way to the offer for sale or sale of any Debt-Relief Product or Service since January 1, 2015.

F. For each Receivership Defendant, Individual Defendant, and Relief Defendant, other than identifying the name and address of the Financial Institution responsive to Section 8.D, compliance with Sections 8.D and 8.E shall be based on information within each Defendants' possession, custody, and control.

## IX.    CONSUMER CREDIT REPORTS

**IT IS FURTHER ORDERED** that pursuant to Section 604(a)(1) of the Fair Credit Reporting Act, 15 U.S.C. § 1681b(a)(1), Plaintiffs may obtain credit reports concerning any Defendant or Relief Defendant, and that, upon written request, any credit reporting agency from which such reports are requested shall provide them to Plaintiffs.

## X.    REPATRIATION OF FOREIGN ASSETS

**IT IS FURTHER ORDERED** that, to the extent not already done so pursuant to the TRO, within three business days following the service of this Order, each Defendant shall:

A. Provide Plaintiffs' counsel and the Receiver with a full accounting, verified under oath and accurate as of the date of this Order, of all Assets, accounts, and Documents outside of the territory of the United States of America that are held (1) by the Defendant; (2) for any Defendant's benefit or for the benefit of any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed, or controlled by any Defendant; (3) in trust by or for any Defendant, individually or jointly; or (4) under any Defendant's direct or indirect control, individually or jointly;

19

B. Transfer to the territory of the United States of America all Assets, accounts, and Documents in foreign countries held (1) by any Defendant; (2) for any Defendant's benefit; (3) in trust by or for any Defendant, individually or jointly; or (4) under any Defendant's direct or indirect control, individually or jointly;

C. Hold and retain all repatriated Assets, accounts, funds, and Documents, and prevent any transfer, disposition, or dissipation whatsoever of any such Assets, accounts, or Documents;

D. Provide Plaintiffs access to all records of accounts, Documents, or Assets of the Receivership Defendant, Individual Defendant, or Relief Defendant held by Financial Institutions or other third parties located outside the territorial United States of America by signing the Consent to Release of Financial Records attached to this Order as Attachment C. All repatriated Assets, accounts, and Documents are subject to Section VI (Asset Freeze) of this Order; and

E. The same business day as any repatriation, (1) notify the Receiver and counsel for Plaintiffs of the name and location of the Financial Institution or other entity that is the recipient of such Assets, accounts, and Documents; and (2) serve this Order on any such Financial Institution or other entity.

F. This Section does not apply to the Chapter 7 Trustee.

G. Section X.B above may be modified or stayed by agreement of the parties without further order of the Court.

## XI.   NONINTERFERENCE WITH REPATRIATION

**IT IS FURTHER ORDERED** that Defendants and their successors, assigns, officers, agents, servants, employees, and attorneys, and those Persons in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, are

20

hereby preliminarily restrained and enjoined from taking any action, directly or indirectly, which may result in the hindrance of the repatriation required by Section X of this Order, including, but not limited to:

     A. Sending any statement, communication, letter, fax, email or wire transmission, or telephoning or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time that all Assets have been fully repatriated pursuant to Section X (Repatriation of Foreign Assets) of this Order; or

     B. Notifying any trustee, protector, or other agent of any foreign trust or other related entities of either the existence of this Order, or of the fact that repatriation is required pursuant to a court order, until such time that all Assets have been fully repatriated pursuant to Section X (Repatriation of Foreign Assets) of this Order.

## XII.   MONITORING OF BUSINESS ACTIVITY BY PLAINTIFFS

**IT IS FURTHER ORDERED** that agents or representatives of Plaintiffs may contact Defendants directly or anonymously, posing as consumers, suppliers, or other individuals or entities, without the necessity of identification or prior notice, for the purpose of monitoring compliance with the injunctive provisions of this Order, and may tape record any oral communications that occur in the course of such contacts.

## XIII.  REPORT OF NEW BUSINESS ACTIVITY

**IT IS FURTHER ORDERED** that Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby preliminarily restrained and enjoined from creating, operating, or exercising any control over any business entity, whether newly formed or previously inactive, including any partnership, limited partnership, joint

21

venture, sole proprietorship, or corporation, without first providing Plaintiffs'
counsel and the Receiver with a written statement disclosing: (1) the name of the
business entity; (2) the address and telephone number of the business entity; (3) the
names of the business entity's officers, directors, principals, managers, and
employees; and (4) a detailed description of the business entity's intended
activities.

## XIV.  APPOINTMENT OF RECEIVER

**IT IS FURTHER ORDERED** that Thomas W. McNamara shall continue
to serve as Receiver for the business activities of Receivership Defendants with the
full power of an equity receiver. The Receiver shall solely be the agent of this
Court in acting as Receiver under this Order. The Receiver shall be accountable
directly to this Court. The Receiver shall comply with all laws and Local Rules of
this Court governing federal equity receivers.

## XV.   DUTIES AND AUTHORITIES OF RECEIVER

**IT IS FURTHER ORDERED** that the Receiver is directed and authorized
to accomplish the following:

    A. Assume full control of the Receivership Defendants by removing, as the
Receiver deems necessary or advisable, any director, officer, independent
contractor, employee, attorney, or agent of any of the Receivership
Defendants, including but not limited to any named Defendant, from
control of, management of, or participation in, the affairs of the
Receivership Defendants;

    B. Take exclusive custody, control, and possession of all Assets and
Documents of, or in the possession, custody, or under the control of, the
Receivership Defendants, wherever situated. The Receiver will assume
control over the income and profits therefrom and all sums of money now
or hereafter due or owing to the Receivership Defendants. The Receiver
shall have full power to divert mail and to sue for, collect, receive, take

22

into possession, hold, and manage all Assets and Documents of the
Receivership Defendants and other Persons whose interests are now held
by or under the direction, possession, custody, or control of the
Receivership Defendants. *Provided, however,* however, that the Receiver
will not attempt to collect or receive any amount from a Consumer if the
Receiver or Plaintiffs believes the Consumer was a victim of the
unlawful conduct alleged in the complaint in this matter;

C. Take all steps necessary to secure the business premises of the
Receivership Defendants. Such steps may include, but are not limited to,
the following as the Receiver deems necessary or advisable:

1. serving and filing this Order;

2. completing a written inventory of all Receivership Assets;

3. obtaining pertinent information from all employees and other
agents of the Receivership Defendants, including but not limited
to, the name, home address, social security number, job
description, method of compensation, and all accrued and unpaid
commissions and compensation of each such employee or agent,
and all computer hardware and software passwords;

4. videotaping or photographing all portions of such business
premises;

5. securing the location by changing the locks and alarm codes and
disconnecting any internet access or other means of access to the
computers, servers, internal networks, or other records maintained
at that location;

6. requiring any Persons present on the premises at the time this
Order is served to leave the premises, to provide the Receiver with
proof of identification, or to demonstrate to the satisfaction of the

1        Receiver that such Persons are not removing from the premises

2        Documents or Assets of the Receivership Defendants;

3      7. requiring all employees, independent contractors, and consultants

4        of the Receivership Defendants to complete a questionnaire

5        submitted by the Receiver; and

6   D. Conserve, hold, and manage all Receivership Defendants' Assets, and

7      perform all acts necessary or advisable to preserve the value of those

8      Assets, in order to prevent any irreparable loss, damage, or injury to

9      Consumers or to creditors of the Receivership Defendants, including, but

10     not limited to, obtaining an accounting of the Assets and preventing

11     transfer, withdrawal, or misapplication of Assets;

12   E. Liquidate any and all securities or commodities owned by or for the

13     benefit of the Receivership Defendants as the Receiver deems to be

14     advisable or necessary;

15   F. Take all steps necessary to prevent the modification, destruction, or

16     erasure of any web page or website registered to and operated, in whole

17     or in part, by any Defendant, and to provide access to all such web page

18     or websites to Plaintiffs' representatives, agents, and assistants, as well as

19     Defendants and their representatives;

20   G. Enter into contracts and purchase insurance as the Receiver deems to be

21     advisable or necessary;

22   H. Prevent the inequitable distribution of Assets and determine, adjust, and

23     protect the interests of Consumers and creditors who have transacted

24     business with the Receivership Defendants;

25   I. Manage and administer the business of the Receivership Defendants until

26     further order of this Court by performing all incidental acts that the

27     Receiver deems to be advisable or necessary, which includes retaining,

28     hiring, or dismissing any employees, independent contractors, or agents;

24

J. Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

K. Make payments and disbursements from the Receivership Defendants' estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order. The Receiver shall apply to the Court for prior approval of any payment of any Debt or obligation incurred by the Receivership Defendants prior to the date of entry of this Order, except payments that the Receiver deems necessary or advisable to secure Assets of the Receivership Defendants, such as rental payments;

L. Determine and implement measures to ensure that the Receivership Defendants comply with and prevent violations of this Order and all other applicable laws, including, but not limited to, if appropriate, revising sales materials and implementing monitoring procedures;

M. Institute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Defendants, or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order, including but not limited to actions challenging fraudulent or voidable transfers, *provided, however*, that the Receiver shall not attempt to collect any amount from a consumer if the Receiver believes the consumer's liability to the Receivership Entities has resulted from the violations of law alleged in the Complaint in this matter, without prior Court approval;

N. Defend, compromise, adjust, or otherwise dispose of any or all actions or proceedings instituted in the past or in the future against the Receiver in

his or her role as Receiver, or against the Receivership Defendants, that the Receiver deems necessary and advisable to preserve the Assets of the Receivership Defendants or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

O. Continue and conduct the business of the Receivership Defendants in such manner, to such extent, and for such duration as the Receiver may in good faith deem to be necessary or appropriate to operate the business profitably and lawfully, if at all; *provided, however*, that the continuation and conduct of the business shall be conditioned upon the Receiver's good faith determination that the businesses can be lawfully operated at a profit using the Assets of the Receivership Defendants' estate;

P. Take depositions and issue subpoenas to obtain Documents and records pertaining to the receivership estate and compliance with this Order. Subpoenas may be served by agents or attorneys of the Receiver and by agents of any process server retained by the Receiver;

Q. Open one or more bank accounts as designated depositories for funds of the Receivership Defendants. The Receiver shall deposit all funds of the Receivership Defendants in such a designated account and shall make all payments and disbursements from the receivership estate from such account(s);

R. Maintain accurate records of all receipts and expenditures that made as Receiver;

S. Cooperate with reasonable and lawful requests for information or assistance from any state or federal law enforcement agency;

T. If the Receiver identifies a nonparty entity as a Receivership Entity, promptly notify the entity as well as the parties, and inform the entity that it can challenge the Receiver's determination by filing a motion with the Court. Provided, however, that the Receiver may delay providing such

26

notice until the Receiver has established control of the nonparty entity
and its Assets and records, if the Receiver determines that notice to the
entity may result in the destruction of records, dissipation of Assets, or
any other obstruction of the Receiver's control of the entity;

U. Maintain the chain of custody of all of Defendants' records in their
possession;

V. Notify all courts in which Receivership Defendants have litigation
pending, that this case is pending, and request temporary stays, where
appropriate, of those cases or any other necessary relief to preserve the
rights of Consumers; and

W. If in the Receiver's judgment the business operations cannot be continued
legally and profitably, take all steps necessary to ensure that any of the
Receivership Entities' web pages or websites relating to the activities
alleged in the Complaint cannot be accessed by the public, or are
modified solely for consumer education and/or informational purposes,
and take all steps necessary to ensure that any telephone numbers
associated with the Receivership Entities cannot be accessed by the
public, or are answered solely to provide consumer education or
information regarding the status of operations.

**XVI.  CONTINUING ACCESS TO BUSINESS PREMISES AND RECORDS**

**IT IS FURTHER ORDERED** that, consistent with Section XIV of the
TRO, that Plaintiffs, the Receiver, and their respective representatives, agents,
contractors, or assistants, and the Chapter 7 Trustee as it relates to property of the
Bankruptcy Estate, are granted continued access to the Receivership Defendants'
business premises and records.

27

## XVII. COOPERATION WITH RECEIVER

**IT IS FURTHER ORDERED** that:

A. Receivership Defendants, Individual Defendants, and Relief Defendants and their successors, assigns, officers, agents, directors, servants, employees, salespersons, independent contractors, attorneys, and corporations, and all other Persons or entities in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, or any of them, shall fully cooperate with and assist the Receiver. Receivership Defendants', Individual Defendants', and Relief Defendants' cooperation and assistance shall include, but not be limited to:

1. Providing any information to the Receiver that the Receiver deems necessary to exercising the authority and discharging the responsibilities of the Receiver under this Order, including but not limited to allowing the Receiver to inspect Documents and Assets and to partition office space;

2. Providing any username or password and executing any Documents required to access any computer or electronic files in any medium, including but not limited to Electronically Stored Information stored, hosted, or otherwise maintained by an Electronic Data Host;

3. Advising all Persons who owe money to the Receivership Defendants that all Debts should be paid directly to the Receiver; and

B. Receivership Defendants, Individual Defendants, and Relief Defendants and their successors, assigns, officers, directors, agents, servants, employees, attorneys, and all other Persons or entities directly or

indirectly, in whole or in part, under their control, and all other Persons in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, shall not interfere in any manner, directly or indirectly with the custody possession, management, or control by the Receiver of Assets and Documents, and are hereby preliminarily restrained and enjoined from directly or indirectly:

1. Transacting any of the business of the Receivership Defendants;

2. Destroying, secreting, erasing, mutilating, defacing, concealing, altering, transferring or otherwise disposing of, in any manner, directly or indirectly, any Documents or equipment of Defendants, including but not limited to contracts, agreements, Consumer files, Consumer addresses and telephone numbers, correspondence, advertisements, brochures, sales material, sales presentations, Documents evidencing or Defendants' services, training materials, scripts, data, computer tapes, disks, or other computerized records, books, written or printed records, handwritten notes, telephone logs, "verification" or "compliance" tapes or other audio or video tape recordings, receipt books, invoices, postal receipts, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, copies of federal, state or local business or personal income or property tax returns, photographs, mobile devices, electronic storage media, accessories, and any other Documents, records or equipment of any kind that relate to the business practices or business or personal finances of the Defendants or any other entity directly or indirectly under the control of the Defendants;

3. Transferring, receiving, altering, selling, encumbering, pledging, assigning, liquidating, or otherwise disposing of any Assets owned,

29

controlled, or in the possession or custody of, or in which an
interest is held or claimed by, the Receivership Defendants, or the
Receiver;

4. Excusing Debts owed to the Receivership Defendants;

5. Failing to notify the Receiver of any Asset, including accounts, of
a Receivership Defendant held in any name other than the name of
the Receivership Defendant, or by any Person or entity other than
the Receivership Defendant, or failing to provide any assistance or
information requested by the Receiver in connection with
obtaining possession, custody, or control of such Assets;

6. Failing to create and maintain books, records, and accounts which,
in reasonable detail, accurately, fairly, and completely reflect the
incomes, assets, disbursements, transactions and use of monies by
the Defendants or any other entity directly or indirectly under the
control of the Defendants;

7. Doing any act or refraining from any act whatsoever to interfere
with the Receiver's taking custody, control, possession, or
managing of the Assets or Documents subject to this Receivership;
or to harass or to interfere with the Receiver in any way; or to
interfere in any manner with the exclusive jurisdiction of this Court
over the Assets or Documents of the Receivership Defendants; or
to refuse to cooperate with the Receiver or the Receiver's duly
authorized agents in the exercise of their duties or authority under
any Order of this Court; and

8. Filing, or causing to be filed, any petition on behalf of the
Receivership Defendants for relief under the United States
Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, or of any similar

30

insolvency proceeding on behalf of the Receivership Defendants, without prior approval of the Receiver and the Court.

## XVIII.    DELIVERY OF RECEIVERSHIP PROPERTY

**IT IS FURTHER ORDERED** that, to the extent not already done so pursuant to the TRO, immediately upon service of this Order upon them or upon their otherwise obtaining actual knowledge of this Order (or within a period permitted by the Receiver), Defendants, and any other Person or entity, including but not limited to Financial Institutions and Electronic Data Hosts, shall transfer or deliver access to possession, custody, and control of the following to the Receiver:

A. All Assets held by or for the benefit of the Receivership Defendants;

B. All Documents of the Receivership Defendants, including but not limited to books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, records of ACH transactions, and check registers), client or customer lists, title Documents and other papers;

C. All Assets belonging to members of the public now held by the Receivership Defendants;

D. All keys, computer and other passwords, user names, entry codes, combinations to locks required to open or gain or secure access to any Assets or Documents of or pertaining to the Receivership Defendants, wherever located, including, but not limited to, access to their business premises, means of communication, accounts, computer systems (onsite and remote), Electronic Data Hosts, or other property;

E. All Assets and Documents belonging to other Persons or entities whose interests are under the direction, possession, custody, or control of the Receivership Entities; and

F.  Information identifying the accounts, employees, properties, or other Assets or obligations of the Receivership Defendants.

G.  This Section does not apply to the Chapter 7 Trustee or property of the Bankruptcy Estate.

**IT IS FURTHER ORDERED** that, in the event any Person or entity fails to deliver or transfer immediately any Asset or otherwise fails to comply with any provision of this Section, the Receiver may file *ex parte* with the court an Affidavit of Non-Compliance regarding the failure. Upon filing of the affidavit, the Court may authorize, without additional process or demand, Writs of Possession or Sequestration or other equitable writs requested by the Receiver. The writs shall authorize and direct the United States Marshal, any Deputy United States Marshal, the Federal Bureau of Investigation, the Internal Revenue Service, or any sheriff or deputy sheriff of any county to seize the Asset, Document, or other thing and to deliver it to the Receiver.

### XIX.  NON-INTERFERENCE WITH RECEIVER

**IT IS FURTHER ORDERED** that the Receivership Defendants, their officers, agents, employees, attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, are hereby preliminarily restrained and enjoined from directly or indirectly:

A.  Interfering with the Receiver's efforts to manage, or take custody, control, or possession of, the Assets or Documents subject to the receivership;

B.  Transacting any of the business of the Receivership Entities;

C.  Transferring, receiving, altering, selling, encumbering, pledging, assigning, liquidating, or otherwise disposing of any Assets owned, controlled, or in the possession or custody of, or in which the interest is held or claimed by, the Receivership Entities; or

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

D. Refusing to cooperate with the Receiver or the Receiver's duly
authorized agents in the exercise of their duties or authority under any
order of this Court.

## XX.   COMPENSATION FOR RECEIVER

**IT IS FURTHER ORDERED** that the Receiver and all personnel hired by
the Receiver as herein authorized, including counsel to the Receiver and
accountants, are entitled to reasonable compensation for the performance of duties
pursuant to this Order, and for the cost of actual out-of-pocket expenses incurred
by them, from the Assets now held by or in the possession or control of, or which
may be received by, the Receivership Defendants. The Receiver shall file with the
Court and serve on the parties periodic requests for the payment of such reasonable
compensation, with the first such request filed no more than sixty (60) days after
the date of this Order. The Receiver shall not increase the hourly rates used as the
bases for such fee applications without prior approval of the Court.

## XXI.  RECEIVER'S REPORTS

**IT IS FURTHER ORDERED** that to the extent not already done, the
Receiver shall report to this Court: (1) the steps taken by the Receiver to
implement the terms of this Order; (2) the value of all liquidated and unliquidated
assets of the Receivership Defendants; (3) the sum of all liabilities of the
Receivership Defendants; (4) the steps the Receiver intends to take in the future to
(a) prevent any diminution in the value of assets of the Receivership Defendants,
(b) pursue receivership assets from third parties, and (c) adjust the liabilities of the
Receivership Defendants, if appropriate; (5) the Receiver's assessment of whether
the business can be operated in compliance with this Order; and (6) any other
matters that the Receiver believes should be brought to the Court's attention.
Provided, however, that if any of the required information would hinder the
Receiver's ability to pursue receivership assets, the portions of the Receiver's

STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND
OTHER EQUITABLE RELIEF

report containing such information may be filed under seal and not served on the parties.

## XXII. TURNOVER OF PROPERTY OF THE BANKRUPTCY ESTATE

**IT IS FURTHER ORDERED** that to the extent that Plaintiff or the Receiver come into possession of property of the Bankruptcy Estate, such property shall be turned over to the Chapter 7 Trustee as soon as it is reasonably possible to do so.

## XXIII.    WITHDRAWAL OF RECEIVER

**IT IS FURTHER ORDERED** that the Receiver and any professional retained by the Receiver, including but not limited to his or her attorneys and accountants, be and are hereby authorized to reasonably withdraw from his or her respective appointments or representations and apply for payment of their professional fees and costs at any time after the date of this Order by sending written notice seven days prior to the date of the intended withdrawal to the Court and to the parties along with a written report reflecting the Receiver's work, findings, and recommendations, as well as an accounting for all funds and Assets in possession or control of the Receiver. The Receiver shall be exonerated and the receivership deemed closed seven days from the date of the mailing of such notice of withdrawal. The Court will retain jurisdiction to consider the fee applications, report, and accounting submitted by the Receiver and the professionals. The written notice shall include an interim report indicating the Receiver's actions and reflect the knowledge gained along with the fee applications of the Receiver and his or her professionals. The report shall also contain the Receiver's recommendations, if any.

## XXIV.    RECEIVER'S BOND/LIABILITY

**IT IS FURTHER ORDERED** that no bond shall be required in connection with the appointment of the Receiver. Except for an act of gross negligence, the Receiver and the professionals shall not be liable for any loss or damage suffered by any of the Defendants, their officers, agents, servants, employees, and attorneys

1  or any other person, by reason of any act performed or omitted to be performed by

2  the Receiver and the professionals in connection with the discharge of his or her

3  duties and responsibilities, including but not limited to their withdrawal from the

4  case under Section XXIII.

5        **XXV.    PROHIBITION ON RELEASE OF CONSUMER**

6                        **INFORMATION**

7        **IT IS FURTHER ORDERED** that, except as required by a law

8  enforcement agency, law, regulation, or court order, Defendants, and their

9  successors, assigns, officers, agents, servants, employees, and attorneys, and all

10  other Persons in active concert or participation with any of them, who receive

11  actual notice of this Order by personal service or otherwise, are preliminarily

12  restrained and enjoined from disclosing, using, or benefitting from Consumer

13  information, including the name, address, telephone number, email address, social

14  security number, other identifying information, or any data that enables access to a

15  Consumer's account (including a credit card, bank account, or other financial

16  account), of any person, which any Defendant obtained prior to entry of this Order

17  in connection with any Debt-Relief Product or Service.

18        **XXVI.        STAY OF ACTIONS**

19        **IT IS FURTHER ORDERED** that:

20  A. Except by leave of this Court, during pendency of the Receivership

21         ordered herein, Defendants are hereby stayed from taking any action for,

22         against, on behalf of, or in the name of any of the following: the

23         Receivership Defendants, any of their subsidiaries, affiliates,

24         partnerships, Assets, Documents, or the Receiver or the Receiver's duly

25

26

27

28

STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND
OTHER EQUITABLE RELIEF

authorized agents acting in their capacities as such. Such hereby-stayed
actions include, but are not limited to, the following:

   1. Commencing, prosecuting, continuing, entering, or enforcing any
suit or proceeding, except that such actions may be filed to toll any
applicable statute of limitations;

   2. Attempting to foreclose, forfeit, alter, or terminate any interest in
any Asset, whether such acts are part of a judicial proceeding, are
acts of self-help, or otherwise;

   3. Executing, issuing, serving, or causing the execution, issuance, or
service of, any legal process, including, but not limited to,
attachments, garnishments, subpoenas, writs of replevin, writs of
execution, or any other form of process whether specified in this
Order or not; or

   4. Doing any act or thing whatsoever to interfere with the Receiver
taking custody, control, possession, or management of the Assets
or Documents subject to the Receivership, or to harass or interfere
with the Receiver in any way, or to interfere in any manner with
the exclusive jurisdiction of this Court over the Assets or
Documents of the Receivership Defendants; and

B. Except by leave of this Court, during pendency of the Receivership
ordered herein, all creditors, lessors, customers, employees, and other
persons seeking to establish or enforce any claim, right, or interest
against Receivership Defendants, and all others acting for or on behalf of
such persons, are enjoined from taking action that would interfere with
the exclusive jurisdiction of this Court over the Assets or Documents of
the Receivership Defendants, including:

   1. Commencing, prosecuting, or continuing a judicial, administrative,
or other action or proceeding against the Receivership Defendants,

36

including the issuance of employment of process against the
Receivership Defendants, except that such actions may be
commenced if necessary to toll any applicable statute of
limitations; or

2. Filing or enforcing any lien on any asset of the Receivership
Defendants, taking or attempting to take possession, custody, or
control of any Asset of the Receivership Defendants; or attempting
to foreclose, forfeit, alter, or terminate any interest in any Asset of
the Receivership Defendants, whether such acts are part of a
judicial proceedings, or acts of self-help, or otherwise.

C. This Section does not stay:

1. The commencement or continuation of a criminal action or
proceeding;

2. The commencement or continuation of an action or proceeding by
a state bar association to enforce its police or regulatory power;

3. The commencement or continuation of an action or proceeding by
a governmental unit to enforce such governmental unit's police or
regulatory power;

4. The enforcement of a judgment, other than a money judgment,
obtained in an action or proceeding by a governmental unit to
enforce such governmental unit's police or regulatory power;

5. The Bankruptcy Proceeding or any action of the Chapter 7 Trustee
with respect to property of the Bankruptcy Estate; or

6. The issuance to a Receivership Defendant of a notice of tax
deficiency; and

D. Except as otherwise provided in this Order, all Persons and entities in
need of Documentation from the Receiver shall in all instances first
attempt to secure such information by submitting a formal written request

1    to the Receiver, and, if such request has not been responded to within

2    thirty days of receipt by the Receiver, any such Person or entity may

3    thereafter seek an Order of this Court with regard to the relief requested.

4    **XXVII.    RESOLUTION OF BANKRUPTCY PROCEEDING**

5    **IT IS FURTHER ORDERED** that, should the Bankruptcy Proceeding be

6    dismissed during the pendency of this action, CAC will become a Receivership

7    Defendant and the property of the Bankruptcy Estate shall revert to the exclusive

8    control of the Receiver and will be deemed Assets subject to the provisions of this

9    Order.

10    **XXVIII.    LIMITED EXPEDITED DISCOVERY**

11    **IT IS FURTHER ORDERED** that Plaintiffs are granted leave to conduct

12    certain expedited discovery, and that, commencing with the time and date of this

13    Order until a Rule 16(b) scheduling order is issued, in lieu of the time periods,

14    notice provisions, and other requirements of Rules 19, 26, 30, 34, and 45 of the

15    Federal Rules of Civil Procedure, and applicable Local Rules, Plaintiffs and the

16    Receiver are granted leave to:

17    A. Take the deposition, on three days' notice, of any Person or entity,

18    whether or not a party, for the purpose of discovering: (1) the nature,

19    location, status, and extent of Assets of Defendants or their affiliates or

20    subsidiaries; (2) the nature, location, and identity of participants in

21    Defendants' business transactions and operations; 3) the nature and

22    location of Documents and business records of Defendants or their

23    affiliates or subsidiaries: and (4) compliance with this Order. The

24    limitations and conditions set forth in Rules 30(a)(2) and 31(a)(2) of the

25    Federal Rules of Civil Procedure regarding subsequent depositions shall

26    not apply to depositions taken pursuant to this Section. In addition, any

27    such depositions taken pursuant to this Section shall not be counted

28    toward the ten deposition limit set forth in Rules 30(a)(2)(A)(i) and

38

1
2
3
4
5

31(a)(2)(A)(i) of the Federal Rules of Civil Procedure and shall not preclude Plaintiffs from subsequently deposing the same Person or entity in accordance with the Federal Rules of Civil Procedure. Service of discovery upon a party, taken pursuant to this Section, shall be sufficient if made by facsimile, email or by overnight delivery.

6
7
8
9
10
11
12
13
14
15
16
17
18

B. Serve upon parties requests for production or inspection of Documents, or interrogatories that require production, inspection, or interrogatory responses within three calendar days of service, and may serve subpoenas upon non-parties that direct production, inspection, or responses to interrogatories within five calendar days of service, for the purpose of discovering: 1) the nature, location, status, and extent of Assets of Defendants or their affiliates or subsidiaries; (2) the nature, location, identify of participants, and extent of Defendants' transactions; (3) the nature and location of Documents and business records of Defendants or their affiliates or subsidiaries; and (4) enforcing compliance with this Order, *provided that* twenty-four hours' notice shall be deemed sufficient for the production of any such Documents that are maintained or stored only as electronic data;

19
20
21

C. Serve deposition notices and other discovery requests upon the parties to this action by facsimile or overnight courier, and take depositions by telephone or other remote electronic means;

22
23
24

D. If a Defendant fails to appear for a properly noticed deposition or fails to comply with a request for production or inspection, seek to prohibit that Defendant from introducing evidence at any subsequent hearing;

25
26
27

E. Any expedited discovery taken pursuant to this Section is in addition to, and is not subject to, the limits on discovery set forth in the Federal Rules of Civil Procedure and the Local Rules of this Court. The expedited

28

STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF

1    discovery permitted by this Section does not require a meeting or

2    conference of the parties, pursuant to Fed. R. Civ. P. 26(d) & (f); and

3    F.   The Parties are exempted from making initial disclosures under Fed. R.

4        Civ. P. 26(a)(1) until further order of this Court. This Section does not

5        apply to the Chapter 7 Trustee.

6    **XXIX.    DEFENDANTS' DUTY TO DISTRIBUTE ORDER**

7    **IT IS FURTHER ORDERED** that Defendants shall immediately provide a

8    copy of this Order to each affiliate, subsidiary, division, sales entity, successor,

9    assign, officer, director, employee, independent contractor, client company,

10   Electronic Data Host, agent, authorized signatory to bank accounts, attorney,

11   spouse, and representative of Defendants and shall, within three calendar days

12   from the date of entry of this Order, provide Plaintiffs' counsel with a sworn

13   statement that: (a) confirms that Defendants have provided copies of the Order as

14   required by this Section and (b) lists the names and addresses of each entity or

15   Person to whom Defendants provided a copy of the Order. Furthermore,

16   Defendants shall not take any action that would encourage officers, agents,

17   directors, employees, salespersons, independent contractors, attorneys,

18   subsidiaries, affiliates, successors, assigns, or other Persons or entities in active

19   concert or participation with Defendants to disregard this Order or believe that they

20   are not bound by its provisions.  This Section does not apply to the Chapter 7

21   Trustee.

22   **XXX. DURATION OF ORDER**

23   **IT IS FURTHER ORDERED** that this Order shall expire upon entry of a

24   final judgment in this case.

25

26   **XXXI.    CORRESPONDENCE WITH PLAINTIFFS**

27   **IT IS FURTHER ORDERED** that, for the purposes of this Order, because

28   mail addressed to the Bureau is subject to delay due to heightened security

1  screening, all correspondence and service of pleadings on Plaintiff Bureau of

2  Consumer Financial Protection shall be sent either via electronic submission

3  through the court's electronic filing system or via commercial overnight express

4  delivery to:

5        Bureau of Consumer Financial Protection

6        Office of Enforcement

7        1700 G Street, NW

8        Washington, DC 20552

9        ATTN: Sarah Preis

10       Email: Sarah.Preis@cfpb.gov; Jesse.Stewart@cfpb.gov

11       **IT IS FURTHER ORDERED** that, for the purposes of this Order, all

12  correspondence and service of pleadings on Plaintiffs State of Minnesota, State of

13  North Carolina, and People of the State of California shall be sent either via

14  electronic submission through the Court's electronic filing system or email or

15  addressed to:

16       Evan S. Romanoff

17       Assistant Attorney General

18       Minnesota Attorney General's Office

19       445 Minnesota Street, Suite 1200

20       St. Paul, Minnesota 55101-2130

21       Email: Evan.Romanoff@ag.state.mn.us

22

23       M. Lynne Weaver

24       Special Deputy Attorney General

25       North Carolina Department of Justice

26       114 W. Edenton Street

27       Raleigh, NC 27603

28       Email: lweaver@ncdoj.gov

41

1

2    Christina V. Tusan

3    Supervising Deputy City Attorney

4    Office of the City Attorney

5    200 N. Main Street, 500 City Hall East

6    Los Angeles, CA 90012-4131

7    Email: christina.tusan@lacity.org

8             **XXXII.    SERVICE OF THIS ORDER**

9          **IT IS FURTHER ORDERED** that copies of this Order may be served by

10 facsimile transmission, email, personal or overnight delivery, or US Mail, by

11 Plaintiffs' agents and employees or any local, state, or federal law enforcement

12 agency or by private process server, upon any Financial Institution or other entity

13 or Person that may have possession, custody, or control of any Documents or

14 Assets of any Defendant, or that may otherwise be subject to any provision of this

15 Order. Service upon any branch, subsidiary, affiliate, or office shall effect service

16 upon the entire entity.

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATED PRELIMINARY INJUNCTION WITH ASSET FREEZE, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF

## XXXIII.   RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for all purposes of construction, modification, and enforcement of this Order.

**SO ORDERED**, this 15th  day of November, 2019, at 12:59 p.m.


_____
The Honorable James V. Selna
United States District Judge

43

# EXHIBIT "B"

**BUREAU OF CONSUMER FINANCIAL PROTECTION**
SARAH PREIS (D.C. Bar No. 997387)
(admitted *Pro Hac Vice*)
Tel.: (202)-435-9318 / Email: sarah.preis@cfpb.gov
JESSE STEWART (N.Y. Bar No. 5145495)
(admitted *Pro Hac Vice*)
Tel: (202)-435-9641 / Email: jesse.stewart@cfpb.gov
1700 G Street, NW
Washington, DC 20552
Fax: (202) 435-5471

LEANNE E. HARTMANN (CA Bar No. 264787)
(Local Counsel for the Bureau of Consumer Financial Protection)
301 Howard Street, Suite 1200
San Francisco, CA 94105
Email: leanne.hartmann@cfpb.gov/Fax: (415) 844-9788

*Attorneys for Plaintiff the Bureau of Consumer Financial Protection*

**THE STATE OF MINNESOTA**
EVAN ROMANOFF (Attorney Reg. No. 0398223)
(admitted *Pro Hac Vice*)
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel.: (651) 757-1454/Email: evan.romanoff@ag.state.mn.us

*Attorneys for Plaintiff the State of Minnesota*

**THE STATE OF NORTH CAROLINA**
M. LYNNE WEAVER (N.C. Bar No. 19397)
(admitted *Pro Hac Vice*)
MICHAEL T. HENRY (N.C. Bar No. 35338)
(admitted *Pro Hac Vice*)
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27602
Tel.: (919) 716-6000 / Fax: (919) 716-6050
Emails: lweaver@ncdoj,gov/mhenry@ncdoj.gov

*Attorneys for Plaintiff the State of North Carolina*

**THE PEOPLE OF THE STATE OF CALIFORNIA**
MICHAEL N. FEUER, City Attorney (CA Bar No. 111529)
MARY CLARE MOLIDOR, Chief Assistant City Attorney, (CA Bar No. 82404)
CHRISTINA V. TUSAN, Supervising Deputy City Attorney (CA Bar No. 192203)
WILLIAM PLETCHER, Deputy City Attorney (CA Bar No. 212664)
REBECCA MORSE, Deputy City Attorney (CA Bar No. 314853)
OFFICE OF THE CITY ATTORNEY
200 N. Main Street, 500 City Hall East
Los Angeles, California 90012-4131
Tel: (213) 978-8707/Fax: (213) 978-8112
Emails: christina.tusan@lacity.org / william.pletcher@lacity.org

*Attorneys for Plaintiff the People of the State of California*

1

**FIRST AMENDED COMPLAINT**

1

2 **UNITED STATES DISTRICT COURT**

3 **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

4 Bureau of Consumer Financial          ) Case No: SACV 19-1998-MWF(KSx)
Protection; State of Minnesota, by its )
5 Attorney General, Keith Ellison;       )
State of North Carolina, *ex rel.*     ) **FIRST AMENDED COMPLAINT**
6 Joshua H. Stein, Attorney General;     )
and The People of The State of         )
7 California, Michael N. Feuer, Los      )
Angeles City Attorney,                 )
8                                        )
Plaintiffs,                     )
9                                        )
v.                            )
10                                       )
Consumer Advocacy Center Inc., d/b/a   )
11 Premier Student Loan Center; True     )
Count Staffing Inc., d/b/a SL Account  )
12 Management; Prime Consulting LLC,     )
d/b/a Financial Preparation Services;  )
13 TAS 2019 LLC d/b/a Trusted Account    )
Services; Horizon Consultants LLC;     )
14 First Priority LLC d/b/a Priority     )
Account Management; Albert Kim,        )
15 a/k/a Albert King; Kaine Wen, a/k/a   )
Wenting Kaine Dai, Wen Ting Dai, and   )
16 Kaine Wen Dai; and Tuong Nguyen,      )
a/k/a Tom Nelson,                      )
17                                       )
Defendants, and                 )
18                                       )
Infinite Management Corp., f/k/a       )
19 Infinite Management Solutions Inc.;   )
Hold The Door, Corp.; TN               )
20 Accounting Inc.; Mice and Men         )
LLC; 1st Generation Holdings, LLC;     )
21 Sarah Kim, and Anan Enterprise,       )
Inc.,                                  )
22                                       )
23        Relief Defendants.            )

24 _____

25 **INTRODUCTION**

26      1.    The Bureau of Consumer Financial Protection (Bureau) brings this action

27 under §§ 1031, 1036(a), 1054, and 1055 of the Consumer Financial Protection Act of

28 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564 & 5565; and under and the

2

Telemarketing and Consumer Fraud and Abuse Prevention Act (Telemarketing Act), 15 U.S.C. §§ 6101-6108, and its implementing regulation, the Telemarketing Sales Rule (TSR), 16 C.F.R. Part 310. The Bureau brings this action against the student-loan debt-relief operation involving Defendants Consumer Advocacy Center Inc., d/b/a Premier Student Loan Center; True Count Staffing Inc., d/b/a SL Account Management; Prime Consulting LLC, d/b/a Financial Preparation Services (collectively, Student Loan Debt Relief Companies); Defendants TAS 2019 LLC, d/b/a Trusted Account Services, Horizon Consultants LLC, and First Priority LLC (collectively, Payment Companies); and Defendants Albert Kim, Kaine Wen, and Tuong Nguyen (collectively, Individual Defendants) (Student Loan Debt Relief Companies, Payment Companies, and Individual Defendants are referred to, collectively, as Defendants).

2.     The State of Minnesota, by its Attorney General, brings this enforcement action to, among other things, obtain temporary, preliminary, and permanent injunctive relief, restitution, and civil penalties for Defendants' acts or practices in violation of the Minnesota Prevention of Consumer Fraud Act (MNCFA), Minn. Stat. §§ 325F.68-.694; the Minnesota Uniform Deceptive Trade Practices Act (MNDTPA), Minn. Stat. §§ 325D.43-.48; and the Telemarketing Act, 15 U.S.C. §§ 6101-6108, and its implementing regulation, the TSR, 16 C.F.R. Part 310, in connection with Defendants' student-loan debt-relief operation.

3.     The State of North Carolina, by its Attorney General, brings this enforcement action to, among other things, obtain temporary, preliminary, and permanent injunctive relief, restitution, and civil penalties for Defendants' acts or practices in violation of North Carolina's Debt Adjusting Act, N.C. Gen. Stat. § 14-423, *et seq.*, (NCDAA); North Carolina's Unfair and Deceptive Practices Act, N.C. Gen. Stat. § 75-1.1 (NCUDPA); North Carolina's Telephonic Seller Registration Act, N.C. Gen. Stat. § 66-260, *et seq.* (NCTSRA); and the Telemarketing Act, 15 U.S.C. §§ 6101-6108, and its implementing regulation, the TSR, 16 C.F.R. Part 310, in connection with Defendants' student-loan debt-relief operation.

3

**FIRST AMENDED COMPLAINT**

4.     The People of the State of California (collectively with the States of Minnesota and North Carolina, "the States"), by and through Michael N. Feuer, Los Angeles City Attorney, bring this enforcement action to, among other things, obtain temporary, preliminary, and permanent injunctive relief, restitution, and civil penalties for Defendants' acts or practices in violation of California's Business and Professions Code section 17200 et seq. (the "Unfair Competition Law," or "UCL") and the Telemarketing Act, 15 U.S.C. §§ 6101-6108, and its implementing regulation, the TSR, 16 C.F.R. Part 310, in connection with student-loan debt-relief operation.

5.     Defendants engaged in an unlawful student-loan debt-relief business that harmed consumers nationwide by charging consumers unlawful advance fees and misrepresenting the terms and conditions of their services.

6.     The Bureau and the States bring this action to stop Defendants' unlawful conduct, obtain relief for harmed consumers, and impose civil money penalties on Defendants for their unlawful actions.

7.     The Bureau and the States also bring this action against Infinite Management Corporation, Hold the Door, Corp., TN Accounting Inc., Mice and Men LLC, 1st Generation Holdings, LLC, Sarah Kim, and Anan Enterprise, Inc., as Relief Defendants.

**OVERVIEW**

8.     From at least 2015 until the filing of this action, Defendants operated a debt-relief enterprise that deceived thousands of federal-student-loan borrowers and collected over $83 million in illegal advance fees, in violation of the TSR, the CFPA, the MNCFA, the MNDTPA, the NCDAA, the NCUDPA, the NCTSRA, and the UCL.  Unless otherwise noted, all references to "borrowers" and "consumers" in this Complaint include California, Minnesota, and North Carolina borrowers and consumers.

9.     The Student Loan Debt Relief Companies, controlled by the Individual Defendants, purported to help federal-student-loan borrowers obtain loan forgiveness or lower monthly payments through programs administered by the U.S. Department of //

**FIRST AMENDED COMPLAINT**

1  Education (DOE).

2      10.    In fact, the Student Loan Debt Relief Companies deceived consumers,

3  including by misrepresenting that consumers would qualify for loan forgiveness in a

4  matter of months, when forgiveness takes at least 10 years of on-time payments and is

5  determined by DOE; that consumers were approved for lower monthly payments on their

6  student loans, when consumers had not yet been approved or when the new payment

7  amount was approved based on false information; and that consumers' lower payments

8  would be permanent when in fact they are subject to change based on changes in the

9  consumers' family size, income, and marital status.

10     11.    The Student Loan Debt Relief Companies also falsely told consumers, or led

11  consumers to believe, that the consumers' payments to the companies would go toward

12  paying consumers' student loan balances.

13     12.    When describing the services offered to consumers, the Student Loan Debt

14  Relief Companies failed to inform consumers that it was their practice to request that

15  consumers' loans be placed into forbearance or that interest would continue to accrue

16  during the forbearance period, thereby increasing consumers' overall loan balances.

17     13.    When describing the services offered to consumers, the Student Loan Debt

18  Relief Companies failed to inform consumers that it was their practice to submit false

19  information about consumers' income, family size, and marital status on loan adjustment

20  applications in order to try to qualify consumers for lower monthly payments.

21     14.    The Student Loan Debt Relief Companies charged consumers an initial fee

22  of $900-$1,750 for their services. This initial fee was typically levied well before

23  consumers had been accepted to and made a payment under their new loan agreement, in

24  violation of the TSR.

25     15.    At no time did the Student Loan Debt Relief Companies hold consumer

26  payments in independent third-party accounts.

27     16.    At no time did the Student Loan Debt Relief Companies use payments from

28  consumers to make payments toward consumers' student loan debts.

5

**FIRST AMENDED COMPLAINT**

17.     The Individual Defendants conducted this operation using a network of several interrelated companies and over a dozen unregistered and fictitious business names. The Student Loan Debt Relief Companies operated as a common enterprise controlled by the Individual Defendants, rendering each jointly and severally liable for the illegal acts of the Student Loan Debt Relief Companies.

## JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction over this action because it is brought under federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.  This Court has supplemental jurisdiction over the States' claims pursuant to 28 U.S.C. § 1367.

19.     Venue is proper in this district pursuant to 12 U.S.C. § 5564(f) because Defendants are located, reside, or do business in this district.

## PARTIES

20.     The Bureau is an independent agency charged with enforcing violations of Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority, 12 U.S.C. § 5564(a)-(b), including the authority to enforce the CFPA's prohibitions on unfair, deceptive, and abusive acts or practices, 12 U.S.C. §§ 1031, 1036, and the TSR as it applies to persons subject to the CFPA, 15 U.S.C. §§6102(c), 6105(d).

21.     The Bureau has authority to bring civil actions against persons violating federal consumer-financial laws and to "seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law." 12 U.S.C. § 5564(a).

22.     Keith Ellison, Attorney General of the State of Minnesota, is authorized under Minnesota Statutes chapter 8; the MNCFA, Minn. Stat. § 325F.69, *et seq.*; the MNDTPA, Minn. Stat. § 325D.44, *et seq.*; the Telemarketing Act, 15 U.S.C. § 6103(a); and has common law authority, including *parens patriae* authority, to bring this action on

1    behalf of the State of Minnesota and its citizens to enforce Minnesota law.

2        23.    The State of North Carolina is acting through its Attorney General Joshua H.

3    Stein, pursuant to authority granted by Chapters 14, 66, 75, and 114 of the North Carolina

4    General Statutes, and the Telemarketing Act, 15 U.S.C. § 6103(a).

5        24.    Michael N. Feuer, City Attorney for the City of Los Angeles, is authorized

6    under California Business and Professions Code section 17200 et seq. (the "Unfair

7    Competition Law," or "UCL") and the Telemarketing Act, 15 U.S.C. § 6103(a) and

8    (f)(2), to bring this civil law enforcement action on behalf of the People of the State of

9    California.

10       25.    Defendant Consumer Advocacy Center Inc. (CAC) is a California

11   corporation formed on August 6, 2014, and it has held itself out as doing business at the

12   following addresses: 173 Technology Drive, Suite 202, Irvine, CA 92618; 29901 Santa

13   Margarita Pkwy, Suite 200F, Rancho Santa Margarita, CA 92688; 8 Hughes Parkway,

14   Irvine, CA 92618; 5350 E Suncrest Rd., Anaheim, CA 92807; and 24852 Acropolis Dr.,

15   Mission Viejo, CA 92691.

16       26.    CAC has held itself out as doing business as Premier Student Loan Center.

17       27.    CAC transacted its student-loan debt-relief business in the Central District of

18   California since at least November 2015.

19       28.    On January 16, 2019, CAC filed for protection under chapter 11 of the

20   Bankruptcy Code in the United States Bankruptcy Court for the Southern District of

21   Florida. *See In re Consumer Advocacy Center, Inc.*, No. 19-10655-BKC-JKO (Bankr.

22   S.D. Fla.).

23       29.    Defendant True Count Staffing Inc. (True Count) registered as a California

24   corporation on February 13, 2017, and it has held itself out as doing business at the

25   following addresses: 173 Technology Dr., Ste 202, Irvine, CA 92618; 777 E. Sierra

26   Madre Ave, Azusa, CA 91702; 8 Hughes Parkway, Irvine, CA 92618; and 7545 Irvine

27   Center Drive, Suite 200, PMB #108, Irvine, CA, 92618.

28   //

**FIRST AMENDED COMPLAINT**

30. True Count has held itself out as doing business as SL Account Management.

31. Defendant Prime Consulting LLC (Prime) is a Wyoming limited-liability company that registered with the California Secretary of State on April 25, 2018, and it has held itself out as doing business at 11932 Klingerman Street, Suite 3, El Monte, CA, 91732 and 7545 Irvine Center Drive, Suite 200, Room 108, Irvine, CA, 92618.

32. Prime has held itself out as doing business as Financial Preparation Services.

33. Defendant TAS 2019 LLC, d/b/a Trusted Account Services (TAS) is a Wyoming limited liability corporation that has held itself out as doing business at two locations affiliated with companies providing resident agent services in Wyoming, 109 E. 17th Street Suite 5656, Cheyenne, WY, 82001, and 30 N Gould Street, Suite R, Sheridan, WY 82801; a rented virtual office address at 17011 Beach Blvd., Suite 900, Huntington Beach, CA 92467; and a residential address affiliated with its purported owner, Kenny Huang, in Arcadia, CA.

34. TAS 2019 LLC's operations and principal place of business were located in the Central District of California.

35. Defendant Horizon Consultants LLC (Horizon) is a Wyoming limited liability corporation that has been registered to operate in California since October 2018. It has held itself out as doing business at 2522 Chambers Rd Suite 100 Rm 209, Tustin, CA 92780.

36. Defendant First Priority LLC d/b/a Priority Account Management (First Priority) is a Wyoming limited liability corporation that has been registered to operate in California since May 2018. It has held itself out as doing business at 1704 South Granada Ave, Alhambra, CA 91801.

37. Defendant Albert Kim (a/k/a Albert King) is CAC's primary owner and founder.

38. Kim is a resident of the State of California and performed work for CAC while residing in this jurisdiction.

**FIRST AMENDED COMPLAINT**

39. Kim exercised substantial control over CAC's business practices.

40. Kim exercised managerial responsibility for CAC and participated in the conduct of its affairs.

41. Defendant Kaine Wen (a/k/a Wenting Kaine Dai, Wen Ting Dai) is True Count's primary owner and founder and has also been an owner and manager of CAC. Wen incorporated True Count and has served as its chief executive officer, director, partner, and president.

42. Wen is a resident of the State of California and performed work for CAC and True Count while residing in this jurisdiction.

43. Wen exercised substantial control over True Count's business practices.

44. Wen exercised managerial responsibility for True Count and participated in the conduct of its affairs.

45. Wen exercised managerial responsibility for CAC and participated in the conduct of its affairs.

46. Defendant Tuong Nguyen (a/k/a Tom Nelson) served as CAC's controller and as True Count's secretary.

47. Nguyen is a resident of the State of California and performed work for CAC and True Count while residing in this jurisdiction.

48. Nguyen exercised managerial responsibility for CAC and participated in the conduct of its affairs.

49. Nguyen exercised managerial responsibility for True Count and participated in the conduct of its affairs.

50. Relief Defendant Infinite Management Corp., f/k/a Infinite Management Solutions Inc. (Infinite Management) registered as a California corporation on September 8, 2016, and it has held itself out as doing business at 9228 City Lights Drive, Aliso Viejo, CA, 92656.

51. Kim served as Infinite Management's registered agent and president, and he is the sole signatory on a bank account belonging to it.

**FIRST AMENDED COMPLAINT**

52.    Relief Defendant Hold the Door Corp. (Hold the Door) registered as a California corporation on December 30, 2016, and it listed its address as 777 E. Sierra Madre Ave, Azusa, CA 91702. It described its business type as "consulting services" in corporate filings with the California Secretary of State.

53.    Hold the Door was incorporated by Wen, and he has served as its sole corporate officer.

54.    Relief Defendant TN Accounting Inc. (TN Accounting) is a California corporation that filed its Articles of Incorporation with the California Secretary of State on February 8, 2017, and it has listed its principal place of business address of 1704 S. Granada Ave, Alhambra, CA 91801 in corporate filings with the Secretary of State.

55.    Nguyen has served as TN Accounting's president and sole corporate officer.

56.    Relief Defendant Mice and Men LLC (Mice and Men) is a Wyoming corporation incorporated in December 2018 that has listed its principal place of business as 30 N. Gould St, Ste R, Sheridan, WY 82801.

57.    Registered Agents Inc., is Mice and Men's registered agent in Wyoming, and is the company that filed the Wyoming articles of organization for Mice and Men. The address for Registered Agents, Inc., is 30 N. Gould St, Ste R, Sheridan, WY 82801.

58.    Mice and Men is purportedly owned by Judy Dai, Defendant Wen's mother, who resides in Monterey Park, CA.

59.    Judy Dai was listed with Registered Agents Inc. as the contact person for Mice and Men, using her Monterey Park, CA residence as the mailing address.

60.    Invoices from Registered Agents Inc. for services rendered for Mice and Men were billed to Mice and Men, LLC, Judy Dai, at Judy Dai's Monterey Park, CA residence.

61.    Relief Defendant 1st Generation Holdings, LLC (1st Generation) is a Wyoming corporation with its principal place of business in Downey, California.

62.    Relief Defendant Sarah Kim is Defendant Kim's wife. She is a resident of the State of California.

**FIRST AMENDED COMPLAINT**

63.     Relief Defendant Anan Enterprise, Inc. (Anan Enterprise), is a California corporation that has listed its principal place of business as 2080 E. 25th Street, Vernon, CA 90058. Anan Enterprise is owned by Defendant Albert Kim's brother-in-law and Relief Defendant Sarah Kim's brother, Kyle Kim.

## FACTS

### Student Loan Forgiveness and Repayment Programs

64.     DOE administers several federal student-loan repayment programs. Some potentially offer lower monthly loan payments. Others allow consumers who make the requisite qualifying payments over a period ranging from 10 to 25 years (and who meet other eligibility criteria) to obtain loan forgiveness.

65.     One such program is the income-driven repayment (IDR) program. IDR plans may lower consumers' monthly payments to more affordable amounts based on the consumers' income and family size. Consumers enrolled in IDR plans who make qualifying payments may also have their outstanding student-loan balances forgiven after 20-25 years.

66.     Under another program, the Public Service Loan Forgiveness program, consumers who work full-time for a qualifying public-service employer, make 120 qualifying payments, and meet other eligibility criteria, can apply to have their outstanding student-loan balances forgiven after 10 years.

67.     Because a borrower's income and family size can fluctuate over the life of the loan, consumers are required to recertify their eligibility for IDR programs on an annual basis. Variables such as marital status and tax-filing status (single, married filing separately, married filing jointly) may affect how DOE calculates monthly payment amounts. As a result, monthly payments under the IDR programs can vary from year to year.

### The Student Loan Debt Relief Companies

68.     CAC began offering student-loan debt-relief services purporting to lower consumers' monthly loan payments and obtain loan forgiveness through enrollment in

**FIRST AMENDED COMPLAINT**

1  loan forgiveness or IDR plans as early as November 2015.

2  69.    Initially, CAC's internal structure included sales, processing, and customer-
3  service departments.

4  70.    The sales department fielded incoming consumer calls, made outbound
5  marketing calls, and enrolled consumers in the Student Loan Debt Relief Companies'
6  services by providing consumers with contracts for electronic signature during sales calls.

7  71.    The processing department charged consumers the initial advance fees, and
8  prepared and submitted forbearance, loan-consolidation, and IDR requests to consumers'
9  student-loan servicers. The consumer's student-loan servicer then evaluated the requests.

10  72.    In March 2018, Kim and Wen moved CAC's processing and customer-
11  service operations into a new entity, True Count.

12  73.    As part of this shift, CAC's processing and customer-service departments
13  physically moved to a new office location.

14  74.    CAC continued to handle sales, while True Count took over preparing and
15  submitting loan-consolidation and IDR-plan applications and collecting payments from
16  consumers (including from consumers who had enrolled for services with CAC).

17  75.    As early as April 2018, CAC transferred its sales functions to a new entity,
18  Prime, which ultimately assumed CAC's role as the main sales company enrolling
19  consumers for True Count's services.

20  76.    The Individual Defendants, through True Count and Prime, set up First
21  Priority, Horizon, and TAS to collect payments from consumers.

22  **Debt Relief Sales and Business Practices**

23  77.    The Student Loan Debt Relief Companies marketed their debt-relief services
24  through inbound and outbound calls, websites, social media, and direct mail.

25  78.    When consumers called the front-end sales company (CAC or Prime), the
26  consumer first spoke with a sales representative.

27  79.    Sales representatives instructed consumers on how to create an ID and
28  password for consumers' online accounts with Federal Student Aid (FSA), an office of

1  DOE, if the consumer had not previously done so.  The sales representatives then
2  instructed the consumer to provide the sales representative with the consumer's FSA ID
3  and password.

4      80.    Sales representatives downloaded student-loan data from the consumer's
5  online FSA account into the company's customer–relationship-management system.

6      81.    Sales representatives often stated that there was an urgent need to sign up for
7  the respective Student Loan Debt Relief Company's services.

8      82.    For example, some sales representatives told consumers that they had a
9  limited time in which they could apply for an IDR program.

10     83.    At times, sales representatives represented that the respective Student Loan
11 Debt Relief Company was affiliated with DOE.

12                        **Representations about Fees**

13     84.    During sales calls, sales representatives made affirmative representations or
14 material omissions about the purpose of the fees paid by consumers to the Student Loan
15 Debt Relief Companies.

16     85.    Sales representatives frequently represented that the fees would be applied to
17 the balance of consumers' student loans.

18     86.    In fact, all monies paid by the consumers to the Student Loan Debt Relief
19 Companies were fees retained by the companies and were not remitted to student-loan
20 servicers to be applied toward consumers' loan balances.

21     87.    Sales representatives frequently represented that fees paid to the Student
22 Loan Debt Relief Companies would be the only payments consumers would owe on their
23 student loans after being accepted into a DOE repayment program.

24     88.    In fact, the fees paid to the Student Loan Debt Relief Companies were in
25 addition to, and did not relieve consumers of, their obligation to pay their student loans.

26     89.    Sales representatives frequently represented to consumers that the fees
27 charged by the Student Loan Debt Relief Companies were necessary to participate and
28 remain enrolled in a loan-forgiveness or IDR program.

**FIRST AMENDED COMPLAINT**

90.    In fact, consumers can apply free of charge for loan forgiveness or IDR programs, either through their student-loan servicer or directly to the DOE.

91.    Moreover, consumers can recertify annually their eligibility to remain enrolled in their IDR plans through their student-loan servicer for free.

### Representations about Loan Forgiveness

92.    The Student Loan Debt Relief Companies' sales representatives often told consumers that they were qualified or approved for loan forgiveness.

93.    Sales representatives frequently represented to consumers that they could get consumers' student loans forgiven in whole or in part shortly after enrolling in the respective Student Loan Debt Relief Company's services.

94.    The DOE's loan forgiveness programs require anywhere from 10-25 years of qualifying payments, as well as satisfaction of other eligibility criteria, to qualify for loan forgiveness.

95.    Only the DOE can approve consumers for loan forgiveness.

96.    Because only the DOE can approve consumers for loan forgiveness, and only after a consumer makes qualifying monthly payments over a period ranging from 10 to 25 years, the Student Loan Debt Relief Companies' representations to consumers that all or part of their loans would be forgiven upon payment of enrollment fees were false.

### Representations about Lower Monthly Payments

97.    The Student Loan Debt Relief Companies' sales representatives often told consumers that they qualified or were approved for a specific lower monthly payment.

98.    In fact, the new, lower monthly payment amount identified by sales representatives was often calculated based on an incorrect family size, income, or marital status.

99.    Sales representatives often represented that consumers' lower monthly payment would be in place over the life of the loan.

100.    In fact, monthly payment amounts are determined by student loan servicers and can fluctuate year to year depending on changes in consumers' income, family size,

14

**FIRST AMENDED COMPLAINT**

or marital status, and it is therefore not possible to determine a set monthly payment for an IDR plan for the life of the loan.

### Preparing and Submitting Forbearance Requests and IDR Plan Applications

101.   Following an initial sales call, consumers who purchased the Student Loan Debt Relief Companies' services were assigned to a company representative called a "processor."

102.   Processors conducted a "welcome call" during which they typically asked consumers for proof of income and, at times, verified certain information.

103.   Following the welcome call, processors submitted forbearance requests to student-loan servicers on behalf of consumers.

104.   Processors typically asked for a forbearance period of three months in the forbearance requests they submitted.

105.   If a servicer approves a forbearance request, the consumer is excused from making his or her monthly student loan payments during the period of forbearance. But interest on the consumer's student loan accrues during the period of forbearance and may be added to the principal balance.

106.   Typically, consumers were not informed during sales calls or the welcome call that processors would submit forbearance requests on their behalf.

107.   Typically, consumers were not informed during sales calls or the welcome call that interest on the consumer's student loan accrues during the period of forbearance and may be added to the principal balance.

108.   In fact, most consumers did not ask the Student Loan Debt Relief Companies for forbearance requests, and many consumers were not aware that the Student Loan Debt Relief Companies submitted forbearance requests to their student loan servicers on their behalf.

109.   Processors signed the forbearance requests in the consumer's name so that it appeared the request was submitted by the consumer.

//

**FIRST AMENDED COMPLAINT**

110.   Many consumers were unaware the fees they paid to the Student Loan Debt Relief Companies were not paying down their student loans.

### Submitting Consolidation and IDR Requests with False Information

111.   Processors submitted IDR applications to servicers on behalf of consumers with false information about consumers' income, family size, or marital status.

112.   For consumers who did not provide proof of income to the Student Loan Debt Relief Companies, processors frequently listed those consumers as unemployed on their IDR applications, even when the consumers were employed at the time.

113.   Processors frequently submitted IDR applications to consumers' student loan servicers that listed consumers' family sizes greater than the consumers' actual family size.

114.   Processors frequently submitted IDR applications to consumers' student loan servicers that listed consumers as single, even if the consumer had informed the Student Loan Debt Relief Companies that he or she was married.

115.   When submitting IDR applications to consumers' student loan servicers, processors typically changed consumers' email address to an email address created by the Student Loan Debt Relief Company in order to temporarily divert all email correspondence from the consumer's student-loan servicer to the Student Loan Debt Relief Company.

116.   When submitting IDR applications to consumers' student-loan servicers, processors typically changed consumers' mailing address to a mailing address used by the Student Loan Debt Relief Company in order to temporarily divert all postal mail from the consumer's student-loan servicer to the Student Loan Debt Relief Company.

117.   After receiving confirmation from a consumer's student loan servicer that a consumer's loan consolidation or IDR application had been approved, processors typically logged back into the consumer's loan account and changed the consumers email and mailing address back to the consumer's actual information.

//

16

**FIRST AMENDED COMPLAINT**

118.   The Student Loan Debt Relief Companies' practice of diverting correspondence to consumers from the consumers' student-loan servicers helped conceal the Student Loan Debt Relief Companies' practice of submitting false information to student loan servicers.

### Representations about and Collection of Fees from Consumers

119.   The Student Loan Debt Relief Companies typically collected enrollment fees from consumers before consumers had been approved for a loan consolidation or an IDR plan.

120.   The Student Loan Debt Relief Companies collected monthly fees, typically ranging from $10-$42, before submitting the consumer's corresponding annual IDR plan recertification.

121.   At all times material to this Complaint, the Student Loan Debt Relief Companies did not track whether consumers had made an initial payment on an adjusted loan.

122.    As early as April 2018, the Student Loan Debt Relief Companies' contracts began including a section entitled "No Advance Fees."

123.   The section of the Student Loan Debt Relief Companies' contract entitled "No Advance Fees" states that the company "does not take any advance fees from Client" and further provides that consumer fees will be held in an independent third party "trust account" and not paid to the company until the consumer "has received a consolidation, adjustment, or otherwise satisfactory result" and makes one payment "towards such."

124.   At all times material to this Complaint, the Student Loan Debt Relief Companies did not use trust accounts to hold fees collected from consumers before placing consumers into loan repayment plans – at no time did the Student Loan Debt Relief Companies hold payments from consumers in accordance with Section 310.4(a)(5)(ii) of the TSR.

125.   Rather, fees collected from consumers by the Student Loan Debt Relief Companies were directly deposited into the companies' bank accounts and commingled

1  with company assets.

2      126.   The Defendants have collected over $83 million in illegal advance fees from

3  thousands of consumers nationwide.

4  ### Roles of the Individual Defendants

5      127.   Albert Kim (a/k/a Albert King) is CAC's primary owner and manager.

6      128.   Kim was in the office frequently and helped manage CAC's and True

7  Count's day-to-day operations.

8      129.   Kim oversaw CAC's marketing.

9      130.   Kim signed CAC's merchant-account applications or agreements with at

10  least three different payment processors.

11      131.   At times, Kim personally responded to consumers' complaints.

12      132.   Kim controlled CAC's bank accounts, and was an authorized user on CAC's

13  and True Count's bank accounts.

14      133.   When Kim applied for a merchant account on CAC's behalf in or about July

15  2017, he agreed to maintain fraud and chargebacks below certain levels.

16      134.   Monthly account statements sent to CAC's corporate address for that

17  merchant account identify tens of thousands of dollars in chargebacks and hundreds of

18  thousands of dollars in consumer refunds between August 2017 and March 2019.

19      135.   After CAC filed for bankruptcy, Kim personally generated marketing leads

20  for Prime.

21      136.   Kaine Wen served as CAC's owner, managing partner, and general counsel.

22      137.   CAC's 2016 tax returns and U.K. registration documents list Wen as CAC's

23  50% owner.

24      138.   Wen made capital contributions to CAC in October 2015 that accounted for

25  75% of capital contributions by members at that time.

26      139.   Wen participated in the decision to move CAC's processing functions to

27  True Count.

28      140.   Wen personally guaranteed True Count's lease agreement.

**FIRST AMENDED COMPLAINT**

141. Wen set up payment-processing agreements for True Count.

142. Wen corresponded with payment processors regarding True Count's excessive chargeback rates.

143. Wen represented to a payment processor that True Count "understands, currently fully complies with, and during the term of the Agreement will fully comply with" the TSR, CFPA, and "all other applicable federal, state, and local laws, rules, and regulations."

144. Wen has been an authorized user on CAC's, Premier Student Loan Center's, True Count's, and Hold the Door's bank accounts.

145. Wen was also a point of contact or signed for at least three merchant accounts for CAC and at least one merchant account for True Count.

146. Tuong Nguyen served as the controller and provided accounting services for CAC.

147. Nguyen was responsible for paying CAC's bills, reviewed its bank statements, and was a signatory on several of CAC's bank accounts.

148. At times, Nguyen also responded to consumer complaints, and was listed as a point of contact for CAC's d/b/a, Premier Student Loan Center, in the Bureau's consumer-complaint portal.

149. True Count identified Nguyen as its secretary in some communications with banks.

150. Nguyen was a point of contact for at least two of CAC's merchant accounts and one of True Count's merchant accounts.

151. In January 2018, Nguyen signed a letter to a payment processor acknowledging CAC had incurred "excessive chargebacks" during "December/2017."

152. Nguyen also acknowledged that the top chargeback reasons included fraud.

153. Nguyen incorporated TN Accounting and served as its president and sole corporate officer.

154. Nguyen has been a signatory on a bank account held by TN Accounting.

**FIRST AMENDED COMPLAINT**

155. TN Accounting's primary source of income is over $225,000 from CAC and True Count from March 2017 through December 2018.

156. Nguyen was also an authorized user on bank accounts held by CAC, Premier Student Loan Center, and True Count.

**Roles of the Payment Companies**

157. The Individual Defendants, True Count, and Prime used TAS, Horizon, and First Priority to obtain merchant accounts and to collect fees from consumers.

158. In September 2019, the Individual Defendants, True Count, and Prime transferred customer payment processing to TAS.

159. TAS held itself out as an "independent third party" in its contracts with consumers.

160. In fact, TAS was not independent of Defendants.

161. Rather, TAS was run from within True Count and Prime by the Individual Defendants.

162. TAS's domain credentials (username and password) were stored in an account in Albert Kim's name.

163. The Individual Defendants and the Student Loan Debt Relief Companies controlled TAS's email system, and the Student Loan Debt Relief Companies' employees reviewed and responded to consumers' emails sent to TAS. Defendant Wen executed or acted as TAS's agent to handle the application necessary for TAS to open a merchant account to process payments from the Student Loan Debt Relief Companies' consumers. Wen and True Count's Operations Manager created a fictional employee to interact with True Count's and Prime's software provider to promote the appearance of TAS as an entity independent of Defendants.

164. Since September 12, 2019, until the date of the temporary restraining order issued by this Court, TAS collected approximately $3 million in payments from consumers.

//

**FIRST AMENDED COMPLAINT**

165.   The Individual Defendants, True Count, and Prime used Horizon to process consumers' payments to the student-loan debt-relief enterprise.

166.   Horizon's incorporation documents list Keneth Hu, an IT professional employed by the Student Loan Debt Relief Companies, as its Chief Executive Officer and President.

167.   Notwithstanding Mr. Hu's nominal ownership, Defendants Wen, Nguyen, True Count, and Prime exercised substantial control over Horizon.

168.   Defendant Nguyen was a signatory on a Horizon bank account.

169.   Defendant Wen was Horizon's designated contact on a merchant account.

170.   Defendant True Count asserts that Horizon holds over $700,000 for its benefit.

171.   Horizon's stated business address was leased by Defendant Prime Consulting.

172.   Horizon applied for at least two merchant accounts to process consumer payments (including any associated chargebacks or refunds) on behalf of the Student Loan Debt Relief Companies.

173.   Defendants Wen and Nguyen received a finalized payment processor application for a merchant account with Quantum Electronic Payments on Horizon's behalf.

174.   Defendant Wen later instructed Hu to sign the application for a merchant account with Quantum Electronic Payments.

175.   Horizon processed about $9 million in consumer payments through at least one of its payment processor accounts on behalf of the Student Loan Debt Relief Companies.

176.   The Individual Defendants, True Count, and Prime used First Priority to open merchant accounts to receive consumer payments to the student loan debt relief enterprise.

//

**FIRST AMENDED COMPLAINT**

177.   The Individual Defendants, True Count, and Prime used First Priority to obtain and then copy documents, such as agreements and contracts, for use by TAS in the student-loan debt-relief operation.

178.   First Priority's corporate registration identifies Defendant Nguyen as its president and sole owner.

179.   Defendants Kim and Wen served as contacts on behalf of First Priority for a payment processor.

180.   First Priority's income in 2018 and 2019 consisted of approximately $400,000 in transfers from True Count and $150,000 in consumer fees collected through two payment processor accounts on behalf of Prime and True Count.

**The Student Loan Debt Relief Companies Operated as a Common Enterprise**

181.   CAC, True Count, and Prime shared employees, customers, scripts, and training materials, and they used the same database to store consumers' information and track aspects of their business activity.

182.   CAC, True Count, and Prime shared the proceeds of the debt-relief enterprise.

183.   For example, since April 2018, True Count, acting as the purported "billing department" for CAC and Prime, has transferred at least $12 million to CAC and at least $25 million to Prime.

184.   CAC lent hundreds of thousands of dollars to True Count without interest or any written agreement.

185.   CAC stated in a lease guarantee that it had a "financial interest" in True Count.

186.   CAC guaranteed at least one lease on behalf of Prime Consulting and two leases on behalf of True Count.

187.   CAC, True Count, and Prime have used overlapping addresses to carry out the debt-relief operation.

//

**FIRST AMENDED COMPLAINT**

188.   For example, addresses True Count identifies as its business addresses are also business addresses for CAC, Prime, and Hold the Door.

189.   To market their debt-relief services to consumers, CAC, True Count, and Prime shared over a dozen fictitious names, including but not limited to South Coast Financial Center, Direct Account Services, Financial Loan Advisors, Account Preparation Services, Administrative Financial, Tangible Savings Solutions, Coastal Shores Financial Group, First Choice Financial Centre (a/k/a First Choice Financial Center), Administrative Account Services, Primary Account Solutions, Prime Document Services, Financial Accounting Center, Doc Management Solutions, First Priority LLC, ALW Loans Administrative Accounting Center, Best Choice Financial Center, First Document Services, Global Direct Accounting Solutions, Keystone Document Center, Pacific Palm Financial Group, Pacific Shores Advisory, Sequoia Account Management, Signature Loan Solutions, Yellowstone Account Services, ClearStudentLoanDebt, and Clear Student Loan Debt.

190.   The websites for Doc Management Solutions, Financial Accounting Center, Prime Document Services, Primary Account Solutions, Administrative Account Services, South Coast Financial Center, First Choice Financial Center, Coastal Shores Financial Group, Tangible Savings Solutions, Administrative Financial, Account Preparation Services, Financial Loan Advisors, and Direct Account Services are nearly identical.

**Transfer of Assets to Relief Defendants**

191.   Defendants Wen, Kim, and Nguyen directed and controlled Relief Defendants Hold the Door, Infinite Management, and TN Accounting, respectively.

192.   Wen, Kim, and Nguyen are the signatories on bank accounts for the respective companies and thus controlled the flow of money into and out of their corporate accounts.

193.   From 2017 to 2019, payments from CAC or True Count made up most or almost all the income of Hold the Door, Infinite Management, and TN Accounting.
//

**FIRST AMENDED COMPLAINT**

194.   Monies were transferred from Hold the Door, Infinite Management, and TN Accounting to the respective individuals' personal accounts or to pay their personal expenses.

195.   Hold the Door made over $200,000 in direct transfers to Wen's personal bank accounts, and it made payments for purchases of art and for Wen's Tesla and Mercedes Benz automobiles.

196.   Infinite Management made more than $300,000 in payments to pay Kim's personal credit cards, wedding expenses, dental expenses, and to purchase luxury cars.

197.   Infinite Management purchased approximately $87,500 in jewelry, paid over $200,000 to purchase a luxury vehicle, and spent approximately $60,000 as a down payment for a second luxury vehicle for Relief Defendant Sarah Kim.

198.   Sarah Kim is not employed by Infinite Management, nor has she ever done business with Infinite Management.

199.   TN Accounting transferred over $100,000 to Nguyen's personal bank accounts and made payments on Nguyen's personal credit cards and Tesla.

200.   In December 2018, Mice and Men opened a banking account with Bank of America, listing Judy L Dai as the signor, and a related debit card was issued to Mice and Men LLC Judy L Dai.

201.   In December 2018, a total of 14 deposits and credits were received in the Mice and Men account at Bank of America from Prime Consulting, totaling $5,041,039. Thirteen of the deposits and credits were for purported marketing expenses, and one was for purported residual expenses.  During its existence, no other deposits were made into this account.

202.   In January 2019, a bank account in the name of Mice and Men was opened with UBS, listing Judy L Dai as the signor.

203.   In or around February 2019, Bank of America notified Mice and Men that Bank of America was closing the Mice and Men account.

//

**FIRST AMENDED COMPLAINT**

1    204.   In February 2019, a bank check from Bank of America in the amount of
2  $5,041,039 was deposited into the Mice and Men account at UBS.  This represented the
3  entire balance in the Mice and Men Bank America account.

4    205.   In April 2019, Defendant Wen was granted third party access to the Mice
5  and Men account at UBS, which gave him the ability to view account information,
6  balances, monthly statements and tax information.

7    206.   In the Corporate Financial Statement submitted by True Count Staffing
8  pursuant to the October 21, 2019 Temporary Restraining Order (TRO), True Count
9  identified the Mice and Men UBS account, which contained approximately $4 million, as
10  being held by True Count Staffing.

11    207.   Defendant Wen is the 100% owner of True Count Staffing.

12    208.   Prime transferred approximately $4 million to 1st Generation Holdings over
13  the last three years.

14    209.   True Count's Corporate Financial Statement submitted pursuant to the TRO
15  identified funds in 1st Generation Holdings accounts as held for the benefit of True
16  Count.

17    210.   Between 2017-2018, CAC paid Anan Enterprise approximately $3.6 million
18  ostensibly for services, but Anan Enterprise never rendered those services.

19                              **LEGAL BACKGROUND**
20                                   **The TSR**

21    211.   The TSR defines "debt relief service" as "any program or service
22  represented, directly or by implication, to renegotiate, settle, or in any way alter the terms
23  of payment or other terms of the debt between a person and one or more unsecured
24  creditors or debt collectors, including, but not limited to, a reduction in the balance,
25  interest rate, or fees owed by a person to an unsecured creditor or debt collector." 16
26  C.F.R. § 310.2(o).

27    212.   The TSR defines a "seller" as "any person who, in connection with a
28  //

**FIRST AMENDED COMPLAINT**

1  telemarketing transaction, provides, offers to provide, or arranges for others to provide
2  goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd).

3      213.  The TSR defines "telemarketer" as "any person who, in connection with
4  telemarketing, initiates or receives telephone calls to or from a customer." 16 C.F.R.
5  § 310.2(ff).

6      214.  The TSR defines "telemarketing" in relevant part as "a plan, program, or
7  campaign which is conducted to induce the purchase of goods or services . . . by use of
8  one or more telephones and which involves more than one interstate telephone call." 16
9  C.F.R. § 310.2(gg).

10     215.  The Student Loan Debt Relief Companies offered services to renegotiate,
11  settle, or alter the terms of payments of consumers' federal student loans by submitting
12  requests for loan forgiveness or IDR plans to consumers' student-loan servicers.

13     216.  The Student Loan Debt Relief Companies offered and provided these
14  services to consumers nationwide using the telephones and employed more than one
15  interstate telephone call.

16     217.  The Student Loan Debt Relief Companies offered and provided these
17  services to consumers in exchange for payment of enrollment and monthly fees in
18  connection with a telemarketing transaction.

19     218.  The Student Loan Debt Relief Companies are each a "telemarketer" or
20  "seller" offering a "debt relief service" under the TSR.

21     219.  Kim arranged for CAC to provide debt-relief services to consumers in
22  exchange for consideration and personally generated marketing leads for Prime. Kim is a
23  "telemarketer" or "seller" offering a "debt relief service" under the TSR. 16 C.F.R.
24  § 310.2(dd), (ff), (o).

25     220.  Wen arranged for CAC and True Count to provide debt-relief services to
26  consumers in exchange for consideration. Wen is a "seller" offering a "debt relief
27  service" under the TSR. 16 C.F.R. § 310.2(dd), (o).
28  //

**FIRST AMENDED COMPLAINT**

221.    Nguyen arranged for CAC and True Count to provide debt-relief services to consumers in exchange for consideration. Nguyen is a "seller" offering a "debt relief service" under the TSR. 16 C.F.R. § 310.2(dd), (o).

222.    TAS is a "seller" because it provided, offered to provide, or arranged for others to provide third-party dedicated account services to consumers "in connection with a telemarketing transaction." 16 C.F.R. § 310.2(dd).

### The CFPA

223.    Sections 1031 and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B), prohibit "covered person[s]" and "service provider[s]" from engaging in any "unfair, deceptive, or abusive act or practice."

224.    The Student Loan Debt Relief Companies are each "covered persons" under the CFPA because they offer or provide consumer-financial products or services, including financial-advisory services such as assisting consumers with debt-management or debt-settlement and modifying the terms of any extension of credit. 12 U.S.C. § 5481(5), (6), (15)(A)(viii).

225.    TAS is a "covered person" under the CFPA because it offered or provided consumer-financial products or services, including by "engaging in deposit-taking activities, transmitting or exchanging funds, or otherwise acting as a custodian of funds or any financial instrument for use by or on behalf of a consumer." 12 U.S.C. § 5481(15)(iv).

226.    The CFPA also defines "covered person" to include "(B) any affiliate of a person [that engages in offering or providing a consumer financial product or service] if such affiliate acts as a service provider to such person." 12 U.S.C. § 5481(6).

227.    Section 1002(1) of the CFPA defines the term "affiliate" to mean "any person that controls, is controlled by, or is under common control with another person." 12 U.S.C. § 5481(1).

228.    Section 1002(26)(A) of the CFPA defines the term "service provider" to mean "any person that provides a material service to a covered person in connection with

27

the offering or provision by such covered person of a consumer financial product or service, including a person that-- … (ii) processes transactions relating to the consumer financial product or service ….” 12 U.S.C. § 5481(26)(A)(ii).

229.   TAS, Horizon and First Priority are affiliates of the Student Loan Debt Relief Companies because they are controlled by the Student Loan Debt Relief Companies. Further, by processing consumer payments made to the Student Loan Debt Relief Companies, TAS, Horizon, and First Priority acted as service providers to the Student Loan Debt Relief Companies. TAS, Horizon, and First Priority are each “covered persons” under the CFPA.

230.   Section 1002(25) of the CFPA defines the term “related person” to mean “any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of,” or “any . . . other person . . . who materially participates in the conduct of the affairs of” a non-bank provider of a consumer-financial product or service. 12 U.S.C. § 5481(25)(C). Section 1002(25) further provides that a “related person” shall be “deemed to mean a covered person for all purposes of any provision of Federal consumer financial law.” 12 U.S.C. § 5481(25)(B).

231.   Kim is a “related person” and “covered person” under the CFPA because he is CAC’s owner and officer and had managerial responsibility for CAC. He controlled CAC’s bank accounts, oversaw CAC’s sales and marketing, entered into contractual relationships on CAC’s behalf with payment processors, and responded to certain consumer complaints.

232.   Wen is a “related person” and “covered person” under the CFPA because he is True Count’s owner and officer, has been an owner and manager of CAC, and has had managerial responsibility for both companies. He was involved in making decisions for CAC, including the decision to shift CAC’s processing function to True Count, entered into contractual relationships on behalf of True Count with payment processors, and was a signatory on True Count’s bank accounts.

//

**FIRST AMENDED COMPLAINT**

233.   Nguyen is a "related person" and "covered person" under the CFPA because he is an officer of CAC and True Count and has managerial responsibility for CAC, and because he materially participated in the conduct of the Student Loan Debt Relief Companies. He managed CAC's finances and responded to consumers' complaints on CAC's behalf. He also was the point of contact for several of CAC's and True Count's merchant accounts.

## COUNT I

**By the Bureau and the States**
**(Advance Fees in Violation of the TSR – Enrollment Fees)**
**(The Student Loan Debt Relief Companies and Individual Defendants)**

234.   The allegations in paragraphs 1-222 are incorporated by reference.

235.   Under the TSR, it is an abusive act or practice for a seller or telemarketer to request or receive payment of any fee or consideration for any debt-relief services unless and until (A) the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the customer; and (B) the customer has made at least one payment pursuant to that settlement agreement, debt-management plan, or other valid contractual agreement between the customer and the creditor or debt collector. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

236.   In the course of providing, offering to provide, or arranging for others to provide debt-relief services, the Student Loan Debt Relief Companies and Individual Defendants charged and collected from consumers enrollment fees before consumers had been approved for IDR plans and before consumers had made any payments toward such IDR plans, in violation of the TSR. 16 C.F.R. § 310. 4(a)(5)(i)(A)-(B).

237.   Moreover, because the IDR plans in which consumers were placed often were based on false information about consumers' family size, income, and marital status that the Student Loan Debt Relief Companies submitted to consumers' student-loan servicers, none of the payments made by consumers in these plans were made pursuant to a "valid contractual agreement" within the meaning of the TSR and thus were collected in

1  violation of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

2                                    **COUNT II**

3                              **By the Bureau and the States**
   **(Advance Fees in Violation of the TSR – Monthly Fees)**
4  **(The Student Loan Debt Relief Companies and Individual Defendants)**

5        238.    The allegations in paragraphs 1-222 are incorporated by reference.

6        239.    In the course of providing, offering to provide, or arranging for others to

7  provide debt-relief services, the Student Loan Debt Relief Companies and Individual

8  Defendants charged and collected from consumers monthly fees before consumers had

9  completed their annual recertifications of eligibility for IDR plans and before consumers

10 had made any payments toward such recertified IDR plans, in violation of the TSR. 16

11 C.F.R. § 310. 4(a)(5)(i)(A)-(B).

12       240.    Moreover, because the IDR plans in which consumers were placed often

13 were based on false information about consumers' family size, income, and marital status

14 that the Student Loan Debt Relief Companies submitted to consumers' student-loan

15 servicers, none of the payments made by consumers in these plans were made pursuant to

16 a "valid contractual agreement" within the meaning of the TSR and thus were collected in

17 violation of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

18                                   **COUNT III**

19                             **By the Bureau and the States**
   **(Misrepresentations About Material**
20 **Aspects of Their Services in Violation of the TSR)**
   **(The Student Loan Debt Relief Companies and Individual Defendants)**
21

22       241.    The allegations in paragraphs 1-222 are incorporated by reference.

23       242.    It is a deceptive practice under the TSR for a seller or telemarketer to

24 misrepresent any material aspect of the efficacy of their services and to misrepresent any

25 material aspect of a debt-relief service. 16 C.F.R. § 310.3(a)(2)(iii), (x).

26       243.    Among other things, the Student Loan Debt Relief Companies and

27 Individual Defendants misrepresented, directly or indirectly, expressly or by implication

28 that:

                                          30

1
2
      a.    fees paid by consumers were payments toward the consumer's outstanding loan debt;

3
4
      b.    fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

5
6
      c.    consumers' loans would be forgiven in whole or in part shortly after enrolling in the Student Loan Debt Relief Companies' services;

7
8
9
      d.    consumers were eligible or approved for lower monthly payments, including where such payment amounts had been calculated based on an incorrect family size, income, or marital status;

10
11
      e.    consumers' monthly payment amount had been lowered for the life of the repayment plan; and

12
13
14
      f.    any fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services.

15
16
    244.   The Student Loan Debt Relief Companies and Individual Defendants also failed to inform consumers that:

17
18
      a.    it was their practice to submit forbearance requests on behalf of consumers; and

19
20
      b.    it was their practice to falsify consumers' family size, marital status, and income to consumers' student-loan servicers.

21
22
23
    245.   The acts or practices of the Individual Defendants and Student Loan Debt Relief Companies, as set forth in this Count, are deceptive acts or practices that violate the TSR, 16 C.F.R. 310.3(a)(2)(iii), (x).

24
**COUNT IV**

25
26
**By the Bureau and the States**
**(Misrepresentations About Material**
**Aspects of Their Services in Violation of the TSR)**
**(True Count, Prime, and TAS)**

27
28
    246.   The allegations in paragraphs 1-222 are incorporated by reference.

**FIRST AMENDED COMPLAINT**

247.   It is a deceptive practice under the TSR for a seller or telemarketer to misrepresent any material aspect of the efficacy of their services and to misrepresent any material aspect of a debt-relief service. 16 C.F.R. § 310.3(a)(2)(iii), (x).

248.   True Count, Prime, and TAS misrepresented, directly or indirectly, expressly or by implication, that TAS was an independent third-party provider of dedicated customer escrow accounts.

249.   The misrepresentations relate to a material aspect of a debt-relief service.

250.   The acts or practices of the Individual Defendants, Student Loan Debt Relief Companies, and TAS, as set forth in this paragraph, are deceptive acts or practices that violate the TSR, 16 C.F.R. 310.3(a)(2)(iii), (x).

## COUNT V

### By the Bureau and the States
### (Substantial Assistance in Violation of the TSR)
### (Individual Defendants)

251.   The allegations in paragraphs 1-222 are incorporated by reference.

252.   The TSR prohibits any person from providing "substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that [constitutes deceptive or abusive conduct]" under the Rule. 16 C.F.R. § 310.3(b).

253.   Kim managed both CAC's and True Count's day-to-day operations. As CAC's co-owner and president, Kim oversaw CAC's marketing and approved its sales scripts.

254.   Kim knew, or recklessly avoided knowing, the material misrepresentations and omissions that CAC's and True Count's sales representatives and processors made to consumers.

255.   Kim knew, or recklessly avoided knowing, that the Student Loan Debt Relief Companies charged and collected enrollment and monthly fees from consumers before the companies had obtained loan-repayment plans for consumers and before consumers had made their first payments toward such repayment plans.

**FIRST AMENDED COMPLAINT**

256. Kim represented CAC in contractual relationships with payment processors.

257. As CAC's point of contact on a merchant account where he agreed to keep chargebacks and fraud below a certain level, Kim knew, or recklessly avoided knowing, that the merchant's monthly statements identified tens of thousands of dollars in chargebacks and hundreds of thousands of dollars in consumer refunds between August 2017 and March 2019.

258. As CAC's co-owner and officer and True Count's owner and officer, Wen entered into payment-processing agreements on CAC's and True Count's behalf, including at least one where he represented that True Count intended to fully comply with the TSR.

259. As a principal representative for CAC's and True Count's merchant accounts and a signatory on the bank accounts from which refunds and chargebacks to consumers were paid, Wen knew, or recklessly avoided knowing, CAC's and True Count's high chargeback and refund rates, including that during at least one period, the top chargeback reasons included "fraud."

260. Wen knew, or recklessly avoided knowing, the material misrepresentations and omissions that CAC's and True Count's sales representatives and processors made to consumers.

261. Wen knew, or recklessly avoided knowing, that the Student Loan Debt Relief Companies charged and collected enrollment and monthly fees from consumers before the companies had obtained loan-repayment plans for consumers and before consumers had made their first payments toward such repayment plans.

262. As an officer of CAC and True Count, Nguyen managed CAC's finances, served as a point of contact for several of CAC's and True Count's merchant accounts, and responded to consumer complaints on CAC's behalf.

263. Because he signed a January 2018 letter from CAC to a payment processor in which he acknowledged that CAC had incurred excessive chargebacks and that fraud was one of the top reasons for such chargebacks, Nguyen knew, or recklessly avoided

**FIRST AMENDED COMPLAINT**

1   knowing, the material misrepresentations and omissions that CAC's and True Count's
2   sales representatives and processors made to consumers.

3   264.   Nguyen knew, or recklessly avoided knowing, that the Student Loan Debt
4   Relief Companies charged and collected enrollment and monthly fees from consumers
5   before the companies had obtained loan-repayment plans for consumers and before
6   consumers had made their first payments toward such repayment plans.

7   265.   Kim, Wen, and Nguyen provided substantial assistance to the Student Loan
8   Debt Relief Companies in their violations of the TSR.

9                                  **COUNT VI**

10                          **By the Bureau and the States**
                    **(Substantial Assistance in Violation of the TSR)**
11                              **(Payment Companies)**

12   266.   The allegations in paragraphs 1-222 are incorporated by reference.

13   267.   The TSR prohibits any person from providing "substantial assistance or
14   support to any seller or telemarketer when that person knows or consciously avoids
15   knowing that the seller or telemarketer is engaged in any act that [constitutes deceptive or
16   abusive conduct]" under the Rule. 16 C.F.R. § 310.3(b).

17   268.   The Payment Companies knew, or consciously avoided knowing, the
18   material misrepresentations that the Student Loan Debt Relief Companies made to
19   consumers.

20   269.   The Payment Companies knew, or consciously avoided knowing, that the
21   Student Loan Debt Relief Companies charged and received fees from consumers before
22   consumers' applications for loan consolidations, loan-repayment plans, and loan-
23   forgiveness plans were approved, and before consumers had made the first payments
24   under the altered terms of their student loans.

25   270.   The Payment Companies provided substantial assistance to the Student Loan
26   Debt Relief Companies in their violations of the TSR.  16 C.F.R. § 310.3(b)

27   //
28   //

**FIRST AMENDED COMPLAINT**

## COUNT VII

### By the Bureau
### (CFPA – Deception)
### (The Student Loan Debt Relief Companies and Individual Defendants)

271.   The allegations in paragraphs 1-210 and 223-233 are incorporated by reference.

272.   Among other things, the Student Loan Debt Relief Companies and Individual Defendants misrepresented, directly or indirectly, expressly or by implication that:

   a.   fees paid by consumers were payments toward the consumer's outstanding loan debt;

   b.   fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

   c.   consumers' loans would be forgiven in whole or in part following payment of the initial enrollment fees;

   d.   consumers were eligible or approved for lower monthly payments, including where such payment amounts have been calculated based on an incorrect family size, income, or marital status;

   e.   consumers' monthly payment amounts had been lowered for the life of the repayment plan; and

   f.   any fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services.

273.   The Student Loan Debt Relief Companies also failed to inform consumers that:

   a.   it was their practice to submit forbearance requests on behalf of consumers; and

//

//

**FIRST AMENDED COMPLAINT**

1

        b.     it was their practice to falsify consumers' family size, marital status,

2

and income to consumers' student-loan servicers and the consequences for

3

consumers of that practice.

4

    274.   The Student Loan Debt Relief Companies' representations were material and

5

likely to mislead consumers acting reasonably under the circumstances.

6

    275.   Among other things, Kim generated marketing leads for Prime, approved

7

sales scripts for CAC, and managed day-to-day operations for CAC and True Count. He

8

was also aware of CAC's and True Count's high chargeback and consumer-refund rates.

9

He participated directly in these representations or had the authority to control them as

10

CAC's co-owner and president and had knowledge of these representations, was

11

recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a

12

high probability of fraud along with an intentional avoidance of the truth.

13

    276.   Among other things, Wen managed payment-processor relationships on

14

behalf of True Count, was a signatory on True Count's bank accounts, and was aware of

15

CAC's and True Count's high chargeback and consumer-refund rates. He participated

16

directly in these representations or had the authority to control them as CAC's co-owner

17

and president and True Count's owner and president and had knowledge of these

18

representations, was recklessly indifferent to the truth or falsity of the misrepresentations,

19

or was aware of a high probability of fraud along with an intentional avoidance of the

20

truth.

21

    277.   Among other things, Nguyen managed CAC's finances, responded to

22

consumer complaints, and served as point of contact on several of CAC's and True

23

Count's merchant accounts. He was aware of CAC's and True Count's high chargeback

24

and consumer-refund rates. He participated directly in these representations or had the

25

authority to control them and had knowledge of these representations, was recklessly

26

indifferent to the truth or falsity of the misrepresentations, or was aware of a high

27

probability of fraud along with an intentional avoidance of the truth.

28

//

**FIRST AMENDED COMPLAINT**

278. The Student Loan Debt Relief Companies and Individual Defendants have therefore engaged in deceptive acts or practices in violation of §§ 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536.

## COUNT VIII
### By the Bureau
### (CFPA – Deception)
### (True Count, Prime, and TAS)

279. The allegations in paragraphs 1-210 and 223-233 are incorporated by reference.

280. True Count, Prime, and TAS misrepresented, directly or indirectly, expressly or by implication, that TAS was an independent third-party provider of dedicated customer accounts.

281. The representations were material and likely to mislead consumers acting reasonably under the circumstances.

282. True Count, Prime, and TAS have therefore engaged in deceptive acts or practices in violation of §§ 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536.

## COUNT IX
### By the Bureau
### (Substantial Assistance in Violation of the CFPA)
### (Individual Defendants)

283. The allegations in paragraphs 1-210 and 223-233 are incorporated by reference.

284. Section 1036(a)(3) of the CFPA prohibits any person from "knowingly or recklessly provid[ing] substantial assistance to a covered person or service provider in violation of the provisions of section 1031" and states that "the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided." 12 U.S.C. § 5536(a)(3).

285. As CAC's co-owner and president, and as someone who managed the day-to-day operations of CAC and True Count and who generated marketing leads for Prime, Kim knowingly or recklessly provided substantial assistance to the Student Loan Debt

1  Relief Companies in their deceptive acts or practices.

2      286.   As CAC's co-owner and True Count's owner and president who was aware

3  that high chargeback and consumer refund rates were attributable at least in part to fraud,

4  Wen knowingly or recklessly provided substantial assistance to the Student Loan Debt

5  Relief Companies in their deceptive acts or practices.

6      287.   As an individual responsible for managing CAC's finances and responding

7  to consumers' complaints on behalf of CAC and who was aware that the Student Loan

8  Debt Relief Companies' high chargeback and consumer-refund rates were attributable at

9  least in part to fraud, Nguyen knowingly or recklessly provided substantial assistance to

10  the Student Loan Debt Relief Companies in their deceptive acts or practices.

11      288.   The Individual Defendants thus provided substantial assistance to the

12  Student Loan Debt Relief Companies in their deceptive acts or practices, in violation of

13  § 1036(a)(3) of the CFPA. 12 U.S.C. § 5563(a)(3).

## COUNT X

14  

15  **By the Bureau**
**(Substantial Assistance in Violation of the CFPA)**
16  **(Payment Companies)**

17      289.   The allegations in paragraphs 1-210 and 223-233 are incorporated by

18  reference.

19      290.   Section 1036(a)(3) of the CFPA prohibits any person from "knowingly or

20  recklessly provid[ing] substantial assistance to a covered person or service provider in

21  violation of the provisions of section 1031" and states that "the provider of such

22  substantial assistance shall be deemed to be in violation of that section to the same extent

23  as the person to whom such assistance is provided." 12 U.S.C. § 5536(a)(3).

24      291.   The Payment Companies knew, or recklessly avoided knowing, the material

25  misrepresentations that the Student Loan Debt Relief Companies made to consumers.

26      292.   The Payment Companies provided substantial assistance to the Student Loan

27  Debt Relief Companies in their deceptive acts or practices, in violation of § 1036(a)(3) of

28  the CFPA. 12 U.S.C. § 5563(a)(3).

**FIRST AMENDED COMPLAINT**

## COUNT XI

### By the Bureau
### CFPA Violation Based on Violation of TSR
### (All Defendants)

293.    The allegations in paragraphs 1-233 are incorporated by reference.

294.    The Bureau is authorized to enforce the Telemarketing Act with respect to the offering or provision of a consumer-financial product or service subject to the CFPA. 15 U.S.C. § 6105(d).

295.    A violation of the TSR "committed by a person subject to the Consumer Financial Protection Act of 2010 shall be treated as a violation of a rule under Section 1031 of [the CFPA] regarding unfair, deceptive, or abusive acts or practices." 15 U.S.C. § 6102.

296.    Section 1031 of the CFPA provides that "[t]he Bureau may prescribe rules applicable to a covered person or service provider identifying as unlawful unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(b).

297.    Defendants' violations of the TSR are treated as violations of a rule under § 1031 of the CFPA. 15 U.S.C. § 6102(c).

298.    Because Defendants are "covered persons" who violated the TSR by charging and collecting illegal advance fees from consumers and engaging in deceptive conduct, they violated § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

## COUNT XII

### By the Bureau and the States
### (Relief Defendants)

299.    The allegations in paragraphs 1-233 are incorporated by reference.

300.    Relief Defendants Hold the Door, Infinite Management, TN Accounting, Mice and Men, 1st Generation Holdings, Sarah Kim, and Anan Enterprise have received, directly or indirectly, funds or other assets from Defendants that are traceable to funds

1   obtained from consumers through the deceptive and unlawful practices described herein.

2       301.   The Relief Defendants are not bona fide purchasers with legal or equitable
3   title to the funds or other assets received from Defendants.

4       302.   The Relief Defendants would be unjustly enriched if not required to disgorge
5   funds or the value of the benefits received as a result of Defendants' unlawful acts or
6   practices.

7       303.   The Relief Defendants therefore hold funds and assets in constructive trust
8   for the benefit of the Student Loan Debt Relief Companies' customers.

9                       **COUNT XIII**

10                  **By the State of Minnesota**

11          **Prevention of Consumer Fraud Act**
           **Minn. Stat. § 325F.69, et seq.**
12  **(The Student Loan Debt Relief Companies and Individual Defendants)**

13       304.   The allegations in paragraphs 1-270 and 299-303 are incorporated by
14   reference.

15       305.   Minnesota Statutes section 325F.69, subdivision 1 reads:

16       306.   The act, use, or employment by any person of any fraud, false pretense, false
17   promise, misrepresentation, misleading statement or deceptive practice, with the intent
18   that others rely thereon in connection with the sale of any merchandise, whether or not
19   any person has in fact been misled, deceived, or damaged thereby, is enjoinable as
20   provided in section 325F.70.

21       307.   The term "merchandise" within the meaning of Minnesota Statutes section
22   325F.69 includes services.  See Minn. Stat. § 325F.68, subd. 2.

23       308.   The term "person" includes "any natural person or legal representative,
24   partnership, corporation (domestic and foreign), company, trust, business entity, or
25   association, and any agent, employee, salesperson, partner, officer, director, member,
26   stockholder, associate, trustee, or cestui que thereof."  Minn. Stat. § 325F.68, subd. 3.
27   The Student Loan Debt Relief Companies and Individual Defendants are "persons"
28   within the meaning of the statute.

**FIRST AMENDED COMPLAINT**

309.   The Student Loan Debt Relief Companies and Individual Defendants repeatedly violated Minnesota Statutes section 325F.69, subdivision 1, by engaging in the deceptive and fraudulent practices described in this Complaint, with the intent that others rely thereon in connection with the sale of their student loan debt relief services.  This conduct includes, but is not limited to:

   a.   Misrepresenting to consumers that the Student Loan Debt Relief Companies could forgive consumers' loans and otherwise misrepresenting their ability to reduce or eliminate student loan debt;

   b.   Misrepresenting to consumers that the consumers were "approved" for student loan relief, and otherwise misrepresenting their ability to qualify borrowers for government programs;

   c.   Misrepresenting and falsely leading consumers to believe that the Student Loan Debt Relief Companies would apply payments made to it to consumers' loans;

   d.   Misrepresenting and falsely leading consumers to believe that fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

   e.   Misrepresenting to consumers that the amount owed on their student loans would be reduced;

   f.   Misrepresenting to consumers that their loans would be forgiven in whole or in part following payment of the enrollment fees;

   g.   Misrepresenting to consumers that their monthly student loan payment amount had been lowered for the life of the repayment plan;

   h.   Misrepresenting to consumers that fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services;

   i.   Misleading consumers to believe that the Student Loan Debt Relief Companies were tied to or had a relationship with the federal government

or a particular federal debt relief plan;

      Misrepresenting government programs and payment plan terms to

consumers; and

      The other practices described in this Complaint.

310.   Due to the deceptive and fraudulent conduct described in this Complaint,

Minnesota consumers made payments to Defendants for services that they otherwise

would not have purchased, thereby causing harm to those consumers.

311.   Defendants' conduct, practices, and actions described in this Complaint

constitute multiple, separate violations of Minnesota Statutes section 325F.69.

## COUNT XIV

**By the State of Minnesota**
**Uniform Deceptive Trade Practices Act**
**Minn. Stat. § 325F.43, et seq.**
**(The Student Loan Debt Relief Companies and Individual Defendants)**

312.   The allegations in paragraphs 1-270 and 299-311 are incorporated by

reference.

313.   Minnesota Statutes section 325D.44, subdivision 1 provides, in part that:

A person engages in a deceptive trade practice when, in the course of business,
vocation, or occupation, the person:

               ***

(2) causes likelihood of confusion or of misunderstanding as to the source,
sponsorship, approval, or certification of goods or services;

               ***

(5) represents that goods or services have sponsorship, approval, characteristics,
ingredients, uses, benefits, or quantities that they do not have or that a person has a
sponsorship, approval, status, affiliation, or connection that the person does not
have;

               ***

(7) represents that goods or services are of a particular standard [or] quality . . . if
they are of another;

               ***

(9) advertises goods or services with intent not to sell them as advertised; [or]

               ***

(13) engages in any other conduct which similarly creates a likelihood of

**FIRST AMENDED COMPLAINT**

1    confusion or of misunderstanding.

2        314.   The Student Loan Debt Relief Companies and Individual Defendants are

3    "persons" within the meaning of the statute.

4        315.   The Student Loan Debt Relief Companies and Individual Defendants

5    repeatedly violated Minnesota Statutes section 325D.44, subdivision 1, by, in the course

6    of business, engaging in the deceptive and fraudulent practices described in this

7    Complaint that caused a likelihood of confusion or of misunderstanding among

8    consumers in connection with the sale of Defendants' student loan debt relief services,

9    including by making false, deceptive, fraudulent, and/or misleading representations to

10   consumers regarding its advertised services.  These practices include but are not limited

11   to:

12           a.    Misrepresenting to consumers that the Student Loan Debt Relief

13       Companies could forgive consumers' loans and otherwise misrepresenting their

14       ability to reduce or eliminate student loan debt;

15           b.    Misrepresenting to consumers that the consumers were "approved" for

16       student loan relief, and otherwise misrepresenting their ability to qualify borrowers

17       for government programs;

18           c.    Misrepresenting and falsely leading consumers to believe that the

19       Student Loan Debt Relief Companies would apply payments made to it to

20       consumers' loans;

21           d.    Misrepresenting and falsely leading consumers to believe that fees

22       paid by consumers reflected the adjusted amount of the consumers' periodic

23       payments toward their outstanding loan balance;

24           e.    Misrepresenting to consumers that the amount owed on their student

25       loans would be reduced;

26           f.    Misrepresenting to consumers that their loans would be forgiven in

27       whole or in part following payment of the enrollment fees;

28   //

**FIRST AMENDED COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

      g.     Misrepresenting to consumers that their monthly student loan payment amount had been lowered for the life of the repayment plan;

      h.     Misrepresenting to consumers that fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services;

      i.     Misleading consumers to believe that the Student Loan Debt Relief Companies were tied to or had a relationship with the federal government or a particular federal debt relief plan;

      j.     Misrepresenting government programs and payment plan terms to consumers; and

      k.     The other practices described in this Complaint.

316.   Due to the deceptive and fraudulent conduct described in this Complaint, Minnesota consumers made payments to Defendants for services that they otherwise would not have purchased, thereby causing harm to those consumers.

317.   Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325D.44.

## Count XV

**By the State of North Carolina**
**North Carolina Debt Adjusting Act**
**N.C. Gen. Stat. § 14-423, et seq.**
**(The Student Loan Debt Relief Companies and Individual Defendants)**

318.   The allegations in paragraphs 1-270 and 299-303 are incorporated by reference.

319.   The Student Loan Debt Relief Companies engaged in illegal "debt adjusting" as that term is defined in Article 56 of Chapter 14 of the North Carolina General Statutes.  Specifically, N.C. Gen. Stat. § 14-423(2) defines "debt adjusting" as any of the following:

//

//

**FIRST AMENDED COMPLAINT**

1   "Debt adjusting" means entering into or making a contract,
2   express or implied, with a particular debtor whereby the debtor
    agrees to pay a certain amount of money periodically to the
3   person engaged in the debt adjusting business and that person,
    for consideration, agrees to distribute, or distributes the same
4   among certain specified creditors in accordance with a plan
    agreed upon.

5   Debt adjusting includes the business or practice of any
6   person who holds himself out as acting or offering or attempting
    to act for consideration as an intermediary between a debtor and
7   his creditors for the purpose of settling, compounding, or in any
    way altering the terms of payment of any debt of a debtor, and to
8   that end receives money or other property from the debtor, or on
    behalf of the debtor, for the payment to, or distribution among,
9   the creditors of the debtor.

10  Debt adjusting also includes the business or practice of
    debt settlement . . . whereby any person holds himself or herself
11  out as acting for consideration as an intermediary between a
    debtor and the debtor's creditors for the purpose of reducing,
12  settling, or altering the terms of the payment of any debt of the
    debtor, whether or not the person distributes the debtor's funds
13  or property among the creditors, and receives a fee or other
    consideration for reducing, settling, or altering the terms of the
14  payment of the debt in advance of the debt settlement having
    been completed or in advance of all the services agreed to having
15  been rendered in full.

16      320.   Debt adjusting is prohibited by N.C. Gen. Stat. § 14-424, which provides

17  that "[i]f any person shall engage in, or offer to or attempt to, engage in the business or

18  practice of debt adjusting, or if any person shall hereafter act, offer to act, or attempt to

19  act as a debt adjuster, he shall be guilty of a Class 2 misdemeanor."

20      321.   The Student Loan Debt Relief Companies and Individual Defendants'

21  offering and purported rendering of debt adjusting services was in violation of North

22  Carolina's debt adjusting statute.

23      322.   The Student Loan Debt Relief Companies have entered into contracts with

24  North Carolina student loan debtors whereby the debtors agreed to pay certain amounts

25  of money periodically to the Student Loan Debt Relief Companies, and the Student Loan

26  Debt Relief Companies, for consideration, represented or implied that they would

27  distribute debtors' money among debtors' student loan servicers or lenders and/or DOE

28  in accordance with a plan agreed upon.

**FIRST AMENDED COMPLAINT**

323.   The Student Loan Debt Relief Companies and Individual Defendants have engaged in the business or practice of holding themselves out as acting or offering or attempting to act for consideration, as an intermediary between North Carolina student loan debtors and their servicers or lenders and/or DOE for the purpose of settling, compounding, or altering the terms of payment of the student loan debts of the debtors, and to that end received money from the debtors, or on behalf of the debtors, for the payment to, or distribution among, the student loan creditors of the debtors.

324.   Defendants have engaged in a business or practice in which they hold themselves out as acting or offering or attempting to act, for consideration, as an intermediary between North Carolina student loan debtors and their student loan servicers or lenders and/or DOE for the purpose of reducing, settling, or altering the terms of payment of North Carolina debtors' student loan debts, and defendants receive a fee in advance of the debt settlements having been completed or in advance of all the services agreed to having been rendered in full.

325.   Pursuant to N.C. Gen. Stat. § 14-425, the Attorney General is authorized to seek (a) injunctive relief to enjoin Defendants from the continuation of any debt adjusting activities or the offering of any debt adjusting services in North Carolina; (b) the disgorgement of all monies unlawfully collected by Defendants from North Carolina consumers; (c) the appointment of a receiver to assist in the recovery of funds unlawfully collected by Defendants and to ensure their return to consumers; and (d) the assessment of civil penalties under N.C. Gen. Stat. § 75-15.2 and attorneys' fees for the State under N.C. Gen. Stat. § 75-16.1.

**Count XVI**

**By the State of North Carolina**
**North Carolina Unfair and Deceptive Practices Act**
**N.C. Gen. Stat. § 75-1.1**
**(All Defendants)**

326.   The allegations in paragraphs 1-270, 299-303, and 318-325 are incorporated by reference.

327.    In the course of soliciting and promoting their student loan debt relief services to North Carolina consumers, in entering into agreements with North Carolina consumers to provide such services, and in either performing or failing to meaningfully perform those services, the Defendants have engaged in unfair and deceptive acts and practices in trade or commerce in violation of N.C. Gen. Stat. § 75-1.1.

328.    The Student Loan Debt Relief Companies were engaged in trade or commerce in the State of North Carolina.

329.    The Student Loan Debt Relief Companies' unfair or deceptive acts and practices include, but are not limited to, the following:

330.    Engaging in violations of the TSR, as set forth supra, which are specifically prohibited by 16 C.F.R. Part 310;

331.    Engaging in illegal debt adjusting activities, as set forth supra, which are specifically prohibited by N.C. Gen. Stat. 14-423, et seq.;

332.    Failing to register as a telephonic seller under North Carolina's Telephonic Seller Registration Act, N.C. Gen. Stat §§ 66-260 and 66-261, as set forth infra; and

333.    Making deceptive and misleading representations to consumers, including but not limited to:

a.    Misrepresenting to consumers that the Student Loan Debt Relief Companies could forgive consumers' loans and otherwise misrepresenting the Student Loan Debt Relief Companies' ability to reduce or eliminate student loan debt;

b.    Misrepresenting to consumers that the consumers were "approved" for student loan relief, and otherwise misrepresenting their ability to qualify borrowers for government programs;

c.    Misrepresenting and falsely leading consumers to believe that the Student Loan Debt Relief Companies would apply payments made to the Student Loan Debt Relief Companies and Payment Companies to the consumers' outstanding loans;

**FIRST AMENDED COMPLAINT**

d.    Misrepresenting and falsely leading consumers to believe that fees paid by consumers reflected the adjusted amount of the consumers' periodic payments toward their outstanding loan balance;

e.    Misrepresenting to consumers that the amount owed on their student loans would be reduced if students signed up for the Student Loan Debt Relief Companies' services;

f.    Misrepresenting to consumers that their loans would be forgiven in whole or in part shortly after enrolling in the Student Loan Debt Relief Companies' services;

g.    Misrepresenting to consumers that their monthly student loan payment amount had been lowered for the life of the repayment plan;

h.    Misrepresenting that consumers were eligible or approved for lower monthly payments, including where such payment amounts had been calculated based on an incorrect family size, income, or marital status;

i.    Misrepresenting to consumers that fees collected would be held in trust accounts maintained by a third-party account provider until the Student Loan Debt Relief Companies had performed certain services;

j.    Misrepresenting to consumers that TAS was an independent third-party provider of dedicated customer accounts;

k.    Misleading consumers to believe that the Student Loan Debt Relief Companies were tied to or had a relationship with the federal government or a particular federal debt relief plan;

l.    Failing to inform consumers that it was their practice to submit false information about consumers' income, family size, and marital status on loan adjustment applications in order to try to qualify consumers for lower monthly payments;

m.    Misrepresenting government programs and payment plan terms to consumers; and

**FIRST AMENDED COMPLAINT**

1           n.     The other practices described in this Amended Complaint.

2          334.    The Attorney General is authorized to seek an injunction against

3   Defendants' practices under N.C. Gen. Stat. § 75-14, the restoration of any moneys

4   obtained by Defendants from North Carolina consumers as well as the cancellation of

5   Defendants' contracts with North Carolina consumers under N.C. Gen. Stat. § 75-15.1,

6   civil penalties under N.C. Gen. Stat. § 75-15.2, and attorneys' fees under N.C. Gen. Stat.

7   § 75-16.1.

8                                **Count XVII**

9                         **By the State of North Carolina**
                  **North Carolina Telephonic Seller Registration Act**
10                         **N.C. Gen. Stat. § 66-260**
          **(The Student Loan Debt Relief Companies and Individual Defendants)**

11         335.    The allegations in paragraphs 1-270, 299-303, and 318-334 are incorporated

12  by reference.

13         336.    North Carolina's Telephonic Seller Registration Act, N.C. Gen. Stat §§ 66-

14  260 and 66-261, requires any non-exempt person engaged in telephonic solicitations

15  directed to North Carolina consumers to: (a) register with the North Carolina Secretary of

16  State not less than 10 days before commencing telephone solicitations; (b) provide

17  specified information on a form provided by the Secretary of State that contains the

18  notarized signature of each principal of the telephonic seller; and (c) pay a $100.00 filing

19  fee.

20         337.    Pursuant to N.C. Gen. Stat. § 66-261(c), a registration of a telephonic seller

21  is valid for one year from the effective date of the provision of all required information,

22  and may be renewed annually by making the filing required by N.C. Gen. Stat. § 66-262,

23  and paying the filing fee of $100.00.

24         338.    Each of the Student Loan Debt Relief Companies was a "telephonic seller"

25  as defined in N.C. Gen. Stat. § 66-260(11), as the Student Loan Debt Relief Companies

26  caused directly, or through employees or agents, telephone solicitations or attempted

27  telephone solicitations to occur, and the Student Loan Debt Relief Companies are not

28

1  exempt from the Act.

2      339.  The Student Loan Debt Relief Companies engaged in violations of the

3  Telephonic Seller Registration Act, N.C. Gen. Stat. § 66-260, et seq., by failing to

4  register with the North Carolina Secretary of State as a telephonic seller; by failing to

5  provide the North Carolina Secretary of State with the information mandated by N.C.

6  Gen. Stat. § 66-262; by failing to pay the filing fee of $100.00; and by failing to register

7  in each year the Student Loan Debt Relief Companies engaged in telephonic solicitations.

8      340.  N.C. Gen. Stat. § 66-266(a) provides that any violation of the Telephonic

9  Seller Registration Act "shall constitute an unfair and deceptive trade practice in violation

10  of N.C. Gen. Stat. §75-1.1."

11      341.  N.C. Gen. Stat. § 66-266(c) further provides that the remedies and penalties

12  available under the section "shall be supplemental to others available under the law, both

13  civil and criminal."

14      342.  Pursuant to N.C. Gen. Stat. §§ 66-266(b), in an action by the Attorney

15  General against a telephonic seller for violation of the Telephonic Seller Registration Act,

16  or for any other act or practice by a telephonic seller constituting a violation of N.C. Gen.

17  Stat. § 75-1.1, the court may impose civil penalties of up to $25,000 for each violation

18  involving North Carolina purchasers or prospective purchasers who are 65 years of age or

19  older.

20                              **Count XVIII**

21                  **By the People of the State of California**
                    **California Unfair Competition Law**
22                  **Cal. Bus. & Prof. Code § 17200 et seq.**
                    **(All Defendants and Relief Defendants)**
23

24      343.  The People of the State of California re-allege and incorporate herein

25  paragraphs 1 through 342 of this Complaint.

26      344.  California's UCL, Business and Professions Code section 17200, prohibits

27  any "unlawful, unfair or fraudulent business act[s] or practice[s]." Cal. Bus. & Prof. Code

28  § 17200.

**FIRST AMENDED COMPLAINT**

345.   Section 17203 of the UCL provides that "(a)ny person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction." Section 17203 also permits recovery of any "interest in money or property, real or personal" acquired by a violation of the UCL. Cal. Bus. & Prof. Code § 17203.

346.   Section 17206, subdivision (a), of the UCL provides that any person violating Section 17200 "shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the [P]eople of the State of California . . . by any city attorney of a city having a population in excess of 750,000," thereby authorizing the City Attorney of Los Angeles, which has a population in excess of 750,000, to bring such an action. Cal. Bus. & Prof. Code § 17206.

347.   Under the UCL's Section 17205, these remedies and penalties are "cumulative to each other and to the remedies or penalties available under all other laws of this state." Cal. Bus. & Prof. Code § 17205.

348.   Defendants are all "persons" within the meaning of the UCL. Cal. Bus. & Prof. Code § 17201.

349.   "Unlawful" acts or practices, "unfair" acts or practices, and "fraudulent" acts or practices each independently violate Section 17200. Beginning no later than 2015, and continuing to the filing of this action, Defendants, and each of them, have repeatedly violated the UCL by engaging in "unlawful, unfair, or fraudulent business act[s] or practice[s]" with the sale of their purported student loan debt settlement services. Cal. Bus. & Prof. Code § 17200. These violations include, but are not limited to:

    a.   Violating the UCL through the following unlawful acts or practices committed against California consumers, including in the City and County of Los Angeles:

        i.   As to the Student Loan Debt Relief Companies and Individual Defendants, violating California Financial Code § 12000 et seq., the

**FIRST AMENDED COMPLAINT**

1　California Check Sellers, Bill Payers and Proraters Law, by acting as a

2　check seller, bill payer, or prorater without first obtaining a license from the

3　California Commissioner of Business Oversight. Cal. Fin. Code § 12200;

4　　　　1.　As alleged in this Complaint, including but not limited to

5　in paragraphs 8-17, 25-32, 37-49, and 64-210, California consumers

6　provided funds to Defendants based upon assurances and

7　representations that Defendants would assist them in reducing or

8　otherwise managing their student loan debts and/or negotiate with

9　their creditors and distribute payments.

10　　　　2.　At all relevant times, the Student Loan Debt Relief

11　Companies and Individual Defendants were not licensed by the

12　California Corporations Commissioner as required by Financial Code

13　§ 12000 et seq.

14　　　ii.　As to the Student Loan Debt Relief Companies and Individual

15　Defendants, violating California Financial Code section 28100, et seq., the

16　California Student Loan Servicing Act, which requires Student Loan

17　Servicers to be licensed to lawfully operate, by engaging in the business of

18　servicing student loans in California without obtaining a license as required

19　under the Act;

20　　　　1.　The Student Loan Debt Relief Companies and Individual

21　Defendants are "persons" under the Student Loan Servicing Act. Cal.

22　Fin. Code § 28104, subd. (j).

23　　　　2.　As alleged in this Complaint, including but not limited to

24　in paragraphs 8-17, 25-32, 37-49, and 64-210, the Student Loan Debt

25　Relief Companies and Individual Defendants have engaged in the

26　business of servicing student loans in California. Cal. Fin. Code

27　§ 28104, subds. (f), (g), (l), (m), (n).

28　　　　3.　The Student Loan Debt Relief Companies and Individual

52

**FIRST AMENDED COMPLAINT**

1                Defendants never obtained a license to service student loans as

2                required under the California Student Loan Servicing Act. Cal. Fin.

3                Code § 28102, subd. (a).

4           iii.     As to all Defendants, violating the Telemarketing Sales Rule

5  ("TSR"), which is specifically set forth in 16 C.F.R. Part 310, as set forth in

6  this Complaint, including but not limited to in paragraphs 25-63, 211-222

7  and paragraphs 234-270 (Count I (Advance Fees in Violation of the TSR –

8  Enrollment Fees), Count II (Advance Fees in Violation of the TSR –

9  Monthly Fees), Count III (Misrepresentations About Material Aspects of

10  Their Services in Violation of the TSR) (The Student Loan Debt Relief

11  Companies and Individual Defendants), Count IV (Misrepresentations

12  About Material Aspects of Their Services in Violation of the TSR) (True

13  Count, Prime, and TAS), Count V (Substantial Assistance in Violation of the

14  TSR) (Individual Defendants), and Count VI (Substantial Assistance in

15  Violation of the TSR) (Payment Companies)).

16           iv.     As to all Defendants, violating the Consumer Financial

17  Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531 et seq., as set forth in

18  this Complaint, including but not limited to in paragraphs 25-63, 223-233

19  and paragraphs 271-298 (Count VII (CFPA – Deception) (The Student Loan

20  Debt Relief Companies and Individual Defendants), Count VIII (CFPA –

21  Deception) (True Count, Prime, and TAS), Count IX (Substantial Assistance

22  in Violation of the CFPA) (Individual Defendants), Count X (Substantial

23  Assistance in Violation of the CFPA) (Payment Companies), and Count XI

24  (CFPA Violation Based on Violation of TSR)).

25           v.     As to the Relief Defendants, by receiving, directly or indirectly,

26  funds or other assets from Defendants that are traceable to funds obtained

27  from consumers through the deceptive and unlawful practices as set forth in

28  this Complaint, without having legal or equitable title to funds or other

**FIRST AMENDED COMPLAINT**

1  assets received from Defendants as bona fide purchasers, as further alleged

2  in paragraphs 50-63, 191-210, and paragraphs 299-303 (Count XII).

3      b.      The Student Loan Debt Relief Companies and Individual Defendants

4  also violated the UCL through the following unlawful, fraudulent and/or unfair

5  acts or practices committed against California consumers, including consumers in

6  the City and County of Los Angeles:

7          i.      Misrepresenting to consumers that Defendants could forgive

8  consumers' loans and otherwise misrepresenting Defendants' ability to

9  reduce or eliminate student loan debt;

10         ii.      Misrepresenting to consumers that the consumers were

11  "approved" for student loan relief, and otherwise misrepresenting their

12  ability to qualify borrowers for government programs;

13         iii.     Misrepresenting and falsely leading consumers to believe that

14  Defendants would apply payments made to Defendants to the consumers'

15  outstanding loans;

16         iv.      Misrepresenting and falsely leading consumers to believe that

17  fees paid by consumers reflected the adjusted amount of the consumers'

18  periodic payments toward their outstanding loan balance;

19         v.       Misrepresenting to consumers that the amount owed on their

20  student loans would be reduced if students signed up for Student Loan Debt

21  Relief Companies' services;

22         vi.      Misrepresenting to consumers that their loans would be

23  forgiven in whole or in part shortly after enrolling in Student Loan Debt

24  Relief Companies' services;

25         vii.     Misrepresenting to consumers that their monthly student loan

26  payment amount had been lowered for the life of the repayment plan;

27  //

28  //

**FIRST AMENDED COMPLAINT**

1         viii.    Misrepresenting that consumers were eligible or approved for

2 lower monthly payments, including where such payment amounts had been

3 calculated based on an incorrect family size, income, or marital status;

4         ix.    Misrepresenting to consumers that fees collected would be held

5 in trust accounts maintained by a third-party account provider until the

6 Student Loan Debt Relief Companies had performed certain services;

7         x.    Misleading consumers to believe that the Student Loan Debt

8 Relief Companies are tied to or have a relationship with the federal

9 government or a particular federal debt relief plan;

10        xi.    Failing to inform consumers that it was their practice to submit

11 false information about consumers' income, family size, and marital status

12 on loan adjustment applications in order to try to qualify consumers for

13 lower monthly payments;

14        xii.    Misrepresenting government programs and payment plan terms

15 to consumers; and

16        xiii.    The other practices described in this Complaint.

17    350.   Due to the deceptive and fraudulent conduct described in this Complaint,

18 California consumers made payments to Defendants for services that they otherwise

19 would not have purchased, thereby causing harm to those consumers.

20    351.   Defendants' conduct, practices, and actions described in this Complaint

21 constitute multiple, separate violations of California Business and Professions Code

22 section 17200.

23 **DEMAND FOR RELIEF**

24    352.   WHEREFORE, the Bureau and the States request, under 12 U.S.C.

25 §§ 5538(a), 5565(a); Minn. Stat. §§ 8.31, 325D.45, and 325F.70; the State of Minnesota's

26 common law authority, including *parens partiae* authority; N.C. Gen. Stat. §§ 14-424,

27 75-14, 75-15.1, 75-16.1, and 66-266; and Cal. Bus. & Prof. Code §§ 17200 et seq. that

28 the Court:

**FIRST AMENDED COMPLAINT**

a.     award the Bureau and the States such preliminary and injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, including but not limited to a temporary and preliminary injunction, an order freezing assets, immediate access to business premises, and appointment of a Receiver against Defendants and Relief Defendants;

b.     permanently enjoin Defendants from committing future violations of the TSR, the CFPA, the MNCFA, the MNDTPA, the NCDAA, the NCUDPA, the NCTSRA, and the UCL, and enter such other injunctive relief as appropriate;

c.     permanently enjoin Defendants from the advertisement, marketing, promotion, offering for sale, or selling of any consumer-financial product or service, including but not limited to any debt relief service;

d.     grant additional injunctive relief as the Court may deem to be just and proper;

e.     award damages and other monetary relief against Defendants and Relief Defendants as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA, the TSR, the MNCFA, the MNDTPA, the NCDAA, the NCUDPA, and the NCTSRA, including but not limited to rescission or reformation of contracts, the refund of monies paid, restitution, disgorgement or compensation for unjust enrichment;

f.     award restitution against Defendants and Relief Defendants as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the UCL;

g.     award the Bureau and the States civil money penalties;

h.     award the Bureau and the States the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper; and

i.     award the States the costs of investigation and attorneys' fees.

**FIRST AMENDED COMPLAINT**

1  Dated: February 24, 2020

2                              Respectfully submitted,

3
4                              THOMAS G. WARD
                               Enforcement Director

5                              DEBORAH MORRIS
                               Deputy Enforcement Director
6
7                               /s/   Jesse Stewart

8                              Sarah Preis (admitted *pro hac vice*)
                               Jesse Stewart (admitted *pro hac vice*)
9                              Enforcement Attorneys

10                             *Attorneys for Plaintiff Bureau of Consumer*
11                             *Financial Protection*

12
13                             JOSHUA H. STEIN
                               Attorney General of North Carolina

14                              /s/   M. Lynne Weaver

15                             M. Lynne Weaver
                               Special Deputy Attorney General
16                             (Admitted *pro hac vice*)

17                             *Attorney for the State of North Carolina*

18
19                             KEITH ELLISON
                               Attorney General of Minnesota

20                              /s/   Evan S. Romanoff

21                             Evan S. Romanoff (admitted *pro hac vice*)
                               Assistant Attorney General
22
                               *Attorney for the State of Minnesota,*
23                             *By Its Attorney General, Keith Ellison*

24                              /s/    Christina V. Tusan
25                             Christina V. Tusan (CA Bar No. 192203)
                               Supervising Deputy City Attorney
26                             Office of the Los Angeles City Attorney
                               Telephone (213) 978-8707
27                             Fax (213) 978-8111
                               christina.tusan@lacity.org
28
                               *Attorney for the People of the State of California*

                                        57

                            **FIRST AMENDED COMPLAINT**

I, Jesse Stewart, attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

　　　　　　　　　　　　　_/s/__ Jesse Stewart_____

　　　　　　　　　　　　　　　　Jesse Stewart

**FIRST AMENDED COMPLAINT**

# EXHIBIT "C"

1  SARAH PREIS (D.C. Bar No. 997387)
2  (Admitted *pro hac vice*)
   sarah.preis@cfpb.gov
3  Tel.: (202) 435-9318
4  JESSE STEWART (N.Y. Bar No. 5145495)
   (Admitted *pro hac vice*)
5  jesse.stewart@cfpb.gov
6  Tel.: (202) 435-9641
   1700 G Street, NW
7  Washington, DC 20552
8  Fax: (202) 435-5471

9  LEANNE E. HARTMANN (CA Bar No. 264787) – Local Counsel
10 leanne.hartmann@cfpb.gov
   301 Howard Street, Suite 1200
11 San Francisco, CA 94105
12 Tel: (415) 844-9787
   Fax: (415) 844-9788
13
14 *Attorneys for Plaintiff*
   *Bureau of Consumer Financial Protection*
15
16              **UNITED STATES DISTRICT COURT**
17              **CENTRAL DISTRICT OF CALIFORNIA**
18                    **SOUTHERN DIVISION**
19
20 Bureau of Consumer Financial          CASE NO. 8:19-cv-01998 MWF-KS
   Protection, et al.,
21                                        **NOTICE OF PENDENCY OF OTHER**
                                          **ACTION OR PROCEEDING**
22        Plaintiffs,
23        v.
24                                        Court:    Hon. Michael W. Fitzgerald
   Consumer Advocacy Center Inc., d/b/a            Courtroom 5A
25 Premier Student Loan Center, et al.,
26
        Defendants.
27
28

1    PLEASE TAKE NOTICE, pursuant to Local Rule 83-1.4, of a pending action or

2  proceeding involving Defendants Consumer Advocacy Center Inc. (CAC) and Anan

3  Enterprise, Inc. The Chapter 7 Trustee appointed over the estate of Defendant CAC (the

4  Trustee) initiated an adversarial proceeding against Anan under 11 U.S.C. §§ 547 and

5  548 and for unjust enrichment on December 30, 2019, in the U.S. Bankruptcy Court for

6  the Southern District of Florida.  The adversarial proceeding appears to arise from the

7  same facts that form the basis of the Bureau's claims against Anan as a Relief Defendant

8  in this proceeding.  The Trustee and the Bureau each allege that Anan was unjustly

9  enriched by payments from CAC to Anan.  A copy of the complaint filed in the

10  adversarial proceeding is included as Attachment A to this Notice.

11    The names, addresses, and telephone numbers for the parties to that adversarial

12  proceeding are:

13

14  **Plaintiff:**

15  Sonya Salkin Slott, Chapter 7 Trustee

16  c/o Glenn D. Moses

17  Genovese Joblove & Battista, P.A.

18  100 S.E. Second Street

19  Suite 4400

20  Miami, FL 33131

21  Tel: 954-423-4469

22

23  **Represented by:**

24  Glenn D. Moses

25  Genovese Joblove & Battista, P.A.

26  100 S.E. Second Street

27  Suite 4400

28  Miami, FL 33131

Tel: (305) 349-2300

**Defendant:**

Anan Enterprise Inc.

c/o Kyle Dongwook Kim

1015 Crocket St.

R#25

Los Angeles, CA 90021


**Represented by:**

Pro Se


Please note that although Anan is listed as pro se in the adversarial proceeding, the

following attorneys entered an appearance on its behalf in the underlying bankruptcy

proceeding (Case No. 19-10655-PGH):


Michael S. Budwick, Esquire

Utibe I. Ikpe, Esquire

MELAND RUSSIN & BUDWICK, P.A.

3200 Southeast Financial Center

200 South Biscayne Boulevard

Miami, Florida 33131

Telephone: (305) 358-6363


Dated: February 24, 2020              Respectfully submitted,


/s/ Sarah Preis
_____
Sarah Preis (D.C. Bar No. 997387)
(admitted *pro hac vice*)
*Enforcement Attorney*
1700 G Street NW
Washington, DC 20552
Phone: (202) 435-9318

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Fax: (202) 435-9346
Email: sarah.preis@cfpb.gov

Attorney for Plaintiff
Bureau of Consumer Financial Protection

# EXHIBIT "D"

# EXHIBIT 3



### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA

IN RE:

ROTHSCHILD RESERVE                          CASE NO. 01-30448-BKC-SHF
INTERNATIONAL, INC.,                        CHAPTER 11

                Debtor.
_____/

### ORDER DENYING DEBTOR'S EXPEDITED MOTION FOR ENFORCEMENT OF AUTOMATIC STAY AND/OR TURNOVER RE: UNITED STATES SECURITIES AND EXCHANGE COMMISSION

This matter came on for hearing on May 1, 2001 for consideration of the Debtor's

Expedited Motion for Enforcement of Automatic Stay and/or Turnover Re: United States

Securities and Exchange Commission. The Chapter 11 petition was filed on February 1, 2001.

On March 15, 2001, the United States Securities and Exchange Commission ("SEC") commenced

a civil action in the United States District Court for the Southern District of Florida, alleging

several violations of federal securities laws, against certain defendants and against the Debtor and

three (3) other "relief defendants." During the course of the civil action, the District Court

entered a Temporary Restraining Order and a Preliminary Injunction and Other Relief as to Relief

Defendant Rothschild Reserve International, Inc. ("Debtor"). In addition, a Receiver has been

appointed and the Debtor's assets have been frozen and turned over to the Receiver. The Debtor

filed the instant motion contending that the SEC's commencement and continuation of the civil

action constitute a willful violation of the automatic stay pursuant to 11 U.S.C. §362(a) and that

the Debtor is entitled to actual damages, attorney's fees and costs, and punitive damages as a

result of this violation. Having considered the instant motion; the opposition to the motion; and



the arguments presented by counsel for both the Debtor and the SEC, the Court denies the



Debtor's motion.

The Debtor filed its voluntary Chapter 11 petition on February 1, 2001. The SEC was not listed on the Debtor's schedules as a creditor, nor was it served with notice of the commencement of the instant Chapter 11 bankruptcy case. Without actual or constructive notice of the Debtor's filing, the SEC filed a civil complaint in the United States District Court for the Southern District of Florida against the Debtor, a relief defendant, and three (3) other relief defendants on March 15, 2001, captioned *Securities and Exchange Commission v. Hawa Corporation, Hawa Communications, Inc. Ilona Alexis Mandlebaum, Robert Duke and Sura Gomez de Ferro, Defendants, and Rothschild Reserve International, Inc., Sam Sara Investments, Inc. and Shava Corporation, Relief Defendants,* Case No. 01-8220-CIV (S.D. Fla., Judge Hurley). Through the civil action, the SEC seeks, among other things, an order requiring the Debtor to disgorge proceeds in its possession that were allegedly derived from activities in violation of the securities laws. During the course of the civil case, the District Court placed the Debtor into a receivership and ordered that the assets of the Debtor be frozen and turned over to the receiver.

Upon discovery of the Debtor's bankruptcy filing, the SEC provided written notice to the Court of the continuation of the governmental action, claiming that the action is excepted by 11 U.S.C. §362(b)(4) from the effect of the automatic stay imposed by §362(a) of the Bankruptcy Code. The Debtor filed the instant motion seeking the entry of an order enforcing the automatic stay and to imposing sanctions for the SEC's willful violation of the automatic stay, contending that the exception found in §362(b)(4) does not apply to the SEC action. The Debtor's position is based upon the assertion that the Debtor is merely a relief defendant and, thus, the only interest the SEC has in the Debtor is a pecuniary interest. The SEC argues that the exception does apply



2



because the SEC civil action is a governmental action to enforce its police and regulatory power

and only seeks to obtain a money judgment against the Debtor. The SEC further asserts it does

not seek to enforce any money judgment through the civil action, but instead intends to obtain

payment of any money judgment against the Debtor through distributions under the Debtor's

chapter 11 plan.

Section 362 of the Bankruptcy Code provides an automatic stay of litigation against a

debtor. Section 362(a) provides:

(a) Except as provided in subsection (b) of this section, a petition filed under
section 301, 302, or 303 of this title, or an application filed under section 5(a)(3)
of the Securities Investor Protection Act of 1970, operates as a stay, applicable to
all entities, of--
(1) the commencement or continuation, including the issuance or employment of
process, of a judicial, administrative, or other action or proceeding against the
debtor that was or could have been commenced before the commencement of the
case under this title, or to recover a claim against the debtor that arose before the
commencement of the case under this title;
(2) the enforcement, against the debtor or against property of the estate, of a
judgment obtained before the commencement of the case under this title;
(3) any act to obtain possession of property of the estate or of property from the
estate or to exercise control over property of the estate;
(4) any act to create, perfect, or enforce any lien against property of the estate;
(5) any act to create, perfect, or enforce against property of the debtor any lien to
the extent that such lien secures a claim that arose before the commencement of the
case under this title;
(6) any act to collect, assess, or recover a claim against the debtor that arose before
the commencement of the case under this title;
(7) the setoff of any debt owing to the debtor that arose before the commencement
of the case under this title against any claim against the debtor;  and
(8) the commencement or continuation of a proceeding before the United States
Tax Court concerning the debtor.

However, the Bankruptcy Code provides certain exceptions to this rule. Pursuant to §362(b)(4),

the filing of a bankruptcy petition does not operate as a stay "of the commencement or

continuation of an action or proceeding by a governmental unit . . . to enforce such governmental

3



unit's . . . police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's . . . police or regulatory power."

In the instant case, there is no doubt that the civil action was commenced by a governmental unit. The only issue the Court must determine is whether the action was commenced to enforce the SEC's police or regulatory power. The legislative history behind §362(b)(4) explains that the exemption from the automatic stay should be narrowly construed in order to permit a governmental unit to protect the public welfare. *See Securities and Exchange Commission v. Towers Financial Corp.*, 205 B.R. 27, 29 (S.D.N.Y. 1997) (quoting 11 U.S.C. §362 Historical and Statutory Notes, 1990 Acts, at pp. 62-62). An action to protect a pecuniary interest in a debtor's property would not be exempt from the automatic stay. *See id.* Thus, courts employ the public policy test and the pecuniary purpose test to determine whether an action is seeking to enforce a governmental unit's police power. *See Towers Financial Corp.*, 205 B.R. at 30 (citations omitted); *see also, National Labor Relations Board v. Continental Hagen Corp.*, 932 F.2d 828, 833-34 (9th Cir. 1991). The public policy test analyzes whether the action is being brought to carry out public policy or instead to adjudicate private rights. *See Continental Hagen Corp.*, 932 F.2d at 833. The pecuniary purpose test concentrates on whether the primary purpose of the action is to protect the government's interest in the property of the debtor or to promote the public health and safety. *See id.* If the government action is being pursued mainly to advance a pecuniary interest, it will be subject to the automatic stay. *See Universal Life Church, Inc. v. U.S. (In re Universal Life Church, Inc.)*, 128 F.3d 1294, 1297 (9th Cir. 1997). On the other hand, if the action is being pursued to effectuate public policy and to promote the public welfare,

4



it is exempt from the automatic stay.

In the instant case, the Debtor has conceded the fact that the SEC's action satisfies the public policy test, as the action does not serve the purpose of adjudicating private rights. However, the Debtor argues that the civil action does not fulfill the pecuniary purpose test, because the Debtor is merely a relief defendant in the civil action. The Debtor's instant motion states:

> . . . a 'relief defendant' is one who has been included not because of any infraction on its part, but because funds from the alleged wrongdoer could possibly have been diverted to it. As such, [the Debtor] has not been accused of any infraction of S.E.C. rules or regulations *per se*, but has been included as a relief defendant because the S.E.C. believes that [the Debtor] could possibly be a place where alleged ill-gotten gains from HAWA CORPORATION have been diverted.

The SEC maintains that it is merely seeking to liquidate the amount of its claim for disgorgement and civil penalties under the federal securities laws and that it is not seeking to obtain any pecuniary advantage over other parties in regard to the Debtor's estate. The SEC contends that the disgorgement judgment sought is not for the purpose of protecting a pecuniary interest in the Debtor's property, but rather is being sought to prevent unjust enrichment and deter securities fraud.

The Court is not persuaded by the Debtor's argument and finds that the SEC action satisfies the pecuniary interest test. "Where a governmental unit is suing a debtor to prevent or stop violation of fraud, . . . or similar police or regulatory laws, or attempting to fix damages for violation of such law, the action or proceedings is not stayed under the automatic stay." *Towers Financial Corp.*, 205 B.R. at 29-30 (citation omitted). "While there is no question that the automatic stay provisions prevent the SEC from attempting to enforce any disgorgement award,



5



this Court is satisfied that the mere fixing of the award is well within the provisions of 11 U.S.C. §362(b)(4)." *Id.* at 30 (quoting *Bilzerian v. Securities and Exchange Commission*, 146 B.R. 871, 873 (Bankr. M.D.Fla. 1992).

The Debtor also disputes that the injunctive relief sought by the SEC of appointing a receiver and freezing all of the Debtor's assets constitutes the enforcement of the SEC's police powers for the purposes of exemption from the automatic stay. The SEC asserts that the injunctive relief is a permitted and necessary part of the enforcement of its regulatory powers. The Fifth Circuit, in the case of *Securities and Exchange Commission v. First Financial Group of Texas*, 645 F.2d 429 (5th Cir. 1981), addressed this same issue. In *First Financial*, the SEC brought a civil enforcement action seeking to enjoin the defendants from violating certain federal securities laws. *See First Financial*, 645 F.2d at 432. Within that action, the SEC sought the appointment of a temporary receiver to take control of First Financial's assets. *See id.* The court issued the order appointing a temporary receiver five days after an involuntary petition in bankruptcy had been filed against First Financial. *See id.* The Fifth Circuit rejected First Financial's contention that the appointment of a temporary receiver after the bankruptcy case had been commenced violated the automatic stay. *See id.* at 437. The court held that the continuing civil enforcement proceeding brought by the SEC and the enforcement of injunctive relief obtained therein are not subject to the automatic stay provision of §362(a). *See id.* The court reasoned that the appointment of a receiver is a well-established equitable remedy available to the SEC in its civil enforcement proceedings for injunctive relief and is often a necessary ancillary form of relief. *See id.* at 438.

Addressing First Financial's argument that the appointment of the temporary receiver was

Case 14-35043-bjh11 Doc 280-3 Filed 12/12/14   Entered 12/12/14 14:34:25   Page 8 of 9
05/03/01  12:31   ☎561 833 3153   JUDGE  FRIEDMAN   ☎008
Case: 2:04-cv-00739-GLF-MRA Doc #: 89-1 Filed: 10/14/05 Page: 7 of 8 PAGEID #: 2536



subject to the automatic stay pursuant to §362(a)(3) as an act to obtain possession of the debtor's

property because the receiver was ordered "to take exclusive custody, control, and possession of"

all of the debtor's assets, the court stated:

> An examination of the legislative history of §362, however, reveals that an "act of obtain possession" was not intended to include the judicial appointment of a receiver pursuant to a governmental unit's enforcement of its police or regulatory powers (and the transfer of possession of the violator's property to the receiver in order that he may perform his duty to maintain the status quo). Rather, the automatic stay applies to prevent dismemberment of the estate and insure its orderly distribution [citation omitted] in order to eliminate the impetus for a race of diligence by fast-acting creditors. [citation omitted].  The appointment of a temporary receiver, on the other hand, itself serves to prevent dismemberment of the [bankruptcy] estate . . .

*First Financial*, 645 F.2d at 439.

This Court finds the *First Financial* case directly on point and conclusive on the issue of whether

the injunctive relief sought by the SEC in the instant case violated the automatic stay.  The Fifth

Circuit decision is not only applicable to but also binding in the instant case.  The SEC action is

excepted from the automatic stay pursuant to §362(b)(4).  Accordingly, it is hereby

ORDERED that the Debtor's Motion Expedited Motion for Enforcement of Automatic

Stay and/or Turnover Re: United States Securities and Exchange Commission is denied.

ORDERED in the Southern District of Florida this ____ day of May, 2001.

**STEVEN H. FRIEDMAN**
**U.S. BANKRUPTCY JUDGE**

Copies furnished to parties listed on the attached page.

7



Copies to:

United States Trustee, 51 SW 1st Avenue, Room 1204, Miami, FL 33130
David Lloyd Merrill, Esq., Cohen Conway Copeland Paiva & Merril, P.A., 10570 S. Federal
Hwy., Suite 203, Port St. Lucie, FL 34952
Kenneth B. Robinson, Esq., Rice and Robinson, P.A., 848 Brickell Ave., Suite 110, Miami, FL
33131
Securities and Exchange Commission, S.E. Regional Office, 1401 Brickell Ave, Suite 200,
Miami, FL 33131
Laura Unger, Commissioner of the S.E.C., 450 5th St. N.W., Washington, D.C. 20549
John Ashcroft, Attorney Genreal, 950 Pennsylvania Ave, N.W., #4400, Washington, D.C. 20530
Constance S. Silver successor trust of the Marjorie P. Silver Trust, c/o Nathan Yeager Gerson,
et.al., 1645 Palm Beach Lakes Blvd., #1200, West Palm Beach, FL 33401
Ilona Mandelbaum, 30 Milestone Way, West Palm Beach, FL 33415
James Gartey, 136 1643rd North, Royal Palm Beach, FL 33411
Larry Greenblat, 919 North University Drive, Coral Springs, FL 33071
Sara Gomez, 262 Worth Court South, West Palm Beach, FL 33401
Thomas Rucker, 30 Milestone Way, West Palm Beach, FL 33415

8